Sealed

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE COMMISSION,    :
                                        :
                Plaintiff,              :
                                        :
        v.                              :
                                        :       CASE NO.
BKCOIN MANAGEMENT, LLC and              :
MIN WOO KANG a/k/a "KEVIN" KANG,        :
                                        :
                Defendants, and         :
                                        :
BKCOIN CAPITAL, LP,                     :
BK OFFSHORE FUND, LTD.,                 :
BKCOIN MULTI-STRATEGY                   :
MASTER FUND, LTD.,                      :
BKCOIN MULTI-STRATEGY FUND, LP,         :
BKCOIN MULTI-STRATEGY FUND LTD., AND    :
BISON DIGITAL LLC,                      :
                                        :
                Relief Defendants.      :
_____ :

FILED BY _____ D.C.

FEB 23 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## SECURITIES AND EXCHANGE COMMISSION'S *EX PARTE* EMERGENCY MOTION AND MEMORANDUM OF LAW FOR ASSET FREEZE AND OTHER RELIEF

## I.    INTRODUCTION

The Securities and Exchange Commission ("Commission") files this emergency action to prevent further fraudulent dissipation and conversion of investor assets. The Commission seeks an asset freeze and related relief against BKCoin Management, LLC ("BKCoin"), and one of its two managing members, Min Woo Kang a/k/a "Kevin" Kang ("Kang"), and Relief Defendants BKCoin Capital, LP (the "Legacy Fund"), BK Offshore Fund, Ltd. (the "Offshore Fund"), three "Multi-Strategy" funds: BKCoin Multi-Strategy Master Fund, Ltd., BKCoin Multi-Strategy Fund, LP and BKCoin Multi-Strategy Fund Ltd. (the "Multi-Strategy Funds"), (all funds collectively, "BKCoin Funds"), and Bison Digital LLC ("Bison Digital").

From at least October 2018 through September 2022 (the "Relevant Period"), Defendants raised nearly $100 million from at least 55 investors purportedly for the primary purpose of investing in crypto assets.[1]   In fund offering documents, investor agreements and other communications to investors, Defendants stated that BKCoin generated returns for investors in the BKCoin Funds, or separately managed accounts ("SMAs"), through specific investment strategies and objectives focusing on crypto assets.  Defendants also told investors and prospective investors in the Multi-Strategy Funds that BKCoin or one of the Multi-Strategy Funds had obtained a US opinion from a top four auditor.

These statements were false or materially misleading.  In reality, Defendants disregarded fund structures, comingled BKCoin Funds' assets, and used millions for unauthorized purposes. For example, Defendants diverted $3.6 million from the Multi-Strategy Funds' bank accounts to make Ponzi-like payments to investors in the Legacy Fund and one SMA investor.  Kang also misappropriated over $371,000 of investor funds to finance his lavish lifestyle.  Kang tried to conceal his misuse of funds by providing altered bank statements to Multi-Strategy Funds' third-party administrator, which incorporated inflated balances in statements provided to investors. Defendants' representations about the audit were also false.

In October 2022, Defendants' fraud unraveled and BKCoin suspended Kang's employment and notified investors that it was suspending redemption requests and capital withdrawals from the BKCoin Funds.  BKCoin also filed an emergency petition in state court seeking appointment

---

[1] Crypto assets are unique digital assets maintained on a cryptographically-secured blockchain.  A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages.  The system relies on cryptographic techniques for secure recording of transactions.  Crypto tokens may be traded on crypto asset trading platforms in exchange for other crypto assets or fiat currency (legal tender issued by a country).

of a receiver over the Multi-Strategy Funds, which was granted and subsequently expanded to include the Legacy Fund and the Offshore Fund.[2]

Through their fraudulent conduct, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2)]. To protect investors and prevent further dissipation of assets, the Commission seeks asset freezes and other emergency relief against Defendants and the Relief Defendants.

## II.    **DEFENDANT AND RELIEF DEFENDANTS**

### A.    **Defendants**

1) Kang, age 33, resides in New York, New York.[3] Kang co-founded BKCoin and is one of its two managing members.[4] Kang is a Chartered Financial Analyst, however, he is not registered with the Commission and holds no securities licenses.[5]

2) BKCoin is a Delaware limited liability company with its principal place of business in Miami, Florida.[6] Since November 2018, BKCoin has filed reports with the Commission as an exempt reporting adviser.[7] In its most recent Form ADV filing with the Commission on March

---

[2] *BKCoin Management LLC et al. v. BKCoin Multi-Strategy Fund Ltd. et al.*, Case No. 2022-020760-CA-01 (Fla. 11th Circ. Ct. 2022). An SMA investor also sued Defendants and others in federal court alleging, among other things, breach of fiduciary duty. *Canto v. BKCoin Management, LLC et al.*, Case No.: 22-cv-8858 (JPO) (S.D. N.Y. 2022).
[3] Declaration of Jeffrey Goldberg ("Exhibit 1") ¶¶ 8.a-8.b (Attach. 10-11).
[4] Ex.1 ¶ 8.c (Attach. 12).
[5] Declaration of Julia D'Antonio ("Exhibit 2") (Attach. 1.)
[6] Ex. 1 ¶¶ 6.a-6b (Attach. 1-2).
[7] Ex. 1 ¶ 15 (Attach. 22).

