## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Sealed**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | :    CASE NO. |
| BKCOIN MANAGEMENT, LLC and | : |
| MIN WOO KANG a/k/a "KEVIN" KANG, | : |
| | : |
| Defendants, and | : |
| | : |
| BKCOIN CAPITAL, LP, | : |
| BK OFFSHORE FUND, LTD., | : |
| BKCOIN MULTI-STRATEGY | : |
| MASTER FUND, LTD., | : |
| BKCOIN MULTI-STRATEGY FUND, LP, | : |
| BKCOIN MULTI-STRATEGY FUND LTD., AND | : |
| BISON DIGITAL LLC, | : |
| | : |
| Relief Defendants. | : |
| _____ | : |

## INDEX TO EXHIBITS TO EMERGENCY MOTION
## FOR ASSET FREEZE AND OTHER RELIEF

| EXHIBIT No. | DESCRIPTION |
|---|---|
| 1. | Declaration of Jeffrey B. Goldberg |
| 2. | Declaration of Julia D'Antonio |
| 3. | Declaration of James K. Richardson |
| 4. | Declaration of Michael I. Goldberg |
| 5. | Declaration of Bryce Gilleland |
| 6. | Declaration of Greg Grinberg |

# EXHIBIT 1

## DECLARATION OF JEFFREY B. GOLDBERG

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

**Introduction**

1.      My name is Jeffrey B. Goldberg.  I am over the age of twenty-one years old and I have personal knowledge of the matters set forth herein.

2.      I am an attorney employed by the United States Securities and Exchange Commission (the "Commission") in the Division of Enforcement.  My office is located at 801 Brickell Avenue, Suite 1950, Miami, Florida.  I am licensed to practice law in Florida and am admitted to practice before the Eleventh Circuit Court of Appeals and the District Courts for the Southern District of Florida and the Eastern District of Pennsylvania.

3.      I provide this declaration in support of the Commission's emergency civil action against BKCoin Management, LLC ("BKCoin"), an exempt reporting adviser, and Min Woo Kang aka "Kevin" Kang ("Kang"), one of its two managing members.

4.      As part of my duties as an attorney with the Commission, I am responsible for investigating potential violations of the federal securities laws.  In conducting investigations, my job responsibilities generally include sending subpoenas, reviewing documents, taking testimony, and conducting other investigative activities.

5.      As part of the investigation into BKCoin, I issued subpoenas to banks and other entities, interviewed witnesses, reviewed and analyzed, among other things, certain documents relating to Kang, BKCoin, BKCoin Capital, LP (the "Legacy Fund"), BK Offshore Fund, Ltd. (the "Offshore Fund"), and three "Multi-Strategy Funds:" BKCoin Multi-Strategy Master Fund, Ltd., BKCoin Multi-Strategy Fund, LP and BKCoin Multi-Strategy Fund Ltd. (the "Multi-Strategy Funds") (all funds collectively "the BKCoin Funds").

**Documents Obtained By Commission Staff**

1

6.   The Commission's staff reached out to registrar and Secretary of State offices in the U.N. and abroad, and in November and December 2022 obtained certified versions of the following

    a.  A Certificate of Formation of BKCoin, filed March 2, 2018, a true and accurate copy of which is attached hereto as Attachment 1;

    b.  BKCoin records with Florida's Department of State, true and accurate copies of which are attached hereto as Attachment 2;

    c.  The Certificate of Limited Partnership, dated March 5, 2018 for the Legacy Fund, a true and accurate copy of which is attached hereto as Attachment 3;

    d.  The Memorandum of Association and Articles of Association of the Offshore Fund, incorporated on May 24, 2019 in the British Virgin Islands, a true and accurate copy of which is attached hereto as Attachment 4;

    e.  The Memorandum of Association and Articles of Association of BKCoin Multi-Strategy Master Fund Ltd., incorporated on March 9, 2022 in the British Virgin Islands, a true and accurate copy of which is attached hereto as Attachment 5;

    f.  The Certificate of Limited Partnership, filed on October 28, 2021 in Delaware, for BKCoin Multi-Strategy Fund LP, a true and accurate copy of which is attached hereto as Attachment 6;

    g.  The Memorandum of Association and Articles of Association of BKCoin Multi-Strategy Fund Ltd., incorporated on March 9, 2022 in the British Virgin Islands, a true and accurate copy of which is attached hereto as Attachment 7; and

       h.  Articles of Organization, dated December 11, 2019, and files from the

          Wyoming Secretary of State for Bison Digital, LLC, true and accurate copies

          of which are attached hereto as Attachment 8.

7.     On October 27, 2022, an IT Specialist at the Commission completed a website

capture of a historical version of the BKCoin website (www.bkcoincapital.com). A true and

accurate copy of an excerpt from the captured website is attached hereto as Attachment 9.

**Documents Obtained In Response to Subpoena**

8.     In response to a subpoena the Commission issued on November 16, 2022, a

crypto asset trading platform produced documents to the Commission on November 18, 2022,

including:

       a.  A photograph of a passport issued to Kang, a true and accurate copy of which

          is attached hereto as Attachment 10;

       b.  An electric bill issued to Kang at an address in New York, a true and accurate

          copy of which is attached hereto as Attachment 11; and

       c.  A Limited Liability Company Agreement of BKCoin, dated July 26, 2018, a

          true and accurate copy of which is attached hereto as Attachment 12.

9.     In response to a subpoena the Commission issued on November 17, 2022, a

crypto asset trading platform produced documents to the Commission on December 1, 2022,

including:

       a.  A Certificate of Incorporation in the British Virgin Islands, dated March 9,

          2022, for BKCoin Multi-Strategy Master Fund Ltd., a true and accurate copy

          of which is attached hereto as Attachment 13; and

b. A Private Placement Memorandum for BKCoin Multi-Strategy Fund Ltd., dated March 3, 2022, a true and accurate copy of which is attached hereto as Attachment 14.

10. In response to a subpoena the Commission issued on November 22, 2022, T.D. Bank, N.A. produced to the Commission, on December 2, 2022, business account opening documents for Bison Digital LLC, true and accurate copies of which are attached hereto as Attachment 15.

11. In response to a subpoena the Commission issued on November 8, 2022, the Commission received documents on November 23, 2022 from State Street Bank and Trust Company ("State Street"). Included in State Street's production was a letter, dated October 5, 2022, to an investor in the Multi-Strategy Funds from Counsel for BKCoin. A true and accurate copy of the October 5, 2022 Letter is attached hereto as Attachment 16.

12. On January 13, 2023, the Commission received additional documents from State Street. Included in State Street's January 2023 production were emails, dated July 18, 2022, August 12, 2022, and September 15, 2022, in which Kang sent staff at State Street account activity documents related to a BKCoin Multi-Strategy Fund LP account at Silvergate Bank. True and accurate copies of the July 18, August 12, and September 15, 2022 Emails and their attachments are attached consecutively hereto as Attachments 17-19.

13. In response to a subpoena the Commission issued on November 9, 2022 to Silvergate Bank, the Commission received documents on November 22, 2022, including bank statements dated June 30, 2022, July 29, 2022, and August 31, 2022 related to a BKCoin Multi-Strategy Fund LP account. True and accurate copies of the June 30, 2022, July 29, 2022, and August 31, 2022 Bank Statements are attached collectively hereto as Attachment 20.

4

**Documents Obtained from Investors**

14.      An investor in the Legacy Fund provided the Commission with a copy of a letter, dated October 5, 2022, to the investor from counsel for BKCoin.  A true and accurate copy of the October 5, 2022 Letter is attached hereto as Attachment 21.

**Documents and Information Obtained Via Open Source Searches**

15.      While performing open source research on BKCoin, I obtained information from the website https://adviserinfo.sec.gov/.  The website shows that BKCoin has been registered with the Commission since November 9, 2018.  From this website, I also obtained a copy of BKCoin's most recent ADV filed with the Commission, dated March 29, 2022, a true and accurate copy of which is attached hereto as Attachment 22.


I declare under penalty of perjury that the foregoing is true and correct.  Signed this 22nd day of February 2023 in Surfside, Florida.


_____

Jeffrey B. Goldberg, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE COMMISSION,          :
                                             :
              Plaintiff,                     :
       v.                                    :
                                             :       CASE NO.
BKCOIN MANAGEMENT, LLC and                   :
MIN WOO KANG a/k/a "KEVIN" KANG,             :
                                             :
              Defendants, and                :
                                             :
BKCOIN CAPITAL, LP,                          :
BK OFFSHORE FUND, LTD.,                       :
BKCOIN MULTI-STRATEGY                        :
MASTER FUND, LTD.,                           :
BKCOIN MULTI-STRATEGY FUND, LP,              :
BKCOIN MULTI-STRATEGY FUND LTD., AND         :
BISON DIGITAL LLC,                           :
                                             :
              Relief Defendants.             :
_____      :

## INDEX TO ATTACHMENTS TO DECLARATION OF JEFFREY B. GOLDBERG

| ATTACHMENT NO. | DESCRIPTION |
|---|---|
| 1. | Certificate of Formation of BKCoin Management, LLC |
| 2. | Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida by BKCoin Management, LLC |
| 3. | Certificate of Limited Partnership of BKCoin Capital LP |
| 4. | Memorandum of Association and Articles of Association of BK Offshore Fund, Ltd. |
| 5. | Memorandum of Association and Articles of Association of BK Multi-Strategy Master Fund Ltd. |
| 6. | Certificate of Limited Partnership for BKCoin Multi-Strategy Fund LP |
| 7. | Memorandum of Association and Articles of Association of BK Multi-Strategy Fund Ltd. |

| 8. | Articles of Organization for Bison Digital, LLC |
|---|---|
| 9. | Web capture of BKCoin Management, LLC's website (www.bkcoincapital.com) dated January 23, 2022 |
| 10. | Min Woo Kang's Passport |
| 11. | Kevin Kang's Utility Bill |
| 12. | Limited Liability Company Agreement of BKCoin Management, LLC dated July 26, 2018 |
| 13. | Certificate of Incorporation - BKCoin Multi-Strategy Master Fund Ltd. |
| 14. | BKCoin Multi-Strategy Fund Ltd.'s Private Placement Memorandum dated March 3, 2022 |
| 15. | Bison Digital LLC's Business Account Opening Documents TD Bank, N.A. |
| 16. | October 5, 2022 Notice of Suspension – BKCoin Multi-Strategy Fund |
| 17. | July 18, 2022 Email from Kevin Kang to State Street Bank |
| 18. | August 12, 2022 Email from Kevin Kang to State Street Bank |
| 19. | September 15, 2022 Email from Kevin Kang to State Street Bank |
| 20. | BKCoin Multi-Strategy Fund LP Bank Statements |
| 21. | October 5, 2022 Notice of Suspension – BKCoin Capital LP |
| 22. | BKCoin Management LLC Form ADV |

# **ATTACHMENT 1**



# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF FORMATION OF "BKCOIN MANAGEMENT
LLC", FILED IN THIS OFFICE ON THE SECOND DAY OF MARCH, A.D.
2018, AT 1:23 O`CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

6779386  8100
SR# 20224071133

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 204910056
Date: 11-21-22

State of Delaware
Secretary of State
Division of Corporations
Delivered  01:23 PM 03/02/2018
FILED  01:23 PM 03/02/2018
SR 20181671541 · File Number  6779386

# CERTIFICATE OF FORMATION
## OF
## BKCoin Management LLC

(A Delaware Limited Liability Company)

**First:** The name of the limited liability company is: BKCoin Management LLC

**Second:** Its registered office in the State of Delaware is located at 16192 Coastal Highway, Lewes, Delaware 19958, County of Sussex. The registered agent in charge thereof is Harvard Business Services, Inc.

IN WITNESS WHEREOF, the undersigned, being fully authorized to execute and file this document have signed below and executed this Certificate of Formation on this March 02, 2018.

Harvard Business Services, Inc., Authorized Person
By: Richard H. Bell, II, President

# **ATTACHMENT 2**



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the complete file of BKCOIN MANAGEMENT LLC, a Delaware limited liability company, authorized to transact business within the state of Florida, as shown by the records of this office.

The document number of this limited liability company is M21000017097.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Thirtieth day of November, 2022



*Cord Byrd*
*Secretary of State*

CR2E022 (01-11)

# M21000017097



600377847116

12/13/21--01032--012  **125.00

---

(Requestor's Name)

(Address)

(Address)

(City/State/Zip/Phone #)

☐ PICK-UP    ☐ WAIT    ☐ MAIL

(Business Entity Name)

(Document Number)

Certified Copies _____    Certificates of Status _____

Special Instructions to Filing Officer

Office Use Only

FILED
2021 DEC 13 PM 12: 20
SECRETARY OF STATE
TALLAHASSE. FLORIDA

**COVER LETTER**

**TO:**   **Registration Section**
          **Division of Corporations**

**SUBJECT:** _____ BKCOIN MANAGMENT LLC _____
                                    Name of Limited Liability Company

The enclosed "Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida," Certificate of Existence, and check are submitted to register the above referenced foreign limited liability company to transact business in Florida.

Please return all correspondence concerning this matter to the following:

                              Peter Dzuba, Esq.
                              Name of Person

                              Dzuba Law, P.A.
                              Firm/Company

                              1101 Brickell Ave South Tower #8
                              Address

                              Miami, Florida 33131
                              City/State and Zip Code

                              peter@dzubalaw.com
                              E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

_____ at (_____) _____
Name of Contact Person           Area Code      Daytime Telephone Number

**Mailing Address:**                    **Street Address:**
Registration Section                    Registration Section
Division of Corporations                Division of Corporations
P.O. Box 6327                           The Centre of Tallahassee
Tallahassee, FL 32314                   2415 N. Monroe Street, Suite 810
                                        Tallahassee, FL 32303

Enclosed is a check for the following amount:
Please make check payable to: **FLORIDA DEPARTMENT OF STATE**
☒ $125.00 Filing Fee   ☐ $130.00 Filing Fee &   ☐ $155.00 Filing Fee &   ☐ $160.00 Filing Fee, Certificate
                         Certificate of Status      Certified Copy           of Status & Certified Copy

## APPLICATION BY FOREIGN LIMITED LIABILITY COMPANY FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA

*IN COMPLIANCE WITH SECTION 605.0902, FLORIDA STATUTES, THE FOLLOWING IS SUBMITTED TO REGISTER A FOREIGN LIMITED LIABILITY COMPANY TO TRANSACT BUSINESS IN THE STATE OF FLORIDA:*

1. _____BKCOIN MANAGEMENT LLC_____
   (Name of Foreign Limited Liability Company; must include "Limited Liability Company," "L.L.C.," or "LLC")

   _____
   (If name unavailable, enter alternate name adopted for the purpose of transacting business in Florida. The alternate name must include "Limited Liability Company," "L.L.C," or "LLC")

2. _____Delaware_____                      3. _____82-4667659_____
   (Jurisdiction under the law of which foreign limited liability company is organized)        (FEI number, if applicable)

4. _____
   (Date first transacted business in Florida, if prior to registration.)
   (See sections 605.0904 & 605.0905, F.S. to determine penalty liability.)

5. _____1101 Brickell Ave South Tower #8_____      6. _____1101 Brickell Ave South Tower #8_____
   (Street Address of Principal Office)                  (Mailing Address)

   _____Miami, Florida 33131_____                      _____Miami, Florida 33131_____

7. Name and <u>street address</u> of Florida registered agent:  (P.O. Box <u>NOT</u> acceptable)

   Name:          _____Dzuba Law, P.A._____

   Office Address:   _____1101 Brickell Ave South Tower #8_____

                    _____Miami_____ , Florida _____33131_____
                     (City)                      (Zip code)

FILED
2021 DEC 13  PM 12: 20
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

**Registered agent's acceptance:**
*Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this application, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.*

_____/s/ Peter Dzuba, on behalf of Dzuba Law, P.A._____
(Registered agent's signature)

8. For initial indexing purposes, list names, title or capacity and addresses of the primary members/managers or persons authorized to manage (up to six (6) total):

| Title or Capacity: | Name and Address: | Title or Capacity: | Name and Address: |
|---|---|---|---|
| ☒Manager | Name: Carlos Betancourt | ☒Manager | Name: Kevin Kang |
| ☐Member | Address: | ☐Member | Address: |
| ☐Authorized | 1101 Brickell Ave South Tower #8 | ☐Authorized | 1101 Brickell Ave South Tower #8 |
| Person | Miami, Florida 33131 | Person | Miami, Florida 33131 |
| ☐Other | ☐Other | ☐Other | ☐Other |
| | | Text | |
| ☐Manager | Name: | ☐Manager | Name: |
| ☐Member | Address: | ☐Member | Address: |
| ☐Authorized | | ☐Authorized | |
| Person | | Person | |
| ☐Other | ☐Other | ☐Other | ☐Other |
| ☐Manager | Name: | ☐Manager | Name: |
| ☐Member | Address: | ☐Member | Address: |
| ☐Authorized | | ☐Authorized | |
| Person | | Person | |
| ☐Other | ☐Other | ☐Other | ☐Other |

Important Notice: Use an attachment to report more than six (6). The attachment will be imaged for reporting purposes only. Non-indexed individuals may be added to the index when filing your Florida Department of State Annual Report form.

9. Attached is a certificate of existence, no more than 90 days old, duly authenticated by the official having custody of records in the jurisdiction under the law of which it is organized. (If the certificate is in a foreign language, a translation of the certificate under oath of the translator must be submitted)

10. This document is executed in accordance with section 605.0203 (1) (b), Florida Statutes. I am aware that any false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.

/s/ Carlos Betancourt
_____
Signature of an authorized person

Carlos Betancourt
_____
Typed or printed name of signee



Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY "BKCOIN MANAGEMENT LLC" IS DULY FORMED

UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND

HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS

OF THE EIGHTEENTH DAY OF NOVEMBER, A.D. 2021.

6779386  8300

SR# 20213837182

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 204738828

Date: 11-18-21

## 2022  FOREIGN LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# M21000017097

Entity Name: BKCOIN MANAGEMENT LLC

**FILED**
**May 01, 2022**
**Secretary of State**
**7635661750CC**

**Current Principal  Place of Business:**

1101 BRIKELL AVE S TOWER #8
MIAMI, FL  33131

**Current Mailing Address:**

1101 BRIKELL AVE S TOWER #8
MIAMI, FL  33131 US

**FEI Number: 82-4667659**                                    Certificate of Status Desired:  No

**Name and Address of Current Registered Agent:**

DZUBA LAW, P.A.
1101 BRIKELL AVE S TOWER #8
MIAMI, FL  33131 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida*

SIGNATURE:

_____
          Electronic Signature of Registered Agent                                                Date

**Authorized Person(s) Detail :**

| | | | |
|---|---|---|---|
| Title | MGR | Title | MGR |
| Name | BETANCOURT, CARLOS | Name | KANG, KEVIN |
| Address | 1101 BRIKELL AVE S TOWER #8 | Address | 1101 BRIKELL AVE S TOWER #8 |
| City-State-Zip: | MIAMI FL  33131 | City-State-Zip: | MIAMI  FL  33131 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: CARLOS BETANCOURT                          MANAGER                 05/01/2022
_____
          Electronic Signature of Signing Authorized Person(s) Detail                              Date

# **ATTACHMENT 3**



# Delaware

## The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF LIMITED PARTNERSHIP OF "BKCOIN
CAPITAL LP", FILED IN THIS OFFICE ON THE FIFTH DAY OF MARCH,
A.D. 2018, AT 4:56 O'CLOCK P.M.



Jeffrey W. Bullock, Secretary of State

6782832  8100
SR# 20224071135

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 204910102
Date: 11-21-22

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:56 PM 03/05/2018
FILED 04:56 PM 03/05/2018
SR 20181712672 - File Number 6782832

# CERTIFICATE OF LIMITED PARTNERSHIP

## OF

## BKCoin Capital LP

THE UNDERSIGNED, desiring to form a limited partnership pursuant to the Delaware Revised Uniform Limited Partnership Act, 6 Delaware Code, Chapter 17, do hereby certify as follows:

**FIRST:**  The name of the limited partnership is: BKCoin Capital LP

**SECOND:**  The name and address of the Registered Agent is: 16192 Coastal Highway, Lewes Delaware 19958-9776, County of Sussex.  The registered agent in charge thereof is Harvard Business Services, Inc.

**THIRD:**  The name and mailing address of each general partner is as follows:

BKCoin Management LLC
185 Montag Cir NE Unit 455
Atlanta, GA 30307

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Limited Partnership of BKCoin Capital LP on March 5, 2018.

Signature of Authorized Person of BKCoin Management LLC,
General Partner of BKCoin Capital LP

Carlos Betancourt

Printed Name of Authorized Person of BKCoin Management LLC,
General Partner of BKCoin Capital LP

# **ATTACHMENT 4**



**BRITISH VIRGIN ISLANDS**
**BVI Business Companies Act 2004**

**Memorandum of Association**
**and Articles of Association of**



**BK Offshore Fund Ltd.**

**A COMPANY LIMITED BY SHARES**

**Incorporated on 24th day of May 2019**



Harneys Corporate Services Limited
Craigmuir Chambers, Road Town, Tortola VG1110, British Virgin Islands
+1 284 494 2233
+1 284 494 3547
harneysfiduciary.com

CERTIFIED A TRUE COPY

REGISTRAR OF CORPORATE AFFAIRS
BRITISH VIRGIN ISLANDS
Date _____ 01/12/2022

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**
**BVI BUSINESS COMPANIES ACT 2004**

**MEMORANDUM OF ASSOCIATION**

**OF**

**BK Offshore Fund Ltd.**

A Company Limited By Shares

**1      NAME**

1.1     The name of the Company is BK Offshore Fund Ltd.

**2      STATUS**

2.1     The Company is a company limited by shares.

**3      REGISTERED OFFICE AND REGISTERED AGENT**

3.1     The first registered office of the Company is at Craigmuir Chambers, PO Box 71, Road Town, Tortola VG1110, British Virgin Islands.

3.2     The first registered agent of the Company is Harneys Corporate Services Limited of Craigmuir Chambers, PO Box 71, Road Town, Tortola VG1110, British Virgin Islands.

3.3     The Company may, by Resolution of Shareholders or by Resolution of Directors, change the location of its registered office or change its registered agent.

3.4     If at any time the Company does not have a registered agent it may, by Resolution of Shareholders or Resolution of Directors, appoint a registered agent.

**4      CAPACITY AND POWERS**

4.1     Subject to the Act and any other British Virgin Islands legislation, the Company has, irrespective of corporate benefit:

   (a)     full capacity to carry on or undertake any business or activity, do any act or enter into any transaction; and

   (b)     for the purposes of paragraph (a), full rights, powers and privileges.

4.2     For the purposes of section 9(4) of the Act, there are no limitations on the business that the Company may carry on.

1

**5       NUMBER AND CLASSES OF SHARES**

5.1     The Company is authorised to issue a maximum of 50,000 which are divided into 49,900 no par value participating shares of two classes, namely Class A Shares and Class Restricted A Shares, and a maximum of 100 non-participating no par value shares designated as Class M Shares.

5.2     The Company may issue fractional Shares and a fractional Share shall have the corresponding fractional rights, obligations and liabilities of a whole Share of the same Class or Series.

5.3     The Company may issue a Class in one or more Series.  The division of a Class into one or more Series and the designation to be made to each Series shall be determined by the directors or their authorised agent from time to time.

**6       RIGHTS OF SHARES**

6.1     Each Class M Share in the Company confers upon the Shareholder:

(a)      the right to one vote on any Resolution of Shareholders;

(b)      no right to redeem such Share;

(c)      no right to any dividend or other distribution paid by the Company; and

(d)      no right to receive any payment or to otherwise participate in the distribution of the surplus assets of the Company on its liquidation, save for a return of the subscription sum paid for the issue of such Share following the payment in full of all sums due to the holders of the Participating Shares.

6.2     Each Participating Share confers upon the Shareholder:

(a)      no right to receive notice of, attend at or vote at any meeting of the Shareholders or on any Resolution of Shareholders, save as arises pursuant to the operation of Clause 8.3;

(b)      the right to redeem such Share out of the net assets of the Company attributable to the Class or Series to which such Share belongs with reference to the Investment Accounts;

(c)      the right to an equal share in any dividend or other distribution paid by the Company and which is attributable to the Class to which such Share belongs with reference to the Investment Accounts; and

(d)      the right to receive an equal share in the distribution of the surplus assets of the Company on its liquidation properly attributable to the Class or Series to which such Share belongs with reference to the Investment Accounts.

6.3     The redemption of Participating Shares pursuant to Clause 6.2 shall be effected in accordance with the Articles.

6.4     The Company may redeem, purchase or otherwise acquire all or any of the Shares in the Company in accordance with the Articles.

2

**7      REGISTERED SHARES**

7.1     The Company shall issue registered Shares only.  The Company is not authorised to issue bearer Shares, convert registered Shares to bearer Shares or exchange registered Shares for bearer Shares.

**8      AMENDMENT OF THE MEMORANDUM AND THE ARTICLES**

8.1     The Company may amend this Memorandum or the Articles by Resolution of Shareholders or by Resolution of Directors save that no amendment may be made by Resolution of Directors:

(a)     to restrict the rights or powers of the Shareholders to amend this Memorandum or the Articles;

(b)     to change the percentage of Shareholders required to pass a Resolution of Shareholders to amend this Memorandum or the Articles; or

(c)     in circumstances where this Memorandum or the Articles cannot be amended by the Shareholders; or

(d)     to this Clause 8.1.

8.2     Any amendment of this Memorandum or the Articles will take effect from the date that the notice of amendment, or restated Memorandum and Articles incorporating the amendment, is registered by the Registrar or from such other date as determined pursuant to the Act.

8.3     The rights conferred upon the holders of Shares of any Class as specified in Clause 6.1 or 6.2 may only be varied to a material adverse extent, whether or not the Company is in liquidation, with the consent in writing of the holders of a majority of the issued Shares of that Class or by a resolution approved at a duly convened and constituted meeting of the Shares of that Class by the affirmative vote of a majority of the votes of the Shares of that Class which were present at the meeting and were voted.    At any such meeting, all voting will be on a poll and each Shareholder who is present in person or by proxy will have one vote for every Share held.

8.4     The directors may determine to treat two or more Classes as comprising a single Class for the purposes of Clause 8.3 if they determine, by Resolution of Directors, that all such Classes will be affected in the same way by the proposed variation of the rights attaching to the shares of such Classes.

8.5     The rights conferred upon the holders of the Shares of any Class or Series shall not, unless otherwise expressly provided by the terms of issue of the Shares of that Class or Series, be deemed to be varied by the creation or issue of further Shares of that Class or Series or of other Classes or Series (whether or not such Classes or Series represent other Class or Series funds or sub-funds of the Company) unless such Shares rank in priority to the Shares of such Class or Series as regards participation in the profits or assets of the Investment Account for such Class or Series.

8.6     The rights conferred upon the holders of the Shares of any Class or Series shall not be deemed to be varied by the exercise of the powers to allocate assets (or amounts treated as notional assets)

3

and charge liabilities to the Investment Accounts or any of them as provided for in Regulations 21.6 to 21.9.

**9    APPROVED FUND**

9.1   The Company is approved in accordance with the Securities and Investment Business (Incubator and Approved Funds Regulations), 2015 as an approved fund.

**10   DEFINITIONS AND INTERPRETATION**

10.1  In this Memorandum of Association and the attached Articles of Association, if not inconsistent with the subject or context:

*AEOI Legislation* means any legislation, regulations or guidance in force in the British Virgin Islands relating to the systematic and periodic exchange of information for tax purposes pursuant to any agreement or treaty entered into by the British Virgin Islands (or any British Virgin Islands government body) including the intergovernmental agreement entered into with the United States to facilitate compliance with Sections 1471 to 1474 of the US Internal Revenue Code of 1986 and any other agreement included as subsidiary legislation in the form of an order to the Mutual Legal Assistance (Tax Matters) Act 2003.

*Act* means the BVI Business Companies Act 2004, as amended from time to time, and includes the BVI Business Companies Regulations 2012 and any other regulations made under the Act.

*Articles* means the attached Articles of Association of the Company;

*Business Day* means any day on which banks in the British Virgin Islands are authorised to open for normal banking business and/or such other day or days as the directors may determine, either generally or in any particular case.

*Class* means a class of Shares created and designated by the directors pursuant to the Articles.

*Class A Shares* means the no par value Class A participating redeemable Shares having the rights set out in this Memorandum.

*Class Restricted A Shares* means the no par value class restricted A shares having the rights set out in this Memorandum.

*Class M Shares* means the no par value Class M non-participating, non-redeemable Shares having the rights set out in this Memorandum.

*Dealing Day* means, in respect of each Class, such day or days as the directors may determine from time to time.

*Initial Series* means, in relation to each Class of Participating Shares, the Series to which the first Shares to be issued in that Class belong or such other Series as may be designated by the directors or their authorised agent as the Initial Series.

*Investment Account* has the meaning specified in Regulation 21.6.

4

*Memorandum* means this Memorandum of Association of the Company.

*Net Asset Value* means the net asset value attributed to the Company or to a Class or Series (as the context requires) determined in accordance with the Articles.

*Net Asset Value per Share* has the meaning specified in Regulation 5.3.

*New Issue Security* means any security acquired by the Company that is determined by the directors or their authorised agent to be a new issue within the meaning of the Rule.

*person* includes individuals, corporations, trusts, the estates of deceased individuals, partnerships and unincorporated associations of persons.

*Participating Shares* means the Class A Shares and Class Restricted A Shares.

*Performance Fee* means any performance fee or incentive fee payable by the Company in respect of any Class or Series of Participating Shares to any person appointed for the time being as investment manager or investment adviser to the Company.

*Performance Fee Period* means a period of three months commencing on each 1 January, 1 April, 1 July and 1 October, provided that the first Performance Fee Period in respect of any Series will be the period commencing on the date such Series is issued and ending on the next following 31 March, 30 June, 30 September or 31 December.

*Prohibited Person* means any person who is restricted or prevented from owning Shares either directly or indirectly in accordance with the terms on which the Shares are offered for issue.

*Proscribed Powers* means the powers to: (a) amend this Memorandum or the Articles; (b) designate committees of directors; (c) delegate powers to a committee of directors; (d) appoint or remove directors; (e) appoint or remove an agent; (f) approve a plan of merger, consolidation or arrangement; (g) make a declaration of solvency or approve a liquidation plan; or (h) make a determination that immediately after a proposed distribution the value of the Company's assets will exceed its liabilities and the Company will be able to pay its debts as they fall due.

*Redemption Day* means the first business day of January, April, July and October in each year following the initial issuance of Participating Shares and/or such other day or days as the directors may determine from time to time.

*Redemption Day* means the first Business Day of January, April, July and October in each year following the initial issuance of Participating Shares and/or such other day or days as the directors may determine from time to time.

*Redemption Price* means the price per Share at which a Participating Share of any Class or Series shall be redeemed determined in accordance with the Articles.

*Redemption Request* means a request for the redemption of Participating Shares in writing (in such form or subject to such conditions as prescribed by the directors or their authorised agent) from a Shareholder specifying the number, Class and, if applicable, Series registered in the Shareholder's name to be redeemed.

5

**Registrar** means the Registrar of Corporate Affairs appointed under section 229 of the Act.

**Resolution of Directors** means either:

(a)     a resolution approved at a duly convened and constituted meeting of directors of the Company by the affirmative vote of a majority of the directors present at the meeting who voted except that where a director is given more than one vote, he shall be counted by the number of votes he casts for the purpose of establishing a majority; or

(b)     a resolution consented to in writing by all directors or by all members of a committee of directors of the Company, as the case may be.

**Resolution of Shareholders** means either:

(a)     a resolution approved at a duly convened and constituted meeting of the Shareholders by the affirmative vote of a majority of the votes of the Shares entitled to vote thereon which were present at the meeting and were voted; or

(b)     a resolution consented to in writing by a majority of the votes of the Shares entitled to vote on such resolution.

**Restricted Class** means the Class Restricted A Shares and any other Class so designated by the directors or their authorised agent.

**Restricted Person** means, as to any New Issue Security, any person to whom the sale of that New Issue Security would be restricted under the Rule and any person whom the directors determine to treat as a person to whom the sale of that New Issue Security would be restricted under the Rule pursuant to the Articles.

**Restricted Share** means a Share in a Restricted Class.

**Rule** means Rule 5130 (Restrictions on the Purchase and Sale of Initial Equity Public Offerings) of the Financial Industry Regulatory Authority, Inc. (FINRA) rulebook, as amended from time to time.

**Seal** means any seal that has been duly adopted as the common seal of the Company.

**Series** means a series of any Class designated by the directors pursuant to the Articles.

**Share** means a share issued or to be issued by the Company of any Class or Series.

**Shareholder** means a person whose name is entered in the register of members of the Company as the holder of one or more Shares or fractional Shares.

**Shareholder Caused Liability** means, in respect of any Shareholder, any liability which in the opinion of the directors is attributable to the representations, actions or inactions (directly or indirectly) of such Shareholder or arises as a consequence (directly or indirectly) of the relevant Shareholder holding Participating Shares, and for this purpose **liability** includes:

6

(a)     any liability, cost, expense, tax, withholding or deduction incurred or suffered by the Company or that in the opinion of the directors will be incurred or suffered by the Company;

(b)     any deduction or withholding which the Company is required to make in respect of the Shareholder;

including, in either case, those arising in connection with the AEOI Legislation and where a liability is attributable to more than one Shareholder, such liability may be allocated between the relevant Shareholders in such manner as the directors may determine.

*Unrestricted Class* means the Class A Shares and any other Class so designated by the directors or their authorised agent.

*Unrestricted Share* means a Share in an Unrestricted Class.

*Valuation Day* means close of business on the last Business Day in each month or such other time and date or dates as the directors may determine from time to time.

*written* or any term of like import includes information generated, sent, received or stored by electronic, electrical, digital, magnetic, optical, electromagnetic, biometric or photonic means, including electronic data interchange, electronic mail, telegram, telex or telecopy, and in writing shall be construed accordingly.

10.2    In this Memorandum and the Articles, unless the context otherwise requires, a reference to:

(a)     a *Regulation* is a reference to a regulation of the Articles;

(b)     a *Clause* is a reference to a clause of this Memorandum;

(c)     voting by Shareholders is a reference to the casting of the votes attached to the Shares held by the Shareholder voting;

(d)     the Act, this Memorandum or the Articles is a reference to the Act or those documents as amended or, in the case of the Act any re-enactment thereof;

(e)     the singular includes the plural and vice versa;

(f)     a period of time expressed as a number of days shall be construed as a reference to a period of days which includes the day on which the period begins but does not include the day on which it ends; and

(g)     a *month* shall be construed as a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month and a reference to a period of several months shall be construed accordingly.

10.3    Any words or expressions defined in the Act bear the same meaning in this Memorandum and the Articles unless the context otherwise requires or they are otherwise defined in this Memorandum or the Articles.

10.4   Headings are inserted for convenience only and shall be disregarded in interpreting this Memorandum and the Articles.

10.5   All determinations to be made by the directors and all powers, authorities and discretions exercisable by them under this Memorandum or the Articles may be made and exercised by the directors in their sole and absolute discretion, either generally or in any particular case, subject only to any qualifications or limitations expressed in these Articles or imposed by law.

Signed for Harneys Corporate Services Limited of Craigmuir Chambers, PO Box 71, Road Town, Tortola VG1110, British Virgin Islands for the purpose of incorporating a BVI Business Company under the laws of the British Virgin Islands on 24 May 2019:

Incorporator

..............................................................

Andrew Saunders
Authorised Signatory
Harneys Corporate Services Limited

8

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**
**BVI BUSINESS COMPANIES ACT 2004**

**ARTICLES OF ASSOCIATION**
**OF**

**BK Offshore Fund Ltd.**

A Company Limited By Shares

**1      DISAPPLICATION OF THE ACT**

1.1      The following sections of the Act shall not apply to the Company:

    (a)      section 46 (*Pre-emptive rights*);

    (b)      section 60 (*Process for purchase, redemption or other acquisition of own shares*);

    (c)      section 61 (*Offer to one or more shareholders*);

    (d)      section 62 (*Shares redeemed otherwise than at the option of the company*); and

    (e)      section 175 (*Disposition of assets*).

**2      SHARES**

2.1      Unless and until the directors resolve to issue share certificates, no share certificates shall be issued, and the records of the shareholdings of each Shareholder shall be in uncertified book entry form.  If the directors do resolve to issue share certificates in respect of any one or more Classes, then every Shareholder shall be entitled, upon written request only, to a certificate signed by a director or officer of the Company, or any other person authorised by Resolution of Directors or under the Seal specifying the number of Shares held by him and the signature of the director, officer or authorised person and the Seal may be facsimiles.

2.2      Any Shareholder receiving a certificate shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of any wrongful or fraudulent use or representation made by any person by virtue of the possession thereof.  If a certificate for Shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by Resolution of Directors.

2.3      If several persons are registered as joint holders of any Shares, any one of such persons may give an effectual receipt for any distribution.

**3      ISSUE OF SHARES**

3.1      Subject to the provisions of these Articles, Shares may be issued at such times, to such persons, for such consideration and on such terms as the directors or their authorised agents may determine.

3.2    For the avoidance of doubt, the directors may issue Participating Shares from a single Class on terms which include the provision for different levels of fees to be borne by some of the Participating Shares in that Class to those being borne by other Participating Shares in the same Class and on varying liquidity terms including as to notice periods for the redemption of Participating Shares and the terms of payment of redemption proceeds, as provided in the terms of offer approved by the directors from time to time or as permitted by the Memorandum or these Articles. Such variation in the terms of issue shall not cause Participating Shares issued on such varied terms to constitute a different Class to the remaining Participating Shares in that Class. For this purpose, the Company may enter into letters of agreement with one or more Shareholders.

3.3    On the allotment of any Participating Share, the directors or their authorised agent shall:

(a)    on the first issue of each Class, designate whether the Class is a Restricted Class or an Unrestricted Class; and

(b)    designate the Class to which the Participating Share shall belong; and

(c)    designate the Series to which such Participating Share shall belong, if any.

3.4    The directors may, on such day or days as the directors may determine, make the initial issue of Participating Shares of any Class at such initial price per Participating Share as the directors may determine.

3.5    Participating Shares of any existing Class may be issued on any Dealing Day and shall be issued at such price per Participating Share as the directors shall determine provided that:

(a)    unless each Series is issued at a fixed price, the price per Participating Share shall not be less than an amount equal to the Net Asset Value per Share of the Initial Series of that Class as at the Valuation Day on or immediately prior to the Dealing Day; and

(b)    except in the case of the initial issue of any Class, no Participating Shares of the Initial Series of any Class shall be issued at any time other than on the first day of a Performance Fee Period.

3.6    Unrestricted Shares may not be issued by the Company to, and may not be held by, Restricted Persons. The directors shall make a determination regarding whether a person shall be treated as being restricted or unrestricted from having an interest in New Issue Securities under the Rule notwithstanding that such person has provided the directors with information as to such person's employment, business activities and business connections as well as those of such person's affiliates and immediate family members which purports to establish that such person is not a person to whom sale of a New Issue Security is restricted or prohibited under the Rule. Where a person fails to provide the directors with such information as to that person's employment, business activities and business connections as well as those of such person's affiliates and immediate family members to enable the directors to establish on reasonable grounds whether that person is not a person to whom sale of a New Issue Security is restricted or prohibited under the Rule, that person shall be regarded as being restricted from having an interest in New Issue Securities under the Rule.

2

3.7    Shares shall not be issued by the Company to, and may not be held by, Prohibited Persons.

3.8    No Participating Shares of any Class shall be issued during any period when the determination of Net Asset Value of such Class is suspended pursuant to Regulation 6.

3.9    Class M Shares shall be issued at an issue price determined by the directors.  No Class M Shares shall be issued subsequent to the initial issue of the Class M Shares without the unanimous consent in writing of the holders of the outstanding Class M Shares.

3.10   Unless the directors determine otherwise, as of the commencement of business on the day following the last day of each Performance Fee Period the issued and outstanding Participating Shares of each Class issued in Series other than (i) the longest designated Series of that Class in respect of which a Performance Fee has been charged in respect of the immediately preceding Performance Fee Period (such Series to be designated by the directors as the Initial Series); and (ii) any Series of that Class in respect of which no Performance Fee has been charged for the immediately preceding Performance Fee Period, shall be redeemed by the Company and the Redemption Price shall be applied by the Company towards the issue of Initial Series of Participating Shares of the same Class at their then Net Asset Value.

3.11   The Company shall keep a register of members containing:

   (a)    the names and addresses of the persons who hold Shares;

   (b)    the number of each Class and Series held by each Shareholder;

   (c)    the date on which the name of each Shareholder was entered in the register of members; and

   (d)    the date on which any person ceased to be a Shareholder.

3.12   The register of members may be in any such form as the directors may approve, but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents.  Until the directors otherwise determine, the magnetic, electronic or other data storage form shall be the original register of members.

3.13   All rights and obligations attaching to a treasury share are suspended and shall not be exercised by or against the Company while it holds the Share as a treasury share.

3.14   Treasury shares may be transferred by the Company in accordance with the provisions of this Regulation 3 as if they are newly issued Shares.

4      REDEMPTION OF SHARES

4.1    The Company may purchase, redeem or otherwise acquire its own Shares with the consent of the Shareholders whose Shares are to be purchased, redeemed or otherwise acquired and without such consent if permitted by the Act or any other provision in the Memorandum or these Articles.

3

4.2     Subject to the provisions of these Articles, the Act and to the rights attaching to any Class, and subject also to receipt by the Company or its authorised agent of a valid Redemption Request, Participating Shares shall be redeemable at the option of a Shareholder on and with effect from any Redemption Day.

4.3     Redemption Requests must be received by the Company or its authorised agent at least 30 calendar days prior to the relevant Redemption Day and all conditions as to the validity of the Redemption Request must be fulfilled prior to the relevant Redemption Day.  Notwithstanding the foregoing, the directors or their authorised agent may waive such notice period and other conditions, if any, whether in whole or in part and whether in respect of one or more Shareholders.  The conditions as to the validity of the Redemption Request may stipulate a time after which the Redemption Request will be deemed to have been received on the next following Business Day.  Subject to Regulation 4.5, unless the directors consent to the withdrawal of a Redemption Request made in accordance with these Articles, the Shareholder shall not be entitled to withdraw such Redemption Request.

4.4     Where share certificates have been issued in respect of the Shares being redeemed the Shareholder shall lodge such certificates with the Company or its authorised agent for cancellation upon the redemption of such Shares.  The directors may waive the requirement to lodge a certificate which shall have become lost or destroyed upon compliance by the Shareholder with the like requirements to those applying in the case of an application by him for replacement of a lost or destroyed certificate under Regulation 2.2.

4.5     The Company, its directors and agents may rely upon any Redemption Request believed by them in good faith to be genuine.

4.6     The redemption of Participating Shares of any Class may be suspended pursuant to Regulation 6.  A Shareholder who has made a Redemption Request for redemption on and with effect from a Redemption Day which occurs during a period of suspension of redemptions of the relevant Class may withdraw such Redemption Request and such withdrawal shall be effective if received by the Company prior to the termination of the period of suspension. Subject to these Articles, Participating Shares for which a Redemption Request is made and not withdrawn shall be redeemed on the first Redemption Day following the termination of the suspension period.

4.7     A Redemption Request shall not be satisfied where such Redemption Request relates to:

        (a)     a number of Participating Shares fewer than such number as the directors may determine from time to time; or

        (b)     Participating Shares having an aggregate value by reference to their Net Asset Value per Share of less than such amount as the directors may determine from time to time.

4.8     If a Redemption Request is received from a Shareholder which would, if satisfied, result in such Shareholder holding:

        (a)     a number of Participating Shares fewer than such number as the directors may determine from time to time; or

4

(b)     Participating Shares having an aggregate value by reference to the Net Asset Value per Share of less than such amount as the directors may determine from time to time,

the directors may treat such Redemption Request as a request for the redemption of all the Participating Shares held by such Shareholder or as a request for a partial redemption that would result in the Shareholder continuing to hold such minimum number or amount as has been determined by the directors.

4.9     The Redemption Price of a Participating Share being redeemed shall be the Net Asset Value per Share of the Series to which that Participating Share belongs calculated as at the Valuation Day immediately preceding the Redemption Day on which such Share is to be redeemed, adjusted in accordance with these Articles.

4.10    The directors may adjust the Redemption Price by applying a redemption charge of such amount as they may determine from time to time on the redemption of Participating Shares of any Class or Series. The amount of such charge shall be deducted from the relevant redemption proceeds. Such charge may be waived in whole or in part by the directors. Such charge may be paid to the Company or to such other person as the directors may determine.

4.11    The Company may adjust the Redemption Price by holding back from the redemption proceeds payable to a redeeming Shareholder an amount equivalent to any Shareholder Caused Liability. The amount held back shall be retained for the benefit of the Company and may be used to discharge any obligation imposed on the Company as a consequence (directly or indirectly) of such Shareholder holding Participating Shares. The redeeming Shareholder shall have no claim against the Company in respect of any amount held back. However, any amount held back which the directors determine is no longer required to satisfy the relevant Shareholder Caused Liability shall be paid to the relevant Shareholder.

4.12    On any redemption of a Share in accordance with these Articles the directors shall have the power to divide in specie the whole or any part of the assets of the Company and appropriate such assets in satisfaction or part satisfaction of the Redemption Price (an *In Kind Redemption*) at any time up to the actual payment of the Redemption Price. The directors or their authorised agents shall determine the assets to comprise an In Kind Redemption and there shall be no obligation to select any one or more specific assets in respect of an In Kind Redemption.

4.13    The value of any asset included or to be included in any In Kind Redemption shall be the value of such asset determined in accordance with Regulation 5.4 as at the applicable Redemption Day for the redemption of such Participating Shares being redeemed.

4.14    In the event that a redeeming Shareholder fails or refuses to take receipt of any or all of the assets comprising an In Kind Redemption, the Company shall be entitled to deposit such assets with a third party to be determined by the directors or to hold such assets on behalf of such Shareholder, or redeemed Shareholder as the case may be, without any duty on the Company, the directors or any agent of the Company, to manage such assets other than to ensure their bare custody. Any fees or expenses incurred in the custody of such assets, including reasonable fees of the Company not to exceed the amount of any management fee charged to assets of the Company plus any disbursements incurred by the Company, shall be borne by and deducted from the assets as determined by the directors. The directors may compel the sale of such

assets at a discount, on commercially reasonable terms, in order to satisfy any fees or expenses incurred or charged by the Company in respect of the custody of such assets.

4.15    Upon the redemption of a Participating Share, the holder of such Participating Share shall cease to have any rights with respect thereto, except the right to receive the Redemption Price payable pursuant to Regulation 4.9 and the right to receive any dividend declared but unpaid prior to the relevant Redemption Day. From the Redemption Day, the former Shareholder shall rank as an unsecured creditor of the Company in respect of such Redemption Price and any declared but unpaid dividends and, for the avoidance of doubt, such rights and interests of a former Shareholder in the Company shall rank ahead of the rights and interests of each continuing Shareholder conferred on him by virtue of his continued holding of Participating Shares in the distribution of the surplus assets of the Company on its liquidation.

4.16    Where the directors have resolved pursuant to Regulation 2.1 to issue share certificates in respect of any Shares, on redemption or purchase of only part of such Shares, the directors shall, if so requested by the Shareholder, procure a share certificate in respect of the balance of such Shares to be sent to the Shareholder or as he shall direct.

4.17    Any amount due to a Shareholder in connection with the redemption of Participating Shares:

(a)    shall be paid in US Dollars, or such other currency as the directors may determine, in such manner or on such terms as the directors may determine and may, upon the Shareholder's request, be transferred at his expense by wire transfer;

(b)    may be satisfied by the transfer of assets of the Company in accordance with Regulation 4.12; or

(c)    may be satisfied partly in cash and partly by the transfer of other assets of the Company in accordance with Regulation 4.12.

4.18    The Company may suspend payment of redemption proceeds when:

(a)    the directors have declared a suspension pursuant to the provisions of Regulation 6; or

(b)    if the directors suspect or are advised that the payment of the redemption proceeds may result in a breach of any applicable laws or regulations in any relevant jurisdiction.

4.19    The directors may by notice in writing at any time require a Shareholder holding Unrestricted Shares to provide acceptable evidence that such Shareholder is not a Restricted Person. If such Shareholder does not respond or does not provide evidence acceptable to the directors within the time period specified by the directors in the notice, the directors may by further notice redeem compulsorily the Unrestricted Shares of such Shareholder as of the date specified in such second notice (the effective date) at the Net Asset Value per Share of the Unrestricted Shares being redeemed calculated as at the effective date and shall apply the proceeds of the redemption of such Unrestricted Shares to the allotment of Restricted Shares. The directors shall issue such number of Restricted Shares to the Shareholder as may be allotted at the Net Asset Value per Share of the Restricted Shares on the effective date using all the proceeds of the redemption of the Restricted Shares. Each Shareholder authorises the Company to make such redemption and purchase and irrevocably appoints the Company as its agent for such purpose.

6

4.20 Subject to Regulations 4.21 and 4.22, the Company may, as determined by the directors and without assigning any reason, redeem compulsorily (without the consent of the holder of the relevant Shares) all or a portion of the Shares of any Shareholder.

4.21 The Company may not compulsorily redeem Participating Shares of a particular Class pursuant to Regulation 4.20 during any period that the determination of the Net Asset Value of that Class is suspended pursuant to Regulation 6.1(a), but may compulsorily redeem such Participating Shares where the redemption of Participating Shares of that Class is suspended pursuant to Regulation 6.1(b) but a simultaneous suspension of the determination of the Net Asset Value of such Class has not been declared.

4.22 Redemption of Participating Shares pursuant to Regulation 4.20 shall be made in the following manner:

  (a) not less than 10 calendar days notice of the compulsory redemption shall be sent to the Shareholder at his address as shown in the register of members of the Company or as provided to the Company specifying the date of redemption, unless the redemption is undertaken in contemplation of a merger or consolidation, in which case no notice is required; and

  (b) an amount equal to the aggregate Redemption Price determined in accordance with Regulation 4.9 as at the date of redemption of the Participating Shares being redeemed, less any further amount which the directors may reasonably deduct in respect of the costs and expenses of the Company incurred in connection with such redemption, shall be sent to such Shareholder by such means as the directors deem appropriate as soon as reasonably practicable after the date of redemption.

4.23 The Company shall be entitled to compulsorily require any Shareholder to exchange Participating Shares of any Class or Series for Participating Shares of any other Class or Series at any time upon such terms as the directors may determine which may include but is not limited to circumstances where such exchange is necessary or desirable to (i) comply with any applicable law or regulation, or (ii) ensure that any Shareholder Caused Liabilities are allocated equitably. Participating Shares shall be exchanged by way of redemption of the Participating Shares to be exchanged and the use of such redemption proceeds to subscribe for Participating Shares of the relevant Series in the relevant Class or Classes.

4.24 Shares that the Company purchases, redeems or otherwise acquires shall be cancelled or held as treasury shares provided that the number of Shares purchased, redeemed or otherwise acquired and held as treasury shares, when aggregated with Shares of the same Class already held by the Company as treasury shares, may not exceed 50 per cent of the Shares of that Class previously issued by the Company excluding shares that have been cancelled. Shares which have been cancelled shall be available for reissue.

4.25 Notwithstanding any other provision of these Articles, the directors may waive any notice period, redemption fee, minimum holding requirement or any other restriction or conditions applicable to the redemption of Participating Shares, if any, whether in whole or in part and whether in respect of one or more Shareholders.

**5      DETERMINATION OF NET ASSET VALUE**

5.1     The Net Asset Value of the Company shall be determined by or under the direction of the directors or by the Company's authorised agent as at each applicable Valuation Day, and shall be the value as at such date of all the assets of the Company (including interest and dividends accrued) less all the liabilities of the Company (including accrued expenses), calculated on the basis of this Regulation 5.

5.2     The Net Asset Value of a Class or Series shall be determined by or under the direction of the directors or by the Company's authorised agent as at each applicable Valuation Day, and shall be the value as at such date of all the assets of the Company (including interest and dividends accrued) attributable to the Class or Series, less all the liabilities of the Company (including accrued expenses) attributable to the Class or Series, calculated on the basis of this Regulation 5 and ascertained with reference to the Investment Accounts established and maintained for that Class or Series in accordance with Regulations 21.6 to 21.9.

5.3     The Net Asset Value per Share attributable to a Series shall be determined by or under the direction of the directors or by the Company's authorised agent as at each applicable Valuation Day, and shall be the Net Asset Value of the Series divided by the number of Shares of such Series then outstanding calculated in accordance with Regulation 5.7. Where Shares are not issued in separate Series, all the Shares in the same Class shall be treated as having been issued in a single Series for the purposes of this Regulation.

5.4     The value of the assets and liabilities of the Company shall be determined in accordance with the valuation policies and procedures adopted by the Company from time to time.

5.5     For the purposes of calculation of the Net Asset Value of the Company and the Net Asset Value of a Class or Series, unless the directors determine otherwise:

        (a)     the price for Shares for which applications have been made to the Company (less commissions, if any, and less any other duties and charges payable by the Company in connection with their issuance) shall be deemed to be an asset of the Company at the commencement of business on the Dealing Day on which such Shares are deemed to be in issue;

        (b)     the price for Shares in the Company to be redeemed shall, from the close of business on the Redemption Day on which they are actually redeemed until the Redemption Price is paid be deemed to be a liability of the Company;

        (c)     investments, cash balances and other assets of the Company shall be valued and liabilities of the Company shall be calculated in US Dollars and if not initially expressed in US Dollars, after taking into account such rate of exchange as the directors shall consider appropriate. A certificate of a custodian provided to the directors as to the exchange rate applicable in any particular case may be relied upon by the directors and, if relied upon, shall be conclusive and binding on all persons, except in cases of manifest error;

        (d)     any expense or liability may be amortised over such period as the directors may determine;

8

(e)     administrative and other expenses of a regular or recurring nature may be calculated on an estimated figure for yearly or other periods in advance and accrue the same in equal proportions over any such period and may establish such reserves or holdbacks for contingent liabilities as the directors or their authorised agent determine appropriate.

5.6     Any determinations made pursuant to Regulation 5 shall be binding on all persons.

5.7     For the purpose of calculating the number of Shares in issue and deemed to be in issue for purposes of this Regulation 5:

    (a)     Shares for which applications have been made pursuant to Regulation 3.1 shall be deemed to be in issue at the commencement of business on the Dealing Day on which they are allotted; and

    (b)     Shares to be redeemed in accordance with these Articles shall be deemed to remain in issue through the close of business on the Redemption Day on which they are actually redeemed.

## 6     SUSPENSIONS

6.1     The directors may declare a suspension of:

    (a)     the determination of the Net Asset Value per Share of any one or more Classes and any such suspension must be combined with a simultaneous suspension of the redemption of Participating Shares of such Class or Classes and may (but need not) be combined with a suspension of the payment of redemption proceeds;

    (b)     the redemption of Participating Shares of any one or more Classes and may (but need not) combine such a suspension with a simultaneous suspension of the determination of the Net Asset Value per Share of such Class or Classes and/or a simultaneous suspension of the redemption proceeds; and/or

    (c)     the payment or redemption proceeds.

6.2     The directors may declare a suspension in accordance with Regulation 6.1 in such circumstances as they may deem appropriate, including the whole or any part of any period:

    (a)     during which any securities exchange or similar electronic system on which a substantial part of the assets of the Company are traded is closed (other than customary closings) or dealings are otherwise restricted or suspended;

    (b)     during which, in the opinion of the directors, it is not possible to determine the value of a substantial portion of the assets of the Company or the disposal of a substantial part of the assets of the Company would not be reasonably practicable or could not be carried out in an orderly manner;

    (c)     during which redemption proceeds cannot lawfully be paid by the Company in the currency of the relevant Class;

(d)     during which, due to a breakdown in the systems normally used to determine the Net Asset Value or for any other reason, it is not reasonably practicable to accurately determine the Net Asset Value;

(e)     during which the business operations of the functionaries to the Company are substantially interrupted or closed due to pestilence, acts of war, terrorism, insurrection, revolution, civil unrest, riot, strikes, cyber attack, natural disaster or other events beyond the reasonable control of the relevant party;

(f)     during which the proceeds of the sale or redemption of Participating Shares cannot be transmitted to or from the Company's account;

(g)     when, in the opinion of the directors, it would be in the best interests of the Company to do so; or

(h)     after the directors form the opinion that it is in the best interest of the Company or the Shareholders to wind up and dissolve the Company.

6.3     Any suspension of the determination of Net Asset Value shall be publicised by the directors in such manner as they may deem appropriate to the persons likely to be affected by it.

6.4     Any suspension declared pursuant to this Regulation shall take effect at such time as the directors shall determine and shall continue until the directors shall declare the suspension to be at an end.

6.5     Whenever the directors declare a suspension under the provisions of these Articles the directors shall, as soon as may be practicable after any such declaration, give notice of the suspension to the affected Shareholder or Shareholders. At the end of any period of suspension the directors shall give notice to the affected Shareholder or Shareholders stating that the period of suspension has ended. Any such notice may be given in such manner as the directors determine.

## 7     MORTGAGES AND CHARGES OF SHARES

7.1     Shares may only be mortgaged or charged with the prior written consent of the directors, as evidenced by a Resolution of Directors, which consent may be withheld or made subject to such conditions as the directors may determine.

7.2     Where a Share is mortgaged or charged with the consent of the directors, there shall be entered in the register of members at the written request of the Shareholder:

(a)     a statement that the Shares held by him are mortgaged or charged;

(b)     the name of the mortgagee or chargee; and

(c)     the date on which the particulars specified in sub-paragraphs (a) and (b) are entered in the register of members.

7.3     Where particulars of a mortgage or charge are entered in the register of members, such particulars may be cancelled:

10

(a)     with the written consent of the named mortgagee or chargee or anyone authorised to act on his behalf; or

(b)     upon evidence satisfactory to the directors of the discharge of the liability secured by the mortgage or charge and the issue of such indemnities as the directors shall consider necessary or desirable.

7.4     Whilst particulars of a mortgage or charge over Shares are entered in the register of members pursuant to this Regulation:

(a)     no transfer of any Share the subject of those particulars shall be effected without the written consent of the named mortgagee or chargee;

(b)     the Company shall not purchase, redeem or otherwise acquire any such Share without giving not less than five Business Days written notice to the named mortgagee or chargee; and

(c)     no replacement certificate shall be issued in respect of such Shares without the written consent of the named mortgagee or chargee.

**8       FORFEITURE**

8.1     Shares that are not fully paid on issue are subject to the forfeiture provisions set forth in this Regulation and for this purpose Shares issued for a promissory note, other written obligation to contribute money or property or a contract for future services are deemed to be not fully paid.

8.2     A written notice of call specifying the date for payment to be made shall be served on the Shareholder who defaults in making payment in respect of the Shares.

8.3     The written notice of call referred to in Regulation 8.2 shall name a further date not earlier than the expiration of fourteen days from the date of service of the notice on or before which the payment required by the notice is to be made and shall contain a statement that in the event of non-payment at or before the time named in the notice the Shares, or any of them, in respect of which payment is not made will be liable to be forfeited.

8.4     Where a written notice of call has been issued pursuant to Regulation 8.3 and the requirements of the notice have not been complied with, the directors may, at any time before tender of payment, forfeit and cancel the Shares to which the notice relates.

8.5     The Company is under no obligation to refund any moneys to the Shareholder whose Shares have been cancelled pursuant to Regulation 8.4 and that Shareholder shall be discharged from any further obligation to the Company.

**9       TRANSFER OF SHARES**

9.1     Shares may only be transferred with the prior written consent of the directors or their authorised agent which consent may be withheld or made subject to such conditions as the directors may determine.

9.2  Subject to Regulation 9.1, Shares may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, which shall be sent to the Company for registration.

9.3  The transfer of a Share is effective when the name of the transferee is entered on the register of members.

9.4  If the directors of the Company are satisfied that an instrument of transfer relating to Shares has been signed but that the instrument has been lost or destroyed, they may resolve by a Resolution of Directors:

(a)  to accept such evidence of the transfer of Shares as they consider appropriate; and

(b)  that the transferee's name should be entered in the register of members notwithstanding the absence of the instrument of transfer.

9.5  The personal representative of a deceased Shareholder may transfer a Share even though the personal representative is not a Shareholder at the time of the transfer.

10  **MEETINGS AND CONSENTS OF SHAREHOLDERS**

10.1  Any director of the Company may convene meetings of the Shareholders or the holders of a Class (for the purposes of this Regulation 10, a *meeting*) at such times and in such manner and places within or outside the British Virgin Islands as the director considers necessary or desirable.

10.2  Upon the written request of one or more Shareholders entitled to exercise 30 per cent or more of the voting rights in respect of the matter for which the meeting is requested the directors shall convene a meeting of Shareholders.

10.3  The director convening a meeting shall give not less than seven days' notice of a meeting of Shareholders to:

(a)  those Shareholders whose names on the date the notice is given appear as Shareholders in the register of members of the Company and are entitled to vote at the meeting; and

(b)  the other directors.

10.4  The director convening a meeting of Shareholders may fix as the record date for determining those Shareholders that are entitled to vote at the meeting the date notice is given of the meeting, or such other date as may be specified in the notice, being a date not earlier than the date of the notice.

10.5  A meeting of Shareholders held in contravention of the requirement to give notice is valid if Shareholders holding at least 90 per cent of the total voting rights on all the matters to be considered and voted on at the meeting, have waived notice of the meeting and, for this purpose, the presence of a Shareholder at the meeting shall constitute waiver in relation to all the Shares which that Shareholder holds.

12

10.6     The inadvertent failure of the director who convenes a meeting to give notice of a meeting to a Shareholder or another director, or the fact that a Shareholder or another director has not received notice, does not invalidate the meeting.

10.7     A Shareholder may be represented at a meeting by a proxy who may speak and vote on behalf of the Shareholder.

10.8     The instrument appointing a proxy shall be produced at the place designated for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.   The notice of the meeting may specify an alternative or additional place or time at which the proxy shall be presented.   The directors may accept a copy of an instrument appointing a proxy or such other evidence of its existence as they see fit in lieu of the original.

10.9     The instrument appointing a proxy shall be in such form as the directors from time to time approve or as the chairman of the meeting shall accept as properly evidencing the wishes of the Shareholder appointing the proxy.

10.10    The following applies where Shares are jointly owned:

         (a)      if two or more persons hold Shares jointly each of them may be present in person or by proxy at a meeting and may speak as a Shareholder;

         (b)      if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners; and

         (c)      if two or more of the joint owners are present in person or by proxy they must vote as one.

10.11    A Shareholder or his proxy or (in the case of a Shareholder that is not an individual) an authorised representative shall be deemed to be present at a meeting if he participates by telephone or other electronic means and all Shareholders, proxies and (in the case of Shareholders that are not individuals) authorised representatives participating in the meeting are able to hear each other.

10.12    A meeting of Shareholders is duly constituted if, at the commencement of the meeting, there are present in person or by proxy the holders of not less than 25 per cent of the Shares entitled to be voted on the matters to be considered at the meeting.   A quorum may comprise a single Shareholder or proxy and then such person may pass a Resolution of Shareholders or a resolution of the holders of a Class and a certificate signed by such person accompanied where such person be a proxy by a copy of the proxy instrument shall constitute a valid Resolution of Shareholders or a resolution of the holders of a Class.

10.13    If within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved; in any other case it shall stand adjourned to the next business day in the jurisdiction in which the meeting was to have been held at the same time and place or to such other time and place as the directors may determine, and if at the adjourned meeting there are present within one hour from the time appointed for the meeting in person or by proxy the holders of not less than 10 per cent. of the

13

votes of the Shares entitled to vote on the matters to be considered and voted on at the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved.

10.14   At every meeting of Shareholders, the chairman of the board shall preside as chairman of the meeting. If there is no chairman of the board or if the chairman of the board is not present at the meeting, the Shareholders present shall choose one of their number to be the chairman. If the Shareholders are unable to choose a chairman for any reason, then the person representing the greatest number of voting Shares present in person or by proxy at the meeting shall preside as chairman failing which the oldest individual Shareholder or representative of a Shareholder present shall take the chair.

10.15   The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

10.16   At any meeting of Shareholders the chairman is responsible for deciding in such manner as he considers appropriate whether any resolution proposed has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes of the meeting. If the chairman has any doubt as to the outcome of the vote on a proposed resolution, he shall cause a poll to be taken of all votes cast upon such resolution. If the chairman fails to take a poll then any Shareholder present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall cause a poll to be taken. If a poll is taken at any meeting, the result shall be announced to the meeting and recorded in the minutes of the meeting.

10.17   Any Shareholder that is not an individual may authorise such individual as it thinks fit to act as its representative at any meeting and the individual so authorised shall be entitled to exercise the same rights on behalf of the Shareholder which he represents as that Shareholder could exercise if it were an individual. For the purposes of this Regulation 10, a Shareholder that is not an individual shall be deemed to be present in person at a meeting if they are represented at such meeting by an authorised representative. The Company shall be entitled to assume that the relevant Shareholder has taken all necessary corporate action in authorising such individual to exercise all rights of the Shareholder.

10.18   The chairman of any meeting at which a vote is cast by proxy or on behalf of any Shareholder that is not an individual may call for the original proxy or authority or a copy of such proxy or authority (certified in such manner as the chairman may reasonably require) which shall be produced within seven days of being so requested or the votes cast by such proxy or on behalf of such Shareholder shall be disregarded.

10.19   Directors of the Company may attend and speak at any meeting of Shareholders and at any separate meeting of the holders of any Class or Series.

10.20   An action that may be taken by the Shareholders at a meeting may also be taken by a resolution consented to in writing, without the need for any notice, but if any Resolution of Shareholders is adopted otherwise than by the unanimous written consent of all Shareholders entitled to vote on such action, a copy of such resolution shall forthwith be sent to all such Shareholders not consenting to such resolution. The consent may be in the form of counterparts, each counterpart being signed by one or more Shareholders. If the consent is in one or more

14

counterparts, and the counterparts bear different dates, then the resolution shall take effect on the earliest date upon which Shareholders holding a sufficient number of votes of Shares to constitute a Resolution of Shareholders or resolution of the holders of a Class have consented to the resolution by signed counterparts.

**11    DIRECTORS**

11.1   The first director or directors of the Company shall be appointed by the first registered agent within six months of the date of the incorporation of the Company; and thereafter, the directors shall be elected by Resolution of Shareholders or by Resolution of Directors.  If, before the Company has any Shareholders, all of the directors appointed by the registered agent resign or die or otherwise cease to exist, the registered agent may appoint one or more further persons as directors of the Company.

11.2   No person shall be appointed as a director or alternate director, or nominated as a reserve director, of the Company unless he has consented in writing to be a director or alternate director or to be nominated as a reserve director.

11.3   Subject to Regulation 11.1, the minimum number of directors shall be one and there shall be no maximum number.

11.4   Each director holds office for the term, if any, fixed by the Resolution of Shareholders or Resolution of Directors appointing him, or until his earlier death, resignation or removal.  If no term is fixed on the appointment of a director, the director serves indefinitely until his earlier death, resignation or removal.

11.5   A director may be removed from office:

   (a)    with or without cause, by Resolution of Shareholders passed at a meeting of Shareholders called for the purpose of removing the director or for purposes including the removal of the director or by a written resolution passed by at least 75 per cent of the votes of the Shares of the Company entitled to vote thereon; or

   (b)    with cause, by Resolution of Directors passed at a meeting of directors called for the purpose of removing the director or for purposes including the removal of the director.

11.6   A director may resign his office by giving written notice of his resignation to the Company and the resignation has effect from the date the notice is received by the Company or from such later date as may be specified in the notice.  A director shall resign forthwith as a director if he is, or becomes, disqualified from acting as a director under the Act.

11.7   The directors may at any time appoint any person to be a director either to fill a vacancy or as an addition to the existing directors.  Where the directors appoint a person as director to fill a vacancy, the term shall not exceed the term that remained when the person who has ceased to be a director ceased to hold office.

11.8   A vacancy in relation to directors occurs if a director dies or otherwise ceases to hold office prior to the expiration of his term of office.

15

11.9    The Company shall keep a register of directors containing:

(a)    the names and addresses of the persons who are directors of the Company or who have been nominated as reserve directors of the Company;

(b)    the date on which each person whose name is entered in the register was appointed as a director, or nominated as a reserve director, of the Company;

(c)    the date on which each person named as a director ceased to be a director of the Company;

(d)    the date on which the nomination of any person nominated as a reserve director ceased to have effect; and

(e)    such other information as may be prescribed by the Act.

11.10    The register of directors may be kept in any such form as the directors may approve, but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents.  Until a Resolution of Directors determining otherwise is passed, the magnetic, electronic or other data storage shall be the original register of directors.

11.11    The directors may fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

11.12    A director is not required to hold a Share as a qualification to office.

12    POWERS OF DIRECTORS

12.1    The business and affairs of the Company shall be managed by, or under the direction or supervision of, the directors of the Company.  The directors of the Company have all the powers necessary for managing, and for directing and supervising, the business and affairs of the Company.  The directors may exercise all such powers of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by the Shareholders.  The directors may pay and be reimbursed by the Company all expenses incurred preliminary to and in connection with the incorporation of the Company.

12.2    Each director shall exercise his powers for a proper purpose and shall not act or agree to the Company acting in a manner that contravenes the Memorandum, these Articles or the Act.  Each director, in exercising his powers or performing his duties, shall act honestly and in good faith in what the director believes to be the best interests of the Company.

12.3    Any director which is a body corporate may appoint any individual its duly authorised representative for the purpose of representing it at meetings of the directors, with respect to the signing of consents or otherwise.

12.4    The continuing directors may act notwithstanding any vacancy in their body.

16

12.5    The directors may by Resolution of Directors exercise all the powers of the Company to incur indebtedness, liabilities or obligations and to secure indebtedness, liabilities or obligations whether of the Company or of any third party.

**13      PROCEEDINGS OF DIRECTORS**

13.1    Any one director of the Company may call a meeting of the directors by sending a written notice to each other director.

13.2    The directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the directors may determine to be necessary or desirable.

13.3    A director is deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

13.4    A director shall be given reasonable notice of meetings of directors, but a meeting of directors held without reasonable notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting who do not attend waive notice of the meeting, and for this purpose the presence of a director at a meeting shall constitute waiver by that director.  The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

13.5    A director of the Company (the *appointing director*) may appoint any other director or any other eligible person as his alternate to exercise the appointing director's powers and carry out the appointing director's responsibilities in relation to the taking of decisions by the directors in the absence of the appointing director.

13.6    The appointment and termination of an alternate director must be in writing, and written notice of the appointment and termination must be given by the appointing director to the Company as soon as reasonably practicable.

13.7    An alternate director has the same rights as the appointing director in relation to any directors' meeting and any written resolution circulated for consent.  An alternate director has no power to appoint a further alternate, whether of the appointing director or of the alternate director, and the alternate does not act as agent for the appointing director.

13.8    The appointing director may, at any time, voluntarily terminate the alternate director's appointment.  The voluntary termination of the appointment of an alternate shall take effect from the time when written notice of the termination is given to the Company.  The rights of an alternate shall automatically terminate if the appointing director dies or otherwise ceases to hold office.

13.9    A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than two directors.

13.10   If the Company has only one director the provisions herein contained for meetings of directors do not apply and such sole director has full power to represent and act for the Company in all matters as are not by the Act, the Memorandum or these Articles required to be exercised by the

Shareholders.  In lieu of minutes of a meeting the sole director shall record in writing and sign a note or memorandum of all matters requiring a Resolution of Directors.  Such a note or memorandum constitutes sufficient evidence of such resolution for all purposes.

13.11   The directors may appoint a director as chairman of the board of directors.  At meetings of directors at which the chairman of the board is present, he shall preside as chairman of the meeting.  If there is no chairman of the board or if the chairman of the board is not present, the directors present shall choose one of their number to be chairman of the meeting.

13.12   An action that may be taken by the directors or a committee of directors at a meeting may also be taken by a resolution consented to in writing by all directors or by all members of the committee, as the case may be, without the need for any notice.  The consent may be in the form of counterparts each counterpart being signed by one or more directors.  If the consent is in one or more counterparts, and the counterparts bear different dates, then the resolution shall take effect on the date upon which the last director has consented to the resolution by signed counterparts.

## 14      COMMITTEES

14.1    The directors may, by Resolution of Directors, designate one or more committees, each consisting of one or more directors, and delegate one or more of their powers, including the power to affix the Seal, to the committee.

14.2    The directors have no power to delegate to a committee of directors any of the Proscribed Powers.

14.3    A committee of directors, where authorised by the Resolution of Directors appointing such committee or by a subsequent Resolution of Directors, may appoint a sub-committee and delegate powers exercisable by the committee to the sub-committee.

14.4    The meetings and proceedings of each committee of directors consisting of two or more directors shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of directors so far as the same are not superseded by any provisions in the Resolution of Directors establishing the committee.

14.5    Where the directors delegate their powers to a committee of directors they remain responsible for the exercise of that power by the committee, unless they believed on reasonable grounds at all times before the exercise of the power that the committee would exercise the power in conformity with the duties imposed on directors of the Company under the Act.

## 15      OFFICERS AND AGENTS

15.1    The Company may, by Resolution of Directors appoint officers of the Company at such times as may be considered necessary or expedient.  The officers shall perform such duties as are prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by Resolution of Directors.

15.2    The emoluments of all officers shall be fixed by Resolution of Directors.

18

15.3   The officers of the Company shall hold office until their successors are duly appointed, but any officer elected or appointed by the directors may be removed at any time, with or without cause, by Resolution of Directors.  Any vacancy occurring in any office of the Company may be filled by Resolution of Directors.

15.4   The directors may, by Resolution of Directors, appoint any person, including a person who is a director, to be an agent of the Company.

15.5   An agent of the Company shall have such powers and authority of the directors, including the power and authority to affix the Seal, as are set forth in these Articles or in the Resolution of Directors appointing the agent, except that no agent has any power or authority with respect to the following:

(a)   the Proscribed Powers;

(b)   to change the registered office or agent;

(c)   to fix emoluments of directors; or

(d)   to authorise the Company to continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands.

15.6   The Resolution of Directors appointing an agent may authorise the agent to appoint one or more substitutes or delegates to exercise some or all of the powers conferred on the agent by the Company.

15.7   The directors may remove an agent appointed by the Company and may revoke or vary a power conferred on him.

16   **CONFLICT OF INTERESTS**

16.1   A director of the Company shall, forthwith after becoming aware of the fact that he is interested in a transaction entered into or to be entered into by the Company, disclose the interest to all other directors of the Company.

16.2   For the purposes of Regulation 16.1, a disclosure to all other directors to the effect that a director is a member, director or officer of another named entity or has a fiduciary relationship with respect to the entity or a named individual and is to be regarded as interested in any transaction which may, after the date of the entry into the transaction or disclosure of the interest, be entered into with that entity or individual, is a sufficient disclosure of interest in relation to that transaction.

16.3   A director of the Company who is interested in a transaction entered into or to be entered into by the Company may:

(a)   vote on a matter relating to the transaction;

(b)   attend a meeting of directors at which a matter relating to the transaction arises and be included among the directors present at the meeting for the purposes of a quorum; and

19

(c)     sign a document on behalf of the Company, or do any other thing in his capacity as a director, that relates to the transaction,

and, subject to compliance with the Act shall not, by reason of his office be accountable to the Company for any benefit which he derives from such transaction and no such transaction shall be liable to be avoided on the grounds of any such interest or benefit.

## 17     INDEMNIFICATION

17.1    Subject to the limitations hereinafter provided the Company shall indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who:

(a)     is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director of the Company; or

(b)     is or was, at the request of the Company, serving as a director of, or in any other capacity is or was acting for, another body corporate or a partnership, joint venture, trust or other enterprise.

17.2    The indemnity in Regulation 17.1 only applies if the person acted honestly and in good faith with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that their conduct was unlawful.

17.3    The decision of the directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful is, in the absence of fraud, sufficient for the purposes of these Articles, unless a question of law is involved.

17.4    The termination of any proceedings by any judgment, order, settlement, conviction or the entering of a *nolle prosequi* does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

17.5    Expenses, including legal fees, incurred by a director in defending any legal, administrative or investigative proceedings may be paid by the Company in advance of the final disposition of such proceedings upon receipt of an undertaking by or on behalf of the director to repay the amount if it shall ultimately be determined that the director is not entitled to be indemnified by the Company in accordance with Regulation 17.1.

17.6    Expenses, including legal fees, incurred by a former director in defending any legal, administrative or investigative proceedings may be paid by the Company in advance of the final disposition of such proceedings upon receipt of an undertaking by or on behalf of the former director to repay the amount if it shall ultimately be determined that the former director is not entitled to be indemnified by the Company in accordance with Regulation 17.1 and upon such terms and conditions, if any, as the Company deems appropriate.

17.7     The indemnification and advancement of expenses provided by, or granted pursuant to, this section is not exclusive of any other rights to which the person seeking indemnification or advancement of expenses may be entitled under any agreement, Resolution of Shareholders, resolution of disinterested directors or otherwise, both as acting in the person's official capacity and as to acting in another capacity while serving as a director of the Company.

17.8     If a person referred to in Regulation 17.1 has been successful in defence of any proceedings referred to in Regulation 17.1, the person is entitled to be indemnified against all expenses, including legal fees, and against all judgments, fines, and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings.

17.9     The Company may purchase and maintain insurance in relation to any person who is or was a director, officer or liquidator of the Company, or who at the request of the Company is or was serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability as provided in these Articles.

## 18     CORPORATE RECORDS

18.1     The Company shall keep the following documents at the office of its registered agent:

      (a)     the Memorandum and these Articles;

      (b)     the register of members, or a copy of the register of members;

      (c)     the register of directors, or a copy of the register of directors; and

      (d)     copies of all notices and other documents filed by the Company with the Registrar of Corporate Affairs in the previous ten years.

18.2     Until the directors determine otherwise by Resolution of Directors the Company shall keep the original register of members and original register of directors at the office of its registered agent.

18.3     If the Company maintains only a copy of the register of members or a copy of the register of directors at the office of its registered agent, it shall:

      (a)     within fifteen days of any change in either register, notify the registered agent in writing of the change; and

      (b)     provide the registered agent with a written record of the physical address of the place or places at which the original register of members or the original register of directors is kept.

18.4     The Company shall keep the following records at the office of its registered agent or at such other place or places, within or outside the British Virgin Islands, as the directors may determine:

      (a)     minutes of meetings and Resolutions of Shareholders and Classes of Shareholders;

(b)     minutes of meetings and Resolutions of Directors and committees of directors; and

(c)     an impression of the Seal.

18.5    Where any original records referred to in this Regulation are maintained other than at the office of the registered agent of the Company, and the place at which the original records is changed, the Company shall provide the registered agent with the physical address of the new location of the records of the Company within fourteen days of the change of location.

18.6    The records kept by the Company under this Regulation shall be in written form or either wholly or partly as electronic records complying with the requirements of the Electronic Transactions Act 2001 as from time to time amended or re-enacted.

## 19      SEAL

19.1    The Company shall have a Seal.  The Company may have more than one Seal and references herein to the Seal shall be references to every Seal that shall have been duly adopted by Resolution of Directors.  The directors shall provide for the safe custody of the Seal and for an imprint thereof to be kept at the registered office.   Except as otherwise expressly provided herein the Seal when affixed to any written instrument shall be witnessed and attested to by the signature of any one director or other person so authorised from time to time by Resolution of Directors.  Such authorisation may be before or after the Seal is affixed, may be general or specific and may refer to any number of dealings.  The directors may provide for a facsimile of the Seal and of the signature of any director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been attested to as hereinbefore described.

## 20      DISTRIBUTIONS BY WAY OF DIVIDENDS

20.1    The directors of the Company may, by Resolution of Directors, authorise a distribution by way of dividend at a time, and of an amount they think fit if they are satisfied, on reasonable grounds, that immediately after the distribution, the value of the Company's assets will exceed its liabilities and the Company will be able to pay its debts as they fall due.

20.2    Dividends may be paid in money, shares, or other property.

20.3    The directors may deduct from any distribution payable to any Shareholder (i) all sums of money, if any, then payable by the Shareholder to the Company on account of calls or otherwise, and (ii) and amount equivalent to any Shareholder Caused Liability. Any amount deducted in respect of any Shareholder Caused Liability shall be retained for the benefit of the Company and may be used to discharge any obligation imposed on the Company as a consequence (directly or indirectly) of such Shareholder holding Participating Shares. The Shareholder shall have no claim against the Company in respect of the amount deducted but any amount which the directors determine is no longer required to satisfy the relevant Shareholder Caused Liability shall be paid to the relevant Shareholder.

20.4    Notice of any dividend that may have been declared shall be given to each Shareholder as specified in Regulation 22.1 and all dividends unclaimed for three years after having been declared may be forfeited by Resolution of Directors for the benefit of the Company.

20.5    No dividend shall bear interest as against the Company and no dividend shall be paid on treasury shares.

**21      ACCOUNTS AND AUDIT**

21.1    The Company shall keep records and underlying documentation that are sufficient to show and explain the Company's transactions and that will, at any time, enable the financial position of the Company to be determined with reasonable accuracy.

21.2    The records and underlying documentation of the Company shall be kept at the office of its registered agent or at such other place or places, within or outside the British Virgin Islands, as the directors may determine and if the records and underlying documentation are kept in a location other than the office of the registered agent, the Company shall provide the registered agent with a written record of:

(a)    the physical address of the place at which the records and underlying documentation are kept; and

(b)    the name of the person who maintains and controls the Company's records and underlying documentation.

21.3    If the location at which the records and underlying documentation are kept or the name of the person who maintains and controls the records and underlying documentation changes, the Company shall, within 14 days of the change, provide its registered agent with:

(a)    the physical address of the new location at which the records and underlying documentation are kept; and

(b)    the name of the new person who maintains and controls the Company's records and underlying documentation.

21.4    The Company may, at the discretion of the directors, prepare periodically a profit and loss account and a balance sheet. The profit and loss account and balance sheet shall be drawn up so as to give respectively a true and fair view of the profit and loss of the Company for a financial period and a true and fair view of the assets and liabilities of the Company as at the end of a financial period.

21.5    Auditors may be appointed by Resolution of Shareholders or by Resolution of Directors. The remuneration of the auditors of the Company may be fixed by Resolution of Directors.

21.6    The Company or its duly authorised agent may establish and maintain separate accounts (each an *Investment Account*) for each Class and Series, or for one or more Classes or Series, to which the following provisions shall apply:

23

(a)     the proceeds from the allotment and issue of the Shares may be applied in the books of the Company to the Investment Account established for the Shares and the assets and liabilities (including any liability to pay any Performance Fee) and income and expenditure attributable thereto shall be applied or charged to such Investment Account subject to the provisions of Regulations 21.6 to 21.9;

(b)     where any asset is derived from another asset (whether cash or otherwise) such derivative asset shall be applied in the books of the Company to the same Investment Account as the asset from which it was derived, and on each re-evaluation of an investment the increase or diminution in value thereof (or the relevant portion of such increase or diminution in value) shall be applied to the relevant Investment Account;

(c)     in the case of an asset of the Company (or amount treated as a notional asset) which the Company or its authorised agent does not consider is attributable to a particular Investment Account or Investment Accounts, such asset shall be allocated between Investment Accounts at the discretion of the Company or its duly authorised agent in such manner as they consider fair and reasonable in all circumstances and the Company or its duly authorised agent shall have power at any time and from time to time to vary such basis.  Without limiting the generality of the foregoing such allocation shall generally be pro rata to the Net Asset Value of the relevant Classes or Series;

(d)     the Company or its duly authorised agent shall allocate the liability to pay a dividend or distribution on a Class to the corresponding Investment Account and the Company or its duly authorised agent shall allocate any other liability to the Investment Account or Investment Accounts to which, in the opinion of the Company or its duly authorised agent, it relates or, if in the opinion of the Company or its duly authorised agent it does not relate to any particular Investment Account or Investment Accounts, between Investment Accounts at the discretion of the Company or its authorised agent in such manner as they consider fair and reasonable in all the circumstances and the Company or its duly authorised agent shall have power at any time and from time to time to vary such basis.  Without limiting the generality of the foregoing, such allocation shall generally be pro rata to the Net Asset Value of the relevant Classes or Series;

(e)     in any proceedings brought by any holder of Shares of a particular Class or Series in respect of the rights of such holder as the holder of such Shares, any liability of the Company to such Shareholder in respect of such proceedings shall only be settled out of the assets in the Investment Account corresponding to such Shares, without recourse in respect of such liability or any allocation of such liability to any other Class or Series of the Company;

(f)     to the extent possible, any Shareholder Caused Liability suffered or incurred by the Company is borne only by the Investment Account or Accounts corresponding to the Shares held by such Shareholder; and

(g)     the Company or its duly authorised agent may transfer in the books of the Company any assets (or amounts treated as notional assets) to and from Investment Accounts if, as a result of a creditor or litigant proceeding against certain of the assets of the Company or otherwise, a liability would be borne in a different manner from that in which it would have been borne under sub-paragraphs (d) and (e) above, or in any similar circumstances.

24

21.7   Save as otherwise provided in these Articles, the assets held in each Investment Account shall be applied solely in respect of the Shares to which such Investment Account appertains.

21.8   Distributions declared and paid by the directors in accordance with these Articles on a Class shall be paid only out of such surplus assets as are allocated to the relevant Investment Account(s).

21.9   If the Company shall be wound up, any liabilities of the Company attributable to an Investment Account shall be settled out of any assets allocated to that Investment Account, and, if such assets are insufficient, shall then be apportioned between (and settled out of) the assets allocated to the other Investment Accounts pro rata or as the directors or the liquidator (as the case may be) shall think fit.  Any remaining assets allocated to an Investment Account shall be distributed (in cash or in specie, as the liquidator thinks fit) to the holders of Participating Shares corresponding to such Investment Account.

21.10  Upon any conversion of Shares from one Class and Series to another in accordance with the provisions of these Articles, the directors shall allocate assets to the value of the Shares being converted from the Investment Accounts drawn up for the Class and Series from which the Shares are being converted to the Investment Accounts drawn up for the Class and Series into which the Shares are being converted.

## 22   NOTICES

22.1   Any notice, information or written statement to be given by the Company to Shareholders shall be in writing and may be given by personal service mail, courier, email or fax to such Shareholder's address as shown in the register of members or to such Shareholder's email address or fax number as notified by the Shareholder to the Company in writing from time to time.

22.2   Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail addressed to the Company at the offices of the registered agent of the Company.

22.3   Where a notice is sent by the Company by post, service of the notice shall be deemed to be effected by properly addressing, prepaying and posting a letter containing notice, and shall be deemed to be received on the fifth business day following the day on which the notice was posted.  Where a notice is sent by the Company by fax or email, notice shall be deemed to be effected by transmitting the email or fax to the address or number provided by the intended recipient and service of the notice shall be deemed to have been received on the same day that it was transmitted.

## 23   AUTOMATIC EXCHANGE OF INFORMATION

23.1   The Company may release or disclose to any relevant regulatory authority any information in its possession regarding the affairs of the Company or regarding any Shareholder, including any information contained in the register of members and any information provided pursuant to or in connection with the Shareholder's subscription for Participating Shares (collectively *Relevant Information*) if such release or disclosure is necessary in order to comply with any AEOI

Legislation nor the Company is required to do so under the laws of any jurisdiction relevant to the Company.

23.2   The Company may authorise any person to disclose Relevant Information on behalf of the Company and in connection with any such authorisation, may release and disclose any Relevant Information to such person.

**24      WINDING UP**

24.1   The Company's business shall continue for so long as the Company holds assets and investments irrespective of whether the directors have determined that the Company shall not acquire any further assets or investments.  If the directors determine that the business of the Company shall be terminated and that the assets and investments of the Company shall be realised in anticipation of such termination, the business of the Company shall continue and shall be regarded as continuing as a going concern, until the process of realisation of the assets and investments of the Company is complete.

24.2   Subject to the Act, the Company may by Resolution of Shareholders or by Resolution of Directors appoint an eligible individual as voluntary liquidator alone or jointly with one or more other voluntary liquidators.

**25      CONTINUATION**

The Company may by Resolution of Shareholders or by a resolution passed unanimously by all directors of the Company continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

Signed for Harneys Corporate Services Limited of Craigmuir Chambers, PO Box 71, Road Town, Tortola VG1110, British Virgin Islands for the purpose of incorporating a BVI Business Company under the laws of the British Virgin Islands on 24 May 2019:

Incorporator

.................................................................
Andrew Saunders
Authorised Signatory
Harneys Corporate Services Limited

# **ATTACHMENT 5**

BVI BC No: 2093494



**BRITISH VIRGIN ISLANDS**

**BVI Business Companies Act 2004**

**Memorandum of Association**
**and Articles of Association of**



**BKCoin Multi-Strategy Master Fund Ltd.**

**A COMPANY LIMITED BY SHARES**

**Incorporated on 9 March 2022**
**Amended and Restated on 20 May 2022**



Harneys Corporate Services Limited
Craigmuir Chambers, Road Town, Tortola, VG 1110, British Virgin Islands
+1284 494 2233
+1284 494 3547
harneysfiduciary.com

CERTIFIED A TRUE COPY

REGISTRAR OF CORPORATE AFFAIRS
BRITISH VIRGIN ISLANDS
Date _____ 01/12/2022

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**

**BVI BUSINESS COMPANIES ACT 2004**

**MEMORANDUM OF ASSOCIATION**

**OF**

**BKCOIN MULTI-STRATEGY MASTER FUND LTD.**

A Company Limited by Shares

**1      NAME**

The name of the Company is BKCoin Multi-Strategy Master Fund Ltd.

**2      STATUS**

The Company is a company limited by shares.

**3      REGISTERED OFFICE AND REGISTERED AGENT**

3.1    The first registered office of the Company is at Craigmuir Chambers, PO Box 71, Road Town, Tortola, British Virgin Islands, VG1110.

3.2    The first registered agent of the Company is Harneys Corporate Services Limited of Craigmuir Chambers, PO Box 71, Road Town, Tortola, British Virgin Islands, VG1110.

3.3    The Company may, by Resolution of Shareholders or by Resolution of Directors, change the location of its registered office or change its registered agent.

3.4    If at any time the Company does not have a registered agent it may, by Resolution of Shareholders or Resolution of Directors, appoint a registered agent.

**4      CAPACITY AND POWERS**

4.1    Subject to the Act and any other British Virgin Islands legislation, the Company has, irrespective of corporate benefit:

   (a)    full capacity to carry on or undertake any business or activity, do any act or enter into any transaction; and

   (b)    for the purposes of paragraph (a), full rights, powers and privileges.

4.2    For the purposes of section 9(4) of the Act, there are no limitations on the business that the Company may carry on.

1

**5**      **NUMBER AND CLASSES OF SHARES**

5.1      The Company is authorised to issue a maximum of 50,000 no par value shares divided into four classes, 49,900 of which are participating shares and designated as Class A Shares, Class Restricted A Shares, Class S Shares, and Class L Shares, and 100 non-participating shares designated as Class M Shares.

5.2      The Company may issue fractional Shares and a fractional Share shall have the corresponding fractional rights, obligations and liabilities of a whole Share of the same Class or Series.

5.3      The Company may issue a Class in one or more Series.  The division of a Class into one or more Series and the designation to be made to each Series shall be determined by the directors or their authorised agent from time to time.

**6**      **RIGHTS OF SHARES**

6.1      Each Class M Share in the Company confers upon the Shareholder:

(a)      the right to one vote on any Resolution of Shareholders;

(b)      no right to redeem such Share;

(c)      no right to any dividend or other distribution paid by the Company; and

(d)      no right to receive any payment or to otherwise participate in the distribution of the surplus assets of the Company on its liquidation, save for a return of the subscription sum paid for the issue of such Share following the payment in full of all sums due to the holders of the Participating Shares.

6.2      Each Participating Share confers upon the Shareholder:

(a)      no right to receive notice of, attend at or vote at any meeting of the Shareholders or on any Resolution of Shareholders, save as arises pursuant to the operation of Clause 8.3;

(b)      the right to redeem such Share out of the net assets of the Company attributable to the Class or Series to which such Share belongs with reference to the Investment Accounts;

(c)      the right to an equal share in any dividend or other distribution paid by the Company and which is attributable to the Class to which such Share belongs with reference to the Investment Accounts; and

(d)      the right to receive an equal share in the distribution of the surplus assets of the Company on its liquidation properly attributable to the Class or Series to which such Share belongs with reference to the Investment Accounts.

6.3      Each Side Pocket Investment Share confers upon the Shareholder:

(a)      no right to receive notice of, attend at or vote at any meeting of the Shareholders or on any Resolution of Shareholders, save as arises pursuant to the operation of Clause 8.3;

2

      (b)     no right to redeem such Share, except pursuant to <u>Regulation 4.7</u>;

      (c)     the right to an equal share in any dividend or other distribution paid by the Company and which is attributable to the Class to which such Share belongs with reference to the Investment Accounts; and

      (d)     the right to receive an equal share in the distribution of the surplus assets of the Company on its liquidation properly attributable to the Class or Series to which such Share belongs with reference to the Investment Accounts.

6.4    Each Allocation Share confers upon the Shareholder:

      (a)     no right to receive notice of, attend at or vote at any meeting of the Shareholders or on any Resolution of Shareholders, save as arises pursuant to the operation of <u>Clause 8.3</u>;

      (b)     the right to redeem such Share, in accordance with <u>Regulation 4.8</u> below.

6.5    The redemption of Participating Shares pursuant to <u>Clause 6.2</u> shall be effected in accordance with the Articles.

6.6    The Company may redeem, purchase or otherwise acquire all or any of the Shares in the Company in accordance with the Articles.

**7**    **REGISTERED SHARES**

The Company shall issue registered Shares only. The Company is not authorised to issue bearer Shares, convert registered Shares to bearer Shares or exchange registered Shares for bearer Shares.

**8**    **AMENDMENT OF THE MEMORANDUM AND THE ARTICLES**

8.1    The Company may amend this Memorandum or the Articles by Resolution of Shareholders or by Resolution of Directors save that no amendment may be made by Resolution of Directors:

      (a)     to restrict the rights or powers of the Shareholders to amend this Memorandum or the Articles;

      (b)     to change the percentage of Shareholders required to pass a Resolution of Shareholders to amend this Memorandum or the Articles; or

      (c)     in circumstances where this Memorandum or the Articles cannot be amended by the Shareholders; or

      (d)     to this <u>Clause 8.1</u>.

8.2    Any amendment of this Memorandum or the Articles will take effect from the date that the notice of amendment, or restated Memorandum and Articles incorporating the amendment, is registered by the Registrar or from such other date as determined pursuant to the Act.

8.3    The rights conferred upon the holders of Shares of any Class as specified in <u>Clause 6.1</u> or <u>6.2</u> may only be varied to a material adverse extent, whether or not the Company is in liquidation, with the

3

consent in writing of the holders of a majority of the issued Shares of that Class or by a resolution approved at a duly convened and constituted meeting of the Shares of that Class by the affirmative vote of a majority of the votes of the Shares of that Class which were present at the meeting and were voted. At any such meeting, all voting will be on a poll and each Shareholder who is present in person or by proxy will have one vote for every Share held.

8.4    The directors may determine to treat two or more Classes as comprising a single Class for the purposes of Clause 8.3 if they determine, by Resolution of Directors, that all such Classes will be affected in the same way by the proposed variation of the rights attaching to the shares of such Classes.

8.5    The rights conferred upon the holders of the Shares of any Class or Series shall not, unless otherwise expressly provided by the terms of issue of the Shares of that Class or Series, be deemed to be varied by the creation or issue of further Shares of that Class or Series or of other Classes or Series (whether or not such Classes or Series represent other Class or Series funds or sub-funds of the Company) unless such Shares rank in priority to the Shares of such Class or Series as regards participation in the profits or assets of the Investment Account for such Class or Series.

8.6    The rights conferred upon the holders of the Shares of any Class or Series shall not be deemed to be varied by the exercise of the powers to allocate assets (or amounts treated as notional assets) and charge liabilities to the Investment Accounts or any of them as provided for in Regulations 21.6 to 21.9.

9      **PROFESSIONAL FUND**

9.1    The fund interests of the Company shall be issued only to professional investors.

9.2    The initial investment of each investor in the Company, other than exempted investors, shall not be less than such sum as is prescribed in the Mutual Funds Regulations 2010.

9.3    Words and expressions defined in the Securities and Investment Business Act 2010 shall have the same meaning in this Clause 9.

10     **DEFINITIONS AND INTERPRETATION**

10.1   In this Memorandum of Association and the attached Articles of Association, if not inconsistent with the subject or context:

*AEOI Legislation* means any legislation, regulations or guidance in force in the British Virgin Islands relating to the systematic and periodic exchange of information for tax purposes pursuant to any agreement or treaty entered into by the British Virgin Islands (or any British Virgin Islands government body) including the intergovernmental agreement entered into with the United States to facilitate compliance with sections 1471 to 1474 of the US Internal Revenue Code of 1986 and any other agreement included as subsidiary legislation in the form of an order to the Mutual Legal Assistance (Tax Matters) Act 2003.

*Act* means the BVI Business Companies Act 2004, as amended from time to time, and includes the BVI Business Companies Regulations 2012 and any other regulations made under the Act.

4

***Allocation Shares*** means the Class L Shares having the rights set out in this Memorandum;

***Articles*** means the attached Articles of Association of the Company, as may be amended from time to time;

***Business Day*** means any day on which the Federal Reserve Bank of New York is open for business and/or such other day or days as the directors may determine, either generally or in any particular case.

***Class*** means a class of Shares created and designated by the directors pursuant to the Articles.

***Class A Shares*** means the no par value Class A participating redeemable Shares having the rights set out in this Memorandum.

***Class L Shares*** means the no par value Class L redeemable Shares having the rights set out in this Memorandum.

***Class Restricted A Shares*** means the no par value Class Restricted A participating redeemable Shares having the rights set out in this Memorandum.

***Class S Shares*** means the no par value Class S participating redeemable Shares having the rights set out in this Memorandum.

***Class M Shares*** means the no par value Class M participating non-redeemable Shares having the rights set out in this Memorandum.

***Dealing Day*** means, in respect of each Class, day or days as the directors may determine from time to time.

***Feeder Funds*** means BKCoin Multi-Strategy Fund Ltd., a British Virgin Islands company limited by shares formed under the BVI Business Companies Act 2004, having its registered office at Craigmuir Chambers, PO Box 71, Tortola, British Virgin Islands, VG1110 and BKCoin Multi-Strategy Fund LP, a Delaware limited partnership, the general partner of which has its registered office at 1101 Brickell Avenue, South Tower #8, Miami, Florida 33131, USA.

***Initial Series*** means, in relation to each Class of Participating Shares, the Series to which the first Shares to be issued in that Class belong or such other Series as may be designated by the directors or their authorised agent as the Initial Series.

***Investment Account*** has the meaning specified in Regulation 21.6.

***Investment Manager*** means BKCoin Management, LLC or any other person appointed for the time being as investment manager or investment adviser to the Company.

***Lock-up Period*** means the period of twelve calendar months from the date of subscription for the Participating Shares, or such shorter period as may from time to time be determined by the directors in their absolute discretion, either generally or in any particular case.

***Management Fee*** means the fee payable to the Investment Manager for services rendered in connection with managing the investment program of the Company and/or the Feeder Funds.

5

***Memorandum*** means this Memorandum of Association of the Company, as may be amended from time to time.

***Net Asset Value*** means the net asset value attributed to the Company or to a Class or Series (as the context requires) determined in accordance with the Articles.

***Net Asset Value per Share*** has the meaning specified in Regulation 5.3.

***New Issue Security*** means any security acquired by the Company that is determined by the directors or their authorised agent to be a new issue within the meaning of the Rule.

***person*** includes individuals, corporations, trusts, the estates of deceased individuals, partnerships and unincorporated associations of persons.

***Participating Shares*** means the Class A Shares and the Class Restricted A Shares.

***Performance Fee*** means any performance fee or incentive allocation payable by the Company or the Feeder Funds in respect of any Class or Series of Participating Shares to any person appointed for the time being as investment manager or investment adviser to the Company, and subject to the 'high water mark' set forth in Regulation 5.11. If Shares are Redeemed on a day other than the last day of a Performance Fee Period, the Performance Fee in respect to such Shares shall be calculated as though the relevant Redemption Day was the end of a Performance Fee Period.

***Performance Fee Period*** means a period of three months commencing on each 1 January, 1 April, 1 July and 1 October, provided that the first Performance Fee Period in respect of any Series will be the period commencing on the date such Series is issued and ending on the next following 31 March, 30 June, 30 September or 31 October.

***PPM*** means the Company's confidential offering memorandum which is provided to prospective investors, as may be amended from time to time.

***Prohibited Person*** means any person who is restricted or prevented from owning Shares either directly or indirectly in accordance with the terms on which the Shares are offered for issue.

***Proscribed Powers*** means the powers to: (a) amend this Memorandum or the Articles; (b) designate committees of directors; (c) delegate powers to a committee of directors; (d) appoint or remove directors; (e) appoint or remove an agent; (f) approve a plan of merger, consolidation or arrangement; (g) make a declaration of solvency or approve a liquidation plan; or (h) make a determination that immediately after a proposed distribution the value of the Company's assets will exceed its liabilities and the Company will be able to pay its debts as they fall due.

***Redemption Day*** means the first Business Day of each month following the initial issuance of Participating Shares and/or such other day or days as the directors may determine from time to time, in each case subject to the Lock-up Period.

***Redemption Price*** means the price per Share at which a Participating Share of any Class or Series shall be redeemed determined in accordance with the Articles.

6

**Redemption Request** means a request for the redemption of Participating Shares in writing (in such form or subject to such conditions as prescribed by the directors or their authorised agent) from a Shareholder specifying the number, Class and, if applicable, Series registered in the Shareholder's name to be redeemed.

**Registrar** means the Registrar of Corporate Affairs appointed under section 229 of the Act.

**Resolution of Directors** means either:

(a)   a resolution approved at a duly convened and constituted meeting of directors of the Company by the affirmative vote of a majority of the directors present at the meeting who voted except that where a director is given more than one vote, he shall be counted by the number of votes he casts for the purpose of establishing a majority; or

(b)   a resolution consented to in writing by all directors or by all members of a committee of directors of the Company, as the case may be.

**Resolution of Shareholders** means either:

(a)   a resolution approved at a duly convened and constituted meeting of the Shareholders by the affirmative vote of a majority of the votes of the Shares entitled to vote thereon which were present at the meeting and were voted; or

(b)   a resolution consented to in writing by a majority of the votes of the Shares entitled to vote on such resolution.

**Restricted Class** means the Class A Restricted Shares and any other Class so designated by the directors or their authorised agent.

**Restricted Person** means, as to any New Issue Security, any person to whom the sale of that New Issue Security would be restricted under the Rule and any person whom the directors determine to treat as a person to whom the sale of that New Issue Security would be restricted under the Rule pursuant to the Articles.

**Restricted Share** means a Share in a Restricted Class.

**Rule** means Rule 5130 (Restrictions on the Purchase and Sale of Initial Equity Public Offerings) of the Financial Industry Regulatory Authority, Inc. (FINRA) rulebook, as amended from time to time.

**Seal** means any seal that has been duly adopted as the common seal of the Company.

**Series** means a series of any Class designated by the directors pursuant to the Articles.

**Share** means a share issued or to be issued by the Company of any Class or Series.

**Shareholder** means a person whose name is entered in the register of members of the Company as the holder of one or more Shares or fractional Shares.

**Shareholder Caused Liability** means, in respect of any Shareholder, any liability which in the opinion of the directors is attributable to the representations, actions or inactions (directly or

indirectly) of such Shareholder or arises as a consequence (directly or indirectly) of the relevant Shareholder holding Participating Shares, and for this purpose *liability* includes:

(a)     any liability, cost, expense, tax, withholding or deduction incurred or suffered by the Company or that in the opinion of the directors will be incurred or suffered by the Company;

(b)     any deduction or withholding which the Company is required to make in respect of the Shareholder;

including, in either case, those arising in connection with the AEOI Legislation and where a liability is attributable to more than one Shareholder, such liability may be allocated between the relevant Shareholders in such manner as the directors may determine.

*Side Pocket Investment* means an investment which the Investment Manager, in its sole discretion, determines lacks a readily ascertainable market value or should be held until the resolution of a special event or circumstance.

*Side Pocket Investment Shares* means the Class C Shares having the rights set out in this Memorandum.

*Unrestricted Class* means the Class A Shares and any other Class so designated by the directors or their authorised agent.

*Unrestricted Share* means a share in an Unrestricted Class.

*Valuation Day* means close of business on the last Business Day in each month or such other time and date or dates as the directors may determine from time to time.

*written* or any term of like import includes information generated, sent, received or stored by electronic, electrical, digital, magnetic, optical, electromagnetic, biometric or photonic means, including electronic data interchange, electronic mail, telegram, telex or telecopy, and in writing shall be construed accordingly.

10.2    In this Memorandum and the Articles, unless the context otherwise requires, a reference to:

(a)     a *Regulation* is a reference to a regulation of the Articles;

(b)     a *Clause* is a reference to a clause of this Memorandum;

(c)     voting by Shareholders is a reference to the casting of the votes attached to the Shares held by the Shareholder voting;

(d)     the Act, this Memorandum or the Articles is a reference to the Act or those documents as amended or, in the case of the Act any re-enactment thereof;

(e)     the singular includes the plural and vice versa;

8

(f)     a period of time expressed as a number of days shall be construed as a reference to a period of days which includes the day on which the period begins but does not include the day on which it ends; and

(g)     a *month* shall be construed as a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month and a reference to a period of several months shall be construed accordingly.

10.3    Any words or expressions defined in the Act bear the same meaning in this Memorandum and the Articles unless the context otherwise requires or they are otherwise defined in this Memorandum or the Articles.

10.4    Headings are inserted for convenience only and shall be disregarded in interpreting this Memorandum and the Articles.

10.5    All determinations to be made by the directors and all powers, authorities and discretions exercisable by them under this Memorandum or the Articles may be made and exercised by the directors in their sole and absolute discretion, either generally or in any particular case, subject only to any qualifications or limitations expressed in these Articles or imposed by law.

Signed for Harneys Corporate Services Limited of Craigmuir Chambers, PO Box 71, Road Town, Tortola, British Virgin Islands, VG1110 for the purpose of incorporating a BVI Business Company under the laws of the British Virgin Islands on 9 March 2022:

Incorporator

**(sgd.) Indira Ward-Lewis**
Authorised Signatory
Harneys Corporate Services Limited

9

TERRITORY OF THE BRITISH VIRGIN ISLANDS

BVI BUSINESS COMPANIES ACT 2004

ARTICLES OF ASSOCIATION

OF

BKCOIN MULTI-STRATEGY MASTER FUND LTD.

A Company Limited by Shares

**1      DISAPPLICATION OF THE ACT**

The following sections of the Act shall not apply to the Company:

(a)      section 46 (*Pre-emptive rights*);

(b)      section 60 (*Process for purchase, redemption or other acquisition of own shares*);

(c)      section 61 (*Offer to one or more shareholders*);

(d)      section 62 (*Shares redeemed otherwise than at the option of the company*); and

(e)      section 175 (*Disposition of assets*).

**2      SHARES**

2.1      Unless and until the directors resolve to issue share certificates, no share certificates shall be issued, and the records of the shareholding of each Shareholder shall be in uncertified book entry form. If the directors do resolve to issue share certificates in respect of any one or more Classes, then every Shareholder shall be entitled, upon written request only, to a certificate signed by a director or officer of the Company, or any other person authorised by Resolution of Directors or under the Seal specifying the number of Shares held by him and the signature of the director, officer or authorised person and the Seal may be facsimiles.

2.2      Any Shareholder receiving a certificate shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of any wrongful or fraudulent use or representation made by any person by virtue of the possession thereof.  If a certificate for Shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by Resolution of Directors.

2.3      If several persons are registered as joint holders of any Shares, any one of such persons may give an effectual receipt for any distribution.

**3      ISSUE OF SHARES**

3.1     Subject to the provisions of these Articles, Shares may be issued at such times, to such persons, for such consideration and on such terms as the directors or their authorised agents may determine.

3.2     For the avoidance of doubt, the directors may issue Participating Shares from a single Class on terms which include the provision for different levels of fees to be borne by some of the Participating Shares in that Class to those being borne by other Participating Shares in the same Class and on varying liquidity terms including as to notice periods for the redemption of Participating Shares and the terms of payment of redemption proceeds, as provided in the terms of offer approved by the directors from time to time or as permitted by the Memorandum or these Articles.  Such variation in the terms of issue shall not cause Participating Shares issued on such varied terms to constitute a different Class to the remaining Participating Shares in that Class.  For this purpose, the Company may enter into letters of agreement with one or more Shareholders.

3.3     On the allotment of any Participating Share, the directors or their authorised agent shall:

        (a)     on the first issue of each Class, designate whether the Class is a Restricted Class or an Unrestricted Class; and

        (b)     designate the Class to which the Participating Share shall belong; and

        (c)     designate the Series to which such Participating Share shall belong, if any.

3.4     The directors may, on such day or days as the directors may determine, make the initial issue of Participating Shares of any Class at such price per Participating Share as the directors may determine.

3.5     Participating Shares of any existing Class may be issued on any Dealing Day and shall be issued at such price per Participating Share as the directors shall determine provided that:

        (a)     unless each Series is issued at a fixed price, the price per Participating Share shall not be less than an amount equal to the Net Asset Value per Share of the Initial Series of that Class as at the Valuation Day on or immediately prior to the Dealing Day; and

        (b)     except in the case of the initial issue of any Class, no Participating Shares of the Initial Series of any Class shall be issued at any time other than on the first day of a Performance Fee Period.

3.6     Unrestricted Shares may not be issued by the Company to, and may not be held by, Restricted Persons.  The directors shall make a determination regarding whether a person shall be treated as being restricted or unrestricted from having an interest in New Issue Securities under the Rule notwithstanding that such person has provided the directors with information as to such person's employment, business activities and business connections as well as those of such person's affiliates and immediate family members which purports to establish that such person is not a person to whom sale of a New Issue Security is restricted or prohibited under the Rule.  Where a person fails to provide the directors with such information as to that person's employment, business activities and business connections as well as those of such person's affiliates and

11

immediate family members to enable the directors to establish on reasonable grounds whether that person is not a person to whom sale of a New Issue Security is restricted or prohibited under the Rule, that person shall be regarded as being restricted from having an interest in New Issue Securities under the Rule.

3.7     Shares shall not be issued by the Company to, and may not be held by, Prohibited Persons.

3.8     No Participating Shares of any Class shall be issued during any period when the determination of Net Asset Value of such Class is suspended pursuant to <u>Regulation 6</u>.

3.9     Class M Shares shall be issued at an issue price determined by the directors.  No Class M Shares shall be issued subsequent to the initial issue of the Class M Shares without the unanimous consent in writing of the holders of the outstanding Class M Shares.

3.10    At any time that the directors (as advised by the Investment Manager) designates an investment of the Company as a Side Pocket Investment, a pro rata portion of the Class A Shares held by a Shareholder will automatically convert by way of redemption and reissue into the number of Class S shares corresponding to the proportional interest of such Shareholder in the Side Pocket Investment.  Class S Shares issued in connection with any single Side Pocket Investment generally will constitute a separate series of Class S Shares. The Investment Manager may elect, in its sole discretion, to hold any Side Pocket Investment in a new series of Class S Shares until its realization, or until the Investment Manager's determination that all or a portion of such investment need no longer be treated as a Side Pocket Investment.

3.11    Class L Shares shall be issued in at the end of each Performance Fee Period (if applicable), in accordance with the mechanism set forth in Regulation 5.7 below, and subject in each case to the following high water mark restriction. A Performance Fee shall only be paid to the extent that any increase in Net Asset Value allocated in relation to a Share (upon which the Performance Fee is being calculated) exceeds any decreases in Net Asset Value allocated in relation to the same Share which have not been recovered.

3.12    Unless the directors determine otherwise, as of the commencement of business on the day following the last day of each Performance Fee Period the issued and outstanding Participating Shares of each Class issued in Series other than (i) the longest designated Series of that Class in respect of which a Performance Fee has been charged in respect of the immediately preceding Performance Fee Period (such Series to be designated by the directors as the Initial Series); and (ii) any Series of that Class in respect of which no Performance Fee has been charged for the immediately preceding Performance Fee Period, shall be redeemed by the Company and the Redemption Price shall be applied by the Company towards the issue of Initial Series of Participating Shares of the same Class at their then Net Asset Value.

3.13    The Company shall keep a register of members containing:

        (a)     the names and addresses of the persons who hold Shares;

        (b)     the number of each Class and Series held by each Shareholder;

        (c)     the date on which the name of each Shareholder was entered in the register of members; and

12

(d)     the date on which any person ceased to be a Shareholder.

3.14    The register of members may be in any such form as the directors may approve, but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents.  Until the directors otherwise determine, the magnetic, electronic or other data storage form shall be the original register of members.

3.15    All rights and obligations attaching to a treasury share are suspended and shall not be exercised by or against the Company while it holds the Share as a treasury share.

3.16    Treasury shares may be transferred by the Company in accordance with the provisions of this Regulation 3 as if they are newly issued Shares.

**4       REDEMPTION OF SHARES**

4.1     The Company may purchase, redeem or otherwise acquire its own Shares with the consent of the Shareholders whose Shares are to be purchased, redeemed or otherwise acquired and without such consent if permitted by the Act or any other provision in the Memorandum or these Articles.

4.2     Subject to the provisions of these Articles, the Act and to the rights attaching to any Class, and subject also to receipt by the Company or its authorised agent of a valid Redemption Request, Participating Shares shall be redeemable at the option of a Shareholder on and with effect from any Redemption Day.

4.3     Redemption Requests must be received by the Company or its authorised agent at least 14 calendar days' prior to the relevant Redemption Day and all conditions as to the validity of the Redemption Request must be fulfilled by the relevant Redemption Day. Notwithstanding the foregoing, the directors or their authorised agent may waive such notice period and other conditions, if any, whether in whole or in part and whether in respect of one or more Shareholders. The conditions as to the validity of the Redemption Request may stipulate a time after which the Redemption Request will be deemed to have been received on the next following Business Day. Subject to Regulation 4.5, unless the directors consent to the withdrawal of a Redemption Request made in accordance with these Articles, the Shareholder shall not be entitled to withdraw such Redemption Request.

4.4     Where share certificates have been issued in respect of the Shares being redeemed the Shareholder shall lodge such certificates with the Company or its authorised agent for cancellation upon the redemption of such Shares.  The directors may waive the requirement to lodge a certificate which shall have become lost or destroyed upon compliance by the Shareholder with the like requirements to those applying in the case of an application by him for replacement of a lost or destroyed certificate under Regulation 2.2.

4.5     The Company, its directors and agents may rely upon any Redemption Request believed by them in good faith to be genuine.

4.6     Participating Shares may not be redeemed during the Lock-up Period. The Lock-up Period may from time to time be waived, in whole or in part, by the directors in their absolute discretion, either generally or in a particular case. Additional subscriptions for Participating Shares by a

Shareholder will be subject to a new Lock-Up Period.  For the purposes of the Lock-Up Period, redemptions will be deemed to be made on a "first-in, first out" basis.

4.7     The holders of Side Pocket Investment Shares will have no right to redeem their Side Pocket Investment Shares.   Each Side Pocket Investment held on behalf of a Shareholder who is redeeming all of his Participating Shares (a **Retiring Shareholder**) will continue to be held by the Company and the Retiring Shareholder will continue to participate in the Side Pocket Investment until there is a realisation of the Side Pocket Investment or the Investment Manager determines, in its absolute discretion, that the Side Pocket Investment should no longer be maintained in a class of Side Pocket Investment Shares. Upon the occurrence of a realization or determination, the Side Pocket Investment Shares held by such Retiring Shareholder shall be compulsorily redeemed by the Company and the Redemption Price shall be equal to such Shareholder's proportional share of the net proceeds of the sale of the Side Pocket Investment (or the fair value thereof as determined by the Company if the investment is not sold).  The directors may, however, in their sole discretion, redeem the Side Pocket Investment Shares of the Retiring Shareholder at the same time as such Retiring Shareholder redeems all of its Participating Shares in which event the Redemption Price of the Side Pocket Investment Shares shall be the fair value of such Retiring Shareholder's proportional interest in any Side Pocket Investment at the time of redemption (as determined in the sole discretion of the directors, in consultation with the Investment Manager and/or the Company's administrator and whose determination shall be final) whereupon such Side Pocket Investment will be allocated to the Side Pocket Investment Shares of all other Shareholders originally participating in such class of Side Pocket Investment Shares.

4.8     The holder(s) of Allocation Shares, which have been issued pursuant to Regulation 5.7 below, will have the right to redeem the fair value of such Allocation Shares at any time and from time to time, including during any period that suspension is declared pursuant to Regulation 6 below.

4.9     The redemption of Participating Shares of any Class may be suspended pursuant to Regulation 6. A Shareholder who has made a Redemption Request for redemption on and with effect from a Redemption Day which occurs during a period of suspension of redemptions of the relevant Class may withdraw such Redemption Request and such withdrawal shall be effective if received by the Company prior to the termination of the period of suspension. Subject to these Articles, Participating Shares for which a Redemption Request is made and not withdrawn shall be redeemed on the first Redemption Day following the termination of the suspension period.

4.10    A Redemption Request shall not be satisfied where such Redemption Request relates to:

(a)     a number of Participating Shares fewer than such number as the directors may determine from time to time; or

(b)     Participating Shares having an aggregate value by reference to their Net Asset Value per Share of less than such amount as the directors may determine from time to time.

4.11    If a Redemption Request is received from a Shareholder which would, if satisfied, result in such Shareholder holding:

(a)     a number of Participating Shares fewer than such number as the directors may determine from time to time; or

(b)     Participating Shares having an aggregate value by reference to the Net Asset Value per Share of less than such amount as the directors may determine from time to time,

the directors may treat such Redemption Request as a request for the redemption of all the Participating Shares held by such Shareholder or as a request for a partial redemption that would result in the Shareholder continuing to hold such minimum number or amount as has been determined by the directors.

4.12    The Redemption Price of a Participating Share being redeemed shall be the Net Asset Value per Share of the Series to which that Participating Share belongs calculated as at the Valuation Day immediately preceding the Redemption Day on which such Share is to be redeemed, adjusted in accordance with these Articles, and subject in each case to any deductions (including deductions of the Management Fee and Performance Fee, if any), reserves, holdbacks, adjustments, or other sums, provide for in these Articles, the Memorandum, or the PPM, or any applicable subscription agreement.

4.13    Subject to the remainder of this Regulation 4.13, the directors will use best endeavours to ensure that the Redemption Price is paid within 30 calendar days of a Redemption Day prior which the Company had received a valid Redemption Request from a Shareholder. However, the directors shall have the right, at their entire discretion, to withhold up to 5% of the Redemption Price until no later than 30 calendar days after completion of the year-end audit of the Company's financial statements for any redemption of 90% or more of a Shareholder's Net Asset Value of their Shares (or if a redemption, when combined with other withdrawals of a Shareholder during the preceding 12 months would result in such Shareholder having withdrawn 90% or more of such Shareholder's Net Asset Value of their Shares as of the beginning of such period). In such circumstances, the directors will remit the balance of the redemption proceed without interest. The directors, in their sole discretion, may waive these withdrawal restrictions as to any Shareholder.

4.14    The directors may adjust the Redemption Price by applying a redemption charge of such amount as they may determine from time to time on the redemption of Participating Shares of any Class or Series. The amount of such charge shall be deducted from the relevant redemption proceeds. Such charge may be waived in whole or in part by the directors and may be paid to the Company or to such other person as the directors may determine. The Company may also adjust the Redemption Price by holding back from the redemption proceeds payable to a redeeming Shareholder an amount equivalent to any Shareholder Caused Liability. The amount held back shall be retained for the benefit of the Company and may be used to discharge any obligation imposed on the Company as a consequence (directly or indirectly) of such Shareholder holding Participating Shares. The redeeming Shareholder shall have no claim against the Company in respect of any amount held back. However, any amount held back which the directors determine is no longer required to satisfy the relevant Shareholder Caused Liability shall be paid to the relevant Shareholder.

4.15    The Company shall have the right, at any time and in its discretion, to establish reserves for contingencies (including general reserves for unspecified contingencies). The establishment of such reserves will not insulate any portion of the Company's assets from being at risk, and such assets may still be traded by the Company. A pro rata portion of the reserve may be withheld from distribution to a redeeming Shareholder.

4.16    On any redemption of a Share in accordance with these Articles the directors shall have the power to divide in specie the whole or any part of the assets of the Company and appropriate such assets in satisfaction or part satisfaction of the Redemption Price (an *In Kind Redemption*) at any time up to the actual payment of the Redemption Price. The directors or their authorised agents shall determine the assets to comprise an In Kind Redemption and there shall be no obligation to select any one or more specific assets in respect of an In Kind Redemption.

4.17    The value of any asset included or to be included in any In Kind Redemption shall be the value of such asset determined in accordance with Regulation 5.4 as at the applicable Redemption Day for the redemption of such Participating Shares being redeemed.

4.18    In the event that a redeeming Shareholder fails or refuses to take receipt of any or all of the assets comprising an In Kind Redemption, the Company shall be entitled to deposit such assets with a third party to be determined by the directors or to hold such assets on behalf of such Shareholder, or redeemed Shareholder as the case may be, without any duty on the Company, the directors or any agent of the Company, to manage such assets other than to ensure their bare custody. Any fees or expenses incurred in the custody of such assets, including reasonable fees of the Company not to exceed the amount of any management fee charged to assets of the Company plus any disbursements incurred by the Company, shall be borne by and deducted from the assets as determined by the directors. The directors may compel the sale of such assets at a discount, on commercially reasonable terms, in order to satisfy any fees or expenses incurred or charged by the Company in respect of the custody of such assets.

4.19    Upon the redemption of a Participating Share the holder of such Participating Share shall cease to have any rights with respect thereto, except the right to receive the Redemption Price payable pursuant to Regulation 4.12 and the right to receive any dividend declared but unpaid prior to the relevant Redemption Day. From the relevant Redemption Day, the former Shareholder shall rank as an unsecured creditor of the Company in respect of such Redemption Price and any declared but unpaid dividends and, for the avoidance of doubt, such rights and interests of a former Shareholder in the Company shall rank ahead of the rights and interests of each continuing Shareholder conferred on him by virtue of his continued holding of Participating Shares in the distribution of the surplus assets of the Company on its liquidation.

4.20    Where the directors have resolved pursuant to Regulation 2.1 to issue share certificates in respect of any Shares, on redemption or purchase of only part of such Shares, the directors shall, if so requested by the Shareholder, procure a share certificate in respect of the balance of such Shares to be sent to the Shareholder or as he shall direct.

4.21    Any amount due to a Shareholder in connection with the redemption of Participating Shares:

        (a)    shall be paid in US Dollars, or such other currency as the directors may determine, in such manner or on such terms as the directors may determine and may, upon the Shareholder's request, be transferred at his expense by wire transfer;

        (b)    may be satisfied by the transfer of assets of the Company in accordance with Regulation 4.16; or

        (c)    may be satisfied partly in cash and partly by the transfer of other assets of the Company in accordance with Regulation 4.16.

16

4.22    The Company may suspend payment of redemption proceeds when:

    (a)    the directors have declared a suspension pursuant to the provisions of <u>Regulation 6</u>; or

    (b)    if the directors suspect or are advised that the payment of the redemption proceeds may result in a breach of any applicable laws or regulations in any relevant jurisdiction.

4.23    If a Redemption Request relates to more than such percentage as the directors may determine of the Participating Shares held by a Shareholder, the Company may retain such percentage of the redemption proceeds as the directors may determine pending completion of the next occurring annual audit. Following completion of the audit, the directors may adjust the Redemption Price to reflect any adjustment to the Net Asset Value per Share resulting from the audit. The Company will pay to the redeemed Shareholder the balance, if any, of the amount to which such redeemed Shareholder is entitled after taking account of any such adjustment. No interest will be paid by the Company in respect of redemption proceeds held back.

4.24    The directors may by notice in writing at any time require a Shareholder holding Unrestricted Shares to provide acceptable evidence that such Shareholder is not a Restricted Person. If such Shareholder does not respond or does not provide evidence acceptable to the directors within the time period specified by the directors in the notice, the directors may by further notice redeem compulsorily the Unrestricted Shares of such Shareholder as of the date specified in such second notice (the effective date) at the Net Asset Value per Share of the Unrestricted Shares being redeemed calculated as at the effective date and shall apply the proceeds of the redemption of such Unrestricted Shares to the allotment of Restricted Shares. The directors shall issue such number of Restricted Shares to the Shareholder as may be allotted at the Net Asset Value per Share of the Restricted Shares on the effective date using all the proceeds of the redemption of the Restricted Shares. Each Shareholder authorises the Company to make such redemption and purchase and irrevocably appoints the directors as its agent for such purpose.

4.25    Subject to <u>Regulations 4.26</u> and <u>4.27</u>, the Company may, as determined by the directors and without assigning any reason, redeem compulsorily (without the consent of the holder of the relevant Shares) all or a portion of the Shares of any Shareholder.

4.26    The Company may not compulsorily redeem Participating Shares of a particular Class pursuant to <u>Regulation 4.25</u> during any period that the determination of the Net Asset Value of that Class is suspended pursuant to <u>Regulation 6.1(a)</u>, but may compulsorily redeem such Participating Shares where the redemption of Participating Shares of that Class is suspended pursuant to <u>Regulation 6.1(b)</u> but a simultaneous suspension of the determination of the Net Asset Value of such Class has not been declared.

4.27    Redemption of Participating Shares pursuant to <u>Regulation 4.25</u> shall be made in the following manner:

    (a)    not less than immediately notice of the compulsory redemption shall be sent to the Shareholder at his address as shown in the register of members of the Company or as provided to the Company specifying the date of redemption, unless the redemption is undertaken in contemplation of a merger or consolidation, in which case no notice is required; and

17

(b)     an amount equal to the aggregate Redemption Price determined in accordance with Regulation 4.12 as at the date of redemption of the Participating Shares being redeemed, less any further amount which the directors may reasonably deduct in respect of the costs and expenses of the Company incurred in connection with such redemption, shall be sent to such Shareholder by such means as the directors deem appropriate as soon as reasonably practicable after the date of redemption.

4.28    The Company shall be entitled to compulsorily require any Shareholder to exchange Participating Shares of any Class or Series for Participating Shares of any other Class or Series at any time upon such terms as the directors may determine which may include but is not limited to circumstances where such exchange is necessary or desirable to (i) comply with any applicable law or regulation, or (ii) ensure that any Shareholder Caused Liabilities are allocated equitably. Participating Shares shall be exchanged by way of redemption of the Participating Shares to be exchanged and the use of such redemption proceeds to subscribe for Participating Shares of the relevant Series in the relevant Class or Classes.

4.29    Shares that the Company purchases, redeems or otherwise acquires shall be cancelled or held as treasury shares provided that the number of Shares purchased, redeemed or otherwise acquired and held as treasury shares, when aggregated with Shares of the same Class already held by the Company as treasury shares, may not exceed 50 per cent of the Shares of that Class previously issued by the Company excluding Shares that have been cancelled. Shares which have been cancelled shall be available for reissue.

4.30    Notwithstanding any other provision of these Articles, the directors may waive any notice period, redemption fee, minimum holding requirement or any other restriction or conditions applicable to the redemption of Participating Shares by, whether in whole or in part and whether in respect of one or more Shareholders.

5       DETERMINATION OF NET ASSET VALUE; ALLOCATIONS

5.1     The Net Asset Value of the Company shall be determined by or under the direction of the directors or by the Company's authorised agent as at each applicable Valuation Day, and shall be the value as at such date of all the assets of the Company (including interest and dividends accrued) less all the liabilities of the Company (including accrued expenses), calculated on the basis of this Regulation 5.

5.2     The Net Asset Value of a Class or Series shall be determined by or under the direction of the directors or by the Company's authorised agent as at each applicable Valuation Day, and shall be the value as at such date of all the assets of the Company (including interest and dividends accrued) attributable to the Class or Series, less all the liabilities of the Company (including accrued expenses) attributable to the Class or Series, calculated on the basis of this Regulation 5 and ascertained with reference to the Investment Accounts established and maintained for that Class or Series in accordance with Regulations 21.6 to 21.9.

5.3     The Net Asset Value per Share attributable to a Series shall be determined by or under the direction of the directors or by the Company's authorised agent as at each applicable Valuation Day, and shall be the Net Asset Value of the Series divided by the number of Shares of such Series then outstanding calculated in accordance with Regulation 5.9. Where Shares are not issued in

18

separate Series, all the Shares in the same Class shall be treated as having been issued in a single Series for the purposes of this Regulation.

5.4     The value of the assets and liabilities of the Company shall be determined in accordance with the valuation policies and procedures adopted by the Company from time to time.

5.5     For the purposes of calculation of the Net Asset Value of the Company and the Net Asset Value of a Class or Series, unless the directors determine otherwise:

(a)     the price for Shares for which applications have been made to the Company (less commissions, if any, and less any other duties and charges payable by the Company in connection with their issuance) shall be deemed to be an asset of the Company at the commencement of business on the Dealing Day on which such Shares are deemed to be in issue;

(b)     the price for Shares in the Company to be redeemed shall, from the close of business on the Redemption Day on which they are actually redeemed until the Redemption Price is paid be deemed to be a liability of the Company;

(c)     investments, cash balances and other assets of the Company shall be valued and liabilities of the Company shall be calculated in US Dollars and if not initially expressed in US Dollars, after taking into account such rate of exchange as the directors shall consider appropriate. A certificate of a custodian provided to the directors as to the exchange rate applicable in any particular case may be relied upon by the directors and, if relied upon, shall be conclusive and binding on all persons except in cases of manifest error;

(d)     any expense or liability may be spread over such period as the directors may determine;

(e)     administrative and other expenses of a regular or recurring nature may be calculated on an estimated figure for yearly or other periods in advance and accrue the same in equal proportions over any such period and may establish such reserves or holdbacks for contingent liabilities as the directors or their authorised agent determine appropriate.

5.6     Subject to Regulation 5.7, any increase or decrease in Net Asset Value of the Company (disregarding for these purposes (i) any changes in the Net Asset Value due to subscriptions, redemptions or the payment of dividends, and (ii) any designated adjustments (as described below)) will be allocated pro rata to the record for each Class based on the previous Net Asset Value of each Class. Those costs, expenses, losses, dividends, profits, gains, and income which the directors determine related solely to a particular Class or series (the designated adjustments) will then be allocated to the record of the relevant Class or series.

5.7     Unless the directors determine otherwise, as of the commencement of business on the day following the last day of each Performance Fee Period, a quantity of Class A Shares or Class A Restricted Shares of a value equalling the Performance Fee liability (as described in Regulation 21.6(a) shall be redeemed by the Company and this Redemption Price shall be applied by the Company towards the issue of Class L Shares (the "Performance Fee Reallocation"). Class S Shares shall also be subject to the Performance Fee Reallocation, provided that such reallocation shall not occur until the side pocket investment is liquidated. Notwithstanding the foregoing, the

19

Company's financial statements will reflect the Performance Fee Reallocation even on Class S Shares, as if were earned.

5.8     Any determinations made pursuant to Regulation 5 shall be binding on all persons.

5.9     For the purpose of calculating the number of Shares in issue and deemed to be in issue for purposes of this Regulation 5:

(a)     Shares for which applications have been made pursuant to Regulation 3.1 shall be deemed to be in issue at the commencement of business on the Dealing Day on which they are allotted; and

(b)     Shares to be redeemed in accordance with these Articles shall be deemed to remain in issue through the close of business on the Redemption Day on which they are actually redeemed.

**6       SUSPENSIONS**

6.1     The directors may declare a suspension of:

(a)     the determination of the Net Asset Value per Share of any one or more Classes and any such suspension must be combined with a simultaneous suspension of the redemption of Participating Shares of such Class or Classes and may (but need not) be combined with a suspension of the payment of redemption proceeds;

(b)     the redemption of Participating Shares of any one or more Classes and may (but need not) combine such a suspension with a simultaneous suspension of the determination of the Net Asset Value per Share of such Class or Classes and/or a simultaneous suspension of the redemption proceeds; and/or

(c)     the payment or redemption proceeds.

6.2     The directors may declare a suspension in accordance with Regulation 6.1 in such circumstances as they may deem appropriate, including the whole or any part of any period:

(a)     during which any securities exchange or similar electronic system on which a substantial part of the assets of the Company are traded is closed (other than customary closings) or dealings are otherwise restricted or suspended;

(b)     during which, in the opinion of the directors, it is not possible to determine the value of a substantial portion of the assets of the Company or the disposal of a substantial part of the assets of the Company would not be reasonably practicable or could not be carried out in an orderly manner;

(c)     during which redemption proceeds cannot lawfully be paid by the Company in the currency of the relevant Class;

(d)     during which, due to a breakdown in the systems normally used to determine the Net Asset Value or for any other reason, it is not reasonably practicable to accurately determine the Net Asset Value;

(e)     during which the business operations of the functionaries to the Company are substantially interrupted or closed due to pestilence, acts of war, terrorism, insurrection, revolution, civil unrest, riot, strikes, cyber-attack, natural disaster or other events beyond the reasonable control of the relevant party;

(f)     during which the transfer of funds involved in the realization or acquisition of any investment cannot, in the opinion of the directors, be effected at normal rates of exchange;

(g)     during which the Company receives redemption requests, which in the aggregate, would create in the sole discretion of the directors, a material adverse effect on the Company if such withdrawal requests were satisfied;

(h)     during which the proceeds of the sale or redemption of Participating Shares cannot be transmitted to or from the Company's account;

(i)     when, in the opinion of the directors it would be in the best interests of the Company to do so; or

(j)     after the directors form the opinion that it is in the best interest of the Company or the Shareholders to wind up and dissolve the Company.

6.3     Any suspension of the determination of the Net Asset Value shall be publicised by the directors in such manner as they may deem appropriate to persons likely to be affected by it.

6.4     Any suspension declared pursuant to this Regulation shall take effect at such time as the directors shall determine and shall continue until the directors shall declare the suspension to be at an end.

6.5     Whenever the directors declare a suspension under the provisions of these Articles the directors shall, as soon as may be practicable after any such declaration, give notice of the suspension to the affected Shareholder or Shareholders. At the end of any period of suspension the directors shall give notice to the affected Shareholder or Shareholders stating that the period of suspension has ended.  Any such notice may be given in such manner as the directors determine.

**7       MORTGAGES AND CHARGES OF SHARES**

7.1     Shares may only be mortgaged or charged with the prior written consent of the directors, as evidenced by a Resolution of Directors, which consent may be withheld or made subject to such conditions as the directors may determine.

7.2     Where a Share is mortgaged or charged with the consent of the directors, there shall be entered in the register of members at the written request of the Shareholder:

(a)     a statement that the Shares held by him are mortgaged or charged;

(b)     the name of the mortgagee or chargee, and

    (c)    the date on which the particulars specified in sub-paragraphs (a) and (b) are entered in the register of members.

7.3    Where particulars of a mortgage or charge are entered in the register of members, such particulars may be cancelled:

    (a)    with the written consent of the named mortgagee or chargee or anyone authorised to act on his behalf; or

    (b)    upon evidence satisfactory to the directors of the discharge of the liability secured by the mortgage or charge and the issue of such indemnities as the directors shall consider necessary or desirable.

7.4    Whilst particulars of a mortgage or charge over Shares are entered in the register of members pursuant to this Regulation:

    (a)    no transfer of any Share the subject of those particulars shall be effected without the written consent of the named mortgagee or chargee;

    (b)    the Company shall not purchase, redeem or otherwise acquire any such Share without giving not less than five Business Days written notice to the named mortgagee or chargee; and

    (c)    no replacement certificate shall be issued with respect of such Shares without the written consent of the named mortgagee or chargee.

**8    FORFEITURE**

8.1    Shares that are not fully paid on issue are subject to the forfeiture provisions set forth in this Regulation and for this purpose Shares issued for a promissory note, other written obligation to contribute money or property or a contract for future services are deemed to be not fully paid.

8.2    A written notice of call specifying the date for payment to be made shall be served on the Shareholder who defaults in making payment in respect of the Shares.

8.3    The written notice of call referred to in Regulation 8.2 shall name a further date not earlier than the expiration of fourteen days from the date of service of the notice on or before which the payment required by the notice is to be made and shall contain a statement that in the event of non-payment at or before the time named in the notice the Shares, or any of them, in respect of which payment is not made will be liable to be forfeited.

8.4    Where a written notice of call has been issued pursuant to Regulation 8.3 and the requirements of the notice have not been complied with, the directors may, at any time before tender of payment, forfeit and cancel the Shares to which the notice relates.

8.5    The Company is under no obligation to refund any moneys to the Shareholder whose Shares have been cancelled pursuant to Regulation 8.4 and that Shareholder shall be discharged from any further obligation to the Company.

22

**9      TRANSFER OF SHARES**

9.1     Shares may only be transferred with the prior written consent of the directors or their authorised agent which consent may be withheld or made subject to such conditions as the directors may determine.

9.2     Subject to Regulation 9.1, Shares may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, which shall be sent to the Company for registration.

9.3     The transfer of a Share is effective when the name of the transferee is entered on the register of members.

9.4     If the directors of the Company are satisfied that an instrument of transfer relating to Shares has been signed but that the instrument has been lost or destroyed, they may resolve by a Resolution of Directors:

(a)     to accept such evidence of the transfer of Shares as they consider appropriate; and

(b)     that the transferee's name should be entered in the register of members notwithstanding the absence of the instrument of transfer.

9.5     The personal representative of a deceased Shareholder may transfer a Share even though the personal representative is not a Shareholder at the time of the transfer.

**10     MEETINGS AND CONSENTS OF SHAREHOLDERS**

10.1    Any director of the Company may convene meetings of the Shareholders or the holders of a Class (for the purposes of this Regulation 10, a meeting) at such times and in such manner and places within or outside the British Virgin Islands as the director considers necessary or desirable.

10.2    Upon the written request of one or more Shareholders entitled to exercise 30 per cent or more of the voting rights in respect of the matter for which the meeting is requested the directors shall convene a meeting of Shareholders.

10.3    The director convening a meeting shall give not less than seven days' notice of a meeting of Shareholders to:

(a)     those Shareholders whose names on the date the notice is given appear as Shareholders in the register of members of the Company and are entitled to vote at the meeting; and

(b)     the other directors.

10.4    The director convening a meeting of Shareholders may fix as the record date for determining those Shareholders that are entitled to vote at the meeting the date notice is given of the meeting, or such other date as may be specified in the notice, being a date not earlier than the date of the notice.

10.5    A meeting of Shareholders held in contravention of the requirement to give notice is valid if Shareholders holding at least 90 per cent of the total voting rights on all the matters to be

23

considered and voted on at the meeting, have waived notice of the meeting and, for this purpose, the presence of a Shareholder at the meeting shall constitute waiver in relation to all the Shares which that Shareholder holds.

10.6   The inadvertent failure of the director who convenes a meeting to give notice of a meeting to a Shareholder or another director, or the fact that a Shareholder or another director has not received notice, does not invalidate the meeting.

10.7   A Shareholder may be represented at a meeting by a proxy who may speak and vote on behalf of the Shareholder.

10.8   The instrument appointing a proxy shall be produced at the place designated for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote. The notice of the meeting may specify an alternative or additional place or time at which the proxy shall be presented. The directors may accept a copy of an instrument appointing a proxy or such other evidence of its existence as they see fit in lieu of the original.

10.9   The instrument appointing a proxy shall be in such form as the directors from time to time approve or as the chairman of the meeting shall accept as properly evidencing the wishes of the Shareholder appointing the proxy.

10.10   The following applies where Shares are jointly owned:

(a)   if two or more persons hold Shares jointly each of them may be present in person or by proxy at a meeting and may speak as a Shareholder;

(b)   if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners; and

(c)   if two or more of the joint owners are present in person or by proxy they must vote as one.

10.11   A Shareholder or his proxy or (in the case of a Shareholder that is not an individual) an authorised representative shall be deemed to be present at a meeting if he participates by telephone or other electronic means and all Shareholders, proxies and (in the case of Shareholders that are not individuals) authorised representatives participating in the meeting are able to hear each other.

10.12   A meeting of Shareholders is duly constituted if, at the commencement of the meeting, there are present in person or by proxy the holders of not less than 25 per cent of the Shares entitled to be voted on the matters to be considered at the meeting. A quorum may comprise a single Shareholder or proxy and then such person may pass a Resolution of Shareholders or a resolution of the holders of a Class and a certificate signed by such person accompanied where such person be a proxy by a copy of the proxy instrument shall constitute a valid Resolution of Shareholders or a resolution of the holders of a Class.

10.13   If within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved; in any other case it shall stand adjourned to the next business day in the jurisdiction in which the meeting was to have been held at the same time and place or to such other time and place as the directors may determine, and if at the adjourned meeting there are present within one hour from the time appointed for the

24

meeting in person or by proxy the holders of not less than 10 per cent. of the votes of the Shares entitled to vote on the matters to be considered and voted on at the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved.

10.14    At every meeting of Shareholders, the chairman of the board shall preside as chairman of the meeting. If there is no chairman of the board or if the chairman of the board is not present at the meeting, the Shareholders present shall choose one of their number to be the chairman. If the Shareholders are unable to choose a chairman for any reason, then the person representing the greatest number of voting Shares present in person or by proxy at the meeting shall preside as chairman failing which the oldest individual Shareholder or representative of a Shareholder present shall take the chair.

10.15    The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

10.16    At any meeting of Shareholders, the chairman is responsible for deciding in such manner as he considers appropriate whether any resolution proposed has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes of the meeting. If the chairman has any doubt as to the outcome of the vote on a proposed resolution, he shall cause a poll to be taken of all votes cast upon such resolution. If the chairman fails to take a poll, then any Shareholder present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall cause a poll to be taken. If a poll is taken at any meeting, the result shall be announced to the meeting and recorded in the minutes of the meeting.

10.17    Any Shareholder that is not an individual may authorise such individual as it thinks fit to act as its representative at any meeting and the individual so authorised shall be entitled to exercise the same rights on behalf of the Shareholder which he represents as that Shareholder could exercise if it were an individual. For the purposes of this Regulation 10, a Shareholder that is not an individual shall be deemed to be present in person at a meeting if they are represented at such meeting by an authorised representative. The Company shall be entitled to assume that the relevant Shareholder has taken all necessary corporate action in authorising such individual to exercise all rights of the Shareholder.

10.18    The chairman of any meeting at which a vote is cast by proxy or on behalf of any Shareholder that is not an individual may call for the original proxy or authority or a copy of such proxy or authority (certified in such manner as the chairman may reasonably require) which shall be produced within seven days of being so requested or the votes cast by such proxy or on behalf of such Shareholder shall be disregarded.

10.19    Directors of the Company may attend and speak at any meeting of Shareholders and at any separate meeting of the holders of any Class or Series.

10.20    An action that may be taken by the Shareholders at a meeting may also be taken by a resolution consented to in writing, without the need for any notice, but if any Resolution of Shareholders is adopted otherwise than by the unanimous written consent of all Shareholders entitled to vote on such action, a copy of such resolution shall forthwith be sent to all such Shareholders not consenting to such resolution. The consent may be in the form of counterparts, each counterpart

25

being signed by one or more Shareholders. If the consent is in one or more counterparts, and the counterparts bear different dates, then the resolution shall take effect on the earliest date upon which Shareholders holding a sufficient number of votes of Shares to constitute a Resolution of Shareholders or resolution of the holders of a Class have consented to the resolution by signed counterparts.

## 11    DIRECTORS

11.1    The first director or directors of the Company shall be appointed by the first registered agent within six months of the date of the incorporation of the Company; and thereafter, the directors shall be elected by Resolution of Shareholders or by Resolution of Directors. If, before the Company has any Shareholders, all of the directors appointed by the registered agent resign or die or otherwise cease to exist, the registered agent may appoint one or more further persons as directors of the Company.

11.2    No person shall be appointed as a director or alternate director, or nominated as a reserve director, of the Company unless he has consented in writing to be a director or alternate director or to be nominated as a reserve director.

11.3    Subject to Regulation 11.1, the minimum number of directors shall be one and there shall be no maximum number.

11.4    Each director holds office for the term, if any, fixed by the Resolution of Shareholders or Resolution of Directors appointing him, or until his earlier death, resignation or removal. If no term is fixed on the appointment of a director, the director serves indefinitely until his earlier death, resignation or removal.

11.5    A director may be removed from office:

(a)    with or without cause, by Resolution of Shareholders passed at a meeting of Shareholders called for the purpose of removing the director or for purposes including the removal of the director or by a written resolution passed by at least 75 per cent of the votes of the Shares of the Company entitled to vote thereon, or

(b)    with cause, by Resolution of Directors passed at a meeting of directors called for the purpose of removing the director or for purposes including the removal of the director.

11.6    A director may resign his office by giving written notice of his resignation to the Company and the resignation has effect from the date the notice is received by the Company or from such later date as may be specified in the notice. A director shall resign forthwith as a director if he is, or becomes, disqualified from acting as a director under the Act.

11.7    The directors may at any time appoint any person to be a director either to fill a vacancy or as an addition to the existing directors. Where the directors appoint a person as director to fill a vacancy, the term shall not exceed the term that remained when the person who has ceased to be a director ceased to hold office.

11.8    A vacancy in relation to directors occurs if a director dies or otherwise ceases to hold office prior to the expiration of his term of office.

11.9    The Company shall keep a register of directors containing:

  (a)     the names and addresses of the persons who are directors of the Company or who have been nominated as reserve directors of the Company;

  (b)     the date on which each person whose name is entered in the register was appointed as a director, or nominated as a reserve director, of the Company;

  (c)     the date on which each person named as a director ceased to be a director of the Company;

  (d)     the date on which the nomination of any person nominated as a reserve director ceased to have effect; and

  (e)     such other information as may be prescribed by the Act.

11.10   The register of directors may be kept in any such form as the directors may approve, but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents.  Until a Resolution of Directors determining otherwise is passed, the magnetic, electronic or other data storage shall be the original register of directors.

11.11   The directors may fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

11.12   A director is not required to hold a Share as qualification to office.

**12      POWERS OF DIRECTORS**

12.1    The business and affairs of the Company shall be managed by, or under the direction or supervision of, the directors of the Company. The directors of the Company have all the powers necessary for managing, and for directing and supervising, the business and affairs of the Company.  The directors may exercise all such powers of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by the Shareholders.  The directors may pay and be reimbursed by the Company all expenses incurred preliminary to and in connection with the incorporation of the Company.

12.2    Each director shall exercise his powers for a proper purpose and shall not act or agree to the Company acting in a manner that contravenes the Memorandum, these Articles or the Act.  Each director, in exercising his powers or performing his duties, shall act honestly and in good faith in what the director believes to be the best interests of the Company.

12.3    Any director which is a body corporate may appoint any individual its duly authorised representative for the purpose of representing it at meetings of the directors, with respect to the signing of consents or otherwise.

12.4    The continuing directors may act notwithstanding any vacancy in their body.

12.5    The directors may by Resolution of Directors exercise all the powers of the Company to incur indebtedness, liabilities or obligations and to secure indebtedness, liabilities or obligations whether of the Company or of any third party.

27

**13      PROCEEDINGS OF DIRECTORS**

13.1    Any one director of the Company may call a meeting of the directors by sending a written notice to each other director.

13.2    The directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the directors may determine to be necessary or desirable.

13.3    A director is deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

13.4    A director shall be given reasonable notice of meetings of directors, but a meeting of directors held without reasonable notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting who do not attend waive notice of the meeting, and for this purpose the presence of a director at a meeting shall constitute waiver by that director.  The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

13.5    A director of the Company (the appointing director) may appoint any other director or any other eligible person as his alternate to exercise the appointing director's powers and carry out the appointing director's responsibilities in relation to the taking of decisions by the directors in the absence of the appointing director.

13.6    The appointment and termination of an alternate director must be in writing, and written notice of the appointment and termination must be given by the appointing director to the Company as soon as reasonably practicable.

13.7    An alternate director has the same rights as the appointing director in relation to any directors' meeting and any written resolution circulated for consent.  An alternate director has no power to appoint a further alternate, whether of the appointing director or of the alternate director, and the alternate does not act as agent for the appointing director.

13.8    The appointing director may, at any time, voluntarily terminate the alternate director's appointment.  The voluntary termination of the appointment of an alternate shall take effect from the time when written notice of the termination is given to the Company.  The rights of an alternate shall automatically terminate if the appointing director dies or otherwise ceases to hold office.

13.9    A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than two directors.

13.10   If the Company has only one director the provisions herein contained for meetings of directors do not apply and such sole director has full power to represent and act for the Company in all matters as are not by the Act, the Memorandum or these Articles required to be exercised by the Shareholders.  In lieu of minutes of a meeting the sole director shall record in writing and sign a note or memorandum of all matters requiring a Resolution of Directors.  Such a note or memorandum constitutes sufficient evidence of such resolution for all purposes.

28

13.11   The directors may appoint a director as chairman of the board of directors.  At meetings of directors at which the chairman of the board is present, he shall preside as chairman of the meeting.  If there is no chairman of the board or if the chairman of the board is not present, the directors present shall choose one of their number to be chairman of the meeting.

13.12   An action that may be taken by the directors or a committee of directors at a meeting may also be taken by a resolution consented to in writing by all directors or by all members of the committee, as the case may be, without the need for any notice.  The consent may be in the form of counterparts each counterpart being signed by one or more directors.  If the consent is in one or more counterparts, and the counterparts bear different dates, then the resolution shall take effect on the date upon which the last director has consented to the resolution by signed counterparts.

**14      COMMITTEES**

14.1    The directors may, by Resolution of Directors, designate one or more committees, each consisting of one or more directors, and delegate one or more of their powers, including the power to affix the Seal, to the committee.

14.2    The directors have no power to delegate to a committee of directors any of the Proscribed Powers.

14.3    A committee of directors, where authorised by the Resolution of Directors appointing such committee or by a subsequent Resolution of Directors, may appoint a sub-committee and delegate powers exercisable by the committee to the sub-committee.

14.4    The meetings and proceedings of each committee of directors consisting of two or more directors shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of directors so far as the same are not superseded by any provisions in the Resolution of Directors establishing the committee.

14.5    Where the directors delegate their powers to a committee of directors they remain responsible for the exercise of that power by the committee, unless they believed on reasonable grounds at all times before the exercise of the power that the committee would exercise the power in conformity with the duties imposed on directors of the Company under the Act.

**15      OFFICERS AND AGENTS**

15.1    The Company may, by Resolution of Directors appoint officers of the Company at such times as may be considered necessary or expedient.  The officers shall perform such duties as are prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by Resolution of Directors.

15.2    The emoluments of all officers shall be fixed by Resolution of Directors.

15.3    The officers of the Company shall hold office until their successors are duly appointed, but any officer elected or appointed by the directors may be removed at any time, with or without cause, by Resolution of Directors.  Any vacancy occurring in any office of the Company may be filled by Resolution of Directors.

29

15.4    The directors may, by Resolution of Directors, appoint any person, including a person who is a director, to be an agent of the Company.

15.5    An agent of the Company shall have such powers and authority of the directors, including the power and authority to affix the Seal, as are set forth in these Articles or in the Resolution of Directors appointing the agent, except that no agent has any power or authority with respect to the following:

    (a)    the Proscribed Powers;

    (b)    to change the registered office or agent;

    (c)    to fix emoluments of directors; or

    (d)    to authorise the Company to continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands.

15.6    The Resolution of Directors appointing an agent may authorise the agent to appoint one or more substitutes or delegates to exercise some or all of the powers conferred on the agent by the Company.

15.7    The directors may remove an agent appointed by the Company and may revoke or vary a power conferred on him.

**16    CONFLICT OF INTERESTS**

16.1    A director of the Company shall, forthwith after becoming aware of the fact that he is interested in a transaction entered into or to be entered into by the Company, disclose the interest to all other directors of the Company.

16.2    For the purposes of Regulation 16.1, a disclosure to all other directors to the effect that a director is a member, director or officer of another named entity or has a fiduciary relationship with respect to the entity or a named individual and is to be regarded as interested in any transaction which may, after the date of the entry into the transaction or disclosure of the interest, be entered into with that entity or individual, is a sufficient disclosure of interest in relation to that transaction.

16.3    A director of the Company who is interested in a transaction entered into or to be entered into by the Company may:

    (a)    vote on a matter relating to the transaction;

    (b)    attend a meeting of directors at which a matter relating to the transaction arises and be included among the directors present at the meeting for the purposes of a quorum; and

    (c)    sign a document on behalf of the Company, or do any other thing in his capacity as a director, that relates to the transaction,

and, subject to compliance with the Act shall not, by reason of his office be accountable to the Company for any benefit which he derives from such transaction and no such transaction shall be liable to be avoided on the grounds of any such interest or benefit.

30

**17      INDEMNIFICATION**

17.1     Subject to the limitations hereinafter provided the Company shall indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who:

(a)     is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director of the Company; or

(b)     is or was, at the request of the Company, serving as a director of, or in any other capacity is or was acting for, another body corporate or a partnership, joint venture, trust or other enterprise.

17.2     The indemnity in <u>Regulation 17.1</u> shall apply in all cases, except in the case of any act or omission with respect to which a court of competent jurisdiction (or similar tribunal) has issued a final and non-appealable decision, judgment or order that such act or omission result from the persons' bad faith, gross negligence, wilful misconduct, or fraud.

17.3     The termination of any proceedings by any judgment, order, settlement, conviction or the entering of a *nolle prosequi* does not, by itself, create a presumption that the person's act or omission was the result of bad faith, gross negligence, wilful misconduct, or fraud.

17.4     Expenses, including legal fees, incurred by a director in defending any legal, administrative or investigative proceedings may be paid by the Company in advance of the final disposition of such proceedings upon receipt of an undertaking on behalf of the director to repay the amount if it shall ultimately be determined that the person is not entitled to be indemnified by the Company in accordance with <u>Regulation 17.1</u>.

17.5     Expenses, including legal fees, incurred by a former director in defending any legal, administrative or investigative proceedings may be paid by the Company in advance of the final disposition of such proceedings upon receipt of an undertaking by or on behalf of the former director to repay the amount if it shall ultimately be determined that the former director is not entitled to be indemnified by the Company in accordance with <u>Regulation 17.1</u> and upon such terms and conditions, if any, as the Company deems appropriate.

17.6     The indemnification and advancement of expenses provided by, or granted pursuant to, this section is not exclusive of any other rights to which the person seeking indemnification or advancement of expenses may be entitled under any agreement, Resolution of Shareholders, resolution of disinterested directors or otherwise, both as acting in the person's official capacity and as to acting in another capacity while serving as a director of the Company.

17.7     If a person referred to in <u>Regulation 17.1</u> has been successful in defence of any proceedings referred to in <u>Regulation 17.1</u>, the person is entitled to be indemnified against all expenses, including legal fees, and against all judgments, fines, and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings.

31

17.8   The Company may purchase and maintain insurance in relation to any person who is or was a director, officer or liquidator of the Company, or who at the request of the Company is or was serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability as provided in these Articles.

## 18   CORPORATE RECORDS

18.1   The Company shall keep the following documents at the office of its registered agent:

(a)   the Memorandum and these Articles;

(b)   the register of members, or a copy of the register of members;

(c)   the register of directors, or a copy of the register of directors; and

(d)   copies of all notices and other documents filed by the Company with the Registrar of Corporate Affairs in the previous ten years.

18.2   Until the directors determine otherwise by resolution of Directors the Company shall keep the original register of members and original register of directors at the office of its registered agent.

18.3   If the Company maintains only a copy of the register of members or a copy of the register of directors at the office of its registered agent, it shall:

(a)   within fifteen days of any change in either register, notify the registered agent in writing of the change; and

(b)   provide the registered agent with a written record of the physical address of the place or places at which the original register of members or the original register of directors is kept.

18.4   The Company shall keep the following records at the office of its registered agent or at such other place or places, within or outside the British Virgin Islands, as the directors may determine:

(a)   minutes of meetings and Resolutions of Shareholders and Classes of Shareholders;

(b)   minutes of meetings and Resolutions of Directors and committees of directors; and

(c)   an impression of the Seal.

18.5   Where any original records referred to in this Regulation are maintained other than at the office of the registered agent of the Company, and the place at which the original records is changed, the Company shall provide the registered agent with the physical address of the new location of the records of the Company within fourteen days of the change of location.

18.6   The records kept by the Company under this Regulation shall be in written form or either wholly or partly as electronic records complying with the requirements of the Electronic Transactions Act 2001 as from time to time amended or re-enacted.

32

**19      SEAL**

The Company shall have a Seal.  The Company may have more than one Seal and references herein to the Seal shall be references to every Seal that shall have been duly adopted by Resolution of Directors.  The directors shall provide for the safe custody of the Seal and for an imprint thereof to be kept at the registered office.  Except as otherwise expressly provided herein the Seal when affixed to any written instrument shall be witnessed and attested to by the signature of any one director or other person so authorised from time to time by Resolution of Directors.  Such authorisation may be before or after the Seal is affixed, may be general or specific and may refer to any number of sealings.  The directors may provide for a facsimile of the Seal and of the signature of any director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been attested to as hereinbefore described.

**20      DISTRIBUTIONS BY WAY OF DIVIDENDS**

20.1    The directors of the Company may, by Resolution of Directors, authorise a distribution by way of dividend at a time, and of an amount they think fit if they are satisfied, on reasonable grounds, that immediately after the distribution the value of the Company's assets will exceed its liabilities and the Company will be able to pay its debts as they fall due.

20.2    Dividends may be paid in money, shares, or other property.

20.3    The directors may deduct from any distribution payable to any Shareholder (i) all sums of money, if any, then payable by the Shareholder to the Company on account of calls or otherwise, and (ii) and amount equivalent to any Shareholder Caused Liability. Any amount deducted in respect of any Shareholder Caused Liability shall be held for the benefit of the Company and may be used to discharge any obligation imposed on the Company as a consequence (directly or indirectly) of such Shareholder holding Participating Shares. The Shareholder shall have no claim against the Company in respect of the amount deducted. Any amount which the directors determine is no longer required to satisfy the relevant Shareholder Caused Liability shall be paid to the relevant Shareholder.

20.4    Notice of any dividend that may have been declared shall be given to each Shareholder as specified in Regulation 22.1 and all dividends unclaimed for three years after having been declared may be forfeited by Resolution of Directors for the benefit of the Company.

20.5    No dividend shall bear interest as against the Company and no dividend shall be paid on treasury shares.

**21      ACCOUNTS AND AUDIT**

21.1    The Company shall keep records and underlying documentation that are sufficient to show and explain the Company's transactions and that will, at any time, enable the financial position of the Company to be determined with reasonable accuracy.

21.2    The records and underlying documentation of the Company shall be kept at the office of its registered agent or at such other place or places, within or outside the British Virgin Islands, as the directors may determine and if the records and underlying documentation are kept in a location

other than the office of the registered agent, the Company shall provide the registered agent with a written record of:

(a)     the physical address of the place at which the records and underlying documentation are kept; and

(b)     the name of the person who maintains and controls the Company's records and underlying documentation.

21.3    If the location at which the records and underlying documentation are kept or the name of the person who maintains and controls the records and underlying documentation changes, the Company shall, within 14 days of the change provide its registered agent with:

(a)     the physical address of the new location at which the records and underlying documentation are kept; and

(b)     the name of the new person who maintains and controls the Company's records and underlying documentation.

21.4    The Company may, at the discretion of the Directors, prepare periodically a profit and loss account and a balance sheet. The profit and loss account and balance sheet shall be drawn up so as to give respectively a true and fair view of the profit and loss of the Company for a financial period and a true and fair view of the assets and liabilities of the Company as at the end of a financial period.

21.5    Auditors may be appointed by Resolution of Shareholders or by Resolution of Directors. The remuneration of the auditors of the Company may be fixed by Resolution of Directors.

21.6    The Company or its duly authorised agent may establish and maintain separate accounts (each an **Investment Account**) for each Class and Series, or for one or more Classes or Series, to which the following provisions shall apply:

(a)     the proceeds from the allotment and issue of the Shares may be applied in the books of the Company to the Investment Account established for the Shares and the assets and liabilities (including any liability to pay any Performance Fee) and income and expenditure attributable thereto shall be applied or charged to such Investment Account subject to the provisions of Regulations 21.6 to 21.9;

(b)     where any asset is derived from another asset (whether cash or otherwise) such derivative asset shall be applied in the books of the Company to the same Investment Account as the asset from which it was derived, and on each re-evaluation of an investment the increase or diminution in value thereof (or the relevant portion of such increase or diminution in value) shall be applied to the relevant Investment Account;

(c)     in the case of an asset of the Company (or amount treated as a notional asset) which the Company or its authorised agent does not consider is attributable to a particular Investment Account or Investment Accounts, such asset shall be allocated between Investment Accounts at the discretion of the Company or its duly authorised agent in such manner as they consider fair and reasonable in all circumstances and the Company or its duly authorised agent shall have power at any time and from time to time to vary such

34

basis. Without limiting the generality of the foregoing such allocation shall generally be pro rata to the Net Asset Value of the relevant Classes or Series;

(d) the Company or its duly authorised agent shall allocate the liability to pay a dividend or distribution on a Class to the corresponding Investment Account and the Company or its duly authorised agent shall allocate any other liability to the Investment Account or Investment Accounts to which, in the opinion of the Company or its duly authorised agent, it relates or, if in the opinion of the Company or its duly authorised agent it does not relate to any particular Investment Account or Investment Accounts, between Investment Accounts at the discretion of the Company or its authorised agent in such manner as they consider fair and reasonable in all the circumstances and the Company or its duly authorised agent shall have power at any time and from time to time to vary such basis. Without limiting the generality of the foregoing, such allocation shall generally be pro rata to the Net Asset Value of the relevant Classes or Series;

(e) in any proceedings brought by any holder of Shares of a particular Class or Series in respect of the rights of such holder as the holder of such Shares, any liability of the Company to such Shareholder in respect of such proceedings shall only be settled out of the assets in the Investment Account corresponding to such Shares, without recourse in respect of such liability or any allocation of such liability to any other Class or Series of the Company;

(f) to the extent possible any Shareholder caused liability suffered or incurred by the Company is borne only by the Investment Account or Accounts corresponding to the Shares held by such Shareholder;

(g) the Company or its duly authorised agent may transfer in the books of the Company any assets (or amounts treated as assets) to and from Investment Accounts if, as a result of a creditor or default proceeding against certain of the assets of the Company or otherwise, a liability would be borne in a different manner from that in which it would have been borne under sub-paragraph (d) and (e) above, or in any similar circumstances.

21.7 Save as otherwise provided in these Articles, the assets held in each Investment Account shall be applied solely in respect of the Shares to which such Investment Account appertains.

21.8 Distributions declared and paid by the directors in accordance with these Articles on a Class shall be paid only out of such surplus assets as are allocated to the relevant Investment Account(s).

21.9 If the Company shall be wound up, any liabilities of the Company attributable to an Investment Account shall be settled out of any assets allocated to that Investment Account, and, if such assets are insufficient, shall then be apportioned between (and settled out of) the assets allocated to the other Investment Accounts pro rata or as the directors or the liquidator (as the case may be) shall think fit. Any remaining assets allocated to an Investment Account shall be distributed (in cash or in specie, as the liquidator thinks fit) to the holders of Participating Shares corresponding to such Investment Account.

21.10 Upon any conversion of Shares from one Class and Series to another in accordance with the provisions of these Articles, the directors shall allocate assets to the value of the Shares being converted from the Investment Accounts drawn up for the Class and Series from which the Shares

35

are being converted to the Investment Accounts drawn up for the Class and Series into which the Shares are being converted.

**22    NOTICES**

22.1    Any notice, information or written statement to be given by the Company to Shareholders shall be in writing and may be given by personal service mail, courier, email or fax to such Shareholder's address as shown in the register of members or to such Shareholder's email address or fax number as notified by the Shareholder to the Company in writing from time to time.

22.2    Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail addressed to the Company at the offices of the registered agent of the Company.

22.3    Where a notice is sent by the Company by post, service of the notice shall be deemed to be effected by properly addressing, prepaying and posting a letter containing notice, and shall be deemed to be received on the fifth business day following the day on which the notice was posted. Where a notice is sent by the Company by fax or email, notice shall be deemed to be effected by transmitting the email or fax to the address or number provided by the intended recipient and service of the notice shall be deemed to have been received on the same day that it was transmitted.

**23    AUTOMATIC EXCHANGE OF INFORMATION**

23.1    The Company may release or disclose to any relevant regulatory authority any information in its possession regarding the affairs of the Company or regarding any Shareholder, including any information contained in the register of members and any information provided pursuant to or in connection with the Shareholder's subscription for Participating Shares (collectively *Relevant Information*) if such release or disclosure is necessary in order to comply with any AEOI Legislation nor the Company is required to do so under the laws of any jurisdiction relevant to the Company.

23.2    The Company may authorise any person to disclose Relevant Information on behalf of the Company and in connection with any such authorisation, may release and disclose any Relevant Information to such person.

**24    WINDING UP**

24.1    The Company's business shall continue for so long as the Company holds assets and investments irrespective of whether the directors have determined that the Company shall not acquire any further assets or investments.  If the directors determine that the business of the Company shall be terminated and that the assets and investments of the Company shall be realised in anticipation of such termination, the business of the Company shall continue and shall be regarded as continuing as a going concern, until the process of realisation of the assets and investments of the Company is complete.

24.2    Subject to the Act, the Company may by Resolution of Shareholders or by Resolution of Directors appoint an eligible individual as voluntary liquidator alone or jointly with one or more other voluntary liquidators.

**25    CONTINUATION**

The Company may by Resolution of Shareholders or by a resolution passed unanimously by all directors of the Company continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

Signed for Harneys Corporate Services Limited of Craigmuir Chambers, PO Box 71, Road Town, Tortola, British Virgin Islands, VG1110 for the purpose of incorporating a BVI Business Company under the laws of the British Virgin Islands on 9 March 2022

Incorporator

**(sgd.) Indira Ward-Lewis**
Authorised Signatory
Harneys Corporate Services Limited

37

# **ATTACHMENT 6**



# Delaware

## The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF LIMITED PARTNERSHIP OF "BKCOIN MULTI-STRATEGY FUND LP", FILED IN THIS OFFICE ON THE TWENTY-EIGHTH DAY OF OCTOBER, A.D. 2021, AT 9:53 O'CLOCK A.M.



6345017  8100
SR# 20224071132

You may verify this certificate online at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

Authentication: 204910097
Date: 11-21-22

# STATE OF DELAWARE
# CERTIFICATE OF LIMITED PARTNERSHIP

- **The Undersigned,** desiring to form a limited partnership pursuant to the Delaware Revised Uniform Limited Partnership Act, 6 Delaware Code, Chapter 17, do hereby certify as follows:

- **First:** The name of the limited partnership is

  _____ BKCoin Multi-Strategy Fund LP _____.

- **Second:** The address of its registered office in the State of Delaware is

  _____ 16192 Coastal Hwy _____ in the city of _____ Lewes _____.

  Zip code _____ 19958 _____. The name of the Registered Agent at such address is

  _____ Harvard Business Services, Inc. _____.

- **Third:** The name and mailing address of each general partner is as follows:

  > BKCoin Management LLC
  > 1101 Brickell Avenue South Tower #8
  > Miami, Florida 33131

- **In Witness Whereof,** the undersigned has executed this Certificate of Limited Partnership as of _____ 28th _____ day of _____ October _____, A.D. _____ 2021 _____.

  By: _/s/ Carlos Betancourt, on behalf of BKCoin Management LLC_
  **General Partner**

  Name: _____ Carlos Betancourt _____
  **(type or print name)**

State of Delaware
Secretary of State
Division of Corporations
Delivered  09:53 AM 10/28/2021
FILED  09:53 AM 10/28/2021
SR 20213638289 - File Number  6345017

# **ATTACHMENT 7**



**BRITISH VIRGIN ISLANDS**
**BVI Business Companies Act 2004**

**Memorandum of Association**
**and Articles of Association of**



**BKCoin Multi-Strategy Fund Ltd.**

**A COMPANY LIMITED BY SHARES**

**Incorporated on 9th day of March 2022**



Harneys Corporate Services Limited
Craigmuir Chambers, Road Town, Tortola, VG 1110, British Virgin Islands
+1284 494 2233
+1284 494 3547
harneysfiduciary.com

CERTIFIED A TRUE COPY

REGISTRAR OF CORPORATE AFFAIRS
BRITISH VIRGIN ISLANDS
Date _____ 01/12/2022

TERRITORY OF THE BRITISH VIRGIN ISLANDS

BVI BUSINESS COMPANIES ACT 2004

MEMORANDUM OF ASSOCIATION

OF

BKCoin Multi-Strategy Fund Ltd.

A Company Limited by Shares

**1      NAME**

The name of the Company is BKCoin Multi-Strategy Fund Ltd.

**2      STATUS**

The Company is a company limited by shares.

**3      REGISTERED OFFICE AND REGISTERED AGENT**

3.1      The first registered office of the Company is at Craigmuir Chambers, PO Box 71, Road Town, Tortola, British Virgin Islands, VG1110.

3.2      The first registered agent of the Company is Harneys Corporate Services Limited of Craigmuir Chambers, PO Box 71, Road Town, Tortola, British Virgin Islands, VG1110.

3.3      The Company may, by Resolution of Shareholders or by Resolution of Directors, change the location of its registered office or change its registered agent.

3.4      If at any time the Company does not have a registered agent it may, by Resolution of Shareholders or Resolution of Directors, appoint a registered agent.

**4      CAPACITY AND POWERS**

4.1      Subject to the Act and any other British Virgin Islands legislation, the Company has, irrespective of corporate benefit:

(a)      full capacity to carry on or undertake any business or activity, do any act or enter into any transaction; and

(b)      for the purposes of paragraph (a), full rights, powers and privileges.

4.2      For the purposes of section 9(4) of the Act, there are no limitations on the business that the Company may carry on.

**5      NUMBER AND CLASSES OF SHARES**

5.1    The Company is authorised to issue a maximum of 50,000 no par value shares divided into four classes, 49,900 of which are participating shares and designated as Class A Shares, Class Restricted A Shares, and Class S Shares, and 100 non-participating shares designated as Class M Shares.

5.2    The Company may issue fractional Shares and a fractional Share shall have the corresponding fractional rights, obligations and liabilities of a whole Share of the same Class or Series.

5.3    The Company may issue a Class in one or more Series.  The division of a Class into one or more Series and the designation to be made to each Series shall be determined by the directors or their authorised agent from time to time.

**6      RIGHTS OF SHARES**

6.1    Each Class M Share in the Company confers upon the Shareholder:

    (a)    the right to one vote on any Resolution of Shareholders;

    (b)    no right to redeem such Share;

    (c)    no right to any dividend or other distribution paid by the Company; and

    (d)    no right to receive any payment or to otherwise participate in the distribution of the surplus assets of the Company on its liquidation, save for a return of the subscription sum paid for the issue of such Share following the payment in full of all sums due to the holders of the Participating Shares.

6.2    Each Participating Share confers upon the Shareholder:

    (a)    no right to receive notice of, attend at or vote at any meeting of the Shareholders or on any Resolution of Shareholders, save as arises pursuant to the operation of Clause 8.3;

    (b)    the right to redeem such Share out of the net assets of the Company attributable to the Class or Series to which such Share belongs with reference to the Investment Accounts;

    (c)    the right to an equal share in any dividend or other distribution paid by the Company and which is attributable to the Class to which such Share belongs with reference to the Investment Accounts; and

    (d)    the right to receive an equal share in the distribution of the surplus assets of the Company on its liquidation properly attributable to the Class or Series to which such Share belongs with reference to the Investment Accounts.

6.3    Each Side Pocket Investment Share confers upon the Shareholder:

    (a)    no right to receive notice of, attend at or vote at any meeting of the Shareholders or on any Resolution of Shareholders, save as arises pursuant to the operation of Clause 8.3;

(b)     no right to redeem such Share, except pursuant to Regulation 4.7;

(c)     the right to an equal share in any dividend or other distribution paid by the Company and which is attributable to the Class to which such Share belongs with reference to the Investment Accounts; and

(d)     the right to receive an equal share in the distribution of the surplus assets of the Company on its liquidation properly attributable to the Class or Series to which such Share belongs with reference to the Investment Accounts.

6.4     The redemption of Participating Shares pursuant to Clause 6.2 shall be effected in accordance with the Articles.

6.5     The Company may redeem, purchase or otherwise acquire all or any of the Shares in the Company in accordance with the Articles.

7       **REGISTERED SHARES**

The Company shall issue registered Shares only. The Company is not authorised to issue bearer Shares, convert registered Shares to bearer Shares or exchange registered Shares for bearer Shares.

8       **AMENDMENT OF THE MEMORANDUM AND THE ARTICLES**

8.1     The Company may amend this Memorandum or the Articles by Resolution of Shareholders or by Resolution of Directors save that no amendment may be made by Resolution of Directors:

(a)     to restrict the rights or powers of the Shareholders to amend this Memorandum or the Articles;

(b)     to change the percentage of Shareholders required to pass a Resolution of Shareholders to amend this Memorandum or the Articles; or

(c)     in circumstances where this Memorandum or the Articles cannot be amended by the Shareholders; or

(d)     to this Clause 8.1.

8.2     Any amendment of this Memorandum or the Articles will take effect from the date that the notice of amendment, or restated Memorandum and Articles incorporating the amendment, is registered by the Registrar or from such other date as determined pursuant to the Act.

8.3     The rights conferred upon the holders of Shares of any Class as specified in Clause 6.1 or 6.2 may only be varied to a material adverse extent, whether or not the Company is in liquidation, with the consent in writing of the holders of a majority of the issued Shares of that Class or by a resolution approved at a duly convened and constituted meeting of the Shares of that Class by the affirmative vote of a majority of the votes of the Shares of that Class which were present at the meeting and were voted.  At any such meeting, all voting will be on a poll and each Shareholder who is present in person or by proxy will have one vote for every Share held.

3

8.4    The directors may determine to treat two or more Classes as comprising a single Class for the purposes of Clause 8.3 if they determine, by Resolution of Directors, that all such Classes will be affected in the same way by the proposed variation of the rights attaching to the shares of such Classes.

8.5    The rights conferred upon the holders of the Shares of any Class or Series shall not, unless otherwise expressly provided by the terms of issue of the Shares of that Class or Series, be deemed to be varied by the creation or issue of further Shares of that Class or Series or of other Classes or Series (whether or not such Classes or Series represent other Class or Series funds or sub-funds of the Company) unless such Shares rank in priority to the Shares of such Class or Series as regards participation in the profits or assets of the Investment Account for such Class or Series.

8.6    The rights conferred upon the holders of the Shares of any Class or Series shall not be deemed to be varied by the exercise of the powers to allocate assets (or amounts treated as notional assets) and charge liabilities to the Investment Accounts or any of them as provided for in Regulations 21.6 to 21.9.

9      **PROFESSIONAL FUND**

9.1    The fund interests of the Company shall be issued only to professional investors.

9.2    The initial investment of each investor in the Company, other than exempted investors, shall not be less than such sum as is prescribed in the Mutual Funds Regulations 2010.

9.3    Words and expressions defined in the Securities and Investment Business Act 2010 shall have the same meaning in this Clause 9.

10     **DEFINITIONS AND INTERPRETATION**

10.1   In this Memorandum of Association and the attached Articles of Association, if not inconsistent with the subject or context:

       **AEOI Legislation** means any legislation, regulations or guidance in force in the British Virgin Islands relating to the systematic and periodic exchange of information for tax purposes pursuant to any agreement or treaty entered into by the British Virgin Islands (or any British Virgin Islands government body) including the intergovernmental agreement entered into with the United States to facilitate compliance with sections 1471 to 1474 of the US Internal Revenue Code of 1986 and any other agreement included as subsidiary legislation in the form of an order to the Mutual Legal Assistance (Tax Matters) Act 2003.

       **Act** means the BVI Business Companies Act 2004, as amended from time to time, and includes the BVI Business Companies Regulations 2012 and any other regulations made under the Act.

       **Articles** means the attached Articles of Association of the Company, as may be amended from time to time;

**Business Day** means any day on which the Federal Reserve Bank of New York is open for business and/or such other day or days as the directors may determine, either generally or in any particular case.

**Class** means a class of Shares created and designated by the directors pursuant to the Articles.

**Class A Shares** means the no par value Class A participating redeemable Shares having the rights set out in this Memorandum.

**Class Restricted A Shares** means the no par value Class Restricted A participating redeemable Shares having the rights set out in this Memorandum.

**Class S Shares** means the no par value Class S participating redeemable Shares having the rights set out in this Memorandum.

**Class M Shares** means the no par value Class M non-participating, non-redeemable Shares having the rights set out in this Memorandum.

**Dealing Day** means, in respect of each Class, such day or days as the directors may determine from time to time.

**Initial Series** means, in relation to each Class of Participating Shares, the Series to which the first Shares to be issued in that Class belong or such other Series as may be designated by the directors or their authorised agent as the Initial Series.

**Investment Account** has the meaning specified in Regulation 21.6

**Investment Manager** means BKCoin Management LLC, or any other person appointed for the time being as investment manager or investment adviser to the Company.

**Lock-up Period** means the period of twelve calendar months from the date of subscription for the Participating Shares, or such shorter period as may from time to time be determined by the directors in their absolute discretion, either generally or in any particular case.

**Management Fee** means the fee payable by the Company, out of the assets of the Company, to the investment manager, for services performed in managing the investment program of the Company and/or the Master Fund.

**Master Fund** means BKCoin Multi-Strategy Master Fund Ltd., a British Virgin Islands company limited by shares formed under the BVI Business Companies Act 2004, having its registered office at Craigmuir Chambers, PO Box 71, Tortola, British Virgin Islands, VG1110.

**Memorandum** means this Memorandum of Association of the Company, as may be amended from time to time.

**Net Asset Value** means the net asset value attributed to the Company or to a Class or Series (as the context requires) determined in accordance with the Articles.

**Net Asset Value per Share** has the meaning specified in Regulation 5.3.

***New Issue Security*** means any security acquired by the Company that is determined by the directors or their authorised agent to be a new issue within the meaning of the Rule.

***person*** includes individuals, corporations, trusts, the estates of deceased individuals, partnerships and unincorporated associations of persons.

***Participating Shares*** means the Class A Shares and the Class Restricted A Shares.

***Performance Fee*** means any performance fee or incentive fee payable by the Company or the Master Fund in respect of any Class or Series of Participating Shares to any person appointed for the time being as investment manager or investment adviser to the Company, and subject to the 'high water mark' set forth in the PPM. If Shares are redeemed during a Performance Fee Period, the Performance Fee in respect to such Shares will be calculated as though the relevant Redemption Day was the end of Performance Fee Period.

***Performance Fee Period*** means a period of three months commencing on each 1 January, 1 April, 1 July and 1 October, provided that the first Performance Fee Period in respect of any Series will be the period commencing on the date such Series is issued and ending on the next following 31 March, 30 June, 30 September or 31 December.

***PPM*** means the Company's confidential offering memorandum which is intended to be provided to prospective investors, as may be amended from time to time.

***Prohibited Person*** means any person who is restricted or prevented from owning Shares either directly or indirectly in accordance with the terms on which the Shares are offered for issue.

***Proscribed Powers*** means the powers to (a) amend this Memorandum or the Articles; (b) designate committees of directors; (c) delegate powers to a committee of directors; (d) appoint or remove directors; (e) appoint or remove an agent; (f) approve a plan of merger, consolidation or arrangement; (g) make a declaration of solvency or approve a liquidation plan; or (h) make a determination that immediately after a proposed distribution the value of the Company's assets will exceed its liabilities and the Company will be able to pay its debts as they fall due.

***Redemption Day*** means the first Business Day of each month following the initial issuance of Participating Shares and/or such other day or days as the directors may determine from time to time, in each case subject to the Lock-up Period.

***Redemption Gate*** has the meaning as specified in Regulation 4.8.

***Redemption Price*** means the price per Share at which a Participating Share of any Class or Series shall be redeemed determined in accordance with the Articles.

***Redemption Request*** means a request for the redemption of Participating Shares in writing (in such form or subject to such conditions as prescribed by the directors or their authorised agent) from a Shareholder specifying the number, Class and, if applicable, Series registered in the Shareholder's name to be redeemed.

***Registrar*** means the Registrar of Corporate Affairs appointed under section 229 of the Act.

6

***Resolution of Directors*** means either:

(a)      a resolution approved at a duly convened and constituted meeting of directors of the Company by the affirmative vote of a majority of the directors present at the meeting who voted except that where a director is given more than one vote, he shall be counted by the number of votes he casts for the purpose of establishing a majority; or

(b)      a resolution consented to in writing by all directors or by all members of a committee of directors of the Company, as the case may be.

***Resolution of Shareholders*** means either:

(a)      a resolution approved at a duly convened and constituted meeting of the Shareholders by the affirmative vote of a majority of the votes of the Shares entitled to vote thereon which were present at the meeting and were voted; or

(b)      a resolution consented to in writing by a majority of the votes of the Shares entitled to vote on such resolution.

***Restricted Class*** means the Class of Restricted Shares and any other Class so designated by the directors or their authorised agent.

***Restricted Person*** means, in respect of any New Issue Security, any person to whom the sale of that New Issue Security would be restricted under the Rule and any person whom the directors determine to treat as a person to whom the sale of that New Issue Security would be restricted under the Rule pursuant to the Articles.

***Restricted Share*** means a Share in the Restricted Class.

***Rule*** means Rule 5130 (Restrictions on the Purchase and Sale of Initial Equity Public Offerings) of the Financial Industry Regulatory Authority, Inc. (FINRA) rulebook, as amended from time to time.

***Seal*** means any seal that has been duly adopted as the common seal of the Company.

***Series*** means a series of any Class designated by the directors pursuant to the Articles.

***Share*** means a share issued or to be issued by the Company of any Class or Series.

***Shareholder*** means a person whose name is entered in the register of members of the Company as the holder of one or more Shares or fractional Shares.

***Shareholder Caused Liability*** means, in respect of any Shareholder, any liability which in the opinion of the directors is attributable to the representations, actions or inactions (directly or indirectly) of such Shareholder or arises as a consequence (directly or indirectly) of the relevant Shareholder holding Participating Shares, and for this purpose *liability* includes:

(a)      any liability, cost, expense, tax, withholding or deduction incurred or suffered by the Company or that in the opinion of the directors will be incurred or suffered by the Company;

7

(b)    any deduction or withholding which the Company is required to make in respect of the Shareholder;

including, in either case, those arising in connection with the AEOI Legislation and where a liability is attributable to more than one Shareholder, such liability may be allocated between the relevant Shareholders in such manner as the directors may determine.

*Side Pocket Investment* means an investment which the Investment Manager, in its sole discretion, determines lacks a readily ascertainable market value or should be held until the resolution of a special event or circumstance.

*Side Pocket Investment Shares* means the Class S Shares having the rights set out in this Memorandum.

*Unrestricted Class* means the Class A Shares and any other Class so designated by the directors or their authorised agent.

*Unrestricted Share* means a Share in an Unrestricted Class.

*Valuation Day* means close of business on the last Business Day in each month or such other time and date or dates as the directors may determine from time to time.

*written* or any term of like import includes information generated, sent, received or stored by electronic, electrical, digital, magnetic, optical, electromagnetic, biometric or photonic means, including electronic data interchange, electronic mail, telegram, telex or telecopy, and in writing shall be construed accordingly.

10.2    In this Memorandum and the Articles, unless the context otherwise requires, a reference to:

(a)    a *Regulation* is a reference to a regulation of the Articles;

(b)    a *Clause* is a reference to a clause of this Memorandum;

(c)    voting by Shareholders is a reference to the casting of the votes attached to the Shares held by the Shareholder voting;

(d)    the Act, this Memorandum or the Articles is a reference to the Act or those documents as amended or, in the case of the Act any re-enactment thereof;

(e)    the singular includes the plural and vice versa;

(f)    a period of time expressed as a number of days shall be construed as a reference to a period of days which includes the day on which the period begins but does not include the day on which it ends; and

(g)    a *month* shall be construed as a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month and a reference to a period of several months shall be construed accordingly.

10.3    Any words or expressions defined in the Act bear the same meaning in this Memorandum and the Articles unless the context otherwise requires or they are otherwise defined in this Memorandum or the Articles.

10.4    Headings are inserted for convenience only and shall be disregarded in interpreting this Memorandum and the Articles.

10.5    All determinations to be made by the directors and all powers, authorities and discretions exercisable by them under this Memorandum or the Articles may be made and exercised by the directors in their sole and absolute discretion, either generally or in any particular case, subject only to any qualifications or limitations expressed in these Articles or imposed by law.

Signed for Harneys Corporate Services Limited of Craigmuir Chambers, PO Box 71, Road Town, Tortola, British Virgin Islands, VG1110 for the purpose of incorporating a BVI Business Company under the laws of the British Virgin Islands on 9 March 2022:

Incorporator

......................................
Indira Ward-Lewis
Authorised Signatory
Harneys Corporate Services Limited

9

TERRITORY OF THE BRITISH VIRGIN ISLANDS

BVI BUSINESS COMPANIES ACT 2004

ARTICLES OF ASSOCIATION

OF

BKCoin Multi-Strategy Fund Ltd.

A Company Limited by Shares

1      DISAPPLICATION OF THE ACT

The following sections of the Act shall not apply to the Company:

(a)      section 46 (*Pre-emptive rights*);

(b)      section 60 (*Process for purchase, redemption or other acquisition of own shares*);

(c)      section 61 (*Offer to one or more shareholders*);

(d)      section 62 (*Shares redeemed otherwise than at the option of the company*); and

(e)      section 175 (*Disposition of assets*).

2      SHARES

2.1    Unless and until the directors resolve to issue share certificates, no share certificates shall be issued, and the records of the shareholdings of each Shareholder shall be in uncertified book entry form. If the directors do resolve to issue share certificates in respect of any one or more Classes, then every Shareholder shall be entitled, upon written request only, to a certificate signed by a director or officer of the Company, or any other person authorised by Resolution of Directors or under the Seal specifying the number of Shares held by him and the signature of the director, officer or authorised person and the Seal may be facsimiles.

2.2    Any Shareholder receiving a certificate shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of any wrongful or fraudulent use or representation made by any person by virtue of the possession thereof. If a certificate for Shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by Resolution of Directors.

2.3    If several persons are registered as joint holders of any Shares, any one of such persons may give an effectual receipt for any distribution.

1

**3      ISSUE OF SHARES**

3.1     Subject to the provisions of these Articles, Shares may be issued at such times, to such persons, for such consideration and on such terms as the directors or their authorised agents may determine.

3.2     For the avoidance of doubt, the directors may issue Participating Shares from a single Class on terms which include the provision for different levels of fees to be borne by some of the Participating Shares in that Class to those being borne by other Participating Shares in the same Class and on varying liquidity terms including as to notice periods for the redemption of Participating Shares and the terms of payment of redemption proceeds, as provided in the terms of offer approved by the directors from time to time or as permitted by the Memorandum or these Articles. Such variation in the terms of issue shall not cause Participating Shares issued on such varied terms to constitute a different Class to the remaining Participating Shares in that Class. For this purpose, the Company may enter into letters of agreement with one or more Shareholders.

3.3     On the allotment of any Participating Share, the directors or their authorised agent shall:

        (a)     on the first issue of each Class, designate whether the Class is a Restricted Class or an Unrestricted Class; and

        (b)     designate the Class to which the Participating Share shall belong; and

        (c)     designate the Series to which such Participating Share shall belong, if any.

3.4     The directors may, on such day or days as the directors may determine, make the initial issue of Participating Shares of any Class at such price per Participating Share as the directors may determine.

3.5     Participating Shares of any existing Class may be issued on any Dealing Day and shall be issued at such price per Participating Share as the directors shall determine provided that:

        (a)     unless each Series is issued at a fixed price, the price per Participating Share shall not be less than an amount equal to the Net Asset Value per Share of the Initial Series of that Class as at the Valuation Day on or immediately prior to the Dealing Day; and

        (b)     except in the case of the initial issue of any Class, no Participating Shares of the Initial Series of any Class shall be issued at any time other than on the first day of a Performance Fee Period.

3.6     Unrestricted Shares may not be issued by the Company to, and may not be held by, Restricted Persons. The directors shall make a determination regarding whether a person shall be treated as being restricted or unrestricted from having an interest in New Issue Securities under the Rule notwithstanding that such person has provided the directors with information as to such person's employment, business activities and business connections as well as those of such person's affiliates and immediate family members which purports to establish that such person is not a person to whom sale of a New Issue Security is restricted or prohibited under the Rule. Where a person fails to provide the directors with such information as to that person's

2

employment, business activities and business connections as well as those of such person's affiliates and immediate family members to enable the directors to establish on reasonable grounds whether that person is not a person to whom sale of a New Issue Security is restricted or prohibited under the Rule, that person shall be regarded as being restricted from having an interest in New Issue Securities under the Rule.

3.7    Shares shall not be issued by the Company to, and may not be held by, Prohibited Persons.

3.8    No Participating Shares of any Class shall be issued during any period when the determination of Net Asset Value of such Class is suspended pursuant to Regulation 6.

3.9    Class M Shares shall be issued at an issue price determined by the directors. No Class M Shares shall be issued subsequent to the initial issue of the Class M Shares without the unanimous consent in writing of the holders of the outstanding Class M Shares.

3.10   At any time that the directors (as advised by the Investment Manager) designates an investment of the Company as a Side Pocket Investment, a pro rata portion of the Class A Shares held by a Shareholder will automatically convert by way of redemption and reissue into the number of Class S shares corresponding to the proportional interest of such Shareholder in the Side Pocket Investment. Class S Shares issued in connection with any single Side Pocket Investment generally will constitute a separate series of Class S Shares. The Investment Manager may elect, in its sole discretion, to hold any Side Pocket Investment in a new series of Class S Shares until its realization, or until the Investment Manager's determination that all or a portion of such investment need no longer be treated as a Side Pocket Investment.

3.11   Unless the directors determine otherwise, as of the commencement of business on the day following the last day of each Performance Fee Period (i) issued and outstanding Participating Shares of each Class issued in series other than (a) the longest designated Series of that Class in respect of which a Performance Fee has been charged in respect of the immediately preceding Performance Fee Period (such Series to be designated by the directors as the Initial Series); and (ii) any Series of that Class in respect of which no Performance Fee has been charged for the immediately preceding Performance Fee Period, shall be redeemed by the Company and the Redemption Price shall be applied by the Company towards the issue of Initial Series of Participating Shares of the same Class at their then Net Asset Value.

3.12   The Company shall keep a register of members containing:

   (a)    the names and addresses of the persons who hold Shares;

   (b)    the number of each Class and Series held by each Shareholder;

   (c)    the date on which the name of each Shareholder was entered in the register of members; and

   (d)    the date on which any person ceased to be a Shareholder.

3.13   The register of members may be in any such form as the directors may approve, but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible

3

evidence of its contents.  Until the directors otherwise determine, the magnetic, electronic or other data storage form shall be the original register of members.

3.14   All rights and obligations attaching to a treasury share are suspended and shall not be exercised by or against the Company while it holds the Share as a treasury share.

3.15   Treasury shares may be transferred by the Company in accordance with the provisions of this Regulation 3 as if they are newly issued Shares.

**4      REDEMPTION OF SHARES**

4.1    The Company may purchase, redeem or otherwise acquire its own Shares with the consent of the Shareholders whose Shares are to be purchased, redeemed or otherwise acquired and without such consent if permitted by the Act or any other provision in the Memorandum or these Articles.

4.2    Subject to the provisions of these Articles, the Act and to the rights attaching to any Class, and subject also to receipt by the Company or its authorised agent of a valid Redemption Request, Participating Shares shall be redeemable at the option of a Shareholder on and with effect from any Redemption Day.

4.3    Redemption Requests must be received by the Company or its authorised agent at least 14 calendar days' prior to the relevant Redemption Day and all conditions as to the validity of the Redemption Request must be fulfilled prior to the relevant Redemption Day.  Notwithstanding the foregoing, the directors or their authorised agent may waive such notice period and other conditions, if any, whether in whole or in part and whether in respect of one or more Shareholders.  The conditions as to the validity of the Redemption Request may stipulate a time after which the Redemption Request will be deemed to have been received on the next following Business Day.  Subject to Regulation 4.5, unless the directors consent to the withdrawal of a Redemption Request made in accordance with these Articles, the Shareholder shall not be entitled to withdraw such Redemption Request.

4.4    Where share certificates have been issued in respect of the Shares being redeemed the Shareholder shall lodge such certificates with the Company or its authorised agent for cancellation upon the redemption of such Shares.  The directors may waive the requirement to lodge a certificate which shall have become lost or destroyed upon compliance by the Shareholder with the like requirements to those applying in the case of an application by him for replacement of a lost or destroyed certificate under Regulation 2.2.

4.5    The Company, its directors and agents may rely upon any Redemption Request believed by them in good faith to be genuine.

4.6    Participating Shares may not be redeemed during the Lock-up Period. The Lock-up Period may from time to time be waived, in whole or in part, by the directors in their absolute discretion, either generally or in a particular case. Additional subscriptions for Participating Shares by a Shareholder will be subject to a new Lock-Up Period.  For the purposes of the Lock-Up Period, redemptions will be deemed to be made on a "first-in, first out" basis.

4.7     The holders of Side Pocket Investment Shares will have no right to redeem their Side Pocket Investment Shares. Each Side Pocket Investment held on behalf of a Shareholder who is redeeming all of his Participating Shares (a *Retiring Shareholder*) will continue to be held by the Company and the Retiring Shareholder will continue to participate in the Side Pocket Investment until there is a realisation of the Side Pocket Investment or the Investment Manager determines, in its absolute discretion, that the Side Pocket Investment should no longer be maintained in a class of Side Pocket Investment Shares. Upon the occurrence of a realization or determination, the Side Pocket Investment Shares held by such Retiring Shareholder shall be compulsorily redeemed by the Company and the Redemption Price shall be equal to such Shareholder's proportional share of the net proceeds of the sale of the Side Pocket Investment (or the fair value thereof as determined by the Company if the investment is not sold). The directors may, however, in their sole discretion, redeem the Side Pocket Investment Shares of the Retiring Shareholder at the same time as such Retiring Shareholder redeems all of its Participating Shares in which event the Redemption Price of the Side Pocket Investment Shares shall be the fair value of such Retiring Shareholder's proportional interest in any Side Pocket Investment at the time of redemption (as determined in the sole discretion of the directors, in consultation with the Investment Manager and/or the Company's administrator and whose determination shall be final) whereupon such Side Pocket Investment will be allocated to the Side Pocket Investment Shares of all other Shareholders originally participating in such class of Side Pocket Investment Shares.

4.8     All redemptions of Participating Shares shall be subject to a redemption gate condition, as follows:

        (a)     in the event that the Company receives Redemption Requests for a Redemption Day which exceed, in the aggregate, an amount equal to 30% of the Net Asset Value of the Company as of the applicable Redemption Day, the directors may, in their sole discretion, (i) accept all such Redemption Requests or (ii) reduce all such Redemption Requests so that only 30% (or more, in the sole discretion of the directors) of the Net Asset Value of the Company is redeemed on any Redemption Date (the *Redemption Gate*). Shareholders whose Redemption Requests are reduced pursuant to the Redemption Gate will participate in the aggregate amount available for redemption on a pro-rata basis;

        (b)     to the extent that a Shareholder's Redemption Request has been reduced by the imposition of the Redemption Gate, a Redemption Request for the remaining portion of the original Redemption Request will be deemed made (unless thereafter rescinded) as of the next Redemption Day and such remaining portion shall be satisfied as of that Redemption Day, subject to the Redemption Gate being imposed once again, noting that where any Redemption Request that remains unsatisfied for more than two (2) consecutive Redemption Days as a result of the Redemption Gate, it will be accepted in full as of the next Redemption Day, provided, however, that the Company has not formally suspended the redemption of Shares or commenced a winding-down process; and

        (c)     for the avoidance of doubt, any Participating Shares that are not redeemed by virtue of restrictions imposed by the Redemption Gate shall remain subject to the Management Fee, Performance Fee, and the expenses of the Company until such time as they are

5

redeemed pursuant to this Regulation 4.8.

4.9     The redemption of Participating Shares of any Class may be suspended pursuant to Regulation 6. A Shareholder who has made a Redemption Request for redemption on and with effect from a Redemption Day which occurs during a period of suspension of redemptions of the relevant Class may withdraw such Redemption Request and such withdrawal shall be effective if received by the Company prior to the termination of the period of suspension. Subject to these Articles, Participating Shares for which a Redemption Request is made and not withdrawn shall be redeemed on the first Redemption Day following the termination of the suspension period.

4.10    A Redemption Request shall not be satisfied where such Redemption Request relates to:

(a)     a number of Participating Shares fewer than such number as the directors may determine from time to time; or

(b)     Participating Shares having an aggregate value by reference to their Net Asset Value per Share of less than such amount as the directors may determine from time to time.

4.11    If a Redemption Request is received from a Shareholder which would, if satisfied, result in such Shareholder holding:

(a)     a number of Participating Shares fewer than such number as the directors may determine from time to time; or

(b)     Participating Shares having an aggregate value by reference to the Net Asset Value per Share of less than such amount as the directors may determine from time to time,

the directors may treat such redemption request as a request for the redemption of all the Participating Shares held by such Shareholder or as a request for a partial redemption that would result in the Shareholder continuing to hold such minimum number or amount as has been determined by the directors.

4.12    The Redemption Price of a Participating Share being redeemed shall be the Net Asset Value per Share of the Series to which that Participating Share belongs calculated as at the Valuation Day immediately preceding the Redemption Day on which such Share is to be redeemed, adjusted in accordance with these Articles, and subject in each case to any deductions, including deductions of the Management Fee, Performance Fee (if applicable), reserves, holdbacks, adjustments, or other sums provide for in these Articles and/or the Memorandum and/or the PPM and/or any applicable subscription agreement.

4.13    Subject to the remainder of this Regulation 4.13, the directors will use best endeavours to ensure that the Redemption Price is paid within 30 calendar days of a Redemption Day prior which the Company had received a valid Redemption Request from a Shareholder. However, the directors shall have the right, at their entire discretion, to withhold up to 5% of the Redemption Price until no later than 30 calendar days after completion of the year-end audit of the Company's financial statements for any redemption of 90% or more of a Shareholder's Net Asset Value of their Shares (or if a redemption, when combined with all other withdrawals of a Shareholder during the preceding 12 months would result in such Shareholder having withdrawn 90% or more of such Shareholder's Net Asset Value of their Shares as of the beginning of such

period). In such circumstances, the directors will remit the balance of the redemption proceed without interest. The directors, in their sole discretion may, waive these withdrawal restrictions as to any Shareholder.

4.14    The directors may adjust the Redemption Price by applying a redemption charge of such amount as they may determine from time to time on the redemption of Participating Shares of any Class or Series. The amount of such charge shall be deducted from the relevant redemption proceeds. Such charge may be waived in whole or in part by the directors and may be paid to the Company or to such other person as the directors may determine. The Company may also adjust the Redemption Price by holding back from the redemption proceeds payable to a redeeming Shareholder an amount equivalent to any Shareholder Caused Liability. The amount held back shall be retained for the benefit of the Company and may be used to discharge any obligation imposed on the Company as a consequence (directly or indirectly) of such Shareholder holding Participating Shares. The redeeming Shareholder shall have no claim against the Company in respect of any amount held back. However, any amount held back which the directors determine is no longer required to satisfy the relevant Shareholder Caused Liability shall be paid to the relevant Shareholder.

4.15    The Company shall have the right, at any time and in its discretion, to establish reserves for contingencies (including general reserves for unspecified contingencies). The establishment of such reserves will not insulate any portion of the Company's assets from being at risk, and such assets may still be traded by the Company. A pro rata portion of the reserve may be withheld from distribution to a redeeming Shareholder.

4.16    On any redemption of a Share in accordance with these Articles the directors shall have the power to divide in specie the whole or any part of the assets of the Company and appropriate such assets in satisfaction or part satisfaction of the Redemption Price (an *In Kind Redemption*) at any time up to the actual payment of the Redemption Price. The directors or their authorised agents shall determine the assets to comprise an In Kind Redemption and there shall be no obligation to select any one or more specific assets in respect of an In Kind Redemption.

4.17    The value of any asset included or to be included in any In Kind Redemption shall be the value of such asset determined in accordance with Regulation 5.4 as at the applicable Redemption Day for the redemption of such Participating Shares being redeemed.

4.18    In the event that a redeeming Shareholder fails or refuses to take receipt of any or all of the assets comprising an In Kind Redemption, the Company shall be entitled to deposit such assets with a third party to be determined by the directors or to hold such assets on behalf of such Shareholder, or redeemed Shareholder as the case may be, without any duty on the Company, the directors or any agent of the Company, to manage such assets other than to ensure their bare custody. Any fees or expenses incurred in the custody of such assets, including reasonable fees of the Company not to exceed the amount of any management fee charged to assets of the Company plus any disbursements incurred by the Company, shall be borne by and deducted from the assets as determined by the directors. The directors may compel the sale of such assets at a discount, on commercially reasonable terms, in order to satisfy any fees or expenses incurred or charged by the Company in respect of the custody of such assets.

4.19    Upon the redemption of a Participating Share, the holder of such Participating Share shall cease to have any rights with respect thereto, except the right to receive the Redemption Price payable

7

pursuant to Regulation 4.123 and the right to receive any dividend declared but unpaid prior to the relevant Redemption Day. From the Redemption Day, the former Shareholder shall rank as an unsecured creditor of the Company in respect of such Redemption Price and any declared but unpaid dividends and, for the avoidance of doubt, such rights and interests of a former Shareholder in the Company shall rank ahead of the rights and interests of each continuing Shareholder conferred on him by virtue of his continued holding of Participating Shares in the distribution of the surplus assets of the Company on its liquidation.

4.20    Where the directors have resolved pursuant to Regulation 2.1 to issue share certificates in respect of any Shares, on redemption or purchase of only part of such Shares, the directors shall, if so requested by the Shareholder, procure a share certificate in respect of the balance of such Shares to be sent to the Shareholder or as he shall direct.

4.21    Any amount due to a Shareholder in connection with the redemption of Participating Shares:

(a)    shall be paid in US Dollars, or such other currency as the directors may determine, in such manner or on such terms as the directors may determine and may, upon the Shareholder's request, be transferred at his expense by wire transfer;

(b)    may be satisfied by the transfer of assets of the Company in accordance with Regulation 4.16; or

(c)    may be satisfied partly in cash and partly by the transfer of other assets of the Company in accordance with Regulation 4.16.

4.22    The Company may suspend payment of redemption proceeds when:

(a)    the directors have declared a suspension pursuant to the provisions of Regulation 6; or

(b)    if the directors suspect or are advised that the payment of the redemption proceeds may result in a breach of any applicable laws or regulations in any relevant jurisdiction.

4.23    If a Redemption Request relates to more than such percentage as the directors may determine of the Participating Shares held by a Shareholder, the Company may retain such percentage of the redemption proceeds as the directors may determine pending completion of the next occurring annual audit. Following completion of the audit, the directors may adjust the Redemption Price to reflect any adjustment to the Net Asset Value per Share resulting from the audit. The Company will pay to the redeemed Shareholder the balance, if any, of the amount to which such redeemed Shareholder is entitled after taking account of any such adjustment. No interest will be paid by the Company in respect of redemption proceeds held back.

4.24    The directors may by notice in writing at any time require a Shareholder holding Unrestricted Shares to provide acceptable evidence that such Shareholder is not a Restricted Person. If such Shareholder does not respond or does not provide evidence acceptable to the directors within the time period specified by the directors in the notice, the directors may by further notice redeem compulsorily the Unrestricted Shares of such Shareholder as of the date specified in such second notice (the effective date) at the Net Asset Value per Share of the Unrestricted Shares being redeemed calculated as at the effective date and shall apply the proceeds of the redemption of such Unrestricted Shares to the allotment of Restricted Shares. The directors

8

shall issue such number of Restricted Shares to the Shareholder as may be allotted at the Net Asset Value per Share of the Restricted Shares on the effective date using all the proceeds of the redemption of the Restricted Shares. Each Shareholder authorises the Company to make such redemption and purchase and irrevocably appoints the Company as its agent for such purpose.

4.25    Subject to Regulations 4.26 and 4.27, the Company may, as determined by the directors and without assigning any reason, redeem compulsorily (without the consent of the holder of the relevant Shares) all or a portion of the Shares of any Shareholder.

4.26    The Company may not compulsorily redeem Participating Shares of a particular Class pursuant to Regulation 4.25 during any period that the determination of the Net Asset Value of that Class is suspended pursuant to Regulation 6.1(a), but may compulsorily redeem such Participating Shares where the redemption of Participating Shares of that Class is suspended pursuant to Regulation 6.1(b) but a simultaneous suspension of the determination of the Net Asset Value of such Class has not been declared.

4.27    Redemption of Participating Shares pursuant to Regulation 4.25 shall be made in the following manner:

(a)    not less than immediately notice of the compulsory redemption shall be sent to the Shareholder at his address as shown in the register of members of the Company or as provided to the Company specifying the date of redemption, unless the redemption is undertaken in contemplation of a merger or consolidation, in which case no notice is required; and

(b)    an amount equal to the aggregate Redemption Price determined in accordance with Regulation 4.12 as at the date of redemption of the Participating Shares being redeemed, less any further amount which the directors may reasonably deduct in respect of the costs and expenses of the Company incurred in connection with such redemption, shall be sent to such Shareholder by such means as the directors deem appropriate as soon as reasonably practicable after the date of redemption.

4.28    The Company shall be entitled to compulsorily require any Shareholder to exchange Participating Shares of any Class or Series for Participating Shares of any other Class or Series at any time upon such terms as the directors may determine which may include but is not limited to circumstances where such exchange is necessary or desirable to (i) comply with any applicable law or regulation, or (ii) ensure that any Shareholder Caused Liabilities are allocated equitably. Participating Shares shall be exchanged by way of redemption of the Participating Shares to be exchanged and the use of such redemption proceeds to subscribe for Participating Shares of the relevant Series in the relevant Class or Classes.

4.29    Shares that the Company purchases, redeems or otherwise acquires shall be cancelled or held as treasury shares provided that the number of Shares purchased, redeemed or otherwise acquired and held as treasury shares, when aggregated with Shares of the same Class already held by the Company as treasury shares, may not exceed 50 per cent of the Shares of that Class previously issued by the Company excluding shares that have been cancelled. Shares which have been cancelled shall be available for reissue.

9

4.30   Notwithstanding any other provision of these Articles, the directors may waive any notice period, redemption fee, minimum holding requirement or any other restriction or conditions applicable to the redemption of Participating Shares, if any, whether in whole or in part and whether in respect of one or more Shareholders.

**5      DETERMINATION OF NET ASSET VALUE; ALLOCATIONS**

5.1    The Net Asset Value of the Company shall be determined by or under the direction of the directors or by the Company's authorised agent as at each applicable Valuation Day, and shall be the value as at such date of all the assets of the Company (including interest and dividends accrued) less all the liabilities of the Company (including accrued expenses), calculated on the basis of this Regulation 5.

5.2    The Net Asset Value of a Class or Series shall be determined by or under the direction of the directors or by the Company's authorised agent as at each applicable Valuation Day, and shall be the value as at such date of all the assets of the Company (including interest and dividends accrued) attributable to the Class or Series, less all the liabilities of the Company (including accrued expenses) attributable to the Class or Series, calculated on the basis of this Regulation 5 and ascertained with reference to the Investment Accounts established and maintained for that Class or Series in accordance with Regulations 21.5 to 21.9.

5.3    The Net Asset Value per Share attributable to a Series shall be determined by or under the direction of the directors or by the Company's authorised agent as at each applicable Valuation Day, and shall be the Net Asset Value of the Series divided by the number of Shares of such Series then outstanding calculated in accordance with Regulation 5.7.  Where Shares are not issued in separate Series, all the Shares in the same Class shall be treated as having been issued in a single Series for the purposes of this Regulation.

5.4    The value of the assets and liabilities of the Company shall be determined in accordance with the valuation policies and procedures adopted by the Company from time to time.

5.5    For the purposes of calculation of the Net Asset Value of the Company and the Net Asset Value of a Class or Series, unless the directors determine otherwise:

       (a)    the price for Shares for which applications have been made to the Company (less commissions, if any, and less any other duties and charges payable by the Company in connection with their issuance) shall be deemed to be an asset of the Company at the commencement of business on the Dealing Day on which such Shares are deemed to be in issue;

       (b)    the price for Shares in the Company to be redeemed shall, from the close of business on the Redemption Day on which they are actually redeemed until the Redemption Price is paid be deemed to be a liability of the Company;

       (c)    investments, cash balances and other assets of the Company shall be valued and liabilities of the Company shall be calculated in US Dollars and if not initially expressed in US Dollars, after taking into account such rate of exchange as the directors shall consider appropriate.  A certificate of a custodian provided to the directors as to the exchange

10

rate applicable in any particular case may be relied upon by the directors and, if relied upon, shall be conclusive and binding on all persons, except in cases of manifest error;

(d)    any expense or liability may be amortised over such period as the directors may determine;

(e)    administrative and other expenses of a regular or recurring nature may be calculated on an estimated figure for yearly or other periods in advance and accrue the same in equal proportions over any such period and may establish such reserves or holdbacks for contingent liabilities as the directors or their authorised agent determine appropriate.

5.6    Any determinations made pursuant to Regulation 5 shall be binding on all persons.

5.7    For the purpose of calculating the number of Shares in issue and deemed to be in issue for purposes of this Regulation 5:

(a)    Shares for which applications have been made pursuant to Regulation 3.1 shall be deemed to be in issue at the commencement of business on the Dealing Day on which they are allotted; and

(b)    Shares to be redeemed in accordance with these Articles shall be deemed to remain in issue through the close of business on the Redemption Day on which they are actually redeemed.

5.8    Any increase or decrease in the Net Asset Value (disregarding for these purposes (i) any changes in the Net Asset Value due to subscriptions, redemptions or the payment of dividends and (ii) any designated adjustments as described) will be allocated pro rata to the record for each Class based on the previous Net Asset Value of each Class. Those costs, expenses, losses, dividends, profits, gains and income which the Directors determine relate solely to a particular class or desire, will then be allocated to the record of the relevant Class or series.

**6    SUSPENSIONS**

6.1    The directors may declare a suspension of:

(a)    the determination of the Net Asset Value per Share of any one or more Classes and any such suspension must be combined with a simultaneous suspension of the redemption of Participating Shares of such Class or Classes and may (but need not) be combined with a suspension of the payment of redemption proceeds;

(b)    the redemption of Participating Shares of any one or more Classes and may (but need not) combine such a suspension with a simultaneous suspension of the determination of the Net Asset Value per Share of such Class or Classes and/or a simultaneous suspension of the redemption proceeds; and/or

(c)    the payment or redemption proceeds.

6.2    The directors may declare a suspension in accordance with Regulation 6.1 in such circumstances as they may deem appropriate, including the whole or any part of any period:

11

(a)     during which any securities exchange or similar electronic system on which a substantial part of the assets of the Company are traded is closed (other than customary closings) or dealings are otherwise restricted or suspended;

(b)     during which, in the opinion of the directors, it is not possible to determine the value of a substantial portion of the assets of the Company or the disposal of a substantial part of the assets of the Company would not be reasonably practicable or could not be carried out in an orderly manner;

(c)     during which redemption proceeds cannot lawfully be paid by the Company in the currency of the relevant Class;

(d)     during which, due to a breakdown in the systems normally used to determine the Net Asset Value or for any other reason, it is not reasonably practicable to accurately determine the Net Asset Value;

(e)     during any period when the board of directors of the Master Fund has deferred or suspended the determination of the net asset value of investments in the Master Fund and the issue or redemption of shares in the Master Fund in accordance with the provisions of the articles of association of the Master Fund;

(f)     during which the business operations of the functionaries to the Company are substantially interrupted or closed due to pestilence, acts of war, terrorism, insurrection, revolution, civil unrest, riot, strikes or attack, natural disaster or other events beyond the reasonable control of the relevant party;

(g)     during which the transfer of funds involved in the realization or acquisition of any investment cannot, in the opinion of the directors, be effected at normal rates of exchange;

(h)     during which the Company receives redemption requests, which in the aggregate, would create in the sole discretion of the directors, a material adverse effect on the Company if such withdrawal requests were satisfied;

(i)     during which the proceeds of the sale or redemption of Participating Shares cannot be transmitted to or from the Company's account;

(j)     when, in the opinion of the directors, it would be in the best interests of the Company to do so; or

(k)     after the directors form the opinion that it is in the best interest of the Company or the Shareholders to wind up and dissolve the Company.

6.3     Any suspension of the determination of Net Asset Value shall be publicised by the directors in such manner as they may deem appropriate to the persons likely to be affected by it.

6.4     Any suspension declared pursuant to this Regulation shall take effect at such time as the directors shall determine and shall continue until the directors shall declare the suspension to be at an end.

12

6.5     Whenever the directors declare a suspension under the provisions of these Articles the directors shall, as soon as may be practicable after any such declaration, give notice of the suspension to the affected Shareholder or Shareholders. At the end of any period of suspension the directors shall give notice to the affected Shareholder or Shareholders stating that the period of suspension has ended.  Any such notice may be given in such manner as the directors determine.

**7      MORTGAGES AND CHARGES OF SHARES**

7.1     Shares may only be mortgaged or charged with the prior written consent of the directors, as evidenced by a Resolution of Directors, which consent may be withheld or made subject to such conditions as the directors may determine.

7.2     Where a Share is mortgaged or charged with the consent of the directors, there shall be entered in the register of members at the written request of the Shareholder:

   (a)     a statement that the Shares held by him are mortgaged or charged;

   (b)     the name of the mortgagee or chargee; and

   (c)     the date on which the particulars specified in sub-paragraphs (a) and (b) are entered in the register of members.

7.3     Where particulars of a mortgage or charge are entered in the register of members, such particulars may be cancelled:

   (a)     with the written consent of the named mortgagee or chargee or anyone authorised to act on his behalf; or

   (b)     upon evidence satisfactory to the directors of the discharge of the liability secured by the mortgage or charge and the issue of such indemnities as the directors shall consider necessary or desirable.

7.4     Whilst particulars of a mortgage or charge over Shares are entered in the register of members pursuant to this Regulation:

   (a)     no transfer of any Share the subject of those particulars shall be effected without the written consent of the named mortgagee or chargee;

   (b)     the Company shall not purchase, redeem or otherwise acquire any such Share without giving not less than five Business Days written notice to the named mortgagee or chargee; and

   (c)     no replacement certificate shall be issued in respect of such Shares without the written consent of the named mortgagee or chargee.

**8      FORFEITURE**

8.1     Shares that are not fully paid on issue are subject to the forfeiture provisions set forth in this Regulation and for this purpose Shares issued for a promissory note, other written obligation to contribute money or property or a contract for future services are deemed to be not fully paid.

13

8.2   A written notice of call specifying the date for payment to be made shall be served on the Shareholder who defaults in making payment in respect of the Shares.

8.3   The written notice of call referred to in Regulation 8.2 shall name a further date not earlier than the expiration of fourteen days from the date of service of the notice on or before which the payment required by the notice is to be made and shall contain a statement that in the event of non-payment at or before the time named in the notice the Shares, or any of them, in respect of which payment is not made will be liable to be forfeited.

8.4   Where a written notice of call has been issued pursuant to Regulation 8.3 and the requirements of the notice have not been complied with, the directors may, at any time before tender of payment, forfeit and cancel the Shares to which the notice relates.

8.5   The Company is under no obligation to refund any moneys to the Shareholder whose Shares have been cancelled pursuant to Regulation 8.4 and that Shareholder shall be discharged from any further obligation to the Company.

**9      TRANSFER OF SHARES**

9.1   Shares may only be transferred with the prior written consent of the directors or their authorised agent which consent may be withheld or made subject to such conditions as the directors may determine.

9.2   Subject to Regulation 9.1, Shares may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, which shall be sent to the Company for registration.

9.3   The transfer of a Share is effective when the name of the transferee is entered on the register of members.

9.4   If the directors of the Company are satisfied that an instrument of transfer relating to Shares has been signed but that the instrument has been lost or destroyed, they may resolve by a Resolution of Directors:

      (a)     to accept such evidence of the transfer of Shares as they consider appropriate, and

      (b)     that the transferee's name should be entered in the register of members notwithstanding the absence of the instrument of transfer.

9.5   The personal representative of a deceased Shareholder may transfer a Share even though the personal representative is not a Shareholder at the time of the transfer.

**10     MEETINGS AND CONSENTS OF SHAREHOLDERS**

10.1  Any director of the Company may convene meetings of the Shareholders or the holders of a Class (for the purposes of this Regulation 10, a *meeting*) at such times and in such manner and places within or outside the British Virgin Islands as the director considers necessary or desirable.

14

10.2    Upon the written request of one or more Shareholders entitled to exercise 30 per cent or more of the voting rights in respect of the matter for which the meeting is requested the directors shall convene a meeting of Shareholders.

10.3    The director convening a meeting shall give not less than seven days' notice of a meeting of Shareholders to:

(a)    those Shareholders whose names on the date the notice is given appear as Shareholders in the register of members of the Company and are entitled to vote at the meeting; and

(b)    the other directors.

10.4    The director convening a meeting of Shareholders may fix as the record date for determining those Shareholders that are entitled to vote at the meeting the date notice is given of the meeting, or such other date as may be specified in the notice, being a date not earlier than the date of the notice.

10.5    A meeting of Shareholders held in contravention of the requirement to give notice is valid if Shareholders holding at least 90 per cent of the total voting rights on all the matters to be considered and voted on at the meeting have waived notice of the meeting and, for this purpose, the presence of a Shareholder at the meeting shall constitute waiver in relation to all the Shares which that Shareholder holds.

10.6    The inadvertent failure of the director who convenes a meeting to give notice of a meeting to a Shareholder or another director, or the fact that a Shareholder or another director has not received notice, does not invalidate the meeting.

10.7    A Shareholder may be represented at a meeting by a proxy who may speak and vote on behalf of the Shareholder.

10.8    The instrument appointing a proxy shall be produced at the place designated for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.  The notice of the meeting may specify an alternative or additional place or time at which the proxy shall be presented.  The directors may accept a copy of an instrument appointing a proxy or such other evidence of its existence as they see fit in lieu of the original.

10.9    The instrument appointing a proxy shall be in such form as the directors from time to time approve or as the chairman of the meeting shall accept as properly evidencing the wishes of the Shareholder appointing the proxy.

10.10   The following applies where Shares are jointly owned:

(a)    if two or more persons hold Shares jointly each of them may be present in person or by proxy at a meeting and may speak as a Shareholder;

(b)    if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners; and

15

(c)     if two or more of the joint owners are present in person or by proxy they must vote as one.

10.11   A Shareholder or his proxy or (in the case of a Shareholder that is not an individual) an authorised representative shall be deemed to be present at a meeting if he participates by telephone or other electronic means and all Shareholders, proxies and (in the case of Shareholders that are not individuals) authorised representatives participating in the meeting are able to hear each other.

10.12   A meeting of Shareholders is duly constituted if, at the commencement of the meeting, there are present in person or by proxy the holders of not less than 25 per cent of the Shares entitled to be voted on the matters to be considered at the meeting.  A quorum may comprise a single Shareholder or proxy and then such person may pass a Resolution of Shareholders or a resolution of the holders of a Class and a certificate signed by such person accompanied where such person be a proxy by a copy of the proxy instrument shall constitute a valid Resolution of Shareholders or a resolution of the holders of a Class.

10.13   If within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved; in any other case it shall stand adjourned to the next business day in the jurisdiction in which the meeting was to have been held at the same time and place or to such other time and place as the directors may determine, and if at the adjourned meeting there are present within one hour from the time appointed for the meeting in person or by proxy the holders of not less than 10 per cent. of the votes of the Shares entitled to vote on the matters to be considered and voted on at the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved.

10.14   At every meeting of Shareholders the chairman of the Board shall preside as chairman of the meeting.  If there is no chairman of the board or if the chairman of the board is not present at the meeting, the Shareholders present shall choose one of their number to be the chairman.  If the Shareholders are unable to choose a chairman for any reason, then the person representing the greatest number of voting Shares present in person or by proxy at the meeting shall preside as chairman failing which the oldest individual Shareholder or representative of a Shareholder present shall take the chair.

10.15   The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

10.16   At any meeting of Shareholders, the chairman is responsible for deciding in such manner as he considers appropriate whether any resolution proposed has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes of the meeting.  If the chairman has any doubt as to the outcome of the vote on a proposed resolution, he shall cause a poll to be taken of all votes cast upon such resolution.  If the chairman fails to take a poll then any Shareholder present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall cause a poll to be taken. If a poll is taken at any meeting, the result shall be announced to the meeting and recorded in the minutes of the meeting.

16

10.17    Any Shareholder that is not an individual may authorise such individual as it thinks fit to act as its representative at any meeting, and the individual so authorised shall be entitled to exercise the same rights on behalf of the Shareholder which he represents as that Shareholder could exercise if it were an individual. For the purposes of this Regulation 10, a Shareholder that is not an individual shall be deemed to be present in person at a meeting if they are represented at such meeting by an authorised representative. The Company shall be entitled to assume that the relevant Shareholder has taken all necessary corporate action in authorising such individual to exercise all rights of the Shareholder.

10.18    The chairman of any meeting at which a vote is cast by proxy or on behalf of any Shareholder that is not an individual may call for the original proxy or authority or a copy of such proxy or authority (certified in such manner as the chairman may reasonably require) which shall be produced within seven days of being so requested or the votes cast by such proxy or on behalf of such Shareholder shall be disregarded.

10.19    Directors of the Company may attend and speak at any meeting of Shareholders and at any separate meeting of the holders of any Class or Series.

10.20    An action that may be taken by the Shareholders at a meeting may also be taken by a resolution consented to in writing, without the need for any notice, but if any Resolution of Shareholders is adopted otherwise than by the unanimous written consent of all Shareholders entitled to vote on such action, a copy of such resolution shall forthwith be sent to all such Shareholders not consenting to such resolution. The consent may be in the form of counterparts, each counterpart being signed by one or more Shareholders. If the consent is in one or more counterparts, and the counterparts bear different dates, then the resolution shall take effect on the earliest date upon which Shareholders holding a sufficient number of votes of Shares to constitute a Resolution of Shareholders or a resolution of the holders of a Class have consented to the resolution by signed counterparts.

## 11    DIRECTORS

11.1    The first director or directors of the Company shall be appointed by the first registered agent within six months of the date of the incorporation of the Company; and thereafter, the directors shall be elected by Resolution of Shareholders or by Resolution of Directors. If, before the Company has any Shareholders, all of the directors appointed by the registered agent resign or die or otherwise cease to exist, the registered agent may appoint one or more further persons as directors of the Company.

11.2    No person shall be appointed as a director or alternate director, or nominated as a reserve director, of the Company unless he has consented in writing to be a director or alternate director or to be nominated as a reserve director.

11.3    Subject to Regulation 11.1, the minimum number of directors shall be one and there shall be no maximum number.

11.4    Each director holds office for the term, if any, fixed by the Resolution of Shareholders or Resolution of Directors appointing him, or until his earlier death, resignation or removal. If no term is fixed on the appointment of a director, the director serves indefinitely until his earlier death, resignation or removal.

17

11.5    A director may be removed from office:

(a)    with or without cause, by Resolution of Shareholders passed at a meeting of Shareholders called for the purpose of removing the director or for purposes including the removal of the director or by a written resolution passed by at least 75 per cent of the votes of the Shares of the Company entitled to vote thereon; or

(b)    with cause, by Resolution of Directors passed at a meeting of directors called for the purpose of removing the director or for purposes including the removal of the director.

11.6    A director may resign his office by giving written notice of his resignation to the Company and the resignation has effect from the date the notice is received by the Company or from such later date as may be specified in the notice.  A director shall resign forthwith as a director if he is, or becomes, disqualified from acting as a director under the Act.

11.7    The directors may at any time appoint any person to be a director either to fill a vacancy or as an addition to the existing directors.  Where the directors appoint a person as director to fill a vacancy, the term shall not exceed the term that remained when the person who has ceased to be a director ceased to hold office.

11.8    A vacancy in relation to directors occurs if a director dies or otherwise ceases to hold office prior to the expiration of his term of office.

11.9    The Company shall keep a register of directors containing:

(a)    the names and addresses of the persons who are directors of the Company or who have been nominated as reserve directors of the Company;

(b)    the date on which each person whose name is entered in the register was appointed as a director, or nominated as a reserve director, of the Company;

(c)    the date on which each person named as a director ceased to be a director of the Company;

(d)    the date on which the nomination of any person nominated as a reserve director ceased to have effect; and

(e)    such other information as may be prescribed by the Act.

11.10    The register of directors may be kept in any such form as the directors may approve, but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents.  Until a Resolution of Directors determining otherwise is passed, the magnetic, electronic or other data storage shall be the original register of directors.

11.11    The directors may fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

11.12    A director is not required to hold a Share as a qualification to office.

18

## 12    POWERS OF DIRECTORS

12.1    The business and affairs of the Company shall be managed by, or under the direction or supervision of, the directors of the Company. The directors of the Company have all the powers necessary for managing, and for directing and supervising, the business and affairs of the Company. The directors may exercise all such powers of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by the Shareholders. The directors may pay and be reimbursed by the Company all expenses incurred preliminary to and in connection with the incorporation of the Company.

12.2    Each director shall exercise his powers for a proper purpose and shall not act or agree to the Company acting in a manner that contravenes the Memorandum, these Articles or the Act. Each director, in exercising his powers or performing his duties, shall act honestly and in good faith in what the director believes to be the best interests of the Company.

12.3    Any director which is a body corporate may appoint any individual its duly authorised representative for the purpose of representing it at meetings of the directors, with respect to the signing of consents or otherwise.

12.4    The continuing directors may act notwithstanding any vacancy in their body.

12.5    The directors may by Resolution of Directors exercise all the powers of the Company to incur indebtedness, liabilities or obligations and to secure indebtedness, liabilities or obligations whether of the Company or of any third party.

## 13    PROCEEDINGS OF DIRECTORS

13.1    Any one director of the Company may call a meeting of the directors by sending a written notice to each other director.

13.2    The directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the directors may determine to be necessary or desirable.

13.3    A director is deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

13.4    A director shall be given reasonable notice of meetings of directors, but a meeting of directors held without reasonable notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting who do not attend waive notice of the meeting, and for this purpose the presence of a director at a meeting shall constitute waiver by that director. The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

13.5    A director of the Company (the *appointing director*) may appoint any other director or any other eligible person as his alternate to exercise the appointing director's powers and carry out the appointing director's responsibilities in relation to the taking of decisions by the directors in the absence of the appointing director.

19

13.6    The appointment and termination of an alternate director must be in writing, and written notice of the appointment and termination must be given by the appointing director to the Company as soon as reasonably practicable.

13.7    An alternate director has the same rights as the appointing director in relation to any directors' meeting and any written resolution circulated for consent. An alternate director has no power to appoint a further alternate, whether of the appointing director or of the alternate director, and the alternate does not act as agent for the appointing director.

13.8    The appointing director may, at any time, voluntarily terminate the alternate director's appointment. The voluntary termination of the appointment of an alternate shall take effect from the time when written notice of the termination is given to the Company. The rights of an alternate shall automatically terminate if the appointing director dies or otherwise ceases to hold office.

13.9    A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than two directors.

13.10   If the Company has only one director the provisions herein contained for meetings of directors do not apply and such sole director has full power to represent and act for the Company in all matters as are not by the Act, the Memorandum or these Articles required to be exercised by the Shareholders. In lieu of minutes of a meeting the sole director shall record in writing and sign a note or memorandum of all matters requiring a Resolution of Directors. Such a note or memorandum constitutes sufficient evidence of such resolution for all purposes.

13.11   The directors may appoint a director to chairman of the board of directors. At meetings of directors at which the chairman of the board is present he shall preside as chairman of the meeting. If there is no chairman of the board or if the chairman of the board is not present, the directors present shall choose one of their number to be chairman of the meeting.

13.12   An action that may be taken by the directors or a committee of directors at a meeting may also be taken by a resolution consented to in writing by all directors or by all members of the committee, as the case may be, without the need for any notice. The consent may be in the form of counterparts each counterpart being signed by one or more directors. If the consent is in one or more counterparts, and the counterparts bear different dates, then the resolution shall take effect on the date upon which the last director has consented to the resolution by signed counterparts.

14      COMMITTEES

14.1    The directors may, by Resolution of Directors, designate one or more committees, each consisting of one or more directors, and delegate one or more of their powers, including the power to affix the Seal, to the committee.

14.2    The directors have no power to delegate to a committee of directors any of the Proscribed Powers.

14.3     A committee of directors, where authorised by the Resolution of Directors appointing such committee or by a subsequent Resolution of Directors, may appoint a sub-committee and delegate powers exercisable by the committee to the sub-committee.

14.4     The meetings and proceedings of each committee of directors consisting of two or more directors shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of directors so far as the same are not superseded by any provisions in the Resolution of Directors establishing the committee.

14.5     Where the directors delegate their powers to a committee of directors they remain responsible for the exercise of that power by the committee, unless they believed on reasonable grounds at all times before the exercise of the power that the committee would exercise the power in conformity with the duties imposed on directors of the Company under the Act.

**15       OFFICERS AND AGENTS**

15.1     The Company may, by Resolution of Directors appoint officers of the Company at such times as may be considered necessary or expedient.   The officers shall perform such duties as are prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by Resolution of Directors.

15.2     The emoluments of all officers shall be fixed by Resolution of Directors.

15.3     The officers of the Company shall hold office until their successors are duly appointed, but any officer elected or appointed by the directors may be removed at any time, with or without cause, by Resolution of Directors. Any vacancy occurring in any office of the Company may be filled by Resolution of Directors.

15.4     The directors may, by Resolution of Directors, appoint any person, including a person who is a director, to be an agent of the Company.

15.5     An agent of the Company shall have such powers and authority of the directors, including the power and authority to affix the Seal, as are set forth in these Articles or in the Resolution of Directors appointing the agent, except that no agent has any power or authority with respect to the following:

(a)      the Proscribed Powers;

(b)      to change the registered office or agent;

(c)      to fix emoluments of directors, or

(d)      to authorise the Company to continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands.

15.6     The Resolution of Directors appointing an agent may authorise the agent to appoint one or more substitutes or delegates to exercise some or all of the powers conferred on the agent by the Company.

21

15.7    The directors may remove an agent appointed by the Company and may revoke or vary a power conferred on him.

**16      CONFLICT OF INTERESTS**

16.1    A director of the Company shall, forthwith after becoming aware of the fact that he is interested in a transaction entered into or to be entered into by the Company, disclose the interest to all other directors of the Company.

16.2    For the purposes of Regulation 16.1, a disclosure to all other directors to the effect that a director is a member, director or officer of another named entity or has a fiduciary relationship with respect to the entity or a named individual and is to be regarded as interested in any transaction which may, after the date of the entry into the transaction or disclosure of the interest, be entered into with that entity or individual, is a sufficient disclosure of interest in relation to that transaction.

16.3    A director of the Company who is interested in a transaction entered into or to be entered into by the Company may:

(a)     vote on a matter relating to the transaction;

(b)     attend a meeting of directors at which a matter relating to the transaction arises and be included among the directors present at the meeting for the purposes of a quorum; and

(c)     sign a document on behalf of the Company, or do any other thing in his capacity as a director, that relates to the transaction,

and, subject to compliance with the Act and these Articles, by reason of his office be accountable to the Company for any benefit which he derives from such transaction and no such transaction shall be liable to be avoided on the grounds of any such interest or benefit.

**17      INDEMNIFICATION**

17.1    Subject to the limitations hereinafter provided the Company shall indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who:

(a)     is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director of the Company; or

(b)     is or was, at the request of the Company, serving as a director of, or in any other capacity is or was acting for, another body corporate or a partnership, joint venture, trust or other enterprise.

17.2    The indemnity in Regulation 17.1 shall apply in all cases, except in the case of any act or omission with respect to which a court of competent jurisdiction (or similar tribunal) has issued a final and

22

non-appealable decision, judgment or order that such act or omission result from the persons' bad faith, gross negligence, wilful misconduct, or fraud.

17.3    The termination of any proceedings by any judgment, order, settlement, conviction or the entering of a *nolle prosequi* does not, by itself, create a presumption that the person's act or omission was the result of bad faith, gross negligence, wilful misconduct, or fraud.

17.4    Expenses, including legal fees, incurred by a director in defending any legal, administrative or investigative proceedings may be paid by the Company in advance of the final disposition of such proceedings upon receipt of an undertaking by or on behalf of the director to repay the amount if it shall ultimately be determined that the director is not entitled to be indemnified by the Company in accordance with Regulation 17.1.

17.5    Expenses, including legal fees, incurred by a former director in defending any legal, administrative or investigative proceedings may be paid by the Company in advance of the final disposition of such proceedings upon receipt of an undertaking by or on behalf of the former director to repay the amount if it shall ultimately be determined that the former director is not entitled to be indemnified by the Company in accordance with Regulation 17.1 and upon such terms and conditions, if any, as the Company deems appropriate.

17.6    The indemnification and advancement of expenses provided by, or granted pursuant to, this section is not exclusive of any other rights to which the person seeking indemnification or advancement of expenses may be entitled under any agreement, Resolution of Shareholders, resolution of disinterested directors or otherwise, both as acting in the person's official capacity and as to acting in another capacity while serving as a director of the Company.

17.7    If a person referred to in Regulation 17.1 has been successful in defence of any proceedings referred to in Regulation 17.1, the person is entitled to be indemnified against all expenses, including legal fees, and against all judgments, fines, and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings.

17.8    The Company may purchase and maintain insurance in relation to any person who is or was a director, officer or liquidator of the Company, or who at the request of the Company is or was serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability as provided in these Articles.

## 18    CORPORATE RECORDS

18.1    The Company shall keep the following documents at the office of its registered agent:

(a)      the Memorandum and these Articles;

(b)      the register of members, or a copy of the register of members;

(c)      the register of directors, or a copy of the register of directors; and

23

(d)    copies of all notices and other documents filed by the Company with the Registrar of Corporate Affairs in the previous ten years.

18.2    Until the directors determine otherwise by Resolution of Directors the Company shall keep the original register of members and original register of directors at the office of its registered agent.

18.3    If the Company maintains only a copy of the register of members or a copy of the register of directors at the office of its registered agent, it shall:

(a)    within fifteen days of any change in either register, notify the registered agent in writing of the change; and

(b)    provide the registered agent with a written record of the physical address of the place or places at which the original register of members or the original register of directors is kept.

18.4    The Company shall keep the following records at the office of its registered agent or at such other place or places, within or outside the British Virgin Islands, as the directors may determine:

(a)    minutes of meetings and Resolutions of Shareholders and Classes of Shareholders;

(b)    minutes of meetings and Resolutions of Directors and committees of directors; and

(c)    an impression of the Seal.

18.5    Where any original records referred to in this Regulation are maintained other than at the office of the registered agent of the Company, and the place at which the original records is changed, the Company shall provide the registered agent with the physical address of the new location of the records of the Company within fourteen days of the change of location.

18.6    The records kept by the Company under this Regulation shall be in written form or either wholly or partly as electronic records complying with the requirements of the Electronic Transactions Act 2001 as from time to time amended or re-enacted.

**19    SEAL**

The Company shall have a Seal.  The Company may have more than one Seal and references herein to the Seal shall be references to every Seal that shall have been duly adopted by Resolution of Directors.  The directors shall provide for the safe custody of the Seal and for an imprint thereof to be kept at the registered office.  Except as otherwise expressly provided herein the Seal when affixed to any written instrument shall be witnessed and attested to by the signature of any one director or other person so authorised from time to time by Resolution of Directors.  Such authorisation may be before or after the Seal is affixed, may be general or specific and may refer to any number of sealings.  The directors may provide for a facsimile of the Seal and of the signature of any director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been attested to as hereinbefore described.

24

**20      DISTRIBUTIONS BY WAY OF DIVIDENDS**

20.1    The directors of the Company may, by Resolution of Directors, authorise a distribution by way of dividend at a time, and of an amount they think fit if they are satisfied, on reasonable grounds, that immediately after the distribution, the value of the Company's assets will exceed its liabilities and the Company will be able to pay its debts as they fall due.

20.2    Dividends may be paid in money, shares, or other property.

20.3    The directors may deduct from any distribution payable to any Shareholder (i) all sums of money, if any, then payable by the Shareholder to the Company on account of calls or otherwise, and (ii) and amount equivalent to any Shareholder Caused Liability. Any amount deducted in respect of any Shareholder Caused Liability shall be retained for the benefit of the Company and may be used to discharge any obligation imposed on the Company as a consequence (directly or indirectly) of such Shareholder holding Participating Shares. The Shareholder shall have no claim against the Company in respect of the amount deducted but any amount which the directors determine is no longer required to satisfy the relevant Shareholder Caused Liability shall be paid to the relevant Shareholder.

20.4    Notice of any dividend that may have been declared shall be given to each Shareholder as specified in Regulation 221 and all dividends unclaimed for three years after having been declared may be forfeited by Resolution of Directors for the benefit of the Company.

20.5    No dividend shall bear interest as against the Company and no dividend shall be paid on treasury shares.

**21      ACCOUNTS AND AUDIT**

21.1    The Company shall keep records and underlying documentation that are sufficient to show and explain the Company's transactions and that will, at any time, enable the financial position of the Company to be determined with reasonable accuracy.

21.2    The records and underlying documentation of the Company shall be kept at the office of its registered agent or at such other place or places, within or outside the British Virgin Islands, as the directors may determine and if the records and underlying documentation are kept in a location other than the office of the registered agent, the Company shall provide the registered agent with a written record of:

(a)     the physical address of the place at which the records and underlying documentation are kept; and

(b)     the name of the person who maintains and controls the Company's records and underlying documentation.

21.3    If the location at which the records and underlying documentation are kept or the name of the person who maintains and controls the records and underlying documentation changes, the Company shall, within 14 days of the change provide its registered agent with:

(a)    the physical address of the new location at which the records and underlying documentation are kept; and

(b)    the name of the new person who maintains and controls the Company's records and underlying documentation.

21.4    The Company may, at the discretion of the directors, prepare periodically a profit and loss account and a balance sheet. The profit and loss account and balance sheet shall be drawn up so as to give respectively a true and fair view of the profit and loss of the Company for a financial period and a true and fair view of the assets and liabilities of the Company as at the end of a financial period.

21.5    Auditors may be appointed by Resolution of Shareholders or by Resolution of Directors. The remuneration of the auditors of the Company may be fixed by Resolution of Directors.

21.6    The Company or its duly authorised agent may establish and maintain separate accounts (each an *Investment Account*) for each Class and Series, or for one or more Classes or Series, to which the following provisions shall apply:

(a)    the proceeds from the allotment and issue of the Shares may be applied in the books of the Company to the Investment Account established for the Shares and the assets and liabilities (including any liability to pay any Performance Fee) and income and expenditure attributable thereto may be applied or charged to such Investment Account subject to the provisions of Regulations 21.6 to 21.9;

(b)    where any asset is derived from another asset (whether cash or otherwise) such derivative asset shall be applied in the books of the Company to the same Investment Account as the asset from which it was derived, and on each re-evaluation of an investment the increase or diminution in value thereof (or the relevant portion of such increase or diminution in value) shall be applied to the relevant Investment Account;

(c)    in the case of an asset of the Company (or amount treated as a notional asset) which the Company or its authorised agent does not consider is attributable to a particular Investment Account or Investment Accounts, such asset shall be allocated between Investment Accounts at the discretion of the Company or its duly authorised agent in such manner as they consider fair and reasonable in all circumstances and the Company or its duly authorised agent shall have power at any time and from time to time to vary such basis. Without limiting the generality of the foregoing such allocation shall generally be pro rata to the Net Asset Value of the relevant Classes or Series;

(d)    the Company or its duly authorised agent shall allocate the liability to pay a dividend or distribution on a Class to the corresponding Investment Account and the Company or its duly authorised agent shall allocate any other liability to the Investment Account or Investment Accounts to which, in the opinion of the Company or its duly authorised agent, it relates or, if in the opinion of the Company or its duly authorised agent it does not relate to any particular Investment Account or Investment Accounts, between Investment Accounts at the discretion of the Company or its authorised agent in such manner as they consider fair and reasonable in all the circumstances and the Company or its duly authorised agent shall have power at any time and from time to time to vary

26

such basis. Without limiting the generality of the foregoing, such allocation shall generally be pro rata to the Net Asset Value of the relevant Classes or Series;

(e) in any proceedings brought by any holder of Shares of a particular Class or Series in respect of the rights of such holder as the holder of such Shares, any liability of the Company to such Shareholder in respect of such proceedings shall only be settled out of the assets in the Investment Account corresponding to such Shares, without recourse in respect of such liability or any allocation of such liability to any other Class or Series of the Company;

(f) to the extent possible, any Shareholder Caused Liability suffered or incurred by the Company is borne only by the Investment Account or Accounts corresponding to the Shares held by such Shareholder; and

(g) the Company or its duly authorised agent may transfer in the books of the Company any assets (or amounts treated as notional assets) to and from Investment Accounts if, as a result of a creditor or litigant proceeding against certain of the assets of the Company or otherwise, a liability would be borne in a different manner from that in which it would have been borne under sub-paragraphs (d) and (e) above, or in any similar circumstances.

21.7    Save as otherwise provided in these Articles, the assets held in each Investment Account shall be applied solely in respect of the Shares to which such Investment Account appertains.

21.8    Distributions declared and paid by the directors in accordance with these Articles on a Class shall be paid only out of such surplus assets as are allocated to the relevant Investment Account(s).

21.9    If the Company shall be wound up, the assets of the Company attributable to an Investment Account shall be settled out of any assets allocated to that Investment Account, and, if such assets are insufficient, shall then be apportioned between (and settled out of) the assets allocated to the other Investment Accounts pro rata or as the directors or the liquidator (as the case may be) shall think fit. Any remaining assets allocated to an Investment Account shall be distributed (in cash or in specie, as the liquidator thinks fit) to the holders of Participating Shares corresponding to such Investment Account.

21.10   Upon any conversion of Shares from one Class and Series to another in accordance with the provisions of these Articles, the directors shall allocate assets to the value of the Shares being converted from the Investment Accounts drawn up for the Class and Series from which the Shares are being converted to the Investment Accounts drawn up for the Class and Series into which the Shares are being converted.

## 22    NOTICES

22.1    Any notice, information or written statement to be given by the Company to Shareholders shall be in writing and may be given by personal service mail, courier, email or fax to such Shareholder's address as shown in the register of members or to such Shareholder's email address or fax number as notified by the Shareholder to the Company in writing from time to time.

22.2    Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail addressed to the Company at the offices of the registered agent of the Company.

22.3    Where a notice is sent by the Company by post, service of the notice shall be deemed to be effected by properly addressing, prepaying and posting a letter containing notice, and shall be deemed to be received on the fifth business day following the day on which the notice was posted. Where a notice is sent by the Company by fax or email, notice shall be deemed to be effected by transmitting the email or fax to the address or number provided by the intended recipient and service of the notice shall be deemed to have been received on the same day that it was transmitted.

## 23    AUTOMATIC EXCHANGE OF INFORMATION

23.1    The Company may release or disclose to any relevant regulatory authority any information in its possession regarding the affairs of the Company or regarding any Shareholder, including any information contained in the register of members and any information provided pursuant to or in connection with the Shareholder's subscription for Participating Shares (collectively *Relevant Information*) if such release or disclosure is necessary in order to comply with any AEOI Legislation nor the Company is required to do so under the laws of any jurisdiction relevant to the Company.

23.2    The Company may authorise any person to disclose Relevant Information on behalf of the Company and in connection with any such authorisation, may release and disclose any Relevant Information to such person.

## 24    WINDING UP

24.1    The Company's business shall continue for so long as the Company holds assets and investments irrespective of whether the directors have determined that the Company shall not acquire any further assets or investments. If the directors determine that the business of the Company shall be terminated and that the assets and investments of the Company shall be realised in anticipation of such termination, the business of the Company shall continue and shall be regarded as continuing as a going concern, until the process of realisation of the assets and investments of the Company is complete.

24.2    Subject to the Act, the Company may by Resolution of Shareholders or by Resolution of Directors appoint an eligible individual as voluntary liquidator alone or jointly with one or more other voluntary liquidators.

## 25    CONTINUATION

The Company may by Resolution of Shareholders or by a resolution passed unanimously by all directors of the Company continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

Signed for Harneys Corporate Services Limited of Craigmuir Chambers, PO Box 71, Road Town, Tortola, British Virgin Islands, VG1110 for the purpose of incorporating a BVI Business Company under the laws of the British Virgin Islands on 9 March 2022:

Incorporator

.....................................................
Indira Ward-Lewis
Authorised Signatory
Harneys Corporate Services Limited



29

# **ATTACHMENT 8**



# Wyoming Secretary of State

**Karl Allred**
Secretary of State

**Karen L. Wheeler**
Deputy Secretary of State

## Certified Copy

**Date:**              12/14/2022 2:22 PM

**Through Date:**      12/14/2022 2:22 PM

**Corporate Name:**    Bison Digital LLC

The undersigned filing officer hereby certifies that the attached copies are a true and complete copy of the document as filed in this office.

| Document Number | Description | Number of Pages |
|---|---|---|
| 2020-002790651 | Address Update | 1 |
| 2019-000889574 | Initial Filing | 4 |

Respectfully,

Karl Allred
Wyoming Secretary of State
Certified By: _Kaytlynn Whisenhunt_



1



**Wyoming Secretary of State**
Herschler Building East, Suite 101
122 W 25th Street
Cheyenne, WY 82002-0020
Ph. 307.777.7311
Email: Business@wyo.gov

WY Secretary of State
FILED: 03/25/2020 02:27 PM
Original ID: 2019-000889574
Amendment ID: 2020-002790651

## Update Form

**Name of Entity:** Bison Digital LLC

**ID#:** 2019-000889574        *Example: 2000-000123456*

The above entity is requesting an update be made to reflect their most current information:

**Principal Address:**

30 N Gould St Ste 11492, Sheridan, WY 82801

**Mailing Address:**

30 N Gould St Ste 11492, Sheridan, WY 82801

**Phone:** 307-200-2803

**Fax:**

**Email:** reports@registeredagentsinc.com

*(Email provided will receive annual report reminders and filing evidence)*
*\*May list multiple email addresses*

**Signature:** *Riley Park*        **Date:** 03/23/2019

**Printed Name:** Riley Park

**Title:** Authorized Individual

*Form may be submitted by:*
**Fax** 307.777.5339
**Email:** SOSRequest@wyo.gov
**Mail-in** Refer to address at top of this form.

UpdateForm - Revised August 2019



**Secretary of State**

**Wyoming Secretary of State**

Herschler Bldg East, Ste.100 & 101

Cheyenne, WY 82002-0020
Ph. 307-777-7311

<u>For Office Use Only</u>

**WY Secretary of State**
**FILED: Dec 11 2019  3:59PM**
**Original ID: 2019-000889574**

# Limited Liability Company
# Articles of Organization

**I. The name of the limited liability company is:**

Bison Digital LLC

**II. The name and physical address of the registered agent of the limited liability company is:**

Registered Agents Inc.
30 N Gould St Ste R
Sheridan, WY 82801

**III. The mailing address of the limited liability company is:**

30 N Gould St
Ste R
Sheridan, WY 82801

**IV. The principal office address of the limited liability company is:**

30 N Gould St
Ste R
Sheridan, WY 82801

**V. The organizer of the limited liability company is:**

Registered Agents Inc.
30 N Gould St Ste R, Sheridan, WY 82801

**Signature:**   *Riley Park*                              Date:  **12/11/2019**

Print Name:     **Riley Park**

Title:          **Authorized individual**

Email:          **reports@registeredagentsinc.com**

Daytime Phone #:  **(307) 200-2803**



Secretary of State

**Wyoming Secretary of State**

Herschler Bldg East, Ste.100 & 101

Cheyenne, WY 82002-0020
Ph. 307-777-7311

---

☑ I am the person whose signature appears on the filing; that I am authorized to file these documents on behalf of the business entity to which they pertain; and that the information I am submitting is true and correct to the best of my knowledge.

☑ I am filing in accordance with the provisions of the Wyoming Limited Liability Company Act, (W.S. 17-29-101 through 17-29-1105) and Registered Offices and Agents Act (W.S. 17-28-101 through 17-28-111).

☑ I understand that the information submitted electronically by me will be used to generate Articles of Organization that will be filed with the Wyoming Secretary of State.

☑ I intend and agree that the electronic submission of the information set forth herein constitutes my signature for this filing.

☑ I have conducted the appropriate name searches to ensure compliance with W.S. 17-16-401.

**Notice Regarding False Filings: Filing a false document could result in criminal penalty and prosecution pursuant to W.S. 6-5-308.**

> **W.S. 6-5-308. Penalty for filing false document.**
>
> (a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he files with the secretary of state and willfully or knowingly:
>
> (i) Falsifies, conceals or covers up by any trick, scheme or device a material fact;
>
> (ii) Makes any materially false, fictitious or fraudulent statement or representation; or
>
> (iii) Makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry.

☑ I acknowledge having read W.S. 6-5-308.

**Filer is:**    ☐ An Individual    ☑ An Organization

The Wyoming Secretary of State requires a natural person to sign on behalf of a business entity acting as an incorporator or organizer. The following individual is signing on behalf of all Organizers or Incorporators.

**Filer Information:**
**By submitting this form I agree and accept this electronic filing as legal submission of my Articles of Organization.**

Signature:    *Riley Park*                         Date:  **12/11/2019**

Print Name:   **Riley Park**

Title:        **Authorized individual**

Email:        **reports@registeredagentsinc.com**

Daytime Phone #:  **(307) 200-2803**



Secretary of State

**Wyoming Secretary of State**

Herschler Bldg East, Ste.100 & 101

Cheyenne, WY 82002-0020
Ph. 307-777-7311

## Consent to Appointment by Registered Agent

**Registered Agents Inc.**, whose registered office is located at **30 N Gould St Ste R, Sheridan, WY 82801**, voluntarily consented to serve as the registered agent for **Bison Digital LLC** and has certified they are in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

I have obtained a signed and dated statement by the registered agent in which they voluntarily consent to appointment for this entity.

Signature: *Riley Park*                    Date: **12/11/2019**

Print Name:     **Riley Park**

Title:          **Authorized individual**

Email:          **reports@registeredagentsinc.com**

Daytime Phone #:  **(307) 200-2803**

# STATE OF WYOMING
## Office of the Secretary of State

I, EDWARD A. BUCHANAN, Secretary of State of the State of Wyoming, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

### CERTIFICATE OF ORGANIZATION

**Bison Digital LLC**

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **11th** day of **December, 2019** at **3:59 PM.**

Remainder intentionally left blank.



Filed Date: 12/11/2019

Secretary of State

Filed Online By:

Riley Park

on 12/11/2019



# Wyoming Secretary of State

| **Karl Allred** | **Karen L. Wheeler** |
|---|---|
| Secretary of State | Deputy Secretary of State |

## Certified Copy

**Date:**          12/14/2022 2:24 PM

**Through Date:**          12/14/2022 2:24 PM

**Corporate Name:**     **Bison Digital LLC**

The undersigned filing officer hereby certifies that the attached copies are a true and complete copy of the public document as filed in this office.

| Document Number | Description | Number of Pages |
|---|---|---|
| 7631790 | 2022 Annual Report | 1 |
| 6718396 | 2021 Annual Report | 1 |
| 5974227 | 2020 Annual Report | 1 |

Respectfully,

Karl Allred
Wyoming Secretary of State
Certified By:  Anneleisa Renner



1

**2022**             **Limited Liability Company Annual Report**

Due on or Before:    December 1, 2022
ID:    2019-000889574
State of Formation:    Wyoming
License Tax Paid:    $60.00
AR Number:    07631790

<u>For Office Use Only</u>
Wyoming Secretary of State
Herschler Bldg East, Ste.100 & 101, Cheyenne, WY 82002-0020
307-777-7311
https://wyobiz.wyo.gov/Business/AnnualReport.aspx

### Bison Digital LLC

1:  **Mailing Address**

30 N Gould St Ste 11492
Sheridan, WY 82801

<u>Current Registered Agent:</u>
Registered Agents Inc
30 N Gould St Ste R
Sheridan, WY 82801

2:  **Principal Office Address**

30 N Gould St Ste 11492
Sheridan, WY 82801

Email: reports@registeredagentsinc.com

• Please review the current Registered Agent information and, if it needs to be changed or updated, complete the <u>appropriate</u> form available from the Secretary of State's website at https://sos.wyo.gov

---

I hereby certify under the penalty of perjury that the information I am submitting is true and correct to the best of my knowledge.

| Riley Park | Riley Park | September 14, 2022 |
|---|---|---|
| Signature | Printed Name | Date |

**The fee is $60 or two-tenths of one mill on the dollar ($.0002), whichever is greater.**

**Instructions:**
1. Complete the required worksheet;
2. Sign and date this form; and
3. Return both the form and worksheet to the Secretary of State at the address provided above.

**2021**          **Limited Liability Company Annual Report**

| | | |
|---|---|---|
| Due on or Before: | December 1, 2021 | |
| ID: | 2019-000889574 | |
| State of Formation: | Wyoming | |
| License Tax Paid: | $60.00 | |
| AR Number: | 06718396 | |

<u>For Office Use Only</u>
Wyoming Secretary of State
Herschler Bldg East, Ste.100 & 101, Cheyenne, WY 82002-0020
307-777-7311
https://wyobiz.wyo.gov/Business/AnnualReport.aspx

**Bison Digital LLC**

1: Mailing Address

30 N Gould St Ste 11492
Sheridan, WY 82801

<u>Current Registered Agent:</u>
Registered Agents Inc.
30 N Gould St Ste R
Sheridan, WY 82801

2: Principal Office Address

30 N Gould St Ste 11492
Sheridan, WY 82801

Phone: (307) 200-2803
Email: reports@registeredagentsinc.com

• Please review the current Registered Agent information and, if it needs to be changed or updated, complete the <u>appropriate</u> form available from the Secretary of State's website at https://sos.wyo.gov

---

I hereby certify under the penalty of perjury that the information I am submitting is true and correct to the best of my knowledge.

| Riley Park | Riley Park | September 15, 2021 |
|---|---|---|
| Signature | Printed Name | Date |

**The fee is $60 or two-tenths of one mill on the dollar ($.0002), whichever is greater.**

**Instructions:**
1. Complete the required worksheet;
2. Sign and date this form; and
3. Return both the form and worksheet to the Secretary of State at the address provided above.

**2020**                    **Limited Liability Company Annual Report**

Due on or Before:      December 1, 2020                <u>For Office Use Only</u>
ID:                    2019-000889574                  Wyoming Secretary of State
State of Formation:    Wyoming                          Herschler Bldg East, Ste.100 & 101, Cheyenne, WY
License Tax Paid:      $50.00                           82002-0020
AR Number:             05974227                         307-777-7311
                                                        https://wyobiz.wyo.gov/Business/AnnualReport.aspx

**Bison Digital LLC**                                  *Current Registered Agent:*
                                                        Registered Agents Inc.
1:  **Mailing Address**                                 30 N Gould St Ste R
                                                        Sheridan, WY 82801
   30 N Gould St Ste 11492
   Sheridan, WY 82801

2:  **Principal Office Address**                        • Please review the current Registered Agent
                                                        information and, if it needs to be changed or updated,
   30 N Gould St Ste 11492                              complete the <u>appropriate</u> Statement of Change form
   Sheridan, WY 82801                                   available from the Secretary of State's website at
                                                        <u>http://soswy.state.wy.us</u>
   Phone: (307) 200-2803
   Email: reports@registeredagentsinc.com

---

I hereby certify under the penalty of perjury that the information I am submitting is true and correct to the best of my knowledge.

| Riley Park | Riley Park | November 4, 2020 |
|---|---|---|
| Signature | Printed Name | Date |

---

**The fee is $50 or two-tenths of one mill on the dollar ($.0002), whichever is greater.**

**Instructions:**
1.  Complete the required worksheet.
2.  Sign and date this form and return it to the Secretary of State at the address provided above.

# **ATTACHMENT 9**

Page 86
Our Strategies
https://web.archive.org/web/20220123085227/https://www.bkcoincapital.com/our-strategies



BKCoin Capital offers five distinct, customizable strategies for institutional investors. All of our strategies are designed to help investors achieve superior returns, and benefit from the combination of our team's investment prowess and proprietary algorithms.

### Market Neutral

Our USD-denominated market neutral strategy provides investors with consistent low volatility returns by utilizing in-house proprietary arbitrage algorithms to capitalize on market inefficiencies within digital asset market

The strategy's uncorrelated returns on the digital asset market makes it an excess source for alpha. This strategy is available to both US and foreign investors through BKCoin Capital LP (US Fund) and BK Offshore Fund Ltd.



(BVI Fund) respec...





## Bitcoin Smart Beta

Bitcoin denominated strategy that utilizes arbitrage, mean-reversion, momentum, and trend following components in order to provide superior risk adjusted returns for investors that are seeking bitcoin accumulation.

## Ethereum Smart Beta

Ethereum denominated strategy that utilizes arbitrage, mean-reversion, momentum, and trend following components in order to provide superior risk adjusted returns for investors that are seeking Ethereum accumulation.





## Decentralized Finance (DeFi)

We combine multiple strategies that typically invests in 10-15 liquid tokens at any point in time, while performing meticulous fundamental and risk analysis. The strategies are predominantly driven by discretionary and quantitative strategies focused on decentralised finance and adjacent assets.



## Market Making

We provide liquidity across major exchanges by quoting two-sided markets on multiple currency pairs. Our proprietary high frequency algorithms allow us to provide deep liquidity at every level of the order book and generate alpha by collecting the bid-ask spread with dynamic hedging.

Our Strategies

Monthly market commentary

BKCoin in the News

The Team

Contact Us

Follow Us

**Subscribe to Our Newsletter**

Fill out the form below to receive our latest insights on digital assets.

First Name

Last Name

Email address

SUBSCRIBE

**naic**

Captured by FireShot Pro: 26 October 2022, 12:07:13
https://getfireshot.com

# U. S. SECURITIES AND EXCHANGE COMMISSION

Investigation # FL-04334

## DECLARATION OF LEEVENTED HENLEY

Pursuant to 28 U.S.C. Section 1746, the undersigned states as follows:

1.  My name is Leevented Henley I am over twenty-one years of age and have personal knowledge of the matters set forth herein.

2.  I am assigned as an IT Specialist to the U.S. Securities and Exchange Commission's Division of Enforcement in Washington, D.C. As part of my duties, I have been trained to preserve various forms of online content. For investigation # FL-04334, I have been tasked to conduct a Website Capture/Video Capture/Social Media/Telegram/live stream/blog.

3.  In support of investigation number # FL-04334 at the direction of my supervisor, I was tasked to conduct an internet preservation of the following URL's.

    https://www.bkcoincapital.com/

    https://web.archive.org/web/20220000000000*/https://www.bkcoincapital.com/
    https://web.archive.org/web/20221023050315/https://www.bkcoincapital.com/

    https://web.archive.org/web/20210715000000*/https://www.bkcoincapital.com/

    I completed the above-mentioned internet preservation on October 27, 2022, using the following tools:

    Adobe Acrobat Pro / Google Search Browser / Fire shot Pro/

    The above listed tools are commonly used to preserve internet content.

4.  I saved the above-mentioned internet preservation using FTK Imager, which ensures that the internet preservation will not be altered or modified during storage. Specifically, FTK Imager forensically seals the internet preservation such that it can be opened only with FTK Imager. The sealed internet preservation has been labeled # FL-04334 and saved to the following location:

    K:\Other_Projects\Webcaptures\imagefiles

5.  I also saved a copy of the above-mentioned internet preservation along with this declaration to a network share. The location for this network share is provided below:

    \\ad\ENFDataExchange\HQtoMIRO_dropoff\Webcapture

I declare under penalty of perjury that the foregoing is true, correct, and made in good faith.

_Leevent J Henley_____ [Analyst Name]          Executed on this 27 Day of October 2022.

**ATTACHMENT 10**



# **ATTACHMENT 11**

# conEdison
**Working for you 24/7**

| Amount Due $ |
| Pay By 12/02/19 |

**KEVIN KANG**

**Your account number:** ███████████

**Service delivered to:**

**Your electric rate:** EL1 Residential or Religious

**Next meter reading date: Monday, Dec 9, 2019**
Avoid estimated bills - please give us access to read your meter.

## Your billing summary as of Nov 6, 2019

### Your previous charges and payments
Total charges from your last bill
Payments through Nov 4, thank you 

**Remaining balance**                                 None

### Your new charges - details start on page 2
Billing period: Oct 07, 2019 to Nov 05, 2019
Electricity charges - for 29 days 

**Total new charges**                            

## Total amount due
Payment is due upon receipt of this bill. To avoid a late payment charge of 1.5%, please pay the total amount due by Dec 2, 2019.

## Message Center

Join our Direct Payment Plan (DPP). Just place an 'X' in the DPP enrollment box on your payment slip when you mail back your payment by check. We'll use your banking information to enroll you in the plan. Then, each month, after you've had time to review your bill, we will automatically deduct your Con Edison bill payment from your checking account. Join Now.

Avoid estimated bills - please give us access to read your meter(s). You can avoid estimated bills by switching to a smart meter. Call 1-800-576-2005 to have your smart meter(s) installed.

Con Edison's offices will be closed Monday, November 11, in observance of Veterans' Day. In the event of an emergency, our call center is available 24 hours a day, every day, including the holiday. However, we will experience very high call volumes on Tuesday, November 12. You can avoid an extended wait by not calling on that day.

Con Edison's offices will be closed Thursday, November 28, and Friday, November 29, in observance of Thanksgiving. In the event of an emergency, our call center is available 24 hours a day, every day, including the holiday. However, we will experience very high call volumes on Monday, December 02. You can avoid an extended wait by not calling on that day.

**Messages continued on page 3.**

## Contact us 24 hours a day, 7 days a week

To report a service problem, call 1-800-75-CONED (1-800-752-6633) or visit conEd.com

Self-Service conEd.com
For payments, visit conEd.com or call 1-888-925-5016

Con Edison
Cooper Station
P.O. Box 138
New York, NY 10276-0138

For other information, call 1-212-243-1900 or 1-800-75-CONED (1-800-752-6633)

Tear or Cut here

Looking for more detailed information on your bill? Visit www.coned.com/MyAccount.

Page 1 of 3

---

# conEdison

## Payment slip
Please make checks payable to Con Edison.

To avoid a late payment charge of 1.5%, please pay the total amount due by Dec 2, 2019.

Your account number: ███████████
Total amount due: 

Amount enclosed:

KEVIN KANG

NEW YORK NY 10022-1414

JAF STATION
P.O. BOX 1702
NEW YORK, NY 10116-1702

Mark X to enroll in DPP



M79
0024054

**Name:** KEVIN KANG                     **Account number:** ▓▓▓▓▓▓▓     **Billing period ending:** Nov 05, 2019

Page **2** of 3

# Your electricity charges

These charges are for the electricity you used (supply) and getting that electricity to you (delivery). Rates are based on a 30 day period. When your billing period is more or less than 30 days, we prorate your bill accordingly.

> **Electricity you used during this 29 day billing period from Oct 07, 2019 to Nov 05, 2019**
> **Rate:** EL1 Residential or Religious          **Meter#** 002593013
>
> We measure your electricity by how many kilowatt hours (kWh) you use. One kWh will light a 100 watt bulb for 10 hours.
>
> Nov 05, 19 estimated reading              1938
> Oct 07, 19 actual reading                 -1473
> **Your electricity use**                   **465 kWh**

## ▶ Your supply charges

**Supply   465 kWh @6.5011¢/kWh**                        ▓▓▓
Charge for the electricity supplied to you by Con Edison.

**Merchant function charge**                              ▓▓▓
Charge associated with procuring electricity, credit and collection related activities and uncollectible accounts.

**GRT & other tax surcharges**                            ▓▓▓
Taxes on Con Edison gross receipts from sales of utility services and other tax surcharges.

**Total supply charges**                                  ▓▓▓

> Your total electricity supply cost for this bill is 7.2¢ per kWh. You can compare this price with those offered by energy services companies (ESCOs). For a list of ESCOs, visit PowerYourWay.com or call 1-800-780-2884.

## ▶ Your delivery charges

**Basic service charge**                                  ▓▓▓
Charge for basic system infrastructure and customer-related services, including customer accounting, and metering services. A billing and payment processing charge of $1.20, *which may be avoided by switching to an energy services company (ESCO)*, is also included.

**Delivery 465 kWh @12.8409¢/kWh**                        ▓▓▓
Charge for maintaining the system through which Con Edison delivers electricity to you.

**System Benefit Charge @0.6796¢/kWh**                    ▓▓
The System Benefits Charge recovers costs associated with clean energy activities conducted by the New York State Energy Research and Development Authority (NYSERDA) and energy efficiency programs implemented by the Company.

**Tax Sur-Credit @-0.7505¢/kWh**                          ▓
Credit reflecting the tax savings related to the Tax Cuts and Jobs Act of 2017.

**GRT & other tax surcharges**                            ▓▓
See earlier definition.

**Total delivery charges**                                ▓▓▓

## ▶ Your sales tax

**Sales tax @4.5000%**                                    ▓▓
Tax collected on behalf of New York City.

**Total sales tax**                                       ▓▓

## ▶▶ Total electricity charges                           ▓▓▓

**Your average daily electricity use**



## Ways To Pay Your Bill

**1. Direct Payment** — Pay your bill automatically from your checking or savings account at no charge. Enroll at **conEd.com/myaccount** or call **1-212-243-1900**.

**2. Internet** — Pay online at **conEd.com/myaccount**. There is no fee for payments from a checking or savings account, but our payment agent charges a small fee for debit/credit card transactions.

**3. Phone** — Pay by phone at **1-888-925-5016**. There is no fee for payments from a checking or savings account, but our payment agent charges a small fee for debit/credit card transactions.

**4. In-Person Authorized Payment Agents** — Visit **conEd.com/paymentagents** or call **1-212-243-1900** for the nearest agents in your area.
Our walk-in centers are open Monday to Friday, 8:30 a.m. to 5 p.m.

**Manhattan** - 122 East 124th Street
**Queens** - @National Grid - 89-67 162nd Street
**Staten Island** - 1140 Richmond Terrace (exact pay only)
**Bronx** - 1775 Grand Concourse
**Brooklyn** - @National Grid - 345 Jay Street
**Westchester** - @Food Bazaar - 1 Bogopa Plaza, Mt. Vernon

**5. Mail** — Make check or money order payable to Con Edison and mail it in the window envelope provided with your bill. Do not send cash.

**Mail to: Con Edison, JAF Station, PO Box 1702, New York, NY 10116-1702**
Check processing notice: When you provide a check as payment, you authorize us to either use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check. You will not receive your check back from your financial institution.
**Address Change?** — If you are moving or changing your mailing address, call **1-800-752-6633** and let us know.
For more information, call **1-800-75-CONED (1-800-752-6633)**.

**Name:** KEVIN KANG                    **Account number:** ███████        **Billing period ending:** Nov 05, 2019

## Message Center (Continued from page 1)

**YOUR DOLLAR FOR ENERGYSHARE CAN MAKE A DIFFERENCE**
If you pay the total amount of this bill and exactly $1.00 more, that dollar will go into the EnergyShare fund sponsored by Con Edison. And, Con Edison matches each contribution. EnergyShare helps eligible residential customers who are struggling to pay their bills with one-time grants of up to $200.

# **ATTACHMENT 12**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**BKCOIN MANAGEMENT LLC**

**A Delaware limited liability company taxed as an S Corporation**

**Dated July 26, 2018**

THE UNITS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES ACTS OR LAWS OF ANY STATE IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS AND LAWS. THE SALE OR OTHER DISPOSITION OF SUCH UNITS IS RESTRICTED AS STATED IN THIS AGREEMENT, AND IN ANY EVENT IS PROHIBITED UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL SATISFACTORY TO IT AND ITS COUNSEL THAT SUCH SALE OR OTHER DISPOSITION CAN BE MADE WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ANY APPLICABLE STATE SECURITIES ACTS AND LAWS. BY ACQUIRING UNITS REPRESENTED BY THIS AGREEMENT, EACH MEMBER REPRESENTS THAT IT WILL NOT SELL OR OTHERWISE DISPOSE OF ITS UNITS WITHOUT COMPLIANCE WITH THE PROVISIONS OF THIS AGREEMENT AND REGISTRATION OR OTHER COMPLIANCE WITH THE AFORESAID ACTS AND LAWS AND THE RULES AND REGULATIONS ISSUED THEREUNDER.

**SCHEDULES**

Schedule A:        Schedule of Members

**EXHIBITS**

Exhibit A:         Glossary of Terms

Doc ID: fdbdf19cdce65b3ba40071c320350d6e8abe4fbf

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## BKCOIN MANAGEMENT LLC

### A Delaware Limited Liability Company

This Limited Liability Company Agreement (collectively with all schedules and exhibits hereto, as amended and/or restated from time to time, this "Agreement" or "Operating Agreement") of BKCOIN MANAGEMENT LLC, a Delaware limited liability company with its principal place of business at 410 W 48th Street Suite 2, New York, New York 10036 (the "Company"), is made and entered into as of this 26th day of July, 2018 (the "Effective Date") by and among the Persons whose names and addresses are listed on the Schedule of Members attached hereto as Schedule A (the "Schedule of Members", each a "Party" and collectively the "Parties"). Unless otherwise indicated, capitalized words and phrases in this Agreement shall have the meanings set forth in the Glossary of Terms attached hereto as Exhibit A.

### Recitals

WHEREAS, the Certificate of Formation of the Company was filed with the Secretary of State of Delaware on March 2, 2018 to organize the Company as a Delaware limited liability company;

WHEREAS, an election on IRS Form 2553 was filed with the Internal Revenue Service, electing to have the Company taxed as an S Corporation;

WHEREAS, the Members desire to operate the Company in accordance with the terms of, and subject to the conditions set forth in this Agreement and to set forth certain rights, duties, obligations, liabilities and powers of the Company, the Members, and the Board of the Company;

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members, intending to be legally bound, hereby agree as follows:

### Article I

### FORMATION

1.1     Formation; General Terms; Effective Date. The Company was formed on March 2, 2018 as a Delaware limited liability company by the filing of Certificate of Formation with the Secretary of State of the State of Delaware.  The Persons listed on the Schedule of Members are the Members of the Company. The rights and obligations of the Members and the terms and conditions of the Company shall be governed by the Act and this Agreement.  To the extent the Act and this Agreement are inconsistent with respect to any subject matter covered in this Agreement, this Agreement shall govern to the extent permitted by law. The name of the Company shall be "BKCOIN MANAGEMENT LLC". The name of the Company shall be the exclusive property of the Company, and no Member shall have any rights, commercial or otherwise, in the Company's name or any derivation thereof.  The Company's name may be changed only by an amendment to the Certificate of Formation of the Company.

3

Doc ID: fdbdf19cdce65b3ba40071c320350d6e8abe4fbf

1.2     Purposes.  The principal business activity and purposes of the Company initially shall be any and all lawful purpose. The business and purposes of the Company shall not be limited to any initial principal business activity and, unless the Board otherwise determines, it shall have authority to engage in any other lawful business, purpose or activity permitted by the Act, and it shall possess and may exercise all of the powers and privileges granted by the Act or which may be exercised by any person, together with any powers incidental thereto, so far as such powers or privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company. Notwithstanding the foregoing, Company shall use caution in engaging in any activities that may cause it to become an "ineligible corporation" within the meaning of Code §1361(b)(2) or that may otherwise cause the Company's status as an S Corporation to terminate.

1.3     Principal Place of Business.  The principal place of business of the Company shall be at such place as the Board may designate from time to time, which need not be in the State of New York.  The Company may have such other offices (within or without the State of New York) as the Board may designate from time to time.

1.4     Registered Agent; Registered Office.   The Company's registered agent and registered office are set forth in the Certificate of Formation and may be changed from time to time only by the Board pursuant to the provisions of the Act.

1.5     Commencement and Term.  The Company commenced at the time and on the date appearing in the Certificate of Formation and shall continue until it is dissolved, its affairs are wound up and final liquidating distributions are made pursuant to this Agreement and in compliance with the Act.

1.6     S-Election and Preservation of Company's Status as an S Corporation. The Company, the Board, and the Members shall take all necessary and appropriate actions to elect, preserve, and if need be, restore the Company's status as an S Corporation (including taking such activity as may be necessary under Code §1361(f) to remedy an inadvertent termination of the Company's election to be an S Corporation). Each Member shall execute, acknowledge, and cause to be filed with the appropriate tax authorities (including the Internal Revenue Service) any certificates, statements, forms, schedules, reports or other documents as may be required, or that the Board determines to be necessary or appropriate for the Company to be, and otherwise be treated as, an S Corporation (including signing Internal Revenue Service Form 2553 acknowledging Members' consent and agreement to the Company's election to be an S Corporation, and taking such actions as may be necessary or appropriate to maintain or reinstate or otherwise restore that election or status as an S Corporation). In furtherance of the foregoing, the Company shall not issue any units or other ownership interests to any corporation, partnership, limited liability company, trust, or other Person who is not eligible to be a shareholder of an S Corporation as contemplated by Code §§1361(b)(1)(B) an (C) or issue any Units or other ownership interests that may be considered to be a second class of stock as prohibited by Code §1361(b)(1)(D). All of the provisions of this Section 1.6 shall be subject to the Agreement to Maintain the Ownership Percentages of Peter Dzuba and Brandon Esposito ("the "Ownership Percentages Agreement") signed on the same day as this Agreement, and the provisions of that Ownership Percentages Agreement shall supersede the provisions of this Section 1.6.

Doc ID: fdbdf19cdce65b3ba40071c320350d6e8abe4fbf

**Article II**

**UNITS; CAPITAL CONTRIBUTIONS**

2.1    Classes of Units; Voting.

(a)    Classes of Units.  All interests of the Members in distributions and other amounts specified in this Agreement, as well as the rights of the Members to vote on, consent to, or approve any matter related to the Company, shall be denominated in units of membership interests in the Company (each a "Unit" and collectively, the "Units"), and the relative rights, privileges, preferences and obligations of the Members with respect to Units shall be determined under this Agreement and the Act to the extent provided herein and therein.  The number and the class of Units held by each Member shall be set forth opposite such Member's name on the Schedule of Members.  The classes of Units as of the Effective Date are as follows: the Common Units (the "Common Units"), of which there are 1,000,000 authorized as of the Effective Date, 1,000,000 of which are issued and outstanding as of the Effective Date.

(b)    Voting.  The Members shall have no right to vote on any matter, except as specifically set forth in this Agreement, or as may be required under the Act.  Any such vote shall be at a meeting of the Members entitled to vote or in writing as provided herein.  Each Common Unit shall be entitled to cast one (1) vote on any matter requiring the approval of the Common Units.  Except as otherwise provided in this Agreement and to the extent permissible under the Act, the default threshold for approving matters upon which a vote is taken shall be the affirmative vote of a majority of the issued and outstanding Units.

2.2    Additional Capital Contributions; Additional Members.  Subject to Section 5.3 and except as otherwise expressly provided in this Agreement, the Board may from time to time authorize and cause the Company to issue additional Units, securities or rights convertible into Units, options or warrants to purchase Units, or any combination of the foregoing, consisting either of the classes of Units authorized hereby or as otherwise may be authorized in accordance with the terms hereof (collectively, "New Securities"), and with such rights, privileges, preferences and restrictions and other terms and conditions, and in exchange for such cash or other lawful consideration, as the Board may determine; provided, however, no Member shall have any obligation to contribute additional capital to the Company except to the extent expressly set forth in Section 3.3. Any such New Securities will be issued pursuant to subscription agreements and such other documents deemed appropriate by the Board. The Board should exercise caution when issuing these additional Units, to ensure that Company's election to be taxed as an S Corporation is not affected.  Further, additional Persons who are eligible under the S Corporation statutes, may be admitted to the Company as Members and new Units may be issued to those Persons and to existing Members upon the approval of the Requisite Members, on such terms and conditions as they may determine at the time of admission of such additional Persons and for such value as the Board deems to be appropriate. The terms of admission or issuance shall be in accordance with this Operating Agreement, and shall in no circumstance compromise the Company's status as being taxed as an S Corporation. Any new member must agree to the terms of terms of this Operating Agreement by executing and delivering a joinder to this Agreement. The Board shall amend the Schedule of Members from time to time to reflect the admission of new Members pursuant to this Section.

2.3    Liability of Members.  No Member shall be liable for any debts or losses of capital or profits of the Company or be required to guarantee the liabilities of the Company.  Except as set

5

forth in Section 2.2, Section 2.4, or Section 3.3, no Member shall be required to contribute or lend funds to the Company.

2.4    Capital Contributions.  The initial Capital Contribution (if any) and additional Capital Contribution(s) (if any) of each Member to the capital of the Company shall be set forth opposite such Member's name under the heading "Cash Contribution" on the Schedule of Members and in the Company's books and records.

## Article III

## DISTRIBUTIONS

3.1    Non-Liquidating Distributions. Each Unit shall confer identical economic rights (i.e., identical rights to distribution and liquidation proceeds as contemplated in Treas. Reg. §1.1361-1(1), for the Company to be deemed to have only one class of stock outstanding as, and to the extent required by, Code §1361(b)(1)(D)) as the Company's other outstanding Units. Except as limited by the Act or as provided subsequently in Section 3.2 below, all funds and assets of the Company which are determined by the Board to be available for distribution shall be distributed to the holders of Common Units pro rata in proportion to the number of Common Units held by such holders.

3.2    Distributions Upon Liquidation or a Deemed Liquidation Event.

(a)    Upon a Liquidation or a Deemed Liquidation Event, after payment of, or other adequate provision for, the debts and obligations of the Company, including the expenses of its liquidation and dissolution or other transaction expenses, the Company shall distribute the net proceeds or assets available for distribution, whether in cash or in other property ("Net Liquidation Proceeds"), to the holders of Common Units pro rata in proportion to the number of Common Units held by such holders. For this purpose, each Unit shall confer identical economic rights (i.e., identical rights to distribution and liquidation proceeds as contemplated in Treas. Reg. §1.1361.1(1) for the company to have only one class of stock outstanding as, and to the extent required by, Code §1361(b)(1)(D)) as any of the Company's other outstanding Units.

(b)    A "Deemed Liquidation Event" shall mean (a) any merger, consolidation, recapitalization, sale or transfer of Units or other transaction or series of transactions in which the Members and their Permitted Transferees immediately prior to such transaction do not own a majority of the equity of the surviving entity after the closing of such transaction (other than the issuance of equity securities by the Company in connection with a transaction where the principal business purpose is raising capital), or (b) a sale or disposition of all or substantially all of the Company's assets to any Person.

3.3    Withholding.  If any federal, foreign, state or local jurisdiction requires the Company to withhold taxes or other amounts with respect to any Member's allocable share of taxable income or any items thereof, or with respect to distributions, the Company shall withhold from distributions or other amounts then due to such Member an amount necessary to satisfy the withholding responsibility and shall pay any amounts withheld to the appropriate taxing authorities. In such a case, for purposes of this Agreement the Member for whom the Company has paid the withholding tax shall be deemed to have received the withheld distribution or other amount due and to have paid the withholding tax directly and such Member's share of cash distributions or other amounts due shall be reduced by a corresponding amount.

6

Doc ID: fdbdf19cdce65b3ba40071c320350d6e8abe4fbf

If it is anticipated that, at the due date of the Company's withholding obligation, the Member's share of cash distributions or other amounts due is less than the amount of the withholding obligation, the Member with respect to which the withholding obligation applies shall pay to the Company the amount of such shortfall within thirty (30) days after notice by the Company. If a Member fails to make the required payment when due hereunder, and the Company nevertheless pays the withholding, in addition to the Company's remedies for breach of this Agreement, the amount paid shall be deemed a recourse loan from the Company to such Member bearing interest at the Default Rate, and the Company shall apply all distributions or payments that would otherwise be made to such Member toward payment of the loan and interest, which payments or distributions shall be applied first to interest and then to principal until the loan is repaid in full. In furtherance of the aforementioned and in all cases subject to the Ownership Percentages Agreement, Company shall take whichever approach will not compromise Company's S Corporation, and if all options would compromise the Company's S Corporation election, then this Section 3.3 shall not be followed.

## Article IV

## ALLOCATIONS

The Company's income or loss, as determined in accordance with applicable federal income tax accounting principles, including all items of income, gain or loss (whether taxable or tax-exempt), deduction and expense, and all credits, are to be allocated among the Members in the manner provided and otherwise contemplated by Code §1366 and, more generally, Subchapter S of the Code, the Code itself, and otherwise applicable federal and state income tax law.

## Article V

## MANAGEMENT AND GOVERNANCE

5.1     Management by Board; Specific Acts Authorized; Delegation of Authority by the Board.

(a)     General Authority of the Board; Size.  The business, property and affairs of the Company shall be managed by a board of managers (the "Board").  The Board shall consist of two (2) designees, who shall be Carlos Betancourt and Kevin Kang (each a "Manager" and collectively, the "Managers"). The number of Board members is fixed at two (2) members, and this number may not be expanded without the unanimous vote of the Board. Any vacancy on the Board shall be filled upon the vote or written consent of either the Requisite Members or the other Managers then serving on the Board. Except as otherwise required by the Act, the Board shall have authority, power and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to supervise, direct and control the actions of the Officers and to perform any and all other actions customary or incident to the management of the Company's business, property and affairs.  The Members shall have no power to participate in the management of the Company or to vote on any matter, except as specifically set forth in this Agreement, or as may be required under non-waivable provision of the Act.

(b)     Meetings of the Board.  Meetings of the Board may be called by any Manager.  Notice of any meeting shall be given pursuant to Section 10.1 below to the other Manager not less than forty-eight (48) hours prior to the meeting.  All of the Managers shall be

7

required to constitute a quorum for the transaction of business by the Board. Approval by both Managers shall be required for the Board to take any action. A notice need not specify the purpose of any meeting.  Notice of a meeting need not be given to any Manager who signs a waiver of notice, a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting the lack of notice prior to the commencement of the meeting.  All such waivers, consents and approvals shall be filed with the Company's records or made a part of the minutes of the meeting.  Managers may participate in any meeting of the Managers by means of conference telephones or other means of electronic communication so long as all Managers participating can hear or communicate with one another. A Manager so participating is deemed to be present at the meeting.

        (c)    <u>Board Action by Written Consent</u>.  Any action that is permitted or required to be taken by the Board may be taken or ratified by written consent setting forth the specific action to be taken, which written consent is signed by all of the Managers.

        (d)    <u>Limitation of Liability; Fiduciary Duties</u>.  No Manager shall be obligated personally for any debt, obligation or liability of the Company or of any Member, whether arising in contract, tort or otherwise, by reason of being or acting as Manager of the Company.  No Manager shall be personally liable to the Company or its Members for any action undertaken or omitted in good faith reliance upon the provisions of this Agreement unless the acts or omissions of the Manager were not in good faith or involved criminal activity, willful misconduct, fraud, or a knowing violation or breach of this Agreement; <u>provided</u>, <u>however</u>, that each Manager shall owe, and shall act in a manner consistent with, fiduciary duties to the Company and its Members of the nature, and to the same extent, as those owed by directors of a Delaware corporation.

    5.2    <u>Officers</u>.

        (a)    <u>Enumeration; Appointment</u>.  Except as otherwise provided herein, the Board may appoint one or more officers of the Company (each an "<u>Officer</u>" and, collectively, the "<u>Officers</u>"), which shall initially consist of two (2) Operating Directors, and which may consist of such other Officers as the Board may determine from time to time, including but not limited to a Chief Executive Officer and President, Vice President, Treasurer and a Secretary. The Board may appoint an Officer at any time.

        (b)    <u>Qualification</u>.  An Officer need not be a Member or Manager.  Any number of offices may be held by the same Person.

        (c)    <u>Tenure</u>.  Except as otherwise provided by the Act or by this Agreement and unless otherwise specified, each of the Officers shall hold office until his or her successor is appointed or until his or her earlier resignation or removal.

        (d)    <u>Removal</u>. Any Officer appointed by the Board may be removed at any time by the Board.

        (e)    <u>Vacancies</u>.  Any vacancy in any office may be filled for the unexpired portion of the term by the Board.

        (f)    <u>Operating Directors.</u>  The Operating Directors shall perform the variety of duties in connection with the day-to-day operation of the Company, and shall have such duties and power as are customarily incident to such an office, as well as such duties and powers as may be designated from time to time by the Board. Notwithstanding the foregoing, any action taken

Doc ID: fdbdf19cdce65b3ba40071c320350d6e8abe4fbf

by the Operating Directors that requires the prior approval of the Board, including those actions requiring prior approval of the Board which are set forth in the Operating Directors' Employment Agreement or Independent Contractor Agreement, whichever is applicable, shall be void and shall not bind the Company, unless the Operating Directors have received prior approval from the Board for such action.

(g)     Chief Executive Officer and President.  The Chief Executive Officer and President, subject to the direction of the Board, shall have general supervision and control of the Company's business.  Notwithstanding the foregoing, any action taken by the Chief Executive Officer and President that requires prior approval of the Board shall be void and shall not bind the Company, unless the Chief Executive Officer and President has received prior approval from the Board for such action.

(h)     Vice President. In the absence of the Chief Executive Officer and President, or in the event of his or her inability or refusal to act, the Vice President shall perform the duties of the Chief Executive Officer and President, and when so acting, shall have all the powers of, and be subject to, all of the Board's restrictions upon the Chief Executive Officer and President.

(i)     Treasurer.  The Treasurer shall have custody of all funds, securities, and valuable documents of the Company and shall have general charge of the financial affairs of the Company.

(j)     Secretary.  The Secretary shall record all the proceedings of the meetings of the Board in books kept for that purpose.   In his or her absence from any such meeting, a temporary secretary may be chosen at the meeting, and shall record the proceedings thereof. The Secretary shall have such other duties and powers as may be designated from time to time by the Board.

5.3     Certain Approval Rights of the Members.  Notwithstanding anything contained in this Agreement to the contrary, without the prior written consent of at least (i) seventy-five percent (75%) of the Members and (ii) an affirmative vote of at least seventy-five percent (75%) of issued and outstanding Units, the Company shall not directly, or indirectly, by amendment, merger, recapitalization, sale, consolidation or otherwise:

(a)     Amendment of Organizational Documents.  Amend or modify this Agreement or the Certificate of Formation or the Company's form of existence in any manner.

(b)     Liquidation.  Liquidate, dissolve, effect a recapitalization or reorganization in any form of transaction, commence a voluntary case under the U.S. bankruptcy code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, consent to the entry of an order for relief in an involuntary case, or the conversion of an involuntary case to a voluntary case, under any such law, consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property, or make a general assignment for the benefit of creditors.

(c)     Sale Transactions.  Effect any Sale Transaction.

(d)     New Securities.  Issue any New Securities.

9

(e)  <u>Actions relating to the foregoing</u>.  Enter into any agreement or otherwise obligate the Company or any Subsidiary to do any of the foregoing.

**Article VI**

**TRANSFER OF INTERESTS**

6.1    <u>In General</u>.  Except as otherwise set forth in this <u>Article VI</u>, a Member may not effect a Transfer of all or any portion of its Units, unless such Transfer complies with the applicable provisions of this <u>Article VI</u>.  Any Transfer that does not comply with this <u>Article VI</u> shall be void ab initio and of no force or effect.  The terms and conditions on this <u>Article VI</u> shall terminate and be of no further force or effect immediately before consummation of an IPO or a Deemed Liquidation Event. A Unit holder shall not effect a Transfer of all or any portion of its Units: (i) in a way that may cause the Company to be deemed to have more than one class of stock outstanding as contemplated by Code §1361(b)(1)(D); (ii) to a corporation, partnership, limited liability company, trust, or other Person described in Code §§1361(b)(1)(B) or (C) whose ownership of such interest will cause the Company to fail to be considered a "small business corporation" within the meaning of Code §1361(b)(f); (iii) to any Person or Person if by doing so may cause the Company to have more than one-hundred (100) "shareholders" as prohibited by Code §1361(b)(1)(A) for the Company to be a "small business corporation" with the meaning of Code §1361(b)(f); or (iv) in any other way or to any other Person or Persons that would cause the termination of the Company's election as an S Corporation; and any purported Transfer or other action as a Unit holder in violation of the foregoing or that would otherwise cause the termination of the Company's election as an S Corporation shall be void ab initio and will have no force an effect whatsoever and shall otherwise be treated as if that transaction or other action had never taken place or occurred.

6.2 <u>Limited Exception For Transfers of Units</u>.

(a)    <u>Certain Permitted Transfers</u>.  Subject to any other restrictions contained in any agreement between the Company and such Member, each Member may effect a Voluntary Transfer to one or more Permitted Transferees of all or a portion of the Units owned by such Member; <u>provided</u> that in each case the Permitted Transferee shall have become a Member in accordance with <u>Section 6.3</u> and all Units so Transferred shall continue to be subject to all provisions of this Agreement as if such Units were still held by such Member; and <u>provided further</u>, that no further Transfer shall thereafter be permitted hereunder except (i) by the Permitted Transferee back to the transferring Member or (ii) to another Permitted Transferee of such Member in compliance with this <u>Article VI</u>.

(b)    <u>Voluntary Transfers; Right of First Refusal</u>.  Each Member agrees that at least thirty (30) days prior to making any Voluntary Transfer of any Units (other than Transfers effected pursuant to <u>Section 6.2(a)</u>, Transfers in connection with a Sale Transaction and the forfeiture or repurchase of Units by the Company in connection with the termination of the holder's employment or other service relationship with the Company, including forfeiture for "Cause" pursuant to a Member's Restricted Unit Agreement, if applicable), the Member proposing to effect a Voluntary Transfer (a "<u>Selling Member</u>") shall deliver a written notice (a "<u>Offer Notice</u>") to the Company and the Members.  The Offer Notice shall disclose in reasonable detail the proposed number and class of Units to be transferred, the identity of the proposed purchaser, and the proposed terms (including, but not limited to,  the price and whether paid in one lump sum or in installments) and conditions of the Transfer (the "<u>Minimum Sale Terms</u>").  Provided there is a consensus that the price in the Offer Notice is fair, the Members may elect to purchase all of such Selling

10

Member's Units not purchased by the Company (the "Offered Units") at the price and on the terms specified in the Offer Notice by delivering written notice of such election to the Selling Member as soon as practical, but in any event within thirty (30) days after delivery of the Offer Notice. If the Members have, in the aggregate, elected to purchase more than the number of the Offered Units, the Offered Units shall be allocated among the Members electing to purchase Offered Units according to a percentage interest equal to, with respect to each Member electing to purchase Offered Units, (x) the number of Units held by each such Member electing to purchase Offered Units divided by (y) the total number of Units held by all Members electing to purchase Offered Units.

The price at which the proposed number and class of Units are to be transferred shall not exceed the Fair Market Value of those Units. Thus, notwithstanding the above, if the Company or any of the other Members ("Dissenting Party") believes that the price of the proposed Transfer does, indeed, exceed the Fair Market Value of said Units, then either the Company or the other Members may request an appraisal by an independent business appraiser be undertaken. The expense of such appraisal shall be paid by the Dissenting Party. The Selling Member may then either (i) accept the valuation produced by this independent business appraiser chosen by the Dissenting Party and sell to the Company and/or to the other Members pursuant to mechanism set forth above, based on the value of this appraisal; (ii) may opt, at the Selling Member's own expense, to have a second valuation undertaken by an independent business valuator of their own choosing, in which case the price applicable to the above Right of First Refusal shall be the average of the two appraisals; or (iii) elect to not sell the Units.

If any Members have elected to purchase Selling Member's Units from the Selling Member, the Transfer of such shares shall be consummated as soon as practical after the delivery of the election notices, but in any event within sixty (60) days after the delivery of the Offer Notice to the Company and the Members. To the extent the Members have not elected to purchase all of the Selling Member's Units being offered, the Selling Member may, within one hundred twenty (120) days after the delivery of the Offer Notice to the Company and the Members and, to the extent applicable, Transfer such Selling Member's Units not elected to be purchased by the Company and the Members to one (1) or more specifically identified third-parties (but not the assigns of such third parties) at a price(s) no less than the price(s) per share specified in the Offer Notice and on other terms no more favorable to the transferees than offered to the Company and the Members in the Offer Notice. The purchase price(s) specified in any Offer Notice shall be payable solely in cash at the closing of the transaction or in installments over time.

(c)     Threatened Divestiture of a Member's Units due to Substantial Debt Burden. Any Member who becomes subject to substantial debt so that it becomes likely, under the relevant laws then in effect at the time, that that Member's Units would ultimately become divested in favor of a third party (in particular, a bankruptcy trustee), then first the Company and then the other Members pursuant to the mechanism set forth above in Section 6.2(b), shall acquire an option to purchase said Member's Units, at sixty percent (60%) of the Units' Fair Market Value. This discount is set based upon a variety of factors, including but not limited to: (i) the reality that the Company's transfer restrictions in this Operating Agreement were specifically set so as to ensure that the Members would not do business with any third party who they did not approve of, and are vehemently opposed to any attempt to contravene this position, (ii) the reality that any Units would hold little value in the hands of any third party in light of these transfer restrictions and the position of the Company; (iii) the time, effort and cost saved for the third party, (iv) the Company's time, effort and cost to effectuate the sale, which are not insubstantial, and (v) the additional risks inherent to any purchaser(s) of becoming involved in proceedings associated with these Units. If the option in this subsection pertains to the Units of a Member that is on the Board, then the approval of the

11

Doc ID: fdbdf19cdce65b3ba40071c320350d6e8abe4fbf

Requisite Members shall be required prior to exercise of the option and effectuating any purchase of the Units pursuant to this subsection. If the option in this subsection pertains to the Units of a Member of the Company that is not on the Board, then the approval of the Board and of that Member shall be required prior to exercise of the option and effectuating any purchase of the Units pursuant to this subsection.

        (d)    <u>Effect of Non-Compliance</u>.  Any attempted Transfer which is not both permitted by and in compliance with this <u>Section 6.2</u> shall be null and void, and the Company shall not recognize the attempted purchaser, assignee, or transferee for any purpose whatsoever, and the Member attempting such Transfer shall have breached this Agreement for which the Company and the Members shall have all remedies available for breach of contract.

     6.3    <u>Admission as a Member</u>.  No Transfer of Units shall be effective and no Person taking or acquiring, by whatever means, all or any portion of any Units shall be admitted as a Member unless (in addition to the requirements of <u>Section 6.2</u>) such proposed Transfer complies with each of the following provisions:

        (a)  <u>Prior Notice</u>.  In the case of a Voluntary Transfer, the Member proposing to effect a Voluntary Transfer delivers a notice to the Company at least ten (10) days prior to any proposed Voluntary Transfer of Units otherwise permitted pursuant to <u>Section 6.2</u>;

        (b)  <u>Securities Law Compliance</u>.  In the case of either a Voluntary Transfer or an Involuntary Transfer, either (i) the Units are registered under the Securities Act and the rules and regulations thereunder, and any applicable state securities laws; or (ii) the Company and its counsel determine that the Transfer qualifies for an exemption from the registration requirements of the Securities Act, any applicable state securities laws and any securities laws of any applicable jurisdiction;

        (c)  <u>Termination</u>.  In the case of either a Voluntary Transfer or an Involuntary Transfer, the Transfer will not (i) result in the taxation of the Company as an association taxable as a corporation or otherwise subject the Company to entity-level taxation for federal income tax purposes or (ii) affect the Company's existence or qualification as a limited liability company under the Act;

        (d)  <u>LLC Agreement</u>.  Such proposed transferee agrees to become a Member by executing and delivering a joinder to this Agreement;

        (e)  <u>Assignment</u>.  Such Member and its proposed transferee execute, acknowledge, and deliver to the Company a written assignment of the Units in such form as may be required by the Board.

        (f)  <u>Written Attestation,</u> The proposed transferee delivers a written certification or other statement to the Company that the prospective transferee is a "United States person" within the meaning of Code §7701(a)(30) and is not a person described in Code §§1361(b)(1)(B) and (C) whose ownership of Units other than ownership interest in the Company will cause the Company to cease be an entity meeting the requirements for being a "small business corporation" within the meaning of Code §1361(b)(f).

    The Board shall amend the Schedule of Members from time to time to reflect the admission of Members pursuant to this <u>Section 6.3</u>.

Doc ID: fdbdf19cdce65b3ba40071c320350d6e8abe4fbf

6.4     <u>Distributions and Allocations With Respect to Transferred Units</u>. Subject to the Ownership Percentages Agreement, if any Units are transferred (by Voluntary Transfer or Involuntary Transfer) during any Fiscal Year in compliance with the provisions of this <u>Article VI</u>, then (i) allocations of net income and net loss with respect to the Units for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during such Fiscal Year in accordance with relevant S Corporation provisions of the Internal Revenue Code, using any conventions permitted by the Code and selected by the transferor and transferee in connection with the transfer and approved by the Board; (ii) all distributions on or before the date of such transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee; and (iii) the transferee shall succeed to and assume the Capital Account and other similar items of the transferor to the extent related to the transferred Units. Solely for purposes of making the allocations and distributions, the Company shall recognize such transfer not later than the end of the calendar month during which the Company receives notice of such transfer and all of the conditions in <u>Section 6.2</u> are satisfied. If the Company does not receive a notice stating the date the Units were transferred and such other information as the Company may reasonably require within thirty (30) days after the end of the Fiscal Year during which the transfer occurs, then all of such items shall be allocated, and all distributions shall be made to the new unit holder. Neither the Company nor any Member shall incur any liability for making allocations and distributions in accordance with the provisions of this <u>Section 6.4</u>, whether or not such Person had knowledge of any transfer of ownership of any Units. Any Member proposing to transfer all or a portion of any interest in the Company (or the transferee of such interest) shall be required to pay the Company's reasonable out-of-pocket costs incurred in connection with the proposed transfer, including any additional accounting, tax preparation or other administrative expenses incurred (or to be incurred) by the Company as a result of any tax basis adjustments under the relevant S Corporation provisions of the Internal Revenue Code.

**Article VII**

**CESSATION OF MEMBERSHIP**

7.1     <u>When Membership Ceases</u>. A Person who is a Member shall cease to be a Member upon the Voluntary Transfer or Involuntary Transfer of such Member's Units as permitted under this Agreement. A Member is not entitled to withdraw voluntarily from the Company while such Member owns Units.

7.2     <u>Deceased, Incompetent or Dissolved Members</u>.   The personal representative, executor, administrator, guardian, conservator or other legal representative of a deceased individual Member or of an individual Member who has been adjudicated incompetent may exercise the rights of the Member for the purpose of administration of such deceased Member's estate or such incompetent Member's property. The beneficiaries of a deceased Member's estate shall become Members only upon compliance with the conditions of this Agreement. If a Member who is a Person other than an individual is dissolved, the legal representative or successor of such Person may exercise the rights of the Member pending liquidation. The distributees of such Person may become members of the dissolved Member only upon compliance with the conditions of this Agreement.

7.3     <u>Consequences of Cessation of Membership</u>. In the event a Person ceases to be a Member as provided in <u>Section 7.1</u> above, the Person (or the Person's successor in interest) shall continue to be liable for all obligations of the former Member to the Company and, with respect to

13

any Units owned by such Person, shall be an assignee with only the rights and subject to the restrictions, conditions and limitations described above.

## Article VIII

## DISSOLUTION, WINDING UP AND LIQUIDATING DISTRIBUTIONS

8.1     <u>Dissolution Triggers</u>.  The Company shall dissolve upon the first occurrence of the following events:

(a)  The determination by the Requisite Members that the Company should be dissolved subject to the provisions of <u>Section 5.3</u> herein; or

(b)  The entry of a decree of judicial dissolution or the administrative dissolution of the Company as provided in the Act.

8.2     <u>Winding Up; Termination</u>.  Upon a dissolution of the Company, the Board, or, if there are no members of the Board, a court appointed liquidating trustee, shall take full account of the Company's assets and liabilities and wind up the affairs of the Company.  The Persons charged with winding up the Company shall settle and close the Company's business, and dispose of and convey the Company's non-cash assets as promptly as reasonably possible following dissolution as is consistent with obtaining the fair market value for the Company's assets.

## Article IX

## BOOKS AND RECORDS

9.1     <u>Books and Records</u>.  The Company shall keep adequate books and records at its principal place of business, which shall set forth an accurate account of all transactions of the Company as well as the other information required by the Act.

9.2     <u>Taxable Year; Accounting Methods</u>.  The Company's taxable year shall be the year required by the Code.  The Company shall report its income for income tax purposes using such method of accounting selected by the Board and permitted by law.

## Article X

## MISCELLANEOUS

10.1     <u>Notices</u>.  Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be delivered personally to the Person or to an officer of the Person to whom the same is directed, or sent by registered or certified United States mail return receipt requested, or by nationally recognized overnight delivery service, addressed as follows:  if to the Company or the Board, to the Company's principal office address as set forth on the signature page to this Agreement (with a copy to each Manager), or to such other address as may be specified from time to time by notice to the Members; if to a Member, to the Member's address as set forth on the Schedule of Members, or to such other address as may be specified from time to time by notice to the Members; if to a Manager, to the address of such

14

Manager as set forth in the records of the Company (with a copy to the Member entitled to designate such Manager), or to such other address as such Manager may specify from time to time by notice to the Members. Any such notice shall be deemed to be delivered, given, and received for all purposes as of the date and time of actual receipt.

10.2    Binding Effect. Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members, and their respective heirs, legatees, legal representatives, and permitted successors, transferees, and assigns.

10.3    Construction. No provision of this Agreement is to be interpreted as a penalty upon, or a forfeiture by, any party to this Agreement. The Parties acknowledge that each Party to this Agreement, together with such Party's legal counsel, has shared equally in the drafting and construction of this Agreement and, accordingly, no court construing this Agreement shall construe it more strictly against one party hereto than the other.

10.4    Entire Agreement; No Oral Agreements; Amendments to the Agreement. This Agreement, constitutes the entire agreement among the Members with respect to the affairs of the Company and the conduct of its business, and supersedes all prior agreements and understandings, whether oral or written. The Company shall have no oral operating agreements. Any provision of this Agreement may be amended or waived in accordance with the terms herein. Any amendment adopted consistent with the provisions of this Agreement shall be binding on all Members without the necessity of their execution of the amendment or any other instrument. Notwithstanding anything contained in this Agreement to the contrary, the Board shall be permitted to update Schedule A to reflect (i) Transfers of Units and the admission of new Members made in accordance with the terms and conditions of this Agreement and (ii) the forfeiture or repurchase by the Company of Units upon termination of the holder's employment or other service relationship with the Company, including forfeiture for "Cause" pursuant to a Member's Restricted Unit Agreement, if applicable; and no such update to Schedule A made in accordance with this sentence shall be deemed to be an amendment to this Agreement requiring conformity with the provisions of Section 5.3 herein, provided, however, that any such forfeiture or repurchase referenced in part (ii) of this sentence is made pursuant to an express provision of a contractual agreement with such Party whose Units are subject to such forfeiture or repurchase, other than this Agreement, which specifically enumerates the terms under which such forfeiture or repurchase may be triggered.

10.5    Headings; Interpretation; Treatment of Affiliates and Permitted Transferees. The table of contents and section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof. All references to days or months shall be deemed references to calendar days or months. All references to "$" shall be deemed references to United States dollars. Unless the context otherwise requires, any reference to a "Section", "Schedule" or "Exhibit" shall be deemed to refer to a section of this Agreement or Schedule or Exhibit to this Agreement, as applicable. The words "hereof," "herein" and "hereunder" and words of similar import referring to this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Any agreement, instrument or statute defined or referred to herein, or in any agreement or instrument that is referred to herein, means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and

15

references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its permitted successors and assigns.

10.6    Severability.  Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, then (a) such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement and (b) the parties agree to negotiate in good faith to draft a new legal and enforceable provision that to the maximum extent possible under applicable law comports with the original intent of the parties and maintains the economic and other terms to which the parties originally agreed.

10.7    Variation of Pronouns.  All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

10.8    Governing Law; Dispute Resolution.  The validity, construction, interpretation, performance, and enforcement of this Agreement, shall be governed by the laws of the State of Delaware, without regard to its conflict of laws provisions or the conflict of laws provisions of any other jurisdiction. In addition, the laws of the State of Delaware shall govern the organization and internal affairs of the Company and the limited liability of the Members. Any dispute arising out of this Agreement shall be settled by litigation in the state or federal courts of New York County, New York. The Parties submit to the exclusive venue and jurisdiction of the federal and state courts located New York County, New York for disputes pertaining to this Agreement.

10.9    Waiver of Action for Partition.  Each of the Members irrevocably waives any right that it may have to maintain any action for partition with respect to any of the assets of the Company.

10.10   Counterpart Execution; Facsimile Execution.  This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document.  Such counterparts may be transmitted to the Company and/or the other Members by facsimile or other electronic transmission and such facsimile or other electronic execution shall have the full force and effect of an original signature.  All fully executed counterparts, whether original executions or facsimile executions, electronic executions or a combination of the foregoing, shall be construed together and shall constitute one and the same agreement.

10.11   Confidentiality.  Each Member covenants and agrees that: (a) it, he or she will not disclose or make use of any Trade Secrets or Confidential Information of the Company other than as necessary in connection with the performance of his or her duties as an employee of, or consultant to, the Company; and (b) it, he or she shall not, directly or indirectly, transmit or disclose any Trade Secret or Confidential Information of the Company to any person and shall not make use of any such Trade Secret or Confidential Information, directly or indirectly, for, as applicable, himself, herself or others, without the prior written consent of the Company, except for a disclosure that is required by any law, order or legal process, in which case such Holder shall provide the Company prior written notice of such requirement as promptly as practicable so that the Company may contest such disclosure.  To the extent that such information is a "trade secret" as that term is defined under a state or federal law, this subparagraph is not intended to, and does not, limit the Company's rights or remedies thereunder and the time period for prohibition on disclosure or use of such information is until such information becomes generally known to the public through the act of one who has the right to disclose such information without violating a legal right of the Company.

16

Doc ID: fdbdf19cdce65b3ba40071c320350d6e8abe4fbf

10.12.  Method for Resolving Deadlocks. If any vote is required on any matter under this Operating Agreement, and there are neither sufficient votes to approve or disapprove the matter, then the matter will be deemed to be subject to a deadlock and the following shall apply: Within ten (10) days following the date of the incident at which the deadlock occurred ("Deadlock Notice Period"), each Member or Manager participating in the vote that is subject to the deadlock (each a "Deadlocked Party") shall provide notice to and all other Deadlocked Parties of a representative appointed to meet with the representative of each of the other Deadlocked Parties, which representatives shall serve as agents of each of their respective Deadlocked Parties. The representatives' intent and efforts shall be to resolve the deadlock. Each Deadlocked Party providing such a representative shall be responsible for the compensation and payment of any fees, expenses or charges for its respective representative appointed by such Deadlocked Party. In the event any Deadlocked Party fails to appoint a representative and provide such notice within the Deadlock Notice Period, such Party waives their right to vote in respect to the matter which is the subject of the deadlock and the votes of the remaining Deadlocked Parties shall control. In the event the representatives are unable to resolve the deadlock within twenty (20) days after the date of expiration of the Deadlock Notice Period, the Deadlocked Parties shall agree that all representatives shall within five (5) days after the expiration of such twenty (20) day period, unanimously agree to the appointment of an independent third party which may, but need not be, a professional arbitrator, to resolve the deadlock. Notwithstanding the foregoing, at the request of any Deadlocked Party at the time of the determination of the independent third party, the matter shall be submitted to arbitration before a professional arbitrator in accordance with the Rules of the American Arbitration Association. The Deadlocked Parties shall vote in accordance with the decision of the independent third party or arbitrator, as the case may be, in order to resolve the deadlock. Each Deadlocked Party shall be responsible for its pro rata portion of the compensation and payment of all fees, expenses and charges of such independent third party or arbitrator with such ratable portion to be determined by the number of units held by each Deadlocked Party as a fraction of the total units held by all Deadlocked Parties.

**Signatures Appear On Following Page**

17

Doc ID: fdbdf19cdce65b3ba40071c320350d6e8abe4fbf

IN WITNESS WHEREOF, the Members have executed this Agreement on the following execution page, to be effective as of the Effective Date.

**COMPANY:**

**BKCOIN MANAGEMENT LLC,**
*a Delaware limited liability company taxed as an S Corporation*

By: *Carlos Betancourt*
    Name: Carlos Betancourt
    Title: Manager of BKCoin Management LLC

Address:

410 W 48TH Street, Suite 2
New York, NY 33309

**MEMBERS:**

*Carlos Betancourt*

Carlos Betancourt

Kevin Kang

Peter Dzuba

*Brandon Esposito*

Brandon Esposito

18

Doc ID: fdbdf19cdce65b3ba40071c320350d6e8abe4fbf

### SCHEDULE A
### Schedule of Members

| Member | Common Units | % of Total | Cash Contribution | Capital Account | Issue Date |
|---|---|---|---|---|---|
| *Carlos Betancourt | 475,000 | 47.50% | $4.75 | $4.75 | July 26, 2018 |
| *Kevin Kang | 475,000 | 47.50% | $4.75 | $4.75 | July 26, 2018 |
| Peter Dzuba | 25,000 | 2.5% | $0.25 | $0.25 | July 26, 2018 |
| Brandon Esposito | 25,000 | 2.5% | $0.25 | $0.25 | July 26, 2018 |
| Total | 1,000,000 | 100% | $10.00 | $10.00 | |

*Denotes a Founding Member who signed Form 2553 to elect to have the LLC treated as an S Corporation for federal tax purposes.

Doc ID: fdbdf19cdce65b3ba40071c320350d6e8abe4fbf

**EXHIBIT A**
**Glossary of Terms**

Capitalized words and phrases used in this Agreement are defined below.

"Act" shall mean the Delaware Limited Liability Company Act (or any corresponding provisions of succeeding law).

"Agreement" shall have the meaning set forth in the introductory paragraph hereto.

"Board" shall have the meaning set forth in Section 5.1(a).

"Capital Contribution" shall mean with respect to any Member, the amount of money and the fair market value of any property contributed to the Company with respect to the Units of such Member.

"Certificate of Formation" shall mean the Certificate of Formation required to be filed by the Company pursuant to the Act together with any amendments thereto.

"Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor federal revenue law.

"Common Units" shall have the meaning set forth in Section 2.1(a).

"Company" shall have the meaning set forth in the introductory paragraph hereto.

"Confidential Information" shall mean all information regarding the Company, the Company's activities, the Company's business, clients or customers that is not generally known to persons not employed by the Company and that is not generally disclosed by the Company's practice or authority to persons not employed by the Company, but that does not rise to the level of a Trade Secret, and shall include, but is not limited to, sales and marketing techniques and plans, production techniques, purchase information, prices, billing information, financial plans and data concerning the Company, clients or customers (including, but not limited to client or customer lists), and management planning information. "Confidential Information" shall not include information that (i) has become generally available to the public by the act of one who has the right to disclose such information without violating any legal right or contractual right of the Company or (ii) otherwise becomes available to a third-party and such third-party has no knowledge that such disclosure violated any Company right of confidentiality.

"Deemed Liquidation Event" shall have the meaning set forth in Section 3.2(b).

"Default Rate" shall mean a per annum rate of interest equal to the greater of (i) Prime Rate plus 100 basis points or (ii) 8%, but in no event greater than the amount of interest that may be charged and collected under applicable law.

"Effective Date" shall have the meaning set forth in the introductory paragraph hereto.

"Fair Market Value" shall mean the purchase price for the sale of a Member's interest in the Company under this Agreement and shall be based on the Company's fair market value as

20

Doc ID: fdbdf19cdce65b3ba40071c320350d6e8abe4fbf

determined by an independent business appraiser, multiplied by the ownership percentage held by the selling Member, or the selling Member's legal representatives.

"Fiscal Year" shall be the Company's taxable year, as described in Section 9.2.

"Involuntary Transfer" shall mean the involuntary transfer of all or any portion of Units by way of intestacy, will, bankruptcy, receivership, levy, execution, charging order or other similar seizure by legal process.

"Liquidation" shall mean any liquidation, dissolution or winding up, voluntary or involuntary, of the Company.

"Manager" shall have the meaning set forth in Section 5.1(a).

"Members" shall refer collectively to the Persons listed on the Schedule of Members as Members and to any other Persons who are admitted to the Company as Members or who become Members under the terms of this Agreement until such Persons have ceased to be Members under the terms of this Agreement. "Member" shall mean any one of the Members.

"Minimum Sale Terms" shall have the meaning set forth in Section 6.2(b).

"Net Liquidation Proceeds" shall have the meaning set forth in Section 3.2(a).

"New Securities" shall have the meaning set forth in Section 2.2.

"Offer Notice" shall have the meaning as set forth in Section 6.2(b).

"Officers" shall have the meaning set forth in Section 5.2(a).

"Permitted Transferee" shall mean, provided they meet the requirements of eligible shareholders under Subchapter S of the Internal Revenue Code: (i) the estate, personal representative or executor, or any parent, spouse, or child of such Member, (ii) any trust for the exclusive benefit of any of the Persons set forth in clause (i), (iii) a limited liability company all of the equity interests of which are owned by the Member.

"Person" shall mean any natural person, partnership, trust, estate, association, limited liability company, corporation, custodian, nominee, governmental instrumentality or agency, body politic or any other entity in its own or any representative capacity.

"Prime Rate" as of a particular date shall mean the prime rate of interest as published on that date in the Wall Street Journal, and generally defined therein as "the base rate on corporate loans posted by at least 75% of the nation's 30 largest banks." If the Wall Street Journal is not published on a date for which the Prime Rate must be determined, the Prime Rate shall be the prime rate published in the Wall Street Journal on the nearest-preceding date on which the Wall Street Journal was published.

"Offered Units" shall have the meaning as set forth in Section 6.2(b).

"Requisite Members" shall mean the unanimous decision of Carlos Betancourt and Kevin Kang.

21

"Sale Transaction" means (i) any transaction or series of related transactions pursuant to which any Person or group of Persons acting in concert (other than any Person who is a Member or a Permitted Transferee as of the Effective Date), together with such Person's or group of Persons' Affiliates, acquire(s) more than fifty percent (50%) of the Units of the Company (other than the issuance of equity securities by the Company in connection with a transaction where the principal business purpose is raising capital), or (ii) the sale of all, or substantially all, of the Company's and/or its Subsidiaries' assets determined on a consolidated basis.

"Schedule of Members" shall have the meaning set forth in the introductory paragraph hereto.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Selling Member" shall have the meaning set forth in Section 6.2(b).

"Trade Secret" means all secret, proprietary or confidential information regarding the Company or the Company's activities, including any and all information not generally known to, or ascertainable by, persons not employed by the Company, the disclosure or knowledge of which would permit those persons to derive actual or potential material economic value therefrom or to cause material economic or financial harm to the Company and shall include, but not be limited to, customer lists, pricing information, customer and supplier contacts, technical information regarding Company processes, services and process and service development, information concerning Company methods, current development and expansion or contraction plans of the Company, information concerning the legal affairs of the Company and information concerning the financial affairs of the Company. "Trade Secrets" shall not include information that has become generally available to the public by the act of one who has the right to disclose such information without violating a legal right or privilege of the Company. This definition shall not limit any definition of "trade secrets" or any equivalent term under state or federal law.

"Transfer" shall mean a Voluntary Transfer or an Involuntary Transfer.

"Units" shall have the meaning set forth in Section 2.1(a).

"Voluntary Transfer" shall mean any direct or indirect voluntary sale, assignment, transfer, conveyance, pledge, hypothecation, or other disposition, with or without consideration, or otherwise of all or any portion of any Units.

Doc ID: fdbdf19cdce65b3ba40071c320350d6e8abe4fbf

**▼ HELLOSIGN**                                             Audit Trail

| | |
|---|---|
| **TITLE** | BKCoin Management Operating Agreement - Ready for Signature |
| **FILE NAME** | BK Coin Capital -...ement  (v3.1).pdf |
| **DOCUMENT ID** | fdbdf19cdce65b3ba40071c320350d6e8abe4fbf |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | **07/26/2018**<br>22:49:49 UTC | Sent for signature to Peter Dzuba (peter@dzubalaw.com), Brandon Esposito (brandon.m.esposito@gmail.com), Calos Betancourt (carlos@bkcoincapital.com) and Kevin Kang (kevin@bkcoincapital.com) from peter@dzubalaw.com<br>IP: 98.203.118.8 |
| **VIEWED** | **07/26/2018**<br>22:54:21 UTC | Viewed by Peter Dzuba (peter@dzubalaw.com)<br>IP: 98.203.118.8 |
| **SIGNED** | **07/26/2018**<br>22:54:41 UTC | Signed by Peter Dzuba (peter@dzubalaw.com)<br>IP: 98.203.118.8 |
| **VIEWED** | **07/26/2018**<br>22:58:46 UTC | Viewed by Brandon Esposito (brandon.m.esposito@gmail.com)<br>IP: 99.120.20.43 |
| **SIGNED** | **07/26/2018**<br>23:00:59 UTC | Signed by Brandon Esposito (brandon.m.esposito@gmail.com)<br>IP: 99.120.20.43 |
| **VIEWED** | **07/30/2018**<br>04:34:12 UTC | Viewed by Calos Betancourt (carlos@bkcoincapital.com)<br>IP: 67.161.124.52 |

▼ **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | BKCoin Management Operating Agreement - Ready for Signature |
| **FILE NAME** | BK Coin Capital -...ement  (v3.1).pdf |
| **DOCUMENT ID** | fdbdf19cdce65b3ba40071c320350d6e8abe4fbf |
| **STATUS** | ● Completed |

Document History

**SIGNED**    **07/30/2018**    Signed by Calos Betancourt (carlos@bkcoincapital.com)
              04:37:25 UTC      IP: 67.161.124.52

**VIEWED**    **08/02/2018**    Viewed by Kevin Kang (kevin@bkcoincapital.com)
              15:02:29 UTC      IP: 158.106.192.250

**SIGNED**    **08/02/2018**    Signed by Kevin Kang (kevin@bkcoincapital.com)
              15:03:14 UTC      IP: 158.106.192.250

**COMPLETED** **08/02/2018**    The document has been completed.
              15:03:14 UTC

# **ATTACHMENT 13**

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**
**BVI BUSINESS COMPANIES ACT, 2004**



58CA77D689

**CERTIFICATE OF INCORPORATION**
**(SECTION 7)**

The REGISTRAR of CORPORATE AFFAIRS, of the British Virgin Islands HEREBY CERTIFIES, that pursuant to the BVI Business Companies Act, 2004, all the requirements of the Act in respect of incorporation having been complied with,

**BKCoin Multi-Strategy Master Fund Ltd.**

**BVI COMPANY NUMBER: 2093494**

is incorporated in the BRITISH VIRGIN ISLANDS as a BVI BUSINESS COMPANY, this 9th day of March, 2022.



*for* **REGISTRAR OF CORPORATE AFFAIRS**
9th day of March, 2022

# **ATTACHMENT 14**

# BKCOIN MULTI-STRATEGY FUND LTD.

*A British Virgin Islands company limited by shares*

<u>March 3, 2022</u>

THE PARTICIPATING SHARES (THE "*INTERESTS*") OF BKCOIN MUTLI-STRATEGY FUND LTD. (THE "*FUND*") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "*SECURITIES ACT*"), OR THE SECURITIES LAWS OF ANY STATE. THE FUND IS NOT CURRENTLY REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, OR THE SECURITIES LAWS OF ANY STATE. THIS OFFERING OF INTERESTS IS BEING MADE IN RELIANCE ON A REGISTRATION EXEMPTION UNDER THE SECURITIES  ACT FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND UPON ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS. THIS MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION AND NEITHER THAT COMMISSION NOR ANY STATE SECURITIES REGULATOR HAS PASSED UPON OR ENDORSED THE MERITS OF AN INVESTMENT IN THE FUND OR THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY INTERESTS IN THE FUND IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS UNLAWFUL. AN INVESTMENT IN THE FUND INVOLVES A SIGNIFICANT RISK OF LOSS. SEE "CERTAIN RISK FACTORS" BELOW.

*Recipient's Name:* _____

*Memorandum #:* _____

This Confidential Private Placement Memorandum (the "<u>Memorandum</u>") is being given to the identified recipient solely for the purpose of evaluation for an investment in the Shares described herein. It may not be reproduced or distributed to anyone other than the identified recipient's professional advisers under an equal requirement of confidentiality. By accepting delivery of this Memorandum, the recipient agrees not to make any copies of the Memorandum, and to return it and all related documents to the Fund if the recipient ultimately does not subscribe for an interest.

*Investment Manager of the Fund*:

**BKCOIN MANAGEMENT LLC**
1101 Brickell Avenue South Tower #8
Miami, Florida 33131
Telephone: (786) 623-4656
Email: info@bkcoincapital.com

# NOTICES

***General Notices:***

This Memorandum does not constitute an offer or solicitation to any person in any jurisdiction in which such offer or solicitation is not authorized or to any person to whom it would be unlawful to make such offer or solicitation. The distribution of this Memorandum and the offering of Participating Shares may be restricted in certain jurisdictions. The information contained in this Memorandum is for general purposes only, and it is the responsibility of any person or persons in possession of this Memorandum and wishing to make application for Participating Shares to inform themselves of, and observe, all applicable laws and regulation of any relevant jurisdiction. Prospective applicants for Participating Shares should inform themselves as to legal requirements also applying any applicable exchange control regulations and applicable taxes in the countries of their respective citizenship, residence or domicile.

Shares are being offered in a private placement to sophisticated investor and will not be registered under the United States Securities Act of 1933, as amended ("Securities Act") or the securities act of any state or foreign jurisdiction, and may not be sold or transferred without compliance with any applicable federal, state, or foreign securities laws. None of the Participating Shares offered hereby, the Fund or the Investment Manager have been registered under the Securities Act, or with or approved by the SEC or any other U.S., federal, state or non-U.S. governmental agency, nor has any such authority passed upon the value of Participating Shares, made any recommendations as to their purchase, approved or disapproved this offering, or passed upon the adequacy or accuracy of this Memorandum. Any representation to the contrary is a criminal offense. It is intended that the offering and sale of Participating Shares will be exempt from registration pursuant to Section 4(a)(2) of the Securities Act and pursuant to Rule 506(c) of Regulation D thereunder, since such Participating Shares will only be offered to "accredited investors," as that term is defined in the Securities Act.

**The attention of investors in the Fund is drawn to the general risk factors which appear under the section headed "Risk Factors". Accordingly, an investment should only be made by persons in a position to take on such a risk.**

**Investors should note that because investments in securities can be volatile and that their value may decline as well as appreciate, there can be no assurance that the Fund will be able to attain its objective or that investors will receive a return of their capital. The price of Participating Shares as well as the income therefrom may fall as well as rise to reflect changes in the Net Asset Value of the Fund. An investment should only be made by those persons who are able to absorb a total loss of their investment.**

**In making an investment decision, prospective investors must rely on their own examination of the terms of this offering, including the merits and risks involved. Prospective investors should not subscribe for Participating Shares unless satisfied that they and/or their investment representative have asked for and received all information that would enable them to evaluate the merits and risks of the proposed investment.**

**The contents of this Memorandum are not to be construed as a recommendation or advice to any prospective investor in relation to the subscription, purchase, holding or disposition of Participating Shares. Prospective investors should consult their professional advisers accordingly.**

**Potential subscribers of Participating Shares should inform themselves as to (a) the possible tax consequences, (b) the legal requirements and (c) any foreign exchange restrictions or exchange**

ii

**control requirements which they might encounter under the laws of the countries of their citizenship, residence, incorporation or domicile and which might be relevant to the subscription, holding, or disposal of Participating Shares.**

The Participating Shares offered by this Memorandum may not be transferred except with the consent of the Fund's directors, and excepts as permitted under the Fund's Memorandum and Articles of Association, the Securities Act of 1933, and other applicable laws. Such consent and such compliance may be unlikely. Further, withdrawals of investments in the Fund are subject to significant restriction. As a result, an investment must be in a position to bear the economic risk of an investment in the Fund for a significant period.

Participating Shares will be offered at the Net Asset Value per Participating Share, as further described in this Memorandum. Participating Shares may be issued on any subscription day at the subscription price, and may be redeemed on any Redemption Day at the Redemption Price, in the manner described in this Memorandum. The Directors have the right to compulsorily redeem any or all of the Participating Shares held by any Shareholder at any time and for any reason including where the holding of the Participating Shares may result in regulatory, pecuniary, legal, taxation or material administrative disadvantage for the Fund or its Shareholders as a whole or where, in the opinion of the Directors, it is in the best interests of the Fund to do so.

There is no prohibition on dealings in the assets of the Fund by the Administrator, or the Investment Manager or entities related to the Administrator, the or the Investment Manager, provided the transaction is carried out as if effected on normal commercial terms negotiated at arm's length and is in the best interests of Shareholders.

The Fund invests substantially all of its assets through a master-feeder structure in the Master Fund. The Master Fund is not hereby offering any securities and accordingly this Memorandum is not to be regarded as having been authorised or issued by the Master Fund. The Master Fund does not have an offering document or equivalent document. Other investment vehicles that also feed into the Master Fund may be formed with different terms from those of the Fund, including with respect to fees, expense recovery and redemption terms. The Fund may also invest directly, but this is not currently intended.

To the best of the knowledge and belief of the Investment Manager (who has taken all reasonable care to ensure that such is the case) the information contained in this Memorandum is in accordance with the facts and does not omit anything likely to affect the import of such information.

Any information given or representation made by any dealer, solicitor or other person and (in each case) not contained herein should be regarded as un-authorised and, accordingly, should not be relied upon. Neither the delivery of this Memorandum nor the offer, issue or sale of Participating Shares shall, under any circumstances, constitute a representation that the information contained in this Memorandum is correct at any time subsequent to the date of this Memorandum.

Notwithstanding anything to the contrary contained in this Memorandum, the M&A and the Subscription Agreement, all persons may disclose to any and all persons, without limitations of any kind, the U.S. federal, state and local income tax treatment of the Fund, any fact that may be relevant to understanding the U.S. federal, state and local income tax treatment of the Fund, and all materials of any kind (including opinions or other tax analyses) relating to such U.S. federal, state and local income tax treatment, other than the name of the parties or any other person named herein, or information that would permit identification of the parties or such other persons, and any pricing terms or other non-public business or financial information that is unrelated to the U.S. federal, state or local income tax treatment of the Fund and is not relevant to understanding the U.S. federal, state or local income tax treatment of the Fund.

iii

**TABLE OF CONTENTS**

SUMMARY OF PRINCIPAL TERMS .................................................................................- 1 -

DIRECTORY ..........................................................................................................................- 10 -

INTRODUCTION ....................................................................................................................11

THE FUND AND MASTER FUND .........................................................................................11

INVESTMENT PROGRAM .....................................................................................................12

MANAGEMENT ......................................................................................................................14

ADMINISTRATOR ..................................................................................................................15

BROKERAGE ARRANGEMENTS .........................................................................................16

CUSTODY ARRANGEMENTS ...............................................................................................18

INDEPENDENT AUDITORS ..................................................................................................18

CERTAIN RISK FACTORS .....................................................................................................19

POTENTIAL CONFLICTS OF INTEREST .............................................................................41

ADMISSION OF SHAREHOLDERS ......................................................................................43

EXPENSES AND ALLOCATIONS .........................................................................................44

REDEMPTIONS AND DISTRIBUTIONS ..............................................................................46

OTHER M&A PROVISIONS ...................................................................................................49

PROSPECTIVE INVESTORS ..................................................................................................51

TAXATION ..............................................................................................................................53

CERTAIN CONSIDERATIONS FOR ERISA PLANS ...........................................................56

OTHER REGULATORY POINTS ...........................................................................................58

ADDITIONAL INFORMATION .............................................................................................59

PRIVACY POLICY ..................................................................................................................60

APPENDIX A – COUNTRY-SPECIFIC DISCLOSURES ......................................................61

f

**SUMMARY OF PRINCIPAL TERMS**

This summary is qualified in its entirety by the remainder of this Memorandum, including the Fund's Memorandum and Articles of Association (the "M&A"), and the Subscription Agreement (the "Subscription Agreement"). Prospective investors should consult their own advisers to understand fully all of the consequences of an investment in the Fund. Unless otherwise defined herein, capitalized terms have the meanings assigned to them in the M&A. Investment in the Fund (*as defined below*) involves a high degree of risk. Particular attention is directed to the Section herein entitled "Certain Risk Factors."

**GENERAL**

| | |
|---|---|
| ***The Fund*** | BKCoin Multi-Strategy Fund Ltd. (the "Fund") is a British Virgin Islands company limited by shares. Investors in the Fund will become shareholders (the "Shareholders") of the Fund. The Fund will invest all, or substantially all, of its assets through a "master-feeder" fund structure in BKCoin Multi-Strategy Master Fund Ltd. (the "Master Fund"), also a British Virgin Islands company limited by shares, through which all of its investment activities will be effected. |
| ***The Master Fund*** | The Fund will conduct its investing through the Master Fund, a British Virgin Islands company limited by shares. The Master Fund will be the trading vehicle for the Fund and also for BKCoin Multi-Strategy Fund LP., a Delaware limited partnership (the "Onshore Feeder Fund"), which was formed to accept primarily U.S. investors. In the future, additional feeder companies may be created to invest in the Master Fund. |
| ***The Investment Manager; Directors*** | BKCoin Management LLC (the "Investment Manager") is a limited liability company incorporated under the laws of the State of Delaware, and is responsible for the management of the business and affairs of the Fund and the Master Fund, to the extent powers are not otherwise reserved to the Directors in the entities' respective M&As. The Investment Manager currently files as an exempt reporting adviser with the Securities and Exchange Commission, though it anticipates registering as an investment adviser with this same agency shortly. The Investment Manager also serves as the investment manager for the Fund and the Master Fund. |
| | The Directors of the Fund (currently Carlos Betancourt and Kevin Kang) have overall responsibility for the management and administration of the Fund. However, the Directors have delegated responsibility for the day-to-day functions to the Investment Manager, as set forth herein. |

f

| | |
|---|---|
| ***Investment Objective and Strategy*** | The investment objective of the Fund is, through its investment in the Master Fund, to generate superior risk adjusted returns through the implementation of a variety of innovative alpha-generating investment strategies, which are, in each case, related to the digital asset space. The Investment Manager, as investment manager of the Master Fund, will attempt to meet the objective of capital appreciation by allocating among these strategies in the way it sees fit. There is no assurance that the Master Fund or the Fund will achieve their investment objectives, or that the Fund and its Shareholders will not incur losses. For greater detail, see the "Investment Program" Section herein. |
| ***Risk Factors*** | The investment program of the Fund is speculative and entails substantial risks. There can be no assurance that the investment objective of the Fund will be achieved and that investors will not incur losses. Moreover, an investment in the Fund provides limited liquidity since the Interests are not freely transferable, and the Shareholders will have limited redemption rights. All Investments risk a total loss of capital. See the "Certain Risk Factors" Section herein. The foregoing list of certain risk factors does not purport to be a complete enumeration or explanation of the risks involved in the Fund. |
| ***Conflicts of Interest*** | The Investment Manager will use its best efforts in connection with the purposes and objectives of the Fund and will devote as much of its time and effort to the affairs of the Fund as it deems necessary and appropriate to accomplish the purposes of the Fund. Nevertheless, the Fund will be subject to a number of actual and potential conflicts of interest involving the Investment Managers and its affiliates, including the Investment Manager's obligations in relation to other current funds that it is managing. See the "Potential Conflicts of Interest" Section herein. |

## THE OFFERING

| | |
|---|---|
| ***Offering of Interests*** | The Fund may admit new Shareholders and accept capital contributions, as of the first Business Day of each month, unless otherwise permitted by the Investment Manager in its sole discretion. In the discretion of the Investment Manager, a Shareholder will be permitted to make additional capital contributions to the Fund on the first Business Day of any calendar month, or at other times in the Investment Manager's sole discretion. See the "Admission of Shareholders" section herein. |

f

| | |
|---|---|
| ***The Interests*** | The Fund is currently offering, pursuant to this Memorandum, participating shares in the Fund (the "Interests") to certain eligible investors that, if accepted, will become Shareholders in the Fund. |
| | The Fund is authorized to issue a maximum of 50,000 no par value Shares initially divided into four classes and, comprising: 100 non-participating, no par value shares designated as Class M Shares, and a maximum of 49,900 no par value participating Shares, Class A Shares, Class Restricted A Shares (restricted for purposes of the FINRA rule relating to new issues), and Class S Shares (relating to side-pocket investments). |
| | The Fund may issue a Class in one or more Series. The division of a Class into one or more Series and the designation to be made to each Series shall be determined by the directors or their authorized agent from time to time. In addition, the Director or their authorized agent may enter into Side Letter Agreements with Investor that provide for different or additional terms than those of the Class to which the Investor is subscribing. The terms of this Side Letter may or may not be encapsulated within a separate Series. |
| ***Eligible Investors*** | The Fund is issuing its Interests pursuant to the 506(c) exemption of Regulation D under the Securities Act of 1933. Thus, each subscribing Shareholder generally must be an "accredited investor" and must meet other suitability requirements. The Fund may also accept investments from plans that are subject to the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), and from IRAs, Keoghs and similar non-ERISA plans, provided such investment meet the requirements as set forth in the Fund's offering documents. |
| | Other than tax exempt persons, Interests in the Fund may also generally be purchased by foreign investors, such as non-resident aliens, foreign corporations, foreign partnerships, foreign trusts or foreign estates, all as defined in the Internal Revenue Code. The Fund's subscription agreement contains representations and questionnaires relating to these qualifications. |
| | The Investment Manager may, in its sole discretion, decline to accept the capital contribution of any prospective investor. |

f

- 3 -

| | |
|---|---|
| *New Issue Allocations* | If the Investment Manager determines that a Shareholder is a "restricted person" as defined in the Financial Industry Regulatory Authority, Inc., ("FINRA") Rule 5130, or any successor provision thereto ("Rule 5130"), then the Interests issued to such Shareholder may be designated as "Restricted" and that Shareholder will not be able to participate in the net capital appreciation or net capital depreciation, if any, relating to a "New Issue" security as that term is defined in the above FINRA Rule Manual. Further, if the Investment Manager determines that a Shareholder is a "covered person" as defined in the FINRA Rule 5131(b), or any successor provision thereto ("Rule 5131"), such Shareholder may be also prohibited from participating in the net capital appreciation and net capital depreciation, if any, attributable to trading in, or any other transaction relating to, a "New Issue," as that term is defined in the FINRA Rule Manual.<br><br>The Fund reserves the right to vary its policy with respect to the allocation of "new issues" as it deems appropriate for the Fund as a whole, in light of, among other things, existing interpretations of, and amendments to, Rules 5130 and 5131 and practical considerations, including administrative burdens and principles of fairness and equity. |
| *Subscriptions* | Persons interested in subscribing to the Fund should deliver a signed Subscription Agreement to the Fund at least five (5) Business Days before the intended subscription date, if applicable. The amount subscribed to via the Subscription Agreement shall generally be paid in U.S. dollars, provided that the Investment Manager in its sole discretion may allow subscriptions to be made in-kind as well, or partly in cash and partly in kind. The prospective investor is advised to confer with his/her/its tax consultants regarding the tax risks associated with making any in-kind subscription to the Fund. |
| *Minimum Investment* | The minimum investment by a prospective shareholder to the Fund shall be $1,000,000 for institutional investors and $250,000 for non-institutional investors, subject to waiver of such minimum amounts in the Investment Manager's sole discretion. |

f

- 4 -

## EXPENSES AND ALLOCATIONS

**Management Fee**

The Investment Manager will receive a monthly management fee, calculated at an annual rate of 2.00% (~0.1667% per month) (the "Management Fee") of each Shareholder's Net Asset Value of their Shares.

The Management Fee will be calculated and paid monthly, in arrears, based on the value of each Shareholder's Net Asset Value of their Shares, as of the last day of the month. The Investment Manager may elect to reduce, otherwise modify or waive the Management Fee with respect to any Shareholder. The Management Fee is calculated on a pro rata basis for any partial month of investment.

**Expenses**

In addition to the remuneration of the Investment Manager as set forth herein, the Fund will be responsible for its ongoing operating expenses which include the Fund's own, and its pro rata share of the Master Fund's operating expenses. Such expenses (*set forth in greater detail below*) include, but are not limited to: legal, accounting, auditing, and other professional expenses, administration expenses, bank service fees, trading fees, exchange and broker commissions, and any other reasonable expenses related to the operations of the Fund and the Master Fund, all as shall be determined by the Investment Manager in its sole discretion.

**Share Record; Allocations**

The Fund will establish Share records for the Investment Manager and each Shareholder. Any increase or decrease in the Net Asset Value of the Fund (disregarding for these purposes (i) any changes in the Net Asset Value due to subscriptions, redemptions, or the payment of dividends, and (ii) any adjustments as set forth in the M&A) will be allocated pro rata to the record for each Class based on the previous Net Asset Value for each Class. Those costs, expenses, losses, dividends, profits, gains and income which the Directors determine relate solely to a particular class or series, will then be allocated to the record of the relevant Shares.

**Performance Allocation**

In addition to its proportionate share of allocations of Net Asset Value as set forth above, the Investment Manager will receive an allocation, quarterly, equal to 20% of the Net Asset Value amount allocated for the quarter to each Shareholder (the "Performance Allocation"). A Performance Allocation is also made as to amounts redeemed, as of the effective time of the redemption by Shareholders.

f

Performance Allocations are subject, in each case, to a "high water mark" under which the Investment Manager receives a Performance Allocation from a Shareholder only to the extent allocated increases in Net Asset Value exceeds any decreases previously allocated to it, since the last date a Performance Allocation was assessed (or the original date of contribution, if no Performance Allocation has previously been assessed). If a Shareholder makes a partial redemption or receives a distribution at a time when he/she/it has unrecovered decreases in Net Asset Value, for purposes of calculating future Performance Allocations those unrecovered decreases will be reduced in proportion to the redemption. The "high water mark" provision prevents the Investment Manager from receiving a Performance Allocation on increases in Net Asset Value allocated, that simply restores previously allocated decreases in Net Asset Value. The Investment Manager may elect to reduce, otherwise modify or waive the Performance Allocation with respect to any Shareholder.

## WITHDRAWALS

*Lock-up Period; Redemption Dates*

For a period of twelve (12) months following the date of a subscription for Shares, a Shareholder shall not be allowed to redeem or reduce its subscription or any portion of the value of its Shares from the Fund (the "Lock-up Period"). Thereafter, a Shareholder may redeem all or any part of its Shares on the first Business Day of each month, in each case with 14 days' prior written notice. The Investment Manager may permit redemptions at other times, in its sole discretion. Additional subscriptions for Shares will be subject to a new Lock-up Period.

*Redemptions*

Subject in each case to the Investment Manager's ability to designate Side Pockets (*as defined below*) and other limitations on redemptions set forth herein, provided that the Investment Manager has received all necessary documentation, distribution in respect of the redeemed Shares normally will be made within thirty (30) calendar days after an authorized Redemption Day. However, the Investment Manager shall have the right, at its discretion, to withhold up to 5% of Redemption Price for the Fund's liabilities and other contingencies until no later than thirty (30) days after the completion of the year-end audit of the Fund's financial statements for any withdrawal of 90% or more of a Shareholder's Net Asset Value of its Shares (or if a redemption, when combined with all other redemptions of such Shareholder during the preceding 12 months, would result in such Shareholder having redeemed 90% or more of such Shareholder's Net Asset Value of its Shares as of the

f

- 6 -

beginning of such period). In those circumstances, the directors will remit the balance of the redemption proceeds without interest. The directors, in its sole discretion, may waive these redemption restrictions as to any Shareholder. The directors further, in its sole discretion, may affect redemption payments in cash or in-kind.

The Fund may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies (even if such reserves or holdbacks are not otherwise required or permitted by U.S. generally accepted accounting principles) which could reduce the amount of a distribution upon redemption.

The directors may suspend redemption rights for any or all Shareholders in certain circumstances. Investors are urged to review the "Redemptions and Distributions" section below.

*Distributions*

The Fund has the right, but does not expect to make distributions of profits or capital (in view of the Shareholders' redemption rights). The Fund expects to reinvest any income derived from its investing activities.

*Side Pockets*

The directors (as advised by the Investment Manager) may designate certain assets as "Side Pockets" when the directors, in their sole discretion, determines that an asset is illiquid or it is in the best interest of the Fund to value such investments separately from the Fund's other assets. If the directors designate an investment as a Side Pocket Investment, a pro rata portion of the Class A Shares held by a Shareholder will automatically covert by way of redemption and reissue into the Class S Shares corresponding to the proportional interest of such Shareholder in the Side Pocket Investment. The terms and conditions relating to such Class S Shares are set forth in Clause 6.3 of the Fund's Memorandum of Association. The Investment Manager shall not receive a Performance Allocation with respect to any Side Pocket until the investment is liquidated, and Shareholders may not make a redemption with respect to a Side Pocket Investment Shares until that event. Notwithstanding the foregoing, the Fund's financial statements will reflect the Performance Allocation as if it was earned, treating all assets and liabilities as if they were realized at the reporting date.

f

| | |
|---|---|
| ***Fund-Level Gate*** | In the event that the Fund receives redemption requests and the redemption amounts pursuant to such requests exceed, in the aggregate, an amount equal to 30% of the Net Asset Value of the Fund as of the applicable Redemption Day, the directors may, in their sole discretion, (A) satisfy all such redemption requests or (B) reduce all such redemption requests so that only 30% (or more, in the sole discretion of the directors) of the Net Asset Value of the Fund is redeemed on any Redemption Day (the "<u>Fund-Level Gate</u>"). Shareholders whose redemption amounts are reduced pursuant to the Fund-Level Gate will participate in the aggregate amount available for redemption on a pro-rata basis. |
| | To the extent that a Shareholder's requested redemption amount has been reduced by restrictions imposed by the Fund-Level Gate, a request for the remaining portion of the original redemption amount will be deemed made (unless thereafter rescinded) as of the next Redemption Day, and such remaining portion shall be satisfied as of the next Redemption Day, and such remaining portion shall be satisfied as of the next Redemption Day and thereafter to successive Redemption Days until fully redeemed, each time subject to the Fund-Level Gate; except that any redemption request that remains unsatisfied for more than two (2) consecutive Redemption Day as a result of the Fund-Level Gate shall be satisfied as of the next Redemption Day, provided, however, that the Fund is not in suspension, liquidation or dissolution. |
| | Capital not redeemed from the Fund by virtue of restrictions imposed by the Fund-Level Gate shall remain invested in the Fund and, therefore, shall remain subject to the risks of the Fund and subject to the Management Fee, Performance Allocation, and the expenses of the Fund until such time as it is withdrawn from the Fund. |
| ***Required Redemption*** | The directors, in their sole discretion, may require any Shareholder to redeem all or any part of its Shares from the Fund at any time, such redemption to be effective on the date specified in such notice. |

## **OTHER**

| | |
|---|---|
| ***Fiscal Year*** | The fiscal year of the Fund ends on December 31 of each year. |

f

- 8 -

**Reports to Shareholders**     Each Shareholder will receive periodic statements setting forth the balance (Net Asset Value) of their account, in each case at least quarterly. Shareholders will also receive annual audited financial statements and copies of Schedule K-1 to the Fund's tax return.

**Tax Matters**     The Fund expects to be treated as a corporation for Federal income tax purposes. You should consult with and depend on your own tax adviser regarding the tax consequences of investing in the Fund, including making investments in kind and of receiving allocations but not distributions. *See generally "Taxation" on page 50*.

**Transfer of Interests**     A Shareholder may not, voluntarily or involuntarily, sell, assign, or transfer all or any portion of its interest in the fund without the consent of the directors, which consent may be granted or withheld in the sole discretion of the directors.

**Additional Information**     Please contact the Investment Manager if you would like additional information about the Fund. The Investment Manager will provide any information it can reasonably obtain.

f

# DIRECTORY

| | |
|---|---|
| **The Fund** | ***BKCoin Multi-Strategy Fund Ltd.***<br>c/o Harneys Westwood & Reigels LP<br>Craigmuir Chambers PO Box 71<br>Road Town, Tortola VG1110<br>British Virgin Islands |
| **Investment Manager** | ***BKCoin Management LLC***<br>1101 Brickell Avenue South Tower #8<br>Miami, Florida 33131 |
| **Fund Administrator and Tax Preparer** | ***State Street Bank and Trust Company***<br>One Lincoln Street<br>Boston, Massachusetts 02111 |
| **Fund Auditor** | ***KPMG***<br>Aon Center, Suite 5500<br>Chicago, Illinois 60601 |
| **Fund Bank (Fiat)** | ***Silvergate Bank***<br>4250 Executive Square, Suite 300<br>La Jolla, CA 92037 |
| **Fund Custodians (Digital Assets)** | ***Copper Technologies (UK) Limited***<br>64 North Row, 3rd Floor<br>London, W1K 7DA<br><br>***Gemini Trust Company, LLC***<br>315 Park Avenue South, 18th Floor<br>New York, New York 10010<br><br>***State Street Bank and Trust Company***<br>One Lincoln Street<br>Boston, Massachusetts 02111<br><br>***Cowen Digital LLC***<br>1 Maritime Plaza, 9th Floor<br>San Francisco, California 94111 |
| **Fund Legal Counsel - US** | ***Dzuba Law, P.A.***<br>1101 Brickell Avenue South Tower #8<br>Miami, Florida 33131 |
| **Fund Legal Counsel - BVI** | ***Harneys Westwood & Riegels LP***<br>Craigmuir Chambers, PO Box 71<br>Road Town, Tortola VG1110<br>British Virgin Islands |

Please direct any investor inquiries to the Investment Manager (*Tel.:* 786-623-4656; *Email:* ir@bkcoincapital.com).

f

## INTRODUCTION

This Confidential Private Placement Memorandum (this "Memorandum") sets forth the investment program of the Fund, the principal terms of the Fund's Memorandum and Articles of Association (the "M&A"), and certain other information. This Memorandum does not, however, set forth all of the provisions and distinctions of the M&A that may be significant to a prospective Shareholder. Each prospective Shareholder should examine this Memorandum, the M&A, and the subscription documents accompanying this Memorandum, fully, in order to assure itself that the terms of the M&A and the Fund's investment program are satisfactory.

Prospective Shareholders are invited to review any materials available to the Investment Manager relating to the Fund, the operations of the Fund, and other matters regarding this Memorandum. The Investment Manager will afford prospective Shareholders the opportunity to ask questions of and receive answers from its representatives concerning the terms and conditions of the offering, and to obtain any additional information to the extent that the Investment Manager or the Fund possesses such information or can acquire it without unreasonable effort or expense.

An investment in the Fund is speculative and is not intended as a complete or diversified investment. It is designed only for experienced and sophisticated persons who are able to bear the risk of the substantial impairment or entire loss of their investment in the Fund.

## THE FUND AND MASTER FUND

### *The Fund*

BKCoin Multi-Strategy Fund Ltd. (the "Fund") is a British Virgin Islands company limited by shares, organized and managed by BKCoin Management LLC (the "Investment Manager"). The Fund was organized for the purpose of achieving above-market returns for investors pursuant to the Investment Program set forth herein. The Fund was formed on March 9, 2022.

Substantially all of the assets of the Fund will be invested in a "master-feeder" fund structure in BKCoin Multi-Strategy Master Fund Ltd. (the "Master Fund"), also a British Virgin Islands company limited by shares. The Fund will, through the Master Fund, buy and sell such assets as determined by the Investment Manager to achieve its investment objectives.

BKCoin Multi-Strategy Fund LP (the "Onshore Feeder Fund"), a Delaware limited partnership will also invest substantially all of its assets in the Master Fund, and additional investment vehicles may be formed in the future, to invest in the Master Fund.

The Fund is a pooled investment fund, whose interests are being privately offered to accredited investors pursuant to Section 4(2) and Rule 506 of Regulation D of the Securities Act of 1933. No offer to sell (or solicitation of an offer to buy) is being made in any jurisdiction in which such offer or solicitation would be unlawful.

### *The Master Fund*

The Master Fund is a British Virgin Islands company limited by shares. The Master Fund was also incorporated on March 9, 2022 under the BVI Business Companies Act 2004, as amended, and is empowered under its Memorandum and Articles of Association and the laws of the British Virgin Islands to issue and redeem its own participating shares and to carry on investment activities. The Fund operates as a feeder fund into this Master Fund, such that all, or substantially all, of the assets of the Fund are invested into the Master Fund. The Master Fund shall elect (or has elected) to be treated as a partnership for U.S. federal tax purposes.

The Investment Manager of the Fund is also the Investment Manager of the Master Fund. The Investment Program of the Master Fund is identical to that of the Fund. The investment objectives and strategies of the Master Fund (which will apply indirectly to the Fund, as it will operate as a feeder fund)

f                                          11

are set out below.

To the extent the Fund's capital is invested in the Master Fund, any or all of the fees and expenses payable by the Fund, are paid by the Fund or the Master Fund, but are not duplicated (other than fees and expenses incurred by both the Fund and the Master Fund such as, without limitation, administration fees and auditing fees).

Also, to the extent the Fund's assets are invested in the Master Fund, references to the Fund in this Memorandum will, where the context admits, include the Master Fund and references throughout this document to the investment objective, strategy, program, and risk factors of the Fund will refer to the investment objective, strategy, program, and risk factors of the Master Fund, unless the context otherwise requires.

The Onshore Feeder Fund also invests in the Master Fund. The Investment Manager may accordingly, from time to time, at its discretion, create parallel investment entities which will invest on the same terms and conditions as the Fund, subject to applicable legal, tax, or regulatory considerations. The Master Fund only accepts subscriptions from the Fund and any other feeder funds.

The Master Fund is managed by two directors, who are also the directors of the Fund, and who are also the principals of the General Partner of the Onshore Feeder Fund.

## INVESTMENT PROGRAM

*The following Investment Program will be executed by BKCoin Management LLC, which serves as the Fund and the Master Fund's Investment Manager.*

### *Investment Objectives & Strategies*

The investment objective of the Fund is to achieve above-market returns by making investments related to the digital asset ecosystem, whether that be in digital assets directly or in the derivates or securities which are related to digital assets. The Fund intends to accomplish this objective by contributing all of its assets to the Master Fund which will, in turn, deploy the capital among a variety of innovative, proprietary investment strategies which are ever-evolving and which, as of the date of this Memorandum, include, but is not limited to the following strategies:

- **Stablecoin Arbitrage:** This strategy involves the Fund betting on the convergence of fair values across several stablecoins traded in the cryptocurrency market. The Fund's quantitative models, paired with its informational network, allows the Fund to successfully monitor mispricing and stablecoin flows. This strategy has a low volatility return profile and makes use of both spot and derivative products.

- **Perpetual Swap – Statistical Arbitrage:** This strategy involves the Fund utilizing data from perpetual swap products to capitalize on future price movements. Alpha extraction in the perpetual futures contract derives from behavioral flaws and investors in the still primarily retail dominated product. The directional strategy utilizes both spot and perpetual futures products and offers a medium return volatility profile.

- **Calendar Anomalies:** This strategy involves capitalizing on the recurring behavior patterns from both retail and institutional investors and structural inefficiencies within the cryptocurrency market, which cause drifts in prices around calendar periods. This directional strategy uses primarily spot products, while offering investors a medium volatility return profile.

- **Basis Arbitrage:** This strategy involves the application of the Fund's flagship product, basis arbitrage, to other niche domains in the cryptocurrency space. Through this market neutral strategy, the Fund bets on the convergence of fair values between derivative and

f

spot products, offering investors low volatility and consistent returns.

- **Volatility Arbitrage:** The strategy strives to capture mispricing in cryptocurrency options markets, which are rife with such profit opportunities as a consequence of their immaturity and complexity. The Fund's models are able to identify and capture such mispricing resulting from investor biases as well as capitalize on informational inflows between products. This market-neutral strategy offers investors a low to medium return volatility profile and uses both derivative and spot products.

- **Yield Farming:** This decentralized finance ("DeFi") based strategy involves generating additional yields through staking and yield farming across different counterparties and protocols that have proven security audits. Returns are maximized by the active management of funds across different marketplaces to maximize returns.

- **Synthetix (Stock-Futures) Arbitrage:** This strategy involves trading synthetic equity futures that trade on digital asset exchanges versus the underlying equities, and exploiting mispricing that exist due to illiquidity.

- **Equity (Spinoff) IPO Strategy:** This strategy involves investing in highly anticipated spin-offs of conglomerates in both developed and emerging markets.

- **Structured Products Arbitrage:** This strategy involves trading around the premium or discount found in exchange traded funds ("ETFs") and exchange-traded notes ("ETNs") related to digital assets. As more structured products centered around digital assets come to market, the liquidity continues to improve in the market for the Fund to take advantage of such market conditions.

- **Market Making**: This high frequency strategy involves providing both liquidity and depth to a given digital asset market, profiting by way of the differential in the bid-ask spread.

The strategies enumerated above represent a non-exhaustive list of the primary strategies implemented by the Fund as of the date of this Memorandum to generate alpha in connection with investment related to digital assets. The Fund understands however, that the market for digital assets is rapidly evolving and the ability of a given strategy to generate alpha may be impacted by changes in the market. It is for this reason that the Fund has adopted an attitude towards the continuous innovation of new viable strategies, in its quest to continuously generate alpha for its investors.

In light of the foregoing, as time goes on, certain of the strategies listed above may become deprecated, whereas novel strategies may be added to the list of primary strategies implemented by the Fund. The Fund may engage in any investment strategy, and make any investment, including not described in this Memorandum, that the Investment Manager considers appropriate to pursue the Fund's investment objectives. The Fund will strive, but shall not be required to, communicate to Investors when a new strategy has been innovated and adopted as a main strategy by the Fund. However, the Investment Manager generally will not provide detailed information about the Fund's portfolio or any advance notice of anticipated changes in the composition of the Fund's portfolio.

For avoidance of doubt, the Fund has no restrictions in connection with its Investment Program or the investment strategies it may employ, the markets or instruments in which it may invest, or the percentage of capital that may be invested in a single asset. Further, the Fund has no restrictions on the types of assets it can invest in, the types of positions it may take, the concentration of investments by industry, sector, issuer, counterparty, servicer, country, asset class, or otherwise.

In addition, the Fund is not limited in its ability to use leverage in connection with any strategy. Notwithstanding the foregoing, the Fund does not anticipate using leverage with any strategy (and, indeed, as of the date of this Memorandum it has never used leverage in connection with any strategy), however if it does so choose to exercise its right to use leverage, it likely would not employ leverage to an extent

f

greater than four times (4x) the Net Asset Value of the Fund.

The risks associated with such a flexible Investment Program are broad and wide-ranging. For this reason, the disclaimer in all caps below is included herein, and the "Certain Risk Factors" section below contains a broad range of risks to account for the different directions the investment strategies of the Fund can go. The enumerated risks factors below are by no means a comprehensive listing of all risks associated with the Investment Program of the Fund.

THE FUND MAY BE DEEMED TO BE A HIGHLY SPECULATIVE INVESTMENT AND IS NOT INTENDED AS A COMPLETE INVESTMENT PROGRAM. IT IS DESIGNED ONLY FOR SOPHISTICATED PERSONS WHO CAN BEAR THE ECONOMIC RISK OF THE COMPLETE LOSS OF THEIR INVESTMENT IN THE FUND AND WHO HAVE A LIMITED NEED FOR LIQUIDITY IN THEIR INVESTMENT. THERE CAN BE NO ASSURANCE THAT THE FUND WILL ACHIEVE ITS INVESTMENT OBJECTIVE, OR THAT A TOTAL LOSS OF AN INVESTMENT WILL NOT OCCUR. INVESTORS ARE URGED TO SEE THE "CERTAIN RISK FACTORS" SECTION BELOW.

## MANAGEMENT

The business and affairs of Fund and Master Fund are managed by two directors, who are also the principals of the Investment Manager, BKCoin Management LLC, a Delaware limited liability company. To the extent the powers have not been otherwise reserved by the directors as set forth in the M&A, the powers to manage the affairs of the Fund and its investment program has been delegated to the Investment Manager. The Investment Manager is not currently registered as an investment adviser with the Securities and Exchange Commission; rather, it currently reports as an exempt reporting advisor. As noted above, its principals are Carlos Betancourt and Kevin Kang, who will manage the Fund and Master Fund's investment portfolio and operations on behalf of the Investment Manager pursuant to the guidelines set forth above.

The Investment Manager will devote so much of its time and effort to the affairs of the Fund and Master Fund as may, in its judgment, be necessary to accomplish the purposes of the Fund. However, it should be noted that the Investment Manager (or its principals, affiliates, employees, or independent contractors) may conduct any other business including any business within the finance or cryptocurrency industry whether or not such business is in competition with the Fund or Master Fund.

Any subscriptions to the Fund made by the Investment Manager will be generally on the same basis as subscriptions made by Shareholders, except that no Performance Allocation will be charged to the Investment Manager's Share record. Although neither the Investment Manager nor its principals are required to maintain any particular level of investment in the Fund, the Investment Manager intends to keep a certain amount of capital invested in the Fund.

Set forth below is certain biographical information for the General Partner's principals.

### *Carlos Betancourt, MBA, Founding Principal*

Carlos Betancourt is the Founding Principal of BKCoin Multi-Strategy Fund Ltd. He oversees the Fund's day-to-day operations and the legal, compliance, and research staff report to him. Prior to founding BKCoin Multi-Strategy Fund Ltd., Carlos was the founder and CEO of Yorkville Commodities, a full-service physical commodities brokerage and consulting firm that offered financial services to small to medium sized companies within the energy, mining, and natural resources sectors in North America and LATAM. Carlos' prior experience also includes working at AMCI Group as a Commodities Manager, KCM Asset Management as an Equity Analyst, and The Newport Group, as a Business Analyst.

Carlos is actively involved in helping current students from his alma mater's prestigious Roland George Investment Program develop skills to become successful professionals. As a former Division I

f                                                                        14

student-athlete, he enjoys an active lifestyle and participates in several non-profit organizations and sports leagues in New York City.

Carlos completed his MBA at Stetson University's School of Business Administration and graduated with a B.A. in Finance from Stetson University. He is fluent in English, Spanish, and Papiamento.

***Kevin Kang, BBA, CFA Charter Holder, Founding Principal***

Kevin Kang is also a Founding Principal of BKCoin Multi-Strategy Fund Ltd. He shares the responsibility for the daily management and trading responsibilities at the Fund.

Kevin was a portfolio manager and trader at a major New York-based fund, managing over $4 billion in multi-asset portfolios, with a focus in U.S. equities and fixed income. Prior to this role, Kevin aspired to and was recognized as a successful Associate Portfolio Manager at Alliance Bernstein in New York. During his tenure at Alliance Bernstein, he effectively collaborated with multiple portfolio managers in managing the largest U.S. equities' product by AUM. Additionally, Kevin successfully implemented investment decisions and oversaw the firm's daily positioning of their $40 billion portfolio.

Kevin currently holds the prestigious designation of Chartered Financial Analyst, and earned his Bachelor of Business Administration in Finance from Stetson University. Kevin is fluent in English and Korean.

The Investment Manager has appointed other personnel to assist in managing all or part of the Fund's assets. Their biographies may be found on the www.bkcoincapital.com website.

## ADMINISTRATOR

State Street Bank and Trust Company will serve as the Administrator of the Fund (the "Administrator"). Note that the Master Fund has also entered into a similar administrative services agreement with State Street Bank and Trust Company for the administration of the Master Fund and shall be entitled to the same exculpation from liability and indemnity from the Master Fund as the Administrator is from the Fund, as set forth below.

The Fund has entered into an administration agreement with the Administrator (the "Administration Agreement"). Pursuant to the Administration Agreement, the Administrator will be responsible, under the ultimate supervision of the Investment Manager, for providing certain administrative, accounting, registration, record-keeping, secretarial and related services to the Fund, namely: (a) maintaining the accounting books and records of the Fund; (b) calculating the Net Asset Value of the Fund and preparing periodic financial statements; (c) providing record-keeping services in connection with the issuance and redemption of the Interests; and (d) performing other administrative and clerical services necessary in connection with the administration of the Fund.

In performing its duties, the Administrator shall be entitled to rely, and generally will rely, on information provided to it by the third parties (including but not limited to the Investment Manager) and shall not be responsible for errors contained in such information received. The Administrator is not liable for any loss or damage suffered by the Fund as a consequence of any services rendered by the Administrator to the Fund, unless such liabilities or expenses arise out of the fraud, gross negligence, or willful misconduct of the Administrator.

The Administration Agreement also provides for indemnification of the Administrator from and against any and all claims, demands, actions and suits, and from and against any and all judgments, liabilities, losses, damages, costs, charges, reasonable counsel fees and other expenses of every nature and character which may be asserted against or incurred by the Administrator or for which the Administrator may be held liable (a "Claim") arising out of or in any way relating to (i) the Administrator's actions or omissions except to the extent a Claim resulted from the Administrator's fraud, gross negligence, or willful misconduct in the performance of its duties under the Administration Agreement; (ii) any action

f                                             15

taken by or omission of the Fund, its Investment Manager, any portfolio managers, investment adviser(s), any past or current service provider or other third party.

The Administrator is entitled to monthly fees from the Fund in respect of its services as administrator in accordance with its standard fees as set forth in the Administration Agreement. In addition, the Administrator is entitled to reimbursement by the Fund of all out-of-pocket expenses properly incurred by it in the performance of its services under the Administration Agreement. The Administrator's fees may be amended from time to time by agreement of both the Fund and the Administrator. The Administration Agreement will continue in force until terminated by either party with notice in writing to the other party and may generally be terminated by the Fund or the Administrator upon 90 days' prior written notice.

## BROKERAGE ARRANGEMENTS

The Investment Manager assumes no responsibility for the actions or omissions of any broker or dealer selected by the Investment Manager in good faith to execute any Fund transactions. To the extent that the Fund or Master Fund makes use of broker-dealers to facilitate the purchase of any investments, the following terms shall apply:

The investment securities, if any, of the Fund are principally purchased and sold through brokerage firms in the United States. The Investment Manager may in its sole discretion choose the broker or dealer through which purchases or sales of securities for the Fund are made.

Portfolio transactions for the Fund are allocated to brokers by the Investment Manager. The Investment Manager shall utilize various brokers to execute, settle and clear securities transactions. In selecting brokers to effect portfolio transactions, the Investment Manager considers such factors as price, quality of execution, expertise in particular markets, the ability of the brokers to effect the transactions, the brokers' facilities, reliability, reputation, experience, financial responsibility in particular markets, familiarity both with investment practices generally and techniques employed by the Fund and certain brokerage or research services ("soft dollar items") provided by such brokers and clearing and settlement capabilities, subject at all times to principles of best execution. In selecting broker/dealers to execute transactions, the Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost.

Section 28(e) of the United States Securities Exchange Act of 1934, as amended, establishes a safe harbor (the "Section 28(e) safe harbor" or "safe harbor") allowing investment managers to use client funds, by way of commission dollars, to purchase certain "brokerage and research services." Pursuant to such safe harbor, the brokerage and research services must provide lawful and appropriate assistance to the Investment Manager in the performance of its investment decision-making responsibilities. Further, the amount of commissions paid by the Fund must be reasonable in light of the value of the brokerage or research services offered, taking into account various factors, including commission rates, financial responsibility and strength and ability of the broker to efficiently execute transactions. Accordingly, if the Investment Manager determines in good faith that the amount of commissions charged by a broker is reasonable in relation to the value of the brokerage and research or investment management related services and equipment provided by such broker, the Fund may pay commissions to such broker in an amount greater than the amount another broker might charge. The Investment Manager may in its discretion change its selection of a broker for the Fund.

Section 28(e) safe harbor research services provided by brokers generally include advice, analyses and reports, and may specifically include traditional research reports analyzing the performance of a particular company or stock, certain financial newsletters and trade journals, quantitative analytical software and software that provides analyses of securities portfolios, seminars, conferences and other services that reflect substantive content (i.e., the expression of reasoning or knowledge relating to the subject matter of Section 28(e)) and provide lawful and appropriate assistance to the Investment Manager in the performance of its investment decision-making responsibilities on behalf of the Fund. According to an interpretive release recently issued by the SEC (the "Release"), products with inherently tangible or

f                                                        16

physical attributes, such as computer hardware (including computer terminals), telephone lines and office furniture are ineligible as "research services" under the Section 28(e) safe harbor, as such products do not reflect the expression of reasoning or knowledge. Other products and services that are not eligible under the Section 28(e) safe harbor are rent, legal expenses, office equipment and mass marketed publications.

Certain equipment and services that are ineligible as research services, such as connectivity services between the Investment Manager and the broker and other relevant parties, trading software operated by a broker to route orders to market centers and algorithmic trading software, may, however, be eligible as "brokerage services" under the Section 28(e) safe harbor to the extent such equipment is sufficiently related to the execution, clearing and settlement of securities transactions and other incidental functions. However, "overhead expenses" such as telephone or computer terminals and other products that are not sufficiently related to order execution or fall outside the temporal standard for "brokerage" under the Section 28(e) safe harbor are not eligible.

The SEC's position on the eligibility of custody also falls within the temporal standard for "brokerage services." The SEC states that short-term custody that relates to effecting, clearing and trading particular transactions falls within the safe harbor. However, long-term custody that takes place post-settlement and relates to long-term maintenance of securities positions, is not incidental to effecting the securities transaction and therefore does not fall within the safe harbor. Furthermore, long-term custody is generally a service provided directly to an investment manager's client for the benefit of the client and not provided to an investment manager for the benefit of the client.

Soft dollar items may be provided directly by brokers, by third parties at the direction of brokers or purchased by the Fund with credits or rebates provided by brokers. Soft dollar items may arise from over-the-counter principal or agency transactions, as well as exchange traded agency transactions. Brokers sometimes suggest a level of business that they would like to receive in return for the various services that they provide. Actual brokerage business received by any broker may be less than the suggested allocations, but can (and often does) exceed the suggestions because total brokerage is allocated on the basis of all the considerations described above. A broker will not be excluded from executing transactions for the Fund because it has not been identified as providing soft dollar items. The Section 28(e) safe harbor is available only when the Investment Manager conducts business with a broker that is involved with "effecting" the trades and "provides" the research. "Effecting" trades generally involves executing, clearing or settling the trade. A broker "provides" the product or service if the broker that is effecting transactions for the advised accounts is either legally obligated to pay for the research or, is not legally obligated to pay, but pays the research preparer directly and takes steps to ensure that the services being paid with client commissions are eligible under the safe harbor. The Investment Manager does not currently intend to use soft dollars but may do so in the future.

When the Investment Manager deems the purchase and sale of securities to be in the best interest of the Fund, and any other managed vehicles or accounts, it may aggregate the securities to be purchased or sold in order to obtain superior execution and/or lower brokerage expenses. In particular, execution prices for identical securities purchased or sold on behalf of multiple accounts in any one- business day may be averaged. In such events, allocation of the securities purchased or sold, as well as expenses incurred in the transaction, will be made among the Fund, and any other participating accounts or clients by applying such considerations as the Investment Manager deems appropriate, including relative account size of such entities and clients, amount of available capital, size of existing positions in the same or similar securities, impact of leverage, tax considerations and other factors. Although such allocations may typically be pro-rata as to the Fund and other such entities and clients, they will not necessarily be so, where allocation considerations, such as availability of capital, positions in similar securities or differing objectives dictate a different result. The Fund will not necessarily be entitled to investment priority over other accounts of the Investment Manager, or its clients or affiliates and may not necessarily participate in every investment opportunity.

The Investment Manager may enter into directed brokerage arrangements in its discretion. The Investment Manager, in its discretion, may change or add prime brokers without notice to the Shareholders.

f

## CUSTODY ARRANGEMENTS

The Master Fund intends to use digital asset wallets provided by exchanges and (other) third parties (e.g., Gemini and Copper) to hold all or a portion of the Master Fund's digital assets. Wallet providers used by the Master Fund may also offer physical security and jurisdictional security (in addition to cryptographic security).

The Master Fund's digital assets may also be held in the Investment Manager's internal storage facilities. Specifics of the Investment Manager's internal security system of digital assets are proprietary information which is known by only a few key employees who control, manage and protect the Investment Manager's security protocol. The Master Fund will endeavor to keep in place procedures to reduce risk of loss or theft of digital assets, and the Investment Manager is focused on maintaining a high level of security, and closely monitors the advances and best practices within the digital asset ecosystem regarding digital asset custody and security.

For additional information regarding the security of the Master Fund's digital assets, and accompanying risks, see "Certain Risk Factors — Investment Strategy and Cryptocurrency Risks".

## INDEPENDENT AUDITORS

KPMG (the "**Auditors**") has been retained by the Fund and Master Fund as their independent auditor, to provide auditing and related services. The Fund is not obligated to retain the Auditors and the Investment Manager may, without prior notice to, or receiving consent from, the Shareholders, engage other persons, firms or entities to provide auditing and related services. In addition, the services provided to the Fund and Master Fund by its auditor are subject to specific contract terms which may include certain limitations on the liability of the auditor to the Fund and Master Fund.

f

## CERTAIN RISK FACTORS

There can be no assurance that the Fund will achieve its investment objective. An investment in the Fund involves financial and other risks, including the risk of a loss of principal. It is suitable only for sophisticated investors for whom an investment in the Fund does not represent a complete investment program and who fully understand and can bear the risks of an investment in the Fund. Prospective investors should carefully review the risks involved in investing in the Fund and should evaluate the merits and risks of an investment in the Fund in the context of their overall financial circumstances. The following risk factors do not purport to be exhaustive but should be considered carefully by investors.

## GENERAL RISK FACTORS

*Absence of Substantial Operating History.* Although the Investment Manager of the Fund has experience implementing the investment strategies they intend to employ on behalf of the Fund, the Fund itself has no substantial operating history. Investors should not assume that the Investment Manager can achieve profitable returns on behalf of the Fund.

*Operating Deficits.* The expenses of operating the Fund could exceed its income. This would require that the difference be paid out of the Fund's capital, reducing the amount of capital available to the Fund for investment and the Fund's potential for profitability.

*Business Dependent upon Small Investment and Management Team.* The Shareholders have no authority to make decisions on behalf of the Fund, and generally will not receive information concerning specific portfolio positions held by the Fund. The authority for all decisions is held by the Investment Manager. The Fund's success will depend principally on the skill and acumen of the Investment Manager's investment and management team (which is likely to consist of a few individuals at most), and its ability to implement and further develop investment strategies to achieve the Fund's investment objectives. The Investment Manager may hire additional investment professionals at any time.

*Systemic Risk.* Systemic risk is the risk of broad financial system stress or collapse triggered by the default of one or more financial institutions, which results is a series of defaults by other interdependent financial institutions. Financial intermediaries, such as banks and/or exchanges with which the Fund interacts, as well as the Fund, are all subject to systemic risk. As systemic failure could have material adverse consequences on the Fund and on the markets for digital assets in which the Fund seeks to invest.

*Natural Disasters.* The fund may be subject to the risk of loss arising from exposure that it may incur, indirect, during to the occurrence of various events, including, without limitation, hurricane, earthquakes, and other natural disasters, and other catastrophic events. These risks of loss can be substantial and could have a material adverse effect on the Fund and the Shareholders' investments therein.

*Terrorist Action.* There is a risk of terrorist attacks on the United States and elsewhere causing significant loss of life and property damage and disruptions in global markets. Economic and diplomatic sanctions may be in place or imposed on certain states and military action may be commenced. The impact of such events is unclear, but could have a material effect on general economic conditions and market liquidity.

f

19

**FUND-RELATED RISK FACTORS**

*Illiquidity of Interests.* An investment in the Fund is relatively illiquid and is not suitable for an investor who needs liquidity. There is no public market for Interests (nor is any public market expected to develop for such Interests) and the M&A imposes significant limitations on Shareholders' abilities to transfer Interests. In addition, rights to withdraw funds from the Fund are subject to several limitations. The Investment Manager may consent (or, in its sole and absolute discretion, decline to consent) to deviations from one or more of the procedures or limitations regarding withdrawals. The Investment Manager has the discretion to cause the Fund to deliver amounts withdrawn in-kind rather than cash. The digital assets so delivered may be relatively illiquid and the Shareholder would bear the risk of a decline in their value after the effective time of his or her withdrawal. These facts, taken together, will significantly affect the liquidity of a Shareholder's investment in the Fund.

*Contingency Reserves.* The Fund, at any time in its discretion and in consultation with the Investment Manager, may establish reserves for contingencies (including general reserves for unspecified contingencies). The establishment of such reserves will not insulate any portion of the Fund's assets from being at risk, and such assets may still be traded by the Fund. A pro rata portion of any reserve may be withheld from distribution to a withdrawing Shareholder.

*Limited Redemption Rights.* An investment in the Fund is suitable only for certain sophisticated investors who have no need for liquidity in the investment. Generally, Shareholders may redeem their Shares as of the first Business Day of a given month, after satisfying the Lock-up Period (*as defined herein*). Further, distribution of proceeds upon a Shareholder's withdrawal may be limited where, in the view of the Shareholder, the disposal of all or part of the Fund's assets, or the determination of the value of the Shareholder's Shares, among other reasons, would not be reasonable or practicable or would be prejudicial to the non-withdrawing Shareholders.

*In-Kind Distributions.* In the discretion of the Investment Manager, a Shareholder may receive in-kind distributions from the Fund's portfolio. Such investments so distributed may not be readily marketable or saleable and may have to be held by such Shareholder for an indefinite period of time. Any such in-kind distributions will not materially prejudice the interests of the remaining Shareholders.

*Effect of Substantial Losses or Withdrawals.* If, due to extraordinary market conditions or other reasons, the Fund and other private investment funds managed by the Investment Manager were to incur substantial losses or were subject to an unusually high level of withdrawals, the revenues of the Investment Manager may decline substantially. Such losses and/or withdrawals may hamper the Investment Manager's ability to (i) retain employees, (ii) provide the same level of service to the Fund as it has in the past, and (iii) continue operations.

In addition, substantial withdrawals by Shareholders within a short period of time could require or result in the liquidation of investment positions more rapidly than would otherwise be desirable, possibly reducing the value of the Fund's assets and/or disrupting the Investment Manager's investment strategy. Reduction in the size of the Fund could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Fund's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

The Investment Manager may permit some Shareholders to have access to more information about the Fund's investments, or to obtain information more rapidly, than Shareholders generally. In addition, withdrawals or redemptions by investors in other investment vehicles or accounts managed by the Investment Manager, some of which may have more advantageous information and/or liquidity rights than those provided to Shareholders, could adversely affect the value of portfolio positions held by the Fund.

f

**Potential Mandatory Redemption.** The Investment Manager may, in its sole discretion at any time, require a Shareholder to redeem all or a portion of his /her / its Shares. Such a mandatory redemption could result in adverse tax and/or economic consequences to such Shareholder.

**Portfolio Valuation.** Valuations of the Fund's investment instruments, which will affect the amount of the Investment Manager's Performance Allocation, may involve uncertainties and judgmental determinations. Third-party pricing information may at times not be available regarding certain of the Fund's investments. A disruption in the secondary markets for the Fund's portfolio investments may limit the ability of the Fund to obtain accurate market quotations for purposes of valuing its portfolio investments and calculating its Net Asset Value. In addition, material events occurring after the close of a principal market upon which a portion of the cryptocurrencies, Securities or other assets of the Fund are traded may require the Investment Manager to make a determination of the effect of a material event on the value of the cryptocurrencies, Securities or other assets traded on the market for purposes of determining the Net Asset Value on a valuation date. Further, because of the overall size and concentrations in particular markets and maturities of positions that may be held by the Fund from time to time, the liquidation values of the Fund's cryptocurrency, Securities and other investments may differ significantly from the interim valuations of these investments derived from the valuation methods described herein. If the Fund's valuations should prove to be incorrect, the Net Asset Value of the Fund could be adversely affected. Absent bad faith or manifest error, valuation determinations in accordance with the Fund's valuation policy will be conclusive and binding.

**Side Letters and Other Arrangements with Selected Shareholders; Material Modification of Terms.** The Fund and the Investment Manager intend to enter into one or more side letter arrangements with certain Shareholders from time to time that will contain more favorable fee and expense terms and other terms for such Shareholders, and/or create preferences, priorities or other rights for such certain Shareholders. Any preferences or priorities or rights provided to such Shareholders could adversely affect the liquidity of the Fund's assets, the rate of return on other Shareholders' investment in the Fund, or cause other adverse tax consequences to other Shareholders and/or their Interests. These arrangements may also give rise to a new series of Interests.

**Master-Feeder Structure.** The Fund is a conduit, which means that all or substantially all of the Fund's assets will be invested in the Master Fund. An investment by the Fund in the Master Fund may be affected by an investment by other feeder funds, including the Onshore Feeder Fund, in the Master Fund. In view of the fact that all expenses of the Master Fund may be shared pro rata among its investors, if other investors in the Master Fund redeem their shares, then the possibility exists that the Fund will bear the burden of an increased share of the Master Fund's expenses.

## INVESTMENET STRATEGY AND CRYPTOCURRENCY RISKS

**Reliance on Quantitative Models.** The Investment Manager employs one or more quantitative models in its investment strategy. Although such quantitative models have been tested, no assurance can be made that such models will perform the same in the future. Model-driven strategies employed by others have resulted in substantial losses in a short period of time.

**Turnover.** The turnover rate of the Fund's investment portfolio may be significant, potentially involving substantial brokerage commissions, fees, and other transaction costs.

**Diversification.** There is no requirement on the Fund that it maintain a certain amount of diversification in its trading or investment activities. To the extent that the Investment Manager concentrates the Fund's trades or investments in a particular cryptocurrency, security, DeFi token, other asset, issuer, market or investment strategy, the Fund's investments will become more susceptible to

f                                               21

fluctuations in value resulting from adverse economic or business conditions affect that particular cryptocurrency, security, DeFi token, other asset, issuer, market or investment strategy.

*Leverage Risk.* The Fund may borrow on a secured or unsecured basis for any purpose, including to increase investment capacity, cover operating expenses and make redemption payments or for clearance of transactions. The Fund may issue debt obligations that are senior to the equity of the Shareholders but subordinated to the Fund's general creditors, either to raise additional capital or to satisfy redemptions without liquidating the assets of the Fund. There are no limits on the amount of borrowing, gearing or leverage that the Fund may use. While leverage presents opportunities for increasing the Fund's total return, it has the effect of potentially increasing losses as well.

The interest expense and other costs incurred in connection with the borrowing may exceed the income earned on the investments purchased or carried with borrowed funds. Gains realized with borrowed funds may cause the Fund's Net Asset Value to increase at a faster rate than would be the case without borrowings. Leverage is a two-edged sword, however, and the presence of leverage could result in the Fund's Net Asset Value decreasing faster than if there had been no borrowings. In addition, unanticipated increases in applicable margin requirements could adversely affect the liquidity of the Fund and, therefore, adversely affect the Fund's performance.

Additionally, the Fund may be operationally leveraged as a result of its transactions in certain options markets and other inherently leveraged financial instruments. Because only a relatively small margin deposit or similar outlay is generally required in relation to the contract value of these instruments, a small market movement may result in a disproportionately large change in the Fund's equity in the instrument. As a result, it is possible that the Fund could lose the entire amount of margin on deposit in a relatively short period of time if the market moves adversely. In these instances, the Fund may be required to make substantial additional margin deposits on short notice to maintain its position. If the Fund does not provide additional margin within the required time period, the Fund's position may be liquidated at a loss with the Fund being liable for any resulting deficit. Even if a trade ultimately proves profitable, the Fund may have to accept payment in cash in lieu of a return of the actual assets deposited, and the deposit will not be protected to the same extent as would a cash deposit held in trust in a segregated client bank account.

*Illiquidity of Fund's Assets.* The Fund may invest in investment instruments that are subject to legal and other restrictions on transfer or for which no liquid market exists. Markets for relatively illiquid investments tend to be more volatile than markets for more liquid investments. To the extent the Fund invests in illiquid assets, its ability to dispose of these assets at prices and times that it wishes to do so may be restricted. These risks will be more pronounced, and the Fund may be affected by widening bid-offer spreads, if the Fund is required to liquidate its positions to generate cash to fund withdrawals or meet other obligations. This liquidation may lead to the need for the Fund to incur capital losses in connection with the disposition of assets to meet these cash requirements.

The Fund may be adversely affected by a decrease in market liquidity in normally liquid markets. These market events may impair the Fund's ability to adjust its positions, balance sheet and risk in response to trading losses or other adverse developments. The size of the Fund's positions may magnify the effect of a decrease in market liquidity for the instruments traded by the Fund. Changes in overall market leverage also may adversely affect the Fund's positions (for example, due to changes caused by deleveraging or liquidations by other market participants of the same or similar positions).

*Short Sales.* Short selling involves selling cryptocurrencies, securities, DeFi tokens, other assets, which are not owned by the short seller and borrowing them for delivery to the purchaser, with an obligation to replace the borrowed cryptocurrencies, securities, DeFi token, other assets, at a later date. Short selling allows the investor to profit from a decline in market price to the extent such decline exceeds the transaction costs and the costs of borrowing the cryptocurrencies, securities, DeFi token, other assets.

f

The extent to which the Fund engages in short sales will depend upon the Investment Manager's investment strategy and opportunities. A short sale creates the risk of a theoretically unlimited loss, in that the price of the underlying cryptocurrency, security, DeFi token, other asset could theoretically increase without limit, thus increasing the cost to the Fund of buying those cryptocurrencies, Securities, other assets to cover the short position. There can be no assurance that the Fund will be able to maintain the ability to borrow cryptocurrencies, securities, DeFi tokens, other assets sold short. In such cases, the Fund can be "bought in" (i.e., forced to repurchase the cryptocurrencies, securities, DeFi tokens, other assets in the open market to return to the lender). There also can be no assurance that the cryptocurrencies, securities, DeFi tokens, other assets, necessary to cover a short position will be available for purchase at or near prices quoted in the market. Purchasing cryptocurrencies, securities, DeFi tokens, other assets to close out a short position can itself cause the price of the cryptocurrency, security, DeFi tokens, or other asset to rise further, thereby increasing the loss.

*Risks of Actively Trading Securities and Investments.* The business of actively trading cryptocurrencies, securities, DeFi tokens, and other assets involves numerous risks. If the Fund's trades are delayed, the Fund may be unable to effect the trade at the desired price, if at all. If the broker used by the Fund to execute trades does not make fast, timely executions and confirmations of the Fund's trades to the Investment Manager, then the Investment Manager will have no way of knowing if the Fund is in or out of a position and this lack of information about a trade can cause a loss to the Fund. If the Investment Manager places an order to purchase or sell a particular cryptocurrency, security, DeFi token, or other asset "at the market rate" the Fund is agreeing to purchase or sell the specific number or number of shares of that cryptocurrency, securities, DeFi token, or other asset, at the price at which a matching sale or purchase can be found on the exchange at the time that the order is received on the trading floor of the exchange. If the broker used by the Fund does not timely place the order and execute the trade, the Fund may be purchasing or selling the cryptocurrency, security, DeFi token, or other asset, at a higher or lower price than the intended purchase or sale. This may result in part because the market price of the cryptocurrency, security, DeFi token, or other asset, can move quickly. The cryptocurrencies, securities DeFi tokens, or other assets held by the Fund will regularly fluctuate in value; therefore, there can be no assurance that the Fund will maintain a stable Net Asset Value over a short period of time. As a result, it is possible that a Shareholder's request to withdraw his/her/its investment may ultimately be processed at a different Net Asset Value than the value at the time the request was originally received by the Fund.

*Hedging Transactions.* The Fund is not required to hedge any of its positions, and its portfolio at any time may be partially or entirely unhedged. The Fund nonetheless may use financial instruments, both for investment purposes and for risk management purposes in order to (i) protect against possible changes in the market value of the Fund's investment portfolios resulting from fluctuations in the cryptocurrency, security, and DeFi markets and changes in interest rates; (ii) protect the Fund's unrealized gains in the value of the Fund's investment portfolio; (iii) facilitate the sale of any such investments; (iv) enhance or preserve returns, spreads or gains on any investment in the Fund's portfolio; (v) protect against any increase in the price of any securities the Fund anticipates purchasing at a later date or (vi) for any other reason that the Investment Manager deems appropriate.

The success of the Fund's hedging strategy (if hedging occurs) will depend, in part, upon the Investment Manager's ability to correctly assess the degree of correlation between the performance of the instruments used in the hedging strategy and the performance of the portfolio investments being hedged. Since the characteristics of many securities change as markets change or time passes, the success of the Fund's hedging strategy will also be subject to the Investment Manager's ability to continually recalculate, readjust and execute hedges in an efficient and timely manner. While the Fund may enter into hedging transactions to seek to reduce risk, such transactions may result in a poorer overall performance for the Fund than if it had not engaged in such hedging transactions. For a variety of reasons, the Investment Manager may not seek to establish a perfect correlation between the hedging instruments utilized and the

f                                                  23

portfolio holdings being hedged. Such an imperfect correlation may prevent the Fund from achieving the intended hedge or expose the Fund to risk of loss. The Investment Manager may not hedge against a particular risk because no instruments are available for such purposes, because it does not regard the probability of the risk occurring to be sufficiently high as to justify the cost of the hedge, or because it does not foresee the occurrence of the risk.

**Exposure to Material Non-Public Information.** From time to time, the Investment Manager may receive confidential or material non-public information with respect to an issuer of publicly traded securities. In such circumstances, the Fund may be prohibited (by law, policy or contract) for a period of time from unwinding a position, establishing an initial position or taking any greater position, or from pursuing other investment opportunities related to the issuer. In the event of the foregoing, the Fund will not be free to act upon any such information. Due to these restrictions, the Fund may not be able to initiate a transaction that it otherwise might have initiated and may not be able to sell an investment that it otherwise might have sold.

**Investments in Companies That the Partnership Does Not Control.** Investments by the Fund may include debt instruments and equity securities of companies that it does not control. Such instruments and securities may be acquired by the Fund through market transactions or through purchases of securities directly from the issuer or other shareholders. Those investments will be subject to the risk that the company in which the investment is made may make business, financial or management decisions with which the Fund does not agree or that the majority stakeholders or the management of the company may take risks or otherwise act in a manner that does not serve the Fund's shares. In addition, the Fund may make investments in which it shares control over the investment with co-investors, which may make it more difficult for the Fund to implement its investment approach or exit the investment when it otherwise would. If any of the foregoing were to occur, the values of investments by the Fund could decrease and its financial condition, results of operations and cash flow could suffer as a result.

**Investments in Unlisted Securities.** Although the Fund invests primarily in listed securities, it may, on occasion, take long and short positions in unlisted securities of U.S. and non-U.S. companies. Because of the absence of any trading market for these investments, it may take longer to liquidate, or it may not be possible to liquidate, these positions than would be the case for publicly traded securities. Although these securities may be resold in privately negotiated transactions, the prices realized on these sales could be less than those originally paid by the Fund. Further, companies whose securities are not publicly traded will generally not be subject to public disclosure and other investor protection requirements applicable to publicly traded securities. Such unlisted securities may also be difficult to value and such valuation may require the exercise of substantial discretion by the Investment Manager.

**Counterparty Risk.** Some of the markets in which the Fund may affect its transactions are "over-the-counter" or "interdealer" markets. The participants in such markets are typically not subject to credit evaluation and regulatory oversight as are members of "exchange–based" markets. This exposes the Fund to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not bona fide) or because of a credit or liquidity problem, thus causing the Fund to suffer a loss. Such "counterparty risk" is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the Fund has concentrated its transactions with a single or small group of counterparties. The Fund is not restricted from dealing with any particular counterparty or from concentrating any or all of its transactions with one counterparty. Moreover, the Fund has no internal credit function that evaluates the creditworthiness of their counterparties. The ability of the Fund to transact business with any one or number of counterparties, the lack of any meaningful and independent evaluation of such counterparties financial capabilities and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Fund.

f                                           24

***Risk Associated with Investments in Crypto Assets.*** The Fund has authority to invest, and indeed intends to principally invest in, in a variety of cryptocurrency assets (the "Crypto Assets"). Crypto Assets can be divided into multiple categories, including (but not limited to) currency tokens which are used as a store of value or medium of exchange, and security tokens the value of which are tied to underlying assets such as commodities or equity in a business. Crypto Assets are traded across series of private exchanges and are subject to unique risks compared to traditional investment instruments in addition to the risks associated with underlying assets to which they may be connected. Some of the risks of investments in Crypto Assets, including cryptocurrencies, include the following:

***Theft of Crypto Assets.*** Due to the digital, sometimes anonymized, nature of Crypto Assets, they are prone to certain risks, such as being stolen by hackers. Hackers employ numerous methods of effecting theft of Crypto Assets, which could include the following:

1. **Theft from the Fund's Network.** The Fund may store Crypto Assets on, and transfer Crypto Assets across its network, particularly when conducting trading activity. The Fund may employ multiple layers of network security, including the use of firewalls, software to protect against malware, and the dispersion of the Fund's Crypto Assets across multiple hardware wallets when not being actively traded, all of which mitigate the risk of theft. Nonetheless, hackers may succeed in bypassing or overcoming firewalls and security software to penetrate the Fund's network in order to steal Crypto Assets. In order to be traded, Crypto Assets must be moved from "cold storage", where they are isolated from any network, to and between "hot wallets", where they are connected to the internet. During any period where Crypto Assets are not in "cold storage" they are exposed to prospective theft in the event of infiltration of the Fund's network, and, once stolen, may be virtually impossible to recover, exposing the Fund's Crypto Assets to the risk of loss.

2. **Theft from an Exchange.** Cryptocurrency exchanges facilitate the transacting of billions of U.S. dollars of Crypto Assets on a daily basis. The Fund may access such exchanges to buy and sell Crypto Assets, during which periods of trading activity, certain of the Fund's Crypto Assets may be held on such Exchanges. These exchanges typically employ sophisticated security measures to prevent theft of Crypto Assets being transacted across their network, with some providing remuneration options in the event Crypto Assets are stolen due to a breach in the exchange's security. Nonetheless, the volume of Crypto Assets transferred via exchanges makes them attractive targets for hackers, including for larger-scale, sophisticated hacks aimed at stealing large quantities of Crypto Assets.

   Moreover, there is no uniform minimum standard of security exchanges are required to provide for their networks, meaning the security of Crypto Assets on an exchange's network can vary substantially between exchanges. The explosive growth in trading of Crypto Assets has also substantially increased trading volume for many exchanges. This increased trading volume may place strain on the infrastructure of rapidly expanding exchanges, leaving security measures inadequate until expanded to accommodate the growth in an exchange's user base.

   The Fund may access multiple cryptocurrency exchanges to find liquidity and favorable pricing for its Crypto Assets, exposing those Fund assets to the risk of theft due to vulnerabilities which may exist in the networks of such exchanges. While the Fund may make efforts to confine its trading activities to the extent possible to exchanges considered more reputable and which may offer to cover some amount of client losses in the event of a security breach, given the private nature of cryptocurrency exchanges, they may lack financial

f                                                                          25

transparency and the solvency to reimburse users, if applicable, in the event of a large-scale loss.

3. **Theft via Vulnerabilities in a Blockchain Network.** Crypto Assets are transferred via a distributed, typically public, ledger referred to as a "blockchain". Blockchain technology is regarded to be highly tamper-resistant and almost impossible to corrupt. While some Crypto Assets operate on their own blockchain network, multiple Crypto Assets may operate on the same network, such as with ERC20 tokens, which operate on the Ethereum blockchain. The security and tamper-resistance of a Crypto Asset is contingent upon the architecture of the blockchain on which it operates and is proven both over time and as transactions are processed on the blockchain. More established blockchains, such as the Bitcoin blockchain, have demonstrated the resiliency of their architecture against tampering. Newer Crypto Assets which do not operate on an established blockchain are more likely to be susceptible to vulnerabilities in their architecture allowing the theft or siphoning of Crypto Assets directly from the blockchain.

The Fund may trade in a variety of Crypto Assets to maximize the return of its Portfolio Investments. These Crypto Assets may include those operating on established blockchain networks, such as Bitcoin, as well as novel or emerging Crypto Assets operating on newer blockchains with potential for high growth. To the extent the Fund's investments include Crypto Assets traded on unproven blockchain architecture, such investments are exposed to a greater risk of loss.

*Loss of Crypto Assets due to Data Corruption.* Blockchain networks typically employ asymmetric cryptography to authenticate and encrypt transactions. The result is that Crypto Assets require a "private key" to access. This private key is a complex string of characters that corresponds to a specific Crypto Asset, without which key, transfer of the asset is effectively impossible. Private keys are typically transferred between wallets. The Fund, in the conduct of its trading activities, may transfer and store private keys both on its network and on the networks of various cryptocurrency exchanges. During such transfer and storage, data may be subject to corruption or loss due to a variety of factors including, but not limited to, power outages, software bugs, or hardware failures. In the event of such corruption, any Crypto Assets for which the corresponding private keys cannot be recovered may be permanently inaccessible. The Fund may employ measures to mitigate the risk of data corruption including, but not limited to, distributing Crypto Assets across multiple hardware wallets, creating redundancies, and utilizing battery backups for its storage and trading equipment. Nonetheless, corruption of private keys is possible, in such event exposing the Fund's Crypto Assets to the risk of total loss.

*Volatility.* Crypto Assets are subject to significantly greater fluctuations in price in comparison to conventional financial instruments such as stocks or bonds. This increased volatility may translate to greater risk of loss and can be attributed in part to a number of factors including, but not limited to, those set forth below, which may be applicable to some or all of the Crypto Assets included in the Fund's Portfolio Investments:

1. **Limited Alienability.** Certain Crypto Assets, such as Bitcoin and Ethereum, derive value from their utility as units of exchange. The number of retailers, however, which accept Crypto Assets as payment for goods and services is thus far quite limited, and those retailers which do accept Crypto Assets often place limitations on what they may be used to purchase. Moreover, an indefinite, but prospectively significant, portion of Crypto Asset transactions are conducted for an illicit purpose. Given the comparatively small pool of vendors accepting Crypto Assets as

f                                                       26

payment, any expansion or reduction in the number of such vendors, including reductions or increases in black market vendors due to success or failure of law enforcement efforts, may carry with it an outsized impact on the price of such Crypto Assets.

2. **Susceptibility to Market Sentiment.** Crypto Assets are often highly speculative in nature and in many cases have no underlying value, even as units of exchange. Unlike publicly-traded stock, which may represent equity in a company that has regular earnings and an ascertainable net tangible book value to support its trading price, many Crypto Assets are not supported by verifiable revenue streams or tangible assets. Consequently, the value of many Crypto Assets is tied to the prevailing outlook of the overall market for Crypto Assets, creating the possibility for dramatic fluctuations in the trading price of a Crypto Asset in reaction to external forces, including, but not limited to, rumors, speculation, media reports, and signaling by regulators, even in the absence of any fundamental impact on such Crypto Asset.

3. **Comparative Lack of Market Sophistication.** The majority of publicly traded stocks are held by large institutions with the significant majority of transaction volume being executed at the direction of sophisticated computer algorithms. Fundamental and quantitative analyses of abundant and precise data relating to such stocks is continuously scrutinized by sophisticated investment firms and used to make precise determinations regarding stock values. This constant scrutiny by investment professionals coupled with trading automation limits deviation in the trading price of stock relative to the market consensus on its value. Institutional investment in Crypto Assets, however, is significantly less as a proportion of the overall Crypto Asset market and the information available on Crypto Assets is significantly less robust, making it more difficult for even sophisticated investors to accurately estimate the appropriate trading price of a given Crypto Asset. The lower proportion of sophisticated investors in, and comparatively limited information on, the Crypto Asset market may result in greater deviation between the trading price of a given Crypto Asset and its fundamental value. Consequently, the Fund's investment in Crypto Assets may be subject to substantial fluctuation in trading price, even in the absence of any change in the underlying value of such Crypto Assets.

*Liquidity.* Crypto Assets are primarily traded across a number of online exchanges. While over half of all Crypto Asset trading volume is typically concentrated within the top ten exchanges, the total number of exchanges is in the hundreds. Certain exchanges with low overall volume may nonetheless offer the greatest available volume of a specific Crypto Asset. In order to access sufficient trading volume to meet its investment objectives, the Fund may need to utilize numerous exchanges to both acquire and liquidate Crypto Assets. Certain Crypto Assets acquired by the Fund may be less liquid than others, causing the Fund to hold such assets longer than desired while it attempts to locate demand. The Fund may also accumulate positions in Crypto Assets over time for which there is insufficient volume to immediately liquidate. The Fund maybe unable to liquidate such cumulative positions as quickly as desired, subjecting the Fund to fluctuations in the value of such positions and the possible inability of the Fund to liquidate such positions for their market value, or at all, at the time such liquidation is desired.

*Limited Recourse.* Given the anonymous nature of Crypto Assets, recovery in the event of theft is made more difficult. The sometimes non-local and decentralized nature of Crypto Asset networks further makes responsible parties difficult to identify or submit to legal jurisdiction in connection with a loss of Crypto Assets. Further, unlike with a conventional banking institution which may be able to cancel or reverse a transaction, blockchain networks, by design, typically lack a central authority able to intervene in the event of a loss. The absence of effective recourse may decrease deterrence of criminal activity aimed at stealing Crypto Assets and increase the risk of total loss for such proportion of the Fund's Portfolio

f                                                   27

Investments positioned in Crypto Assets.

    *Reliance on Computing Power and Energy.* Certain blockchain transactions are verified via a process referred to as "mining." Mining occurs when machines operating on a given blockchain network solve cryptographic hashes to individually validate the authenticity of a given transaction as well as verify it with the rest of the network. If the majority of the machines on the network determine the transaction is valid, the transaction is approved and the blockchain is updated with a distributed record of the transaction. Machines donating processing power to mine a given Crypto Asset are typically given a reward denominated in such Crypto Asset in exchange for serving their verification function. This means of verifying Crypto Asset transactions carries with it certain risks, including, but not limited to those enumerated below, which may be applicable to some or all of the Crypto Assets included in the Fund's Portfolio Investments:

1. **Increased Expense and Scarcity of Processing Power.** The architecture of certain blockchains, such as that of Bitcoin, cause the hashes which must be solved in order to verify transactions to increase in complexity with each subsequent transaction verified on the network. This continually increasing complexity in verifying transactions decreases the rate at which mining machines are rewarded for verifying transactions and increases the energy and computing costs to miners. Over time, miners may lose incentive to donate processing power to verify transactions on a network, reducing the rate at which transactions can be verified on such network, decreasing the liquidity of the corresponding Crypto Asset.

2. **Reliance on Energy and Sustainability Concerns.** The computing requirements of mining Bitcoin alone have necessitated the consumption of tremendous amounts of energy. While the exact amount of energy consumed by the Bitcoin network is difficult to precisely ascertain, if the Bitcoin network were a country, its estimated energy consumption would place it in the top 30% of consumers. Moreover, the network's consumption is expected to multiply, as the increasing complexity of verifying transactions demands continually greater computing power and miners compete to capture Bitcoin. The greater the computing power and energy resources devoted to mining Crypto Assets, the more sensitive Crypto Assets may be to fluctuations in the prices of energy required to perform the verification functions essential to their alienation. Continued geometric increase in the energy consumption of the Bitcoin network (and Crypto Asset networks generally) may also result in adverse outcomes including, but not limited to, unfavorable public perception of Crypto Assets, reduced demand, regulatory action, and collapse of certain Crypto Asset networks due to inability to effectively verify transactions.

    *Derivative Instruments.* The Fund has the ability to trade in derivative instruments "derivatives". Derivatives include instruments and contracts which are derived from and are valued in relation to one or more underlying cryptocurrency, security, DeFi tokens, financial benchmarks or indices. Derivatives typically allow an investor to hedge or speculate upon the price movements of a particular cryptocurrency, security, DeFi token, financial benchmark or index at a fraction of the cost of acquiring, borrowing or selling short the underlying asset. The value of a derivative depends largely upon price movements in the underlying asset. Therefore, many of the risks applicable to trading the underlying asset are also applicable to derivatives trading. However, there are a number of other risks associated with derivatives trading. Transactions in certain derivatives are subject to clearance on a U.S. national exchange and to regulatory oversight, while other derivatives are subject to risks of trading in the OTC markets or on non-U.S. exchanges. Additional risks associated with derivatives trading include the following:

    • *Tracking.* When used for hedging purposes, an imperfect or variable degree of correlation between price movements of the derivative instrument and the underlying investment sought to be hedged

may prevent the Fund from achieving the intended hedging effect or expose the Partnership to risk of loss.

• *Liquidity*. Derivative instruments, especially when traded in large amounts, may not be liquid in all circumstances, so that in volatile markets the Fund may not be able to close out a position without incurring a loss. In addition, daily limits on price fluctuations and speculative position limits on exchanges on which the Fund may conduct its transactions in derivative instruments may prevent profitable liquidation of positions, subjecting the Fund to the potential of greater losses.

• *Operational Leverage*. Trading in derivative instruments can result in large amounts of operational leverage. Thus, the leverage offered by trading in derivative instruments will magnify the gains and losses experienced by the Fund and could cause the Fund's Net Asset Value to be subject to wider fluctuations than would be the case if the Fund did not use the leverage feature in derivative instruments.

• *Over-the-Counter Trading*. Derivative instruments that may be purchased or sold by the Fund may include instruments not traded on an exchange. The risk of nonperformance by the obligor on an instrument may be greater than, and the ease with which the Fund can dispose of or enter into closing transactions with respect to an instrument may be less than, that associated with an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for derivative instruments that are not traded on an exchange. Derivative instruments not traded on exchanges also are not subject to the same type of government regulation as exchange-traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with these transactions.

**Credit Risk.** Because many purchases, sales, financing arrangements, cryptocurrency lending transactions, and derivative transactions in which the Fund will engage involve investment instruments that are not traded on an exchange but are instead traded between counterparties based on contractual relations, the Fund is subject to the risk that a counterparty will not perform its obligations under the related contracts. Although the Fund intends to enter into transactions only with counterparties which the Investment Manager believes to be creditworthy, there can be no assurance that a counterparty will not default and that the Fund will not sustain a loss on a transaction as a result.

In situations where the Fund is required to post margin or other collateral with a counterparty, the counterparty may fail to segregate the collateral or may commingle the collateral with the counterparty's own assets. As a result, in the event of the counterparty's bankruptcy or insolvency, the Fund's collateral may be subject to the conflicting claims of the counterparty's creditors, and the Fund may be exposed to the risk of a court treating the Fund as a general unsecured creditor of the counterparty, rather than as the owner of the collateral.

The Fund is subject to the risk that issuers of the investment instruments in which it invests and trades may default on their obligations under those investment instruments, and that certain events may occur which have an immediate and significant adverse effect on the value of those investment instruments. There can be no assurance that an issuer of an investment instrument in which the Fund invests will not default, or that an event which has an immediate and significant adverse effect on the value of an investment instrument will not occur, and that the Fund will not sustain a loss on a transaction as a result.

Transactions entered into by the Fund may be executed on various U.S. and non-U.S. exchanges, and may be cleared and settled through various clearing houses, custodians, depositories and prime brokers throughout the world. Although the Fund will attempt to execute, clear and settle the transactions through entities the General Partner believes to be sound, there can be no assurance that a failure by any such entity will not lead to a loss to the Fund.

**Contractual Risk.** Because many transactions in which the Fund will engage are traded between

f

counterparties based on contractual relations, the Fund is subject to the risk of failing to comply with these contracts or otherwise breaching their provisions. For example, these contracts may terminate upon the departure of a certain number of the principals, the fluctuation of the Net Asset Value beyond certain parameters, the termination of the General Partner as investment manager or other events or circumstances. The Fund may sustain a loss on a transaction that terminates prematurely in accordance with the terms of the underlying contract.

*Counterparty Insolvency.* The Fund's assets may be held in one or more accounts maintained for the Fund by counterparties, including their prime brokers. There is a risk that any of such counterparties could become insolvent. In September 2008, Lehman Brothers Holdings Inc., a major investment bank based in the United States, filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code. While none of its U.S. broker-dealer subsidiaries was included in the Chapter 11 filing, certain of Lehman Brothers subsidiaries, including Lehman Brothers International (Europe) ("LBIE") were placed under administration chartered to wind down their respective business. The insolvency of the Fund's counterparties is likely to impair the operational capabilities or the assets of the Fund. Although the Investment Manager regularly monitors the financial condition of the counterparties it uses, if one or more of the Fund's counterparties were to become insolvent or the subject of liquidation proceedings in the United States (either under the U.S. Securities Investor Protection Act or the U.S. Bankruptcy Code), there exists the risk that the recovery of the Fund's securities and other assets from such prime broker or broker-dealer will be delayed or be of a value less than the value of the securities or assets originally entrusted to such prime broker or broker-dealer.

In addition, the Fund may use counterparties located in various jurisdictions outside the United States, like LBIE. Such non-U.S. counterparties are subject to various laws and regulations in various jurisdictions that are designed to protect their customers in the event of their insolvency. However, the practical effect of these laws and their application to the Fund's assets are subject to substantial limitations and uncertainties. Because of the large number of entities and jurisdictions involved and the range of possible factual scenarios involving the insolvency of a counterparty, it is impossible to generalize about the effect of their insolvency on the Fund and its assets. Investors should assume that the insolvency of any counterparty would result in a loss to the Fund, which could be material.

*Cryptocurrency Lending.* The Fund may borrow and lend cryptocurrencies in the ordinary course of its business. Third parties that borrow cryptocurrencies from the Fund may not be able to return these cryptocurrencies or tokens on demand (possibly causing the Fund to default on its obligations to other parties) and may also default on the payment obligations owed to the Fund in connection with such securities loans, potentially resulting in substantial losses to the Fund. The Fund may lose the entire value of the securities it lends to defaulting borrowers.

*Option Risks.* The Fund may buy and sell (write) both call options and put options, and when it writes options, it may do so on a "covered" or an "uncovered" basis. A call option is "covered" when the writer owns cryptocurrencies of the same class and amount as those to which the call option applies. A put option is covered when the writer has an open short position in cryptocurrencies of the relevant class and amount. The Fund's option transactions, if any, may be part of a hedging strategy (i.e., offsetting the risk involved in another cryptocurrency position) or a form of leverage, in which the Fund has the right to benefit from price movements in a large number of cryptocurrencies with a small commitment of capital. These activities involve risks that can be substantial, depending on the circumstances.

In general, without taking into account other positions or transactions the Fund may enter into, the principal risks involved in options trading can be described as follows: When the Fund buys an option, a decrease (or inadequate increase) in the price of the underlying cryptocurrency in the case of a call, or an increase (or inadequate decrease) in the price of the underlying cryptocurrency in the case of a put,

f

could result in a total loss of the Fund's investment in the option (including commissions). The Fund could (but it may choose not to) mitigate those losses by selling short, or buying puts on, the cryptocurrencies for which it holds call options, or by taking a long position (e.g., by buying the cryptocurrencies or buying calls on them) in cryptocurrencies underlying put options.

When the Fund sells (writes) an option, the risk can be substantially greater than when the Fund buys an option. The seller of an uncovered call option bears the risk of an increase in the market price of the underlying cryptocurrency above the exercise price. The risk is theoretically unlimited unless the option is "covered." If it is covered, the Fund would forego the opportunity for profit on the underlying cryptocurrency should the market price of the cryptocurrency rise above the exercise price. If the price of the underlying cryptocurrency were to drop below the exercise price, the premium received on the option (after transaction costs) would provide profit that would reduce or offset any loss the Fund might suffer as a result of owning the cryptocurrency.

Options on a given cryptocurrency tend to be less liquid than shares or other ownership interests of the underlying cryptocurrency. Transaction costs in options transactions tend to be substantially higher than transaction costs incurred in trading the underlying cryptocurrencies because of wider bid/ask spreads and because options trades often cover more units of the cryptocurrency involved.

***Risks Relating to Markets.*** As the cryptocurrencies, securities, DeFi tokens, or other assets in which the Fund invests are traded on exchanges or over-the-counter, the value of such assets and the risks associated therewith vary in response to events that affect such markets which are beyond the control of the Fund. Market disruptions could result in substantial losses to the Fund.

There is no guarantee that the exchanges and markets can at all times provide continuously liquid markets in which the Fund can close out its positions. The Fund could experience delays and may be unable to purchase or sell cryptocurrencies, securities, DeFi tokens, or other assets, or exercise options purchased through a broker or clearing member that has become insolvent. In that event, positions could also be closed out fully or partially without the Fund's consent.

The Investment Manager may purchase a cryptocurrency, security, DeFi token, or other asset, that is or becomes illiquid for a variety of reasons (i.e., limited trading in the stock or limited number of holders). If a cryptocurrency, security, DeFi token, or other asset, becomes illiquid, the Investor cannot easily convert the cryptocurrency, security, DeFi token, or other asset, into cash, or purchase cryptocurrencies, securities, DeFi tokens, or other assets, with cash. Accordingly, if the Fund is in a position with illiquid cryptocurrencies, securities, DeFi tokens or other assets, it may not be able to sell that cryptocurrency, security, DeFi token, or other asset, if, and when, and at the price the Investment Manager intended. Conversely, if a cryptocurrency, security, DeFi token, or other asset is illiquid and the Investment Manager wants to purchase the cryptocurrency, security, DeFi token, or other asset, the Fund may not be able to purchase the cryptocurrency, security, DeFi token, or other asset, that the Investment Manager wants or at a favorable price and risks losing the opportunity to profit.

***Cryptocurrency Exchange Risk.*** Expanding on the above, one risk facing the Fund and Master Fund relates to the cryptocurrency exchanges which serve as the platform through which trades are executed with counterparties. If the exchange were to go down for any reason (possibly as a consequence of the underlying cloud servers powering the exchange going down, for any reason), then the success of a given trade may be impacted, in particular if the Fund or Master Fund is in the middle of putting on the trade (which may be put on in layered traches, depending on the strategy). When the exchange eventually powers back up, the pricing can be markedly different from the moment immediately prior to the time that the exchange went down, which can cause the Fund or Master Fund to incur losses. This is outside of the control of the Investment Manager and the Investment Manager shall not be responsible for any losses

f                                                                                                      31

stemming from such events, however the Shareholders should be aware of this risk, and its possible impact on the Fund's returns.

**Risks of Global Investing.** The Fund will invest in various capital markets throughout the world. As a result, the Fund is subject to risks relating to (i) currency exchange matters, including fluctuations in the rate of exchange between the U.S. dollar and the various foreign currencies in which the Fund's cryptocurrencies will be denominated, and costs associated with conversion of investment principal and income from one currency into another, and (ii) the possible imposition of withholding taxes on income received from interest, dividends or capital gains with respect to the Fund's investment instruments.

In addition, certain of these capital markets involve certain factors not typically associated with investing in established U.S. securities markets, including risks relating to (i) differences between markets, including potential price volatility in and relative illiquidity of some foreign securities markets, (ii) the absence of uniform accounting, auditing and financial reporting standards, practices and disclosure requirements and less government supervision and regulation, and (iii) certain economic and political risks, including potential exchange control regulations and potential restrictions on foreign investment and repatriation of capital, nationalization of industries, and diplomatic or geopolitical crises.

**Brokerage and Other Arrangements.** In selecting brokers or dealers to effect portfolio transactions, the Investment.Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost. The Investment Manager may cause commissions to be paid to a broker or dealer that furnishes or pays for research, equipment, referral or other services at a higher price than that which might be charged by another broker or dealer for effecting the same transaction.

**Lack of Opportunity for Investors to Evaluate Investments.** The proceeds from this offering and any reinvested Fund assets will be invested in cryptocurrencies, securities, DeFi tokens and other assets, that have not yet been selected by the Investment Manager. Therefore, prospective Investors will not have an opportunity to evaluate for themselves the relevant economic, financial, and other factors regarding investments and will have to rely completely on the ability of the Investment Manager with respect to the selection of investments. Accordingly, the uncertainty and risk of an investment in the Fund will be increased since Investors are unable to evaluate the economic merit of any investments that the Fund may make.

**Standard of Care.** Under the M&A, no director of the Fund will be liable in damages or otherwise to the Fund or to any Shareholder for any act or omission by it in connection with the Fund's activities, except for any liability that results from the directors' bad faith, gross negligence, willful misconduct, or fraud, as determined by a final, non-appealable decision of a court of competent jurisdiction. In addition, the Investment Manager is subject to similar indemnification rights in relation to the Fund, save for actions or omission which are undertaken in bad faith, gross negligence, willful misconduct, or fraud, in connection with its investment management services rendered to the Fund.

### DECENTRALIZED FINANCE ("DEFI") RELATED RISKS

**Risks Associated with the Nascent DeFi Ecosystem.** Decentralized finance is currently in its nascent stages, and a Shareholder should know that many of the lending protocols which will be invested into, contain express disclaimers that the protocols are still in beta mode. As a consequence of this lack of operating history and active experimentation which is still occurring in the space, there are added risks associated with the Fund making an investment into the DeFi space. In addition to the foregoing, DeFi takes the concepts of blockchain, cryptocurrency, cryptocurrency exchanges, and more, and imposes on these additional 'layers' of complexity, in order to provide a truly unique and disruptive value proposition. Notwithstanding this value proposition, an investment by the Fund into a decentralized application ("dApp") lending protocol has not only the risks associated with that protocol and the strategy

f                                             32

employed therein, but also the sum of the risks of its underlying component parts.

**Risks Associated with Stablecoins.** With regards to the Fund's yield farming strategies, at the first stage of any such strategies is usually the conversion of the Fund's fiat currencies to one or more stablecoins (of which, at the time of these Risk Factors, there are over 170 in circulation). Stablecoins are invaluable to the cryptocurrency and DeFi ecosystem in that not only do they mimic the US dollar or other fiat currency at a 1:1 ratio, but they can be transferred much more easily than a typical fiat currency. Various DeFi protocols that the Fund will be investing into accept deposits of stablecoins that are specific to the smart blockchain that the relevant dApp sits on, and so the conversion of fiat to stablecoins and then the conversion from one stablecoin to another, is an integral component of the Fund's strategy.

At any point in time, the Fund may be holding, directly or indirectly, one or more stablecoins. However, there are unique risks associated with each stablecoin, which is often (but not always) set forth within a White Paper that can be found on the website of the organization which oversees the given stablecoin. For example, in the case of UST (USD Tether), the organization responsible for overseeing the pegging of this stablecoin is Tether Limited and Tether Limited's White Paper sets forth the weaknesses of its stablecoin, which include, and are not limited to, the following: (i) Tether Limited could go bankrupt, (ii) the bank at which the USD deposits are stored (Cathay United Bank and Hwatai Bank) could become insolvent, just like any other bank can, (iii) the bank used to hold the USD deposits could freeze or confiscate the funds, (iv) the Tether Limited could abscond with the reserve deposits, provided doing so would cause the agents to become fugitives under the law, (v) the process involves a re-centralization of risk to a single point of failure as it relates to the creation and redemption of tokens.

Conversely, Terra stablecoin (UST), takes a totally different approach is striving to achieve the 1:1 ratio, namely, via an algorithm which burns or increases the supply of UST versus the supply of a protocol token called Luna, in order to control the supply and demand of UST to maintain the target 1:1 pegging.

**Risks Associated with Using DeFi Wallets.** Throughout the Fund's investment strategy as it relates to yield farming, the relevant stablecoins will be contained in one or more DeFi cryptocurrency wallets, usually located within a computer browser extension (e.g., Metamask Terra Station, etc.). The browsers are the gateway to accessing the various lending protocols that the Fund will be investing into. Although these DeFi wallets are, by default, 'hot wallets', there are ways to connect these hot wallets to 'cold wallets' in order to minimize certain risks.

That being said, there will still always be a period of time, albeit brief, when the assets of the Fund will be contained in a wallet that is 'hot', and during this period of time, albeit brief, a malicious actor can prey on the hot wallet to illicitly gain access to the Fund's stablecoins. Other than a hack of a hot wallet, there are a variety of other ways that a malicious actor can gain access to the wallet's assets.

**Risk of Using Blockchain Bridges.** Different smart blockchains (such as Etherium, Binance Smart Chain, etc) function as their own self-contained ecosystems, which makes the transition from one ecosystem to another difficult. This difficulty, however, is ameliorated by the advent of so-called 'blockchain bridges', which helps a user transition horizontally from one blockchain to another. In addition, blockchain bridges also assist in the vertical transition from one layer to a higher or lower layer of smart blockchain. In each case, whether vertical or horizontal, the bridge is accomplished by the bridge software "freezing" the stablecoin at one end, and then creating entirely new tokens of an equal value on the receiving blockchain. When, ultimately, the user wishes to redeem his or her assets, the bridge process is reversed by having the equivalent tokens being burned at the destination blockchain, and then the original frozen assets being unlocked. Given that the Investment Manager has discretion to invest among a variety of smart blockchains and on different vertical layers of smart blockchains, the Fund will be making frequent use of such blockchain bridges.

f                                                                 33

The risks associated with the use of such blockchain bridges includes, but is not limited to, the risk that the bridge may no longer function, or that the bridge may become overwhelmed by the sheer volume of users trying to cross the bridge which would cause a bridge to crash. The consequences of a bridge crashing in this manner would vary depending on the circumstances, but at a minimum, it could affect the Shareholders' ability to redeem their investment until the bridge is once again up and running. That being said, there are generally multiple bridges available, and the Investment Manager will strive to have back up options available at all times to minimize such risks.

**Risks Associated with 'Layers'.** As noted above, the decentralized applications ("dApps") which form the essence of the Fund's strategy sit on one or more so-called 'layers' or 'legos'. The first layer is always the smart blockchain that allows for dApps to be built on top of them (such as Etherium). However, there are a series of dApps which are built on top of Etherium such as Polygon, and then other dApps which are built on top of Polygon such as QuickSwap. Each dApp built on top of another would constitute an additional 'layer'. The key point here to understand, is that the higher you go up the layers, there is a compounding of risk. There is always the risk associated with a lower 'layer' compromising all of the dApps higher up the chain of layers. If a 'layer' stops operating and there are assets which were contained within that layer, then technically it is possible for that asset to be forever unrecoverable, or unrecoverable until that layer and all lower layers on which it depends are up and running again. Given that the Investment Manager will be actively deploying across different dApps lending protocols and thus different layers, a comprehensive overview of the risks associated with the various layers is impossible.

**Risks Associated with DeFi Smart Blockchains (1st Layer).** As noted above, '1st layer' generally refers to the smart blockchain that forms the framework upon which other decentralized finance apps exist. The Fund's strategy intends to transfer stablecoin into one or more smart blockchains for the purpose of deploying the Fund's strategy, including but not limited to Ethereum, Binance Smart Chain, Solana, and Terra. Each DeFi smart blockchain is overseen by an organization, which issues documentation explaining the intricacies of its system and the risks associated with the smart blockchain. The protocol that will be invested into by the Fund will vary depending on the strategy and so it would be impossible to go into the relevant risks. However, if the Investment Manager knows specifically the dApp the Investment Manager is required to invest into, then the relevant smart blockchain can be derived (using a website such as https://dappradar.com) and then an enumeration of the risk factors can be found either within the overseeing organization's White Paper, or possible the report of a security company that has undertaken an audit of the system.

Note that there are some dApps which are similar to the 1st layer, but which are improvements on the smart blockchain. An example of such a dApp would be Polygon. Thus, although they are technically 2nd layer, they would still have functionality very akin to the 1st layer and therefore similar risks.

**Risk Associated with 2nd Layer Lending Protocols.** The 'layer 2' dApps generally refers to the dApp lending protocols which are at the heart of the Fund's DeFi strategy, and these include, for example, Anchor, Pancake Swap, and more. These operate either directly on a 1st layer smart blockchain (such as Etherium) or on a 2nd layer smartchain such as Polygon (in which case it would actually be considered 'layer 3' application). Generally, the way these lending protocols work is that the protocol allows you to connect to it via a compatible DeFi wallet (such as Metamask, which you would load with appropriate stablecoin). Next, you would allow the dApp access to the DeFi wallet by pressing a button to allow the connection to occur. The stablecoin could then be deployed into the relevant lending protocol dApp to secure a return using the yield farming strategy, as follows:

In this strategy, you are powering decentralized exchanges (DEXs) by first swapping your stablecoin for a certain quantity of a token, and depositing a quantity of both into a 'liquidity pool'. This liquidity pool is then used by persons who wish to exchange one cryptocurrency asset for another. The lender benefits by being rewarded in the protocol's native token, which can always be exchanged for

f                                                34

more stablecoin. The most commonly recognized risks associated with this strategy, include 'slippage' and 'impairment loss'. The Investment Manager will strive to screen lending protocols which are providing the best solutions to minimize these risks.

**Risks of 3rd Layer and Up dApps.** Above, we have described the 1st and 2nd layer dApps of the DeFi ecosystem. However, there is no limit to the additional dApp layers which can be created. We already highlighted QuickSwap above, but it's possible for a dApp to plug into QuickSwap, and so on. The reality is that when using each higher level dApps, there is a compounding effect to the level or risk that the Fund would experience, since the unique risks associated with each layer would be added to the risk of each of the legos on which it stands. To the extent the Fund is able to secure the same return, but can do so via a dApp sitting on a lower layer, it will choose the lower layer dApp to reduce such compounding risk.

**Risks Associated with Any Protocol-Specific Tokens Which May Be Received.** As noted above briefly, certain protocols that the Fund's stablecoin will be deposited into, will provide returns not only in the form of additional stablecoins, but also possibly in the form of the protocols' native token. These tokens, such as PancakeSwap (CAKE), Luna (Terra's token), AUTO (Autofarm's token), MATIC (Polygon's token), etc. are openly traded and therefore subject to price fluctuations. Although holding these tokens holds the potential of generating additional yields for the Fund in the case of the token's price appreciation, the Fund intends, to the extent possible, to immediately convert any such tokens into the additional relevant stablecoins, which would then go back into the pot to generate additional yield for the Fund. However, to the extent such tokens are not immediately converted, any value contained within such tokens would be subject to the risk of market price fluctuations.

**Lending Protocol - Risk of Soft Hacks and Hard Hacks.** In the case of DeFi, a soft hack refers to a bad actor (sometimes someone internal to the protocol) minting an additional quantity of the relevant protocol token and then dumping it in the open market, causing the price to plummet. In such a case, the strategy may suffer an adverse impact. In addition to the foregoing, in regards to the strategies that involve the Fund's stablecoin or other token departing from the relevant DeFi wallet and sitting on a given lending protocol for any period of time, there is a veritable risk of a 'hard hack' (i.e., risk of actual asset theft) that is arguably the greatest risk present in DeFi. In particular, the liquidity pools are attractive targets for hackers. Notwithstanding any steps the Manager may take to mitigate such risk, this risk cannot be entirely eliminated. This being said, the lending protocols historically have exercised a variety of tools to remedy such a hack, and any such loss would likely be mitigated by the protocol.

**Reduced Yields as a Consequence of New Users, Black Swan Events.** In regards to any target APY which may have been expressed by the Fund as an expectation for a given strategy, such APY is subject to several risks which would cause it to become lower. First, the yield may be dependent on the number of users that lock up money in the given product. If, for instance, there is another user who makes a substantial deposit, then the Fund's portion of the return would become diluted pro rata. The Investment Manager will strive to mitigate this risk by actively rebalancing the products into which the Fund's funds are placed. In addition, another risk is that a Black Swan event could reduce a product's target APY as a consequence of the token awarded (which, in certain protocols, may be a primary driver of the product's yield) plummeting in value when fear grips users and they become willing to liquidate their tokens at any price. Although this is a risk, DeFi APYs have held up well even under very severe negative events thus far, and in any case a protocol's yield would not be expected to ever turn negative.

f

35

### REGULATORY AND TAXATION RISKS

*UBTI Risk to Tax Exempt Investors.* Since the Fund will be permitted to borrow, tax-exempt Shareholders may incur an income tax liability with respect to their share of any unrelated business taxable income ("UBTI") the Fund may generate. Each investor should consult with and rely on its own independent tax counsel as to the U.S. federal income tax consequences of an investment in the Fund based on its particular circumstances, as well as to applicable state, local or non-United States tax laws.

*Absence of Regulatory Oversight - Fund.* While the Fund may be considered similar to an investment company, it is not required, and does not intend, to register as such under the laws of any jurisdiction. For instance, the provisions of the Investment Company Act of 1940, as amended (the "Investment Company Act"), which may provide certain regulatory safeguards to investors, are not applicable.

*Absence of Regulatory Oversight – Crypto Assets.* Crypto Assets and the exchanges on which they are traded are not currently subject to clear and comprehensive regulatory oversight. Uncertain regulatory treatment of Crypto Assets and Crypto Asset exchanges subjects the overall Crypto Asset market to substantial risk of regulatory intervention. A determination by regulators that certain Crypto Assets are properly classified as securities could result in the delisting of such Crypto Assets from exchanges, significantly reducing such assets' liquidity and, consequently, their value. A determination by the SEC that Crypto Asset exchanges must comply with the standards of a securities exchange could result in the suspension of all activity on exchanges subject to U.S. jurisdiction, significantly reducing the liquidity and value of Crypto Assets across the entire Crypto Asset market. While the both the Fund and the broader Crypto Asset market closely monitors regulatory signals regarding treatment of Crypto Assets, severe, unanticipated regulatory action could result in the total or near total loss of value in the proportion of the Fund's Portfolio Investments positioned in Crypto Assets.

Conversely, absence of regulatory oversight of Crypto Asset markets also poses risks. Lack of uniform standards of reporting and financial transparency makes evaluating and verifying information relating to Crypto Assets and exchanges difficult. Moreover, a substantial proportion of the entire outstanding supply of certain Crypto Assets, is concentrated in the hands of relatively few individuals. Collusion among such individuals has the potential to manipulate pricing across a Crypto Asset market, advantaging a small number of participants at the expense of all others holding the Crypto Asset. In the absence of regulatory oversight and enforcement, such collusion is not only possible, but also may not be illegal in the absence of a specific legal framework applicable to Crypto Asset markets.

*Business and Regulatory Risks of Hedge Funds.* Legal, tax and regulatory changes could occur during the term of the Fund that may adversely affect the Fund. The regulatory environment for hedge funds is evolving, and changes in the regulation of hedge funds may adversely affect the value of investments held by the Fund and the ability of the Fund to obtain the leverage it might otherwise obtain or to pursue its trading strategies. In addition, securities and futures markets are subject to comprehensive statutes, regulations and margin requirements. The Securities and Exchange Commission (the "SEC"), other regulators and self-regulatory organizations and exchanges are authorized to take extraordinary actions in the event of market emergencies. The regulation of derivative transactions and funds that engage in such transactions is an evolving area of law and is subject to modification by government and judicial actions. The effect of any future regulatory change on the Fund could be substantial and adverse.

*Enhanced Scrutiny and Potential Regulation of Private Investment Funds.* There has been enhanced governmental scrutiny and/or increased regulation of the private investment fund and financial services industries in general. The Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") requires, among other things, registration with the SEC of advisors to private

f

investment funds whose assets under management exceed $150 million (with certain limited exceptions) and imposes new reporting and recordkeeping obligations with respect to the private investment funds they advise.

The Dodd-Frank Act, as well as future related legislation, may have an adverse effect on the private investment fund industry generally and/or on the Fund, specifically. In addition, regulatory agencies in the U.S., Europe, or elsewhere may adopt burdensome laws (including tax laws) or regulations, or changes in law or regulation, or in the interpretation or enforcement thereof, which are specifically targeted at the private investment fund industry, or other changes that could adversely affect private investment firms and the funds they sponsor, including the Fund. Additional governmental scrutiny may increase the Fund's and the General Partner's exposure to potential liabilities and to legal, compliance and other related costs. Increased regulatory oversight, enhanced regulation and the adoption of new statutes, rules or regulations with respect to the investment activities of the Fund may also reduce the amount and availability of the investment opportunities of the Fund. The reduction of such investment opportunities could have a material and adverse effect on the investment performance of the Fund. Such increased regulatory oversight and regulation may also impose additional administrative burdens on the General Partner and such regulatory proposals, or any future proposals, if adopted could adversely affect the Fund, including the business, financial condition and prospects of the Fund, and could also require increased transparency as to the identity of the Shareholders.

*Future Regulatory Change is Impossible to Predict.* The securities and derivatives markets are subject to comprehensive statutes, regulations and margin requirements. In addition, the SEC, the Commodity Futures Trading Commission ("CFTC"), and the exchanges are authorized to take extraordinary actions in the event of a market emergency, including, for example, the retroactive implementation of speculative position limits or higher margin requirements, the establishment of daily price limits and the suspension of trading. The regulation of securities and derivatives both inside and outside the United States is a rapidly changing area of law and is subject to modification by government and judicial action.

The Fund invests primarily in digital currencies and digital assets, which currently are either not regulated, or are in the early stages of regulation by U.S. federal and state governments, or self-regulatory organizations. As digital currencies and digital assets have grown in popularity, certain U.S. agencies, such as the Financial Crimes Enforcement Network ("FINCEN") and the CFTC, have begun to examine digital currencies and digital assets and the operations of Bitcoin and other digital currency networks in depth. Currently, the SEC has not formally asserted regulatory authority over digital currencies or digital assets. The SEC has issued a release stating that, depending on the specific facts and circumstances of the digital currencies or digital assets in question, the digital asset may fall under securities regulation. The CFTC has declared that digital currencies and digital assets are commodities, but currently, only certain kinds of digital currencies may be subject to CFTC jurisdiction. To the extent that any type of digital currency or digital asset is determined to be a security, commodity, future or other regulated asset, or to the extent that a U.S. or foreign government or quasigovernmental agency exerts regulatory authority over the digital currencies or digital assets, the Fund may be adversely affected.

Digital currencies and digital assets currently face an uncertain regulatory landscape in not only the United States but also in many foreign jurisdictions such as the European Union, China and Russia. Various foreign jurisdictions may, in the near future, adopt laws, regulations or directives that affect digital assets, digital currency networks and their users, particularly digital currency exchanges and service providers that fall within such jurisdictions' regulatory scope. Such laws, regulations or directives may conflict with those of the United States and may negatively impact the acceptance of digital currencies and digital assets by users, merchants and service providers outside of the United States and may therefore impede the growth of the digital currency and digital assets economy.

f                                                              37

The effect of any future regulatory change on the Fund is impossible to predict, but such change could be substantial and adverse.

*No FDIC or SIPC Protection.* Digital currencies and digital assets held by the Fund are not subject to Federal Deposit Insurance Corporation ("FDIC") or Securities Investor Protection Corporation ("SIPC") protections. The Fund is not a banking institution or otherwise a member of the FDIC or SIPC and, therefore, deposits held with or assets held by the Fund are not subject to the protections enjoyed by depositors with FDIC or SIPC member institutions. While private insurance may be available at times, the undivided interest in the Fund's digital currencies and digital assets represented by Interests in the Fund are not insured.

*Legality of Digital Currencies and Digital Assets.* It may be illegal, now or in the future, to own, hold, sell or use digital currencies or digital assets in one or more countries, including the United States. Although currently digital currencies and digital assets are not regulated or are lightly regulated in most countries, including the United States, one or more countries may take regulatory actions in the future that severely restricts the right to acquire, own, hold, sell or use digital currencies or digital assets or to exchange digital assets or digital currencies for fiat currency. Such an action may restrict the Fund's ability to hold or trade digital currencies and digital assets, and could result in termination and liquidation of the Fund at a time that is disadvantageous to Shareholders, or may adversely affect an investment in the Fund.

*Uncertainty as to Tax Treatment of Certain Digital Asset Items.* With the advent of novel investment strategies in the digital asset space, there is often confusion as to the tax treatment of gains associated with such strategy. Although such gray areas become elucidated over time by additional regulatory guidance, prior to the issuance of such guidance there is the risk of misclassification. For instance, as of the date of this Memorandum, the tax treatment of 'staking' rewards is currently unknown. In such cases, the Investment Manager, with assistance from its relevant advisors will use best efforts to properly classify the item for tax purposes, however the risk always remains that the classification determination made is not in line with the interpretation ultimately promulgated by the agency, which could result in certain detrimental consequences.

*Tax Liability Without Distributions.* Partners will be liable to pay taxes on their allocable shares of Fund taxable income. Taxable income can be expected to differ from Net Profit, primarily because generally only realized gains and losses are considered for income tax purposes but Net Profit and Net Loss will include unrealized gains and losses. It is possible that sales of appreciated securities in a particular period could cause some Shareholders to have taxable gain for that period at the same time that unrealized losses result in an overall Loss. It will generally be necessary for Shareholders to pay such tax liabilities out of separate funds or withdrawals from the Fund. There are significant limitations on a Shareholder's right to withdraw funds from the Fund.

*Required Withdrawal.* The Investment Manager has the right to require the withdrawal of Shareholders' Interests in the Fund at any time. Such required withdrawal may create adverse tax and/or economic consequences to the Shareholder depending on the timing thereof.

*Contributions In-Kind.* Shareholders may be liable to realize gain on a contribution of in-kind assets, whether digital or otherwise, to the Fund.

*Delayed Schedules K-1.* The Fund will provide relevant tax documents to any Shareholder for any given Fiscal Year within 120 days after the end of each fiscal year of the Fund or as soon as

f                                                        38

reasonably practicable thereafter. Shareholders may be required to obtain extensions of the filing date for their income tax returns at the U.S. federal, state and local levels.

*Investment Company Regulation.* The Fund relies on Section 3(c)(1) of the Investment Company Act to avoid requirements that the Fund register as an "investment company" under, and comply with the substantive provisions of, the Investment Company Act. If the Fund were required to be registered as an investment company, the Investment Company Act would require, among other things, that the Fund have a board of directors, some of whom were unrelated to the Investment Manager, compel certain custodial arrangements and regulate the relationship and transactions between the Fund and the Investment Manager. Compliance with some of those provisions could possibly reduce certain risks of loss, although such compliance could significantly increase the Fund's operating expenses and limit the Fund's investment and trading activities. Interpretations of Section 3(c)(1) are complex and uncertain in several respects and, as a result, there can be no assurance that the Fund will remain entitled to rely on that Section. If the Fund were found not to have been entitled to such reliance, the Fund and the Investment Manager could be subject to legal actions by the SEC and others and the Fund could be forced to terminate its business under adverse circumstances.

*Private Offering Exemption.* The Fund offers Interests on a continuing basis without registration under the Securities Act of 1933, as amended (the "Securities Act") in reliance on an exemption for "transactions by an issuer not involving any public offering," and without registration or qualification of the Interests under state laws in reliance on a related exemption. While the Investment Manager believes reliance on such exemptions is justified, there can be no assurance that factors such as the manner in which offers and sales are made, concurrent offerings by other Funds, the scope of disclosure provided, failures to file notices or renewals of claims for exemption, or changes in applicable laws, regulations, or interpretations will not cause the Fund to fail to qualify for such exemptions under federal or one or more states' laws. Failure to so qualify could result in the rescission of sales of Interests at prices higher than the current value of those Interests, potentially materially and adversely affecting the Fund's performance and business. Further, even non-meritorious claims that offers and sales of Interests were not made in compliance with applicable securities laws could materially and adversely affect the Investment Manager's ability to conduct the Fund's business.

*Possibility of Additional Government or Market Regulation.* Market disruptions, the dramatic increase in the capital allocated to alternative investment strategies during recent years, and the growing concern about the lack of regulation of private investment funds, have led to increased governmental as well as self-regulatory scrutiny of the private investment fund industry in general. Certain legislation proposing greater regulation of the industry periodically is considered by U.S. federal, state and local and non-U.S. governments, regulatory or administrative agencies, self regulatory organizations or other similar entities. It is impossible to predict what, if any, changes in the regulations applicable to the Fund, the Investment Manager, the markets in which they trade and invest or the counterparties with which they do business may be instituted in the future. Any such regulation could have a material adverse impact on the profit potential of the Fund, as well as require increased transparency as to the identity of the Shareholders. The financial services industry generally, and certain investment activities of private investment funds similar to the Fund, and their managers, in particular, have been subject to intense and increasing regulatory scrutiny.

Additional governmental scrutiny may increase the Fund's and the Investment Manager's exposure to potential liabilities and to legal, compliance and other related costs. Increased regulatory oversight, enhanced regulation and the adoption of new statutes, rules or regulations with respect to the investment activities of the Fund may also reduce the amount and availability of the investment opportunities of the Fund. The reduction of such investment opportunities could have a material and adverse effect on the

f

investment performance of the Fund. Such increased regulatory oversight and regulation may also impose additional administrative burdens on the Investment Manager and such regulatory proposals, or any future proposals, if adopted could adversely affect the Fund, including the business, financial condition and prospects of the Fund, and could also require increased transparency as to the identity of the Shareholders.

*Other Laws and Regulations.* The Fund and the Investment Manager are subject to various other securities and similar laws and regulations that could limit some aspects of the Fund's operations or subject the Fund or the Investment Manager to the risk of sanctions for noncompliance.

**THE FOREGOING DOES NOT PURPORT TO BE A COMPLETE ENUMERATION OR EXPLANATION OF THE RISKS INVOLVED IN THIS OFFERING OR AN INVESTMENT IN THE FUND. IN ADDITION, AS THE FUND'S INVESTMENT PROGRAM DEVELOPS AND CHANGES OVER TIME, AN INVESTMENT IN THE FUND MAY BE SUBJECT TO ADDITIONAL AND DIFFERENT RISK FACTORS.**

f

# POTENTIAL CONFLICTS OF INTEREST

**Conflicts of Interest.** In addition to managing the activities of the Fund, the Investment Manager may act as investment manager or general partner for other clients, accounts, funds and collective investment vehicles, including collective investment vehicles pursuing similar or varied investment strategies. Because the Investment Manager owes each of its clients a duty of fairness, the Investment Manager must avoid unfairly favoring some client accounts over others. Therefore, the Investment Manager will allocate investment opportunities among its clients in a manner that is fair and equitable, including during times that it may aggregate orders and then allocate the same. However, the Investment Manager may give advice, and take action, with respect to any of those clients, accounts, funds and collective investment vehicles that may differ from or be identical to, the advice given, or the timing or nature of action taken, with respect to the Fund. The Investment Manager, its affiliates, and the principals, officers, directors, managers, employees and agents of the Investment Manager and its affiliates may engage in transactions or investments, or cause or advise other clients to engage in transactions or investments, that may differ from, or be identical to, the transactions or investments engaged in by the Investment Manager for the Fund's account. There can be no assurance that an investment opportunity which comes to the attention of the Investment Manager and its affiliates will not be allocated (i) wholly or primarily to another advisory client, with the Fund being unable to participate in this investment opportunity or participating only on a limited basis, or (ii) wholly or primarily to the Fund, with the other advisory client not sharing the risks of the investment. The Fund could be disadvantaged because of activities conducted by the Investment Manager for the Investment Manager's other clients as a result of, among other things: legal restrictions on the combined size of positions which may be taken for all accounts managed by the Investment Manager, thereby limiting the size of the Fund's position; and the difficulty of liquidating an investment for more than one account where the market cannot absorb the sale of the combined positions.

The Investment Manager may aggregate the Fund's cryptocurrency, securities, commodity futures, and other asset transactions with those of the Investment Manager's other clients that are being made simultaneously, if the Investment Manager believes aggregation is reasonably likely to result in an overall economic benefit to the Fund and the Investment Manager's other clients in the aggregate. This belief may be based on an evaluation that the Fund and the Investment Manager's other clients are benefited by relatively better purchase and sale prices, lower commission expenses, beneficial transaction timing and other similar factors. Purchase and sale orders may be combined for the Fund and the Investment Manager's other clients with each entity paying its proportionate share of the total commission and paying or receiving its proportionate share of the total cost or sales proceeds. However, the aggregate order may not be filled in its entirety or may be filled at different times and prices. To address allocation of "split fills" (i.e., transactions filled at different prices throughout the trading day) or "partial fills" (i.e., transactions not filled in their entirety on the same trading day), the Investment Manager will rotate accounts on a daily cycle to determine which accounts will receive the most favorable fills for a given day. If the Investment Manager does not aggregate the Funds transactions with the Investment Manager's other clients, the Fund and other advisory clients may be competing for similar positions and, depending on whose order is placed first, the difference in timing may result in some clients receiving better execution than others. From the standpoint of the Fund, simultaneous identical portfolio transactions for the Fund and the Investment Manager's other clients may decrease the prices received, and increase the prices required to be paid, by the Fund for its portfolio sales and purchases.

The Investment Manager may purchase property or obtain services from, sell property or provide services to, or otherwise deal with the Investment Manager, any Shareholder or any person in which an investment has been, or is proposed to be made, or any affiliate of any such persons, provided that any such dealing shall be on terms no less favorable to the Fund than would be obtained on an arm's-length basis, as determined by the Investment Manager in good faith. Any affiliate of the Investment Manager who performs services for the Fund will be entitled to be compensated by the Fund, or reimbursed for any offering and organizational or operating and administrative expenses incurred on behalf of the Fund.

**Cross-Transactions.** Situations may arise where certain assets held by one or more funds and investment accounts managed by the Investment Manager may be transferred to other funds and investment accounts managed by the Investment Manager, including for the purpose of rebalancing the portfolios of such funds and investment accounts. Such transactions will be conducted in accordance with, and subject to, the Investment Manager's fiduciary obligations to the Fund.

**Non-Arms'-Length Agreements.** Certain agreements and arrangements, including those relating to compensation, expense reimbursements and indemnification between the Fund and among the Investment Manager and its affiliates are not the result of arms'-length negotiations. The Investment Manager will determine whether the various affiliates of the Investment Manager and the Fund are, in accordance with the terms of the M&A, entitled to exculpation and indemnification.

**Other Business Activities.** Although the principal business of the Investment Manager and its principals and employees is alternative investment management, from time to time the Investment Manager's principals and employees may serve on the boards of directors or as officers of entities whose businesses or activities are independent of the Investment Manager. Principals and employees may also serve on the boards of directors or as officers of companies in which the Fund or other of the Investment Manager's advisory clients invest. The Investment Manager and its principals and employees are permitted to engage in other business activities, including engaging in other business ventures and other investment partnerships whether or not they compete with the Fund.

**Effect of the Performance Allocation.** The Investment Manager's Performance Allocation may create incentives for the Investment Manager to cause the Fund to make investments that are riskier or more speculative than would be the case if the Investment Manager were paid only a fixed fee. In addition, since the Performance Allocation is calculated on a basis that includes unrealized appreciation of the Net Asset Value of the Fund, it may be greater than if it were based solely on realized gains. Moreover, to the extent that investment instruments are valued by the Investment Manager, these values will affect the Performance Allocation to the Investment Manager and the Share values of the Shareholders.

**THE FOREGOING DOES NOT PURPORT TO BE A COMPLETE ENUMERATION OR EXPLANATION OF THE POTENTIAL CONFLICTS OF INTEREST INVOLVED IN THIS OFFERING OR AN INVESTMENT IN THE FUND. IN ADDITION, AS THE FUND'S INVESTMENT PROGRAM DEVELOPS AND CHANGES OVER TIME, AN INVESTMENT IN THE FUND MAY BE SUBJECT TO ADDITIONAL AND DIFFERENT CONFLICTS (SEE BELOW).**

# ADMISSION OF SHAREHOLDERS

*Admission of Partners.*

Admission as a Shareholder in the Fund is not open to the general public and interests in the Fund are privately offered on a confidential basis in reliance upon exemptions contained in the Securities Act of 1933 and the rules and regulations promulgated thereunder for transactions not involving any public offering. Each Shareholder will be required to represent and warrant to the Fund in connection with its subscription, among other things, that the Shareholder is acquiring its Interest for its own account for investment purposes only, and not with a view toward resale or other distribution in whole or in part, that it will not transfer, sell or otherwise dispose of its Interest in any manner that will violate the Securities Act of 1933 or other applicable laws, rules or regulations. In addition, the Fund is relying on the 506(c) exemption under Regulation D for this offering, and thus each Shareholder must additionally represent and warrant that it is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act and a "qualified client" as defined in Rule 205-3 under the Investment Advisers Act.

The Fund may accept investments from plans that are subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and from IRAs, Keoghs and similar non-ERISA plans, provided such investment meet the requirements as set forth in the Fund's offering documents. Interests in the Fund may also generally be purchased by foreign investors, such as non-resident aliens, foreign corporations, foreign partnerships, foreign trusts or foreign estates, all as defined in the Internal Revenue Code. The Fund's subscription agreement contains representations and questionnaires relating to these qualifications Interests in the Fund generally may not generally be purchased by U.S. Persons, other than the tax exempt U.S. persons referenced above. The Fund's subscription agreement contains representations and questionnaires relating to these qualifications.

*Shares.*

The Fund is offering participating shares (the "Shares" or "Interests") in the Fund to certain qualified investors as described herein and in the Subscription Documents. The Fund, in the Investment Manager's sole discretion, may establish additional series and enter into Side Letter Agreements that provide for different or additional terms than those of the Interests described in this Memorandum.

*Admission of Shareholders.*

Interests will be offered for sale on the first Business Day of each month, or at such other times as the Investment Manager, in its sole discretion, may allow. Persons interested in subscribing to the Fund should deliver a signed Subscription Agreement to the Investment Manager at least five (5) Business Days before the intended subscription date, if applicable. In the discretion of the Investment Manager, a Shareholder will be permitted to make *additional* subscriptions to the Fund on the first Business Day of any calendar month, or at other times in the Investment Manager's sole discretion. The Investment Manager may, in its discretion, reject any subscription.

*Form of Subscriptions.*

The Shares subscribed to via the Subscription Agreement shall generally be paid in U.S. dollars, provided that the Investment Manager, in its sole discretion, may allow subscriptions to be made in kind as well, or partly in cash and partly in kind. The prospective shareholder is advised to confer with his/her/its tax consultants regarding the tax risks associated with making any in-kind subscription to the Fund.

f                                                                        43

***Minimum Subscription Amounts.***

The minimum initial subscription of a prospective Shareholder is $1,000,000 for institutional investors and $250,000 for non-institutional investors, subject to waiver of such minimum amounts in the Investment Manager's sole discretion.

***New Issues and IPO Allocations.***

If the Investment Manager determines that a Shareholder is a "restricted person" as defined in the Financial Industry Regulatory Authority, Inc. ("FINRA") Rule 5130, or any successor provision thereto ("Rule 5130"), such Shareholder may be prohibited from participating in the net capital appreciation and net capital depreciation, if any, attributable to trading in, or any other transaction relating to, a "new issue," and the Investment Manager may allocate such net capital appreciation or net capital depreciation to the Shares of Shareholders who are not "restricted persons" under Rule 5130. Notwithstanding the foregoing, a Shareholder that is an entity may participate in such net capital appreciation and net capital depreciation if such entity limits the participation in profits and losses attributable to "new issues" by its beneficial owners that are "restricted persons" to the lesser of such beneficial owners' pro rata share of such entity or 10% (or any other permissible amount under any amendment, supplement or interpretation to Rule 5130).

If the Investment Manager determines that a Shareholder is a "covered person" as defined in FINRA Rule 5131(b), or any successor provision thereto ("Rule 5131"), such Shareholder may be prohibited from participating in the net capital appreciation and net capital depreciation, if any, attributable to trading in, or any other transaction relating to, a "new issue," and the Investment Manager may allocate such net capital appreciation or net capital depreciation to the Capital Account of Shareholders who are not "covered persons" under Rule 5131. Notwithstanding the foregoing, a Shareholder that is an entity may participate in such net capital appreciation and net capital depreciation if such entity limits the participation in profits and losses attributable to "new issues" by its beneficial owners that are "covered persons" to the lesser of such beneficial owners' pro rata share of such entity or 25% (or any other permissible amount under any amendment, supplement or interpretation to Rule 5131).

The Fund reserves the right to vary its policy with respect to the allocation of "new issues" as it deems appropriate for the Fund as a whole, in light of, among other things, existing interpretations of, and amendments to, Rules 5130 and 5131 and practical considerations, including administrative burdens and principles of fairness and equity. The Fund reserves has created a separate Class of Interests which are held by Investors restricted for these purposes, and which shall be issued to any prospective shareholder meeting criteria set referenced herein.

## EXPENSES AND ALLOCATIONS

***Management Fee.***

The Investment Manager will receive a monthly management fee, calculated at an annual rate of 2.0% (~0.1667% per month) (the "Management Fee") of each Shareholder's Net Asset Value of their Shares. The Management Fee will be calculated and paid monthly in arrears, based on the value of each Shareholder's Net Asset Value of their Shares, as of the last day of the month. The Investment Manager may elect to reduce, otherwise modify or waive the Management Fee with respect to any Shareholder. If subscriptions are made at any time other than on the first Business Day of a month, a pro rata portion of the Management Fee will be paid to the Investment Manager in respect of such subscription (based on the actual number of days remaining in such partial month). If a subscription is redeemed at any time other

f                                              44

than on a Redemption Day, a pro rata portion of the Management Fee will be paid to the Investment Manager (based on the actual number of days elapsed in such partial month).

***Expenses.***

The Fund will be responsible the Fund's own, and its *pro rata* share of the Master Fund's operating expenses ("Operating Expenses"), which includes, but is not limited to: any investment related expenses such as currency exchange fees, trading fees, hardware and physical vaults for storage of private keys, brokerage and exchange commissions, interest on margin accounts and other indebtedness, custodial fees, bank service fees, withholding and transfer fees, taxes, tax preparation fees, systems and technology expenses, third party research tools, corporate licensing fees, legal fees, auditing fees, accounting fees, fund administration fees (including middle office and back office services), filing fees and expenses (including regulatory filings such as Form PF preparation and filing expenses), outsourced risk management advisory and software, investment related consultants and travel costs that are research related, and other reasonable expenses related to the purchase, sale, transmittal of fund assets, in each case as shall be determined by the Investment Manager in its sole discretion. Shareholders will pay their pro rata share of any Master Fund operating expenses so allocated to the Fund. Notwithstanding the foregoing, the Investment Manager may in its sole discretion, rebate, waive or reduce a Shareholder's share of Master Fund Operating Expenses. The Investment Manager and its affiliates may not be charged a share of Master Fund Operating Expenses. Notwithstanding the foregoing and except as otherwise specifically provided in this Agreement, the Investment Manager shall not be reimbursed for any costs and expenses relating to the general operation of its business.

The Fund shall bear all organizational expenses ("Organizational Expenses"), which are expenses incurred in connection with the organization and formation of the Fund, and other related entities organized by the General Partner or its Affiliates and the offering of the interests therein, including, without limitation: legal and accounting fees and expenses; printing costs; filing fees; and the transportation, meal, and lodging expenses of the personnel of the General Partner. To the extent that the General Partner has incurred any such Organizational Expenses on the Fund's behalf, the General Partner shall be reimbursed. At the option of the General Partner, Organizational Expenses may be amortized over a period of 60 months from the commencement of the Fund's operations. The amortization of organizational expenses over 60 months is not in accordance with U.S. generally accepted accounting principles and could result in an exception opinion in the auditors' report in the annual audited financial statements if the difference between amortization and recognition of these expenditures when incurred is deemed material to the financial statements. The General Partner may accelerate the amortization of Organizational Expenses in its sole discretion.

***Share Record; Allocations***

The Fund will establish Share records for the Investment Manager and each Shareholder. Any increase or decrease in the Net Asset Value of the Fund (disregarding for these purposes (i) any changes in the Net Asset Value due to subscriptions, redemptions, or the payment of dividends, and (ii) any adjustments as set forth in the M&A) will be allocated pro rata to the record for each Class based on the previous Net Asset Value for each Class. Those costs, expenses, losses, dividends, profits, gains and income which the Directors determine relate solely to a particular class or series, will then be allocated to the record of the relevant Shares.

f

***Performance Allocation to the Investment Manager.***

In addition to its proportionate share of allocations of increases and/or decreases in Net Asset Value as set forth above, the Investment Manager will receive an allocation, quarterly, equal to 20% of the Net Asset Value amount allocated for the quarter to each Shareholder (the "Performance Allocation"). A Performance Allocation is also made as to amounts redeemed, as of the effective time of the redemption by Shareholders.

***High Water Mark.***

Performance Allocations are subject, in each case, to a "high water mark" provision under which the Investment Manager receives a Performance Allocation from a Shareholder only to the extent the allocated increases in Net Asset Value exceeds any decreases previously allocated to it, since the last date a Performance Allocation was assessed (or the original date of contribution, if no Performance Allocation has previously been assessed). If a Shareholder makes a partial redemption or receives a distribution at a time when he/she/it has unrecovered decreases, for purposes of calculating future Performance Allocations, those unrecovered decreases will be reduced in proportion to the redemption.

## REDEMPTIONS AND DISTRIBUTIONS

***Lock-Up Period; Redemptions; Required Redemptions***

Subject to the Investment Manager's ability to designate Side Pockets (*as defined below*) and in each case subject to the Investment Manager's Performance Allocation and other terms set forth herein, the following terms shall apply to Shareholder redemptions:

For twelve (12) months following the date of a subscription for Shares, a Shareholder shall not be allowed to redeem all or any portion of its subscription ("Lock-up Period"). Additional subscriptions for Shares will be subject to a new Lock-up Period. For purposes of the Lock-up Period, redemptions will be deemed to be made on a "first-in, first out" basis.

Following the expiration of the Lock-Up Period, a Shareholder may redeem any portion of the value of its subscription, but only monthly, as of the first Business Day of a month (each a "Redemption Day"). In order for the Shareholder to be able to exercise this right of redemption the Shareholder must provide notice to the Investment Manager, at least fourteen (14) days prior to a Redemption Day that the Shareholder intends to exercise this right of redemption with regards to that Redemption Day. The notice must also specify what portion of the value of the Shareholder's Shares it intends to withdraw. After the notice has been duly received by the Investment Manager, the Shareholder shall not be entitled to redeem a greater amount on the given Redemption Day than the amount stated in the notice. Redemption requests are irrevocable unless the Investment Manager determines otherwise in its sole and absolute discretion, or unless made during a period when the calculation of the Net Asset Value of the Fund is suspended. The Investment Manager may waive notice requirements or permit redemptions at such other times and under such other circumstances and on such conditions as it deems appropriate. Redemptions of Shares shall be suspended during any period of time that the determination of NAV has been suspended pursuant to the relevant terms of the M&A.

***Fund Level Gate.***

(i)  In the event that the Fund receives redemption requests and the redemption amounts pursuant to such requests exceed, in the aggregate, an amount equal to 30% of the Net Asset Value of the Fund as of the applicable Redemption Day, the Investment Manager may, in its sole discretion, (A) satisfy all such

f                                          46

redemption requests or (B) reduce all such redemption requests so that only 30% (or more, in the sole discretion of the Investment Manager) of the Net Asset Value of the Fund is redeemed on any Redemption Day (the "Fund-Level Gate"). Shareholders whose redemption amounts are reduced pursuant to the Fund-Level Gate will participate in the aggregate amount available for redemption on a pro-rata basis.

(ii)   To the extent that a Shareholder's requested redemption amount has been reduced by restrictions imposed by the Fund-Level Gate, a request for the remaining portion of the original redemption amount will be deemed made (unless thereafter rescinded) as of the next Redemption Day, and such remaining portion shall be satisfied as of the next Redemption Day, and such remaining portion shall be satisfied as of the next Redemption Day and thereafter to successive Redemption Days until fully redeemed, each time subject to the Fund-Level Gate; except that any redemption request that remains unsatisfied for more than two (2) consecutive Redemption Days as a result of the Fund-Level Gate shall be satisfied as of the next Redemption Day, provided, however, that the Fund is not in suspension, liquidation or dissolution.

(iii)  Capital not redeemed from the Fund by virtue of restrictions imposed by the Fund-Level Gate shall remain invested in the Fund and, therefore, shall remain subject to the risks of the Fund and subject to the Management Fee, Performance Allocation, and the expenses of the Fund until such time as it is redeemed from the Fund.

### Side Pockets.

The directors (as advised by the Investment Manager) may designate certain assets as "Side Pockets" when the directors, in their sole discretion, determine that an asset is illiquid or it is in the best interest of the Fund to value such investments separately from the Fund's other assets. If the directors designate an investment as a Side Pocket Investment, a pro rata portion of the Class A Shares held by a Shareholder will automatically covert by way of redemption and reissue into the Class S Shares corresponding to the proportional interest of such Shareholder in the Side Pocket Investment. The terms and conditions relating to such Class S Shares are set forth in Clause 6.3 of the Fund's Memorandum of Association. The Investment Manager shall not receive a Performance Allocation with respect to any Side Pocket until the investment is liquidated, and Shareholders may not make a redemption with respect to a Side Pocket Investment Shares until that event. Notwithstanding the foregoing, the Fund's financial statements will reflect the Performance Allocation as if it was earned, treating all assets and liabilities as if they were realized at the reporting date.

### Reserves.

The Investment Manager may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies (even if such reserves or holdbacks are not otherwise required by U.S. generally accepted accounting principles). The establishment of such reserves will not insulate any portion of the Fund's assets from being at risk, and such assets may still be traded by the Fund. A pro rata portion of any reserve may be withheld from distribution to a redeeming Shareholders.

### Payment.

Provided that the Investment Manager has received all necessary documentation, distribution in respect of the withdrawn capital normally will be made in U.S. dollars within 30 calendar days after an authorized Redemption Day. However, the directors shall have the right, at its discretion, to withhold up to 5% of the Net Asset Value of a Shareholder's Shares for the Fund's liabilities and other contingencies until no later than 30 days after the completion of the year-end audit of the Fund's financial statements for any redemption of 90% or more of a Shareholder's Net Asset Value of its Shares (or if a redemption, when combined with all other redemptions of such Shareholder during the preceding 12 months, would result in such Shareholder having withdrawn 90% or more of such Shareholder's Net Asset Value of its Shares

f                                                    47

as of the beginning of such period). In those circumstances, the Fund will remit the balance of the redemption proceeds without interest. The Investment Manager, in its sole discretion, may waive these redemption restrictions as to any Shareholder. The Investment Manager, in its sole discretion, may affect redemption payments in cash or in-kind.

**Suspension of Redemptions.**

The directors may declare a suspension of (a) the determination of the Net Asset Value per Share of any one or more Classes and any such suspension must be combined with a simultaneous suspension of the redemption of Participating Shares of such Class or Classes and may (but need not) be combined with a suspension of the payment of redemption proceeds; (b) the redemption of Participating Shares of any one or more Classes and may (but need not) combine such a suspension with a simultaneous suspension of the determination of the Net Asset Value per Share of such Class or Classes and/or simultaneous suspension of the redemption proceeds; and/or (c) the payment of redemption proceeds.

The directors may declare a suspension in accordance with the above, in such circumstances as they may deem appropriate, including the whole or any part of any period: (a) during which any securities exchange or similar electronic system on which a substantial part of the assets of the Fund are traded is closed (other than customary closings) or dealings are otherwise restricted or suspended; (b) during which, in the opinion of the directors, it is not possible to determine the value of a substantial portion of the assets of the Fund or the disposal of a substantial part of the assets of the Company would not be reasonably practicable or could not be carried out in an orderly manner; (c) during which redemption proceeds cannot lawfully be paid by the Fund in the currency of the relevant Class; (d) during which, due to a breakdown in the systems normally used to determine the Net Asset Value or for any other reason, it is not reasonably practicable to accurately determine the Net Asset Value; (e) during any period when the board of directors of the Master Fund has deferred or suspended the determination of the net asset value of investments in the Master Fund and the issue or redemption of shares in the Master Fund in accordance with the provisions of the articles of association of the Master Fund; (f) during which the business operations of the functionaries to the Fund are substantially interrupted or closed due to pestilence, acts of war, terrorism, insurrection, revolution, civil unrest, riot, strikes, cyber-attack, natural disaster or other events beyond the reasonable control of the relevant party; (g) during which the transfer of funds involved in the realization or acquisition of any investment cannot, in the opinion of the directors, be effected at normal rates of exchange; (h) during which the Fund receives redemption requests, which in the aggregate, would create in the sole discretion of the directors, a material adverse effect on the Fund if such withdrawal requests were satisfied; (i) during which the proceeds of the sale or redemption of Participating Shares cannot be transmitted to or from the Fund's account; (j) when, in the opinion of the directors, it would be in the best interests of the Fund to do so; or (k) after the directors form the opinion that it is in the best interest of the Fund or the Shareholders to wind up and dissolve the Fund.

Any suspension declared by the Fund shall take effect at such time as the directors shall determine and shall continue until the directors shall declare the suspension to be at an end.

**Form of Distribution.**

The Fund reserves the right to pay any redemption request in-kind. If the Fund distributes securities in-kind in satisfaction of a redemption request, the Investment Manager will, at the request of any Shareholder and to the extent practicable, hold any such securities in trust or in a liquidating special purpose vehicle and liquidate such securities on the Shareholder's behalf and distribute the proceeds of such distribution (less the costs of any such liquidation) to the investor.

**Death or Disability of a Shareholder.**

f

48

In the event of the death, disability, incapacity, adjudication of incompetency, termination, bankruptcy, insolvency or dissolution of a Shareholder, the Investment Manager may, in its sole discretion, at any time after such an event, effect a complete redemption of the balance of such Shareholder's Net Asset Value of its Shares. The Net Asset Value of the Shares of such Shareholder shall continue at the risk of the Fund's business until such complete redemption is effected or the earlier termination of the Fund. Payment of the redeeming Shareholder's Shares shall be made on the same terms, and shall be subject to the same conditions as a withdrawal by a Shareholder of all of its Shares.

**Investment Manager Redemptions.**

The Investment Manager may redeem a portion of its Capital Account on the same terms as the Shareholders or at such other times as it determines; provided that the Investment Manager may not redeem capital from the Fund if the Investment Manager suspends redemption rights. Notwithstanding the foregoing, the Investment Manager may redeem capital redeem the Net Asset Value of its Shares equal to the amount of a previously earned Performance Allocation at any time in the Investment Manager's sole and absolute discretion.

**Required Redemptions.**

The directors, in their discretion, may require any Shareholder to redeem all or any part of its Shares from the Fund at any time, such redemption to be effective on the date specified in such notice. If the Investment Manager, in its sole discretion, deems it to be in the best interests of the Fund to do so because the continued participation of any Shareholder in the Fund might cause the Fund to suffer adverse legal, pecuniary, regulatory or tax consequences for the Fund. Under such circumstances, the Investment Manager will have the irrevocable power to act in the name of such Shareholder to redeem its interest in the Fund. The Investment Manager has the right to terminate the Fund at any time by the compulsory termination of all Interests.

**Other Distributions.**

The Fund does not expect to make distributions of profits or capital, other than at times of Shareholder's redemption from the Fund. The Fund expects to reinvest any net investment income and net realized gains. However, the Investment Manager, may, but is not required to, cause the Fund to make a distribution to the Shareholders of such amount as the Investment Manager may determine in its sole discretion. Such distribution shall be made to the Shareholders according to their pro rata ownership in the Fund, for the Fiscal Period in which the distributions are made.

## OTHER M&A PROVISIONS

**Fiscal Year**

The Fund has adopted a fiscal year ending on December 31. Since Shareholders may be admitted or required to retire and additional capital contributions or redemptions may be made during the course of a fiscal year, the M&A provides for fiscal periods, which are portions of a fiscal year, for the purpose of allocating increases or decrease in Net Asset Value, due to changes occurring in capital accounts at such times.

**Reports to Shareholders**

f                                                    49

The Fund will provide to each Shareholder unaudited periodic performance reports, no less frequently than quarterly. Such performance reports shall generally be delivered to the Shareholder directly from the Fund's Administrator. The books and records of the Fund will be audited at the end of each fiscal year by the Auditor selected by the Investment Manager (initially KPMG), and the Shareholders will be furnished with audited year-end financial statements, including a statement of profit or loss for such fiscal year. The Shareholders will also be provided with the status of such partners' Share Net Asset Value at such time. In general, the Fund's financial statements will be prepared in accordance with generally accepted accounting principles in the U.S., consistently applied.

### Computation of Net Asset Value

For the purposes of determining increase or decrease in Net Asset Value to be allocated and all other relevant purposes, the assets and liabilities of the Fund and Master Fund shall be valued as of each Valuation Day ("Net Asset Value"). The Investment Manager shall determine the Fair Market Value of the Fund and Master Fund's assets and liabilities in good faith, and generally with the assistance of the Administrator. To the extent applicable to any of the foregoing, the Investment Manager shall follow U.S. GAAP, except when it in its discretion deems the same to be inequitable or inappropriate. Such determination shall be conclusive and binding on all Shareholders and all parties claiming through or under them.

### Term and Termination

The term of the Fund commenced on the date the Fund's certificate of incorporation was filed with the BVI Registrar of Corporate Affairs (i.e. March 9, 2022), and shall continue in existence until such time as it may be wound up in accordance with Regulation 24.1 of the M&A.

### Valuation

The directors are responsible for valuing the assets of the Fund, but the directors may delegate responsibility for valuing the Fund's assets to an administrator or similar service provider. In this regard, the directors have initially delegated the responsibility for valuing the Fund's assets to the Administrator, which will value such assets as of the close of business on the last day of each calendar month or at such other times as determined by the directors in accordance with the valuation guidelines (also applicable to the Master Fund) as set forth in the M&A.

### Indemnification and Exculpation

Under the M&A, none of the directors of the Fund will be liable in damages or otherwise to the Fund or to any Shareholders for any act or omission by it in connection with the Fund's activities, except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgement or order that such act or omission resulted from such director's bad faith, gross negligence, willful misconduct, or fraud. The Fund will indemnify each director for any loss or damage incurred by the director in connection with the Fund's activities, except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgement or order that such act or omission resulted from such director's bad faith, gross negligence, willful misconduct, fraud. Similarly, the Investment Manager is subject to the same rights to be indemnified save for actions or omissions undertaken in bad faith, gross negligence, willful misconduct or fraud, in each case in connection with any investment management services provide to the Fund or Master Fund, by way of the

f                                                    50

Investment Management Agreement signed with each entity.

***Transfer of Interests***

Interests may be assigned or pledged only with the consent of the directors, which may be granted or withheld in the directors' sole discretion. All expenses incurred in connection with an assignment or pledge will be charged to Share record for the Shareholder requesting it. Transfer of Interests will be subject to certain additional restrictions set forth in the M&A.

***Amendment of the M&A; Side Letters***

Subject to the certain granular terms set forth <u>Regulation 8</u> of the M&A, the terms of the M&A may generally be amended by way of Articles of Resolution by the Directors or Articles of Resolution of the Shareholders, provided the Directors may not (i) restrict the power of the Shareholders to amend the M&A, with the approval of a re directors or by resolution of the Shareholders, (ii) to change the percentage of Shareholders required to pass a Resolution of Shareholders to amend the M&A, (iii) in circumstances where the M&A cannot be amended by the Shareholders, (iv) any change to the foregoing (i) – (iii). . Notwithstanding the foregoing, the Fund may from time to time entire into agreements with certain investors which provide for terms of investment that are more favorable to those investors than the terms described in this M&A (collectively, "<u>Side Letters</u>"), provided not no such side letter or other agreement shall adversely affect the rights of any other Shareholder.

## PROSPECTIVE INVESTORS

***Eligible Investors***

Admission as a Shareholder in the Fund is not open to the general public. The Fund is not intended as a complete investment program and is designed only for persons who are able to bear the economic risk of the loss of their investment in the Fund and either are sophisticated persons with respect to financial and business matters or are represented by such a person in connection with their investment in the Fund. The Fund will be open to investment by persons who represent, among other things, that they are "accredited investors" within the meaning of Regulation D of the United States Securities Act of 1933, as amended.

Prospective investors should read the M&A being furnished to them concurrently with this Memorandum. The M&A sets forth the specific provisions relating to the operations of the Fund.

***Anti-Money Laundering Procedures***

To ensure compliance with statutory and other generally accepted principles relating to anti-money laundering regulations and policies, including any obligations under the USA Patriot Act, the Fund will require verification of identity and source of funds from all prospective investors in the Fund. Pending the provision of evidence satisfactory to the Fund, admission of an investor as a Shareholder may be delayed in the sole discretion of the Investment Manager.

The Investment Manager or the Administrator on its behalf reserves the right to request such further information as it considers necessary to verify the identity of a prospective investor. In the event of delay or failure by the prospective investor to produce any information required for verification purposes, the Investment Manager or the Administrator on its behalf may refuse to accept a subscription

until proper information has been provided, and any funds received will be returned without interest to the account from which the such funds were originally debited.

If the Administrator has not received satisfactory evidence of an investor's identity within a reasonable period of time following a request for such evidence, the Investment Manager may refuse to admit the investor as a Shareholder, in which event any subscriptions received by the Fund from such investor will be returned without interest to the account of such investor at the investor's risk. Investors should note that either the Investment Manager or the Administrator has a suspicion that a payment to the Fund (by way of capital contribution or otherwise) contains the proceeds of criminal conduct, it may be required under applicable anti-money laundering laws and regulations to report its suspicions to one or more enforcement or regulatory agencies, including various U.S. governmental agencies.

All subscriptions must originate from an account held in the name of the subscriber. No third party payments shall be permitted.

The Investment Manager or the Administrator on its behalf also reserves the right to refuse to make any redemption payment or distribution to a Shareholder otherwise than to the account from which the corresponding subscription was paid if the Investment Manager or the Administrator suspects or is advised that the payment of any redemption or distribution moneys to such Shareholder might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund, the Investment Manager or the Administrator with any such laws or regulations in any relevant jurisdiction.

### Procedures for Becoming a Shareholder

In order to become a Shareholder, a prospective Shareholder is required to: (i) complete and execute the execution copy of the Subscription Documents, inserting the amount of such partner's capital contribution, such partner's residence address and his taxpayer identification or social security number, among other things; and (iii) return the completed Subscription Documents to the Fund's Administrator, to the address set forth in the Subscription Agreement or through the relevant online portal.

Subscribers should note that none of the Investment Manager, the Administrator or any of their respective delegates accepts any responsibility for any loss caused as a result of non-receipt of any Subscription Documents sent by facsimile or email.

### Additional Information

Representatives of the Investment Manager will be available to each prospective Investor during normal business hours and will respond to questions concerning the terms and conditions of the offering. These representatives will also provide prospective Investors with any additional information which is available to the Fund or which can be obtained by the Fund without unreasonable effort or expense.

f

# TAXATION

### General

      Investors should consult their professional advisers on the potential tax consequences of subscribing for, purchasing, holding or redeeming Participating Shares under the laws of their country of citizenship, domicile or residence.

      As in the case with any investment, there can be no guarantee that the tax position or proposed tax position prevailing at the time an investment in the Fund is made, will endure indefinitely. The following is based on the law and practice currently in force in the British Virgin Islands and, accordingly, is subject to changes therein.

      In view of the number of different jurisdictions where local laws may apply to Shareholders, the comments below do not address the tax consequences to potential investors of the purchase, ownership, and disposition of Shares. Prospective investors are urged to consult their own tax advisers in determining the possible tax consequences to them under the laws of the jurisdictions of which they are citizens, residents, or domiciliaries, jurisdictions in which they conduct business, and jurisdictions in which they purchase, hold, redeem or dispose of Shares. The comments below do not constitute tax advice.

### British Virgin Islands

      The Fund is a company incorporated in the British Virgin Islands, under the laws of the British Virgin Islands. The Fund is not subject to any income, withholding or capital gains taxes in the British Virgin Islands. Further, as of the date of the Memorandum, Shareholders will not be subject to any income, withholding or capital gains taxes in the British Virgin Islands with respect to their Shares and dividends or distributions received on those Shares, nor will they be subject to any estate or inheritance taxes in the British Virgin Islands. There are no exchange controls in the British Virgin Islands.

### United States

      The following is a general summary of the taxation of the Fund and its Shareholders under the United States ("U.S.") federal income tax laws. The summary is based on the assumption that the Fund is owned, managed and operated as contemplated. The summary is based upon interpretations of existing laws as applied at the date of this Memorandum, but no representation is made or intended by the Fund (i) that changes in such laws or their application or interpretation will not be made in the future (potentially with retroactive effect) or (ii) that, with respect to United States federal income tax laws, the IRS will agree with the interpretation described below as applied to the method of operation of the Fund. Further, the following discussion generally does not address non-United States tax or other consequences of an investment in the Shares. Prospective investors should consult their own legal and tax advisors to determine the possible tax or other consequences relating to subscribing for, purchasing, holding, and redeeming the Shares under the United States or any other country of which an investor is a citizen, resident or domiciliary.

The following summary describes certain significant U.S. federal income tax consequences of owning the Shares but does not purport to address all of the relevant U.S. federal income tax consequences that may be applicable to a particular Shareholder. This discussion is directed only to (i) investors who are not "United States persons" within the meaning of Section 7701(a)(30) of the Code, and (ii) U.S. pension or profit sharing trusts or other U.S. tax-exempt entities. Otherwise, the discussion does not address the tax consequences of Share ownership to any United States person which owns the Shares or is a direct or indirect owner of a Shareholder.

f

This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), the Federal Income Tax Regulations promulgated thereunder (the "Treasury Regulations"), administrative and judicial interpretations thereof and other authorities in effect as of the date of this Memorandum, all of which are subject to change or differing interpretation, possibly with retroactive effect. No tax rulings have been or are anticipated to be requested from the IRS or other taxing authorities with respect to any of the tax matters discussed herein.

THE FOLLOWING SUMMARY IS NOT INTENDED AS A SUBSTITUTE FOR CAREFUL TAX PLANNING. ACCORDINGLY, EACH SHAREHOLDER MUST CONSULT WITH AND RELY SOLELY ON HIS OR HER PROFESSIONAL TAX ADVISORS WITH RESPECT TO THE TAX RESULTS OF HIS OR HER INVESTMENT IN THE FUND.

### Classification of the Fund and the Master Fund

The Fund intends to be classified as an association taxable as a corporation for U.S. federal income tax purposes. The Fund has not, and will not, make an election under Treasury Regulation Section 301.7701-3 to be treated as a partnership for U.S. federal income tax purposes.

However, the Master Fund has made, or will make, an election under Treasury Regulation Section 301.7701-3 be treated as a partnership for U.S. federal income tax purposes.

The remainder of this discussion assumes that the Fund will be classified as a corporation, while the Master Fund will be classified as a partnership, for U.S. federal income tax purposes.

### Taxation of the Fund and the Master Fund

As a partnership, the Master Fund will not generally be subject to U.S. federal income tax at an entity level. Further, the Fund and the Master Fund intend to conduct their respective affairs so that neither should be characterized as being "engaged in the conduct of a trade or business within the United States" ("ETB"), and thereby subject to U.S. federal income tax with respect to all or a portion of their respective taxable income treated as "effectively connected" with the conduct of a U.S. trade or business. It is expected that both the Fund and the Master Fund will conduct their respective operations in conformity with statutory "safe harbor" provisions that exclude a non-U.S. person engaged in certain stock, securities, commodities and derivatives interest trading from characterization as being ETB. Neither the Fund nor the Master Fund intends or expects to be a characterized as a "dealer" in stocks, securities, commodities or derivatives for U.S. federal income tax purposes. Therefore, it is not expected that the Fund or the Master Fund should be deemed to be ETB for U.S. federal income tax purposes.

To the extent that the Fund was deemed to be ETB (either from its own activities or by investing in the Master Fund or a partnership or other "pass-through" entity for U.S. federal income tax purposes that is treated as being ETB), taxable income "effectively connected" to such U.S. trade or business and allocable to the Fund would be subject to U.S. federal income tax (generally at regular U.S. corporate tax rates), and the Fund's "earnings and profits" attributable to such "effectively connected" income could also be subject to a 30% branch profits tax.

The Fund will be subject to a 30% withholding tax payable with respect to (i) any dividends which may be received by the Master Fund or the Fund from U.S. corporations, and (ii) certain other income (such as in certain circumstances, interest payments received by the Master Fund or the Fund from U.S. persons, although it is anticipated that most interest income would be exempt from withholding). Further, amounts received on certain equity swaps that are based on a dividend (*e.g.*, dividend equivalent payments) may be treated as a U.S. source payment subject to this 30% withholding tax (or potentially at a lower tax treaty rate).

f                                              54

In addition to the withholding regime described above, U.S. source interest and dividend payments to the Master Fund may be subject to a separate U.S. withholding tax regime under the Foreign Account Tax Compliance Act ("FATCA"). Pursuant to Sections 1471-1474 of the Code, Treasury Regulations promulgated thereunder and IRS administrative guidance, a 30% withholding tax will be imposed on payments to the Master Fund of U.S. source dividend and interest income and, beginning in 2017, gross proceeds from the sale of property that could give rise to U.S. source interest or dividends. In order to avoid being subject to this new 30% withholding tax, the Master Fund and the Fund will generally be required to comply with certain reporting and disclosure requirements with respect to the names, addresses, and taxpayer identification numbers of certain U.S. persons that own, directly or indirectly, an interest in the Master Fund and the Fund, and potentially additional information with respect to such interests, pursuant to an intergovernmental agreement between the governments of the United States and the Cayman Islands . Although the Master Fund and the Fund expect to make commercially reasonable attempts to satisfy their respective obligations under FATCA and thereby avoid the imposition of this FATCA withholding tax, no assurance can be given that they will, in fact, be able to satisfy these obligations. If the Master Fund or the Fund becomes subject to withholding tax under FATCA, the return of all Shareholders may be materially affected. The Master Fund may be permitted to reduce the amount payable on any distribution or redemption to the Fund if the Fund fails to provide the Master Fund with the requested information. In addition, the Fund may create a separate series for, or reduce the amount payable on any distribution and/or redemption to, a Shareholder that fails to provide the Fund with the requested information. Prospective investors are encouraged to consult with their own tax advisors regarding the possible implications of FATCA on their investments in the Fund.

### *Taxation of Non-U.S. Shareholders*

A Shareholder which is not a "United States person" within the meaning of Section 7701(a)(30) of the Code, should not be subject to any U.S. federal income, withholding, or capital gains taxes with respect to the Shares owned by them and dividends received on such Shares, provided that such shareholder does not have certain present or former connections with the United States *(e.g.*, holding the Shares in connection with the conduct of a trade or business within the United States, or being present in the United States for 183 days or more during a taxable year), which connections should not exist solely by reason of investing in the Fund. A Shareholder who at the time of death is not a U.S. citizen or a U.S. domiciliary should not be subject to U.S. federal estate tax with respect to the Shares.

### *Taxation of U.S. Tax-Exempt Shareholders*

The Fund is a "passive foreign investment company" ("PFIC") as defined in Section 1297 of the Code. A U.S. pension or profit sharing trust or other tax-exempt entity (a "Tax Exempt Shareholder") which does not borrow money or otherwise utilize leverage in connection with its purchase of the Shares should not be subject to U.S. federal income tax under the PFIC provisions of the Code on any dividends from the Fund or any sale or redemption of its Shares.

While the Fund may purchase securities on margin, borrow money and otherwise utilize leverage in connection with its investments, under current law that leverage should not be attributed to Tax Exempt Shareholders in the Fund. Accordingly, assuming such a Tax Exempt Shareholder does not borrow money or otherwise utilize leverage in connection with its purchase of the Shares and the Shares are not otherwise "debt-financed property", any dividends from the Fund or gain on the sale or redemption of the Shares should not constitute "unrelated debt-financed income" as defined in Code Section 514 or "unrelated business taxable income" as defined in Code Section 512 to the Tax Exempt Shareholders. Tax Exempt Shareholders are urged to consult their own tax advisors as to the tax consequences of investing in the Fund.

f

55

A U.S. person who is a Shareholder or who is a direct or an indirect owner of a Shareholder should consult its own tax advisors regarding the potential application of the various anti-deferral provisions of the Code (*i.e.*, PFIC (including qualifying electing funds), and/or controlled foreign corporation provisions) and the application of such provisions with respect to investments made by the Fund. The anti-deferral provisions of the Code are extremely complex and the application of such provisions could result in adverse tax consequences to a United States person who is a Shareholder or is a direct or an indirect owner of a Shareholder.

### Contributions In Kind

The Directors or Investment Manager, in their sole discretion, may accept subscriptions from Subscribers in the form of digital assets. In advance of any such subscription, subscriber should be aware that there are certain risks associated with an in-kind contribution of digital assets, which in the case of the Fund (since it will be taxed as a corporation) is governed by Section 351(e)(1) of the Internal Revenue Code, and associated Treasury Regulations and other guidance, which overrides the non-recognition of gain that normally applies to such contributions to corporation, in the case of certain contributions to 'investment companies' that results in a 'diversification' of the investor's interests. The tax issues involved are complex and depend on the facts of a situation. Thus, each tax exempt subscriber seeking to make a contribution to the Fund in kind should consult with their tax professional in advance of doing so.

### Certain Reporting Requirements

Certain regulations relating to tax return disclosure and record maintenance of "reportable transactions" may apply in respect of the Fund and a U.S. person who, directly or indirectly, owns the Shares. All U.S. persons (including U.S. tax-exempt investors, who own 10% or more of the Shares of the Fund (by vote or value)) will be subject to certain U.S. tax reporting requirements in respect of the Fund and certain of its U.S. Shareholders as well as in respect of certain transfers of securities to the Fund in connection with subscriptions. Failure to make such filings properly will result in a penalty equal to 10% of the value of the cash transferred (not to exceed $100,000 unless such failure is intentional). Further, a U.S. person that holds a direct, and in some circumstances an indirect, financial interest in, or has signature authority over, a "foreign financial account" having an aggregate value in excess of $10,000 at any point during the taxable year is required to file a Report of Foreign Bank and Financial Accounts (an "FBAR") with the U.S. Treasury Department.

The Fund will provide Shareholders sufficient information to enable Shareholders to determine whether the Fund was controlled foreign corporation during any part of the taxable year within meaning of Section 957 of the Code, and, if the Fund is determined to be a controlled foreign corporation, the Fund shall provide to Shareholders sufficient information to enable to Shareholders to complete United States Internal Revenue Service Form 5471.

U.S. tax-exempt investors are urged to consult their tax advisors regarding these potential reporting obligations and any other potential reporting obligations that may arise from an investment in the Fund.

***The foregoing summary should not be considered to describe fully the income and other tax consequences of an investment in the Fund. Prospective investors are strongly urged to consult with their tax advisors, with specific reference to their own situations, with respect to the potential tax consequences of an investment in the Fund.***

## CERTAIN CONSIDERATIONS FOR ERISA PLANS

f

THE FOLLOWING SUMMARY OF CERTAIN ASPECTS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") IS BASED UPON ERISA, JUDICIAL DECISIONS, DEPARTMENT OF LABOR REGULATIONS AND RULINGS IN EXISTENCE ON THE DATE HEREOF. THIS SUMMARY IS GENERAL IN NATURE AND DOES NOT ADDRESS EVERY ERISA ISSUE THAT MAY BE APPLICABLE TO THE FUND OR A PARTICULAR INVESTOR. ACCORDINGLY, EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN COUNSEL IN ORDER TO UNDERSTAND THE ERISA ISSUES AFFECTING THE FUND AND THE INVESTOR.

### General

Persons who are fiduciaries with respect to a U.S. employee benefit plan or trust within the meaning of and subject to the provisions of ERISA (an "ERISA Plan"), an individual retirement account or a Keogh plan subject solely to the provisions of the Code[1] (an "Individual Retirement Fund") should consider, among other things, the matters described below before determining whether to invest in the Fund.

ERISA imposes certain general and specific responsibilities on persons who are fiduciaries with respect to an ERISA Plan, including prudence, diversification, avoidance of prohibited transactions and compliance with other standards. In determining whether a particular investment is appropriate for an ERISA Plan, U.S. Department of Labor ("DOL") regulations provide that a fiduciary of an ERISA Plan must give appropriate consideration to, among other things, the role that the investment plays in the ERISA Plan's portfolio, taking into consideration whether the investment is designed reasonably to further the ERISA Plan's purposes, the risk and return factors of the potential investment, including the fact that the returns may be subject to federal tax as unrelated business taxable income, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the ERISA Plan, the projected return of the total portfolio relative to the ERISA Plan's funding objectives, and the limitation on the rights of Shareholders to redeem all or any part of their Interests or to transfer their Interests. Before investing the assets of an ERISA Plan in the Fund, a fiduciary should determine whether such an investment is consistent with its fiduciary responsibilities and the foregoing regulations. For example, a fiduciary should consider whether an investment in the Fund may be too illiquid or too speculative for a particular ERISA Plan and whether the assets of the ERISA Plan would be sufficiently diversified. If a fiduciary with respect to any such ERISA Plan breaches its responsibilities with regard to selecting an investment or an investment course of action for such ERISA Plan, the fiduciary may be held personally liable for losses incurred by the ERISA Plan as a result of such breach.

### Plan Assets Defined

ERISA and applicable DOL regulations describe when the underlying assets of an entity in which benefit plan investors ("Benefit Plan Investors") invest are treated as "plan assets" for purposes of ERISA. Under ERISA, the term Benefit Plan Investors is defined to include an "employee benefit plan" that is subject to the provisions of Title I of ERISA, a "plan" that is subject to the prohibited transaction provisions of Section 4975 of the Code, and entities the assets of which are treated as "plan assets" by reason of investment therein by Benefit Plan Investors.

Under ERISA, as a general rule, when an ERISA Plan invests assets in another entity, the ERISA Plan's assets include its investment, but do not, solely by reason of such investment, include any of the

---

[1] References hereinafter made to ERISA include parallel references to the Code.

underlying assets of the entity. However, when an ERISA Plan acquires an "equity interest" in an entity that is neither: (a) a "publicly offered security;" nor (b) a security issued by an investment fund registered under the Company Act, then the ERISA Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that: (i) the entity is an "operating company;" or (ii) the equity participation in the entity by Benefit Plan Investors is limited.

Under ERISA, the assets of an entity will not be treated as "plan assets" if Benefit Plan Investors hold less than 25% (or such higher percentage as may be specified in regulations promulgated by the DOL) of the value of each class of equity interests in the entity. Equity interests held by a person with discretionary authority or control with respect to the assets of the entity and equity interests held by a person who provides investment advice for a fee (direct or indirect) with respect to such assets or any affiliate of any such person (other than a Benefit Plan Investor) are not considered for purposes of determining whether the assets of an entity will be treated as "plan assets" for purposes of ERISA. The Benefit Plan Investor percentage of ownership test applies at the time of an acquisition by any person of the equity interests. In addition, an advisory opinion of the DOL takes the position that a redemption of an equity interest by an investor constitutes the acquisition of an equity interest by the remaining investors (through an increase in their percentage ownership of the remaining equity interests), thus triggering an application of the Benefit Plan Investor percentage of ownership test at the time of the redemption.

### Limitation on Investments by Benefit Plan Investors

It is the current intent of the General Partner to monitor the investments in the Fund to ensure that the aggregate investment by Benefit Plan Investors does not equal or exceed 25% of the value of any class of the Interests in the Fund (or such higher percentage as may be specified in regulations promulgated by the DOL) so that assets of the Fund will not be treated as "plan assets" under ERISA. Interests held by the General Partner and its affiliates are not considered for purposes of determining whether the assets of the Fund will be treated as "plan assets" for the purpose of ERISA.

### Representations by Plans

An ERISA Plan proposing to invest in the Fund will be required to represent that it is, and any fiduciaries responsible for the ERISA Plan's investments are, aware of and understand the Fund's investment objectives, policies and strategies, and that the decision to invest plan assets in the Fund was made with appropriate consideration of relevant investment factors with regard to the ERISA Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

WHETHER OR NOT THE ASSETS OF THE FUND ARE TREATED AS "PLAN ASSETS" UNDER ERISA, AN INVESTMENT IN THE FUND BY AN ERISA PLAN IS SUBJECT TO ERISA. ACCORDINGLY, FIDUCIARIES OF ERISA PLANS SHOULD CONSULT WITH THEIR OWN COUNSEL AS TO THE CONSEQUENCES UNDER ERISA OF AN INVESTMENT IN THE FUND.

### OTHER REGULATORY POINTS

The Shares have not been registered under the Securities Act of 1933 or under applicable U.S. state securities laws and are being offered and sold in reliance upon exemptions under the Securities Act of 1933 and applicable state laws. The Fund is not registered as an investment company under the Investment Company Act in reliance upon an exception from the definition of "investment company" under Section 3(c)(1) of the Investment Company Act. Therefore, it will not be required to adhere to certain investment restrictions under the Investment Company Act. Currently, the Investment Manager is not required to be, and is not, registered as an "investment adviser" with the SEC under the Advisers Act

f

or any state securities authority, though it files annually as exempt reporting adviser with this same body.

As of the date of this Memorandum, the Investment Manager is not registered as a commodity pool operator ("CPO") under the CEA. The Fund may, however, directly or indirectly invest in swaps, futures, and/or options on futures from time to time. As a result, the Fund may qualify as a commodity pool, and the Investment Manager may need to register as a CPO unless an exemption applies. The Investment Manager expects to rely on an exemption from registration as a CPO pursuant to CFTC Rule 4.13(a)(3). CFTC Rule 4.13(a)(3) provides an exemption from CPO registration for the operator of a fund that is a commodity pool, if (among other things) that pool's trading in commodity interest positions (including both hedging and speculative positions, and positions in security futures) is limited so that either (i) no more than 5% of the liquidation value of the pool's portfolio is used as initial margin, premiums and required minimum security deposits to establish such positions, or (ii) the aggregate net notional value of the pool's trading in such positions does not exceed 100% of the pool's liquidation value. If the Investment Manager is able to rely on an exemption from CPO registration pursuant to CFTC Rule 4.13(a)(3), then unlike a registered CPO, the Investment Manager would not be required to provide prospective investors with a disclosure document, nor would it be required to provide investors with periodic account statements or certified annual reports, as required by CFTC rules applicable to registered CPOs. As an alternative to this exemption from registration, the Investment Manager may register as a CPO with the CFTC, in which case the Investment Manager may seek to avail itself of relief from certain disclosure, reporting and record-keeping requirements under CFTC Rule 4.7.

## ADDITIONAL INFORMATION

### *Legal Counsel*

Harney Westwood & Riegels LP acts as legal counsel to the Investment Manager and the Fund as to matters of British Virgin Islands law. Dzuba Law, P.A. acts as legal counsel to the Investment Manager and the Fund as to matters of U.S. law. The Directors and the Fund do not have independent counsel. Harney Westwood & Riegels LP and Dzuba Law, P.A. do not represent investors in the Fund, and no independent counsel has been retained to act on behalf of the Shareholders. This Memorandum is based on information furnished by the Directors and the Investment Manager. Harney Westwood & Riegels LP has not independently verified such information.

### *Additional Notices*

As noted in the "Summary of Principal Terms" section above, this Memorandum does not set forth all the provisions of the M&A that may be significant to a particular prospective investor. It is qualified in its entirety by reference to the M&A, the Subscription Agreement and the other documents described herein. Each prospective investor should examine this Memorandum and those agreements carefully, and consult with his or her own advisors, before making an investment decision.

Prospective investors have a right to inquire about, and request and receive, any additional information they may deem appropriate or necessary to further evaluate this offering and to make an investment decision. Representatives of the Investment Manager may prepare written responses to such inquiries or requests if the information requested is available. Only information or representations contained herein may be relied upon as having been authorized by the Investment Manager. No person has been authorized to give any information or to make any representations other than those contained in the Memorandum in connection with the offer being made hereby, and if given or made, such information or representations must not be relied upon as having been authorized by the Investment Manager. The use of any oral representations or any written documents other than those prepared and expressly authorized by the Investment Manager in connection with this offering are not to be relied upon by any prospective

investor. The information presented is as of the date on the cover hereof unless another date is specified, and neither the delivery of this Memorandum nor any sale hereunder shall create any implication that there has been no change in the information presentation subsequent to such date(s). Please contact the Investment manager directly if you have any questions or require additional information.

## PRIVACY POLICY

BKCoin Multi-Strategy Fund Ltd. believes that protecting the privacy of its investors' nonpublic personal information ("personal information") is of great importance. Personal information is nonpublic information about you that is personally identifiable and that we obtain in connection with providing a financial product or service to you. For example, personal information includes information regarding your account balance and investment activity. This notice describes the personal information that we collect about you, and our treatment of that information.

- We collect personal information about you from the following sources: (i) information we receive from you on fund subscription documents and related forms (for example, name, address, social security number, birth date, assets, income, and investment experience); and (ii) information about your transactions with us, our affiliates, or others (for example, account activity and balances).
- We do not disclose any personal information we collect, as described above, about our customers or former customers to anyone other than in connection with the administration, processing and servicing of customer accounts or to our accountants, attorneys and auditors, or otherwise as permitted by law.
- We restrict access to personal information we collect about you to our personnel who need to know that information in order to provide products or services to you. We maintain physical, electronic and procedural controls in keeping with federal standards to safeguard your nonpublic personal information.
- We reserve the right to change this notice, and to apply changes to information previously collected, as permitted by law. We will inform you of any changes as required by law.

f

60

## APPENDIX A – COUNTRY-SPECIFIC DISCLOSURES

**Australia**: This Memorandum and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of Shares may not be circulated or distributed, nor may Shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to the public or any member of the public in Australia or to Australian domiciled persons except where such persons are "wholesale clients" as defined in section 761G of the Corporations Act 2001 (Cth) and where disclosure would not be required under Chapter 6D or Part 7.9 of the Corporations Act 2001 (Cth).

**Austria**: This Memorandum has been produced for the purpose of providing information about the Shares and will be provided only to qualified investors as defined in s1 para 1 subpara 5a of the Austrian Capital Market Act 1991 (*Kapitalmarktgesetz*) in the course of a private placement in Austria. All these qualified investors will be individually known in advance and individually selected by, or on behalf of, the Fund in Austria. This Memorandum is made available on the condition that it is for the use only by the recipient and may not be passed on to any other person or be reproduced in any part. The Shares have not been and will not be offered in the course of a public offering or of equivalent marketing in Austria and therefore, the provisions of the Austrian Investment Fund Act 1993 (*Investmentfondsgesetz 1993*), as amended, and the provisions of the Austrian Capital Market Act 1991, as amended, relating to registration requirements and to prospectus requirements do not apply. The Shares have thus neither been registered for public distribution in Austria with the Austrian Financial Market Authority nor been the subject matter of a prospectus compliant with the Austrian Investment Fund Act or the Austrian Capital Market Act. Any subscription application by any person other than the initial recipient of the Memorandum will be rejected.

**Belgium**: The offering of Shares has not been and will not be notified to the Belgian Banking, Finance and Insurance Commission (*Commissie Voor Het Bank, Financie-en Assurantiewezen / Commission Bancaire, Financière et des Assurances*) nor has this Memorandum been, nor will it be, approved by the Belgian Banking, Finance and Insurance Commission. The Shares may be offered in Belgium only to a maximum of 99 investors or to investors investing a minimum of €250,000 or to institutional or professional investors, in reliance on Article 5 of the Law of July 20, 2004. This Memorandum may be distributed in Belgium only to such investors for their personal use and exclusively for the purposes of this offering of Shares. Accordingly, this Memorandum may not be used for any other purpose nor passed on to any other investor in Belgium.

**Denmark**: The Fund has not applied for or obtained a license under the Danish Act on Investment Associations and Special-Purpose Associations as well as other Collective Investment Schemes etc. (Act No. 1499 of 12 December 2007) (the *Act*) and the Executive Order on Foreign Collective Investment Institutions' Marketing in Denmark (Executive Order No. 1445 of 21 December 2005) (the Order) from the Danish Financial Supervisory Authority. The Shares in the Fund may only be offered or marketed in Denmark in compliance with the Act and the Order as well as any other provisions of Danish law applicable to the offering or marketing of investment products to investors located in Denmark. This implies, inter alia, that the shares in the Fund may not be offered or marketed to potential investors in Denmark unless an approval from the Danish Financial Supervisory Authorities in accordance with Section 16, Sub-Section 1 of the Act has been obtained, or unless the group of potential investors located in Denmark to whom the Shares in the Fund shall be offered or marketed is of such character that it does not fall within the scope of the Act.

**Finland**:  This Memorandum does not constitute an offer to the public in Finland. The Shares cannot be offered or sold in Finland by means of any document to any persons other than "Professional Investors" as defined by the Finnish Mutual Funds Act (*Sijoitusrahastolaki 29.1.1999/48*), as amended. No action has been taken to authorize an offering of the Shares to the public in Finland and the distribution of this Memorandum is not authorized by the Financial Supervision Authority in Finland. This Memorandum is strictly for private use by its holder and may not be passed on to third parties or otherwise publicly distributed. Subscriptions will not be accepted from any persons other than the person to whom this Memorandum has been delivered by the Fund or its representative.  This Memorandum may not include all the information that is required to be included in a prospectus in connection with an offering to the public.

**France**:  The Shares may not be offered or sold directly or indirectly in the Republic of France and neither this Memorandum, which has not been submitted to the *Autorité des Marchés Financiers*, nor any offering material or information contained therein relating to the Fund, may be supplied in the Republic of France nor used in connection with any offer for subscription or sale of the Shares to the public in the Republic of France.

**Germany**:  Each purchaser of Shares acknowledges that the Fund is not and will not be registered for public distribution in Germany.  Accordingly, no offer of the Shares may be made to the public in Germany except pursuant to any of the exemptions set out in section 2 paragraph 11 of the German Investment Act including but not limited to if the Shares are distributed exclusively to credit institutions and financial services providers as defined in the German Banking Act, private or public insurance companies, investment companies and their investment managers as well as pension funds and their administrators.

**Hong Kong**:  WARNING: The contents of this Memorandum have not been reviewed by the Securities and Futures Commission (**SFC**) or any other regulatory authority in Hong Kong.  You are advised to exercise caution in relation to the offer.  If you are in any doubt about any of the contents of this document you should obtain independent professional advice.

Neither the Company nor this Memorandum have been authorized by the SFC. This Memorandum and its contents may only be published, distributed, circulated, issued or otherwise disseminated to a person in Hong Kong on the basis that (i) any offer of Shares for subscription or purchase for cash or other consideration is made only to, and is only capable of acceptance by, and (ii) any invitation to make an offer to subscribe for or purchase for cash or other consideration any Shares is made only to,  and any such offer will only be accepted from, persons who are "professional investors" within the meaning of the Securities and Futures Ordinance or in other circumstances which (x) do not result in  an offer to the public of Shares for subscription or purchase for cash or other consideration, and (y) are not calculated to invite offers by the public for or purchase any Shares for cash or other consideration.

**Italy**:  The Shares may not be offered, sold or delivered and this Memorandum, or any circular, advertisement or other document or offering material relating to the Shares, may not be published, distributed or made available in the Republic of Italy unless: (i) the Shares have been previously registered with the Bank of Italy and, as appropriate, with the Italian Securities and Exchange Commission; and (ii) the offering, sale or delivery of the Shares and publication or distribution of this Memorandum or of any other document or offering material is made in accordance with relevant Italian laws and regulations.

**Japan**: The Shares have not been and will not be registered pursuant to Article 4, Paragraph 1 of the

f                                            62

Financial Instruments and Exchange Law of Japan (Law no. 25 of 1948, as amended) and, accordingly, none of the Shares nor any interest in them may be offered or sold, directly or indirectly, in Japan or to, or for the benefit, of any Japanese person or to others for re-offering or resale, directly or indirectly, in Japan or to any Japanese person except under circumstances which will result in compliance with all applicable laws, regulations and guidelines promulgated by the relevant Japanese governmental and regulatory authorities and in effect at the relevant time. For this purpose, a "Japanese person" means any person resident in Japan, including any corporation or other entity organized under the laws of Japan.

**S. Korea**: The Shares have not been registered under the Securities and Exchange Act of Korea and none of the Shares may be offered, sold or delivered, directly or indirectly, or offered or sold to any person for re-offering or resale, directly or indirectly, in Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea.

**Netherlands**: This document is not addressed to or intended for any individual or legal entity in the Netherlands except (a) individuals or legal entities who qualify as qualified investors as defined by article 2 paragraph 1(e) of the Prospectus Directive (2003/71/EC), as amended or (b) other persons to whom, or in circumstances where, an exemption or exception to the offering of interests in collective investment schemes (*beleggingsinstellingen*) applies pursuant to the Act on Financial Supervision (*Wet op het financieel toezicht*), and the rules and regulations promulgated pursuant thereto, as amended. Distribution of this document does not trigger a license requirement for the Fund in the Netherlands and consequently no supervision will be exercised over the Fund by the Netherlands Authority for the Financial Markets (*Autoriteit Financiële Markten*).

**People's Republic of China**: The Memorandum does not constitute a public offer of the Shares, whether by sale or subscription, in the People's Republic of China. The Shares are not being offered or sold directly or indirectly in the People's Republic of China to or for the benefit of, legal or natural persons of the People's Republic of China.

**Portugal**: The Fund has not been registered with the *Comissão do Mercado dos Valores Mobiliários* (the *CMVM*) as a foreign collective investment scheme and this Memorandum (or any other agreement, document or material in relation to the Fund) has not been approved by the CMVM pursuant to Decree-Law 252/2003 of 17 October, as amended from time to time (the Decree-Law). Therefore: (i) the Shares may not be advertised, offered or sold; and (ii) this Memorandum or any other offering material, may not be distributed or caused to be distributed to the public in circumstances which could qualify as the marketing of Shares in the Republic of Portugal pursuant to the Decree-Law and the Portuguese Securities Code without prior registration of the Fund with the CMVM and all such documentation and marketing material being approved by the CMVM.

**Republic of China (Taiwan)**: The Shares may not be sold, issued or offered in Taiwan. No person or entity in Taiwan has been authorised to offer, sell, give advice regarding or otherwise intermediate the offering and sale of the Shares.

**Republic of Ireland**: The distribution of this Memorandum and the offering or purchase of Shares is restricted to the individual to whom this Memorandum is addressed. Accordingly, it may not be reproduced in whole or in part, nor may its contents be distributed in writing or orally to any third party and it may be read solely by the person to whom it is addressed and his/her professional advisers. The Shares will not be offered or sold otherwise than in conformity with the provisions of the European

Communities (Markets in Financial Instruments) Regulations 2007 (as amended). Shares in the Fund will not in any event be publicly marketed in Ireland except in accordance with the requirements of the Irish Financial Services Regulatory Authority.

**Singapore**: The offer or invitation which is the subject of this Memorandum does not relate to a collective investment scheme which is authorised under Section 286 of the Securities and Futures Act, Chapter 289 of Singapore (the **SFA**) or recognised under Section 287 of the SFA. The Fund is not authorised or recognised by the Monetary Authority of Singapore (**MAS**) and shares are not allowed to be offered to the retail public. Each of this Memorandum and any other document or material issued in connection with the offer or sale is not a prospectus as defined in the SFA. Accordingly, statutory liability under that Act in relation to the content of prospectuses would not apply. You should consider carefully whether the investment is suitable for you.

This Memorandum has not been registered as a prospectus with MAS. Accordingly, this Memorandum and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of Shares may not be circulated or distributed, nor may Shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 304 of the SFA, (ii) to a relevant person pursuant to Section 305(1), or any person pursuant to Section 305(2), and in accordance with the conditions, specified in Section 305 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

**Spain**: The Fund has not been authorized by or registered with the Spanish Securities Market Commission as a foreign collective investment scheme in accordance with section 15.2 of Law 35/2003 of 4 November 2003 on Collective Investment Schemes. Accordingly, the Shares may not be offered or sold in Spain by means of any marketing activities as defined in section 2 of Law 35/2003, as amended by Law 25/2005, of 24 November 2005.

**Sweden**: This Memorandum has not been approved by or registered with the Swedish Financial Supervisory Authority (*Finansinspektionen*) pursuant to the Swedish Financial Instruments Trading Act (*lagen (1991:980) om handel med finansiella instrument*). Accordingly, the Shares may only be offered in Sweden in circumstances that will not result in a requirement to prepare a prospectus pursuant to the Swedish Financial Instruments Trading Act. The Fund is not an Investment Fund (*fondföretag*) for the purpose of the Swedish Investment Funds Act (*lag (2004:46) om investeringsfonder*) and has therefore not been, nor will it be, approved or registered by the Swedish Financial Supervisory Authority pursuant to the Swedish Investment Funds Act.

**Switzerland**: The Fund has not been authorized for public distribution in or from Switzerland pursuant to the Swiss Collective Investment Schemes Act of 23 June 2006 (the CISA) and its implementing regulations. Accordingly, the Shares may only be offered and this Memorandum may only be distributed in or from Switzerland to "qualified investors" (as this term is defined in the CISA and its implementing regulations).

**United Kingdom**: The Fund is an unrecognized collective investment scheme for the purposes of the Financial Services and Markets Act 2000 of the United Kingdom (the **Act**). The promotion of the Fund and the distribution of this Memorandum in the United Kingdom is accordingly restricted by law.

This Memorandum is being issued in the United Kingdom by the Fund to, and/or is directed at,

persons to whom it may lawfully be issued or directed at under The Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 including persons who are authorized under the Act (*authorized persons*), certain persons having professional experience in matters relating to investments, high net worth companies, high net worth unincorporated associations or partnerships, trustees of high value trusts and persons who qualify as certified sophisticated investors. The Shares are only available to such persons in the United Kingdom and this Memorandum must not be relied or acted upon by any other persons in the United Kingdom. In order to qualify as a certified sophisticated investor a person must (a) have a certificate in writing or other legible form signed by an authorized person to the effect that he is sufficiently knowledgeable to understand the risks associated with participating in unrecognized collective investment schemes and (b) have signed, within the last 12 months, a statement in a prescribed form declaring, amongst other things, that he qualifies as a sophisticated investor in relation to such investments. This Memorandum is exempt from the general restriction in Section 21 of the Act on the communication of invitations or

inducements to engage in investment activity on the grounds that it is being issued to and/or directed at only the types of person referred to above.

The content of this Memorandum has not been approved by an authorized person and such approval is, save where this Memorandum is directed at or issued to the types of person referred to above, required by Section 21 of the Act. Acquiring Shares may expose an investor to a significant risk of losing all of the amount invested. Any person who is in any doubt about investing in the Fund should consult an authorized person specializing in advising on such investments.

**United States**: The Shares have not been and will not be registered under the United States Securities Act of 1933, as amended (the *1933 Act*) or the securities laws of any of the states of the United States. The Shares may not be offered, sold or delivered directly or indirectly in the United States or to or for the account or benefit of any "US Person" except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the 1933 Act and any applicable state laws. The Shares are being offered outside the United States pursuant to the exemption from registration under Regulation S under the 1933 Act and inside the United States in reliance on Regulation D promulgated under the 1933 Act and Section 4(2) thereof.

The Fund has not been and will not be registered under the United States Investment Company Act of 1940, as amended (the *1940 Act*) since Shares will only be sold to US Persons who are "qualified purchasers", as defined in the 1940 Act. Each subscriber for Shares that is a US Person will be required to certify that it is an "accredited investor" and a "qualified purchaser", in each case as defined under applicable US federal securities laws, thereby also qualifying as a "qualified eligible person" as defined in Rule 4.7 under the United States Commodity Exchange Act, as amended (the *CEA*).

Pursuant to an exemption from registration as a commodity pool operator set forth in United States Commodity Futures Trading Commission (the *CFTC*) Rule 4.13(a)(4), neither the Manager nor the Investment Advisors are required to register, and are not registered, as commodity pool operators under the CEA. Consequently, unlike a registered commodity pool operator, neither the Manager nor the Investment Advisors are required to provide subscribers for Shares with a disclosure document or certified annual report meeting the requirements of the CFTC Rules otherwise applicable to registered commodity pool operators. This Memorandum has not been, and is not required to be, filed with the CFTC, and the CFTC has not reviewed or approved this Memorandum or the offering of Shares.

The Shares are suitable only for sophisticated investors who do not require immediate liquidity for their

investments, for whom an investment in the Fund does not constitute a complete investment program and who fully understand and are willing to assume the risks involved in the Fund's investment program. The Fund's investment practices, by their nature, may be considered to involve a substantial degree of risk. Subscribers for Shares must represent that they are acquiring the Shares for investment.

The Shares have not been filed with or approved or disapproved by any regulatory authority of the United States or any state thereof, nor has any such regulatory authority passed upon or endorsed the merits of this offering or the accuracy or adequacy of this Memorandum. Any representation to the contrary is unlawful. There will be no public offering of the Shares in the United States.

This Memorandum has been prepared solely for the information of the person to whom it has been delivered by or on behalf of the Fund, and should not be reproduced or used for any other purpose.

The Fund may accept investments from employee benefit plans subject to Part 4 of Title I of the U.S. Employee Retirement Income Security Act of 1974, as amended (**ERISA**), plans or accounts subject to Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the **Code**), insurance company general and separate accounts and entities the underlying assets of which include plan assets (i.e. "Benefit Plan Investors" as defined under ERISA). However, the Fund does not anticipate that its assets will be subject to Title I of ERISA or Section 4975 of the Code, because it intends to limit investments in the Fund by Benefit Plan Investors. Generally, assets of an entity like the Fund will not be subject to Title I of ERISA or section 4975 of the Code, if Benefit Plan Investors own less than 25 per cent of the value of any Class of equity interests in the Fund, excluding from this calculation any non-Benefit Plan Investor interests held by the Investment Advisors and certain affiliated persons or entities. No subscriptions for Shares made by Benefit Plan Investors will be accepted and no transfers of Shares will be permitted to the extent that the investment or transfer would result in the Fund's assets becoming subject to Title I of ERISA or section 4975 of the Code. In addition, because the 25 per cent limit is to be calculated upon every subscription to or redemption from the Fund, the Fund has the authority to require the compulsory redemption of Shares of any Class to ensure that the Fund is not subject to Title I of ERISA or section 4975 of the Code.

**Generally**: The distribution of this Memorandum and the offering of Shares may be restricted in certain jurisdictions. The above information is for general guidance only, and it is the responsibility of any person or persons in possession of this Memorandum and wishing to make application for Shares to inform themselves of, and to observe, all applicable laws and regulations of any relevant jurisdiction. Prospective applicants for Shares should inform themselves as to legal requirements also applying and any applicable exchange control regulations and applicable taxes in the countries of their respective citizenship, residence or domicile.

*This Memorandum does not constitute an offer or solicitation to any person in any jurisdiction in which such offer or solicitation is not authorized or to any person to whom it would be unlawful to make such offer or solicitation.*

# **ATTACHMENT 15**

SEC-TDBANK-E-0000477

**IRS** DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI  OH   45999-0023

Date of this notice:  12-12-2019

Employer Identification Number:
█████████0005

Form:  SS-4

Number of this notice:  CP 575 B

BISON DIGITAL LLC
CARLOS BETANCOURT MBR
███████████████

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.


                    WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

      Thank you for applying for an Employer Identification Number (EIN).  We assigned you
EIN 84-3960005.  This EIN will identify you, your business accounts, tax returns, and
documents, even if you have no employees.  Please keep this notice in your permanent
records.

      When filing tax documents, payments, and related correspondence, it is very important
that you use your EIN and complete name and address exactly as shown above.  Any variation
may cause a delay in processing, result in incorrect information in your account, or even
cause you to be assigned more than one EIN.  If the information is not correct as shown
above, please make the correction using the attached tear off stub and return it to us.

      Based on the information received from you or your representative, you must file
the following form(s) by the date(s) shown.

            Form 1065                         03/15/2020

      If you have questions about the form(s) or the due date(s) shown, you can call us at
the phone number or write to us at the address shown at the top of this notice.  If you
need help in determining your annual accounting period (tax year), see Publication 538,
*Accounting Periods and Methods*.

      We assigned you a tax classification based on information obtained from you or your
representative.  It is not a legal determination of your tax classification, and is not
binding on the IRS.  If you want a legal determination of your tax classification, you may
request a private letter ruling from the IRS under the guidelines in Revenue Procedure
2004-1, 2004-1 I.R.B. 1 (or superseding Revenue Procedure for the year at issue).  Note:
Certain tax classification elections can be requested by filing Form 8832, *Entity
Classification Election*.  See Form 8832 and its instructions for additional information.

      A limited liability company (LLC) may file Form 8832, *Entity Classification
Election*, and elect to be classified as an association taxable as a corporation.  If
the LLC is eligible to be treated as a corporation that meets certain tests and it
will be electing S corporation status, it must timely file Form 2553, *Election by a
Small Business Corporation*.  The LLC will be treated as a corporation as of the
effective date of the S corporation election and does not need to file Form 8832.

      To obtain tax forms and publications, including those referenced in this notice,
visit our Web site at www.irs.gov.  If you do not have access to the Internet, call
1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

**SEC-TDBANK-E-0000477**

SEC-TDBANK-E-0000477

(IRS USE ONLY)    575B            12 12-2019  BISO   B  9999999999  SS 4

**IMPORTANT REMINDERS:**

* Keep a copy of this notice in your permanent records. **This notice is issued only one time and the IRS will not be able to generate a duplicate copy for you.** You may give a copy of this document to anyone asking for proof of your EIN.

* Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

* Refer to this EIN on your tax-related correspondence and documents.

If you have questions about your EIN, you can call us at the phone number or write to us at the address shown at the top of this notice. If you write, please tear off the stub at the bottom of this notice and send it along with your letter. If you do not need to write us, do not complete and return the stub.

Your name control associated with this EIN is BISO. You will need to provide this information, along with your EIN, if you file your returns electronically.

Thank you for your cooperation.

Keep this part for your records.          CP 575 B (Rev. 7-2007)

---

Return this part with any correspondence
so we may identify your account. Please
correct any errors in your name or address.                    CP 575 B

                                                               9999999999

Your Telephone Number  Best Time to Call   DATE OF THIS NOTICE:  12-12-2019
(    )     -                                EMPLOYER IDENTIFICATION NUMBER: ████0005
                                           FORM:  SS-4              NOBOD

INTERNAL REVENUE SERVICE                   BISON DIGITAL LLC
CINCINNATI  OH   45999-0023                CARLOS BETANCOURT MBR

SEC-TDBANK-E-0000478

SEC-TDBANK-E-0000477

**Congratulations!**

# Bison Digital LLC

**is now formed and you are now permitted to do business!**

State of formation: Wyoming          Filing date: 12/11/19

As part of the formation process we have placed the official state documents in your account. This will show you are registered to do business in your state. Also included are the Initial Resolutions which release all power to the managers or members and show the formation details of your company.  An Operating Agreement is also included which provides a guideline on how your LLC will operate. Other documents such as membership certificates and banking resolutions are included as well which will evidence who owns the company and who has authority to sign on behalf of the company. If you are opening a business bank account the bank may want to see all of these documents so it is a good to print them out and take them with you.

The documents placed in your online account are always available to view.  In addition to the Documents section you may always add additional services under the Services tab should you need our assistance with further state registrations, ongoing state compliance and registered agent services.

Thank you for letting us help form your LLC. The best part of our job is meeting different people from various business backgrounds and helping them launch their companies. Please do not hesitate to contact us further should have any questions regarding your company or our services.

Thanks,

Filings Team

SEC-TDBANK-E-0000479

SEC-TDBANK-E-0000477

# INITIAL RESOLUTIONS

I, Riley Park _____ , of Registered Agents Inc. _____ being the Organizer of
Bison Digital LLC _____ , a Wyoming _____ Limited Liability Company, hereby
resolve to relinquish signing authority to the Managers named below and adopt the
following resolutions:

1.      **Resolved,** the named Manager of the Limited Liability Company are hereby
        named as Manager.

                          Kevin  Kang

                          Carlos Betancourt
        _____

2.      **Resolved,** that Bison Digital LLC _____ was organized on 12/11/19 _____
        in the State of Wyoming _____ with assigned filing number
        2019-000889574 _____

3.      **Resolved,** that the copy of the Articles of Organization of the above named
        Limited Liability Company is complete.

4.      **Resolved,** that the general provisions of an operating agreement be adopted
        and included as official records of the Limited Liability Company. If the Manager
        chooses to adopt a more detailed operating agreement, then such agreement
        will take precedence over general provisions in the original operating
        agreement.

5.      **Resolved,** that Manager has formed a limited liability company, and is entitled
        to the full extent of their limitation of liability pursuant to state law. Furthermore,
        Managers' failure to maintain formalities of a limited liability company does not
        preclude them from liability protection under state law.


_____          12/11/19 _____

SEC-TDBANK-E-0000480

SEC-TDBANK-E-0000477

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT FOR

## Bison Digital LLC

## A MANAGER-MANAGED LIMITED LIABILITY COMPANY

### ARTICLE I

### Company Formation

1.1 **FORMATION**. The Members have formed a Limited Liability Company ("Company") subject to the laws of the state in which it was formed. This operating agreement is entered into and effective upon adoption by the Member(s).

1.2 **REGISTERED AGENT**. The name and location of the Company's registered agent of the will be as stated in the formation documents.

1.3 **TERM**. The Company will continue perpetually unless,

(a) Members unanimously vote for dissolution; or

(b) An event occurs which causes the Company's business to become unlawful; or

(c) Any other event causing the Company's dissolution under state laws.

1.4 **CONTINUANCE OF COMPANY**. In the event of an occurrence described in ARTICLE 1.3(c), if there is at least one remaining Member, the Member has the right to continue the Company's business.

1.5 **BUSINESS PURPOSE**. The purpose of the Company is to conduct any and all lawful business appropriate in carrying out the company's objectives.

1.6 **PRINCIPAL PLACE OF BUSINESS**. The location of the Company's principal place of business will be as stated in the formation documents or as selected by the Managers.

1.7 **THE MEMBERS**. The name and residential address of each Member is contained in Exhibit 2 attached to this Agreement.

Operating Agreement - 1

SEC-TDBANK-E-0000481

SEC-TDBANK-E-0000477

1.8 **ADMISSION OF ADDITIONAL MEMBERS.** Members may only be admitted to the Company through issuance of a new interest in the company with unanimous written consent of the Members or the sale of a Member's current interest, except as otherwise expressly provided in the Agreement.

## ARTICLE II

### Capital Contributions

2.1 **INITIAL CONTRIBUTIONS.** The Members will contribute the Company's initial capital as described in Exhibit 3 attached to this Agreement. The agreed total value of such property and cash is <u>USD 1,000</u>.

2.2 **ADDITIONAL CONTRIBUTIONS.** Except as provided in ARTICLE 6.2, no Member is obligated to make any additional contribution to the Company's capital.

## ARTICLE III

### Profits, Losses and Distributions

3.1 **PROFITS/LOSSES.** For financial accounting and tax purposes the Company's net profits or net losses will be determined annually. Profits and losses will be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Exhibit 2 as amended and in accordance with Treasury Regulation 1.704-1.

3.2 **DISTRIBUTIONS.** The Members may determine and distribute available funds annually or more frequently as the Members see fit. "Available funds" refers to the net cash of the Company available after expenses and liabilities, as determined by the Managers. Upon liquidation of the Company or of a Member's interest, distributions must be made according to the positive capital or pursuant to Treasury Regulation 1.704-l(b)(2)(ii)(b)(2). To the extent a Member has a negative capital account balance, there must be a qualified income offset, as set forth in Treasury Regulation 1.704-l(b)(2)(ii)(d).

## ARTICLE IV

### Management

4.1 **MANAGEMENT OF THE BUSINESS.** The Company is managed by Managers. The name and residential address of each Manager is

Operating Agreement - 2

SEC-TDBANK-E-0000482

SEC-TDBANK-E-0000477

attached as Exhibit 1 of this Agreement. At least one Manager will be elected by a vote of the Members holding a majority of the capital interests in the Company, as set forth in Exhibit 2 and any amendments. One Manager will be elected by the Members as Chief Executive Manager.  The Manager(s) may be Members or Non-Members.

4.2   **MEMBERS**. The liability of the Members is limited pursuant to applicable state law.  Members that are not Managers may not take any part in the control, management, direction, or operation of the Company's affairs and have no power to bind the Company. The Members may advise the Managers, but Managers are not required to accept such advice. The Managers have the exclusive right to control and manage the Company. No Member will be an agent of any other Member of the Company solely by reason of being a Member.

4.3   **POWERS OF MANAGERS**. The Managers are authorized to make all decisions regarding the Company's operations and legal affairs, including but not limited to (a) the sale, development, lease or other disposition of the Company's assets; (b) the purchase or other acquisition of other assets of all kinds; (c) the management of all or any part of the Company's assets; (d) the borrowing of money and the granting of security interests in the Company's assets; (e) the pre-payment, refinancing or extension of any loan affecting the Company's assets; (f ) the compromise or release of any of the Company's claims or debts; and, (g) the employment of persons, firms or corporations for the operation and management of the Company's business. Managers are authorized to execute and deliver (a) all contracts, conveyances, assignments leases, sub-leases, franchise agreements, licensing agreements, management contracts and maintenance contracts covering or affecting the Company's assets; (b) all checks, drafts and other orders for the payment of the Company's funds; (c) all promissory notes, loans, security agreements and other similar documents; and, (d) all other instruments of any other kind relating to the Company's business.

4.4   **CHIEF EXECUTIVE MANAGER**. The Chief Executive Manager has primary responsibility for managing company operations and for carrying out the decisions of the Managers.

4.5   **NOMINEE**. Title to the Company's assets will be held in the Company's name or in the name of any nominee that the Managers may designate. The Managers will have power to enter into a nominee agreement with any person, and such agreement may contain provisions indemnifying the nominee, except for his or her willful misconduct.

Operating Agreement - 3

SEC-TDBANK-E-0000483

SEC-TDBANK-E-0000477

4.6     **COMPANY INFORMATION.** Upon request, the Managers will supply to any member, information regarding the Company or its activities. Any Member or a member's authorized representative may access, inspect, and copy all books, records and materials in the Manager's possession regarding the Company or its activities. These rights may be exercised at the requesting Member's expense.

4.7     **EXCULPATION.** Any act or omission of the Managers, the effect of which may cause or result in loss or damage to the Company or the Members, if done in good faith to    promote the best interests of the Company, will not subject the Managers to any liability.

4.8     **INDEMNIFICATION.** The Company will indemnify any person who was or is a party defendant or is threatened to be made a party defendant, in a pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that the person is or was a Member of the Company, employee, or agent of the Company, or is or was serving at the request of the Company. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" does not imply that the party did or did not act in good faith and in a manner which he/she reasonably believed to be lawful and in the best interest of the Company.

4.9     **RECORDS.** The Managers must keep the following at the Company's principal place of business:

(a) A copy of all formation documents, the operating agreement, and any amendments;

(b) A current list of the full name and the last known street address of each Member;

(c) Copies of the Company's federal, state and local income tax returns and reports, if   any, for the three most recent years;

(d) Copies of the Company's financial statements for the three most recent years.

## ARTICLE V

## Compensation

5.1     **MANAGEMENT FEE.** Any Manager rendering services to the Company is entitled to compensation equal to the value of those services.

SEC-TDBANK-E-0000484

SEC-TDBANK-E-0000477

5.2    **REIMBURSEMENT**. The Company will reimburse the Managers or Members for all direct out-of-pocket expenses incurred in managing the Company.

## ARTICLE VI

### Bookkeeping

6.1    **BOOKS**. The Managers will keep complete and accurate accounting of the Company's affairs at the Company's principal place of business or other location agreed upon by the Managers. The Managers will choose the method of accounting and the Company's accounting period will be the calendar year.

6.2    **MEMBER'S ACCOUNTS**. The Managers must maintain separate capital and distribution accounts for each Member. Each Member's capital account must be determined and maintained in the manner set forth in Treasury Regulation 1.704-I(b)(2)(iv) and will consist of the Member's initial capital contribution increased by:

(a) Any additional capital contribution made by the Member;

(b) Credit balances transferred from the member's distribution account to the member's capital account; and decreased by:

(1) Distributions to the Member in reduction of Company capital;

(2) The Member's share of Company losses if charged to the Member's capital account.

6.3    **REPORTS**. When the Managers close the books at the close of each calendar year, the Managers will prepare and send to each Member, a statement of that Member's distributive share of income and expense for income tax reporting purposes.

## ARTICLE VII

### Transfers

7.1    **ASSIGNMENT**. If a Member proposes to sell, assign or otherwise dispose of all or part of the Member's interest in the Company, he or she must comply with the following procedures:

(a) First make a written offer, including the price, to sell such interest to the other Member(s). The exiting Member may only advertise the

Operating Agreement - 5

SEC-TDBANK-E-0000485

SEC-TDBANK-E-0000477

sale if the other Members decline or fail to elect such interest within 60 days after the offer.

(b) If the exiting member has a buyer of interest, the other current Member(s) have first right of refusal to purchase the exiting Members interest for the agreed purchase price.  If there is more than one current remaining Member, the remaining Members may combine funds to purchase the exiting Members' interest.  The exiting Member must show that potential purchaser has full certified funds, or the ability to get full certified funds before 60 day right of first refusal period ends.

(c) Current Members must unanimously approve the sale of exiting Members' interests to grant full membership benefits and functionality to the new Member. If the current remaining Members do not unanimously approve the sale, the purchaser or assignee will have no management or voting rights. The purchaser or assignee is only entitled to receive the share of the profits or other compensation by way of income and the return of contributions to which that Member would otherwise be entitled.  The exiting Member must disclose to the buyer or assignee if the current Members will not approve the sale.

7.2    **VALUATION OF EXITING MEMBERS INTEREST.**  If a Member wants to exit the LLC, and does not have a buyer of its membership interest, exiting Member will assign its interest to current Members according to the following procedures:

(a) A value must be placed upon this membership interest before assigned.

(b) If the exiting Member and the current Members do not agree on the value of the membership interest, the exiting Member must pay for a certified appraiser to assess the Company's value. The appraiser will assign the exiting Members' interest a value according to the exiting Members' interest percentage.

(c) The current Members must approve the certified appraiser used by exiting Member.  Current Members have 30 days to approve the exiting Members certified appraiser.  If current Members disapprove the certified appraiser, they must show evidence to support their disapproval of the certified appraiser as a vendor qualified to appraise the company.  Current Members may not stall the process by disapproving all certified appraisers.

(d) When a certified appraiser places a value on the Company, a value will be placed on the exiting Members' interest according to exiting Members' percentage of membership interest.

Operating Agreement - 6

SEC-TDBANK-E-0000486

(e) If current Members disagree with the value placed on exiting Members' interest, current Members must pay for a certified appraiser to value the company and the exiting Members' interest according to the same terms.

(f) Current Members' appraisal must be completed within 60 days or right of current Members to dispute the value of exiting Member's interest expires.

(g) Upon completion of current Members' appraisal, the exiting Member must approve the value placed on exiting Members' interest. Exiting Member has 30 days to approve this value.

(h) If the exiting Member does not approve the current Members' appraised value, then the value of the Company will be determined by adding both parties' appraised values, then dividing that value in half, creating the value of the exiting Members' interest.

7.3   **DISTRIBUTION OF EXITING MEMBERS INTEREST.** Upon determination of exiting Members' interest value, the value will be a debt of the Company. The exiting Member will only be able to demand payment of this debt at dissolution of the Company or by the following method:

(a) The Company will make timely payments.

(b) The Company will only be required to make payments towards exiting Member's debt if the Company is profitable and passes income to current Members.

(c) The Company must make a debt payment to the exiting Member if the Company's income surpassed 50% of the total determined value of the exiting Members' interest in one taxable year. (Example: If exiting Members' value was $100,000 and current Member(s) received over $50,000 taxable income in the taxable year, the LLC would owe a debt payment to exiting Member. If current Member(s) only received $40,000 in passed income, there would be no payment due.)
(d) The debt payment must be at least 10% of the value of the passed income to current Members.

(e) The company must make payment to exiting Member within 60 days of the end of the company's taxable year.

(f) The payment schedule will continue until the exiting Member's debt is paid.

Operating Agreement - 7

SEC-TDBANK-E-0000477

(g) If the Company dissolves, the exiting Member will be a regular debtor and payment will follow normal dissolution payment statutes.

(h) The exiting Member's value of membership interest assigned current Members may NOT accrue interest.

(i) The Company may pay the amount owed to the exiting Member at any time.

## <u>ARTICLE VIII</u>

### Dissolution

8.1   **DISSOLUTION.**  The Member(s) may dissolve the LLC at any time. The Member(s) may NOT dissolve the LLC for a loss of membership interests.  Upon dissolution the LLC must pay its debts first before distributing cash, assets, and/or initial capital to the Member or the Members interests.  The dissolution may only be ordered by the Member(s), not by the owner of the Member's interests.

Operating Agreement - 8

SEC-TDBANK-E-0000488

# CERTIFICATION OF MEMBERS

The undersigned hereby agree, acknowledge, and certify that the foregoing operating agreement is adopted and approved by each Member, the agreement consisting of ____ pages, constitutes, together with Exhibit 1, Exhibit 2 and Exhibit 3 (if any), the Operating Agreement of <u>Bison Digital LLC</u>, adopted by the Members as of <u>December</u>, <u>12th</u> 20<u>19</u>.

**Members:**

_____            Carlos Betancourt
Signature                                          Printed Name
Percent: <u>50</u> %

_____            Kevin Kang
Signature                                          Printed Name
Percent: <u>50</u> %

_____            _____
Signature                                          Printed Name
Percent: _____%

_____            _____
Signature                                          Printed Name
Percent: _____%

_____            _____
Signature                                          Printed Name
Percent: _____%

Operating Agreement - 9

SEC-TDBANK-E-0000489

SEC-TDBANK-E-0000477

## EXHIBIT 1

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT FOR

Bison Digital LLC

## LISTING OF MANAGERS

By a majority vote of the Members the following Managers were elected to operate the Company pursuant to ARTICLE 4 of the Agreement:

Signature
**Chief Executive Manager**

Carlos Betancourt
**Printed Name**

30 N Gould St     **Address**
Ste R
Sheridan WY 82801

Signature
**Title:** Chief Investment Officer

Kevin  Kang
**Printed Name**

30 N Gould St     **Address**
Ste R
Sheridan WY 82801

The above listed Manager(s) will serve in their capacities until they are removed for any reason by a majority vote of the Members as defined by ARTICLE 4 or upon their voluntary resignation.

Signed and agreed this 12th day of December , 20 19 .

**Signature of Member**

Carlos Betancourt
**Printed Name**

Operating Agreement - 10

SEC-TDBANK-E-0000490

SEC-TDBANK-E-0000477

_(signature)_
Signature of Member

Kevin Kang
Printed Name

_____
Signature of Member

_____
Printed Name

## EXHIBIT 2

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT FOR
Bison Digital LLC

## LISTING OF MEMBERS

As of the _12th_ day of _December_ , 20 _19_ the following is a list of Members of the Company:

**Name** Carlos Betancourt                **Percent** 50 %

**Address** ████████████████████

**Name** Kevin Kang                       **Percent** 50 %

**Address** ████████████████████

**Name** _____          **Percent** _____%

**Address** _____

**Name** _____          **Percent** _____%

**Address** _____

Operating Agreement - 11

SEC-TDBANK-E-0000491

SEC-TDBANK-E-0000477

Authorized by Member(s) to provide Member Listing as of this __12th__ day of
__December__, 20 19 .

_____                _____
Signature of Member                                Signature of Member

_____                _____
Signature of Member                                Signature of Member

## EXHIBIT 3

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT
## FOR

_____Bison Digital LLC_____


## CAPITAL CONTRIBUTIONS

Pursuant to ARTICLE 2, the Members' initial contribution to the Company
capital is stated to be $ 2,000 _____. The description and each
individual portion of this initial contribution is as follows:

| Carlos Betancourt | $ 1,000 |
| Kevin Kang | $ 1,000 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |

Operating Agreement - 12

SEC-TDBANK-E-0000492

SEC-TDBANK-E-0000477

SIGNED AND AGREED this __12th__ day of __December__, 20 __19__.

_____
Member

_____
Member

_____
Member

_____
Member

Operating Agreement - 13

SEC-TDBANK-E-0000493

SEC-TDBANK-E-0000494

SEC-TDBANK-E-0000477

# LLC MEMBERSHIP CERTIFICATE

**Bison Digital LLC**

Company Name

Organized in Wyoming _____ has a total of 2 ___ member(s) at 12/12/2019 _____ date

This certifies that Carlos Betancourt _____ is a member of the above named Limited Liability Company, and holds a 50 ___ % interest of the above named company, which is entitled to the full benefits of such membership.
Such benefits are subject to the membership duties and obligations set forth in the Limited Liability Company operating agreement.
This named Limited Liability Company has caused this certificate to be executed by its members this
12th ___ day of December ___ 2019 ___ A.D. Carlos Betancourt _____ Kevin Kang _____

For _____ received, I, _____ sell and transfer unto _____ , _____ % of the membership interest, represented within this certificate, and appoint

_____

_____

to transfer the allocated interest in the books of the named Limited Liability Company with full power of substitution.

_____
Seller

_____
Newly named member

_____
Witness

SEC-TDBANK-E-0000477

# LLC Resolution to Open a Bank Account

Account _____          Bank Name: _____
Holder: _____          Address:   _____
                                                         _____
                                                         _____

Acct #: _____

As a Member of the LLC named above, I certify that the LLC has been organized within the bounds of state law as an LLC with its principal office located at:

_____

I further attest that at the initial meeting of the LLC's members was held on _____, a quorum was present, and voting and adopted the following resolutions:

**Resolved,** that the financial institution named above is designated as a depository for the funds of this LLC, which may be withdrawn on checks, drafts, advices of debit, notes, or other orders for payments bearing any officer or authorized employee of this LLC.

**Further Resolved,** that the financial institution will accept and pay on, without further inquiry, any checks or debits drawn against any of the LLC's accounts. The checks or debits will be honored by the financial institution whether the item has been drawn or endorsed to the order of any authorized officer or employee signing; tendered by the authorized officer or employee for the purpose of cashing or payment; or for deposit to the officer's or employee's personal account. The financial institution will not be required to inquire as to the use of any check or debit signed in accordance with the resolutions contained herein.

**Further Resolved,** that the officers or authorized employees may execute other agreements, including, but not limited to, special depository agreements, and arrangements concerning the manner, condition, and/or purposes for which funds, checks, debits, or items of the LLC may be deposited, collected, or withdrawn, as long as these other agreements are not contrary to the provisions contained in this resolution.

**Further Resolved,** that the power granted to the LLC's officers or authorized employees will remain in full force and effect until written notice has been delivered and received by the financial institution at each location where an account is maintained. The financial institution will be indemnified and held harmless from any losses suffered or liabilities incurred by continuing to act in accordance with this resolution.

**I Further Attest** that the person named below occupy the stated position, as indicated by their signature, and that the resolutions contained in this document are recorded on the books of the LLC, and these resolutions are in full force and effect and have not been altered in any way.

*CERTIFIED AND ATTESTED TO ON THIS _____ DAY OF _____, 201___, BY:*


X_____
    **LLC MEMBER**

SEC-TDBANK-E-0000495

SEC-TDBANK-E-0000477



Secretary of State

| | Wyoming Secretary of State | For Office Use Only |
|---|---|---|
| | Herschler Bldg East, Ste. 100 & 101 | WY Secretary of State |
| | | FILED: Dec 11 2019 3:59PM |
| | Cheyenne, WY 82002-0020 | Original ID: 2019-000889574 |
| | Ph. 307-777-7311 | |

## Limited Liability Company
## Articles of Organization

**I. The name of the limited liability company is:**

Bison Digital LLC

**II. The name and physical address of the registered agent of the limited liability company is:**

Registered Agents Inc.
30 N Gould St Ste R
Sheridan, WY 82801

**III. The mailing address of the limited liability company is:**

30 N Gould St
Ste R
Sheridan, WY 82801

**IV. The principal office address of the limited liability company is:**

30 N Gould St
Ste R
Sheridan, WY 82801

**V. The organizer of the limited liability company is:**

Registered Agents Inc.
30 N Gould St Ste R, Sheridan, WY 82801

| Signature: | *Riley Park* | Date: 12/11/2019 |
|---|---|---|
| Print Name: | Riley Park | |
| Title: | Authorized Individual | |
| Email: | reports@registeredagentsinc.com | |
| Daytime Phone #: | (307) 200-2803 | |

Page 1 of 4

SEC-TDBANK-E-0000496

SEC-TDBANK-E-0000477



**Wyoming Secretary of State**

Herschler Bldg East, Ste.100 & 101

Cheyenne, WY 82002-0020
Ph. 307-777-7311

<u>For Office Use Only</u>

**WY Secretary of State**
**FILED: Dec 11 2019  3.59PM**
**Original ID: 2019-000889574**

# Limited Liability Company
## Articles of Organization

**I. The name of the limited liability company is:**

Bison Digital LLC

**II. The name and physical address of the registered agent of the limited liability company is:**

Registered Agents Inc.
30 N Gould St Ste R
Sheridan, WY 82801

**III. The mailing address of the limited liability company is:**

30 N Gould St
Ste R
Sheridan, WY 82801

**IV. The principal office address of the limited liability company is:**

30 N Gould St
Ste R
Sheridan, WY 82801

**V. The organizer of the limited liability company is:**

Registered Agents Inc.
30 N Gould St Ste R, Sheridan, WY 82801

| | | |
|---|---|---|
| Signature: | *Riley Park* | Date:  12/11/2019 |
| Print Name: | **Riley Park** | |
| Title: | **Authorized Individual** | |
| Email: | **reports@registeredagentsinc.com** | |
| Daytime Phone #: | **(307) 200-2803** | |

Page 1 of 4

SEC-TDBANK-E-0000497

SEC-TDBANK-E-0000477



**Secretary of State**

**Wyoming Secretary of State**
Herschler Bldg East, Ste. 100 & 101

Cheyenne, WY 82002-0020
Ph. 307-777-7311

☑ I am the person whose signature appears on the filing; that I am authorized to file these documents on behalf of the business entity to which they pertain; and that the information I am submitting is true and correct to the best of my knowledge

☑ I am filing in accordance with the provisions of the Wyoming Limited Liability Company Act, (W.S. 17-29-101 through 17-29-1105) and Registered Offices and Agents Act (W.S. 17-28-101 through 17-28-111).

☑ I understand that the information submitted electronically by me will be used to generate Articles of Organization that will be filed with the Wyoming Secretary of State.

☑ I intend and agree that the electronic submission of the information set forth herein constitutes my signature for this filing.

☑ I have conducted the appropriate name searches to ensure compliance with W.S. 17-16-401.

**Notice Regarding False Filings: Filing a false document could result in criminal penalty and prosecution pursuant to W.S. 6-5-308.**

**W.S. 6-5-308. Penalty for filing false document.**

(a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he files with the secretary of state and willfully or knowingly:

(i) Falsifies, conceals or covers up by any trick, scheme or device a material fact;

(ii) Makes any materially false, fictitious or fraudulent statement or representation; or

(iii) Makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry.

☑ I acknowledge having read W.S. 6-5-308.

**Filer is:**   ☐ An Individual   ☑ An Organization

The Wyoming Secretary of State requires a natural person to sign on behalf of a business entity acting as an incorporator or organizer. The following individual is signing on behalf of all Organizers or Incorporators.

**Filer Information:**
**By submitting this form I agree and accept this electronic filing as legal submission of my Articles of Organization.**

Signature:   *Riley Park*                                    Date:  12/11/2019

Print Name:   **Riley Park**

Title:   **Authorized Individual**

Email:   **reports@registeredagentsinc.com**

Daytime Phone #:   **(307) 200-2803**

Page 2 of 4

SEC-TDBANK-E-0000498

SEC-TDBANK-E-0000477



**Secretary of State**

**Wyoming Secretary of State**
Herschler Bldg East, Ste.100 & 101

Cheyenne, WY 82002-0020
Ph. 307-777-7311

## Consent to Appointment by Registered Agent

**Registered Agents Inc.**, whose registered office is located at **30 N Gould St Ste R, Sheridan, WY 82801**, voluntarily consented to serve as the registered agent for **Bison Digital LLC** and has certified they are in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

I have obtained a signed and dated statement by the registered agent in which they voluntarily consent to appointment for this entity.

Signature: *Riley Park*                                    Date: **12/11/2019**

Print Name:  **Riley Park**

Title:  **Authorized Individual**

Email:  **reports@registeredagentsinc.com**

Daytime Phone #:  **(307) 200-2803**

Page 3 of 4

SEC-TDBANK-E-0000499

SEC-TDBANK-E-0000477

## STATE OF WYOMING
### Office of the Secretary of State

I, EDWARD A. BUCHANAN, Secretary of State of the State of Wyoming, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

CERTIFICATE OF ORGANIZATION

**Bison Digital LLC**

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **11th** day of **December, 2019 at 3:59 PM.**

Remainder intentionally left blank.



Filed Date: 12/11/2019

Secretary of State

Filed Online By:

Riley Park

on 12/11/2019

SEC-TDBANK-E-0000500

SEC-TDBANK-E-0000477

# Certification Regarding Beneficial Owners of Legal Entity Customers

 **TD Bank**

| For TD Personnel use only | | |
|---|---|---|
| Account Number: 2138 | Date: 1/15/20 | |
| TD Bank Representative Name: N. Trask | TD Bank Representative Phone: 212-888-0264 | |
| RC Code (if applicable): | Store Number (if applicable): 3562-- | |

## Account Opening/Maintenance Information

**A. Name and Address of Legal Entity for which an account is being opened or business Relationship is being updated**

Name: Bison Digital LLC

Address: 38 E 37th St Ste 11   City/State/Zip: N.Y N.Y. 10016

**B. Name and Title of Natural Person opening account or updating the Business Relationship**

Name: Kevin Kang   Title: President

## I. Certification of Individual with Control (see page 4 for definition)

| Individual First Name: Kevin | Middle Initial: | Last Name: Kang |
|---|---|---|
| Street Address (no PO Boxes): ███ | | City: ███ |
| State/Province: ███ | Zip/Postal Code: ███ | Country: United States |
| Social Security Number (SSN) (US persons only): ███ 199 | | Date of Birth: ███ 1989 |
| Title (CEO, President, etc.): President | | |
| Non-US persons, please complete the fields below | | |
| Primary ID Type (passport or other): | | Number: |
| Country: | Date of Issuance: | Exp. Date: |

Is this Individual with Control also a Beneficial Owner? ☑ Yes  ☐ No   If yes, what is the percentage of ownership? % 100

## II. Certification of Beneficial Owner(s) (see page 4 for definition)

If no individual meets this requirement, please check "Beneficial Owner Not Applicable" box and move to Section III.   ☐ Beneficial Owner Not Applicable

Beneficial Owner 1 Information:

| Individual First Name: | Middle Initial: | Last Name: |
|---|---|---|
| Street Address (no PO Boxes): | | City: |
| State/Province: | Zip/Postal Code: | Country: |
| Social Security Number (SSN) (US persons only): | Date of Birth: | % of Ownership: % |
| Non-US persons, please complete the fields below | | |
| Primary ID Type (passport or other): | | Number: |
| Country: | Date of Issuance: | Exp. Date: |

Does the Individual hold the ownership interest in the Legal Entity indirectly (via an ownership interest in an intermediate company)?  ☐ Yes  ☐ No
If yes, provide the name of the Intermediate company below:

Name of Company with Ownership Interest in this Relationship:

SEC-TDBANK-E-0000501

SEC-TDBANK-E-0000477

## II. Certification of Beneficial Owner(s)  (cont.)

**Beneficial Owner 2 Information:**

| Individual First Name: | | Middle Initial: | | Last Name: | |
|---|---|---|---|---|---|

| Street Address (no PO Boxes): | | | City: | |
|---|---|---|---|---|

| State/Province: | | Zip/Postal Code: | | Country: | |
|---|---|---|---|---|---|

| Social Security Number (SSN) (US persons only): | | Date of Birth: | | % of Ownership: | % |
|---|---|---|---|---|---|

**Non-US persons, please complete the fields below**

| Primary ID Type (passport or other): | | Number: | |
|---|---|---|---|

| Country: | | Date of Issuance: | | Exp. Date: | |
|---|---|---|---|---|---|

Does the Individual hold the ownership interest in the Legal Entity indirectly (via an ownership interest in an intermediate company)? ☐ Yes ☐ No
If yes, provide the name of the intermediate company below:

Name of Company with Ownership Interest in this Relationship:

**Beneficial Owner 3 Information:**

| Individual First Name: | | Middle Initial: | | Last Name: | |
|---|---|---|---|---|---|

| Street Address (no PO Boxes): | | | City: | |
|---|---|---|---|---|

| State/Province: | | Zip/Postal Code: | | Country: | |
|---|---|---|---|---|---|

| Social Security Number (SSN) (US persons only): | | Date of Birth: | | % of Ownership: | % |
|---|---|---|---|---|---|

**Non-US persons, please complete the fields below**

| Primary ID Type (passport or other): | | Number: | |
|---|---|---|---|

| Country: | | Date of Issuance: | | Exp. Date: | |
|---|---|---|---|---|---|

Does the Individual hold the ownership interest in the Legal Entity indirectly (via an ownership interest in an intermediate company)? ☐ Yes ☐ No
If yes, provide the name of the intermediate company below:

Name of Company with Ownership Interest in this Relationship

**Beneficial Owner 4 Information:**

| Individual First Name: | | Middle Initial: | | Last Name: | |
|---|---|---|---|---|---|

| Street Address (no PO Boxes): | | | City | |
|---|---|---|---|---|

| State/Province: | | Zip/Postal Code: | | Country: | |
|---|---|---|---|---|---|

| Social Security Number (SSN) (US persons only): | | Date of Birth | | % of Ownership: | % |
|---|---|---|---|---|---|

**Non-US persons, please complete the fields below**

| Primary ID Type (passport or other): | | Number: | |
|---|---|---|---|

| Country: | | Date of Issuance: | | Exp. Date: | |
|---|---|---|---|---|---|

Does the Individual hold the ownership interest in the Legal Entity indirectly (via an ownership interest in an intermediate company)? ☐ Yes ☐ No
If yes, provide the name of the intermediate company below:

Name of Company with Ownership Interest in this Relationship:

## III. Certified/Agreed To

☑ Check this box if there have been no updates or changes to Individual with Control or Beneficial Ownership information since last completing a Certification Form.

I, _____ **Kevin Kang** _____, hereby certify, to
(Print Name of person opening the account or adding new accounts or services to an established relationship)

the best of my knowledge, that the information provided above is complete and correct.

Signature
X _____ *Kevin Kang* _____                                      Date 01 , 16 , 2020

Bank deposits FDIC insured  |  Equal Housing Lender �император                    2 of 4

SEC-TDBANK-E-0000502

SEC-TDBANK-E-0000477

**PLEASE MAKE ADDITIONAL COPIES OF THIS PAGE AS INDICATED BY TD PERSONNEL.**

Beneficial Owner _____ Information:

| Individual First Name: | Middle Initial: | Last Name: |
|---|---|---|

| Street Address (no PO Boxes): | City: |
|---|---|

| State/Province: | Zip/Postal Code: | Country: |
|---|---|---|

| Social Security Number (SSN) (US persons only): | Date of Birth: | % of Ownership: % |
|---|---|---|

Non-US persons, please complete the fields below

| Primary ID Type (passport or other): | Number: |
|---|---|

| Country: | Date of Issuance: | Exp. Date: |
|---|---|---|

Does the Individual hold the ownership interest in the Legal Entity Indirectly (via an ownership interest in an intermediate company)?  ☐ Yes  ☐ No
If yes, provide the name of the intermediate company below:

Name of Company with Ownership Interest in this Relationship:

Beneficial Owner _____ Information:

| Individual First Name: | Middle Initial: | Last Name: |
|---|---|---|

| Street Address (no PO Boxes): | City: |
|---|---|

| State/Province: | Zip/Postal Code: | Country: |
|---|---|---|

| Social Security Number (SSN) (US persons only): | Date of Birth: | % of Ownership: % |
|---|---|---|

Non-US persons, please complete the fields below

| Primary ID Type (passport or other): | Number: |
|---|---|

| Country: | Date of Issuance: | Exp. Date: |
|---|---|---|

Does the Individual hold the ownership interest in the Legal Entity indirectly (via an ownership interest in an intermediate company)?  ☐ Yes  ☐ No
If yes, provide the name of the intermediate company below:

Name of Company with Ownership Interest in this Relationship:

Beneficial Owner _____ Information:

| Individual First Name: | Middle Initial: | Last Name: |
|---|---|---|

| Street Address (no PO Boxes): | City: |
|---|---|

| State/Province: | Zip/Postal Code: | Country: |
|---|---|---|

| Social Security Number (SSN) (US persons only): | Date of Birth: | % of Ownership: % |
|---|---|---|

Non-US persons, please complete the fields below

| Primary ID Type (passport or other): | Number: |
|---|---|

| Country: | Date of Issuance: | Exp. Date: |
|---|---|---|

Does the Individual hold the ownership interest in the Legal Entity Indirectly (via an ownership interest in an intermediate company)?  ☐ Yes  ☐ No
If yes, provide the name of the intermediate company below:

Name of Company with Ownership Interest in this Relationship:

SEC-TDBANK-E-0000503

SEC-TDBANK-E-0000477

## General Instructions

**What is this form?**

Federal law requires U.S. financial institutions to obtain, verify, and record information about the beneficial owners of, and individuals with significant control over, legal entities.

A legal entity includes a corporation, limited liability company, partnership and any other similar business entity formed in the United States or a foreign country.

**Who has to complete this form?**

This certification form must be completed by the person opening a new account or adding new accounts or services to an established relationship on behalf of a legal entity with any of the following US financial institutions: (i) a bank or credit union, (ii) a broker or dealer in securities; (iii) a mutual fund; (iv) a futures commission merchant; or (v) an introducing broker in commodities.

**What information do you have to provide?**

This form requires you to provide the name, address, date of birth and Social Security Number* for the following individuals:

<u>Individual with Control:</u>

- **One** individual with significant responsibility for managing the legal entity, such as:
  - An executive officer or senior manager (e.g., Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, Treasurer), or
  - Any other individual who regularly performs similar functions; and

<u>Beneficial Owner:</u>

- **Each** individual, if any, who owns, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, 25 percent or more of the equity interests of the legal entity (e.g., each natural person that owns 25 percent or more of the shares of a corporation). *There may be instances where you will be asked to provide this information on 10 percent owners, in accordance with TD policies.*

*Note

- For a US person, provide a Social Security Number,
- For a Non-US person (non-US Citizen or Resident Alien), provide a passport number, country and date of issuance and expiration date. In lieu of a passport, non-US persons may also provide the equivalent information regarding any other government-issued form of identification evidencing nationality or residence and bearing a photograph or similar safeguard.

TD Bank may also ask to see a government-issued form of identification (e.g. driver's license, passport, etc.) for each of the individuals listed on this form and record details about the identification (i.e., issuer, dates of issuance and expiration and document number).

*You must notify TD Bank promptly in the event of any change to the information in Section I or II of this form.*

*If there have been no updates or changes to the Individual with Control or Beneficial Ownership information of the legal entity customer since the last time a Certification Form was provided, you may skip Section I and II and move to Section III.*

*Instructions for Store Team Members: For New Accounts scan and email to CIFNEWBusinessAccounts@td.com*
*For existing accounts/maintenance scan and email to CIFAccountMaintenanceDocs@td.com*

SEC-TDBANK-E-0000504

SEC-TDBANK-E-0000477

**Bank**
America's Most Convenient Bank™

**ASSESSING YOUR NEW BUSINESS ACCOUNT**
TO BE COMPLETED FOR ALL NEW BUSINESS ACCOUNTS

## SECTION 1A: STORE/ACCOUNT INFORMATION
### TO BE COMPLETED DAY OF ACCOUNT OPENING
(Fill in or CIRCLE answer for each question)

| | | | |
|---|---|---|---|
| Store Employee: | Natosha M Fraser | Date Opened: | 01/15/2020 |
| Store Location: | 57th and 3rd | Store Number: | 3562 |
| Product Type: | TD Bus Convenience Plus Ckg | Account Number: | ████4138 |
| Account Title: | BISON DIGITAL LLC | Phone Number: | (646) 968-0600 |
| | | Best Time to Contact: | Evenings |

Primary Contact Name: KEVIN        KANG
Legal Address: 38 E 37TH ST STE 11
NEW YORK                              NY   10016
Business Email Address: KEVIN@BKCOINCAPITAL.COM
New or Existing TD Business Customer:   New   (Existing)   Home Based:   Yes   (No)

## SECTION 1B: BUSINESS INFORMATION
### TO BE COMPLETED DAY OF ACCOUNT OPENING
(Fill in or CIRCLE answer for each question)

Is the business location at the same address being used to establish account?   ☒ Yes   ☐ No
   If No, please explain:
Type of Business (Circle one):   Corporation   Partnership   (LLC)   LLP   Sole Proprietor
   Non-Profit   Government/Municipal   Other (Describe)
Principle Line of Business   Miscellaneous Financial Investment Activities
   If "Other", describe   finance investment
Purpose of account (payroll, escrow, operating account, etc):   Payroll
Length of time in business:   > 24 months   Does it match the formation documents?   (Yes)   No
   If No, please explain:
Estimated Annual Sales:   $0 - $500,000
Number of Employees:   2
Business geographical area coverage:   In TD Market Area
Is the Business located within market?   (Yes)   No
   If No, please explain:
How is the business paid by its customers?   various
What types of customers/vendors will the business be working with?   consumer
Where does the business maintain merchandise or equipment?

## SECTION 1C: HOME BASED BUSINESS
### TO BE COMPLETED DAY OF ACCOUNT OPENING
(Fill in or CIRCLE answer for each question)

Does the home address provided match the identification of owner?   Yes   No
   If No, please explain:
How long have you lived at your current address?   Do you own or rent?   Own   Rent
**For all home based businesses provide 4 or more items from below checklist   (check all that apply)**
Documents must be sent to CIF with account package (exception- do not photo copy driver's license)
- ☐ Known/Existing Customer for more than 6 months
- ☐ Business open more than 6 months. If so, how was this verified?
- ☐ Has license for trade business (day care, architect, plumber, electrician etc.) or Sales tax usage doc
- ☐ Has Commercial vehicle registration with address that matches business/home address
- ☐ Business is listed on Home Advisor with matching contact information
- ☐ Has invoice or bill mailed to address in business name or in the name of the business owner
- ☐ If property is rented, provide copy of rental agreement
- ☐ If owned, has tax bill, mortgage statement or other means of ownership verification (town tax list online, etc.)
- ☐ Driver's license matches address given (do not photocopy)
- ☐ Website exists and matches information given (provide screenshot)
- ☐ IRS TIN Letter
- ☐ Personal paystub with home address
- ☐ Most recent personal tax return
- ☐ Vehicle Registration
- ☐ Verification from State Website
- ☐ Bank Statement from other banks previous 2 months of activity
- ☐ W2s

SEC-TDBANK-E-0000505

SEC-TDBANK-E-0000477

## SECTION 1D: TO BE COMPLETED DAY OF ACCOUNT OPENING

**BUSINESS ACCOUNT OPENING DOCUMENT CHECKLIST**
Account opener MUST initial each box within a column to evidence each document collected. Any deviations from the required documentation described below should be **Bumped Up!**

| | Corporation | LLC | Partnership (Including Partnership, LP and LLP) | Unincorporated Association / Not for Profit | Sole-Prop |
|---|---|---|---|---|---|
| ▢ = Document required  ▨ = Document required if operating a Home Based Business  ■ = Document not required | | | | | |
| Articles of Incorporation/Organization (filed with the state) OR Certificate of Good Standing (issued by state or court) OR State website report | | NF | | | |
| TD General Business Resolution | | Nr | | | |
| Fictitious Name Registration (if applicable by state, county, or local registrar) | | | | | |
| Operating Agreement (if applicable) | | Nr | | | |
| Board of Director's Resolution/By-Laws (if applicable) | | | | | |
| Partnership Banking Agreement (if applicable) | | | | | |
| Chapter and Bylaws of Association OR copy of minutes of last meeting with new elected officers (if applicable) | | | | | |
| FOR HOME BASED BUSINESSES, COLLECT FOUR ITEMS FROM THE LIST IN SECTION 1C) | | | | | |
| Business Site Visit form | | NF | | | |
| Signed Beneficial Ownership Long Form | | Nf | | | |

## SECTION 2: REVIEW OF NEW ACCOUNT PRODUCT, FORMS AND OPENING DEPOSIT
### TO BE COMPLETED DAY OF ACCOUNT OPENING        (Fill in or CIRCLE answer for each question)

**Review of Existing Accounts your Customer may have:**

Does the signer's signature match identification and any existing signature cards found on FileNet?   **(YES)**   NO   N/A

Are there holds or special instructions on any existing accounts?   YES   NO   **(N/A)**

Length of Business Account Relationship?  _24?s_   Length of Personal Account Relationship?  _N/A_

**Review of the Opening Deposit:**

How is the opening deposit being made?   CHECK   CASH   **(TRANSFER)**   (Circle all that apply)

If Cash is being deposited - does it make sense for how the business gets paid? _____

If a Check is deposited - is the check payable to the name of the business?   YES   NO   **(N/A)**

Was the Starter Kit Deposit Ticket used for the opening deposit?   **(YES)**   NO   N/A

Was the minimum opening deposit made (based on product type)?   **(YES)**   NO   N/A

If no, please explain: _____

Was the check processed through Early Warning in Encore?   YES   **(NO)**

If yes, note any response from Early Warning: _____

If no, please explain:  _Transfer From Acct_

Is date on check prior to the date of the formation documents? If Yes, **Bump It Up!**   YES   NO   **(N/A)**

Does the payee and address on the check exactly match the title on the account? If not, **Bump It Up!**   YES   NO   **(N/A)**

Was the business entity registered within 15 calendar days prior to the account being established?   YES   **(NO)**

If Yes, **Bump It Up** to your SM.

**ALERT!** If there are any concerns with the account, opening deposit and/or Customer **Bump It Up!**

SEC-TDBANK-E-0000506

SEC-TDBANK-E-0000477

**SECTION 3: STORE MANAGEMENT REVIEW** - To be completed by a Store Manager or ASM *other than account opener* no later than the following business day
(Fill in or circle answer for each question)

**Research Information about the business**

Research the business (including through the internet e.g. Google, Bing).

Describe results and/or opportunities: *No Search Results Returned*

List business website if applicable: *Business doesn't have site at this time*

Describe why Google Map search fit the business type: *Commercial/res Build*

Business located within the vicinity/market area of your Store?     (YES)     NO     N/A

If No or N/A, describe why:

**SECTION 4: THANK YOUR CUSTOMER** - To be completed by a Store Manager or ASM *other than account opener* no later than the following business day
(Fill in or circle answer for each question)

Business reached via phone (using directory assistance or 411.com)?     (YES)     NO

Thank You Card mailed with Store Manager business card?     (YES)     NO

Additional comments/opportunities identified (and entered into your calendar/tickler system for follow-up)
*SBSC   SBLOC*

**SECTION 5: DOCUMENTATION / WRAP-UP** - To be completed by a Store Manager or ASM *other than account opener* no later than the following business day
(Fill in or circle answer for each question)

Site visit form printed and time scheduled for visit?     (YES)     NO

All business documents referenced on page 2 have been collected and reviewed (per AYNB Guidelines)?     (YES)     NO

If Assessing Your Business form and/or Site Visit form was completed by a business partner or another line of business, record their name and title:

After completing this checklist, reviewing documentation, and performing additional due diligence, sign and date below. Send the New Account and ALL supporting documentation to CIF for imaging. If any exceptions were made, please attach RMM email.

Reviewed by Signature: _____     Date: 1/13/16

Print Name/Title: *Michael Macoske   SM*

Rev 07/16 | TD BANK, N.A

SEC-TDBANK-E-0000507

**TD Bank**

America's Most Convenient Bank®

**Business Site Visit Form must be completed within 5 calendar days of opening by Store Management**

Business Name: BISON DIGITAL LLC _____ Date Account Opened: _____

Business Physical Address: 38 E 37TH ST NEW YORK, NY 10016 _____

Business Phone Number: (646) 968 - 0600 _____ Account #(s): ▓▓▓▓ 4138 / _____ / _____

Business Owner Contact Name and Title: KEVIN KANG _____

| Section I | Must be completed for Home Based Businesses Only |
|---|---|

Are you able to verify the residential address through Google maps or current tax records? (Review AYB Guide)
If Yes ☐ Attach Documents   If No ☐ Business Site Visit is Required   **Describe observations below:**

Comments: _____

| Section II | Must be completed for all Businesses that are not Home Based |
|---|---|

After tour or Business Site Visit completion, is the business operational; appears to be functioning as the business
described?            Yes ☑            No ☐

Comments: _____

Is there appropriate signage for the nature or type of business? Yes ☐   No ☐

Does the business have an ATM on site? Yes ☐   No ☑ If Yes How is the ATM Funded? _____

Please indicate which signs for the following services are visible:

Check Cashing ☐ Check Cashing Fees ☐ Lottery Sales ☐ Sale of Money Orders ☐ Western Union ☐ Payday Lending ☐

Describe Observations: _____

Is there inventory on site? Yes ☐   No ☐   N/A ☑

Describe observations: _____

Did your observations agree with your expectations for this type of business? Yes ☐   No ☐ **If No Bump It Up!**

Comments: _____

I personally conducted the above described physical site visit on:      Date of Visit: 1/18/22

Site Visit Completed by:

MICHAEL YACONNE _____         _____ (signature)
**Print Name and Title**                                    **Signature**

Rev. 2/2018 | TD BANK, N.A.

SEC-TDBANK-E-0000508

# **ATTACHMENT 16**



**TRIAL LAWYERS**

October 5, 2022

<u>**Via Email Only**</u>

███████████████████████████

**RE: Notice of Suspension – BKCoin Multi-Strategy Fund**

Dear Investor:

You are receiving this letter because you are an investor in BKCoin Multi-Strategy Fund[1] (the "Fund"). I have been asked to contact you on behalf of BKCoin Management, LLC to advise you that certain suspensions, as set forth below, have been declared in connection with each of the three entities comprising BKCoin Multi-Strategy Fund, namely in connection with each of:

> BKCoin Multi-Strategy Fund LP, a Delaware limited partnership
> BKCoin Multi-Strategy Master Fund Ltd., a BVI company
> BKCoin Multi-Strategy Fund Ltd., a BVI company

(1)  <u>BKCoin Multi-Strategy Master Fund Ltd.</u>[2]

> In connection with BKCoin Multi-Strategy Master Fund Ltd., the Directors, pursuant to <u>Regulation 6.1</u> of the Company's Memorandum and Articles of Association (the "<u>M&A</u>"), declared a suspension of each of the following:
>
>> i. the determination of Net Asset Value per Share of all Classes;
>> ii. the redemption of Participating Shares of all Classes; and
>> iii. the payment of redemption proceeds,
>
> effective as of 5:55PM Eastern Standard time October 4, 2022, pending an informal internal review.

(2)  <u>BKCoin Multi-Strategy Fund LP</u>[3]

> In connection with BKCoin Multi-Strategy Fund LP, the General Partner, pursuant to <u>Section 9.11</u> and <u>Section 9.12</u> of the Fund's limited partnership agreement (the "<u>LPA</u>") has decided to (i) suspend all Capital Account withdrawals and the determination of net asset value, and (ii) suspend the right of any Partner to withdraw capital or receive a distribution from the Partnership, effective as of 5:55PM Eastern Standard time October 4, 2022, pending an informal internal review.

(3)  <u>BKCoin Multi-Strategy Fund Ltd.</u>[4]

---

[1] When referencing 'BKCoin Multi-Strategy Fund', we are referring to all investors in the Fund, whether investing initially by way of the domestic feeder entity, BKCoin Multi-Strategy Fund LP, a Delaware limited partnership, or by way of the offshore feeder entity, BKCoin Multi-Strategy Fund Ltd., a BVI company, in each case feeding in to BKCoin Multi-Strategy Master Fund Ltd., a BVI company.

[2] Capitalized terms in this section not otherwise defined in this letter, shall be as defined in the M&A of this entity.

[3] Capitalized terms in this section not otherwise defined in this letter, shall be as defined in the LPA of this entity.

[4] Capitalized terms in this section not otherwise defined in this letter, shall be as defined in the M&A of this entity.

2525 PONCE DE LEON BLVD., SUITE 625, CORAL GABLES, FL 33134
PH : (786) 600-7448 | F : (786) 607-3022
WWW.AA-FIRM.COM

FOIA Confidential Treatment Requested
by State Street Bank and Trust Company

In connection with BKCoin Multi-Strategy Fund Ltd., the Directors, pursuant to <u>Regulation 6.1</u> of the Company's Memorandum and Articles of Association (the "<u>M&A</u>"), declared a suspension of each of the following:

        i. the determination of Net Asset Value per Share of all Classes;
        ii. the redemption of Participating Shares of all Classes; and
        iii. the payment of redemption proceeds,

effective as of 5:55PM Eastern Standard time October 4, 2022, pending an informal internal review.

For each of (1)-(3) above, the duration of the suspension shall be indefinite, and shall continue in effect until the Directors or General Partner, as applicable, declare the suspension to be at an end.

My law firm, Annesser Armenteros, PLLC, has been engaged by BKCoin Management, LLC to assist the informal review process. As soon as the review is completed, you will be notified and we anticipate a report will be made to all investors at that time. All contacts related to this, should be directed to my firm, though we will not be able to provide you with any information while this internal review process is ongoing.

Yours truly,

John Annesser, Esq.
Annesser Armenteros PLLC
2525 Ponce de Leon
Coral Gables, Florida 33134
(786) 600-7446
jannesser@aa-firm.com

2

FOIA Confidential Treatment Requested
by State Street Bank and Trust Company

SSBT_0000261

# **ATTACHMENT 17**

| From: | Kevin Kang |
|---|---|
| To: | Bender, Adrienne |
| Cc: | Brown, Armita; Noble, Kristina; BKCoinNAV; Carlos Betancourt |
| Subject: | [External] Re: BKCoin - touching base |
| Date: | Monday, July 18, 2022 8:52:38 PM |
| Attachments: | Activity - Deposit Accounts.pdf |

Hi Adrienne - please see below:

1. Other than admin and management are there any non-trading accruals that should be booked for June? - No
2. Do any of the investment types have interest accruals? - No
3. Confirm no new issue for June 2022 - No issue
4. Can you please send a copy of your holdings report? We will reconcile to Lukka but also back to BKCoin as a second check. - Please see attached. Lukka should be connected to Blockfills now to see all the trades.
5. Are there any other cash or brokerage accounts outside of STT and Blockfills via Lukka? - At Silvergate bank, please see attached.

Thanks,

On Mon, Jul 11, 2022 at 1:45 PM Bender, Adrienne <Adrienne.Bender@statestreet.com> wrote:

**Information Classification: ●● Limited Access**

Hi Kevin – Thanks for the quick reply. Here are our questions thus far:

1. Other than admin and management are there any non-trading accruals that should be booked for June?
2. Do any of the investment types have interest accruals?
3. Confirm no new issue for June 2022
4. Can you please send a copy of your holdings report? We will reconcile to Lukka but also back to BKCoin as a second check.
5. Are there any other cash or brokerage accounts outside of STT and Blockfills via Lukka?

**Adrienne A. Bender**

Vice President

**State Street Institutional Services**   Alternative Investment Solutions   International Fund Services

640 College Road East, 2nd Floor, Princeton, NJ 08540

P +1 609 580 5966   adrienne.bender@ifs.statestreet.com

The information contained in this email and any attachments have been classified as limited access and/or privileged State Street information/communication and is intended solely for the use of the named addressee(s). If you are not an intended recipient or a person responsible for delivery to an intended recipient, please notify the author and destroy this email. Any unauthorized copying, disclosure, retention or distribution of the material in this email is strictly forbidden. We respect your privacy and are committed to protecting your personal data. Click **here** to view our Data Processing and Privacy Notice which will inform you, how we look after your personal data, and, depending on where you are domiciled, about your privacy rights under applicable laws.

**Go green.** Consider the environment before printing this email.

**From:** Kevin Kang <kevin@bkcoincapital.com>
**Sent:** Monday, July 11, 2022 12:38 PM
**To:** Bender, Adrienne <Adrienne.Bender@statestreet.com>
**Cc:** Brown, Armita <armita.brown@statestreet.com>; Noble, Kristina <Kristina.Noble@statestreet.com>; BKCoinNAV <BKCoinNAV@StateStreet.com>; Carlos Betancourt <carlos@bkcoincapital.com>
**Subject:** [External] Re: BKCoin - touching base

Yes, we expect a June NAV and statements.

Will be on the lookout for your email today.

Thanks,

Kevin

On Mon, Jul 11, 2022 at 12:31 PM Bender, Adrienne <Adrienne.Bender@statestreet.com> wrote:

**Information Classification:** ●● **Limited Access**

Hi Kevin – We understand from Kristina in our middle office team that there were some June trades done and Kristina has closely been working with Lukka to get them set-up to them load into our system. I want to confirm that you are expecting a June NAV and investor statements. We are wrapping up a few things on our end and then will pivot to the NAV process. We have a list of outstanding items/questions on our end that we will also get to you today or tomorrow. We will need to go through a quality assurance review (this is a one-time standard process for any new fund launch), which may add a bit of

extra time on our end to deliver a final nav.  We would look to deliver you a prelim nav as we await QA review.  We will be in touch with our open items shortly.

Thanks.

**Adrienne A. Bender**

Vice President

**State Street Institutional Services** – Alternative Investment Solutions – International Fund Services

600 College Road East, 2nd Floor, Princeton, NJ 08540

P +1 609 580 5960   adrienne.bender@ifs.statestreet.com

The information contained in this email and any attachments have been classified as limited access and/or privileged State Street information/communication and is intended solely for the use of the named addressee(s). If you are not an intended recipient or a person responsible for delivery to an intended recipient, please notify the author and destroy this email. Any unauthorized copying, disclosure, retention or distribution of the material in this email is strictly forbidden. We respect your privacy and are committed to protecting your personal data. Click **here** to view our Data Processing and Privacy Notice which will inform you how we look after your personal data, and, depending on where you are domiciled, about your privacy rights under applicable laws.

**Go green.** Consider the environment before printing this email.

--

**Kevin Kang, CFA**

Founding Principal

**BKCoin Capital, LP**

38 E 37th Street Ste 11

New York, NY 10016

D (646) 968-0600

M (435) 262-2302

kevin@bkcoincapital.com

NOTICE: This email transmission and/or the attachment is accompanying it may contain confidential information belonging to the sender which is protected by law. This information is intended only for the use of the individual or entity to whom it was intended. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this email transmission in error, please promptly notify the sender by reply e-mail, and then destroy all copies of the transmission. Any opinions expressed in this email, including attachments, are those of the author and do not necessarily reflect the opinions of BKCoin Capital. Although every attempt has been taken to ensure protection against viruses in electronic documents, we cannot accept any responsibility for, and consequently disclaim all liability for, damage arising from attachments to the virus, though not currently known.

--
**Kevin Kang, CFA**
Founding Principal

**BKCoin Capital, LP**
38 E 37th Street Ste 11
New York, NY 10016
D (646) 968-0600
M (435) 262-2302
kevin@bkcoincapital.com

NOTICE: This email transmission and/or the attachment accompanying it may contain confidential information belonging to the sender which is protected by law. This information is intended only for the use of the individual or entity to whom it was intended. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this email transmission in error, please promptly notify the sender by reply e-mail, and then destroy all copies of the transmission. Any opinions expressed in this email, including attachments, are those of the author and do not necessarily reflect the opinions of BKCoin Capital. Although every attempt has been taken to ensure protection against viruses in electronic documents, we cannot accept any responsibility for, and consequently disclaim all liability for, damage arising from attachments to the virus, though not currently known.



## Activity - Deposit Accounts

| | |
|---|---|
| Report created | 06/30/2022 05:40:58 PM (ET) |
| Account | ▉▉▉▉*7060 • Checking • Multi-Strategy |
| Date range | 5/24/2022 to 6/30/2022 |
| Transaction types | All transactions |
| Detail option | Includes transaction detail |
| Total by day | Includes totals by day within the selected date range |

▉▉▉▉*7060 • Checking • Multi-Strategy

| Post Date | Reference | Additional Reference | Description | Debit | Credit | Calculated Ending Balance |
|---|---|---|---|---|---|---|
| 06/21/2022 | 34816 | | OUTGOING MONEY TRANSFER<br>M06LI2740HGWPZ4K BENE RELIZ LTD | $797,400.00 | | $15,602,600.00 |
| 06/21/2022 | Total Calculated Debits (1 item) | | | $797,400.00 | | |
| 06/16/2022 | 14968 | | INCOMING MONEY TRANSFER<br>M06GJ2924FQXLOEC ORIG BKCOINLP BPQ7 | | $15,000,000.00 | $16,400,000.00 |
| 06/16/2022 | 14880 | | INCOMING MONEY TRANSFER<br>M06GJ24343XWX39X ORIG BKCOIN MULTI-STRATEGY FUND LTD BPQ8 | | $1,400,000.00 | |
| 06/16/2022 | Total Calculated Credits (2 items) | | | | $16,400,000.00 | |
| 06/23/2022 | Totals | | | $797,400.00 | $16,400,000.00 | |

# **ATTACHMENT 18**

| | |
|---|---|
| **From:** | Kevin Kang |
| **To:** | Wilson-Omara, Michele |
| **Subject:** | [External] Re: Silvergate Activity Export |
| **Date:** | Friday, August 12, 2022 3:12:45 PM |
| **Attachments:** | SilvergateExport.pdf |

No problem - please see attached.

Thanks,
Kevin

On Fri, Aug 12, 2022 at 2:42 PM Wilson-Omara, Michele <Michele.Wilson-Omara@statestreet.com> wrote:

**Information Classification: ●● Limited Access**

Hey Kevin,


Thanks so much, sorry to be a pain, could you send in PDF as well.


Thanks,


**Michele Wilson-Omara**

Assistant Vice President

**State Street Institutional Services**   Alternative Investment Solutions   International Fund Services

690 College Road East, 2nd Floor, Princeton, NJ 08540

P +1 609 580 6293   michele.wilson-omara@statestreet.com


The information contained in this email and any attachments have been classified as limited access and/or privileged State Street information/communication and is intended solely for the use of the named addressee(s). If you are not an intended recipient or a person responsible for delivery to an intended recipient, please notify the author and destroy this email. Any unauthorized copying, disclosure, retention or distribution of the material in this email is strictly forbidden. We respect your privacy and are committed to protecting your personal data. Click here to view our Data Processing and Privacy Notice which will inform you how we look after your personal data, and, depending on where you are domiciled, about your privacy rights under applicable laws.

**Go green.** Consider the environment before printing this e-mail.


**From:** Kevin Kang <kevin@bkcoincapital.com>
**Sent:** Friday, August 12, 2022 2:40 PM
**To:** Wilson-Omara, Michele <Michele.Wilson-Omara@statestreet.com>

**Cc:** BKCoinNAV <BKCoinNAV@StateStreet.com>; BKCoinTA
<BKCoinTA@StateStreet.com>; Carlos Betancourt <carlos@bkcoincapital.com>; Mark
Treinkman <mark@bkcoincapital.com>
**Subject:** [External] Silvergate Activity Export

Hi Michele - please see attached.

Thanks,

--

**Kevin Kang, CFA**

Founding Principal

**BKCoin Capital, LP**

38 E 37th Street Ste 11

New York, NY 10016

D (646) 968-0600

M (435) 262-2302

kevin@bkcoincapital.com

NOTICE: This e-mail transmission, and/or the attachments accompanying it, may contain confidential information belonging to the sender which is protected by law. The information is intended only for the use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Any unauthorized interception of this transmission is illegal. If you have received this transmission in error, please promptly notify the sender by reply e-mail, and then destroy all copies of the transmission. Any opinions expressed in this email, including any attachments, are those of the author and do not necessarily reflect the opinions of BK Coin Capital. We will not accept responsibility for any commitments made by our employees outside the scope of our business. Whilst every effort has been taken to ensure email is protected against virus infection, we cannot accept any responsibility for virus consequently, please ensure that all attachments are virus checked prior to opening.

--
**Kevin Kang, CFA**
Founding Principal

**BKCoin Capital, LP**
38 E 37th Street Ste 11
New York, NY 10016
D (646) 968-0600
M (435) 262-2302
kevin@bkcoincapital.com

NOTICE: This e-mail transmission and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please promptly notify the sender by reply e-mail and then destroy all copies of the transmission and any attachments. Any views or opinions expressed in this email, including attachments, are those of the author and do not necessarily reflect the opinions of BKCoin Capital, LP. We will not accept responsibility for any communications made by employees before the employment of such employees. Whilst every effort has been taken to ensure protection against virus infection we cannot accept any responsibility. It is always your own responsibility to ensure that all attachments are virus checked prior to opening.

| TRC Number | Account Num | Account Type | Account Nan | Post Date | Reference | Additional Re | Amount | Description | Type | Text | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 322286803 | ███ 7060 | Checking | Multi-Strateg | 6/16/22 | 14880 | | $1,400,000.00 | INCOMING N | Deposit | M06GJ24343XWX39X | ORIG:BKCOIN MULTI-STRATEGY FUND LTD BPQ8 |
| 322286803 | ███ 7060 | Checking | Multi-Strateg | 6/16/22 | 14968 | | $15,000,000.00 | INCOMING N | Deposit | M06GJ2924FQXLOEC | ORIG:BKCOINLP BPQ7 |
| 322286803 | ███ 7060 | Checking | Multi-Strateg | 6/21/22 | 34816 | | ($797,400.00) | OUTGOING I | Wire | M06LI2740HGWP24K | BENE:RELIZ LTD |
| 322286803 | ███ 7060 | Checking | Multi-Strateg | 6/24/22 | 14695 | | ($525,000.00) | OUTGOING I | Wire | M06OK313247YEJXT | BENE:RELIZ LTD |
| 322286803 | ███ 7060 | Checking | Multi-Strateg | 7/1/22 | 14546 | | $1,300,000.00 | INCOMING N | Deposit | M071J3707KIYDZ8M | ORIG:BKCOIN MULTI-STRATEGY FUND LTD BPQ8 |
| 322286803 | ███ 7060 | Checking | Multi-Strateg | 7/7/22 | 233 | | ($499,950.00) | BOOK TRANSFER DEBIT | | Ref 1881105 to Dep ███ 5411 | |
| 322286803 | ███ 7060 | Checking | Multi-Strateg | 7/13/22 | 8133 | | ($11,609.39) | OUTGOING I | Wire | M07DF4037IU2ORPI | BENE:RELIZ LTD |

# **ATTACHMENT 19**

| From: | Kevin Kang |
|---|---|
| To: | Wilson-Omara, Michele |
| Subject: | [External] Re: August Statement Request |
| Date: | Thursday, September 15, 2022 6:14:21 PM |
| Attachments: | image001.png |
| | SilvergateExport.csv |
| | SilvergateExport.pdf |
| | BlockFIcompleted-orders_2022-08-30T10_57_12-04_00.csv |

Hi Michele - sincere apologies for the delay. Still catching up on emails.. Please see attached. We requested a statement from Galaxy and will send it to you as soon as we receive it.

Thanks,
Kevin

On Tue, Sep 13, 2022 at 3:18 PM Wilson-Omara, Michele <Michele.Wilson-Omara@statestreet.com> wrote:

Information Classification: ●● Limited Access

Hi Kevin,

I am so sorry to keep asking but I am just missing the below statements and once I receive I can finalize the August NAV. Please let me know when you think you will be sending.

Thanks,

**Michele Wilson-Omara**

**Assistant Vice President**

State Street Institutional Services · Alternative Investment Solutions · Accounting & Fund Services

[illegible]

P: [illegible] 506-[illegible]   michele.wilson-omara@statestreet.com

The information contained in this email and any attachments have been classified as limited access and is privileged State Street information communicated and maintained solely for the use of the named addressee(s). If you are not an intended recipient or a person responsible for delivery to an intended recipient, please notify the author and destroy this email. Any unauthorized copying, disclosure, retention or distribution of the material in this email is strictly forbidden. We respect your privacy and are committed to protecting your personal data. Click here to view our Data Processing and Privacy Notice which will inform you how we process your personal data, and, depending on where you are domiciled, your rights with regard to your personal data under applicable laws.

**Go green.** Consider the environment before printing this e-mail.

**From:** Wilson-Omara, Michele
**Sent:** Monday, September 12, 2022 1:50 PM
**To:** Kevin Kang <kevin@bkcoincapital.com>
**Subject:** RE: [External] Re: August Statement Request

Information Classification: ●● Limited Access

Hi Kevin,

Just checking in on the Silvergate statements. Also do you have anything you can send that shows the positions at Galaxy and BlockFi.

Thanks,

**Michele Wilson-Omara**

Assistant Vice President

State Street Institutional Services · Alternative Investment Solutions · International Fund Services

600 College Road East, 2nd Floor  Princeton, NJ 08540

P: +1 609 580 4202    michele.wilson-omara@statestreet.com

The information contained in this email and any attachments have been classified as Limited Access and/or Privileged State Street information communication and is intended solely for the use of the named addressee(s). If you are not an intended recipient or a person responsible for delivery to an intended recipient, please notify the author and destroy this email. Any unauthorized copying, disclosure, retention or distribution of the material in this email is strictly forbidden. We respect your privacy and are committed to protecting your personal data. Click **here** to view our Data Processing and Privacy Notice which will inform you how we look after your personal data, and, depending on where you are domiciled, about your privacy rights under applicable laws.

**Go green.** Consider the environment before printing this e-mail.

**From:** Wilson-Omara, Michele
**Sent:** Thursday, September 8, 2022 9:22 AM
**To:** Kevin Kang <kevin@bkcoincapital.com>
**Subject:** RE: [External] Re: August Statement Request

Information Classification: ●● Limited Access

Thanks for letting me know Kevin!

**Michele Wilson-Omara**

Assistant Vice President

State Street Institutional Services · Alternative Investment Solutions · International Fund Services

600 College Road East, 2nd Floor  Princeton, NJ 08540

P: +1 609 580 4202    michele.wilson-omara@statestreet.com

The information contained in this email and any attachments have been classified as Limited Access and/or Privileged State Street information communication and is intended solely for the use of the named addressee(s). If you are not an intended recipient or a person responsible for delivery to an intended recipient, please notify the author and destroy this email. Any unauthorized copying, disclosure, retention or distribution of the material in this email is strictly forbidden. We respect your privacy and are committed to protecting your personal data. Click **here** to view our Data Processing and Privacy Notice which will inform you how we look after your personal data, and, depending on where you are domiciled, about your privacy rights under applicable laws.

**Go green.** Consider the environment before printing this e-mail.

**From:** Kevin Kang <kevin@bkcoincapital.com>
**Sent:** Thursday, September 8, 2022 9:13 AM
**To:** Wilson-Omara, Michele <Michele.Wilson-Omara@statestreet.com>
**Subject:** [External] Re: August Statement Request

Hi MIchele - out of office until tomorrow. Let me pull that for you asap.

Thanks,

Kevin

On Tue, Sep 6, 2022 at 4:39 PM Wilson-Omara, Michele <Michele.Wilson-Omara@statestreet.com> wrote:

**Information Classification: ●● Limited Access**

Hi Kevin,

Just following up on the below.

Thanks,

**Michele Wilson-Omara**

Assistant Vice President

State Street Institutional Services | Alternative Investment Solutions – International Fund Services

One College Road East, 2nd Floor, Princeton, NJ 08540

P | | | | | michele.wilson-omara@statestreet.com

The information contained in this email and any attachments have been classified as Limited Access and or privileged State Street information communication and is intended solely for the use of the named addressee(s). If you are not an intended recipient or a person responsible for delivery to an intended recipient, please notify the sender and delete this email. Any unauthorized copying, disclosure, retention or distribution of the material in this email is strictly forbidden. We respect your privacy and are committed to protecting your personal data. Click **here** to view our Data Processing and Privacy Notice which tell you more about how we look after your personal data, and depend on it, allow you, depending on where you are domiciled, about your privacy rights under applicable laws.

**Go green.** Consider the environment before printing this e-mail.

**From:** Wilson-Omara, Michele
**Sent:** Friday, September 2, 2022 5:12 PM
**To:** Kevin Kang <kevin@bkcoincapital.com>
**Subject:** August Statement Request

**Information Classification: ●● Limited Access**

Hi Kevin,

I was wondering if you could send me August statements for Silvergate, BlockFi and Galaxy since we don't have our own access. For Silvergate, the one you sent me in June was formatted and in pdf, wondering if you can send that one for August, I included a snippet below.

Thanks,

**Michele Wilson-Omara**

**Assistant Vice President**

**State Street Institutional Services** · Alternative Investment Solutions · International Fund Services

100 College Road East, 2nd Floor · Princeton · NJ 08540

P: 609-356-9000 · E: michele.wilson-omara@statestreet.com

The information contained in this email and any attachments have been classified to be of use, access and or privileged by State Street. This communication and its contents is solely for the use of the named addressee(s). If you are not an intended recipient or a person responsible for delivery to an intended recipient, please notify the author and destroy this email. Any unauthorized copying, disclosure, retention or distribution of the material in this email is strictly forbidden. We respect your privacy and are committed to protecting your personal data. Click **here** to view our Data Processing and Privacy Notice which will inform you how we look after your personal data and explain your choices to are promoted, about your personal data under applicable laws.

**Go green.** Consider the environment before printing this e-mail.

--

**Kevin Kang, CFA**

Founding Principal

**BKCoin Capital, LP**

38 E 37th Street Ste 11

New York, NY 10016

D (646) 968-0600

M (435) 262-2302

kevin@bkcoincapital.com

--
**Kevin Kang, CFA**
Founding Principal

**BKCoin Capital, LP**
38 E 37th Street Ste 11
New York, NY 10016
D (646) 968-0600
M (435) 262-2302
kevin@bkcoincapital.com

| TRC Number | Account Number | Account Ty | Account Name | Post Date | Reference | Additional Reference | Amount | Description | Type | Text |
|---|---|---|---|---|---|---|---|---|---|---|
| 322286803 | 7060 Checking | | Multi-Strategy | 6/16/2022 | 14880 | | $1,400,000.00 | INCOMING MONEY TRANSFER | Deposit | M06GJ24343XWX39X ORIG:BKCOIN MULTI-STRATEGY FUND LTD BPQ8 |
| 322286803 | 7060 Checking | | Multi-Strategy | 6/16/2022 | 14968 | | $15,000,000.00 | INCOMING MONEY TRANSFER | Deposit | M06GJ2924FQXLOEC ORIG:BKCOINLP BPQ7 |
| 322286803 | 7060 Checking | | Multi-Strategy | 6/21/2022 | 34816 | | ($797,400.00) | OUTGOING MONEY TRANSFER | Wire | M06LI2740HGWPZ4K BENE:RELIZ LTD |
| 322286803 | 7060 Checking | | Multi-Strategy | 6/24/2022 | 14695 | | ($525,000.00) | OUTGOING MONEY TRANSFER | Wire | M06OK131247YEIXT BENE:RELIZ LTD |
| 322286803 | 7060 Checking | | Multi-Strategy | 7/1/2022 | 14546 | | $1,300,000.00 | INCOMING MONEY TRANSFER | Deposit | M071J3707KIYDZ8M ORIG:BKCOIN MULTI-STRATEGY FUND LTD BPQ8 |
| 322286803 | 7060 Checking | | Multi-Strategy | 7/7/2022 | 233 | | ($499,950.00) | BOOK TRANSFER DEBIT | | Ref 1881105 to Dep ▮▮▮▮5411 |
| 322286803 | 7060 Checking | | Multi-Strategy | 7/13/2022 | 8133 | | ($11,609.39) | OUTGOING MONEY TRANSFER | Wire | M07DF4037IU20RPI BENE:RELIZ LTD |
| 322286803 | 7060 Checking | | Multi-Strategy | 8/26/2022 | 14968 | | $13,117.50 | INCOMING MONEY TRANSFER | Deposit | SEN from ▮▮▮4109+1856203 389191 0 ORIG: BLOCKFI INSTITUTIONS |

| TRC Number | Account Num | Account Type | Account Nam | Post Date | Reference | Additional Re | Amount | Description | Type |
|---|---|---|---|---|---|---|---|---|---|
| 322286803 | 7060 | Checking | Multi-Strateg | 6/16/22 | 14880 | | $1,400,000.00 | INCOMING N | Deposit |
| 322286803 | 7060 | Checking | Multi-Strateg | 6/16/22 | 14968 | | $15,000,000.00 | INCOMING N | Deposit |
| 322286803 | 7060 | Checking | Multi-Strateg | 6/21/22 | 34816 | | ($797,400.00) | OUTGOING I | Wire |
| 322286803 | 7060 | Checking | Multi-Strateg | 6/24/22 | 14695 | | ($525,000.00) | OUTGOING I | Wire |
| 322286803 | 7060 | Checking | Multi-Strateg | 7/1/22 | 14546 | | $1,300,000.00 | INCOMING N | Deposit |
| 322286803 | 7060 | Checking | Multi-Strateg | 7/7/22 | 233 | | ($499,950.00) | BOOK TRANSFER DEBIT | |
| 322286803 | 7060 | Checking | Multi-Strateg | 7/13/22 | 8133 | | ($11,609.39) | OUTGOING I | Wire |
| 322286803 | 7060 | Checking | Multi-Strateg | 8/26/22 | 14968 | | $13,117.50 | INCOMING N | Deposit |

Text
M06GJ24343XWX39X        ORIG:BKCOIN MULTI-STRATEGY FUND LTD BPQ8
M06GJ2924FQXLOEC        ORIG:BKCOINLP BPQ7
M06LI2740HGWPZ4K        BENE:RELIZ LTD
M06OK131247YEIXT        BENE:RELIZ LTD
M071J3707KIYDZ8M        ORIG:BKCOIN MULTI-STRATEGY FUND LTD BPQ8
Ref 1881105 to Dep ██████5411
M07DF4037IU20RPI        BENE:RELIZ LTD
SEN from ██████4109+1856203389191 0 ORIG: BLOCKFI INSTITUTIONS

| Term Sheet | Margin | Date | Client | Trade Type | Asset Type | Side | Symbol | Quantity | Price | Cost | Status | Delivery Price | Label | Order ID | txid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2022-08-26T10:39:56 | BKCoin | Spot | Currency | Sell | ETH-USD | 250 | 1647.89 | 411972 | 5 CONFIRMED | | | c76319aa-46b6-47d6-83c3-c818a9b4b835 | e8775e23-b496-4e5b-93aa-a4d0720c4b22 |
| | | 2022-08-26T10:39:51 | BKCoin | Spot | Currency | Sell | ETH-USD | 250 | 1647.52 | 411880 | CONFIRMED | | | 4089d287-4b3c-4737-a50c-7aa42a5ef054 | 1e5d5d90-155e-4cea-9df9-13928c4bfff |
| | | 2022-08-26T10:39:47 | BKCoin | Spot | Currency | Sell | ETH-USD | 250 | 1648.48 | 412120 | CONFIRMED | | | 9ee46c3e-9b2a-4da0-8a34-b7370e63a4d7 | 35655dcc-9e30-489b-bb5b-2a6fae20b1d4 |
| | | 2022-08-26T10:39:44 | BKCoin | Spot | Currency | Sell | ETH-USD | 250 | 1649.17 | 412292 | 5 CONFIRMED | | | d06d83e8-f029-4cf4-a099-dc096b3f74a7 | 2c707798-6979-4c58-ad8f-274b570f7102 |
| | | 2022-08-23T18:10:50 | BKCoin | Spot | Currency | Buy | ETH-USD | 250 | 1635.76 | 408940 | CONFIRMED | | | 68e09508-414b-47f1-aff1-e19f113d76f7 | c1ad548b-6c92-4f92-89d6-0efc9f76fce4 |
| | | 2022-08-23T18:10:46 | BKCoin | Spot | Currency | Buy | ETH-USD | 250 | 1635.64 | 408910 | CONFIRMED | | | a307b969-5a2e-4999-b63a-039002e6357c4 | 8635efb9-9a6a-432d-a30e-8c0719bbb311 |
| | | 2022-08-23T18:10:42 | BKCoin | Spot | Currency | Buy | ETH-USD | 250 | 1634.6 | 408650 | CONFIRMED | | | ba98b6fe-1c06-4643-b811-94b2dc1c5a42 | a279dc23-648e-4ae9-b7ef-39de01bc2ccf |
| | | 2022-08-23T18:10:39 | BKCoin | Spot | Currency | Buy | ETH-USD | 250 | 1634.59 | 408647 | 5 CONFIRMED | | | ac0eafbc-3432-486b-ad4e-c7242c66b4ae | 9aeb9937-6554-45d4-84c4-b81653b3c980 |

# **ATTACHMENT 20**

SEC-SILVERGATE-E-0000644

 Silvergate

BKCOIN MULTI-STRATEGY FUND LP
38 E 37TH ST STE 11
NEW YORK NY 10016-3008

| | |
|---|---|
| Page | 1 of 1 |
| Account Number: | ******7060 |
| Date | 06/30/22 |

## STATEMENT SUMMARY AS OF     06/30/22

| Account Name | Account Number | Balance |
|---|---|---|
| FINTECH HEDGE FUND | XXXXXX7060 | 6,244,543.33 |

| BKCOIN MULTI-STRATEGY FUND LP | FINTECH HEDGE FUND | ACCT | ******7060 |
|---|---|---|---|

### Summary of Activity Since Your Last Statement

| | | | |
|---|---|---|---|
| | Beginning Balance | 5/01/22 | .00 |
| | Deposits / Misc Credits | 2 | 16,400,000.00 |
| | Withdrawals / Misc Debits | 5 | 10,155,456.67 |
| ** | Ending Balance | 6/30/22 | 6,244,543.33 ** |
| | Service Charge | | .00 |

## Deposits and Other Credits

| Date | Amount | Activity Description |
|---|---|---|
| 6/16 | 1,400,000.00 | M06GJ24343XWX3SX |
| | | ORIG:BKCOIN MULTI-STRATEGY FUND LTD BPQ8 |
| 6/16 | 15,000,000.00 | M06GJ2924FQXLOEC |
| | | ORIG:BKCOINLP BPQ7 |

## Debits and Other Withdrawals

| Date | Amount | Activity Description |
|---|---|---|
| 6/21 | 797,400.00 | M06LI2740HGWPZ4K |
| | | BENE:RELIZ LTD |
| 6/23 | 1,554,286.17 | Ref 1741243 to Dep ████5445 |
| 6/23 | 5,278,770.50 | Ref 1741635 to Dep ████5445 |
| 6/24 | 525,000.00 | M06OK13124/YEIXT |
| | | BENE:RELIZ LTD |
| 6/28 | 2,000,000.00 | Ref 1791315 to Dep ████5478 |

## Daily Balance Summary

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 6/16 | 16,400,000.00 | 6/23 | 8,769,543.33 | 6/28 | 6,244,543.33 |
| 6/21 | 15,602,600.00 | 6/24 | 8,244,543.33 | | |

 Silvergate

**Account Number** ••••••7060 **Date** 06/30/2022 **PAGE** 2 of 1

SEC-SILVERGATE-E-0000652

MEMBER
FDIC

EQUAL HOUSING
LENDER

### \*\*\* IMPORTANT INFORMATION accounts for personal, household or consumer use only \*\*\*

#### IN CASE YOU SUSPECT ERRORS OR HAVE QUESTIONS ABOUT YOUR ELECTRONIC TRANSACTIONS:

Direct inquiries in writing to us at 4250 Executive Square Suite 300 La Jolla, CA 92037 and phone inquiries to our customer service number 800-595-5856 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transaction. We must hear from you no later than 60 days after the FIRST statement on which the error or problem appeared was sent to you. Include the following information

1.  Tell us your name and account number.
2.  Describe the error or the transaction you are unsure about and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error and the date it occurred

If you notify us verbally, we may require you to send us your complaint or questions in writing within 10 business days. We will generally tell you the results of our investigation within 10 business days after we hear from you. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we determine that this is necessary, we will provisionally credit your account within 10 business days for the amount you think is in error, so you will have use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account. If we determine there was no error, we will send you a written explanation within three business days after we complete our investigation. If the error involves a transaction processed on the Visa® network, your account will be provisionally credited within 5 business days from receipt of notification. You may ask for copies of the documents used in our investigation.

If you are a new customer and the error or question concerns an electronic transaction that occurred within 30 days after the first deposit to the account was made, we will tell you the results of our investigation within 20 business days after we hear from you. If we need more time, we may take up to 90 days to investigate. In this case, we will credit your account within 20 business days for the amount you think is in error, so that you have use of the money during the time it takes us to complete our investigation.

**For further information regarding your account, please refer to our Deposit Account Agreement and Regulatory Disclosure ("DAARD").**

For any other inquiries concerning your accounts, direct your inquiries in writing to 4250 Executive Square Suite 300 La Jolla, Ca 92037 or phone inquiries to our customer service number 800-595-5856.

### \*\*\* IMPORTANT INFORMATION for Foreign Currency (FC) accounts only \*\*\*

**How to contact us:** You may contact our customer service team by phone at 844-371-3276 or FCAsupport@silvergate.com

**Deposit Account Agreement:** When you opened your account, you agreed to the terms of our Foreign Currency Deposit Account Agreement and applicable fee schedule, which may be amended from time to time. This agreement governs the terms of your deposit account and transactions with Silvergate. FDIC deposit insurance does not insure against loss in the value of your FC Account due to foreign currency fluctuations or any exchange controls Please refer to this agreement for further information about your account. Additional copies of this agreement may be obtained by contacting our customer service team via the contact methods listed above.

**Reporting errors or inquiries related to account transactions:**
You should contact us as soon as you can regarding any suspected errors or questions about a transaction. You may write to us at Silvergate Bank, 4250 Executive Square Suite 300 La Jolla, CA 92037 or email us at FCAsupport@silvergate.com. You must contact us not later than 14 days after the date of the FIRST statement containing the transaction(s) about which you are contacting us. We are not liable to you for disputed or unauthorized transactions, and you agree not to make a claim against us directly. Please include the following information in your written disputes:

1.  Give us your name and FC account number.
2.  Identify the dollar amount(s) of the transaction(s) you are inquiring about.
3.  Explain as clearly as you can the nature of any error you believe may have occurred or why you need more information.

SEC-SILVERGATE-E-0000644

 Silvergate

BKCOIN MULTI-STRATEGY FUND LP
38 E 37TH ST STE 11
NEW YORK NY 10016-3008

Page          1 of 1

Account Number:      ******7060
Date                      07/29/22

## STATEMENT SUMMARY AS OF          07/29/22

| Account Name | Account Number | Balance |
|---|---|---|
| FINTECH HEDGE FUND | XXXXXX7060 | 315,922.71 |

| BKCOIN MULTI-STRATEGY FUND LP | FINTECH HEDGE FUND | ACCT | ******7060 |
|---|---|---|---|

### Summary of Activity Since Your Last Statement

|  | Date | Amount |
|---|---|---|
| Beginning Balance | 7/01/22 | 6,244,543.33 |
| Deposits / Misc Credits | 1 | 1,300,000.00 |
| Withdrawals / Misc Debits | 5 | 7,228,620.62 |
| ** Ending Balance | 7/31/22 | 315,922.71 ** |
| Service Charge |  | .00 |

## Deposits and Other Credits

| Date | Amount | Activity Description |
|---|---|---|
| 7/01 | 1,300,000.00 | M071J3707KIYDZ8M |
|  |  | ORIG:BKCOIN MULTI-STRATEGY FUND LTD BPQ8 |

## Debits and Other Withdrawals

| Date | Amount | Activity Description |
|---|---|---|
| 7/07 | 499,950.00 | Ref 1881105 to Dep ████ 5411 |
| 7/08 | 5,000,000.00 | Ref 1891113 to Dep ████ 5445 |
| 7/13 | 11,609.39 | M07DF4037IU20RPI |
|  |  | BENE:RELIZ LTD |
| 7/20 | 467,061.23 | Ref 2011604 to Dep ████ 5445 |
| 7/26 | 1,250,000.00 | Ref 2071614 to Dep ████ 5445 |

## Daily Balance Summary

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 7/01 | 7,544,543.33 | 7/08 | 2,044,593.33 | 7/20 | 1,565,922.71 |
| 7/07 | 7,044,593.33 | 7/13 | 2,032,983.94 | 7/26 | 315,922.71 |

SEC-SILVERGATE-E-0000654

SEC-SILVERGATE-E-0000644

 Silvergate

**Account Number**      ******7060      **Date**   07/29/2022                              **PAGE**    2 of 1

SEC-SILVERGATE-E-0000655

MEMBER
F D I C

EQUAL HOUSING
LENDER

### *** IMPORTANT INFORMATION accounts for personal, household or consumer use only ***

#### IN CASE YOU SUSPECT ERRORS OR HAVE QUESTIONS ABOUT YOUR ELECTRONIC TRANSACTIONS:

Direct inquiries in writing to us at 4250 Executive Square Suite 300 La Jolla, CA 92037 and phone inquiries to our customer service number 800-595-5856 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transaction. We must hear from you no later than 60 days after the FIRST statement on which the error or problem appeared was sent to you. Include the following information:

1. Tell us your name and account number.
2. Describe the error or the transaction you are unsure about and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error and the date it occurred.

If you notify us verbally, we may require you to send us your complaint or questions in writing within 10 business days. We will generally tell you the results of our investigation within 10 business days after we hear from you. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we determine that this is necessary, we will provisionally credit your account within 10 business days for the amount you think is in error, so you will have use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account. If we determine there was no error, we will send you a written explanation within three business days after we complete our investigation. If the error involves a transaction processed on the Visa® network, your account will be provisionally credited within 5 business days from receipt of notification. You may ask for copies of the documents we used in our investigation.

If you are a new customer and the error or question concerns an electronic transaction that occurred within 30 days after the first deposit to the account was made, we will tell you the results of our investigation within 20 business days after we hear from you. If we need more time, we may take up to 90 days to investigate. In this case, we will credit your account within 20 business days for the amount you think is in error, so that you have use of the money during the time it takes us to complete our investigation.

*For further information regarding your account, please refer to our Deposit Account Agreement and Regulatory Disclosure ("DAARD").*

For any other inquiries concerning your accounts, direct your inquiries in writing to 4250 Executive Square Suite 300 La Jolla, Ca 92037 or phone inquiries to our customer service number 800-595-5856.

### *** IMPORTANT INFORMATION for Foreign Currency (FC) accounts only ***

**How to contact us:** You may contact our customer service team by phone at 844-371-3276 or FCAsupport@silvergate.com

**Deposit Account Agreement:** When you opened your account, you agreed to the terms of our Foreign Currency Deposit Account Agreement and applicable fee schedule, which may be amended from time to time. This agreement governs the terms of your deposit account and transactions with Silvergate. FDIC deposit insurance does not insure against loss in the value of your FC Account due to foreign currency fluctuations or any exchange controls. Please refer to this agreement for further information about your account. Additional copies of this agreement may be obtained by contacting our customer service team via the contact methods listed above.

**Reporting errors or inquiries related to account transactions:**
You should contact us as soon as you can regarding any suspected errors or questions about a transaction. You may write to us at Silvergate Bank, 4250 Executive Square Suite 300 La Jolla, CA 92037 or email us at FCAsupport@silvergate.com. You must contact us not later than 14 days after the date of the FIRST statement containing the transaction(s) about which you are contacting us. We are not liable to you for disputed or unauthorized transactions, and you agree not to make a claim against us directly. Please include the following information in your written disputes:

1. Give us your name and FC account number.
2. Identify the dollar amount(s) of the transaction(s) you are inquiring about.
3. Explain as clearly as you can the nature of any error you believe may have occurred or why you need more information.

SEC-SILVERGATE-E-0000644

 Silvergate

BKCOIN MULTI-STRATEGY FUND LP
38 E 37TH ST STE 11
NEW YORK NY 10016-3008

Page          1 of 1

Account Number:      ******7060
Date                      08/31/22

## STATEMENT SUMMARY AS OF        08/31/22

| Account Name | Account Number | | Balance |
|---|---|---|---|
| FINTECH HEDGE FUND | XXXXXX7060 | | 315,922.71 |
| **BKCOIN MULTI-STRATEGY FUND LP** | **FINTECH HEDGE FUND** | **ACCT** | ******7060 |

### Summary of Activity Since Your Last Statement

| | | |
|---|---|---|
| Beginning Balance | 8/01/22 | 315,922.71 |
| Deposits / Misc Credits | 0 | .00 |
| Withdrawals / Misc Debits | 0 | .00 |
| ** Ending Balance | 8/31/22 | 315,922.71 ** |
| Service Charge | | .00 |

SEC-SILVERGATE-E-0000657

SEC-SILVERGATE-E-0000644

 **Silvergate**

**Account Number**    ******7060    **Date**    08/31/2022                    **PAGE**    2 of 1

**SEC-SILVERGATE-E-0000658**

SEC-SILVERGATE-E-0000644

MEMBER
F D I C

EQUAL HOUSING
L E N D E R

### *** IMPORTANT INFORMATION accounts for personal, household or consumer use only ***

#### IN CASE YOU SUSPECT ERRORS OR HAVE QUESTIONS ABOUT YOUR ELECTRONIC TRANSACTIONS:

Direct inquiries in writing to us at 4250 Executive Square Suite 300 La Jolla, CA 92037 and phone inquiries to our customer service number 800-595-5856 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transaction. We must hear from you no later than 60 days after the FIRST statement on which the error or problem appeared was sent to you. Include the following information

1.  Tell us your name and account number.
2.  Describe the error or the transaction you are unsure about and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error and the date it occurred.

If you notify us verbally, we may require you to send us your complaint or questions in writing within 10 business days. We will generally tell you the results of our investigation within 10 business days after we hear from you. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we determine that this is necessary, we will provisionally credit your account within 10 business days for the amount you think is in error, so you will have use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account. If we determine there was no error, we will send you a written explanation within three business days after we complete our investigation. If the error involves a transaction processed on the Visa® network, your account will be provisionally credited within 5 business days from receipt of notification. You may ask for copies of the documents we used in our investigation.

If you are a new customer and the error or question concerns an electronic transaction that occurred within 30 days after the first deposit to the account was made, we will tell you the results of our investigation within 20 business days after we hear from you. If we need more time, we may take up to 90 days to investigate. In this case, we will credit your account within 20 business days for the amount you think is in error, so that you have use of the money during the time it takes us to complete our investigation.

**For further information regarding your account, please refer to our Deposit Account Agreement and Regulatory Disclosure ("DAARD").**

For any other inquiries concerning your accounts, direct your inquiries in writing to 4250 Executive Square Suite 300 La Jolla, Ca 92037 or phone inquiries to our customer service number 800-595-5856.

### *** IMPORTANT INFORMATION for Foreign Currency (FC) accounts only ***

**How to contact us:** You may contact our customer service team by phone at 844-371-3276 or FCAsupport@silvergate.com

**Deposit Account Agreement:** When you opened your account, you agreed to the terms of our Foreign Currency Deposit Account Agreement and applicable fee schedule, which may be amended from time to time. This agreement governs the terms of your deposit account and transactions with Silvergate. FDIC deposit insurance does not insure against loss in the value of your FC Account due to foreign currency fluctuations or any exchange controls Please refer to this agreement for further information about your account. Additional copies of this agreement may be obtained by contacting our customer service team via the contact methods listed above.

**Reporting errors or inquiries related to account transactions:**
You should contact us as soon as you can regarding any suspected errors or questions about a transaction. You may write to us at Silvergate Bank, 4250 Executive Square Suite 300 La Jolla, CA 92037 or email us at FCAsupport@silvergate.com. You must contact us not later than 14 days after the date of the FIRST statement containing the transaction(s) about which you are contacting us. We are not liable to you for disputed or unauthorized transactions, and you agree not to make a claim against us directly. Please include the following information in your written disputes:

1.  Give us your name and FC account number.
2.  Identify the dollar amount(s) of the transaction(s) you are inquiring about.
3.  Explain as clearly as you can the nature of any error you believe may have occurred or why you need more information.

SEC-SILVERGATE-E-0000659

# <u>ATTACHMENT 21</u>

# ANNESSER ARMENTEROS

## ─ TRIAL LAWYERS ─

October 5, 2022

**Via Email Only**

███████████████████████

**RE: Notice of Suspensions – BKCoin Capital LP**

Dear Investor:

You are receiving this letter because you are an investor in BKCoin Capital LP, a Delaware limited partnership (the "Fund"). I have been asked to contact you on behalf of BKCoin Management, LLC, to advise you that certain suspensions, as set forth below, have been declared in connection with this entity.

In connection with BKCoin Capital LP, the General Partner, pursuant to Section 15.02 of the Fund's limited partnership agreement (the "LPA") has decided to suspend each of the following:

  (i)    the determination of the Fund's Net Asset Value[1];
  (ii)   the acceptance of further capital contributions to the Fund; and
  (iii)  the processing of requests for withdrawals from the Fund,

effective as of 5:55PM Eastern Standard time October 4, 2022, pending the completion of an informal internal review. The duration of the suspension shall be indefinite, and shall continue in effect until the General Partner declares the suspensions to be at an end.

My law firm, Annesser Armenteros, PLLC, has been engaged by BKCoin Management, LLC to assist the informal review process. As soon as the review is completed, you will be notified and we anticipate a report will be made to all investors at that time. All contacts related to this, should be directed to my firm, though we will not be able to provide you with any information while this review process is ongoing.

Yours truly,

John Annesser, Esq.
Annesser Armenteros PLLC
2525 Ponce de Leon
Coral Gables, Florida 33134
(786) 600-7446
jannesser@aa-firm.com

---

[1] Capitalized terms not otherwise defined in this letter, are as defined in the Fund's LPA.

███████████████

# **ATTACHMENT 22**

# FORM ADV

**UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPORTING ADVISERS**

| | |
|---|---|
| **Primary Business Name: BKCOIN MANAGEMENT LLC** | **CRD Number: 299534** |
| **Annual Amendment - All Sections** | **Rev. 10/2021** |
| **3/29/2022 5:39:08 PM** | |

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

**Item 1 Identifying Information**

Responses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registration*, the information in Item 1 should be provided for the *filing adviser* only. General Instruction 5 provides information to assist you with filing an *umbrella registration*.

A.   Your full legal name (if you are a sole proprietor, your last, first, and middle names):
**BKCOIN MANAGEMENT, LLC**

B.   (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.
**BKCOIN MANAGEMENT LLC**

List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.

(2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐

If you check this box, complete a Schedule R for each relying adviser.

C.   If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify whether the name change is of
☐ your legal name or ☐ your primary business name:

D.   (1) If you are registered with the SEC as an investment adviser, your SEC file number:
(2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number: **802-114419**
(3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:
No Information Filed

E.   (1) If you have a number ("CRD Number") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **299534**

If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.

(2) If you have additional *CRD* Numbers, your additional *CRD* numbers:
No Information Filed

F.   *Principal Office and Place of Business*
(1) Address (do not use a P.O. Box):

| Number and Street 1: | | Number and Street 2: |
|---|---|---|
| 1101 BRICKELL AVE SOUTH TOWER #8 | | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| MIAMI | Florida | United States | 33131 |

If this address is a private residence, check this box: ☐

List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest twenty-five offices in terms of numbers of employees as of the end of your most recently completed fiscal year.

(2) Days of week that you normally conduct business at your *principal office and place of business*:
◉ Monday - Friday ○ Other:

Normal business hours at this location:
9:00AM - 5:00PM
(3) Telephone number at this location:
786-623-4656
(4) Facsimile number at this location, if any:
(5) What is the total number of offices, other than your *principal office and place of business*, at which you conduct investment advisory business as of the end of your most recently completed fiscal year?

G. Mailing address, if different from your *principal office and place of business* address:

Number and Street 1:                        Number and Street 2:
City:                   State:              Country:              ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H. If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

Number and Street 1:                        Number and Street 2:
City:                   State:              Country:              ZIP+4/Postal Code:

**Yes  No**

I. Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook and LinkedIn)?   ⦿  ◯

*If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on Section 1.I. of Schedule D. If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available social media platforms where you do not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accounts on publicly available social media platforms.*

J. Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

Name:                                       Other titles, if any:
Telephone number:                           Facsimile number, if any:
Number and Street 1:                        Number and Street 2:
City:                   State:              Country:              ZIP+4/Postal Code:

Electronic mail (e-mail) address, if Chief Compliance Officer has one:

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company registered under the Investment Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Identification Number (if any):
Name:
IRS Employer Identification Number:

K. Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

Name:                                       Titles:
Telephone number:                           Facsimile number, if any:
Number and Street 1:                        Number and Street 2:
City:                   State:              Country:              ZIP+4/Postal Code:

Electronic mail (e-mail) address, if contact person has one:

**Yes  No**

L. Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*?   ◯  ⦿

*If "yes," complete Section 1.L. of Schedule D.*

**Yes  No**

M. Are you registered with a *foreign financial regulatory authority*?   ◯  ⦿

*Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete Section 1.M. of Schedule D.*

**Yes  No**

N. Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934?   ◯  ⦿

**Yes  No**

O. Did you have $1 billion or more in assets on the last day of your most recent fiscal year?   ◯  ⦿
If yes, what is the approximate amount of your assets:

◯  $1 billion to less than $10 billion

◯  $10 billion to less than $50 billion

☑ $50 billion or more

*For purposes of Item 1.O. only, "assets" refers to your total assets, rather than the assets you manage on behalf of clients. Determine your total assets using the total assets shown on the balance sheet for your most recent fiscal year end.*

P.   Provide your *Legal Entity Identifier* if you have one:

A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal entity identifier*.

**SECTION 1.B. Other Business Names**

No Information Filed

**SECTION 1.F. Other Offices**

No Information Filed

**SECTION 1.I. Website Addresses**

List your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (including, but not limited to, Twitter, Facebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social media platform.

Address of Website/Account on Publicly Available Social Media Platform:   https://www.bkcoincapital.com

Address of Website/Account on Publicly Available Social Media Platform:   https://twitter.com/BKCoinCapital

Address of Website/Account on Publicly Available Social Media Platform:   https://www.linkedin.com/company/bk-coin-capital/

**SECTION 1.L. Location of Books and Records**

No Information Filed

**SECTION 1.M. Registration with Foreign Financial Regulatory Authorities**

No Information Filed

**Item 2 SEC Registration/Reporting**

**SEC Reporting by *Exempt Reporting Advisers***

B.   Complete this Item 2.B. only if you are reporting to the SEC as an *exempt reporting adviser*. Check all that apply. You:

☐ (1)   qualify for the exemption from registration as an adviser solely to one or more venture capital funds, as defined in rule 203(l)-1;

☑ (2)   qualify for the exemption from registration because you act solely as an adviser to *private funds* and have assets under management, as defined in rule 203(m)-1, in the United States of less than $150 million;

☐ (3)   act solely as an adviser to *private funds* but you are no longer eligible to check box 2.B.(2) because you have assets under management, as defined in rule 203(m)-1, in the United States of $150 million or more.

*If you check box (2) or (3), complete Section 2.B. of Schedule D.*

**SECTION 2.B. *Private Fund* Assets**

If you check Item 2.B.(2) or (3), what is the amount of the *private fund* assets that you manage?                                    $ 70000000

NOTE: "*Private fund assets*" has the same meaning here as it has under rule 203(m)-1. If you are an investment adviser with your principal office and place of business outside the United States only include *private fund* assets that you manage at a place of business in the United States.

Case 1:3-cv-20719-RNS Document 5-2 Entered on FLSD Docket 02/23/2023 Page 335 of 344

## Item 3 Form of Organization

If you are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

A.  How are you organized?

- ○ Corporation
- ○ Sole Proprietorship
- ○ Limited Liability Partnership (LLP)
- ○ Partnership
- ◉ Limited Liability Company (LLC)
- ○ Limited Partnership (LP)
- ○ Other (specify):

*If you are changing your response to this Item, see Part 1A Instruction 4.*

B.  In what month does your fiscal year end each year?
DECEMBER

C.  Under the laws of what state or country are you organized?

| State | Country |
|-------|---------|
| Delaware | United States |

*If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

*If you are changing your response to this Item, see Part 1A Instruction 4.*

## Item 6 Other Business Activities

In this Item, we request information about your firm's other business activities.

A.  You are actively engaged in business as a (check all that apply):

- ☐ (1)  broker-dealer (registered or unregistered)
- ☐ (2)  registered representative of a broker-dealer
- ☐ (3)  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (4)  futures commission merchant
- ☐ (5)  real estate broker, dealer, or agent
- ☐ (6)  insurance broker or agent
- ☐ (7)  bank (including a separately identifiable department or division of a bank)
- ☐ (8)  trust company
- ☐ (9)  registered municipal advisor
- ☐ (10) registered security-based swap dealer
- ☐ (11) major security-based swap participant
- ☐ (12) accountant or accounting firm
- ☐ (13) lawyer or law firm
- ☐ (14) other financial product salesperson (specify):

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B.(1), complete Section 6.A. of Schedule D.*

|  |  | Yes | No |
|--|--|-----|----|
| B. (1) | Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ◉ |
| (2) | If yes, is this other business your primary business? | ○ | ○ |

*If "yes," describe this other business on Section 6.B.(2) of Schedule D, and if you engage in this business under a different name, provide that name.*

|  |  | Yes | No |
|--|--|-----|----|
| (3) | Do you sell products or provide services other than investment advice to your advisory *clients*? | ○ | ◉ |

*If "yes," describe this other business on Section 6.B.(3) of Schedule D, and if you engage in this business under a different name, provide that name.*

## SECTION 6.A. Names of Your Other Businesses

No Information Filed

**SECTION 6.B.(2) Description of Primary Business**

Describe your primary business (not your investment advisory business):

If you engage in that business under a different name, provide that name:

**SECTION 6.B.(3) Description of Other Products and Services**

Describe other products or services you sell to your *client*. You may omit products and services that you listed in Section 6.B.(2) above.

If you engage in that business under a different name, provide that name:

**Item 7 Financial Industry Affiliations**

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

A.   This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

You have a *related person* that is a (check all that apply):

- ☐ (1)  broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
- ☐ (2)  other investment adviser (including financial planners)
- ☐ (3)  registered municipal advisor
- ☐ (4)  registered security-based swap dealer
- ☐ (5)  major security-based swap participant
- ☐ (6)  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (7)  futures commission merchant
- ☐ (8)  banking or thrift institution
- ☐ (9)  trust company
- ☐ (10) accountant or accounting firm
- ☐ (11) lawyer or law firm
- ☐ (12) insurance company or agency
- ☐ (13) pension consultant
- ☐ (14) real estate broker or dealer
- ☐ (15) sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
- ☐ (16) sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

*Note that Item 7.A. should not be used to disclose that some of your employees perform investment advisory functions or are registered representatives of a broker-dealer. The number of your firm's employees who perform investment advisory functions should be disclosed under Item 5.B.(1). The number of your firm's employees who are registered representatives of a broker-dealer should be disclosed under Item 5.B.(2).*

*Note that if you are filing an umbrella registration, you should not check Item 7.A.(2) with respect to your relying advisers, and you do not have to complete Section 7.A. in Schedule D for your relying advisers. You should complete a Schedule R for each relying adviser.*

*For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete Section 7.A. of Schedule D.*

*You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related person in connection with advisory services you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the related person, and the related person does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) you have no reason to believe that your relationship with the related person otherwise creates a conflict of interest with your clients.*

*You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services you provide to your clients (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)), regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

**SECTION 7.A. Financial Industry Affiliations**

No Information Filed

**Item 7 *Private Fund* Reporting**

|  | Yes | No |
|---|---|---|
| B. Are you an adviser to any *private fund*? | ⊙ | ◯ |

*If "yes," then for each private fund that you advise, you must complete a Section 7.B.(1) of Schedule D, except in certain circumstances described in the next sentence and in Instruction 6 of the Instructions to Part 1A. If you are registered or applying for registration with the SEC or reporting as an SEC exempt*

reporting adviser, and another SEC-registered adviser or SEC-exempt reporting adviser reports this information with respect to such *private fund* in Section 7.B.(1) of Schedule D of its Form ADV (e.g., if you are a subadviser), do not complete Section 7.B.(1) of Schedule D with respect to that *private fund*. You must, instead, complete Section 7.B.(2) of Schedule D.

In either case, if you seek to preserve the anonymity of a private fund client by maintaining its identity in your books and records in numerical or alphabetical code, or similar designation, pursuant to rule 204-2(d), you may identify the private fund in Section 7.B.(1) or 7.B.(2) of Schedule D using the same code or designation in place of the fund's name.

## SECTION 7.B.(1) *Private Fund* Reporting

Funds per Page: 15 ▾  Total Funds: 1

A. PRIVATE FUND

### Information About the *Private Fund*

1. (a) Name of the *private fund*:
   BKCOIN CAPITAL LP

   (b) *Private fund* identification number:
   (include the "805-" prefix also)
   805-2592020728

2. Under the laws of what state or country is the *private fund* organized:
   State:                          Country:
   Delaware                        United States

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

   | Name of General Partner, Manager, Trustee, or Director |
   | --- |
   | BKCOIN MANAGEMENT LLC |

   (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.
   No Information Filed

4. The *private fund* (check all that apply; you must check at least one):
   ☑ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
   ☐ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.
   No Information Filed

6. (a) Is this a "master fund" in a master-feeder arrangement?                     Yes No
                                                                                    ☐  ☑

   (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?
   No Information Filed

   (c) Is this a "feeder fund" in a master-feeder arrangement?                      Yes No
                                                                                    ☐  ☑

   (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
   Name of *private fund*:

   *Private fund* identification number:
   (include the "805-" prefix also)

   NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  |  | Yes | No |
|---|---|---|---|
| 8. (a) | Is this *private fund* a "fund of funds"? | ○ | ◉ |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

|  |  | Yes | No |
|---|---|---|---|
| (b) | If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  |  | Yes | No |
|---|---|---|---|
| 9. | During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ◉ |

10. What type of fund is the *private fund*?

◉ hedge fund ○ liquidity fund ○ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:
$ 16,200,000

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:
$ 0
NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:
13

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:
0%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:
0%

|  |  | Yes | No |
|---|---|---|---|
| (b) | If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ◉ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:
0%

**Your Advisory Services**

|  |  | Yes | No |
|---|---|---|---|
| 17. (a) | Are you a subadviser to this *private fund*? | ○ | ◉ |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

No Information Filed

|  |  | Yes | No |
|---|---|---|---|
| 18. (a) | Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ◉ |

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

No Information Filed

|  |  | Yes | No |
|---|---|---|---|
| 19. | Are your *clients* solicited to invest in the *private fund*? | ○ | ◉ |

NOTE: For purposes of this question, do not consider feeder funds of the private fund.

20.  Approximately what percentage of your *clients* has invested in the *private fund*?
100%

## Private Offering

                                                                   Yes No

21.  Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?     ⦿ ○

22.  If yes, provide the *private fund's* Form D file number (if any):

| Form D file number |
|---|
| 021-327863 |

B. SERVICE PROVIDERS

## Auditors

    Yes No

23.  (a)  (1) Are the *private fund's* financial statements subject to an annual audit?   ○ ⦿

        (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?  ○ ○

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

No Information Filed

    Yes No

(g)  Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?  ○ ○

(h)  Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

○ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

## Prime Broker

    Yes No

24.  (a)  Does the *private fund* use one or more prime brokers?  ○ ⦿

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

## Custodian

    Yes No

25.  (a)  Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?  ⦿ ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)  Legal name of custodian:
COPPER TECHNOLOGIES (UK) LIMITED

(c)  Primary business name of custodian:
PROVIDER OF CUSTODY SOLUTIONS FOR FUNDS

(d)  The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

LONDON     City     State:     Country: United Kingdom

| | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ⦿ |

(f)  If the custodian is a broker-dealer, provide its SEC registration number (if any):

-

CRD Number (if any):

(g)  If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

**Administrator**

| | Yes | No |
|---|---|---|
| 26.  (a) Does the *private fund* use an administrator other than your firm? | ○ | ⦿ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

No Information Filed

27.  During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

| | Yes | No |
|---|---|---|
| 28.  (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ⦿ |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

| Funds per Page: | 15 | ▾ | Total Funds: 1 |
|---|---|---|---|

**SECTION 7.B.(2)** *Private Fund* **Reporting**

No Information Filed

**Item 10 Control Persons**

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you. If you are filing an *umbrella registration*, the information in Item 10 should be provided for the *filing adviser* only.

If you are submitting an initial application or report, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application or report, you must complete Schedule C.

| | Yes | No |
|---|---|---|
| A.  Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies? | ○ | ⦿ |

*If yes, complete Section 10.A. of Schedule D.*

B. If an advisory affiliate is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please complete Section 10.B. of Schedule D.

## SECTION 10.A. *Control Persons*

No Information Filed

## SECTION 10.B. *Control Person* Public Reporting Companies

No Information Filed

## Item 11 Disclosure Information

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below. In accordance with General Instruction 5 to Form ADV, "you" and "your" include the *filing adviser* and all *relying advisers* under an *umbrella registration*.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you. If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.

*If you are registered or registering with the SEC or if you are an exempt reporting adviser, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed; you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

|  | Yes | No |
|---|---|---|
| Do any of the events below involve you or any of your *supervised persons*? | ○ | ◉ |

For "yes" answers to the following questions, complete a Criminal Action DRP:

| A. In the past ten years, have you or any *advisory affiliate*: | Yes | No |
|---|---|---|
| (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ○ | ◉ |
| (2) been *charged* with any *felony*? | ○ | ◉ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.A.(2) to charges that are currently pending.*

| B. In the past ten years, have you or any *advisory affiliate*: | | |
|---|---|---|
| (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ◉ |
| (2) been *charged* with a *misdemeanor* listed in Item 11.B.(1)? | ○ | ◉ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.B.(2) to charges that are currently pending.*

For "yes" answers to the following questions, complete a Regulatory Action DRP:

| C. Has the SEC or the Commodity Futures Trading Commission (CFTC) ever: | Yes | No |
|---|---|---|
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ◉ |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? | ○ | ◉ |
| (3) *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? | ○ | ◉ |
| (5) imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? | ○ | ◉ |

| D. Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*: | Yes | No |
|---|---|---|
| (1) ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? | ○ | ◉ |
| (2) ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? | ○ | ◉ |
| (3) ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business | ○ | ◉ |

denied, suspended, revoked, or restricted?

(4) in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity?     ○  ◉

(5) ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity?     ○  ◉

E.  Has any *self-regulatory organization* or commodities exchange ever:

(1) *found* you or any *advisory affiliate* to have made a false statement or omission?     ○  ◉

(2) *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a "*minor rule violation*" under a plan approved by the SEC)?     ○  ◉

(3) *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted?     ○  ◉

(4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities?     ○  ◉

F.  Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended?     ○  ◉

G.  Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.?     ○  ◉

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

                                                                                     **Yes No**

H.  (1)  Has any domestic or foreign court:

(a) in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity?     ○  ◉

(b) ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations?     ○  ◉

(c) ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*?     ○  ◉

(2) Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H.(1)?     ○  ◉

**Schedule A**
**Direct Owners and Executive Officers**
1. Complete Schedule A only if you are submitting an initial application or report. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.
2. Direct Owners and Executive Officers. List below the names of:
   (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required if you are registered or applying for registration and cannot be more than one individual), director, and any other individuals with similar status or functions;
   (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);
      Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.
   (c) if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;
   (d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and
   (e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.
3. Do you have any indirect owners to be reported on Schedule B?   ○ Yes   ◉ No
4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.
5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).
6. Ownership codes are:   NA - less than 5%         B - 10% but less than 25%    D - 50% but less than 75%
                          A - 5% but less than 10%   C - 25% but less than 50%    E - 75% or more
7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.
   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.
   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | Control Person | PR | CRD No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| KANG, KEVIN, M | I | MANAGER | 03/2018 | C | Y | N | 6406257 |
| Carlos, Betancourt, Ignacio | I | MANAGER | 03/2018 | C | Y | N | 7041645 |

**Schedule B**

**Indirect Owners**

1. Complete Schedule B only if you are submitting an initial application or report. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.

2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

   For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b) in the case of an owner that is a partnership, <u>all</u> general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

   (c) in the case of an owner that is a trust, the trust and each trustee; and

   (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:   C - 25% but less than 50%   E - 75% or more
                          D - 50% but less than 75%   F - Other (general partner, trustee, or elected manager)

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

No Information Filed

**Schedule D - Miscellaneous**

You may use the space below to explain a response to an Item or to provide any other information.

**DRP Pages**

**CRIMINAL DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**Execution Pages**
**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand

for arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

| | |
|---|---|
| Signature:<br>KEVIN KANG | Date: MM/DD/YYYY<br>03/29/2022 |
| Printed Name:<br>KEVIN KANG | Title:<br>MANAGER, ON BEHALF OF BKCOIN MANAGEMENT, LLC |
| Adviser *CRD* Number:<br>299534 | |

## NON-RESIDENT INVESTMENT ADVISER EXECUTION PAGE

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

### 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

### 2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

### 3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

| | |
|---|---|
| Signature: | Date: MM/DD/YYYY |
| Printed Name: | Title: |
| Adviser *CRD* Number:<br>299534 | |