29, 2022, BKCoin reported assets under management of approximately \$70 million.[8]  During the

Relevant Period, BKCoin served as the investment adviser to the BKCoin Funds and SMAs.[9]

**B.      Relief Defendants**

1)      The Legacy Fund, formed in 2018, is an unregistered fund organized as a Delaware

limited partnership.[10]

2)      The Offshore Fund, formed in 2019, is an unregistered fund organized under the

laws of the British Virgin Islands.[11]

3)      BKCoin Multi-Strategy Master Fund Ltd. ("Master Fund"), formed in 2022, is an

unregistered fund organized under the laws of the British Virgin Islands.[12]

4)      BKCoin Multi-Strategy Fund LP, formed in 2021, is an unregistered fund

organized as a Delaware limited partnership, and is the domestic feeder fund for the Master Fund.[13]

5)      BKCoin Multi-Strategy Fund Ltd., formed in 2022, is an unregistered fund

organized under the laws of the British Virgin Islands, and is the offshore feeder fund for the

Master Fund.[14]

6)      Bison Digital LLC formed in 2019, is an unregistered fund organized as a Wyoming

limited liability company.[15]  Kang co-founded Bison Digital LLC and is one of its two managing

members.[16]  Bison Digital LLC has no other investors.[17]

---

[8] *Id.*
[9] Declaration of James K. Richardson ("Exhibit 3") ¶¶ 11-13 (Exs. C-E).
[10] Ex. 1 ¶ 6.c (Attach. 3).
[11] Ex. 1 ¶ 6.d (Attach. 4).
[12] Ex. 1 ¶¶ 6.e, 9.a (Attach. 5, 13).
[13] Ex. 1 ¶ 6.f (Attach. 6).
[14] Ex. 1 ¶ 6.g (Attach. 7).
[15] Ex. 1 ¶ 6.h (Attach. 8).
[16] Ex. 1 ¶ 10 (Attach. 15).
[17] Ex. 2 ¶ 50.

## III.   **VENUE**

The Court has personal jurisdiction over Defendants and venue is proper in the Southern District of Florida because: (a) many of Defendants' acts and transactions constituting violations of the Securities Act, the Exchange Act, and the Advisers Act occurred in this District;[18] (b) BKCoin's principal place of business is in this District;[19] and (c) some of the BKCoin Funds' investors reside in this District.[20]

## IV.   **FACTS**

### A.   Defendants Raised Nearly $100 Million From Investors Who Invested in BKCoin Funds or Through SMAs

Kang co-founded BKCoin in 2018, purportedly to advise domestic and offshore investment funds focused primarily in crypto assets.[21]  Over the next four years, BKCoin, Kang and others formed the BKCoin Funds, which Defendants offered to investors and prospective investors for the primary purpose of investing in crypto assets.[22]  BKCoin served as the investment adviser to each of the five BKCoin Funds, and provided investment advisory services to individual and institutional investors who invested in crypto assets through SMAs.[23]

The BKCoin website and the BKCoin Funds' offering materials describe the funds' respective investment strategies for generating returns primarily through investing in crypto assets.[24]  For instance, according to its website during the Relevant Period, the Legacy Fund invested primarily in crypto assets and its investment strategies included pursuing a "market neutral strategy [that] provides investors with consistent low volatility returns by utilizing in-house

---

[18] Ex. 2 ¶ 12.
[19] Ex. 1 ¶ 6.b (Attach. 2).
[20] Ex. 2 ¶ 12.
[21] Ex. 1 ¶¶ 6.a-6.b (Attach. 1-2).
[22] Ex. 3 ¶¶ 11-12.
[23] Ex. 1 ¶¶ 6.e., 6.g., 9.b (Attach. 5, 7, 14); Ex. 3 ¶¶ 11-12.
[24] Ex. 1 ¶¶ 7 (Attach. 9); Ex. 3 ¶¶ 11-12.

proprietary arbitrage algorithms to capitalize on market inefficiencies within digital asset market."[25]  Similarly, the Offshore Fund, states in a Term Sheet distributed to its investors that it will "deliver uncorrelated, absolute returns of 10-15% annually by using statistical arbitrage strategy."[26]  The Multi-Strategy Funds' marketing materials claim the funds were designed to give investors returns across a "broad spectrum of strategies" involving crypto assets.[27]

During the Relevant Period, Defendants raised nearly $100 million from at least 55 investors.[28]  Approximately $94.5 million of these funds were invested in the Legacy Fund ($67.87 million), the Multi-Strategy Funds ($18.7 million), and the Offshore Fund ($7.94 million).[29]  At least seven investors invested approximately $5 million into SMAs managed by BKCoin.[30]  According to certain fund documents, BKCoin charged yearly advisory fees of 2% and 6% for the services it provided to the Legacy Fund and Offshore Fund, respectively.[31]

**B.     Defendants Made Material Misrepresentations and Omissions to Investors in Connection with its Offering of BKCoin Fund Investments and SMAs**

**1.     Defendants' Misrepresentations and Omissions About the Use of Funds**

Throughout the Relevant Period, Defendants made material misrepresentations and omissions regarding the use of investors' funds.[32]  In the BKCoin Funds' offering materials, limited partnership agreements with investors and other communications, Defendants represented to investors and prospective investors that investor funds would be used primarily for authorized purposes, namely investments in crypto assets.[33]

---

[25] Ex. 1 ¶ 7 (Attach. 9).
[26] Ex. 3 ¶ 13 (Ex. E).
[27] Ex. 3 ¶ 10.a (Ex. B); Declaration of Michael I. Goldberg ("Exhibit 4") ¶ 11.b (Ex. C).
[28] Ex. 2 ¶ 14.a.
[29] Ex. 2 ¶ 14.b.
[30] Ex. 2 ¶¶ 14.a-14.b, 17.
[31] Ex. 3 ¶¶ 11, 13 (Exs. C, E).
[32] *Id.*
[33] *Id.*

For example, the limited partnership agreements for the Legacy Fund and BKCoin Multi-Strategy Fund LP, dated August 28, 2020 and March 3, 2022, respectively, authorize BKCoin to, "acquire, invest in, hold, pledge, manage, sell, transfer, operate, or otherwise deal in or with the Portfolio Investments," defined to include crypto assets.[34]  BKCoin Multi-Strategy Fund Ltd. distributed to prospective investors and investors a private placement memorandum dated March 3, 2022, that stated its investment objective was to "generate superior risk adjusted returns through a variety of innovative alpha-generating investment strategies…related to the digital asset space."[35]  In addition, the investment agreements with the SMA investors authorize BKCoin "to supervise and direct the investment and reinvestment of" cryptocurrency, subject to specific investment guidelines.[36]  Moreover, on September 7 and October 14, 2021, Kang told a Legacy Fund investor that investor funds would be used to trade in crypto assets.[37]

Contrary to these representations, Defendants disregarded the BKCoin Funds' structures, comingled millions of investors' funds among the BKCoin Funds, and misappropriated investors funds for unauthorized purposes.[38]  As discussed in Section IV.C. below, Kang misappropriated more than $371,000 to finance his lavish lifestyle.  Defendants also diverted more than $3.6 million to make Ponzi-like distributions to investors.[39]

2.      **BKCoin Falsely Stated to Investors That It, or One of the Multi-Strategy Funds, Had Received an Opinion From a "Top Four" Auditing Firm**

BKCoin also told prospective investors and investors that BKCoin, or one of the Multi-Strategy Funds, had received an opinion from a "top four" auditing firm.[40]  On May 23, 2022, a

---

[34] Ex. 3 ¶ 11 (Ex. C); Ex. 4 ¶ 11.a.
[35] Ex. 1 ¶ 9.b (Attach. 14).
[36] Ex. 3 ¶ 12 (Ex. D).
[37] Declaration of B. Gilleland ("Exhibit 5") ¶¶ 5-7.
[38] Ex. 2 ¶¶ 17-49.
[39] Ex. 2 ¶¶ 14.c-14.d, 14.f, 14.h-14.i.
[40] Ex. 3 ¶¶ 10.a-10.b (Ex. B); Ex. 4 ¶¶ 11.c-11.e (Exs. C-E).

BKCoin employee emailed two marketing documents to an investor about the Multi-Strategy Funds.[41]  The marketing materials stated BKCoin, or one of the Multi-Strategy Funds, "is also one of the only firms with a US opinion from a top four auditor . . .[.]"[42]  Similarly, on May 24, 2022, BKCoin emailed a prospective investor (and also copied Kang) two "updated marketing documents" that included the same representation.[43]  On June 30, 2022, the prospective investor deposited $1.3 million in a Multi-Strategy Funds account.[44]  BKCoin emailed versions of one or both of these two "marketing documents" to at least 18 additional prospective investors of the Multi-Strategy Funds.[45]  Kang was copied on 11 of those emails and also sent several of those emails to prospective investors.[46]

These representations to prospective investors were false.[47]  Neither BKCoin nor any of the BKCoin Funds received an opinion from a top four auditor, or any auditor.[48]  Indeed, in or around September 2022, when BKCoin's former accountant asked Kang to provide him with copies of all audited financial statements for BKCoin and the BKCoin Funds, Kang told the accountant that no auditor had audited BKCoin or any of the funds.[49]

### C.    Defendants' Misappropriation and Misuse of Investor Funds, and Kang's Efforts to Conceal His Misconduct

Throughout the Relevant period, Kang had authority over, and access to, domestic and, on information and belief, offshore bank accounts for BKCoin and the BKCoin Funds, and over crypto asset trading accounts maintained with at least nine crypto asset trading platforms.[50]

---

[41] Ex. 4 ¶ 11.b (Ex. C).
[42] *Id.*
[43] Ex. 4 ¶ 11.c (Ex. D).
[44] Ex. 2 ¶ 28.a.
[45] Ex. 4 ¶ 11.d (Ex. E).
[46] *Id.*
[47] Declaration of Greg Grinberg ("Exhibit 6") ¶¶ 3-5.
[48] Ex. 6 ¶ 3.
[49] Ex. 6 ¶ 4.
[50] Ex. 2 ¶¶ 7.a-7.e, 9.b, 9.d-9.e; Ex. 4.

Despite his obligation to investors as a fiduciary, and representations to investors about the use of investor funds, Kang repeatedly used investor funds for unauthorized and undisclosed purposes.[51] Moreover, Kang tried to conceal his misconduct by altering information used to generate statements sent to investors.[52]

       1.    **Kang's Misappropriation of Investor Funds for his Personal Use**

During the Relevant Period, Kang misappropriated at least $371,000 of BKCoin investors' funds to pay his personal expenses and other personal payments.[53] The payments included: (i) an October 2018 transfer of $11,000 from the Legacy Fund to his personal account at a crypto asset trading platform in October 2018; (ii) an April 2021 wire transfer of $35,000 from a BKCoin bank account to a third party as rent for a vacation house in Montauk, New York; and (iii) a May 2022 wire transfer of $242,000 from an Offshore Fund bank account to a boutique law firm in New York, as a down payment on a $2.4 million apartment Kang purchased in New York City in the name of the Offshore Fund.[54]

From May 2021 through July 2022, Kang also misappropriated at least $83,000 in investor funds to pay a credit card issued to the Legacy Fund.[55] Kang had charged personal expenses to the Legacy Fund credit card, including, among other things, for travel to the Caribbean, tickets to sporting events, and fine dining.[56]

       2.    **Defendants Commingled Fund Assets and Used at Least $3.6 Million of Multi-Strategy Fund Assets to Make Ponzi-Like Payments to Investors**

Defendants disregarded the BKCoin Funds' structure and commingled assets between the

---

[51] Ex. 2 ¶¶ 14.c-14.i, 14.h, 19.a-19.b, 20.a-20.b, 21.a-21.b, 24, 28-30, 34-36, 37-39, 43; Ex. 3, ¶¶ 11-13.
[52] Ex. 2 ¶¶ 44-47; Ex. 3 ¶¶ 14-15 (Exs. F-G).
[53] Ex. 2 ¶¶ 14.c-14.d, 14.f, 14.i.
[54] Ex. 2 ¶¶ 14.c-14.d, 14.f, 21.a-21.b, 24, 34-36.
[55] Ex. 2 ¶¶ 14.i, 20.a-20.b.
[56] *Id.*

separate funds.[57]  During the Relevant Period, Defendants made approximately 104 transfers worth over $122 million between the BKCoin Funds and Bison Digital bank accounts.[58]  Bison Digital—which had no investors other than Kang and the co-managing member of BKCoin—received approximately $12 million from BKCoin and the BKCoin Funds.[59]

Defendants also diverted funds to make Ponzi-like distributions.[60]  For example, between June and July 2022, Defendants transferred $15.6 million of Multi-Strategy Funds' investor deposits to bank accounts for the Offshore Fund ($13.55 million) and BKCoin ($2 million).[61]  Of the $13.55 million transferred to the Offshore Fund, Defendants transferred $1.65 million to a Legacy Fund account and used those funds to pay redemptions to two Legacy Fund investors.[62]  Similarly, upon receiving the $2 million transfer to its account, BKCoin paid those funds to an SMA investor.[63]

### 3. Kang Falsified Documents To Conceal the Unauthorized Transfers and Misappropriation

Kang attempted to conceal the ongoing misuse of investor funds by providing altered statements to the Multi-Strategy Funds' third-party fund administrator.[64]  Kang inflated the account balances in the statements provided for the Multi-Strategy Funds by:  (i) $9.4 million in June 2022; (ii) $15.55 million in July 2022; and (iii) $15.56 million in August 2022.[65]  The third-party fund administrator incorporated the fictitious bank account balances into the Multi-Strategy Funds' performance reports for those periods and then sent to Multi-Strategy Funds investors.[66]

---

[57] Ex. 2 ¶¶ 15-16.
[58] Ex. 2 ¶ 16.
[59] Ex. 2 ¶¶ 15, 48.
[60] Ex. 2 ¶¶ 19.a-19.b, 26-28, 43.
[61] Id.
[62] Id.
[63] Id.
[64] Ex. 1 ¶¶ 12-14; Ex. 2 ¶¶ 44-47; Ex. 3 ¶¶ 14-15.
[65] Ex. 1 ¶¶ 12-14; Ex. 2 ¶ 46.
[66] Ex. 2 ¶ 47; Ex. 4 ¶¶ 12-13.

### D.    Defendants' Fraudulent Scheme Unravels

In October 2022, BKCoin suspended Kang's employment.[67]    BKCoin also notified investors that it was suspending the acceptance of additional capital, the determination of Net Asset Value, and redemption payments or capital account withdrawals.[68]  On October 28, 2022, BKCoin and its other co-founder sought the appointment of a receiver over the Multi-Strategy Funds in state court, which was granted and subsequently expanded to include the Legacy Fund and the Offshore Fund.[69]  The temporary receiver appointed in that action reported that the approximate value of all cash and crypto assets identified as of January 4, 2023 was only $5,725,780.[70]  Thus, millions of the nearly $100 million raised from investors are unaccounted for.[71]

## V.    __MEMORANDUM OF LAW__

### A.    Standard for Obtaining an Asset Freeze Order

The Court may order an asset freeze "as a means of preserving funds for the equitable remedy of disgorgement." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005).  The Commission's "burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: a reasonable approximation of a defendant's ill-gotten gains" is all that is required.  "Exactitude is not a requirement . . . ." *Id.* at 735 (citation and quotation omitted); *FTC v. IAB Marketing Associates, LP*, 746 F.3d 1228, 1234 (11th Cir. 2014).  The Commission's burden to demonstrate the potential for dissipation of funds is even lighter.  *FTC v. IAB Marketing Associates*, LP, 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013).

---

[67] Ex. 2 ¶ 13 (Attach. 3.)
[68] Ex. 1 ¶¶ 11, 14 (Attach. 16, 21); Ex. 2 ¶ 47.
[69] Ex. 4 ¶¶ 3-4.
[70] Ex. 4 (Attach. A at 9.)
[71] *Id.*

The Court's power to freeze assets extends to relief defendants. *See CFTC v. Walsh*, 618 F.3d 218, 225 (2d Cir. 2010); *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998); *CFTC v. International Berkshire Group Holdings, Inc.*, No. 05-61588, 2006 WL 3716390, at *10 (S.D. Fla. Nov. 3, 2006). A relief defendant is a party not charged with wrongdoing who nevertheless "possesses illegally obtained profits but has no legitimate claim to them." *SEC v. Huff*, 758 F. Supp. 2d 1288, 1362 (S.D. Fla. 2010). To obtain a freeze of a relief defendant's assets, the Commission "must demonstrate only that [it] is likely ultimately to succeed in disgorging the frozen funds." *Walsh*, 618 F.3d at 225.

The Commission's evidence in this case warrants entry of the requested asset freeze and other relief. The declarations, bank records, and other exhibits attached to this Motion demonstrate Defendants have violated the antifraud provisions of the federal securities law.

**B.      Defendants Violated the Antifraud Provisions of the Securities Laws**

      **1.      Misstatement Liability:  Section 17(a)(2) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder**

Section 17(a)(2) of the Securities Act prohibits any person, in the offer or sale of a security, from directly or indirectly obtaining money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading. A violation of Section 17(a)(2) can be shown by negligent conduct. *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980).

Section 10(b) of the Exchange Act and Rule 10b-5(b) prohibit the making of (1) a false statement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of a security. *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007). A fact is material if there is a "substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest]." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988); *Finnerty*

*v. Stiefel Labs., Inc.*, 756 F.3d 1310, 1321 (11th Cir. 2014).  Scienter may be established by a showing of knowing misconduct or severe recklessness.  *ZPR Inv. Mgmt. Inc. v. SEC*, 861 F.3d 1239, 1252 (11th Cir. 2017); *SEC v. Carriba Air Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982).  For purposes of Rule 10b-5(b), the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

### a.  Defendants Made False Statements In Connection with the Purchase or Sale of Securities

Defendants solicited investors to invest their money with the BKCoin Funds for the purchase of securities.  Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, "investment contracts."  In *SEC v. W.J. Howey Co*, 328 U.S. 293 (1946), the Supreme Court held that an investment contract exists where: (1) a person invests his or her money; (2) in a common enterprise; and (3) is led to expect profits from the efforts of the promoter or a third party.  Here, the first element is satisfied because investors sent their money to Defendants for the purpose of investing in crypto assets.[72]

For the second element, the Eleventh Circuit requires finding only "broad vertical commonality," where "investors are dependent upon the expertise or efforts of the investment promoter for their returns."  *ETS Payphones*, 408 F.3d at 732 (internal quotation omitted).  Broad vertical commonality exists here because the profits of investors were dependent on Defendants' efforts.  Defendants and the BKCoin Funds touted their investment expertise with crypto assets, and made all investment decisions for the funds.[73]  Thus, the second *Howey* element is satisfied.

---

[72] Section IV.A.
[73] Sections IV.A, B.1.

The third *Howey* element requires investors' expectation of profits to be derived from the efforts of others. The Eleventh Circuit traditionally looks at whether the efforts made by those other than the investor are significant, including the managerial efforts relating to success or failure. *SEC v. Kirkland*, 521 F. Supp.2d 1281, 1295 (11th Cir. 2007). As discussed above, the BKCoin Funds and SMA investors relied entirely on Defendants to make investment decisions for them. Defendants had exclusive control over the use of investors' funds and made all investment decisions for investors.[74] Therefore, the third *Howey* element is also met.

### b. Defendants Knowingly Made Material Misrepresentations and Omissions

Defendants obtained nearly $100 million from investors by making material misrepresentations and omissions of material facts to investors. In offering documents, investor agreements, and other communications, Defendants told investors and prospective investors that their funds would be used to invest in crypto assets, either through the various BKCoin Funds or through SMAs.[75] In reality, Defendants commingled assets among the BKCoin Funds' bank accounts and crypto trading accounts, and used investor funds to make Ponzi-like distributions to investors.[76] Kang also looted the BKCoin Funds' bank accounts to finance his lavish lifestyle.[77]

Further, Defendants told investors in the Multi-Strategy Funds that BKCoin or one of the Multi-Strategy Funds had received an opinion from a "top four" auditing firm. Defendants disseminated this representation in at least 18 emails they sent to investors and prospective investors. This was false as none of the Multi-Strategy Funds (or BKCoin) received an opinion from any audit firm.[78]

---

[74] Sections IV.B.1, C.
[75] Section IV.B.1.
[76] Sections IV.C.1-2.
[77] Section IV.C.1.
[78] Section IV.B.2.

The false and misleading statements and omissions Defendants made to investors about the use of investor funds were material. A reasonable investor would want to know that Defendants were not using investors' funds for the primary purpose of investing in crypto assets. *See, e.g., SEC v. Research Automation Corp.*, 585 F.2d 31, 35-36 (2nd Cir. 1978) (misleading statements and omissions about the use of investor funds were material as a matter of law). Defendants' false claims to investors of a US audit opinion were also material because a reasonable investor would find the existence (or lack thereof) of an audit opinion important in deciding whether to invest.

For purposes of establishing Rule 10b-5(b) liability, the Commission must show that Defendants are "makers" of the statements made to investors. *Janus Capital Group*, 564 U.S. at 142. BKCoin is the investment adviser of each of the BKCoin Funds, and sent the offering materials, investment contracts and other communications to investors and prospective investors.[79] Kang co-founded BKCoin, was one of its two managing members, and had authority over the entity's statements.[80] Kang also had authority over all relevant accounts from which Defendants made unauthorized transfers.[81] Thus, Defendants had ultimate authority over the misleading statements and omissions described above and are makers under *Janus*.

Lastly, Defendants acted with scienter as required by Rule 10b-5(b). Defendants acted knowingly, or at a minimum recklessly, when they told BKCoin Funds' investors and SMA investors that they would use their money to invest in crypto assets, and then used the money for different, unauthorized and undisclosed purposes. Kang admitted to BKCoin's former accountant that no audit had ever been conducted on either BKCoin or any of the BKCoin Funds.[82] Kang further altered bank statements for the Multi-Strategy Funds and provided them to the third-party

---

[79] Section II.A.2; Section IV.A.
[80] Section II.A.1; Section IV.B.1.
[81] Section IV.C.1.
[82] Section IV.B.2.

administrator, knowing that the inflated figures would be incorporated in statements sent to investors.[83] Kang's knowledge and actions may be imputed to BKCoin because he controlled the entity. *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999). Accordingly, Defendants purposefully misled investors. These same actions also satisfy Section 17(a)(2)'s less stringent negligence standard.

### 2. Scheme Liability: Sections 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)

Defendants knowingly engaged in a scheme to defraud investors. Scheme liability under Sections 17(a)(1) and 17(a)(3) of the Securities Act, Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c), generally requires a showing that the defendant committed a manipulative or deceptive act in furtherance of the alleged scheme to defraud, with scienter (with respect to Section 17(a)(1) and Rules 10b-5(a) and (c)) or negligently (with respect to Section 17(a)(3)). *See SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012). The language of these provisions is "expansive" and "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-02 (2019). In *Lorenzo*, the Supreme Court recognized that there is "considerable overlap among the subsections of" Rule 10b-5 and Section 17(a), and thus the same underlying conduct may establish a violation of more than one subsection. *Id.* at 1101-02 (knowing dissemination of misrepresentations with an intent to deceive violates Rule 10b-5(a) and (c) and Section 17(a)(1)); *see also Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019) (applying *Lorenzo*).

As set forth above, Kang committed numerous deceptive acts, including misappropriating investors' money for his personal benefit, improperly using investor money to make Ponzi-like payments to investors, and attempting to conceal the misuse of funds payments by fabricated

---

[83] Section IV.C.3.

account balances for the Multi-Strategy Funds.[84]  Kang's actions were made with scienter, satisfying Section 17(a)(1) and the provisions of Rule 10b-5. Kang had authority over the accounts in which investors' funds were deposited, and he knew that investors' money was being used contrary to the representations made to investors.  Kang distributed marketing presentations that falsely stated that "BKCoin" received an opinion from a "top four" auditor, even though he knew those statements were false.  Kang also inflated account balances for the Multi-Strategy Funds' accounts knowing that the inflated figures would be sent to investors in their monthly statements. Thus, Kang's actions constitute manipulative or deceptive acts that are part of a fraudulent or deceptive course of conduct, or are in furtherance of a scheme to defraud.  Because Kang's actions can be imputed to BKCoin, *see, e.g., Manor Nursing Ctrs*. 458 F.2d at n.16; *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d at 1340, Kang and BKCoin are liable for violations of Sections 17(a)(1) and (3) of the Securities Act and Rules 10b-5(a) and (c).  Defendants' actions also satisfy the negligence standard applicable under Section 17(a)(3).[85]

### C.    Defendants Violated the Antifraud Provisions of the Advisers Act

Defendants violated Sections 206(1) and 206(2) of the Advisers Act because they acted as investment advisers while misrepresenting and omitting material facts and engaging in the fraudulent conduct discussed above.   Section 202(a)(11) of the Advisers Act defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others ... as to the value of securities or as to the advisability of investing in, purchasing, or selling

---

[84] Sections IV.C.1-3

[85] Defendants' misrepresentations, omissions, and other deceptive acts were made in connection with the sale of securities under Section 10(b) and in the offer or sale of any securities under Section 17(a). The "in connection with" requirement means that the misrepresentation must be "concerning the securities . . . sold." *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 108 (11th Cir. 1986). Thus, "[i]t is enough that the scheme to defraud and the sale of securities coincide." *SEC v. Zandford*, 535 U.S. 813, 822 (2002). Defendants made misrepresentations or omissions about the use of investors' money and the claimed audits of the BKCoin Funds while soliciting investments. Thus, the scheme to defraud and the sale of securities coincided.

securities." The requirement that one receive compensation is met by misappropriation of investor funds. *U.S. v. Ogale*, 378 Fed. Appx. 959, 960-61 (11th Cir. 2010).

BKCoin is an investment adviser. It has filed reports with the Commission as an exempt reporting adviser, has served as the investment adviser to the BKCoin Funds and SMAs and charged management fees to the Offshore Fund and Legacy Fund.[86] Kang, who co-founded BKCoin, carried out BKCoin's responsibilities as investment adviser and made investment decisions for the BKCoin Funds.[87] Accordingly, both BKCoin and Kang are liable as advisers under the Advisers Act. *See, e.g., SEC v. Grenda Group, LLC*, No. 1:18-cv-00954-CCR, 2021 WL 1955330, at *11 (W.D.N.Y. May 17, 2021) (citation omitted).

Section 206(1) of the Advisers Act prohibits any investment adviser from employing "any device, scheme, or artifice to defraud any client or prospective client." Section 206(2) of the Advisers Act prohibits investment advisers from engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." A claim under Section 206(1) requires proof of scienter, *SEC v. Steadman*, 967 F.2d 636, 641, n.3 (D.C. Cir. 1992), which may be established by a showing of recklessness. *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir. 1989). Scienter is not required to establish a violation of Section 206(2), but may rest on a finding of negligence. *Steadman*, 967 F.2d at 643 n.5. These sections impose a fiduciary duty on an investment adviser to exercise the utmost good faith in dealing with their clients, to disclose all material facts, and to employ reasonable care to avoid misleading their clients. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963).

The misstatements detailed above that support charging violations of the antifraud provisions of the Securities Act and Exchange Act also support charging violations of Sections

---

[86] Section II.A.2.
[87] Sections II.A.1, IV.B.1.

206(1) and (2) violations. *See SEC v. Berger*, 244 F. Supp. 2d 180, 192 (S.D.N.Y. 2001). Kang acted with scienter because he engaged in the fraudulent conduct, including personally making misstatements about the use of investment funds to at least one investor, misusing and misappropriating investment funds, and providing fraudulent balances to a third party to conceal the fraud. Kang's scienter can be imputed to BKCoin because Kang controlled the entity's operations. *See Manor Nursing Ctrs.*, 458 F.2d at 1089 n. 3; *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d at 1340. Defendants, therefore, defrauded the BKCoin Funds by misappropriating investor assets.

**D.     A Total Asset Freeze is Appropriate**

The Court should freeze Defendants' and Relief Defendants' assets to ensure a disgorgement award can be satisfied and to prevent further dissipation of investor funds.[88] A total asset freeze is warranted when the assets to be frozen are worth less than the likely disgorgement award.[89] *See SEC v. Lauer*, 478 F. App'x 550, 554 (11th Cir. 2012) (unpublished) ("[I]f potential disgorgement is greater than the value of the defendant's assets, the district court can order a full asset freeze."); *ETS Payphones*, 408 F.3d at 735-36 (affirming order that "froze all of [defendant's] assets" when estimated disgorgement and value of frozen assets were comparable); *see also FTC v. RCA Credit Services, LLC*, No. 8:08 Civ. 2062-T-27MAP, 2008 WL 5428039, at *4 (M.D. Fla.

---

[88] Although the corporate defendant and the BKCoin Funds are currently under the control of a Temporary Receiver appointed in the state court action, the Commission requests an asset freeze over all BKCoin entities and Bison Digital (which is not under receivership) because a federal asset freeze order over these entities will have greater and more efficient reach over assets and accounts located outside of Florida and offshore. Should the Court grant the Commission's motion for appointment of a Receiver in this SEC enforcement action – filed contemporaneously with this motion – the asset freeze order should not apply to the activities of the Receiver in connection with marshalling and securing assets, and other Receivership duties provided under this Court's Receivership Order.

[89] The Commission's Complaint seeks disgorgement as against Defendants and Relief Defendants. Disgorgement is warranted because Defendants, directly and indirectly through the Relief Defendants, misappropriated millions from investors. *SEC v. Monterosso*, 756 F.3d 1326, 1337 (11th Cir. 2014) ("Disgorgement is an equitable remedy intended to prevent unjust enrichment.").

Dec. 31, 2008) (defendants "may not use their victims' assets to hire counsel to help them retain the fruits of their violations").

Here, of the approximately $100 million BKCoin and the Relief Defendants received from investors, millions were misappropriated, and tens of millions of funds are unaccounted for.[90]  For his part, Kang had access to the bank accounts, as well as crypto wallets that housed investors' funds, and may still have access to the unaccounted funds.[91]  Thus, a total asset freeze as to Defendants and Relief Defendants is warranted.

### E.     Repatriation of Assets

An order requiring Defendants and Relief Defendants to repatriate assets to the United States is appropriate, as Defendants and Relief Defendants diverted millions of investor funds to offshore bank accounts, and crypto asset trading platforms.

### F.     An Order Prohibiting Destruction of Records

An Order against Defendants prohibiting the destruction of records is warranted to prevent the destruction of documents before this Court can adjudicate the Commission's claims.  *SEC v. Shiner*, 268 F. Supp. 2d 1333, 1345-46 (S.D. Fla. 2003).

### G.     Sworn Accounting

A sworn accounting by Defendant Kang is necessary to enable the Commission and the Court to determine more precisely the amount Kang has misappropriated, spent, and transferred to himself and others.[92]  *See SEC v. Lybrand*, No. 00 Civ.1387 (SHS), 2000 WL 913894, at *12 (S.D.N.Y. July 6, 2000).

---

[90] Section IV.D.
[91] Section IV.C.
[92] Should the Court grant the Commission's motion to appoint a receiver, the request for an accounting would only be applicable to Kang.

## VI.    CONCLUSION

For the reasons set forth above, the Commission requests that the Court grant the Commission's Emergency Motion for Asset Freeze and Other Relief and enter the Commission's proposed Order.

February 23, 2023                     Respectfully submitted,

By: _____
Pascale Guerrier
Trial Counsel
Fla. Bar No. 22590
Direct Dial: (305) 982-6301
Email: guerrierp@sec.gov

Alexander H. Charap, Esq.
Senior Counsel
SDFL Special Bar No. A5502711
Direct Dial:  (305) 416-6228
Email:  charapal@sec.gov

Jeffrey B. Goldberg, Esq.
Counsel
Fla. Bar No. 0118689
Direct Dial (305) 982-6334
Email: goldergj@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4146