.

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.:

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| BKCOIN MANAGEMENT, LLC and | : |
| MIN WOO KANG a/k/a "KEVIN" KANG, | : |
| | : |
| Defendants, and | : |
| | : |
| BKCOIN CAPITAL, LP, | : |
| BK OFFSHORE FUND, LTD., | : |
| BKCOIN MULTI-STRATEGY | : |
| MASTER FUND, LTD., | : |
| BKCOIN MULTI-STRATEGY FUND, LP, | : |
| BKCOIN MULTI-STRATEGY FUND LTD., AND | : |
| BISON DIGITAL LLC, | : |
| | : |
| Relief Defendants. | : |
| | : |

## DECLARATION OF JAMES K. RICHARDSON

Pursuant to 28 U.S.C. §1746, the undersigned states as follows:

1.     I, James K. Richardson, do hereby declare under penalty of perjury, that the following is true and correct, and that I am over 18 years old and am competent to testify to these matters.

2.     I am employed by the United States Securities and Exchange Commission ("Commission") as a Senior Securities Compliance Examiner in the Investment Adviser/Investment Company Examination Program of the Division of Examinations in the Commission's Miami Regional Office ("MIRO Exams").

1

3.      As part of my job duties, I am responsible for conducting examinations of entities regulated by the Commission to determine whether the entity being examined is conducting its activities in accordance with federal securities laws and rules.  In conducting examinations, my job responsibilities generally include analyzing an entity's operations and procedures, sales practices, supervisory systems, books and records, and financial statements.

4.      I was assigned to conduct an examination of BKCoin Management, LLC ("BKCoin"), an investment adviser.  I have personal knowledge of the facts below, either through direct involvement in the examination or my knowledge of the examination.

***Overview of Examination***

5.      On October 19, 2022, I announced an examination of BKCoin pursuant to the Commission's statutory authority to conduct, at any time or from time to time, reasonable periodic, special and other examinations of the records of specified Commission-regulated entities.  On that date, I sent an Exam Request Letter via secured electronic mail to BKCoin notifying it of the examination and containing a request list that identifies certain information or documents that will be reviewed as part of the examination.  A true and accurate copy of the 10/19/2022 MIRO Exams Request Letter ("Request Letter") is attached hereto as Exhibit A.

6.      In relevant part, the Request Letter stated that the purpose of the examination is to assess the entity's compliance with the securities laws and the rules thereunder, with particular focus on BKCoin's investment advice provided to advisory clients regarding Digital Assets.[1] Moreover, the Request Letter advised BKCoin that any books and records maintained by the entity are subject to examination.

---

[1] The term "digital asset" or "crypto asset" generally refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," digital "coins," and digital "tokens."

7.      As part of the examination, I collected, researched, and analyzed information relating to BKCoin, BKCoin Capital, LP (the "Legacy Fund"), BK Offshore Fund, Ltd. (the "Offshore Fund"), and three "Multi-Strategy Funds:" BKCoin Multi-Strategy Master Fund, Ltd., BKCoin Multi-Strategy Fund, LP and BKCoin Multi-Strategy Fund Ltd. (the "Multi-Strategy Funds") (all funds collectively "the BKCoin Funds"), and Kevin Kang, a managing member of BKCoin, and their use of investor funds.

8.      Among other things, this analysis included a review of certain documents provided by BKCoin, documents provided by investors and other third parties, and bank records relating to accounts of BKCoin and the BKCoin Funds.

*Documents Received in Response to Exam Request Letter*

9.      The Request Letter required BKCoin to produce to MIRO Exams, among other things, "copies of all disclosures, advertising, and marketing materials provided to advisory clients regarding Digital Assets. Please include all private fund disclosures as applicable (i.e. Operating Memoranda, Private Placement Memoranda, Limited Partnership Agreements, etc.)." *See* Exhibit A. In October and November, 2022, BKCoin's counsel, John W. Annesser, Esq., produced the documents identified in paragraphs 10 through 13 below to MIRO Exam in response to the Request Letter.

10.     Attached hereto as Exhibit B are true and accurate copies of the following advertising and marketing materials:

a)   "BKCoin-2 Pager" pdf. dated May 2022.

b)   "BKCoin multi_strategy_deck" pdf. dated May 2022.

11.     Attached hereto as Exhibit C are true and accurate copies of the following documents:

3

a) a Private Offering Memorandum regarding the Legacy Fund, dated August 28, 2020;

b) a Limited Partnership Agreement regarding the Legacy Fund, dated August 28, 2020;

c) a Subscription Agreement regarding BKCoin Multi-Strategy Fund Ltd, effective July 1, 2022; and

d) a Side Letter regarding BKCoin Multi-Strategy Fund, LP, dated May 9, 2022.

12.      Attached hereto as Exhibit D is a true and accurate copy of a Separately Managed Agreement regarding BKCoin, dated October 19, 2020.

13.      Attached hereto as Exhibit E is a true and accurate copy of a Term Sheet regarding the Offshore Fund, dated May 23, 2019.

14.      Attached hereto as Exhibit F are true and accurate copies of Account Statements ("Performance Reports") regarding BKCoin Multi-Strategy Fund Ltd. for June 30, 2022 through August 31, 2022.

15.      Attached hereto as Exhibit G are true and accurate copies of Performance Reports regarding BKCoin Multi-Strategy Fund LP for June 30, 2022 through August 31, 2022.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _22_ of February, 2023

James K Richardson

4

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : CASE NO. |
| BKCOIN MANAGEMENT, LLC and | : |
| MIN WOO KANG a/k/a "KEVIN" KANG, | : |
| | : |
| Defendants, and | : |
| | : |
| BKCOIN CAPITAL, LP, | : |
| BK OFFSHORE FUND, LTD., | : |
| BKCOIN MULTI-STRATEGY | : |
| MASTER FUND, LTD., | : |
| BKCOIN MULTI-STRATEGY FUND, LP, | : |
| BKCOIN MULTI-STRATEGY FUND LTD., AND | : |
| BISON DIGITAL LLC, | : |
| | : |
| Relief Defendants. | : |
| | : |

## INDEX TO EXHIBITS TO DECLARATION OF JAMES K. RICHARDSON

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| A. | SEC's October 19, 2022 Exams Request Letter |
| B. | BKCoin Multi-Strategy Fund's May 2022 Marketing Materials "BKCoin-2 Pager" and "BKCoin multi_strategy_deck" |
| C. | BKCoin Capital LP's Private Offering Memorandum; First Amended and Restated Agreement of Limited Partnership – BKCoin Capital LP; Subscription Documents of BKCoin Multi-Strategy Fund Ltd.; and BKCoin Multi-Strategy Fund LP Side Letter |
| D. | BKCoin Management LLC's Investment Management Agreement |
| E. | Term Sheet – BK Offshore Fund Ltd. |
| F. | BKCoin Multi-Strategy Fund Ltd. Account Statement (June 30, 2022 through August 31, 2022) |

| G. | BKCoin Multi-Strategy Fund LP Account Statement (June 30, 2022 through August 31, 2022) |
|---|---|

# **<u>EXHIBIT A</u>**



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
801 BRICKELL AVENUE, SUITE 1950
MIAMI, FLORIDA 33131

MIAMI
REGIONAL OFFICE

October 19, 2022

DELIVERY VIA SECURE E-MAIL
JAnnesser@aa-firm.com

BKCoin Management, LLC
1101 Brickell Ave., South Tower #8
Miami, FL 33131
c/o John Annesser, Esq.
Annesser Armenteros, PLC
2525 Ponce de Leon Blvd.; Suite 625
Coral Gables, FL 33134

Re:  Examination of BKCoin Management, LLC ("Adviser")
     SEC File No. 802-114419

Dear Mr. Annesser:

The staff of the U.S. Securities and Exchange Commission (the "Staff") is conducting an
examination of the above-captioned investment adviser pursuant to Section 204 of the
Investment Advisers Act of 1940.  The purpose of the examination is to assess Adviser's
compliance with the securities laws and the rules thereunder, with particular focus on the advice
provided regarding Digital Assets.

Additional information about compliance examinations and the examination process is
included in the attached "*Examination Information*" brochure (SEC Form 2389).  Also attached
is information regarding the Commission's authority to obtain the information requested and
additional information: "*Supplemental Information for Entities Directed to Supply Information
to the Commission Other Than Pursuant to Commission Subpoena*" (SEC Form 1661).  Any
books and records maintained by an exempt reporting adviser are subject to examination.

**Information Requested**

Please provide all of the information specified in the attached information request list by **Friday,
October 21, 2022**.  The Staff requests that documents be provided in an electronic format to the
extent possible as set forth in greater detail below.

If the Firm becomes aware of the need for delay in the production of any requested information,
the Firm should immediately contact the undersigned.  During the examination, the Staff may
also request additional or follow-up information, and will discuss timeframes for the Firm to
produce this information.

**Data Delivery**

Please provide all requested documents in electronic format whenever possible. Unless a file format is specifically requested by the exam team, please provide all requested data in the file format ordinarily used and maintained by your business (i.e., "native format"). For example, if a requested spreadsheet is created by your business in Microsoft Excel, produce the file in Microsoft Excel format.

Please contact the exam team if you have any questions regarding file format or if the nature of your production requires additional data delivery guidance or technical specifications. If you are producing a Concordance load file, please ask the Staff for additional guidance.

The requested electronic data may be delivered through the following methods:

**Secure and Preferred Methods:**

- **Kiteworks.** Kiteworks is the Staff's preferred file transfer system. The use of Kiteworks should minimize the risk of inadvertently disclosing or compromising personally identifiable information (PII). Kiteworks may also be quicker and less expensive than other delivery methods. The SEC External Guide for Using Kiteworks can be found on sec.gov or by clicking here: https://www.sec.gov/about/offices/ocie/kiteworksguide.pdf. If needed, you may contact OIT_AccellionSupport@sec.gov for support.

- **Secure Email.** Secure Email (smail) encrypts emails and attachments sent to the SEC. For attachments under 12MBs, smail is a preferred and secure delivery method. To use smail, you must first register with Zixmail. The SEC External Guide for Using the E-mail Encryption Solution, which includes Zixmail registration instructions, can be found on sec.gov or by clicking here: https://www.sec.gov/about/offices/ocie/secureemailguide.pdf

- **Transport Layer Security.** If your business has created a Transport Layer Security (TLS) connection with the SEC, you may securely send the requested data via email.

**Disfavored Methods:**

- **Unencrypted Email.** Sending documents through unencrypted email is not secure. There is a risk it may be intercepted and revealed to outside parties. Emailing password protected files reduces the risk, but remains inferior to TLS or smail.

- **Electronic Media.** Electronic media such as hard drives, compact disks, thumb drives and laptops are also a disfavored means of data delivery. There is a heightened risk that information on electronic media could be lost or stolen. Any produced electronic media should be encrypted. If your business chooses to provide documents on electronic media, please provide passwords separately either via email or in a separate cover letter from the electronic media. Please be advised that such electronic media may be retained, returned or destroyed.

Your cooperation is greatly appreciated in the examination process.  If you have any questions, please contact James Richardson at (305) 416-6297 or Adrian J. Gonzalez at (305) 982-6370.

Sincerely,

*James Richardson*
James Richardson
Senior Securities Compliance Examiner

*Adrian Gonzalez*
Adrian J. Gonzalez
Examination Manager

Enclosures:
- Information Request List
- Examination Information Brochure (Form 2389)
- Supplemental Information (Form 1661)
- Acknowledgment Form

## Examination Information Request List

### Examination Period

Information is requested for the period **July 1, 2021** through **October 19, 2022** (the "Examination Period"), unless otherwise noted. Please notify the Staff of material events or activities that occur after the Examination Period, but while the examination is still ongoing, that would result in material information that would be responsive to a request if not for being outside of the Examination Period.

### Privilege Claims

For any document or Communication responsive to a request, but being withheld by the Adviser based on the claim of privilege, please provide a privilege log. The log should identify each document or portion of a document that is being withheld, and provide sufficient information to support the claim of privilege. It should include: (1) the identity and position of the creator(s) of the document; (2) the identity and position of all persons or entities known to have been furnished the document or a copy of the document or informed of its substance; (3) the creation date; (4) a brief description of the document including its subject-matter; and (5) the reason the document or portion of the document is not being produced or is being redacted, including the specific privilege being claimed, e.g., attorney-client or work product. In addition, where only a portion of a requested document or Communication is privileged, please provide the document or Communication with the privileged information redacted.

### Definition of Terms Used Within this Examination Information Request List

For the purpose of responding to the requests below, please reference the following terms in your responses.

- **Digital Assets.** Includes holdings related to crypto currency (e.g., Bitcoin), Initial Coin Offerings ("ICOs"), distributed ledger technology, blockchain and/or related products and pooled investment vehicles.

- **Public Key.** A Public Key, which is algorithmically derived from the user's Private Key, consists of a long string of letters and numbers; both the Private Key and Public Key are required to complete a transaction on a specific blockchain. The Public Key can be shared with outsiders. **DO NOT** provide the staff with the **Private Key**.

- **Public Address.** A Public Address on the blockchain contains the hashed version of any Public Key, and can be used to view transactions on the relevant public blockchain.

### Information to be Provided by Friday, October 21, 2022

I.  **General Documents and Information**

1.  A copy of the Adviser's organization chart showing ownership percentages of the Adviser and control persons, and a schedule or chart of all affiliated entities. Include all entities that are commonly controlled by, or under common control with, the Adviser. Please indicate any changes in ownership that occurred in the twelve months prior to the date of this letter.

2. In Excel, a list of all advisory clients during the examination period, with the following information:

    a. The Account number, name and current balance, as of **September 30, 2022**;
    b. Whether the client is a related person, affiliated person, or a proprietary account;
    c. The type of account (e.g., individual, defined benefit retirement plan, registered fund, or unregistered fund);
    d. The account custodian and location;
    e. Whether or not the custodian sends periodic account statements directly to the client; whether or not the delivery is electronic, if so, a copy of the authorization; and the form of electronic delivery (e.g., email or website login);
    f. Whether or not the Adviser has discretionary authority;
    g. Whether the Adviser, an officer, an employee, or an affiliate acts as trustee, co-trustee, or successor trustee or has full power of attorney for the account;
    h. Whether Adviser or related persons are deemed to have custody of, possession of or access to the client's assets, and if so, the location of the assets;
    i. The investment strategy (e.g., global equity, high-yield, aggressive growth, long-short, or statistical arbitrage) and the performance composite in which it is included, if any;
    j. The Account portfolio manager(s);
    k. The value of each client's account that was used for purposes of calculating its advisory fee for the most recent billing period;
    l. Whether the client pays a performance fee and the most recent account performance figures;
    m. Whether or not advisory fees are paid directly from the client's custodial account; and
    n. For clients obtained during the Examination Period, provide account inception date and name(s) of consultant(s) related to obtaining the client, if any.
    o. For any accounts for which securities were not maintained with a qualified custodian, please include a description of the security, security name, and location of the security.

3. List of current and former employees, partners, officers and/or directors and their respective titles during the Examination Period.

4. Names of any of the Adviser's employees, partners, officers and/or directors who resigned or were terminated during the Examination Period and information regarding the reason for their departure.

5. The Adviser's balance sheet, income statement, general ledger, cash receipts and disbursements journal (if it contains additional information not contained in the general ledger), trial balance, and chart of accounts as of the end of its two most recent fiscal years and the most current year to date.

6. A list of the Adviser's proprietary bank and brokerage accounts, and/or any account Controlled, owned by, or held for the beneficial interest of the Adviser. Include the custodian name and account number, and a description of how the account is used (e.g., pay expenses, collect fees, correct trade errors, perform block trades, and/or make trades for the Adviser (house accounts)).

7. The last six months of the Adviser's statements for all bank and brokerage accounts Controlled or owned by the Adviser.

8. A description of any threatened, pending or settled litigation or arbitration involving the Adviser, including a description of the allegations, the status, and a brief description of any "out of court" or informal settlement. Also include any threatened, pending, or settled litigation or arbitration involving any Supervised Person of the Adviser (if the matter relates to the Supervised Person's association with the Adviser or a securities-related matter). If none, please provide a written statement to that effect.

9. The names and location of all affiliated and unaffiliated key service providers and the services they perform.

## II.   Digital Asset Documents and Information

10. In Excel, Digital Assets held in all client portfolios as of the end of the **Examination Period**:

   a.   Digital Asset name;
   b.   Digital Asset instrument (e.g., coin/token, SAFT, DPA, other)
   c.   CUSIP (or other identifier, if any);
   d.   Client name;
   e.   Client account number;
   f.   Public Address(es), if applicable;
   g.   Client type (e.g. individual, joint, separately managed, IRA, 401(k), trust);
   h.   Where the Digital Asset is held (i.e., identify the individual wallet type and/or provider, third party custodian, exchange, etc.);
   i.   Date of initial purchase;
   j.   Quantity or principal/notional amount owned by client; and
   k.   Market value of the position.
   l.   Whether the asset is registered as a security

11. Describe advisory fees charged to clients for services related to Digital Assets.

12. To the extent Digital Assets are held by the Adviser in an individual wallet or exchange, explain any measures taken to ensure security and safe-keeping of the Digital Assets.

13. Provide copies of all disclosures, advertising, and marketing materials provided to advisory clients regarding Digital Assets. Please include all private fund disclosures as applicable (i.e. Operating Memoranda, Private Placement Memoranda, Limited Partnership Agreements, etc.)

14. Describe how the trades in Digital Assets are executed and priced.

15. Provide a list of Digital Asset exchanges and brokers used.

16. A list of loans, loan guarantees, or lines of credit between Clients and/or third parties and the Adviser or its Affiliates, as well as any lending arrangements between Clients and the Adviser's Supervised Persons held during the Examination Period. For each such arrangement, provide the terms of the loan (and guarantee, if applicable), the participating parties and their roles, the initial amount, and the current amount outstanding.

**III.    Advisers Sponsoring or Managing Privately Offered Funds**

16. For each private fund, please provide the organization and operating agreement, (e.g. partnership agreement, private placement memoranda and investment management agreements, etc.), including any amendments.

17. Schedules of investors in each fund and their capital account balances, contributions, and withdraws, for each month of the Examination Period.

18. Each fund's balance sheet, trial balance, income statement and cash flow statement as of the end the last fiscal year and the most current year to date.  Also, each fund's general ledger and cash receipts and disbursements journals for the Examination Period.

19. Statements covering the Examination Period for all bank and brokerage accounts owned by each private fund.

20. For each of the funds, the financial statements, audited or unaudited, for the most recent fiscal year and most current year to date.  In addition, please provide documentation indicating when audit reports were delivered to investors.

21. In Excel format, provide information regarding each private and/or unregistered investment fund (and any co-investment or other parallel vehicles) sponsored and/or managed by the Adviser, including:

    a.  name as shown in organizational documents (as amended);
    b.  domicile (country);
    c.  investment strategy (e.g., buyout, venture, mezzanine, fund-of-funds, etc.);
    d.  name of the sub-adviser, if applicable;
    e.  if funds are part of a master/feeder fund structure, full name and domicile of each fund;
    f.  number of investors and total assets as of **September 30, 2022**;
    g.  amount, if any, of Adviser's equity interest in each fund as of **September 30, 2022**;
    h.  amount, if any, of Adviser's affiliated persons' interest as of **September 30, 2022**;
    i.  date the fund began accepting unaffiliated investors;
    j.  offering size;
    k.  amount of leverage, both explicit (on-balance sheet) and off-balance sheet (futures and certain other derivatives), used by the fund as of **September 30, 2022**;
    l.  the value of each fund's account that was used for purposes of calculating its advisory fee for the last billing period;
    m.  the advisory fee charged for the last billing period;
    n.  whether the fund pays carried interest and whether the fund is currently in-the-money or out-of-the-money for earning carried interest; and

21. A schedule of all incentive/performance fees collected by the Adviser (or affiliated General Partner) during the Examination Period.

22. Any and all records maintained or kept by the Adviser during the Examination Period.

# **<u>EXHIBIT B</u>**

# BKCoin Multi-Strategy Fund

MAY 2022



BKCoin Capital

## Overview

The BKCoin Multi-Strategy Fund is designed to give investors exposure to a broad spectrum of strategies, including mean reversion, momentum, relative value, volatility arbitrage, statistical arbitrage, pattern recognition and event-driven. The diversification across our quantitative strategies allows investors to achieve a low volatility return profile from capitalizing on idiosyncratic alpha opportunities, while reducing concentration risk. Our strategy development pipeline gives us the ability to continually implement new strategies allowing us to replace older strategies that have suffered from alpha decay.

## Terms

| | | | |
|---|---|---|---|
| Domicile | Delaware | Redemptions | Monthly (14 days notice) |
| Eligibility | Qualified Purchaser | Custodian | Gemini Standard Custody |
| Minimum Investment | $1,000,000 | Administration | State Street |
| Management Fee | 2% | Auditor | KPMG USA |
| Performance Fee | 20% | US Counsel | Dzuba Law |
| Subscriptions | Monthly | Offshore Counsel | Harneys |

## Performance

| | Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD | Since Inception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BK Coin Multi-Strategy Fund | 2022 | -1.50 | 2.30 | 3.10 | 1.90 | | | | | | | | | 5.86 | 305.89 |
| BKCoin Digital Asset Fund* | 2021 | 8.43 | 9.38 | 8.09 | 7.57 | 4.89 | 0.88 | 1.83 | 1.57 | 1.73 | 9.50 | 8.03 | 1.20 | 83.79 | 283.01 |
| | 2020 | 13.18 | 0.14 | 3.43 | 7.31 | 2.36 | 1.00 | 2.31 | 1.03 | 0.31 | 1.44 | 8.66 | 9.90 | 63.33 | |
| | 2019 | | 1.68 | 3.57 | 1.37 | 3.06 | 2.73 | 1.61 | 0.25 | 1.29 | 1.14 | 2.61 | 2.96 | 18.35 | |
| | 2018 | | | | | | | | | | | | 7.91 | 7.91 | |
| Bloomberg Galaxy Crypto Index | 2022 | -22.44 | 3.99 | 13.93 | -19.56 | | | | | | | | | -26.69 | 642.64* |
| | 2021 | 42.44 | 21.91 | 25.73 | 28.67 | | | 7.65 | 28.84 | | 40.15 | | | 153.39 | |
| | 2020 | 40.26 | 1.81 | | | 0.16 | | 39.48 | 11.21 | | 14.91 | 62.41 | 18.46 | 276.44 | *Nov 2018-Apr 2022 |
| | 2019 | | 15.54 | 5.92 | 13.41 | 58.10 | 17.2 | | | | 10.56 | | | 7.08 | |
| | 2018 | | | | | | | | | | | | | | |
| S&P 500 | 2022 | -5.17 | 2.99 | 3.71 | -8.72 | | | | | | | | | -12.9 | 58.73* |
| | 2021 | | 2.76 | 4.38 | 5.34 | 0.70 | 2.33 | 2.38 | 3.04 | | 7.01 | | 4.48 | 28.71 | |
| | 2020 | | | | 18.83 | 4.76 | 1.99 | 5.64 | 7.19 | | | 10.95 | 3.84 | 18.41 | *Nov 2018-Apr 2022 |
| | 2019 | 7.86 | 2.97 | 1.79 | 3.93 | | 7.84 | 1.44 | | 1.87 | 2.17 | 3.63 | 3.02 | 31.5 | |
| | 2018 | | | | | | | | | | | | | | |

** Track record for the legacy investment vehicle that employed a market neutral strategy. All investors have been rolled in the Multi-Strategy Fund. Performance figures are estimates and are not indicative of future performance.

## Why BKCoin Capital

### Institutional Crypto Pioneer

From inception in 2018, it was BKCoin's aim to bring more transparency and sophistication to a space that lacked institutional-grade investment offerings. BKCoin has one of the longest institutional track records of any crypto investment firm at over three years, while most crypto investment firms have only been in operation for 18 months or less.

### Proven Alpha Generation

Given the firm's tenure, the team has developed the ability to recognize sustainable alpha, alpha decay, capacity constraints and innovative research opportunities within the crypto investment universe.

### In-house Quant Expertise

The key to BKCoin's success has been a commitment to investing in and developing the firm's quantitative research and data analysis capabilities by hiring experienced individuals, instead of outsourcing this function.

### Institutional Infrastructure

Our in-house tech and trusted relationships with the most cutting-edge counterparties in digital assets allows us to access deep liquidity with low execution costs giving us the means to support institutional capital.

### Independent

BKCoin is one of only a few firms to have grown organically, via investing success, without any third parties taking a GP stake. As such, the firm is more nimble and dynamic in decision-making, which is crucial for trading the ever-changing crypto markets.

Our aim is to continue to build a sustainable diversified business that can be a partner to institutional allocators for decades to come.

## Firm Overview

| Founded | Employees | Assets | Markets | Strategy |
|---|---|---|---|---|
| 2018 | 14 | $150M | Cryptocurrencies | Multi-strategy |

### Quantitative Systematic Investing
Capitalize on pricing inefficiencies within cryptocurrency markets without suffering from emotional biases.

### Tight Risk Controls
Our multi-tiered risk management system allows us to confidently deploy our investor's capital making our clients' emotional well being our number one priority.

### Trusted by Institutional Investors
We manage over $150M in assets and our investment base is made up of 14 LPs diversified across UHNW investors, family offices and fund of funds.

## Technology & Operations Overview

From inception, BKCoin has always focused on creating and maintaining an institutional quality operational infrastructure that ensures the **highest levels of security, resiliency and efficiency.**

Given the highly quantitative nature of BKCoin's strategy, and the importance of efficient data analysis, testing and strategy deployment, the firm's tech stack is managed in-house by the **firm's CTO, Adriano Caloiaro.**

This allows the investment team to focus solely on idea generation and research.

One of the firm's key differentiators is the use of **institutional quality service providers to give allocators peace of mind.** Notably, BKCoin will be one of the first funds to use State Street for outsourced fund administration.

It is also **one of the only firms with a US opinion from a top four auditor (KPMG)** – most only have Cayman opinions.

BKCoin has a **dedicated server monitoring market conditions 24/7** with real time alerts for new trade opportunities, including:
- unusually large contango in the futures markets
- options arbitrage
- extreme funding rates across multiple exchanges
- automated execution of options combo trades (taking the best price from public markets, OTC desks and liquidity networks)

## Management Team



**Carlos Betancourt**
Founding Principal

Prior to founding BKCoin Capital, Carlos was the Founder and Managing Director of Yorkville Commodities, a full-service physical commodities brokerage and consulting firm. His previous experience includes working at AMCI Group as a Commodities Manager, KCM Asset Management as an Equity Analyst, and The Newport Group as a Business Analyst. Carlos earned his B.A. in Finance and MBA with a concentration in Finance from Stetson University.



**Paul Magahis**
President

Paul has over 22 years of experience in the alternative investments industry. Prior to BKCoin Capital, Paul was the Head of Capital Strategy at Coinbase. Previously, he was a Managing Director and Global Co-Head of Capital Introduction at StoneX Group Inc.

Prior to that, he managed family office investments at Stifel. Paul was also an SVP and Head of Business Development in the Prime Services group at Lazard. Paul started his career as a buy-side analyst, investing across asset classes and strategies at hedge funds including; Merlin BioMed Group (healthcare fund), Paloma Partners/SBZ Partners (multi-strategy), and Merrill Lynch (Strategic Investment Group) within the firm's internal hedge fund. Paul earned his B.B.A in Finance at Pace University.



**Kevin Kang, CFA**
Founding Principal

Prior to founding BKCoin Capital, Kevin was the portfolio manager and trader at Amalgamated Bank, managing over $4 billion in multi-asset portfolios specializing in US equities and fixed income. His previous experience includes being Associate Portfolio Manager at AllianceBernstein in NYC. Kevin is a CFA® charterholder and earned his B.A. in Finance from Stetson University.



**Mark Treinkman**
Head of Quantitative Trading

Mark began his career in equities as a discretionary trader with Madison Proprietary Trading Group, where he learned to trade with an emphasis on consistent returns and small drawdowns. He later joined Chimera Securities LLC as an equity trader and transitioned to quantitative approaches to trading capital markets. Mark began his financial management career at Pattern Capital Management, serving clients such as small businesses, high net-worth individuals and independent RIAs. Mark holds a B.S. in Computer Science from the Pennsylvania State University.



**Adriano Caloiaro**
Chief Technology Officer

An experienced software engineer, Adriano joined BKCoin from Greenhouse Software, the fastest growing provider of enterprise talent acquisition software. Prior to this, Adriano was a Partner and Software Engineer at Myatt & Johnson, Inc., building a high-performance computational biology platform funded by a grant from the National Institute of Health. Adriano holds a BS in Computer Information Systems and Business Administration from Stetson University.

## Disclaimer

Past performance is not a guarantee of future results. Different types of investments involve varying degrees of risk, and there can be no assurance that the future performance of any specific investment, investment strategy, or product made reference to directly or indirectly in this presentation, will be profitable, equal any corresponding indicated historical performance level(s), or be suitable for your portfolio. Due to various factors, including but not limited to changing market conditions, the use of leverage and different strategies in illiquid and share-c asses, the content may no longer be reflective of current opinions or positions. Moreover, you should not assume that any discussion or information contained in this document serves as the receipt of, or as a substitute for, personalized investment advice from BKCoin Management, LLC or any of its investment vehicles.



# Table of Contents

| | |
|---|---|
| Why BKCoin Capital | 3 |
| Firm Overview | 4 |
| Performance | 5 |
| Inflection Point in Institutional Crypto | 6 |
| Multi-Strategy Investment Process | 9 |
| Risk Management | 12 |
| Technology & Operations | 14 |
| Team | 18 |
| Terms | 20 |
| Appendix | 21 |

BKCoin Multi-Strategy Fund



## Why BKCoin Capital



### Institutional Crypto Pioneer

From inception in 2018, it was BKCosin's aim to bring more transparency and sophistication to a space that lacked institutional-grade investment offerings. BKCoin has one of the longest institutional track records of any crypto investment firm at over three years, while most crypto investment firms have only been in operation for 18 months or less.

### Proven Alpha Generation

Given the firm's tenure, the team has developed the ability to recognize sustainable alpha, alpha decay, capacity constraints and innovative research opportunities within the crypto investment universe.

### In-house Quant Expertise

The key to BKCoin's success has been a commitment to investing in and developing the firm's quantitative research and data analysis capabilities by hiring experienced individuals, instead of outsourcing this function.

### Institutional Infrastructure

Our in-house tech and trusted relationships with the most cutting-edge counterparties in digital assets allows us to access deep liquidity with low execution costs giving us the means to support institutional capital.

### Independent

BKCoin is one of only a few firms to have grown organically, via investing success, without any third parties taking a GP stake. As such, the firm is more nimble and dynamic in decision-making, which is crucial for trading the ever-changing crypto markets.

Our aim is to continue to build a sustainable diversified business that can be a partner to institutional allocators for decades to come.

## Firm Overview
### At the Forefront of Crypto Asset Management





| | Founded | Employees | Assets | Markets | Strategy |
|---|---|---|---|---|---|
| | 2018 | 14 | $150M | Cryptocurrencies | Multi-strategy |

### BKCoin Capital Fund (2019 – Present)

**305.89%**
Return

**95%**
Winning Months

**0.21**
Beta to Bitcoin

**3.29**
Sharpe Ratio

**Quantitative Systematic Investing**

Capitalize on pricing inefficiencies within cryptocurrency markets without suffering from emotional biases.

**Tight Risk Controls**

Our multi-tiered risk management system allows us to confidently deploy our investor's capital, making our clients' emotional well being our number one priority.

**Trusted by Institutional Investors**

We manage over $150M in assets and our investment base is made up of 14 LPs diversified across UHNW investors, family offices and funds of funds.

BKCoin Multi-Strategy Fund

4

# Performance



|  | Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD | Since Inception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BKCoin Multi-Strategy Fund | 2022 | -1.50 | 2.30 | 3.10 | 1.90 | | | | | | | | | 5.86 | 305.89 |
| BKCoin Digital Asset Fund ** | 2021 | 8.43 | 9.38 | 8.09 | 7.57 | 4.89 | 0.88 | 1.83 | 1.57 | 1.73 | 9.50 | 8.03 | 1.20 | 83.79 | 283.01 |
|  | 2020 | 13.18 | 0.14 | 3.43 | 7.31 | 2.36 | 1.00 | 2.31 | 1.03 | 0.31 | 1.44 | 8.66 | 9.90 | 63.33 | |
|  | 2019 | | 1.68 | 3.57 | 1.37 | 3.06 | 2.73 | 1.61 | 0.25 | 1.29 | 1.14 | 2.61 | 2.96 | 18.35 | |
|  | 2018 | | | | | | | | | | | | 7.91 | 7.91 | |
| Bloomberg Galaxy Crypto Index | 2022 | | 3.99 | 13.93 | 19.56 | | | | | | | | | | 642.64* |
|  | 2021 | 42.44 | 21.91 | 25.73 | 28.67 | | | 7.65 | 28.84 | | 40.15 | | | 153.39 | |
|  | 2020 | 40.26 | 1.81 | | 35.85 | 0.16 | | 39.48 | 11.21 | | 14.91 | 62.41 | 18.46 | 276.44 | *Nov 2018-Apr 2022 |
|  | 2019 | | 15.54 | 5.92 | 13.41 | 58.10 | 17.2 | | | | 10.56 | | | 7.08 | |
|  | 2018 | | | | | | | | | | | | | | |
| S&P 500 | 2022 | | 3.99 | 3.71 | 8.72 | | | | | | | | | | 58.73* |
|  | 2021 | | 2.76 | 4.38 | 5.34 | 0.70 | 2.33 | 2.38 | 3.04 | | 7.01 | | 4.48 | 28.71 | |
|  | 2020 | | | | 18.83 | 4.76 | 1.99 | 5.64 | 7.19 | | | 10.95 | 3.84 | 18.41 | |
|  | 2019 | 7.86 | 2.97 | 1.79 | 3.93 | | 7.84 | 1.44 | | 1.87 | 2.17 | 3.63 | 3.02 | 31.5 | *Nov 2018-Apr 2022 |
|  | 2018 | | | | | | | | | | | | | | |

** Track record for the legacy investment vehicle that employed a market neutral strategy. All investors have been rolled in the Mult-Strategy Fund. Performance figures are estimates and are not indicative of future performance.

## Inflection Point
### The Entrance of Legacy Asset Managers



**The total market capitalization of cryptocurrency markets now stands at nearly $3T** and will continue to rapidly expand as half of traditional hedge funds are now considering allocating to digital assets.

The entrance of traditional asset managers will accelerate alpha decay **causing popular arbitrage opportunities to diminish.**

**Current quantitative funds have capacity constraints** and will not be able to handle the inflow of new institutional capital.

Institutional allocators have **minimal options to deploy capital that provides low beta exposure** to cryptocurrency markets.

# Inflection Point
## Strategy Evolution Through the Years



| 2019 – 2020 | 2020 – 2021 | 2022 – Future |
|---|---|---|

### Inter-Exchange, Triangular Currency Pair Arbitrage

BKCoin's initial flagship strategy capitalized on market infrastructure inefficiencies, delivering our clients consistent returns while eliminating currency fluctuation risk as well as exchange risk.

Pivoted once the first wave of HFTs entered the space.

### Future-Spot, Option Vol Arbitrage

The growth of the cryptocurrency derivatives market allowed BKCoin to provide clients with a market neutral approach that would deliver investors consistent returns despite the market environment.

This strategy will continue to be deployed in our multi-strategy portfolio, however we are seeing alpha decay within the strategy as institutions continue to adopt cryptocurrency assets.

### Multi-Strategy

The new inflow of institutional capital entering the space wants the upside benefits of being exposed to a new asset class, but does not want the volatility that comes along with its immaturity.

A multi-strategy approach allows us to deliver our institutional clients low beta returns without having to worry about capacity affecting our risk-adjusted returns.

## Inflection Point
### The Future is Multi-Strategy, But Why?



BKCoin employs a rigorous systematic approach to multi-strategy investing to exploit pricing dislocations and market inefficiencies within crypto. The firm's multi-strategy approach provides the holy trinity of benefits to investors:

### 1 Capacity

Quant funds deploying an individual strategy do not have the capacity to take on institutional capital.

A multi-strategy approach allows us to service institutions while enabling us to continue to provide low beta exposure to digital assets.

### 2 Avoiding Alpha Decay

The fund's livelihood will no longer be predicated on just one strategy. Instead, by diversifying across a wide range of strategies, the fund will be able to minimize the impact of alpha decay on our investors' returns, while continually being able to navigate the rapidly changing cryptocurrency market.

### 3 Diversification

A broad portfolio of strategies allows us to diversify risk across not just the strategy universe, but across different time frames, asset classes and products.

This allows our investors to be confident in our ability to deliver absolute returns despite the current market environment.

## Investment Process
### From Research to Production



The firm's quantitative research process continually analyzes over 30 different strategies by gathering as much relevant data as possible from exchanges and third-parties to backtest and stress test these strategies for ongoing viability and alpha generation.

The idea generation process begins with observing human biases and / or discovering market microstructure anomalies.

*Our Head of Quant* Trading Mark Treinkman has made a 16 year career from successfully capitalizing on price inefficiencies caused by these events.

> "Research is the lifeblood of our firm"
> Carlos Betancourt, Founding Principal



BKCoin Multi-Strategy Fund    Strictly confidential. Not for distribution    9

# Portfolio Construction
## Strategy Implementation



Allocation between strategies is highly opportunistic, dynamic and based on quant signals the investment team analyzes on a daily basis. Similarly, there are tight risk controls, and the team employs a hedge fund trader's mentality of being disciplined around stop losses, quickly exiting trades that aren't working.



BKCoin Multi-Strategy Fund

10

## Investment Universe



BKCoin Digital Asset Fund utilizes proprietary analysis to identify statistical arbitrage opportunities and exploit market dislocations and inefficiencies within the digital asset universe through digital asset spot markets, digital asset futures, digital asset options, digital asset lending facilities and other relevant derivative products within the digital asset space.

Our quant arbitrage strategies transact in spot pairs and corresponding derivatives when price deviations between them exceed rigorously tested thresholds as defined by our proprietary models.



| Spot / Cash Market | Top 100 cryptocurrencies by market capitalization. | Active on +30 cryptocurrency exchanges |
|---|---|---|
| Derivatives | Options and futures on the top 50 cryptocurrencies by market capitalization. | Partnerships with 60+ liquidity providers, OTC counterparties and broker dealers |
| Other Asset Classes | Cash Equities / Options on cash equities | Interactive Brokers |

We have close-knit relationships with several of the largest exchanges and liquidity providers in crypto allowing us to access deep liquidity at premium discounts across the spectrum of financial instruments

# Risk Management



Before entering a trade, we evaluate the current and forecasted liquidity of the market and target assets, portfolio PnL, profit targets, counterparty risk and the current volatility regime of the market and asset being traded in order to determine whether the expected return of the investment is worth the assumed risk.

We identify the risk neutral position for the currency, design a hedging program to reach that exposure, and actively manage around that exposure.



## Risk Notification System
### Live Trading





| Event | Triggers | Notification System (Three Tiered) | |
|---|---|---|---|
| Connection errors | HTTP/s error, exchange updates | Real-time Risk Dashboard | Real-time Telegram updates (each event has its own channel) |
| Risk limits hit | Drawdown thresholds | | Email sent to all team members (during/after working hours) |
| Price level breach | Direction and rate of change of price move | | Human Oversight (anticipate before/during event occurrence) |
| | | Communicate event with team | |
| | | Deploy resources to resolve event | |
| | | Communicate resolution with rest of team | |

The risk notification system provides three backstops in an unlikely event one of our systems temporarily shuts down.

## Technology & Operations Overview



From inception, BKCoin has always focused on creating and maintaining an institutional quality operational infrastructure that ensures **the highest levels of security, resiliency and efficiency.**

Given the highly quantitative nature of BKCoin's strategy, and the importance of efficient data analysis, testing and strategy deployment, the firm's tech stack is managed in-house by the **firm's CTO, Adriano Caloiaro.**

This allows the investment team to focus solely on idea generation and research.

One of the firm's key differentiators is the use of **institutional quality service providers to give allocators peace of mind.** Notably, BKCoin will be one of the **first funds to use State Street for outsourced fund administration.**

It is also **one of the only firms with a US opinion from a top four auditor (KPMG)** – most only have Cayman opinions.

BKCoin has a **dedicated server monitoring market conditions 24/7** with real time alerts for new trade opportunities, including:

- Unusually large contango in the futures markets.
- Options arbitrage.
- Extreme funding rates across multiple exchanges.
- Automated execution of options combo trades (taking the best price from public markets, OTC desks and liquidity networks).

BKCoin Multi-Strategy Fund

14

## Operational Process Flow Architecture



The firm's tech stack integrates the OMS/EMS, risk system, PMS, back-office and data analytics into one streamlined process for enhanced operational efficiency. This is an integral part of our strategy as it allows BKCoin to prioritize delivering consistent risk-adjusted returns for our clients.



### Key Features

- Mainbloq and proprietary systems are used for our OMS / EMS providers. Allowing us to plug into 30+ exchanges and acquire the **best pricing for execution**.

- Our custody process entails the most **cutting edge security model** utilizing Gemini and Standard Custody (all private keys must be present to re-allocate funds).

- Our risk management system provides **real time feedback** to enhance our decision making process.

BKCoin Multi-Strategy Fund

15

# Tech Overview
## Security Deep Dive



## Custody

As we further enhance our tech stack, we look forward to more efficient strategy development and real-time analysis of our strategies.

This will help us move at a rapid pace throughout the strategy development life cycle.

## Tech

Within the last twelve months, we have made incredible progress towards our long term goal of streamlining our strategy development process. In other words, taking proof-of-concept strategy ideas and transforming them into profitable trading systems. Within the next twelve months, our intention is to continue to make this process as painless as possible by facilitating rapid testing, analysis and deployment so we can continue to focus on idea generation and research.

**Key steps taken include:**

- Dedicated server monitoring market conditions 24/7.
- Real time alerts for new trade opportunities, including:
  - Unusually large contango in the futures markets.
  - Options arbitrage.
  - Extreme funding rates across multiple exchanges.
  - Automated execution of options combo trades, taking the best price from public markets, OTC desks and liquidity networks.

- Internal process for automatically evaluating the efficacy of new backtested strategies.
- Internal process for automatically generating daily research newsletters.

# The Future of BKCoin Capital Technology



| Fall 2022 | Spring 2023 | Fall 2023 |
|---|---|---|

### Fully Automate Hedging Mechanism

Implement automatic hedging software to instantaneously hedge an on-chain position when an event is triggered.

### AI Market Filter Regime

Probabilistic AI software to identify market regimes.

### Robo Cash Management System

Daily lending / borrowing software that identifies and allocates to the highest yielding assets across all major L1 Blockchains.



# Team
## Management



### Carlos I. Betancourt
Founding Principal

Carlos oversees the firm's daily operations, including legal and compliance. He also manages the Fund's research staff. Prior to founding BKCoin Capital, Carlos was the Founder and Managing Director of Yorkville Commodities, a full-service physical commodities brokerage and consulting firm that offered financing services to small and medium-sized companies operating in the energy, mining, and natural resources sectors in North America and LATAM.

His previous experience includes working at AMCI Group as a Commodities Manager, KCM Asset Management as an Equity Analyst, and The Newport Group as a Business Analyst. Carlos is actively involved in helping current students from his alma mater's prestigious  develop skills to become successful professionals. As a former Division I student-athlete, he enjoys an active lifestyle and participates in several sports leagues in NYC. Carlos earned his B.A. in Finance and MBA with a concentration in Finance from Stetson University. He is fluent in English, Spanish, and Papiamento.

### Kevin Kang, CFA
Founding Principal

Kevin shares the daily management and trading responsibilities for the Fund. Prior to founding BKCoin Capital, Kevin was the portfolio manager and trader at Amalgamated Bank, managing over $4 billion in multi-asset portfolios specializing in US equities and fixed income. His previous experience includes being Associate Portfolio Manager at AllianceBernstein in NYC. During his tenure at AllianceBernstein, he effectively collaborated with multiple portfolio managers in managing the largest US equities' product by AUM.

Additionally, he successfully implemented investment decisions and efficiently oversaw the firm's daily positioning of its $40 billion portfolio. Kevin is a CFA® charterholder and earned his B.A. in Finance from Stetson University. He is fluent in English and Korean.

# Team
## Management



### Paul Magahis
President

Paul is the President of BKCoin Capital, LP. He oversees corporate strategy, development, operations and is a member of the investment committee. He has over 22 years of experience in the alternative investments industry. Prior to BKCoin Capital, Paul was the Head of Capital Strategy at Coinbase. He and his team were responsible for building relationships with institutional allocators such as family offices, pensions, sovereign wealth funds, endowments and foundations globally. Previously, he was a Managing Director and Global Co-Head of Capital Introduction at StoneX Group Inc. Prior to that, he managed family office investments at Stifel investing in alternatives. Paul was also an SVP and Head of Business Development in the Prime Services group at Lazard.

Paul started his career as a buy-side analyst, investing across asset classes and strategies at hedge funds including; Merlin BioMed Group (healthcare fund), Paloma Partners/SBZ Partners (multi-strategy), and Merrill Lynch (Strategic Investment Group) within the firm's internal hedge fund. Paul earned his B.B.A in Finance at Pace University.

### Mark Treinkman
Head of Quantitative Trading

Mark is a quantitative trader with a deep understanding of market micro-structure. He has developed numerous algorithms to maximize returns, reduce volatility and minimize risk in client portfolios, including long-term investing techniques and active trading strategies. Mark began his career in equities as a discretionary trader with Madison Proprietary Trading Group, where he learned to trade with an emphasis on consistent returns and small drawdowns.

He later joined Chimera Securities LLC as an equity trader and transitioned to quantitative approaches to trading capital markets. Mark began his financial management career at Pattern Capital Management, serving clients such as small businesses, high net-worth individuals and independent RIAs. Outside of his professional experience, Mark manages his own personal funds for profit through trading and real estate development. Mark also holds a B.S. in Computer Science from the Pennsylvania State University.

# Team
## Management



### Kevin Valentine
Venture Partner

Kevin Valentine is a venture investor and entrepreneur with 23 years of experience in capital markets and venture capital. His career began at Moody's Investor Service in the Financial Institutions and Sovereign Risk Group which lead to a role as Director of Risk Management.

From Moody's Mr. Valentine moved to venture capital at Q-Bank Group. While at Q-Bank, Mr. Valentine collaborated with academic institutions such as the University of Oxford and MIT as well as the Department of Defense and IARPA, commercializing novel technologies across various categories such as cognitive computing, cybersecurity, neuroscience, and digital health. Prior to joining BKCoin he was the Managing Partner at Alisio Ventures, where he focused on venture and angel investments in crypto protocols. Mr. Valentine brings a deep understanding of application, DeFi and Web3 protocols. Mr. Valentine graduated from Morehouse College with a B.A. in Business Administration with a concentration in finance.



### Adriano Caloiaro
Chief Technology Officer

Adriano builds and maintains BKCoin's computation and strategy execution platform, while also setting out and implementing the vision for the future of the firm's technology stack.

An experienced software engineer, Adriano joined BKCoin from Greenhouse Software, the fastest growing provider of enterprise talent acquisition software. Adriano spent over five years at Greenhouse Software building many of the systems and teams critical to the company's success. Prior to this, Adriano was a Partner and Software Engineer at Myatt & Johnson, Inc., building a high-performance computational biology platform funded by a grant from the National Institute of Health. Adriano holds a BS in Computer Information Systems and Business Administration from Stetson University.

# Terms



|  | BKCoin Multi-Strategy Fund |
|---|---|
| Domicile | Delaware, British Virgin Islands |
| Eligibility | Qualified Purchaser |
| Minimum Investment | $1,000,000 |
| Management Fee | 2% |
| Performance Fee | 20% |
| Subscriptions | Monthly |
| Redemptions | Monthly (14 days notice) |
| Custodian | Standard Custody<br>Gemini |
| Administrator | State Street |
| Auditor | KPMG |
| US Counsel | Dzuba Law |
| BVI Counsel | Harneys |

# Appendix

## Historical Track Record

| Strategy | Annual Return | Monthly Sharpe | Beta to BTC Monthly | Winning Months (%) | Max Drawdown (%) |
|---|---|---|---|---|---|
| BKCC Fund Since Inception | 305.89% | 3.29 | 0.21 | 95.10% | -5.02% |
| BTC Since BKCC Inception | 848% | 1.22 | 1 | 53.65% | -40.39% |
| BKCC Fund 2022 | 5.86% | 2.58 | 0.02 | 75% | -1.50% |
| Bitcoin 2022 | -18.50% | -1.12 | 1 | 50% | -18.55% |
| BKCC Fund 2021 | 83.79% | 5.22 | 0.25 | 100% | 0.00% |
| Bitcoin 2021 | 59.40% | 0.98 | 1 | 50% | -40.39% |
| BKCC Fund 2020 | 63.33% | 3.31 | 0.15 | 100.00% | 0.00% |
| Bitcoin 2020 | 304.50% | 2.29 | 1 | 66.00% | -31.16% |
| BKCC Fund 2019 | 18.35% | 1.60 | 0.07 | 91.60% | -5.02% |
| Bitcoin 2019 | 94.08% | 1.22 | 1 | 50.00% | -33.33% |



BKCC Cumulative Returns Since Inception

$150M

Assets
Under Management

12

Members
on the Investment
Team

27%

At Capacity

BKCoin Multi-Strategy Fund

22

# Appendix
## Organizational chart

- BKCoin Management LLC (GP)
- BKCoin Multi-Strategy Master Fund Ltd.
- BKCoin Opportunistic DeFi Fund LP (Domestic)
- BK Offshore Fund Ltd. (Offshore - BVI)
- BKCoin Venture Fund I, LP



BKCoin Multi-Strategy Fund

23

# Appendix
## Advisory Board



### Vittorio Fratta, CFA
Advisor

- 19 years of investment experience
- Chief Investment Officer at Cedar Asset Management
- Former Portfolio Manager at ICC Capital Management, Inc.

### Peter Heise
Advisor

- 23 years of investment experience
- Former Portfolio Manager at a $2.4B family office
- Former Director of Trading at KCM Asset Management
- Former Trader at Merrill Lynch

### Justin Simmons
Advisor

- 18 years of investment experience
- Senior Trader at $7 billion L/S Hedge Fund
- Former Managing Director at Evercore ISI
- Former Trader at JP Morgan



HQ

BKCoin Capital, LP
1101 Brickell Ave. S-800
Miami, Florida 33131
+1(786) 623-4656

New York

38 E 37th Street St. 11
New York, NY 10016
+1(646) 600-5182

BKCoin Capital

bkcoincapital.com

# **EXHIBIT C**

# EXHIBIT D
Private Offering Memoranda

# BKCOIN CAPITAL LP

*A Delaware Limited Partnership*

Revised August 28, 2020

THE LIMITED PARTNERSHIP INTERESTS (THE "***INTERESTS***") OF BKCOIN CAPITAL LP (THE "***FUND***") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "***SECURITIES ACT***"), OR THE SECURITIES LAWS OF ANY STATE. THE FUND IS NOT REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, OR THE SECURITIES LAWS OF ANY STATE. THIS OFFERING OF LIMITED PARTNERSHIP INTERESTS IS BEING MADE IN RELIANCE ON A REGISTRATION EXEMPTION UNDER THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND UPON ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS. THIS MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION AND NEITHER THAT COMMISSION NOR ANY STATE SECURITIES ADMINISTRATOR HAS PASSED UPON OR ENDORSED THE MERITS OF AN INVESTMENT IN THE FUND OR THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY INTERESTS IN THE FUND IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS UNLAWFUL. AN INVESTMENT IN THE FUND INVOLVES A SIGNIFICANT RISK OF LOSS. SEE "CERTAIN RISK FACTORS" BELOW.

*Recipient's Name:* █████████████

*Memorandum #:* ONSH-SHCL007C

This Confidential Private Offering Memorandum (the "Memorandum") is being given to the identified recipient solely for the purpose of his or her evaluation for an investment in the limited partnership interests described herein. It may not be reproduced or distributed to anyone other than the identified recipient's professional advisers under an equal requirement of confidentiality. By accepting delivery of this Memorandum, the recipient agrees not to make any copies of the Memorandum, and to return it and all related documents to the General Partner if the recipient ultimately does not subscribe for a limited partnership interest.

*General Partner and Investment Manager of the Fund:*

**BKCOIN MANAGEMENT, LLC**
1101 Brickell Avenue South Tower #8
Miami, Florida 33131
Telephone: (786) 623-4656
Email: info@bkcoincapital.com

# NOTICES

*The following notices are directed to Accredited Investors, who are the target investors eligible to make an investment into the Fund. Please review the following Notices very carefully as they are of fundamental importance to your prospective investment into the Fund:*

### General Notices:

THIS IS A PRIVATE OFFERING AVAILABLE ONLY TO (1) A LIMITED NUMBER OF PERSONS WHO ARE CONSIDERED "UNACCREDITED INVESTORS" (IF APPLICABLE) AND (2) "ACCREDITED INVESTORS" AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT OF 1933. AN ACCREDITED INVESTOR IS ANY PERSON OR ENTITY REASONABLY DESCRIBED IN ANY OF THE FOLLOWING CATEGORIES OR, WHO THE FUND'S GENERAL PARTNER REASONABLY BELIEVES, IN RELIANCE ON REPRESENTATIONS MADE BY THE INVESTOR IN THE SUBSCRIPTION AGREEMENT, IS REASONABLY DESCRIBED IN ANY OF THE FOLLOWING CATEGORIES AT THE TIME OF THE SALE OF THE SECURITIES TO THAT PERSON:

A.  A BANK OR SAVINGS AND LOAN ASSOCIATION, AS DEFINED IN THE SECURITIES ACT, WHETHER ACTING IN ITS INDIVIDUAL OR FIDUCIARY CAPACITY; A BROKER OR DEALER REGISTERED PURSUANT TO THE SECURITIES AND EXCHANGE ACT OF 1934; AN INVESTMENT COMPANY REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940; AN INSURANCE COMPANY, AS DEFINED IN THE SECURITIES ACT; A BUSINESS DEVELOPMENT COMPANY, AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940; A SMALL BUSINESS INVESTMENT COMPANY LICENSED BY THE U.S. SMALL BUSINESS ADMINISTRATION.

B.  A PLAN ESTABLISHED AND MAINTAINED BY A STATE, ITS POLITICAL SUBDIVISIONS, OR AN AGENCY OR INSTRUMENTALITY OF A STATE OR ITS POLITICAL SUBDIVISIONS FOR THE BENEFIT OF ITS EMPLOYEES, IF SUCH PLAN HAS TOTAL ASSETS IN EXCESS OF FIVE MILLION ($5,000,000.00) DOLLARS (USD).

C.  AN EMPLOYEE BENEFIT PLAN WITHIN THE MEANING OF TITLE I OF THE EMPLOYMENT RETIREMENT INCOME SECURITY ACT OF 1974 (ERISA), IF THE INVESTMENT DECISION WITH RESPECT TO THIS INVESTMENT IS MADE BY A PLAN FIDUCIARY AS DEFINED IN ERISA, WHICH IS EITHER A BANK, INSURANCE COMPANY, OR REGISTERED INVESTMENT ADVISOR, <u>OR</u> IF THE EMPLOYEE BENEFIT PLAN HAS TOTAL ASSETS IN EXCESS OF FIVE MILLION ($5,000,000.00) DOLLARS.

D.  A PRIVATE BUSINESS DEVELOPMENT COMPANY, AS DEFINED IN THE INVESTMENT ADVISORS ACT OF 1940.

E.  A TAX-EXEMPT ORGANIZATION DEFINED IN SECTION 501(C)(3) OF THE INTERNAL REVENUE CODE, OR A CORPORATION, MASSACHUSETTS OR SIMILAR BUSINESS TRUST, OR PARTNERSHIP, NOT FORMED FOR THE SPECIFIC PURPOSE OF ACQUIRING THE SECURITIES, WITH TOTAL ASSETS IN EXCESS OF FIVE MILLION ($5,000,000.00) DOLLARS.

F.  A DIRECTOR OR OFFICER OF THE FUND'S GENERAL PARTNER.

G.  A NATURAL PERSON WHO'S INDIVIDUAL NET WORTH (OR JOINT NET WORTH WITH THAT PERSON'S SPOUSE) EXCEEDS ONE MILLION ($1,000,000.00) DOLLARS.

H.  A NATURAL PERSON WHO HAD AN INDIVIDUAL INCOME IN EXCESS OF $200,000 IN EACH OF THE TWO MOST RECENT YEARS AND WHO REASONABLY EXPECTS AN INCOME IN EXCESS OF $200,000 IN THE CURRENT YEAR, OR WHO TOGETHER WITH THEIR SPOUSE HAS A JOINT INCOME IN EXCESS OF $300,000 IN EACH OF THE TWO MOST RECENT YEARS AND WHO REASONABLY EXPECTS AN INCOME IN EXCESS OF $300,000 IN THE CURRENT YEAR.

I.  A TRUST, WITH TOTAL ASSETS IN EXCESS OF FIVE MILLION ($5,000,000.00) DOLLARS, NOT

FORMED FOR THE SPECIFIC PURPOSE OF ACQUIRING THE SECURITIES OFFERED, WHOSE PURCHASE IS DIRECTED BY A SOPHISTICATED PERSON AS DESCRIBED IN RULE 506(b)(2)(II) UNDER THE SECURITIES ACT.

J.   AN ENTITY ALL THE EQUITY OWNERS OF WHICH ARE ACCREDITED INVESTORS.

K.   AN ENTITY NOT LISTED IN § 230.501(a)(1), § 230.501(a)(2), § 230.501(a)(3), § 230.501(a)(7), § 230.501(a)(8), NOT FORMED FOR THE SPECIFIC PURPOSE OF ACQUIRING THE SECURITIES OFFERED, OWNING ASSETS IN EXCESS OF FIVE MILLION ($5,000,000) DOLLARS.

L.   ANY NATURAL PERSON HOLDING IN GOOD STANDING ONE OR MORE PROFESSIONAL CERTIFICATIONS OR DESIGNATIONS OR CREDENTIALS FROM AN ACCREDITED EDUCATIONAL INSITUTION THAT THE SEC HAS DESIGNATED AS QUALIFYING AN INDIVIDUAL FOR ACCREDITED INVESTOR STATUS.

M.   ANY NATURAL PERSON WHO IS A "KNOWLEDGEABLE EMPLOYEE" AS DEFINED IN RULE 3c-5(a)(4) UNDER THE INVESTMENT COMPANY ACT OF 1940 OF THE ISSUER OF SECURITIES BEING OFFERED OR SOLD, WHERE THE ISSUER WOULD BE AN INVESTMENT COMPANY, AS DEFINED IN SECTION 3 OF SUCH ACT, BUT FOR THE EXCLUSION PROVIDED BY EITHER SECTION (3)(C)(1) OR 3(C)(7) OF SUCH ACT.

N.   ANY "FAMILY OFFICE" AS DEFINED IN RULE 202(a)(11)(G)-1 UNDER THE INVESTMENT ADVISERS ACT OF 1940, (I) WITH ASSETS UNDER MANAGEMENT IN EXCESS OF FIVE MILLION DOLLARS ($5,000,000); (II) THAT IS NOT FORMED FOR THE SPECIFIC PURPOSE OF ACQUIRING THE ASSETS OFFERED, AND (III) WHOSE PROSPECTIVE INVESTMENT IS DIRECTED BY A PERSON WHO HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT SUCH FAMILY OFFICE IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF THE PROSPECTIVE INVESTMENT; AND

O.   ANY "FAMILY CLIENT" AS DEFINED IN RULE 202(a)(11)(G)-1 UNDER THE INVESTMENT ADVISERS ACT, OF A FAMILY OFFICE MEETING THE REQUIREMENTS OF PARAGRAPH N ABOVE, AND WHOSE PROSEPCTIVE INVESTMENT IN THE ISSUER IS DIRECTED BY SUCH FAMILY OFFICE PRUSUANT TO PARAGRAPH N ABOVE.

AN INVESTOR MAY SUBSCRIBE FOR SECURITIES BY (1) EXECUTING THE SUBSCRIPTION AGREEMENT ATTACHED TO THIS MEMORANDUM AT EXHIBIT B AND (2) DELIVERING SUCH DOCUMENTS TO THE FUND'S GENERAL PARTNER ALONG WITH THE SUBSCRIPTION PAYMENTS FOR THE SECURITIES PURCHASED.

THE LIMITED PARTNERSHIP INTERESTS OFFERED BY THIS MEMORANDUM MAY NOT BE TRANSFERRED EXCEPT WITH THE CONSENT OF THE GENERAL PARTNER AND EXCEPT AS PERMITTED UNDER THE LIMITED PARTNERSHIP AGREEMENT, THE SECURITIES ACT OF 1933, AND APPLICABLE STATE LAWS. SUCH CONSENT AND SUCH COMPLIANCE MAY BE UNLIKELY. FURTHER, WITHDRAWALS OF INVESTMENTS IN THE FUND ARE SUBJECT TO SIGNIFICANT RESTRICTIONS. AS A RESULT, AN INVESTOR MUST BE IN A POSITION TO BEAR THE ECONOMIC RISK OF AN INVESTMENT IN THE FUND FOR A SIGNIFICANT PERIOD.

PROSPECTIVE INVESTORS SHOULD NOT VIEW THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX OR INVESTMENT ADVICE. EACH INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT OR FINANCIAL ADVISER AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING AN INVESTMENT IN THE FUND.

THE INFORMATION IN THIS MEMORANDUM IS GIVEN AS OF THE DATE ON THE COVER PAGE, UNLESS ANOTHER TIME IS SPECIFIED. INVESTORS MAY NOT INFER FROM EITHER THE SUBSEQUENT DELIVERY OF THIS MEMORANDUM OR ANY SALE OF INTERESTS THAT THERE HAS BEEN NO CHANGE IN THE FACTS DESCRIBED SINCE THAT DATE.

THE GENERAL PARTNER WILL PROVIDE THE RECIPIENT IDENTIFIED ON THE COVER OF THIS MEMORANDUM AND HIS OR HER AUTHORIZED REPRESENTATIVES WITH THE OPPORTUNITY TO

ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, THE GENERAL PARTNER CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING, AND TO OBTAIN ANY ADDITIONAL INFORMATION CONCERNING THIS OFFERING, TO THE EXTENT THE GENERAL PARTNER POSSESSES SUCH ADDITIONAL INFORMATION OR CAN OBTAIN IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR A SOLICITATION IN ANY STATE OR OTHER JURISDICTION WHERE SUCH AN OFFER OR SOLICITATION WOULD BE ILLEGAL.

INVESTMENT COMPANY ACT DISCLOSURE STATEMENT: THE FUND IS NOT PRESENTLY, AND DOES NOT INTEND IN THE FUTURE TO BECOME, REGISTERED AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED. THE INVESTMENT MANAGER IS NOT REGISTERED AS AN INVESTMENT ADVISER UNDER THE INVESTMENT ADVISERS ACT OF 1940, AS AMENDED, BUT MAY BECOME SO REGISTERED IN THE FUTURE.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, PROSPECTIVE INVESTORS ARE HEREBY NOTIFIED THAT: ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS DOCUMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (I) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE OR (II) PROMOTING, MARKETING, OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

FORWARD LOOKING STATEMENTS: THIS MEMORANDUM CONTAINS FORWARD LOOKING STATEMENTS BASED ON THE GENERAL PARTNER'S EXPERIENCE AND EXPECTATIONS ABOUT THE MARKETS IN WHICH THE FUND INVESTS AND THE METHODS BY WHICH THE GENERAL PARTNER EXPECTS TO CAUSE THE FUND TO INVEST IN THOSE MARKETS. THOSE STATEMENTS ARE SOMETIMES INDICATED BY WORDS SUCH AS "EXPECTS," "BELIEVES," "SEEKS," "MAY," "INTENDS," "ATTEMPTS," "WILL" AND SIMILAR EXPRESSIONS. THOSE FORWARD LOOKING STATEMENTS ARE NOT GUARANTIES OF FUTURE PERFORMANCE AND ARE SUBJECT TO MANY RISKS, UNCERTAINTIES AND ASSUMPTIONS THAT ARE DIFFICULT TO PREDICT. THEREFORE, ACTUAL RETURNS COULD BE MUCH LOWER THAN THOSE EXPRESSED OR IMPLIED IN ANY FORWARD LOOKING STATEMENTS AS A RESULT OF VARIOUS FACTORS. THE SECTION TITLED "CERTAIN RISK FACTORS" IN THIS MEMORANDUM DISCUSSES SOME OF THE IMPORTANT RISK FACTORS THAT MAY AFFECT THE FUND'S RETURNS. YOU SHOULD CAREFULLY CONSIDER THOSE RISKS AND OTHER INFORMATION IN THIS MEMORANDUM BEFORE DECIDING WHETHER TO INVEST IN THE FUND. NEITHER THE FUND NOR THE GENERAL PARTNER HAS ANY OBLIGATION  TO REVISE OR UPDATE ANY FORWARD LOOKING STATEMENT FOR ANY REASON.

*State-Specific Notices:*

NOTICE TO INVESTORS IN ALL STATES: IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THIS OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY FEDERAL OR STATE SECURITIES COMMISSIONS OR REGULATORY AUTHORITIES. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THESE SECURITIES ARE NOT DEPOSITS OR OBLIGATIONS, OR GUARANTEED OR ENDORSED BY, ANY BANK OR OTHER INSURED DEPOSITORY INSTITUTION, AND ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION (THE "FDIC"), THE FEDERAL RESERVE BOARD OR ANY OTHER GOVERNMENTAL AGENCY.

ALABAMA INVESTORS: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

ARKANSAS INVESTORS: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 14(B)(14) OF THE ARKANSAS SECURITIES ACT AND SECTION 4(2) OF THE SECURITIES ACT OF 1933. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE; APPROVED OR DISAPPROVED THE OFFERING, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

CALIFORNIA INVESTORS: THE SALE OF THE SECURITIES THAT ARE THE SUBJECT OF THIS MEMORANDUM HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA. THEREFORE, THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OF ANY PART OF THE CONSIDERATION FOR THOSE SECURITIES PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SECURITIES AND THE SALE THEREOF ARE EXEMPT FROM THE QUALIFICATION REQUIREMENT BY §§ 25100, 25102, OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES AS DESCRIBED IN THIS MEMORANDUM ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED OR AN EXEMPTION THEREFROM.

CONNECTICUT INVESTORS: THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SECTION 36b-16 OF THE CONNECTICUT UNIFORM SECURITIES ACT AND MAY NOT BE TRANSFERRED OR SOLD BY A PURCHASER THEREOF EXCEPT IN TRANSACTIONS WHICH ARE EXEMPT FROM REGISTRATION UNDER THE CONNECTICUT UNIFORM SECURITIES ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION THEREUNDER.

FLORIDA INVESTORS: IF THE INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVINGS INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940, A PENSION OR PROFIT-SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT OF 1933), THE INVESTOR ACKNOWLEDGES THAT ANY SALE OF THE UNITS TO THE INVESTOR IS VOIDABLE BY THE INVESTOR EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE INVESTOR TO THE ISSUER, OR AN AGENT OF THE ISSUER, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE INVESTOR, WHICHEVER OCCURS LATER.

GEORGIA INVESTORS: THESE SECURITIES HAVE BEEN ISSUED OR SOLD IN RELIANCE ON PARAGRAPH (13) OF CODE SECTION 10-5-9 OF THE GEORGIA SECURITIES ACT OF 1973, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

NEW JERSEY INVESTORS: NEW JERSEY STATE LAW PROVIDES AN EXEMPTION FROM REGISTRATION FOR SECURITIES THAT ARE SOLD TO NO MORE THAN 35 PURCHASERS WITHIN THE STATE WHERE EACH PURCHASER HAS BEEN PROVIDED WITH AN OFFERING MEMORANDUM AND NO GENERAL SOLICITATION OR ADVERTISEMENT HAS BEEN EMPLOYED IN THE OFFERING. THE SECURITIES DESCRIBED HEREIN ARE BEING OFFERED TO RESIDENTS OF NEW JERSEY IN RELIANCE ON THE FOREGOING EXEMPTION. ACCORDINGLY, NEITHER THE OFFICE OF THE ATTORNEY GENERAL NOR ANY OTHER GOVERNMENTAL AGENCY OF THE STATE OF NEW JERSEY HAS REVIEWED OR PASSED UPON THE MERITS OF THE OFFERING.

NEW YORK INVESTORS: THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE. ACCORDINGLY, NEITHER THE OFFERING MEMORANDUM NOR THE SECURITIES

DESCRIBED HEREIN HAVE BEEN ENDORSED BY THE ATTORNEY GENERAL OR ANY OTHER AGENCY OF THE STATE OF NEW YORK. THE SECURITIES ARE BEING OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE NEW YORK STATE SECURITIES LAWS (NY GENERAL BUSINESS LAW CH. 20, ARTICLE 23-A ET. SEQ.) THAT EXEMPTS FROM REGISTRATION A PRIVATE OFFERING OF SECURITIES TO A LIMITED NUMBER OF ACCREDITED INVESTORS WITHIN THE STATE OF NEW YORK.

NEVADA INVESTORS: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE NEVADA SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

NORTH CAROLINA INVESTORS: IN MAKING AN INVESTMENT DECISION, INVESTOR MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIA RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

OREGON INVESTORS: IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFER AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933 PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. PURCHASERS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD.

PENNYSYLVANIA INVESTORS: UNDER CERTAIN CIRCUMSTANCES YOU MAY HAVE A RIGHT TO WITHDRAW YOUR SUBSCRIPTION WITHIN TWO (2) BUSINESS DAYS AND RECEIVE A FULL REFUND OF ALL MONIES PAID IN CONNECTION THEREWITH. SUBSCRIBER, IF A PENNSYLVANIA RESIDENT, AGREES NOT TO TRANSFER THE INTERESTS FOR A PERIOD OF 12 MONTHS FROM THE DATE OF PURCHASE, UNLESS THE INTERESTS ARE SUBSEQUENTLY REGISTERED UNDER THE PENNSYLVANIA SECURITIES ACT OR UNDER THE SECURITIES ACT OF 1933, AS AMENDED.

SOUTH CAROLINA INVESTORS: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

SOUTH DAKOTA INVESTORS: THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 4731, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATION OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THIS MEMORANDUM IS TRUE, COMPLETE, AND NOT MISLEADING; NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

TENNESSEE INVESTORS: THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

WASHINGTON INVESTORS: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY MISREPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

WYOMING INVESTORS: PROSPECTIVE INVESTORS ARE ADVISED THAT ANYONE OWNING MORE THAN FIVE PERCENT (5%) OF THE SECURITIES OF THE COMPANY AS A RESULT OF THIS OFFERING MAY BE DEEMED TO HAVE ACQUIRED CHEAP STOCK SUBJECT TO ESCROW IN THE EVENT OF A SUBSEQUENT REGISTERED OFFERING.

**PRESENCE OF A LEGEND OF ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN THAT AN OFFER OR SALE MAY BE MADE IN ANY PARTICULAR STATE. THIS MEMORANDUM MAY BE SUPPLEMENTED BY ADDITIONAL STATE LEGENDS. IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE ADVISED TO CONTACT THE COMPANY FOR A CURRENT LIST OF STATES IN WHICH OFFERS OR SALES MAY BE LAWFULLY MADE.**

**ANY INQUIRIES CONCERNING THIS MEMORANDUM AND THE OFFERING SHOULD BE DIRECTED TO BKCOIN CAPITAL LP, ATTENTION: CARLOS BETANCOURT, 1101 Brickell Avenue South Tower #8, Miami, Florida 33131.**

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

# TABLE OF CONTENTS

SUMMARY OF PRINCIPAL TERMS................................................................................... 9

DIRECTORY ...................................................................................................................... 16

INVESTMENT OBJECTIVES, STRATEGIES, AND POLICIES ..................................... 17

CERTAIN RISK FACTORS ............................................................................................... 22

CONFLICTS OF INTEREST .............................................................................................. 40

MANAGEMENT.................................................................................................................. 42

FEES AND EXPENSES....................................................................................................... 43

BROKERAGE ARRANGEMENTS .................................................................................... 44

SUBSCRIPTIONS AND WITHDRAWALS ....................................................................... 44

CAPITAL ACCOUNTS ...................................................................................................... 47

NET ASSET VALUE ........................................................................................................... 47

ALLOCATION OF PROFITS AND LOSSES ..................................................................... 48

DISTRIBUTIONS................................................................................................................ 48

OTHER SIGNIFICANT LIMITED PARTNERSHIP AGREEMENT PROVISIONS ......... 49

TAXATION ......................................................................................................................... 50

CERTAIN CONSIDERATIONS FOR ERISA PLANS ....................................................... 61

ADDITIONAL INFORMATION ........................................................................................ 63

EXHIBIT A LIMITED PARTNERSHIP AGREEMENT .................................................... 65

EXHIBIT B SUBSCRIPTION AGREEMENT .................................................................... 66

# SUMMARY OF PRINCIPAL TERMS

This summary is qualified in its entirety by the remainder of this Memorandum, including the Fund's Limited Partnership Agreement (the "***Limited Partnership Agreement***"), and the Subscription Agreement (the "***Subscription Agreement***"), which are attached as **Exhibits A and B** to this Memorandum respectively. Prospective investors should consult their own advisers to understand fully all of the consequences of an investment in the Fund. Unless otherwise defined herein, capitalized terms have the meanings assigned to them in the Limited Partnership Agreement. Investment in the Fund (as defined below) involves a high degree of risk. Particular attention is directed to the Section entitled "Certain Risk Factors," commencing on page 22.

### The Fund, General Partner, and Investment Manager

BKCoin Capital LP is a Delaware limited partnership (the "***Fund***"). The Fund was formed by filing the Certificate of Formation with the Secretary of State of the State of Delaware on March 5, 2018, and its principal address is located at 1101 Brickell Avenue South Tower #8, Miami, Florida 33131. Its sole general partner is BKCoin Management LLC (the "***General Partner***"), a Delaware limited liability company, which also serves as the Fund's investment manager (the "***Investment Manager***"). The General Partner is not registered as an investment adviser with the Securities and Exchange Commission, given that it qualifies under applicable exemptions from registration (although it has filed Form ADV as an Exempt Reporting Advisor with the SEC). Under the terms of the Limited Partnership Agreement, the management and control of the Fund is vested with the General Partner. The General Partner's managers are Carlos Betancourt and Kevin Kang, and they will manage the Fund's portfolio of assets and operations on behalf of the General Partner. *See the "Management" Section at page 42.* Although pursuant to the Limited Partnership Agreement, neither the General Partner nor its principals are required to maintain any level of investment in the Fund, the General Partner does, nevertheless, intend to maintain a certain level of investment in the Fund on an ongoing basis.

Note that the Fund has the right, in the future, to enter into an arrangement with other investment funds managed by the same General Partner with the same or substantially similar investment objectives as the Fund's to either allow other funds to contribute their assets to the Fund to invest, or to pursue its investment activities by investing all or a portion of its assets in a "Master Fund" that will conduct the investment activities described in this Memorandum.

### Investment Objective and Strategy

The Fund was formed primarily to engage in the business of actively trading, using a variety of trading strategies, a variety of cryptocurrencies, provided however, that the Fund may also trade in other assets that are not cryptocurrencies, including but not limited to, Securities (as that term is defined in the Limited Partnership Agreement), commodities, futures contracts, and other assets not considered Securities, commodities, or futures contracts (collectively, "***Portfolio Investments***"), to achieve capital appreciation on a consistent basis, preserve principal, and avert uncontrolled risk. For greater detail, see *"Investment Objectives, Strategies and Policies" at page 17.*

### Risk Factors; Conflict of Interest

The investment program of the Fund involves significant risks. There is no assurance that the Fund will achieve its investment goal. A Limited Partner may incur losses, possibly including a loss of the

Limited Partner's entire investment. As such, it is not intended as a complete investment program and is designed only for investors that have adequate means of providing for their needs and contingencies without relying on distributions or withdrawals from the Fund accounts, who are financially able to maintain their investment and who can afford a loss of a substantial portion of their investment. In addition to the foregoing, the General Partner might encounter certain conflicts of interests in executing its duties vis-à-vis the Fund while simultaneous undertaking other permissible activities. *See "Conflicts of Interest" at page 40.*

### Subscriptions; Eligible Investors

The General Partner may admit new limited partners to the Fund ("Limited Partners") as of the first business day of each month, or other times in its sole discretion. Persons interested in subscribing to the Fund should deliver a signed Subscription Agreement in substantially the form set forth at Exhibit B hereto to the General Partner at least five (5) business days before the intended subscription date, if applicable. The Capital Amount subscribed to via the Subscription Agreement shall be paid in U.S. dollars or other cash equivalents approved by the General Partner.

Currently, Limited partnership interests may be purchased only by (i) a limited number of investors who are unaccredited and (ii) investors who are "accredited investors" as defined in Regulation 501(a) of Regulation D under the Securities Act. The Fund may also accept investments from plans that are subject to the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), and from IRAs, Keoghs and similar non-ERISA plans, provided such investment meet the requirements as set forth in the Limited Partnership Agreement.

*See "Admission of Partners" at page 44, and the Subscription Agreement. See also "Certain Considerations for ERISA Plans" at page 60 of this Memorandum. For instructions on how to subscribe, see the first page of Exhibit B, which contain the Instructions to the Subscription Agreement.*

### Minimum Investment

There shall be no minimum investment amount required to make an investment into the Fund. The General Partner may approve any amounts for investment into the Fund in its sole discretion.

### Capital Accounts; Capital Contributions

The Fund will establish a capital account ("**Capital Account**") for the General Partner and each Limited Partner. A Limited Partner's Capital Account will be credited with the amount of any capital contributions made by the Limited Partner and any income or gains allocated to the Limited Partner, and will be debited by the amount of any withdrawals made by the Limited Partner and any expenses, losses or deductions allocated to the Limited Partner, in each case as set forth in the Limited Partnership Agreement. In the discretion of the General Partner, a Limited Partner will be permitted to make additional capital contributions to the Limited Partnership on the first business day of any calendar month, or at other times in the General Partner's sole discretion. *See Article VII of the Limited Partnership Agreement; "Capital Accounts" at page 47.*

### Lock-Up Period; Withdrawals; Required Withdrawals

Subject in each case to the General Partner's ability to designate Side Pockets (*as defined below*), for a period of six (6) months following the date of a Closing, a Limited Partner shall not be allowed to withdraw or reduce its Capital Contribution or any portion of the value of its Capital Account from the Fund. Thereafter, a Limited Partner may withdraw all or any part of its Capital Account quarterly, either

on January 1, April 1, July 1, or October 1 of each year, on 30 days' prior written notice. Withdrawals are permissible at other times with the consent of the General Partner.

Provided that the General Partner has received all necessary documentation, distribution in respect of the withdrawn capital normally will be made in U.S. dollars within 30 calendar days after an authorized Withdrawal Date. However, the General Partner shall have the right, at its discretion, to withhold up to 5% of the Capital Account for the Fund's liabilities and other contingencies until no later than 30 days after the completion of the year-end review of the Fund's financial statements for any withdrawal of 90% or more of a Limited Partner's Capital Account balance (or if a withdrawal, when combined with all other withdrawals of such Limited Partner during the preceding 12 months, would result in such Limited Partner having withdrawn 90% or more of such Limited Partner's Capital Account as of the beginning of such period). In those circumstances, the Fund will remit the balance of the withdrawal proceeds without interest. The General Partner, in its sole discretion, may waive these withdrawal restrictions as to any Limited Partner. The General Partner, in its sole discretion, may affect withdrawal payments in cash or in-kind.

The General Partner may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies (even if such reserves or holdbacks are not otherwise required or permitted by U.S. generally accepted accounting principles) which could reduce the amount of a distribution upon withdrawal.

The General Partner may suspend withdrawal rights for any or all Limited Partners in certain circumstances. *See Section 15.02 of the Limited Partnership Agreement; "Net Asset Value" at page 47.*

In addition, the Fund may mandate the Limited Partner withdraw from the Fund under certain circumstances upon delivery of notice. *See 11.05 of the Limited Partnership Agreement; "Lock-Up Period; Withdrawals; Required Withdrawals" at page 46.*

### Side Pockets

The General Partner may designate certain assets, including investments in pre-ICOs (as defined below) and SAFTs, as "Side Pockets" when the General Partner, in its sole discretion, determines that an asset is illiquid or it is in the best interest of the Fund to value such investments separately from the Fund's other assets. If the General Partner designates an asset as a Side Pocket, the Partners of the Fund at the time of such designation will have a proportionate interest in that investment. The General Partner shall not receive an Incentive Allocation with respect to any Side Pocket until the investment is liquidated, and Partners may not make a withdrawal with respect to a Side Pocket until that event. Side Pockets will be included in the calculation of the Management Fee. Notwithstanding the foregoing, the Fund's financial statements will reflect the Incentive Allocation as if it was earned, treating all assets and liabilities as if they were realized at the reporting date.

### New Issues and IPO Allocations

If the General Partner determines that a Limited Partner is a "restricted person" as defined in the Financial Industry Regulatory Authority, Inc., ("FINRA") Rule 5130, or any successor provision thereto ("Rule 5130"), such Limited Partner may be prohibited from participating in the net capital appreciation and net capital depreciation, if any, attributable to trading in, or any other transaction relating to, a "new issue," and the General Partner may allocate such net capital appreciation or net

capital depreciation to the Capital Account of Partners who are not "restricted persons" under the Rule 5130. Notwithstanding the foregoing, a Limited Partner that is an entity may participate in such net capital appreciation and net capital depreciation if such entity limits the participation in profits and losses attributable to "new issues" by its beneficial owners that are "restricted persons" to the lesser of such beneficial owners' *pro rata* share of such entity or 10% (or any other permissible amount under any amendment, supplement or interpretation to the Rule 5130).

If the General Partner determines that a Limited Partner is a "covered person" as defined in the FINRA Rule 5131(b), or any successor provision thereto ("Rule 5131"), such Limited Partner may be prohibited from participating in the net capital appreciation and net capital depreciation, if any, attributable to trading in, or any other transaction relating to, a "new issue," and the General Partner may allocate such net capital appreciation or net capital depreciation to the Capital Account of Partners who are not "covered persons" under the Rule 5131. Notwithstanding the foregoing, a Limited Partner that is an entity may participate in such net capital appreciation and net capital depreciation if such entity limits the participation in profits and losses attributable to "new issues" by its beneficial owners that are "covered persons" to the lesser of such beneficial owners' *pro rata* share of such entity or 25% (or any other permissible amount under any amendment, supplement or interpretation to the Rule 5131).

The Fund reserves the right to vary its policy with respect to the allocation of "new issues" as it deems appropriate for the Fund as a whole, in light of, among other things, existing interpretations of, and amendments to, Rules 5130 and 5131 and practical considerations, including administrative burdens and principles of fairness and equity.

### *Net Asset Value*

The net asset value (the "**Net Asset Value**") of the Fund will be determined as of the close of business of the last business day of each calendar month and at such other times as the General Partner may determine in its discretion. The Net Asset Value of the Fund is equal to the value of the assets of the Partnership (including accrued interest and dividends) less liabilities of the Fund (including accrued expenses). The General Partner's determination of the value of the Fund's assets and liabilities will be final and conclusive. The Fund may suspend determination of the Fund's Net Asset Value for the reasons enumerated in the Fund's Limited Partnership Agreement. *See Article XV of the Limited Partnership Agreement; see also "Net Asset Value" at page 47.*

### *Allocations of Profits and Losses*

Net realized and unrealized appreciation or depreciation in the value of Fund assets will be allocated at the end of each quarter in proportion to the relative values of the Partners' Capital Accounts balances, as adjusted to reflect contributions and withdrawals. *See Article VII of the Limited Partnership Agreement; "Allocation of Profits and Losses" at page 48.*

### *Distributions*

The General Partner may make distributions of Distributable Cash to the Limited Partners from time to time in its sole discretion, in proportion to the Limited Partners' Capital Account balances at the time of the distribution, as adjusted to reflect contributions and withdrawals. Although the Fund has the ability to make distributions pursuant to the Limited Partnership Agreement, the Fund expects to reinvest income and net realized gains. *See Article VIII of the Limited Partnership Agreement;*

*Investment Management Fee*

The General Partner will be paid, quarterly, a management fee ("**Investment Management Fee**") equal to 0.5% (equivalent to 2.0% per annum) multiplied by each Limited Partner's Capital Account balance (prior to any accrual of the Performance Allocation, if applicable), determined as of the last date of each calendar quarter and due and payable on that same day. *See Section 9.02 of the Limited Partnership Agreement; "Fees and Expenses" at page 43.*

*Performance Allocation*

At the end of each fiscal quarter, in addition to the Management Fee set forth above, 20% of the net profits (if any) allocated to each Capital Account of an eligible Limited Partner will be reallocated to the Capital Account of the General Partner (the "Performance Allocation"). In each case, the Performance Allocation is subject to the High Water Mark below. *See Section 9.03 of the Limited Partnership Agreement; "Fees and Expenses" at page 43..*

*High Water Mark*

The Fund will maintain a memorandum loss recovery account for each Capital Account (a "**Loss Recovery Account**"). Each Loss Recovery Account will be debited at the end of each fiscal year with the net losses of the Partnership (if any) allocable to the related Capital Account for that fiscal year, provided such net loss results in the Partner's Capital Account to fall below the amount of that Partner's Capital Contributions. The General Partner will not receive any Profits Allocation attributable to a Capital Account until the Limited Partner has recovered the net losses, if any, debited from the Loss Recovery Account by the application of the net profits of the Partnership allocable to the Capital Account (as adjusted for any withdrawals of the Limited Partner's Capital Account balance attributable to the Capital Account). *See Section 9.04 of the Limited Partnership Agreement; "Fees and Expenses" at page 43.*

*Expenses of the Fund and of the General Partner*

The Fund bears all expenses associated with its investment activities and operations, including brokerage commissions, banking and custody charges, interest and fees relating to borrowing, withholding taxes, expenses of research and data collection and analysis, costs of communicating with Limited Partners and legal, accounting, auditing, insurance, travel expenses and organizational expenses. The General Partner bears its own overhead costs, including office space and utilities costs and compensation of secretarial, clerical and other personnel. *See Section 3.03 of the Limited Partnership Agreement; "Fees and Expenses" at page 43.*

*Reports to Partners*

The Fund will provide to each Limited Partner balance reports through its online portal, which balance reports shall be posted at least quarterly. These balance reports shall show the balance of the Partners' account as well as an overview of the Fund's investments and strategy. In addition, at the end of each Fiscal Year, the Fund will provide each Limited Partner with unaudited financial statements. To the extent that the Partner has made Capital Contributions totaling greater or equal to $500,000, that Partner may request that the Fund provide an audited financial statement at the end of a Fiscal Year in lieu of the unaudited statement. *See Article X of the Limited Partnership Agreement; "Reports to Partners" at page 50.*

*Transfer of Interests*

Limited partnership interests may be assigned or pledged only with the consent of the General Partner, which may be granted or withheld in the General Partner's sole discretion. All expenses incurred in connection with an assignment or pledge will be charged to the Capital Account for the Limited Partner requesting it. Transfer of Interests will be subject to certain additional restrictions set forth in the Limited Partnership Agreement. See *Article XI of the Limited Partnership Agreement; "Transfer of Interests" at* *page 49.*

### Amendments of the Limited Partnership Agreement; Side Letters

The terms of the Limited Partnership Agreement may generally be amended with the approval of the General Partner and a Majority in Interest of the Limited Partners. The General Partner will have the right to amend any provision of the Limited Partnership Agreement, without the approval of any Limited Partner, to make a change that: (i) is of an administrative or ministerial nature or to cure ambiguities or inconsistencies in the Limited Partnership Agreement, (ii) admit or withdraw one or more Limited Partners in accordance with the terms of the terms of the Limited Partnership, (iii) makes changes to the Limited Partnership agreement negotiated with Limited Partners admitted to the Partnership after the Initial Closing so long as such changes do not materially adversely affect the rights and obligations of any existing Limited Partner, or (iv) change the name of the Partnership. In addition, the Fund may from time to time enter into agreements with certain investors, which provide for terms of investment that are more favorable to those investors than the terms described in this Memorandum (collectively, "Side Letters"), provided not no such side letter or other agreement shall adversely affect the rights of any other Limited Partner. For additional information, See *Article XVI of the Limited Partnership Agreement; "Amendment of the Limited Partnership Agreement; Side Letters" at* *page 49.*

### Indemnification and Exculpation

Under the Limited Partnership Agreement, none of the General Partner, Investment Manager, any affiliate of the General Partner or Investment Manager, nor any other officer, director, member, manager, employees, shareholders, partners, members, agents and consultants of the General Partner or Investment Manager (each, a "Covered Person") will be liable in damages or otherwise to the Partnership or to any Limited Partner for any act or omission by it, in connection with the Fund's activities, except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgment or order that such act or omission resulted from such Covered Person's bad faith, gross negligence, willful misconduct, fraud or material breach of the Limited Partnership Agreement or the Investment Management Agreement. The Fund will indemnify each Covered Person for any loss or damage incurred by the Covered Person in connection with the Fund's activities, except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgement or order that such act or omission resulted from such Covered Person's bad faith, gross negligence, willful misconduct, fraud or material breach of the Limited Partnership Agreement or the Investment Management Agreement. For additional details, *see Section 4.03 of the Limited Partnership Agreement; "Indemnification and Exculpation" at* *page 50.*

### Term and Termination

Pursuant to the Fund's Certificate of Limited Partnership filed with the Delaware Secretary of State, the Fund shall exist in perpetuity, unless it is terminated sooner by the General Partner, in its sole discretion, as set forth in the Limited Partnership Agreement, or otherwise as permitted under the Limited Partnership Agreement. See *Article XII of the Limited Partnership Agreement; "Term and Termination" at* *page 49* below.

### Tax Matters

The Fund intends to operate as a limited partnership and not as an association or publicly traded partnership taxable as a corporation for federal tax purposes. Accordingly, the Fund should not be subject to federal income tax, and each Limited Partner will be required to report on its own annual tax return such Limited Partner's distributive share of the Fund's taxable income or loss. Each prospective investor is urged to consult with his or her own tax adviser to fully understand the tax consequences and risks of an investment in the Fund. *See generally "Taxation" on page 50.*

### Legal Counsel

Dzuba Law, P.A. acts as counsel to the Fund in connection with the offering of limited partnership interests. Dzuba Law, P.A. also acts as counsel to the General Partner, the Investment Manager and their affiliates. In connection with the Fund's offering of limited partnership interests and subsequent advice to the General Partner, the Investment Manager and their Affiliates, Dzuba Law, P.A. will not be representing Limited Partners of the Fund. No independent counsel has been retained to represent the Limited Partners of the Fund. *See "Legal Counsel" at page 62.*

# DIRECTORY

| | |
|---|---|
| *General Partner and Investment Manager* | **BKCoin Management, LLC**<br>1101 Brickell Avenue South Tower #8<br>Miami, Florida 33131<br>Attention:  Carlos Betancourt<br>Tel:  (786) 623-4656<br>Email: trading@bkcoincapital.com |
| *Fund Administrator* | **Sudrania Fund Services**<br>633 Rogers St. Suite 106<br>Downers Grove, Illinois 60515 |
| *Accounting* | **Matthew John Soldavini, P.A.**<br>791 10th Street, Ste. 301<br>Naples, Florida 34102 |
| *Legal Counsel to General Partner, Investment Manager, and the Fund* | **Dzuba Law, P.A.**<br>1101 Brickell Ave South Tower #8<br>Miami, Florida 33131<br>Tel: (305 809-0615<br>Email: info@dzubalaw.com |

## INVESTMENT OBJECTIVES, STRATEGIES, AND POLICIES

*The following Investment Objectives, Strategies, and Policies will be executed by BKCoin Management LLC, which serves as the Fund's Investment Manager pursuant to the certain Investment Management Agreement entered into between the Fund and BKCoin Management LLC to provide said services to the Fund.*

### Investment Objectives

The Fund was formed to engage in the business of actively trading a variety of cryptocurrencies, provided however, that the Fund may also trade in other assets that are not cryptocurrencies, including but not limited to, Securities (as that term is defined in the Limited Partnership Agreement), commodities, futures contracts, or other assets not considered Securities, commodities, or futures contracts (collectively, "**Portfolio Investments**"). The Fund may also engage in trading surrounding pre-ICOs and ICOs. In short, the scope of the assets that the Fund may invest in is extremely broad. In regards to these assets, the Fund shall employ various investment strategies to achieve capital appreciation on a consistent basis, preserve principal and avert uncontrolled risk. There can be no assurance that the Fund will achieve any or all of these objectives. Upon the sale of any Portfolio Investments (as that term is defined in the Limited Partnership Agreement), the Fund Manager, in its sole discretion, may, and intends to, reinvest the proceeds therefrom in other Portfolio Investments, rather than distribute the proceeds to Partners of the Fund.

The Fund will strive to satisfy the following investment objectives: (i) to buy and sell cryptocurrencies, Securities, commodities and other assets so that the Fund derives a profit rather than a loss from the transaction; (ii) to reinvest the funds from the sale of Portfolio Investments into other securities or investments (which will then also be deemed Portfolio Investments); and (iii) pool Investors' funds so that an Investor may participate in and benefit in the application of trading techniques vis-à-vis the Portfolio Investments. The Fund will also provide Partners with services designed to reduce the administrative details involved in engaging in the types of investment transactions made by the Fund. The The Fund and the Investment Manager provide no assurances that the Fund will satisfy such objectives because the Fund's investments will be subject to various business and market risks including those risks set forth in the "Certain Risk Factors" section below.

In the future, the Fund may enter into arrangements with other investment funds managed by the General Partner with the same or substantially similar investment objectives as the Fund's to either allow other funds to contribute their assets to the Fund to invest, or pursue its investment activities by investing all or a portion of its assets in a "Master Fund" that will conduct the investment activities described in this Memorandum. Even during periods in which the Fund's assets are invested primarily through a Master Fund, the Fund may invest some of its assets directly rather than through the Master Fund. The Partnership Agreement reserves the fight for the General Partner to decide in the future to allow other funds to contribute their assets to the Fund, or contribute the Fund's assets to a Master Fund managed by the General Partner or its affiliates without consent of the Limited Partners.

### Authority

The Fund and the Investment Manager, BKCoin Management LLC, have broad authority under the Limited Partnership Agreement and the Investment Management Agreement to invest, hold, sell, trade on margin or otherwise, and otherwise deal in domestic and foreign cryptocurrencies, commodities, futures contracts, Securities (including but not limited to, stocks, bonds, notes, options, warrants, mutual funds, rights and other government agency securities and instruments) and other assets. The Fund and the

Investment Manager have the power to sell "short" Securities or other assets, by borrowing securities or other assets from the relevant brokerage firm for delivery on sale and subsequently covering "short" positions by purchasing a like number of such securities or other assets in the market.

The Investment Manager has the authority to lend money or securities/other assets, or to borrow money or Securities/other assets, and to give security therefor upon such terms as the Investment Manager deems proper, for the benefit of the Fund. The Investment Manager may also hold, mortgage, pledge, sell, exchange or otherwise dispose of the Fund's Securities or cash or other assets.

### *Investment Strategy*

All investment decisions for the Fund will be made by BKCoin Management, LLC, the Fund's General Partner and Investment Manager. *See "Management" at page 42.* In pursuit of the Fund's investment objectives, the Fund Manager currently anticipates using a number of investment strategies, methodologies and vehicles. The Fund's actual portfolio mix at any given time will be driven by current market conditions and relative risk/reward characteristics of the particular investments. However, the primary strategy utilized by the Investment Manager will be to employ a variety of tools within the realms of fundamental and technical analysis to trade a variety of cryptocurrencies and other assets, including Securities and commodities, to generate a profit for the Fund. Fundamental analysis generally includes comparisons of price-to-earnings ratios versus anticipated growth rates, current capitalizations versus book values, and insider buying and selling trends. Technical analysis generally involves the monitoring of moving averages, trend lines, support and resistance areas, and break-out points. The Investment Manager intends to combine any market advisory assistance together with its own computer assisted revenue and earnings analyses of the overall market, industry sectors and individual securities to determine short-term and intermediate-term growth potential and trends.

The strategies that the Investment Manager intends to use include the following:

(i)    trading (i.e., purchasing and selling) initially primarily a variety of cryptocurrencies, and to a lesser extent the following: pre-ICOs and ICOs, common and preferred stock, mutual fund shares, stock options, index options, ETFs, futures contracts, bonds, fixed income and related derivatives;

(ii)   taking "long" positions in securities of large and medium (mid-cap) companies, which the Investment Manager deems to be undervalued relative to the securities of other companies within the same industry or sector and which the Investment Manager anticipates will go up in comparison to the purchase price and that a purchaser will be located in time to take advantage of the higher securities price; and selling such securities. The Investment Manager may also from time to time invest in the securities of micro cap companies, if the Investment Manager believes such companies fit its overall investment profile;

(iii)  selling "short" (i.e., selling securities that the Fund does not own) cryptocurrencies and also the shares of the companies in sectors and industries which the Investment Manager considers to be substantially overvalued on a relative basis and which the Investment Manager anticipates the price of which will decline, and the Fund will be able to buy the securities at a lower price in the future to close out the transaction. For the Fund to sell the cryptocurrencies or Securities "short," the Fund must borrow the equivalent cryptocurrencies or Securities to deliver them to the purchaser at the time of the short sale. The Fund will generally borrow the cryptocurrencies or Securities on margin from brokerage firms at which the Fund has established accounts. To finish the transaction or to "cover" the transaction, the Fund will have to purchase the cryptocurrencies or Securities on the market so that the stock previously borrowed may be returned. This is known as "closing the short position;"

(iv)    taking simultaneous "short" and "long" positions, in cryptocurrencies, stocks, options and index futures trades;

(v)    using various strategies involving stock options and index options to enhance investment returns, as well as hedge the Fund's primary portfolio positions. Such strategies may include the purchase and sale of covered stock and index options, as well as combinations and spread positions and selling uncovered (naked) options;

(vi)    selling "put" options;

(vii)    the Investment Manager may apply the major portion of the Fund's assets to short term holdings with the objective of trading in and out of established trading ranges, with the result that the Fund may experience high levels of portfolio turnover from time to time and resulting in higher trading expenses. The Investment Manager, in order to limit the Fund's exposure, may place a portion of the Fund's assets in long term positions at any given time; and

(viii)    the Investment Manager may complement its short-term trading strategy by investing on an intermediate term basis in cryptocurrencies with high potential for increase in value or securities of companies it deems to have the best potential for continued high growth. Such companies will generally possess strong earnings momentum, high value relative to the companies within the same sector, unique products, proven management and/or strong institutional sponsorship. Such companies may also include turn-around situations and out-of-favor companies which the Investment Manager believes have the highest potential for rebound growth.

### *Change in Investment Strategy*

The Investment Manager has wide latitude to change the Fund's emphasis or objectives, all without obtaining the Limited Partners' approval. The Limited Partnership Agreement also imposes no formal limits on the concentration of Fund investments (by country, sector, industry, capitalization, company or asset class), the amount of leverage it may employ, or the number or extent of its short positions. The Fund's assets may at times be fully invested in cryptocurrencies, Securities, or other assets, at other times be held partly or fully in cash or cash equivalents. The Limited Partner shall be periodically updated on the Fund's objectives and strategy via the online portal.

### *Margin Accounts*

The Fund will maintain one or more margin accounts through its clearing broker, which would allow the Fund to borrow money on marginable cryptocurrencies, Securities, or other assets, in the Fund's account using credit extended by the clearing broker. Margin is the amount the Fund pays when using the clearing broker's credit to purchase a cryptocurrency, Security, or other asset. The Fund intends to make use of margin borrowing to leverage the Fund's holdings at such times and in such amounts as the Investment Manager determines appropriate, although the Investment Manager will likely not use 100% of its available margin borrowing capacity in order to avoid forced asset liquidation and to maintain investment power in the event of a general market advance or decline. Moreover, a Limited Partner will not be required to make additional contributions to capital, will not be personally liable for Fund debts and will not be subject to margin calls.

Margin requirements are twofold. First, there is an initial margin requirement at the time of purchase; and second, a minimum margin equity must be maintained in the Fund's account. In most cases, the minimum amount due for initial purposes is established by the Federal Reserve Board in accordance with Regulation T. This requirement is expressed as a percentage of the purchase price and it may change from time to time. For example, if the margin requirement is 50%, and you purchase a stock costing $5,000.00 plus commission, the Fund is only required to deposit 50% of the purchase into the account by the settlement date. The settlement date for purchases and sales of most securities made in

margin accounts is three (3) business days from the date of the transaction. The balance due on the purchase will be loaned to the Fund by the clearing broker, and the Fund's account will be debited this amount. The Fund is required to pay interest on the amount advanced, as the Fund would on any other loan. The clearing broker holds the cryptocurrencies, Securities, or other assets the Fund buys on margin as collateral for the Fund's debt.

In addition to the initial margin requirements of the Federal Reserve Board, the New York Stock Exchange ("NYSE") requires a customer opening a margin account to have minimum initial equity of $2,000 in his account. For example, if your initial purchase of stock costs $2,400, you will have to deposit $2,000 rather than $1,200 which would be required by the Federal Reserve Board (assuming the Regulation T requirement is 50%). The NYSE also sets minimum margin maintenance requirements. Under present NYSE rules, the margin, which must be maintained in an account, is 25% of the market value of all securities "long" in the account. The Fund's clearing broker maintenance requirement is 35%.

If the Fund's equity falls below the maintenance requirement established by the clearing broker, the Fund will usually, but not always, receive a margin call informing it of the additional collateral required to bring its account up to the minimum level. If the Fund fails to meet a margin call or if the broker clearing house must act without a margin call, sufficient cryptocurrencies, Securities or other assets, may be sold to meet the Fund's obligations to the clearing broker.

There are special margin requirements on a "short" sale of securities. NYSE rules presently require maintenance margin on short sales: (i) $2.50 per share or 100% of the current market value, whichever is greater, of each stock short in the account selling at less than $5 per share; or (ii) $5 per share or 30% of the current market value, whichever is greater, of each stock short in the account selling at $5 per share or above.

All transactions that go through the clearing broker and the money and securities that the clearing broker holds for the Fund will be transactions that are deemed to be insured under the Securities Investor Protection Corporation ("SIPC"). SIPC is a non-profit membership corporation that Congress established to afford financial protection against loss to customers from broker dealers that fail. The Investment Manager may maintain, at any given time, accounts with several brokerage firms (which are not affiliated with either the Fund or the Fund Manager), to execute trades on behalf of the Fund at negotiated discount rates.

*Cash Positions*

The Fund's funds (other than those required for immediate operating expenses) may be invested fully in cryptocurrencies or in Securities or other investment instruments, may be held fully in cash or cash equivalents, may be partially invested and partially held in cash, or may be fully or partly committed to short positions in cryptocurrencies or Securities and similar positions in other investment instruments, as the Investment Manager believes that circumstances warrant. In addition, the Fund intends to liquidate all of the Fund's open positions before the end of each trading day, and such proceeds will be kept in cash by the Fund until future trades are executed.

*Moderate Diversification and Concentration*

The Investment Manager expects moderate diversification of the Fund's cryptocurrency, Securities and other asset positions, although the Investment Manager may determine not to seek moderate diversification from time to time. The Investment Manager may also determine at any time to concentrate the Fund's investments in certain cryptocurrencies, Securities relating to companies engaged in the same industry or group of industries, or certain other assets.

***Trading on any Exchange***

Except as set forth in this Memorandum, the Investment Manager, in its sole and independent discretion, may trade in any cryptocurrencies or any Securities or other assets it chooses and which are trade on any exchange including, but not limited to, Coinbase, the NYSE, any of the NASDAQ markets (i.e., National Market, SmallCap Market, Electronic Bulletin Board, "Pink Sheets", etc.), the American Stock Exchange, the Chicago Board Options Exchange, the Chicago Board of Trade, and the Chicago Mercantile Exchange. The Investment Manager will use the Fund's funds to purchase and sell securities through various trading accounts. The Fund may also trade stock that has just been listed on a market through an initial public offering.

*Investing in securities involves significant risks and there can be no assurance that the Fund's investment objectives will be achieved. See "Certain Risk Factors" at* page 22.

## CERTAIN RISK FACTORS

***There can be no assurance that the Fund will achieve its investment objective.*** An investment in the Fund involves financial and other risks, including the risk of a loss of principal. It is suitable only for sophisticated investors for whom an investment in the Fund does not represent a complete investment program and who fully understand and can bear the risks of an investment in the Fund. Prospective investors should carefully review the risks involved in investing in the Fund and should evaluate the merits and risks of an investment in the Fund in the context of their overall financial circumstances. The following risk factors do not purport to be complete but should be considered carefully by investors.

THE FOREGOING SPECIAL CONSIDERATIONS DO NOT PURPORT TO BE A COMPLETE EXPLANATION OF THE RISKS AND POTENTIAL CONFLICTS OF INTERESTS INVOLVED IN THIS OFFERING. PROSPECTIVE INVESTORS MUST READ THE ENTIRE PRIVATE PLACEMENT MEMORANDUM, AND MUST CONSULT THEIR OWN PROFESSIONAL ADVISORS, BEFORE DETERMINING TO INVEST IN THE PARTNERSHIP.

**Absence of Operating History.** Although the Investment Managers of the Fund have experience using the investment strategies they intend to employ on behalf of the Fund, the Fund itself has no substantial operating history. Investors should not assume that the General Partner can achieve profitable returns on behalf of the Fund.

**Business Dependent upon Small Investment and Management Team.** The Limited Partners have no authority to make decisions on behalf of the Fund, and generally will not receive information concerning specific portfolio positions held by the Fund. The authority for all decisions is held by the General Partner. The Fund's success will depend principally on the skill and acumen of the Investment Manager's investment and management team, which is likely to consist of a few individuals at most. The investment and management team presently consists only of Carlos Betancourt and Kevin Kang (whose credentials are set forth in the "*Management*" section at page 42. The General Partner has no present plans to hire additional investment professionals, though it may do so at any time.

**Business and Regulatory Risks of Hedge Funds.** The financial services industry generally, and the activities of hedge funds and their managers, in particular, have been subject to intense regulatory scrutiny. Such scrutiny may increase the Fund's and the Investment Manager's exposure to potential liabilities and to legal, compliance and other related costs. Increased regulatory oversight may also impose additional administrative burdens on the Investment Manager.

In addition, securities and futures markets are subject to comprehensive statutes, regulations and margin requirements. The SEC, other regulators, self-regulatory organizations and exchanges are authorized to take extraordinary actions during market emergencies. The regulation of derivatives transactions and funds that engage in such transactions is an evolving area of law and is subject to modification by government and judicial actions. The effects of any regulatory changes on the Fund could be substantial and adverse.

**Limited Liquidity of Investment in the Fund.** An investment in the Fund is suitable only for sophisticated investors who have no need for liquidity in their investment. An investment in the Fund provides limited liquidity, since interests in the Fund are not freely transferable and withdrawals are generally permitted only on the last day of a fiscal quarter, upon 30 days' prior notice, beginning at the end of the six (6) month period following the Limited Partner's admission to the Fund.

**Turnover.** The turnover rate of the Partnership's investment portfolio may be significant, potentially involving substantial brokerage commissions and fees and other transaction costs.

**Diversification.** There is no requirement on the Fund that it maintain a certain amount of diversification in its trading or investment activities. To the extent that the General Partner concentrates the Fund's trades or investments in a particular cryptocurrency, Security, other asset, issuer, market or investment strategy, the Fund's investments will become more susceptible to fluctuations in value resulting from adverse economic or business conditions affective that particular cryptocurrency, Security, other asset, issuer, market or investment strategy.

**Leverage Risk.** The Fund may borrow on a secured or unsecured basis for any purpose, including to increase investment capacity, cover operating expenses and make redemption payments or for clearance of transactions. The Fund may issue debt obligations that are senior to the equity of the Partners but subordinated to the Partnership's general creditors, either to raise additional capital or to satisfy withdrawals without liquidating the assets of the Fund. There are no limits on the amount of borrowing, gearing or leverage that the Fund may use. While leverage presents opportunities for increasing the Fund's total return, it has the effect of potentially increasing losses as well. The interest expense and other costs incurred in connection with the borrowing may exceed the income earned on the investments purchased or carried with borrowed funds. Gains realized with borrowed funds may cause the Fund's Net Asset Value to increase at a faster rate than would be the case without borrowings. Leverage is a two-edged sword, however, and the presence of leverage could result in the Partnership's Net Asset Value decreasing faster than if there had been no borrowings. In addition, unanticipated increases in applicable margin requirements could adversely affect the liquidity of the Fund and, therefore, adversely affect the Fund's performance.

Additionally, the Fund may be operationally leveraged as a result of its transactions in the futures and options markets and other inherently leveraged Securities and financial instruments, including structured notes, and its repurchase agreement positions. A low margin deposit is required in futures trading and the low cost of carrying cash positions permits a degree of leverage. Because only a relatively small margin deposit or similar outlay is generally required in relation to the contract value of these instruments, a small market movement may result in a disproportionately large change in the Fund's equity in the instrument. As a result, it is possible that the Fund could lose the entire amount of margin on deposit in a relatively short period of time if the market moves adversely. In these instances, the Fund may be required to make substantial additional margin deposits on short notice to maintain its position. If the Fund does not provide additional margin within the required time period, the Fund's position may be liquidated at a loss with the Fund being liable for any resulting deficit. Even if a trade ultimately proves profitable, the Fund may have to accept payment in cash in lieu of a return of the actual assets deposited, and the deposit will not be protected to the same extent as would a cash deposit held in trust in a segregated client bank account. See more under the "*Futures Contracts*" risk factor below.

**Illiquidity of Fund's Assets.** The Partnership may invest in investment instruments that are subject to legal and other restrictions on transfer or for which no liquid market exists. Markets for relatively illiquid investments tend to be more volatile than markets for more liquid investments. To the extent the Partnership invests in illiquid assets, its ability to dispose of these assets at prices and times that it wishes to do so may be restricted. These risks will be more pronounced, and the Partnership may be affected by widening bid-offer spreads, if the Partnership is required to liquidate its positions to generate cash to fund withdrawals or meet other obligations. This liquidation may lead to the need for the Partnership to incur capital losses in connection with the disposition of assets to meet these cash requirements.

Futures contracts may be subject to liquidity risks when market activity decreases or when a daily price fluctuation limit has been reached. Most U.S. futures exchanges limit fluctuations in futures contract

prices during a single day by regulations referred to as "daily limits." During a single trading day, no trades may be executed at prices beyond the daily limit. Once the price of a futures contract has increased or decreased to the limit point, positions can neither be taken nor liquidated. Futures prices have occasionally moved beyond the daily limit for several consecutive days with little or no trading. OTC instruments generally are not as liquid as instruments traded on recognized exchanges. A lack of liquidity whether due to daily limits or infrequent trading could prevent the Partnership from promptly liquidating positions in these instruments and therefore result in substantial losses to the Partnership.

The Partnership may be adversely affected by a decrease in market liquidity in normally liquid markets. These market events may impair the Partnership's ability to adjust its positions, balance sheet and risk in response to trading losses or other adverse developments. The size of the Partnership's positions may magnify the effect of a decrease in market liquidity for the instruments traded by the Partnership. Changes in overall market leverage also may adversely affect the Partnership's positions (for example, due to changes caused by deleveraging or liquidations by other market participants of the same or similar positions).

**Short Sales.** Short selling involves selling cryptocurrencies, Securities, other assets, which are not owned by the short seller and borrowing them for delivery to the purchaser, with an obligation to replace the borrowed cryptocurrencies, Securities, other assets, at a later date. Short selling allows the investor to profit from a decline in market price to the extent such decline exceeds the transaction costs and the costs of borrowing the cryptocurrencies, Securities, other assets. The extent to which the Fund engages in short sales will depend upon the Investment Manager's investment strategy and opportunities. A short sale creates the risk of a theoretically unlimited loss, in that the price of the underlying cryptocurrency, Security, other asset could theoretically increase without limit, thus increasing the cost to the Fund of buying those cryptocurrencies, Securities, other assets to cover the short position. There can be no assurance that the Fund will be able to maintain the ability to borrow cryptocurrencies, Securities, other assets sold short. In such cases, the Fund can be "bought in" (i.e., forced to repurchase the cryptocurrencies, Securities, other assets in the open market to return to the lender). There also can be no assurance that the cryptocurrencies, Securities, other assets, necessary to cover a short position will be available for purchase at or near prices quoted in the market. Purchasing cryptocurrencies, Securities, other assets to close out a short position can itself cause the price of the cryptocurrency, Security, or other asset to rise further, thereby increasing the loss.

**Risks of Actively Trading Securities and Investments.** The business of actively trading cryptocurrencies, Securities, and other assets involves numerous risks. If the Fund's trades are delayed, the Fund may be unable to effect the trade at the desired price, if at all. If the broker used by the Fund to execute trades does not make fast, timely executions and confirmations of the Fund's trades to the Investment Manager, then the Investment Manager will have no way of knowing if the Fund is in or out of a position and this lack of information about a trade can cause a loss to the Fund. If the Investment Manager places an order to purchase or sell a particular cryptocurrency, Security, or other asset "at the market rate" the Fund is agreeing to purchase or sell the specific number or number of shares of that cryptocurrency, Security, or other asset, at the price at which a matching sale or purchase can be found on the exchange at the time that the order is received on the trading floor of the exchange. If the broker used by the Fund does not timely place the order and execute the trade, the Fund may be purchasing or selling the cryptocurrency, Security, or other asset, at a higher or lower price than the intended purchase or sale. This may result in part because the market price of the cryptocurrency asset, Security, or other asset, can move quickly. The cryptocurrencies, Securities, or other assets held by the Partnership will regularly fluctuate in value; therefore, there can be no assurance that the Fund will maintain a stable Net Asset Value over a short period of time. As a result, it is possible that a Limited Partner's request to withdraw his/her/its investment may ultimately be processed at a different Net Asset Value than the value at the time the request was originally received by the Fund.

**Hedging Transactions.** The Fund is not required to hedge any of its positions, and its portfolio at any time may be partially or entirely unhedged. The Fund nonetheless may use financial instruments, both for investment purposes and for risk management purposes in order to (i) protect against possible changes in the market value of the Fund's investment portfolios resulting from fluctuations in the securities markets and changes in interest rates; (ii) protect the Fund's unrealized gains in the value of the Fund's investment portfolio; (iii) facilitate the sale of any such investments; (iv) enhance or preserve returns, spreads or gains on any investment in the Fund's portfolio; (v) protect against any increase in the price of any securities the Fund anticipates purchasing at a later date or (vi) for any other reason that the Investment Manager deems appropriate.

The success of the Fund's hedging strategy (if hedging occurs) will depend, in part, upon the Investment Manager's ability to correctly assess the degree of correlation between the performance of the instruments used in the hedging strategy and the performance of the portfolio investments being hedged. Since the characteristics of many securities change as markets change or time passes, the success of the Fund's hedging strategy will also be subject to the Investment Manager's ability to continually recalculate, readjust and execute hedges in an efficient and timely manner. While the Fund may enter into hedging transactions to seek to reduce risk, such transactions may result in a poorer overall performance for the Fund than if it had not engaged in such hedging transactions. For a variety of reasons, the Investment Manager may not seek to establish a perfect correlation between the hedging instruments utilized and the portfolio holdings being hedged. Such an imperfect correlation may prevent the Fund from achieving the intended hedge or expose the Fund to risk of loss. The Investment Manager may not hedge against a particular risk because no instruments are available for such purposes, because it does not regard the probability of the risk occurring to be sufficiently high as to justify the cost of the hedge, or because it does not foresee the occurrence of the risk.

**Equity Risks.** The Partnership may invest in equities and equity derivatives. The value of these instruments generally will vary with the performance of the issuer and movements in the equity markets. As a result, the Fund may suffer losses if it invests in equity instruments of issuers whose performance diverges from the General Partner's expectations or if equity markets generally move in a single direction and the Fund has not hedged against such a general move. With equity derivatives and private placements, the Fund is exposed to risks that issuers will not fulfill their contractual obligations to the Fund, such as delivering marketable common stock upon conversions of convertible securities and registering restricted securities for public resale.

**Exposure to Material Non-Public Information.** From time to time, the General Partner may receive confidential or material non-public information with respect to an issuer of publicly traded securities. In such circumstances, the Fund may be prohibited (by law, policy or contract) for a period of time from unwinding a position, establishing an initial position or taking any greater position, or from pursuing other investment opportunities related to the issuer. In the event of the foregoing, the Fund will not be free to act upon any such information. Due to these restrictions, the Fund may not be able to initiate a transaction that it otherwise might have initiated and may not be able to sell an investment that it otherwise might have sold.

**Investments in Companies That the Partnership Does Not Control.** Investments by the Partnership may include debt instruments and equity securities of companies that it does not control. Such instruments and securities may be acquired by the Fund through market transactions or through purchases of securities directly from the issuer or other shareholders. Those investments will be subject to the risk that the company in which the investment is made may make business, financial or management decisions with which the Fund does not agree or that the majority stakeholders or the management of the company may take risks or otherwise act in a manner that does not serve the Fund's shares. In addition, the Fund

may make investments in which it shares control over the investment with co-investors, which may make it more difficult for the Fund to implement its investment approach or exit the investment when it otherwise would. If any of the foregoing were to occur, the values of investments by the Fund could decrease and its financial condition, results of operations and cash flow could suffer as a result.

**Small and Medium Capitalization Companies.** The Fund may invest a portion of its assets in the securities of companies with small- to medium-sized market capitalizations. The securities of certain companies, particularly smaller-capitalization companies, involve higher risks in some respects than do investments in securities of larger companies. For example, prices of small-capitalization and even medium-capitalization securities are often more volatile than prices of large-capitalization securities and the risk of bankruptcy or insolvency of many smaller companies (with the attendant losses to investors) is higher than for larger, "blue-chip" companies. Similarly, options on the securities of small and medium capitalization companies may show higher volatility than options on the securities of large-capitalization companies. In addition, due to thin trading in the securities of some small-capitalization companies, an investment in those companies may be illiquid, and options on such securities may accordingly be less liquid than options on the securities of large-capitalization companies.

**Investments in Unlisted Securities.** Although the Fund invests primarily in listed securities, it may, on occasion, take long and short positions in unlisted securities of U.S. and non-U.S. companies. Because of the absence of any trading market for these investments, it may take longer to liquidate, or it may not be possible to liquidate, these positions than would be the case for publicly traded securities. Although these securities may be resold in privately negotiated transactions, the prices realized on these sales could be less than those originally paid by the Fund. Further, companies whose securities are not publicly traded will generally not be subject to public disclosure and other investor protection requirements applicable to publicly traded securities. Such unlisted securities may also be difficult to value and such valuation may require the exercise of substantial discretion by the General Partner.

**Initial Public Offerings.** Investments in initial public offerings may involve higher risks than investments issued in secondary public offerings or purchases on a secondary market due to a variety of factors, including, without limitation, the limited number of shares available for trading, unseasoned trading, lack of investor knowledge of the issuer, and limited operating history of the issuer. In addition, some companies in initial public offerings are involved in relatively new industries or lines of business, which may not be widely understood by investors. Some of these companies may be undercapitalized or regarded as developmental stage companies, without revenues or operating income, or the near-term prospects of achieving them. These factors may contribute to substantial price volatility for securities issued in initial public offerings.

**American Depositary Receipts and Global Depositary Receipts.** American Depositary Receipts ("ADRs") are receipts issued by a U.S. bank or trust company evidencing ownership of underlying securities issued by non-U.S. issuers. ADRs may be listed on a national securities exchange or may be traded in the OTC market. Global Depositary Receipts ("GDRs") are receipts issued by either a U.S. or non-U.S. banking institution representing ownership in a non-U.S. company's publicly traded securities that are traded on non-U.S. stock exchanges or non-U.S. OTC markets. Holders of unsponsored ADRs or GDRs generally bear all the costs of these facilities. The depository of an unsponsored facility frequently is under no obligation to distribute investor communications received from the issuer of the deposited security or to pass through voting rights to the holders of depositary receipts in respect of the deposited securities. Investments in ADRs and GDRs pose, to the extent not hedged, currency exchange risks (including blockage, devaluation and non-exchangeability), as well as a range of other potential risks relating to the underlying shares, which could include expropriation, confiscatory taxation, imposition of withholding or other taxes on dividends, interest, capital gains, other income or gross sale of disposition proceeds, political or social instability or diplomatic developments that could affect investments in those

countries, illiquidity, price volatility and market manipulation. In addition, less information may be available regarding the underlying shares of ADRs and GDRs, and non-U.S. companies may not be subject to accounting, auditing and financial reporting standards and requirements comparable to, or as uniform as, those of U.S. companies. These risks may have a material adverse effect on the performance of these investments and could result in substantial losses.

**Risk Associated with Investments in Crypto Assets.** The Fund has authority to invest, and indeed intends to principally invest in, in a variety of cryptocurrency assets (the "Crypto Assets"). Crypto Assets can be divided into multiple categories, including (but not limited to) currency tokens which are used as a store of value or medium of exchange, and security tokens the value of which are tied to underlying assets such as commodities or equity in a business. Crypto Assets are traded across series of private exchanges and are subject to unique risks compared to traditional investment instruments in addition to the risks associated with underlying assets to which they may be connected. Some of the risks of investments in Crypto Assets, including cryptocurrencies, include the following:

**Theft of Crypto Assets.** Due to the digital, sometimes anonymized, nature of Crypto Assets, they are prone to certain risks, such as being stolen by hackers. Hackers employ numerous methods of effecting theft of Crypto Assets, which could include the following:

1. **Theft from the Fund's Network.** The Fund may store Crypto Assets on, and transfer Crypto Assets across, its network, particularly when conducting trading activity. The Fund may employ multiple layers of network security, including the use of firewalls, software to protect against malware, and the dispersion of the Fund's Crypto Assets across multiple hardware wallets when not being actively traded, all of which mitigate the risk of theft. Nonetheless, hackers may succeed in bypassing or overcoming firewalls and security software to penetrate the Fund's network in order to steal Crypto Assets. In order to be traded, Crypto Assets must be moved from "cold storage", where they are isolated from any network, to and between "hot wallets", where they are connected to the internet. During any period where Crypto Assets are not in "cold storage" they are exposed to prospective theft in the event of infiltration of the Fund's network, and, once stolen, may be virtually impossible to recover, exposing the Fund's Crypto Assets to the risk of loss.

2. **Theft from an Exchange.** Cryptocurrency exchanges facilitate the transacting of billions of US dollars of Crypto Assets on a daily basis. The Fund may access such exchanges to buy and sell Crypto Assets, during which periods of trading activity, certain of the Fund's Crypto Assets may be held on such Exchanges. These exchanges typically employ sophisticated security measures to prevent theft of Crypto Assets being transacted across their network, with some providing remuneration options in the event Crypto Assets are stolen due to a breach in the exchange's security. Nonetheless, the volume of Crypto Assets transferred via exchanges makes them attractive targets for hackers, including for larger-scale, sophisticated hacks aimed at stealing large quantities of Crypto Assets.

   Moreover, there is no uniform minimum standard of security exchanges are required to provide for their networks, meaning the security of Crypto Assets on an exchange's network can vary substantially between exchanges. The explosive growth in trading of Crypto Assets has also substantially increased trading volume for many exchanges. This increased trading volume may place strain on the infrastructure of rapidly expanding exchanges, leaving security measures inadequate until expanded to accommodate the growth in an exchange's user base.

   The Fund may access multiple cryptocurrency exchanges to find liquidity and favorable

pricing for its Crypto Assets, exposing those Fund assets to the risk of theft due to vulnerabilities which may exist in the networks of such exchanges. While the Fund may make efforts to confine its trading activities to the extent possible to exchanges considered more reputable and which may offer to cover some amount of client losses in the event of a security breach, given the private nature of cryptocurrency exchanges, they may lack financial transparency and the solvency to reimburse users, if applicable, in the event of a large-scale loss.

3. **Theft via Vulnerabilities in a Blockchain Network.** Crypto Assets are transferred via a distributed, typically public, ledger referred to as a "blockchain". Blockchain technology is regarded to be highly tamper-resistant and almost impossible to corrupt. While some Crypto Assets operate on their own blockchain network, multiple Crypto Assets may operate on the same network, such as with ERC20 tokens, which operate on the Ethereum blockchain. The security and tamper-resistance of a Crypto Asset is contingent upon the architecture of the blockchain on which it operates and is proven both over time and as transactions are processed on the blockchain. More established blockchains, such as the Bitcoin blockchain, have demonstrated the resiliency of their architecture against tampering. Newer Crypto Assets which do not operate on an established blockchain are more likely to be susceptible to vulnerabilities in their architecture allowing the theft or siphoning of Crypto Assets directly from the blockchain.

The Fund may trade in a variety of Crypto Assets to maximize the return of its Portfolio Investments. These Crypto Assets may include those operating on established blockchain networks, such as Bitcoin, as well as novel or emerging Crypto Assets operating on newer blockchains with potential for high growth. To the extent the Fund's investments include Crypto Assets traded on unproven blockchain architecture, such investments are exposed to a greater risk of loss.

**Loss of Crypto Assets due to Data Corruption.** Blockchain networks typically employ asymmetric cryptography to authenticate and encrypt transactions. The result is that Crypto Assets require a "private key" to access. This private key is a complex string of characters that corresponds to a specific Crypto Asset, without which key, transfer of the asset is effectively impossible. Private keys are typically transferred between wallets. The Fund, in the conduct of its trading activities, may transfer and store private keys both on its network and on the networks of various cryptocurrency exchanges. During such transfer and storage, data may be subject to corruption or loss due to a variety of factors including, but not limited to, power outages, software bugs, or hardware failures. In the event of such corruption, any Crypto Assets for which the corresponding private keys cannot be recovered may be permanently inaccessible. The Fund may employ measures to mitigate the risk of data corruption including, but not limited to, distributing Crypto Assets across multiple hardware wallets, creating redundancies, and utilizing battery backups for its storage and trading equipment. Nonetheless, corruption of private keys is possible, in such event exposing the Fund's Crypto Assets to the risk of total loss.

**Volatility.** Crypto Assets are subject to significantly greater fluctuations in price in comparison to conventional financial instruments such as stocks or bonds. This increased volatility may translate to greater risk of loss and can be attributed in part to a number of factors including, but not limited to, those set forth below, which may be applicable to some or all of the Crypto Assets included in the Fund's Portfolio Investments:

1. **Limited Alienability.** Certain Crypto Assets, such as Bitcoin and Ethereum, derive value from their utility as units of exchange. The number of retailers, however, which accept Crypto Assets

as payment for goods and services is extremely limited, and those retailers which do accept Crypto Assets often place limitations on what they may be used to purchase. Moreover, an indefinite, but prospectively significant, portion of Crypto Asset transactions are conducted for an illicit purpose. Given the comparatively small pool of vendors accepting Crypto Assets as payment, any expansion or reduction in the number of such vendors, including reductions or increases in black market vendors due to success or failure of law enforcement efforts, may carry with it an outsized impact on the price of such Crypto Assets.

2. **Susceptibility to Market Sentiment.** Crypto Assets are often highly speculative in nature and in many cases have no underlying value, even as units of exchange. Unlike publicly-traded stock, which may represent equity in a company that has regular earnings and an ascertainable net tangible book value to support its trading price, many Crypto Assets are not supported by verifiable revenue streams or tangible assets. Consequently, the value of many Crypto Assets is tied to the prevailing outlook of the overall market for Crypto Assets, creating the possibility for dramatic fluctuations in the trading price of a Crypto Asset in reaction to external forces, including, but not limited to, rumors, speculation, media reports, and signaling by regulators, even in the absence of any fundamental impact on such Crypto Asset.

3. **Comparative Lack of Market Sophistication.** The majority of publicly traded stocks are held by large institutions with the significant majority of transaction volume being executed at the direction of sophisticated computer algorithms. Fundamental and quantitative analyses of abundant and precise data relating to such stocks is continuously scrutinized by sophisticated investment firms and used to make precise determinations regarding stock values. This constant scrutiny by investment professionals coupled with trading automation limits deviation in the trading price of stock relative to the market consensus on its value. Institutional investment in Crypto Assets, however, is significantly less as a proportion of the overall Crypto Asset market and the information available on Crypto Assets is significantly less robust, making it more difficult for even sophisticated investors to accurately estimate the appropriate trading price of a given Crypto Asset. The lower proportion of sophisticated investors in, and comparatively limited information on, the Crypto Asset market may result in greater deviation between the trading price of a given Crypto Asset and its fundamental value. Consequently, the Fund's investment in Crypto Assets may be subject to substantial fluctuation in trading price, even in the absence of any change in the underlying value of such Crypto Assets.

**Liquidity.** Crypto Assets are primarily traded across a number of online exchanges. While over half of all Crypto Asset trading volume is typically concentrated within the top ten exchanges, the total number of exchanges is in the hundreds. Certain exchanges with low overall volume may nonetheless offer the greatest available volume of a specific Crypto Asset. In order to access sufficient trading volume to meet its investment objectives, the Fund may need to utilize numerous exchanges to both acquire and liquidate Crypto Assets. Certain Crypto Assets acquired by the Fund may be less liquid than others, causing the Fund to hold such assets longer than desired while it attempts to locate demand. The Fund may also accumulate positions in Crypto Assets over time for which there is insufficient volume to immediately liquidate. The Fund maybe unable to liquidate such cumulative positions as quickly as desired, subjecting the Fund to fluctuations in the value of such positions and the possible inability of the Fund to liquidate such positions for their market value, or at all, at the time such liquidation is desired.

**Regulatory Risk.** Crypto Assets and the exchanges on which they are traded are not currently subject to clear and comprehensive regulatory oversight. Uncertain regulatory treatment of Crypto Assets

and Crypto Asset exchanges subjects the overall Crypto Asset market to substantial risk of regulatory intervention. A determination by regulators that certain Crypto Assets are properly classified as securities could result in the delisting of such Crypto Assets from exchanges, significantly reducing such assets' liquidity and, consequently, their value. A determination by the SEC that Crypto Asset exchanges must comply with the standards of a securities exchange could result in the suspension of all activity on exchanges subject to U.S. jurisdiction, significantly reducing the liquidity and value of Crypto Assets across the entire Crypto Asset market. While the both the Fund and the broader Crypto Asset market closely monitors regulatory signals regarding treatment of Crypto Assets, severe, unanticipated regulatory action could result in the total or near total loss of value in the proportion of the Fund's Portfolio Investments positioned in Crypto Assets.

Conversely, absence of regulatory oversight of Crypto Asset markets also poses risks. Lack of uniform standards of reporting and financial transparency makes evaluating and verifying information relating to Crypto Assets and exchanges difficult. Moreover, a substantial proportion of the entire outstanding supply of certain Crypto Assets, such as Bitcoin, is concentrated in the hands of relatively few individuals. Collusion among such individuals has the potential to manipulate pricing across a Crypto Asset market, advantaging a small number of participants at the expense of all others holding the Crypto Asset. In the absence of regulatory oversight and enforcement, such collusion is not only possible, but also may not be illegal in the absence of a specific legal framework applicable to Crypto Asset markets.

**Limited Recourse.**  Given the anonymous nature of Crypto Assets, recovery in the event of theft is made more difficult. The sometimes non-local and decentralized nature of Crypto Asset networks further makes responsible parties difficult to identify or submit to legal jurisdiction in connection with a loss of Crypto Assets. Further, unlike with a conventional banking institution which may be able to cancel or reverse a transaction, blockchain networks, by design, typically lack a central authority able to intervene in the event of a loss. The absence of effective recourse may decrease deterrence of criminal activity aimed at stealing Crypto Assets and increase the risk of total loss for such proportion of the Fund's Portfolio Investments positioned in Crypto Assets.

**Reliance on Computing Power and Energy.**  Certain blockchain transactions are verified via a process referred to as "mining." Mining occurs when machines operating on a given blockchain network solve cryptographic hashes to individually validate the authenticity of a given transaction as well as verify it with the rest of the network. If the majority of the machines on the network determine the transaction is valid, the transaction is approved and the blockchain is updated with a distributed record of the transaction. Machines donating processing power to mine a given Crypto Asset are typically given a reward denominated in such Crypto Asset in exchange for serving their verification function. This means of verifying Crypto Asset transactions carries with it certain risks, including, but not limited to those enumerated below, which may be applicable to some or all of the Crypto Assets included in the Fund's Portfolio Investments:

1. **Increased Expense and Scarcity of Processing Power.**  The architecture of certain blockchains, such as that of Bitcoin, cause the hashes which must be solved in order to verify transactions to increase in complexity with each subsequent transaction verified on the network. This continually increasing complexity in verifying transactions decreases the rate at which mining machines are rewarded for verifying transactions and increases the energy and computing costs to miners. Over time, miners may lose incentive to donate processing power to verify transactions on a network, reducing the rate at which transactions can be verified on such network, decreasing the liquidity of the corresponding Crypto Asset.

2. **Reliance on Energy and Sustainability Concerns.**  The computing requirements of mining Bitcoin alone have necessitated the consumption of tremendous amounts of energy. While the

exact amount of energy consumed by the Bitcoin network is difficult to precisely ascertain, if the Bitcoin network were a country, its estimated energy consumption would place it in the top 30% of consumers. Moreover, the network's consumption is expected to multiply as much as three-fold in 2018 as the increasing complexity of verifying transactions demands continually greater computing power and miners compete to capture Bitcoin. The greater the computing power and energy resources devoted to mining Crypto Assets, the more sensitive Crypto Assets may be to fluctuations in the prices of energy required to perform the verification functions essential to their alienation. Continued geometric increase in the energy consumption of the Bitcoin network (and Crypto Asset networks generally) may also result in adverse outcomes including, but not limited to, unfavorable public perception of Crypto Assets, reduced demand, regulatory action, and collapse of certain Crypto Asset networks due to inability to effectively verify transactions.

**Derivative Instruments.** The Fund has the ability to trade in derivative instruments "derivatives". Derivatives include instruments and contracts which are derived from and are valued in relation to one or more underlying cryptocurrency, Securities, financial benchmarks or indices. Derivatives typically allow an investor to hedge or speculate upon the price movements of a particular security, financial benchmark or index at a fraction of the cost of acquiring, borrowing or selling short the underlying asset. The value of a derivative depends largely upon price movements in the underlying asset. Therefore, many of the risks applicable to trading the underlying asset are also applicable to derivatives trading. However, there are a number of other risks associated with derivatives trading. Transactions in certain derivatives are subject to clearance on a U.S. national exchange and to regulatory oversight, while other derivatives are subject to risks of trading in the OTC markets or on non-U.S. exchanges. Additional risks associated with derivatives trading include the following:

• *Tracking.* When used for hedging purposes, an imperfect or variable degree of correlation between price movements of the derivative instrument and the underlying investment sought to be hedged may prevent the Fund from achieving the intended hedging effect or expose the Partnership to risk of loss.

• *Liquidity.* Derivative instruments, especially when traded in large amounts, may not be liquid in all circumstances, so that in volatile markets the Fund may not be able to close out a position without incurring a loss. In addition, daily limits on price fluctuations and speculative position limits on exchanges on which the Partnership may conduct its transactions in derivative instruments may prevent profitable liquidation of positions, subjecting the Fund to the potential of greater losses.

• *Operational Leverage.* Trading in derivative instruments can result in large amounts of operational leverage. Thus, the leverage offered by trading in derivative instruments will magnify the gains and losses experienced by the Partnership and could cause the Fund's Net Asset Value to be subject to wider fluctuations than would be the case if the Partnership did not use the leverage feature in derivative instruments.

• *Over-the-Counter Trading.* Derivative instruments that may be purchased or sold by the Fund may include instruments not traded on an exchange. The risk of nonperformance by the obligor on an instrument may be greater than, and the ease with which the Fund can dispose of or enter into closing transactions with respect to an instrument may be less than, that associated with an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for derivative instruments that are not traded on an exchange. Derivative instruments not traded on exchanges also are not subject to the same type of government regulation as exchange-traded instruments, and many of the protections afforded to participants in a regulated environment

may not be available in connection with these transactions.

**Credit Risk.** Because many purchases, sales, financing arrangements, securities lending transactions, and derivative transactions in which the Fund will engage involve investment instruments that are not traded on an exchange but are instead traded between counterparties based on contractual relations, the Fund is subject to the risk that a counterparty will not perform its obligations under the related contracts. Although the Fund intends to enter into transactions only with counterparties which the General Partner believes to be creditworthy, will attempt to reduce its exposure through the use of two-way collateralized mark-to-market agreements and will pursue its remedies under any of these contracts, there can be no assurance that a counterparty will not default and that the Fund will not sustain a loss on a transaction as a result.

In situations where the Fund is required to post margin or other collateral with a counterparty, the counterparty may fail to segregate the collateral or may commingle the collateral with the counterparty's own assets. As a result, in the event of the counterparty's bankruptcy or insolvency, the Fund's collateral may be subject to the conflicting claims of the counterparty's creditors, and the Partnership may be exposed to the risk of a court treating the Fund as a general unsecured creditor of the counterparty, rather than as the owner of the collateral.

The Fund is subject to the risk that issuers of the investment instruments in which it invests and trades may default on their obligations under those investment instruments, and that certain events may occur which have an immediate and significant adverse effect on the value of those investment instruments. There can be no assurance that an issuer of an investment instrument in which the Fund invests will not default, or that an event which has an immediate and significant adverse effect on the value of an investment instrument will not occur, and that the Fund will not sustain a loss on a transaction as a result.

Transactions entered into by the Fund may be executed on various U.S. and non-U.S. exchanges, and may be cleared and settled through various clearing houses, custodians, depositories and prime brokers throughout the world. Although the Fund will attempt to execute, clear and settle the transactions through entities the General Partner believes to be sound, there can be no assurance that a failure by any such entity will not lead to a loss to the Fund.

**Contractual Risk.** Because many transactions in which the Fund will engage are traded between counterparties based on contractual relations, the Fund is subject to the risk of failing to comply with these contracts or otherwise breaching their provisions. For example, these contracts may terminate upon the departure of a certain number of the principals, the fluctuation of the Net Asset Value beyond certain parameters, the termination of the General Partner as investment manager or other events or circumstances. The Partnership may sustain a loss on a transaction that terminates prematurely in accordance with the terms of the underlying contract.

**Counterparty Insolvency.** The Partnership's assets may be held in one or more accounts maintained for the Partnership by counterparties, including their prime brokers. There is a risk that any of such counterparties could become insolvent. In September 2008, Lehman Brothers Holdings Inc., a major investment bank based in the United States, filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code. While none of its U.S. broker-dealer subsidiaries was included in the Chapter 11 filing, certain of Lehman Brothers subsidiaries, including Lehman Brothers International (Europe) ("LBIE") were placed under administration chartered to wind down their respective business. The insolvency of the Fund's counterparties is likely to impair the operational capabilities or the assets of the Fund. Although the General Partner regularly monitors the financial condition of the counterparties it uses, if one or more of the Partnership's counterparties were to become insolvent or the subject of liquidation proceedings in the United States (either under the U.S. Securities Investor Protection Act or the U.S. Bankruptcy Code), there exists the risk that the recovery of the Partnership's securities and other assets from such prime broker or broker-dealer will be delayed or be of a value less than the value of the securities or assets originally entrusted to

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

such prime broker or broker-dealer.

In addition, the Fund may use counterparties located in various jurisdictions outside the United States, like LBIE. Such non-U.S. counterparties are subject to various laws and regulations in various jurisdictions that are designed to protect their customers in the event of their insolvency. However, the practical effect of these laws and their application to the Fund's assets are subject to substantial limitations and uncertainties. Because of the large number of entities and jurisdictions involved and the range of possible factual scenarios involving the insolvency of a counterparty, it is impossible to generalize about the effect of their insolvency on the Fund and its assets. Investors should assume that the insolvency of any counterparty would result in a loss to the Fund, which could be material.

**Securities Lending.** The Fund may borrow and lend securities in the ordinary course of its business. Third parties that borrow securities from the Fund may not be able to return these securities on demand (possibly causing the Partnership to default on its obligations to other parties) and may also default on the payment obligations owed to the Fund in connection with such securities loans, potentially resulting in substantial losses to the Fund. The Fund may lose the entire value of the securities it lends to defaulting borrowers.

**Futures Contracts.** The value of futures depends upon the price of the instruments, such as commodities, underlying them. The prices of futures are highly volatile, and price movements of futures contracts can be influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. In addition, investments in futures are also subject to the risk of the failure of any of the exchanges on which the Fund's positions trade or of its clearinghouses or counterparties.

Futures positions may be illiquid because certain commodity exchanges limit fluctuations in certain futures contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits." Under such daily limits, during a single trading day no trades may be executed at prices beyond the daily limits. Once the price of a particular futures contract has increased or decreased by an amount equal to the daily limit, positions in that contract can neither be taken nor liquidated unless traders are willing to effect trades at or within the limit. This could prevent the Fund from promptly liquidating unfavorable positions and subject the Fund to substantial losses or from entering into desired trades. In extraordinary circumstances, a futures exchange, the CFTC or other similar non-U.S. regulatory body or agency could suspend trading in a particular futures contract, or order liquidation or settlement of all open positions in such contract.

**Non-U.S. Futures Transactions.** Non-U.S. futures transactions involve executing and clearing trades on a non-U.S. exchange. This is the case even if the non-U.S. exchange is formally "linked" to a U.S. exchange, whereby a trade executed on one exchange liquidates or establishes a position on the other exchange. No U.S. organization regulates the activities of a non-U.S. exchange, including the execution, delivery, and clearing of transactions on such an exchange, and no U.S. regulator has the power to compel enforcement of the rules of the non-U.S. exchange or the laws of the non-U.S. country. Moreover, such laws or regulations will vary depending on the non-U.S. country in which the transaction occurs. For these reasons, the Partnership may not be afforded certain of the protections which apply to U.S. transactions, including the right to use U.S. alternative dispute resolution procedures. In particular, funds received from customers to margin non-U.S. futures transactions may not be provided the same protections as funds received to margin futures transactions on U.S. exchanges. In addition, the price of any non-U.S. futures or option contract and, therefore, the potential profit and loss resulting therefrom, may be affected by any fluctuation in the non-U.S. exchange rate between the time the order is placed and the non-U.S. futures contract is liquidated or the non-U.S. option contract is liquidated or exercised.

**Option Risks.** The Fund may buy and sell (write) both call options and put options, and when it writes options, it may do so on a "covered" or an "uncovered" basis. A call option is "covered" when the writer owns securities of the same class and amount as those to which the call option applies. A put option is covered when the writer has an open short position in securities of the relevant class and amount. The Fund's option transactions, if any, may be part of a hedging strategy (i.e., offsetting the risk involved in another securities position) or a form of leverage, in which the Fund has the right to benefit from price movements in a large number of securities with a small commitment of capital. These activities involve risks that can be substantial, depending on the circumstances.

In general, without taking into account other positions or transactions the Fund may enter into, the principal risks involved in options trading can be described as follows: When the Fund buys an option, a decrease (or inadequate increase) in the price of the underlying security in the case of a call, or an increase (or inadequate decrease) in the price of the underlying security in the case of a put, could result in a total loss of the Fund's investment in the option (including commissions). The Fund could (but it may choose not to) mitigate those losses by selling short, or buying puts on, the securities for which it holds call options, or by taking a long position (e.g., by buying the securities or buying calls on them) in securities underlying put options.

When the Fund sells (writes) an option, the risk can be substantially greater than when the Fund buys an option. The seller of an uncovered call option bears the risk of an increase in the market price of the underlying security above the exercise price. The risk is theoretically unlimited unless the option is "covered." If it is covered, the Fund would forego the opportunity for profit on the underlying security should the market price of the security rise above the exercise price. If the price of the underlying security were to drop below the exercise price, the premium received on the option (after transaction costs) would provide profit that would reduce or offset any loss the Fund might suffer as a result of owning the security.

Options on a given security tend to be less liquid than shares or other ownership interests of the underlying security. Transaction costs in options transactions tend to be substantially higher than transaction costs incurred in trading the underlying securities because of wider bid/ask spreads and because options trades often cover more units of the security involved.

**Risk Associated with Investments in Exchange-Traded Funds.** The Fund has authority to invest in exchange-traded funds ("*ETF*"). ETFs are funds that track a particular basket or index of securities traded on a public exchange. In this manner, ETFs are similar to open-ended index mutual funds. However, ETFs are traded like stocks on stock exchanges such as the American Stock Exchange. Although investments in mutual funds and ETFs are subject to similar risks, ETFs have certain unique risks not shared by mutual funds. Some of the risks of investments in stock funds, including ETFs, include the following:

1. **Stock Fund Trading.** It is possible for the value of stock funds to fall or to rise more slowly than the stock market as a whole, even when stock prices in general are rising. Risk is also involved in fund selection. Unlike open-ended mutual funds, ETFs may potentially trade above or below the value of their underlying portfolios. While most ordinary mutual funds can only be bought or sold at the end of the day at the calculated net asset value of the fund, ETFs may be purchased or sold throughout the day at prices that are not guaranteed to match the underlying value of the stocks in the portfolio. Accordingly, the Fund could be exposed to corrective forces if it inadvertently purchases an ETF at a premium (or sells short an ETF at a discount) to its underlying market value.

2. **General Risks.** An investment in stock funds comprised of publicly traded stocks are subject

to the risks that impact the portfolio of underlying stock, including market risks resulting from such factors as economic and political developments, changes in interest rates and perceived trends in stock prices. In addition, investment techniques such as short selling and margin debt may be used with ETFs, which would expose the Fund to the risks associated with those investment techniques. Unlike with mutual funds, however, ETFs are completely transparent in that the investor will know the composition and relative weighting of the fund's underlying securities.

3. **Distributions from Funds.** The tax regulations pertaining to stock funds generally cause them to distribute their taxable gains in the form of a dividend near year-end (although, because ETFs generally have a lower portfolio turnover than mutual funds, ETFs are expected to produce comparatively fewer gain-generating transactions). The share price of the stock fund would generally drop by a corresponding amount on the ex-dividend date of the distribution. Such distributions are made on a *pro rata* basis without regard to the actual gains or losses an individual fund shareholder may have sustained. Accordingly, investors who have real economic gain less than the amount of the dividend may then have a motivation to sell those mutual fund shares to claim the drop in share price as a capital loss and thereby offset the income distribution. The further complication is that wash sale rules require that the investor not re-invest for 31 days in order to claim the capital loss deduction. Accordingly, tax strategies employed by other investors may increase the price volatility of mutual fund shares and of securities owned  by such funds at times near to the distribution of such a dividend. Similarly, the Fund may elect to manage its taxable income by avoiding certain mutual funds during their income distributions, thereby introducing an additional element of risk into its timing models.

**Investments in Certain Metals and Commodities.** The Fund may invest in metals, commodities and similar materials. Since such investments do not generate any investment income, the sole source of return from such investments would be from gains realized on sales of the investments, and a negative return would be realized to the extent such investments are sold at a loss. Certain metals, commodities and similar materials may incur storage or insurance costs that are higher than the custody fees paid on traditional financial assets. Prices of such metals, commodities and materials are affected by factors such as cyclical economic conditions, political events, and monetary policies of various governments and countries. Certain metals, commodities and similar materials are also subject to governmental action for political reasons. There is also a risk that such metals, commodities or similar investments could be lost, damaged or stolen or that access to such investments could be restricted by natural events (e.g., force majeure) or tortious human actions. Markets are therefore at times volatile, and there may be sharp fluctuations in prices even during periods of rising prices.

**Fixed Income Securities.** The Fund may invest in fixed-income securities. The value of fixed income securities in which the Fund will invest will change in response to fluctuations in interest rates. Except to the extent that values are independently affected by currency exchange rate fluctuations, when interest rates decline, the value of fixed income securities generally can be expected to rise. Conversely, when interest rates rise, the value of fixed income securities generally can be expected to decline. The value of certain fixed income securities also can fluctuate in response to perceptions of credit worthiness, political stability or soundness of economic policies. Valuations of other fixed income instruments may fluctuate in response to changes in the economic environment that may affect future cash flows.

**Corporate Debt Securities.** The Fund may invest in corporate debt securities, which are subject to the risk of the issuer's inability to meet principal and interest payments on the obligation and may also be subject to price volatility due to such factors as interest rate sensitivity, market perception of the creditworthiness of the issuer and general market liquidity. When interest rates decline, the value of the

Fund's corporate debt securities can be expected to rise, and when interest rates rise, the value of those securities can be expected to decline. Debt securities with longer maturities tend to be more sensitive to interest rate movements than those with shorter maturities.

**Below Investment-Grade Debt.** The Fund may invest in below investment-grade fixed income securities. Bonds and other fixed income securities, including, without limitation, higher yielding (and, therefore, higher risk) below investment-grade debt securities contain certain risks. Such securities may face ongoing uncertainties and exposure to adverse business, financial or economic conditions which could lead to the issuer's inability to meet timely interest and principal payments. High yield bonds (commonly known as "junk bonds") and other debt securities that may be acquired by the Fund may be junior to the obligations of companies to senior creditors, trade creditors and employees. The lower rating of high yield debt reflects a greater possibility that adverse changes in the financial condition of the issuer or in general economic, financial, competitive, regulatory or other conditions may impair the ability of the issuer to make payments of principal and interest. High yield debt securities have historically experienced greater default rates than investment-grade debt securities.

**Obligations of Governments, Their Agencies and Instrumentalities.** The Fund may invest in government securities. Government securities are obligations of, or are guaranteed by, governments, their agencies or instrumentalities. These instruments include bills, certificates of indebtedness and notes and bonds issued by governments or by government agencies or instrumentalities. Some government securities, such as U.S. Treasury bills and bonds, are supported by the full faith and credit of the government treasury. Others are supported by: the right of the issuer to borrow from the government treasury. Others are supported by: the discretionary authority of the government to purchase the agency's obligations and the credit of the instrumentality. Accordingly, there could be significant credit exposure and risk from investing in such securities.

**Non-U.S. Government Obligations and Related Risks.** The Fund may invest in non-U.S. government obligations. Investments by the Fund in non-U.S. debt securities, whether issued by a non-U.S. government, bank, corporation or other issuer, may present a greater degree of risk than investments in securities of domestic issuers because of less publicly-available financial and other information, less securities regulation, potential imposition of foreign withholding and other taxes, war, expropriation or other adverse governmental actions. Non-U.S. banks and their non-U.S. branches are not regulated by U.S. banking authorities, and generally are not bound by the accounting, auditing and financial reporting standards applicable to U.S. banks. The legal remedies of the Fund may be more limited than the remedies available in the United States.

**Inflation-Linked Fixed Income Securities.** The Fund may invest in inflation-linked fixed income securities. Inflation-linked fixed income securities are fixed income securities whose principal value is periodically adjusted according to the rate of inflation in a particular market. Further, in certain interest rate environments, such as when real interest rates are rising faster than nominal interest rates, inflation protected securities may experience greater losses than other fixed income securities with similar durations. In addition, while inflation-linked securities and instruments generally are expected to be protected from long-term inflationary trends, short-term increases in inflation may lead to a decline in their value. There can be no assurance that the inflation indices to which such securities are linked can accurately measure the real rate of inflation in the prices of goods and services. In any event, the value of an inflation index will lag behind the contemporaneous prices of goods and services.

**Asset-Backed and Mortgage-Backed Securities.** The investment characteristics of asset-backed securities and mortgage-backed securities differ from traditional fixed-income securities. Among the major differences are that interest and principal payments are made more frequently (usually monthly), and that principal may be prepaid at any time because the underlying mortgage loans or other assets

generally may be prepaid at any time. The frequency of prepayments of principal will be effected by a variety of economic factors, including the prevailing level of interest rates. Prepayment of principal at rates either slower or faster than anticipated may result in losses to the Fund. Credit risk may be significant in asset-backed securities and mortgage-backed securities because of the credit risk inherent in the underlying collateral and, in some cases, due to the issuers of the securities being private, non-governmental entities.

Mortgage-backed securities may include collateralized mortgage obligations and other mortgage derivatives, such as "stripped" interest only and principal only securities. To the extent that the Fund makes investments in these securities, the prepayment risks, interest rate risks and hedging risks associated with these securities may be significantly magnified.

**Risks Relating to Markets.** As the cryptocurrencies, Securities, or other assets in which the Fund invests are traded on exchanges or over-the-counter, the value of such assets and the risks associated therewith vary in response to events that affect such markets which are beyond the control of the Fund. Market disruptions could result in substantial losses to the Fund.

There is no guarantee that the exchanges and markets can at all times provide continuously liquid markets in which the Fund can close out its positions. The Fund could experience delays and may be unable to purchase or sell cryptocurrencies, Securities, or other assets, or exercise options purchased through a broker or clearing member that has become insolvent. In that event, positions could also be closed out fully or partially without the Fund's consent.

The Investment Manager may purchase a cryptocurrency, Security, or other asset, that is or becomes illiquid for a variety of reasons (i.e., limited trading in the stock or limited number of holders). If a cryptocurrency, Security, or other asset, becomes illiquid, the Investor cannot easily convert the cryptocurrency, Security, or other asset, into cash, or purchase cryptocurrencies, Securities, or other assets, with cash. Accordingly, if the Fund is in a position with an illiquid cryptocurrencies, Securities or other assets, it may not be able to sell that cryptocurrency, Security, or other asset, if, and when, and at the price the Investment Manager intended. Conversely, if a cryptocurrency, Security, or other asset is illiquid and the Fund Manager wants to purchase the cryptocurrency, Security, or other asset, the Fund may not be able to purchase the cryptocurrency, Security, or other asset, that the Investment Manager wants or at a favorable price and risks losing the opportunity to profit.

**Risks of Global Investing.** The Partnership will invest in various capital markets throughout the world. As a result, the Partnership is subject to risks relating to (i) currency exchange matters, including fluctuations in the rate of exchange between the U.S. dollar and the various foreign currencies in which the Partnership's securities will be denominated, and costs associated with conversion of investment principal and income from one currency into another, and (ii) the possible imposition of withholding taxes on income received from interest, dividends or capital gains with respect to the Partnership's investment instruments.

In addition, certain of these capital markets involve certain factors not typically associated with investing in established U.S. securities markets, including risks relating to (i) differences between markets, including potential price volatility in and relative illiquidity of some foreign securities markets, (ii) the absence of uniform accounting, auditing and financial reporting standards, practices and disclosure requirements and less government supervision and regulation, and (iii) certain economic and political risks, including potential exchange control regulations and potential restrictions on foreign investment and repatriation of capital, nationalization of industries, and diplomatic or geopolitical crises.

**Brokerage and Other Arrangements.** In selecting brokers or dealers to effect portfolio transactions, the General Partner need not solicit competitive bids and does not have an obligation to seek

the lowest available commission cost. The General Partner may cause commissions to be paid to a broker or dealer that furnishes or pays for research, equipment, referral or other services at a higher price than that which might be charged by another broker or dealer for effecting the same transaction. *See "Brokerage Arrangements" at page 44.*

**Possible Effect of Withdrawals from Capital Accounts.** Substantial withdrawals of capital could require the Fund to liquidate investments more rapidly than would otherwise be desirable to raise the necessary cash to fund the withdrawals and to achieve a market position appropriately reflecting a smaller equity base. This could adversely affect the value of interests in the Fund.

**Lack of Opportunity for Investors to Evaluate Investments.** The proceeds from this Offering and any reinvested Fund assets will be invested in cryptocurrencies, Securities and other assets, that have not yet been selected by the Investment Manager. Therefore, prospective Investors will not have an opportunity to evaluate for themselves the relevant economic, financial, and other factors regarding investments and will have to rely completely on the ability of the General Partner and Investment Manager with respect to the selection of investments. Accordingly, the uncertainty and risk of an investment in the Fund will be increased since Investors are unable to evaluate the economic merit of any investments that the Fund may make.

**Standard of Care; Trade Errors.** Under the Partnership Agreement, no Covered Person will be liable in damages or otherwise to the Fund or to any Limited Partner for any act or omission by it in connection with the Partnership's activities, except for any liability that results from the Covered Person's bad faith, gross negligence, willful misconduct, fraud or material breach of the Limited Partnership Agreement or the Investment Management Agreement, as determined by a final, non-appealable decision of a court of competent jurisdiction. This standard of care will result in the Fund possibly bearing the costs of any trade errors committed by the General Partner and its principals and employees. Examples of common trades errors committed by investment advisers include executing a purchase instead of a sale (or vice versa), marking a short sale as a long sale, purchasing or selling a security in the incorrect amount, or purchasing or selling the wrong security.

**Portfolio Valuation.** Valuations of the Partnership's investment instruments, which will affect the amount of the Management Fee and Performance Allocation, may involve uncertainties and judgmental determinations. Third-party pricing information may at times not be available regarding certain of the Fund's cryptocurrencies, Securities, derivatives and other assets. A disruption in the secondary markets for the Fund's portfolio investments may limit the ability of the Fund to obtain accurate market quotations for purposes of valuing its portfolio investments and calculating its Net Asset Value. In addition, material events occurring after the close of a principal market upon which a portion of the cryptocurrencies, Securities or other assets of the Fund are traded may require the General Partner to make a determination of the effect of a material event on the value of the cryptocurrencies, Securities or other assets traded on the market for purposes of determining the Net Asset Value on a valuation date. Further, because of the overall size and concentrations in particular markets and maturities of positions that may be held by the Fund from time to time, the liquidation values of the Fund's cryptocurrency, Securities and other investments may differ significantly from the interim valuations of these investments derived from the valuation methods described herein. If the Fund's valuations should prove to be incorrect, the Net Asset Value of the Fund could be adversely affected. Absent bad faith or manifest error, valuation determinations in accordance with the Fund's valuation policy will be conclusive and binding.

**Effect of the Management Fee.** The payment to the General Partner of the Management Fee may create incentives for the General Partner to attempt to increase the Partnership's assets under management, even in situations where a larger Fund would not result in greater absolute returns for the Limited Partners.

**Effect of the Performance Allocation.** The General Partner's Performance Allocation may create incentives for the General Partner to cause the Fund to make investments that are riskier or more speculative than would be the case if the General Partner were paid only a fixed fee. In addition, since the Performance Allocation is calculated on a basis that includes unrealized appreciation of the Net Asset Value of the Fund, it may be greater than if it were based solely on realized gains. Moreover, to the extent that investment instruments are valued by the General Partner, these values will affect the Performance Allocation to the General Partner and the Capital Account balances of the Limited Partners.

**THE FOREGOING DOES NOT PURPORT TO BE A COMPLETE ENUMERATION OR EXPLANATION OF THE RISKS AND POTENTIAL CONFLICTS OF INTEREST INVOLVED IN THIS OFFERING OR AN INVESTMENT IN THE FUND. IN ADDITION, AS THE FUND'S INVESTMENT PROGRAM DEVELOPS AND CHANGES OVER TIME, AN INVESTMENT IN THE PARTNERSHIP MAY BE SUBJECT TO ADDITIONAL AND DIFFERENT RISK FACTORS AND CONFLICTS (SEE BELOW).**

# CONFLICTS OF INTEREST

**Conflicts of Interest.** In addition to managing the activities of the Fund, the General Partner may act as investment manager or general partner for other clients, accounts, funds and collective investment vehicles, including collective investment vehicles pursuing similar or varied investment strategies. Because the General Partner owes each of its clients a duty of fairness, the General Partner must avoid unfairly favoring some client accounts over others. Therefore, the General Partner will allocate investment opportunities among its clients in a manner that is fair and equitable. However, the General Partner may give advice, and take action, with respect to any of those clients, accounts, funds and collective investment vehicles that may differ from or be identical to the advice given, or the timing or nature of action taken, with respect to the Fund. The General Partner, its affiliates, and the principals, officers, directors, managers, employees and agents of the General Partner and its affiliates may engage in transactions or investments, or cause or advise other clients to engage in transactions or investments, that may differ from or be identical to the transactions or investments engaged in by the General Partner for the Fund's account. There can be no assurance that an investment opportunity which comes to the attention of the General Partner and its affiliates will not be allocated (i) wholly or primarily to another advisory client, with the Fund being unable to participate in this investment opportunity or participating only on a limited basis, or (ii) wholly or primarily to the Fund, with the other advisory client not sharing the risks of the investment. The Fund could be disadvantaged because of activities conducted by the General Partner for the General Partner's other clients as a result of, among other things: legal restrictions on the combined size of positions which may be taken for all accounts managed by the General Partner, thereby limiting the size of the Fund's position; and the difficulty of liquidating an investment for more than one account where the market cannot absorb the sale of the combined positions.

The General Partner may aggregate the Fund's cryptocurrency, Securities, commodity futures, and other asset transactions with those of the General Partner's other clients that are being made simultaneously, if the General Partner believes aggregation is reasonably likely to result in an overall economic benefit to the Fund and the General Partner's other clients in the aggregate. This belief may be based on an evaluation that the Fund and the General Partner's other clients are benefited by relatively better purchase and sale prices, lower commission expenses, beneficial transaction timing and other similar factors. Purchase and sale orders may be combined for the Fund and the General Partner's other clients with each entity paying its proportionate share of the total commission and paying or receiving its proportionate share of the total cost or sales proceeds. However, the aggregate order may not be filled in its entirety or may be filled at different times and prices. To address allocation of "split fills" (i.e., transactions filled at different prices throughout the trading day) or "partial fills" (i.e., transactions not filled in their entirety on the same trading day), the General Partner will rotate accounts on a daily cycle to determine which accounts will receive the most favorable fills for a given day. If the General Partner does not aggregate the Funds transactions with the General Partner's other clients, the Fund and other advisory clients may be competing for similar positions and, depending on whose order is placed first, the difference in timing may result in some clients receiving better execution than others. From the standpoint of the Fund, simultaneous identical portfolio transactions for the Fund and the General Partner's other clients may decrease the prices received, and increase the prices required to be paid, by the Fund for its portfolio sales and purchases.

The General Partner may purchase property or obtain services from, sell property or provide services to, or otherwise deal with the General Partner, any Limited Partner or any person in which an investment has been, or is proposed to be made, or any affiliate of any such persons, provided that any such dealing shall be on terms no less favorable to the Fund than would be obtained on an arm's-length basis, as determined by the General Partner in good faith. Any affiliate of the General Partner who performs services for the Fund will be entitled to be compensated by the Fund, or reimbursed for any offering and organizational or operating and administrative expenses incurred on behalf of the Fund.

**Non-Arms'-Length Agreements.** Certain agreements and arrangements, including those relating

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

to compensation, expense reimbursements and indemnification between the Partnership and among the General Partner and its affiliates are not the result of arms'-length negotiations. The General Partner will determine whether the various affiliates of the General Partner and the Partnership are, in accordance with the terms of the Limited Partnership Agreement, entitled to exculpation and indemnification.

**Other Business Activities.** Although the principal business of the General Partner and its principals and employees is alternative investment management, from time to time the General Partner's principals and employees may serve on the boards of directors or as officers of entities whose businesses or activities are independent of the General Partner. Principals and employees may also serve on the boards of directors or as officers of companies in which the Fund or other of the General Partner's advisory clients invest. The General Partner and its principals and employees are permitted to engage in other business activities, including engaging in other business ventures and other investment partnerships whether or not they compete with the Partnership.

# MANAGEMENT

The Fund is managed solely by the General Partner, BKCoin Management LLC, a Delaware limited liability company, which also serves as the Fund's Investment Manager. The General Partner is not registered as an investment adviser with the Securities and Exchange Commission. Its managers are Carlos Betancourt and Kevin Kang, who will manage the Fund's securities portfolio and operations on behalf of the General Partner pursuant to the guidelines set forth in the *"Investment Objectives, Strategies and Policies"* at *page 17*.

Any Capital Contributions made by the General Partner will be generally on the same basis as Capital Contributions made by Limited Partners, except that no Management Fee or Performance Allocation will be charged to the General Partner. Although neither the General Partner nor its principals are required to maintain any particular level of investment in the Fund, the General Partner intends to keep a certain amount of Capital in the Fund.

Set forth below is certain biographical information for the General Partner's principals.

### Carlos Betancourt, MBA, Founding Principal

Carlos Betancourt is the Founding Principal of BKCoin Capital LP. He oversees the firm's day-to-day operations and the legal, compliance, and research staff report to him. Prior to founding BKCoin Capital LP, Carlos was the founder and CEO of Yorkville Commodities, a full-service physical commodities brokerage and also offered financial services to small to medium sized companies within the energy, mining, and natural resources industries in North and South America. Carlos also worked at KCM Asset Management and The Newport Group, a hedge fund and financial services firm, respectively.

Carlos is actively involved in helping current students from his alma mater's prestigious Roland George Investment Program develop skills to become successful professionals. As a former Division I student-athlete, he enjoys an active lifestyle and participates in several non-profit organizations and sports leagues in New York City.

Carlos completed his MBA at Stetson University's School of Business Administration and graduated with a B.A. in Finance from Stetson University. He is fluent in English, Spanish, and Papiamento.

### Kevin Kang, BBA, CFA Charter Holder, Founding Principal

Kevin Kang is also a Founding Principal of BKCoin Capital LP. He shares the responsibility for the daily management of the Fund, and is also responsible for the trading that occurs at the Fund.

Kevin was a portfolio manager and trader at a major New York-based fund, managing over $4 billion in multi-asset portfolios, with a focus in U.S. equities and fixed income. Prior to this role, Kevin aspired to and was recognized as a successful Associate Portfolio Manager at Alliance Bernstein in New York. During his tenure at Alliance Bernstein, he effectively collaborated with multiple portfolio managers in managing the largest U.S. equities' product by AUM. Additionally, Kevin successfully implemented investment decisions and oversaw the firm's daily positioning of their $40 billion portfolio.

Kevin is currently holds the prestigious designation of Chartered Financial Analyst, and earned his Bachelor of Business Administration in Finance from Stetson University. Kevin is fluence in English and Korean.

The General Partner may appoint other personnel in the future to assist in managing all or part of the Fund assets.

## FEES AND EXPENSES

**Investment Management Fee.** The General Partner receives a quarterly investment management fee (the "***Investment Management Fee***") equal to 0.5% (equivalent to 2.0% per annum) multiplied by each Limited Partner's Capital Account balance (prior to any accrual of the Performance Allocation), determined as of the last day of each calendar quarter, due and payable on the last day of the calendar quarter. The quarterly Investment Management Fee charged on capital contributed on a day other than the first day of the quarter will be adjusted *pro rata* for the number of days remaining in the given quarter. No portion of an Investment Management Fee paid or payable for a quarter will be refundable if all or a portion of the Limited Partner's Capital Account balance is withdrawn during a quarter. If the Fund is not in existence for the entire quarter, the Investment Management Fee for such quarter will be prorated. The General Partner may waive or reduce the Investment Management Fee (or any other fee) due from any Limited Partner in its sole discretion. *See <u>Section 9.02</u> of the Limited Partnership Agreement.*

**Performance Allocation.** The General Partner shall also receive a performance allocation by the Fund based on its investment performance (the "Performance Allocation"). At the end of each fiscal quarter, 20% of the net profits (if any) allocated to each Capital Account of each eligible Limited Partner will be reallocated to the Capital Account of the General Partner. In the event that the Limited Partner withdraws any portion of its Capital Account balance on a day other than on the last business day of a fiscal quarter, the Performance Allocation for that Limited Partner will be determined with respect to the withdrawn amount as of the withdrawal date. Further, in each case, the Performance Allocation shall be subject to the High Water mark set forth below. *See <u>Section 9.03</u> of the Limited Partnership Agreement.*

**High Water Mark.** The Fund will maintain a memorandum loss recovery account for each Capital Account (a "Loss Recovery Account"). Each Loss Recovery Account will be debited at the end of each fiscal year with the net losses of the Partnership (if any) allocable to the related Capital Account for that fiscal year, provided such net loss results in the Partner's Capital Account balance falling below the amount of that Partner's Capital Contributions. The General Partner will not receive a Profits Allocation attributable to a Capital Account until the Limited Partner has recovered the net losses, if any, debited from the Loss Recovery Account by the application of the net profits of the Partnership allocable to the Capital Account (as adjusted for any withdrawals of the Limited Partner's Capital Account balance attributable to the Capital Account). *See <u>Section 9.04</u> of the Limited Partnership Agreement.*

**Expenses.** In consideration for the Investment Management Fee and Performance Allocation, the General Partner bears its own overhead costs, including office space and utilities costs and compensation of secretarial, clerical and other personnel. The Fund is responsible for all expenses associated with the Fund's organization, investment activities and operations, including, without limitation, brokerage commissions, interest on margin accounts and other indebtedness, borrowing charges on securities sold short, custodial fees, bank service fees, research expenses, expenses of data collection and analysis, costs of any outside appraisers, accountants, attorneys or other experts or consultants engaged by the General Partner in connection with specific transactions, any legal fees and costs (including settlement costs) arising in connection with any litigation or regulatory investigation instituted against the Fund or the General Partner in connection with the affairs of the Fund, legal, accounting, auditing and tax services and fees, withholding and transfer fees, clearing and settlement charges, and any other expenses related to the purchase, sale or transmittal of investments. The General Partner has discretion to bear any expense that would otherwise be borne by the Fund. *See <u>Section 3.03</u> of the Limited Partnership Agreement.*

## BROKERAGE ARRANGEMENTS

The General Partner and the Investment Manager assume no responsibility for the actions or omissions of any broker or dealer selected by the Investment Manager in good faith to execute any Fund transactions.

In negotiating commission rates, the Investment Manager takes into account the financial stability and reputation of the broker, and the quality of the investment research, investment strategies, special execution capabilities, clearance, settlement, custody, recordkeeping and other services provided by such broker (as described more fully below), even though the Fund may or may not in any particular instance be the direct or indirect beneficiary of the research or other services provided.

In selecting brokers or dealers to execute transactions for the Fund, the Investment Manager will not solicit competitive bids and has no obligation to seek the lowest available commission cost. The Investment Manager may not always negotiate "execution only" commission rates. In addition to research, the services that may be provided to the Investment Manager by the Fund's brokers may include, without limitation, services such as special execution capabilities, clearance, settlement, net pricing, online pricing, block trading and block positioning capabilities, willingness to execute related or unrelated difficult transactions in the future, online access to computerized data regarding clients' accounts, performance measurement data, consultations, economic and market information, portfolio strategy advice, industry and company comments, technical data, recommendations, general reports, financial strength and stability, efficiency of execution and error resolution, quotation services, the availability of securities to borrow for short sales. Although the General Partner and Investment Manager presently do not contemplate that broker-provided services, if any, will extend to the following, they have authority to retain brokers on behalf of the Fund who agree to provide one or more of such services for the Fund: custody, recordkeeping and similar services, as well as paying for a portion of the Fund's costs and expenses of operation, such as newswire and data processing charges, quotation services, periodical subscription fees and other reasonable expenses incurred by the Fund. The foregoing list of "soft dollar" services which may be received by the Investment Manager is extensive because of the diverse range of the possible services which the Fund's brokers may provide.

Although not prohibited, the Investment Manager does not intend to enter into any arrangement in which the Fund is required to allocate either a stated dollar amount or a stated percentage of its brokerage business to any broker for any minimum time period.

## SUBSCRIPTIONS AND WITHDRAWALS

### Minimum Investment

There is no minimum investment amount to make an investment into the Fund. The acceptance of a certain investment into the Fund shall be subject to the sole discretion of the General Partner.

### Admission of Partners

The General Partner is authorized to admit additional Limited Partners to the Fund, or accept additional Capital Contributions from existing Limited Partners, as of the first business day of any month or at such times as the General Partner in its sole discretion may determine. Persons interested in subscribing to the Fund should deliver a signed Subscription Agreement in substantially the form set forth at Exhibit B hereto to the General Partner at least five (5) business days before the intended subscription date, if applicable. The Capital Amount subscribed to via the Subscription Agreement shall be paid in

U.S. dollars or other cash equivalents approved by the General Partner.

Limited partnership interests may currently be purchased by (i) a limited number of unaccredited investors and (ii) by investors who are "accredited investors" as defined in Regulation 501(a) of Regulation D under the Securities Act. The Fund may also accept investments from plans that are subject to the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), and from IRAs, Keoghs and similar non-ERISA plans, provided such investment meet the requirements as set forth in the Limited Partnership Agreement.

For accredited investors, the Subscription Agreement set forth at Exhibit B below includes Questionnaires designed to determine a subscriber's eligibility under these tests. Each accredited investor will be required to make certain representations in the Subscription Agreement concerning their status as accredited investor.

Admission as a Limited Partner is not open to the general public. An investment in the Fund is suitable only for persons who are able to bear the economic risk of the loss of their investment and either are sophisticated persons in connection with financial and business matters or are represented by such a person. (*See "Certain Risk Factors" at page 22.*) The General Partner may, in its sole discretion, decline to admit any prospective investor.

Note that pursuant to Section 6.10 of the Limited Partnership Agreement the General Partner, on its own behalf, or on behalf of the Partnership, is specifically authorized without further consent by anyone to issue additional classes of Limited Partnership Interests which may differ in terms of, among other things, denomination of currency, the fees charged, minimum commitment amounts, withdrawal rights and other rights. Such additional class of Limited Partnership Interests shall be issued pursuant to a Separate Class Agreement. The terms of such classes will be determined by the General Partner in its sole discretion. Should a Limited Partner not be eligible to participate in "New Issues" pursuant to the relevant FINRA rules, then the General Partner, when issuing a class of Limited Partnership Interests pursuant to Section 6.10 of the Limited Partnership Agreement shall be entitled to designate the class, additionally, as "Restricted" for these purposes.

### *Sales Charge*

There will be no sales charges in connection with the offering of interests. The General Partner, at its own expense, may agree to pay persons who introduce Limited Partners to the Fund.

### *Anti-Money Laundering Regulations*

The Fund and the General Partner (and the Administrator, acting on their behalf) may be required to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "*USA PATRIOT Act*"), the regulations thereunder, United States Executive Order 13224, and other applicable anti-money laundering laws and regulations of any relevant jurisdiction (collectively, the "*Anti-Money Laundering Regulations*"). In order to comply with the Anti-Money Laundering Regulations, the Fund may require from any Limited Partner a detailed verification of the identity of the Limited Partner, the identity of beneficial owners of the Limited Partner, the source of funds used to subscribe for an interest in the Fund or other information. Each subscriber will be required to represent that it is not a "*prohibited person,*" as defined in the Anti-Money Laundering Regulations.

The General Partner or the Administrator may decline a subscription from a subscriber or compel the withdrawal of a Limited Partner who fails to provide any information requested by the General Partner

or the Administrator pursuant to applicable Anti-Money Laundering Regulations.

The General Partner or the Administrator may suspend the withdrawal rights of any Limited Partner if the General Partner or the Administrator reasonably deems it necessary to do so in order to comply with the Anti-Money Laundering Regulations, or if so ordered by a competent U.S. or other court or regulatory authority. Under the Anti-Money Laundering Regulations, the General Partner may also be required to report investors' transactions with the Fund and to disclose the identity of Limited Partners to government authorities. *See the Anti-Money Laundering provisions in the Subscription Agreement.*

### Lock-Up Period; Withdrawals; Required Withdrawals

For a period of six (6) months following the date of a Closing, a Limited Partner shall not be allowed to withdraw or reduce its Capital Contribution or any portion of the value of its Capital Account from the Fund. Thereafter, a Limited Partner may withdraw any portion or all of its Capital Account quarterly, either on January 1, April 1, July 1, or October 1, upon thirty (30) days' prior written notice to the General Partner or the Administrator stating the amount to be withdrawn. With the consent of the General Partner, which may be granted or denied in its sole discretion, a Partner may withdraw capital at other times.

Subject to the General Partner's ability to designated Side Pockets (*see below*) and Reserves (*see below*), provided that the General Partner has received all necessary documentation, distribution in respect of the withdrawn capital normally will be made in U.S. dollars within 30 calendar days after an authorized Withdrawal Date. However, the General Partner shall have the right, at its discretion, to withhold up to 5% of the Capital Account for the Fund's liabilities and other contingencies until no later than 30 days after the completion of the year-end audit of the Fund's financial statements for any withdrawal of 90% or more of a Limited Partner's Capital Account balance (or if a withdrawal, when combined with all other withdrawals of such Limited Partner during the preceding 12 months, would result in such Limited Partner having withdrawn 90% or more of such Limited Partner's Capital Account as of the beginning of such period). In those circumstances, the Fund will remit the balance of the withdrawal proceeds without interest. The General Partner, in its sole discretion, may waive these withdrawal restrictions as to any Limited Partner. The General Partner, in its sole discretion, may affect withdrawal payments in cash or in-kind.

**Side Pockets.** The General Partner may designate certain assets, including investments in pre-ICOs and SAFTs, as "Side Pockets" when the General Partner, in its sole discretion, determines that an asset is illiquid or it is in the best interest of the Fund to value such investments separately from the Fund's other assets. If the General Partner designates an asset as a Side Pocket, the Partners of the Fund at the time of such designation will have a proportionate interest in that investment. The General Partner shall not receive an Incentive Allocation with respect to any Side Pocket until the investment is liquidated, and Partners may not make a withdrawal with respect to a Side Pocket until that event. Side Pockets will be included in the calculation of the Management Fee. Notwithstanding the foregoing, the Fund's financial statements will reflect the Incentive Allocation as if it was earned, treating all assets and liabilities as if they were realized at the reporting date.

**Reserves.** The General Partner may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies (even if such reserves or holdbacks are not otherwise required by U.S. generally accepted accounting principles) which could reduce the amount of a distribution upon withdrawal.

**Mandatory Withdrawal.** If the General Partner determines in good faith after consultation with counsel that the continued participation of a Limited Partner in the Fund would likely result in a violation in the law then the General Partner may require that the Partner withdraw from the Partnership. Further, the General Partner may mandate a Limited Partner's withdrawal at any time and for any reason, in its sole discretion. *See Section 11.05 of the Limited Partnership Agreement.*

## CAPITAL ACCOUNTS

### *Capital Accounts; Capital Contributions*

The Fund will establish a capital account ("**Capital Account**") for the General Partner and each Limited Partner. A Limited Partner's Capital Account will be credited with the amount of any Capital Contributions made by the Limited Partner and any income or gains allocated to the Limited Partner, and will be debited by the amount of any withdrawals made by the Limited Partner and any expenses, losses or deductions allocated to the Limited Partner. In addition, and investor's initial capital contribution will generally be due immediately upon the acceptance of the Limited Partner's subscription for an Interest. In the discretion of the General Partner, a Limited Partner will be permitted to make additional capital contributions to the Limited Partnership on the first business day of any calendar month, or at other times thereafter with the approval of the General Partner.

## NET ASSET VALUE

The net asset value (the "**Net Asset Value**") of the Fund will be determined as of the close of business of the last business day of each calendar month and at such other times as the General Partner may determine in its discretion. The Net Asset Value of the Fund is equal to the value of the assets of the Partnership (including accrued interest and dividends) less liabilities of the Fund (including accrued expenses). For this purpose:

(a) The Fund's assets as of any date shall include: (i) all cash on hand or on deposit, including any interest accrued thereon; (ii) all bills, demand notes, and accounts receivable (including proceeds of assets sold but not delivered); (iii) all instruments owned or contracted for by the Fund; (iv) all Securities and other Portfolio Investments owned by the Fund; (v) all cash dividends, and cash distributions receivable by the Fund (the General Partner may make adjustments with regard to fluctuations in the market value of instruments caused by trading ex- dividend, ex-rights, or by similar practices); (vi) all interest accrued on any interest-bearing instrument except to the extent that the same is included or reflected in the valuation of the instrument; and (vii) all other assets of every kind and nature, including prepaid expenses.

(b) The liabilities of the Fund as of any date shall include: (i) all outstanding loans, bills and accounts payable; (ii) accrued or payable expenses; (iii) the current market value of all short sale obligations; and (iv) all other liabilities. The General Partner and the Administrator may treat estimates of expenses that are incurred on a regular or recurring basis over yearly or other periods as accruing in equal proportions over such period.

(c) The General Partner and the Administrator may establish such reserves for unknown or unfixed liabilities or contingencies as it may determine.

(d) The General Partner may treat any liability or expenditure which becomes fixed or is incurred in an Accounting Period subsequent to the Accounting Period to which the liability or expenditure relates as either (i) arising in the Accounting Period in which the liability becomes fixed or the expenditure is made or (ii) arising in the prior Accounting Period. In the latter case the liability or expenditure shall be charged to Persons who were Limited Partners during that prior Accounting

Period (whether or not the Persons are Limited Partners during the Accounting Period in which the liability is fixed or the expenditure is incurred) pro rata for that prior Accounting Period.

**Suspension of Net Asset Value.**

The General Partner may suspend the determination of the Fund's Net Asset Value, the acceptance of capital contributions and the processing of requests for withdrawals:

(i)     during any period in which any market on which a material part of the assets of the Fund are quoted is closed or has materially limited or suspended dealings;

(ii)    during the existence of any state of affairs (including the restriction of trading in one or more markets) which, in the opinion of the General Partner, makes the determination of the price or value of the disposition of a material part of the Fund's investments impractical or prejudicial to the Partners;

(iii)   during any breakdown in any of the means normally employed by the Fund in ascertaining the value of a material part of its assets or for any other reason the General Partner is of the opinion that the Fund cannot reasonably ascertain the value of a material part of its assets on the valuation date concerned;

(iv)    during any period where the conversion and remittance of the funds which would or might be involved in the realization or acquisition of a material part of the Fund's investments (whether actual or hypothetical for valuation purposes) could not in the opinion of the General Partner be carried out at normal rates of exchange and without undue delay;

(v)     during any period in which distributions or withdrawals would, in the opinion of the General Partner, result in a violation of applicable law; or

(vi)    in the event of the dissolution or winding-up of the Fund.

Limited Partners will be notified of any suspension, and the termination of any suspension, by means of a promptly delivered written notice. If monthly withdrawals are suspended as a result of the foregoing events, withdrawal requests will be honored as of the end of the calendar month next following the termination of any suspension. *See Section 15.02 of the Limited Partnership Agreement.*

**Calculation of Net Asset Value**

The Calculation of the Fund's Net Asset Value shall be in accordance with the parameters set forth in Exhibit C to the Fund's Limited Partnership Agreement. The determination of the Fund's Net Asset Value shall be determined by the General Partner in its sole discretion pursuant to these guidelines, and any such determination shall be final and binding on the Fund. *See Article XV of the Limited Partnership Agreement.*

### ALLOCATION OF PROFITS AND LOSSES

Net realized and unrealized appreciation or depreciation in the value of Fund assets will be allocated, at a minimum, at the end of each quarter in proportion to the relative values of the Partners' Capital Accounts balances, as adjusted to reflect contributions and withdrawals. *See Article VII of the Limited Partnership Agreement.* In addition to the foregoing, certain regulatory allocations shall be made pursuant to the same Article of the Limited Partnership Agreement, including those related to New Issues.

### DISTRIBUTIONS

The General Partner may make distributions of Distributable Cash to the Limited Partners from time to time in its sole discretion, in proportion to the Limited Partners' Capital Account balances at the time of

the distribution, as adjusted to reflect contributions and withdrawals. Although the Fund has the ability to make distributions pursuant to the Limited Partnership Agreement, the Fund does not expect to make distributions and instead expects to reinvest income and net realized gains. *See Article VIII of the Limited Partnership Agreement;*

## OTHER SIGNIFICANT LIMITED PARTNERSHIP AGREEMENT PROVISIONS

### *Term and Termination*

Pursuant to the Fund's Certificate of Limited Partnership filed with the Delaware Secretary of State, the Fund shall exist in perpetuity, unless it is terminated sooner by the General Partner, in its sole discretion, as set forth in the Limited Partnership Agreement or otherwise permitted under the Limited Partnership Agreement. Neither the admission of partners nor the withdrawal, bankruptcy, death, dissolution or incapacity of any Limited Partner will dissolve the Fund.

### *Death, Bankruptcy, Incapacity, etc. of a Partner*

Upon the death, Bankruptcy, dissolution or other cessation of existence of a Limited Partner, such Limited Partner shall not be entitled to receive the Fair Value of its Interest in the Partnership in accordance with Section 17-604 of the Delaware Act. Such Limited Partner's authorized representative, however, shall have all the rights of a Limited Partner for the purpose of settling or managing the estate or effecting the orderly winding up and disposition of the business of such Limited Partner and such power as such Limited Partner possessed to designate a successor as a transferee of its Interest and to join with such transferee in making application to substitute such successor or transferee as a Substitute Limited Partner. The death, Bankruptcy, dissolution, disability, or legal incapacity of a Limited Partner shall not dissolve or terminate the Partnership. *See Section 11.04 of the Limited Partnership Agreement.*

### *Amendment of the Limited Partnership Agreement; Side Letters*

The terms of the Limited Partnership Agreement may generally be amended with the approval of the General Partner and a Majority in Interest of the Limited Partners. The General Partner will have the right to amend any provision of the Limited Partnership Agreement, without the approval of any Limited Partner, to make a change that: (i) is of an administrative or ministerial nature or to cure ambiguities or inconsistencies in the Limited Partnership Agreement, (ii) admit or withdraw one or more Partners in accordance with the terms of the terms of the Limited Partnership, (iii) makes changes to the Limited Partnership agreement negotiated with Limited Partners admitted to the Partnership after the Initial Closing so long as such changes do not materially adversely affect the rights and obligations of any existing Limited Partner, or (iv) change the name of the Partnership. In addition, the Fund may from time to time entire into agreements with certain investors which provide for terms of investment that are more favorable to those investors than the terms described in this Memorandum (collectively, "Side Letters"), provided not no such side letter or other agreement shall adversely affect the rights of any other Limited Partner. *See Article XVI of the Limited Partnership Agreement.*

### *Transfer of Interests*

Interests may be assigned or pledged only with the consent of the General Partner, which may be granted or withheld in the General Partner's sole discretion. All expenses incurred in connection with an assignment or pledge will be charged to the Capital Account for the Partner requesting it. Transfer of Interests will be subject to certain additional restrictions set forth in the Limited Partnership Agreement. *See Article XI of the Limited Partnership Agreement.*

*Limitation of Liability of Limited Partners*

A Limited Partner is liable for the debts and obligations of the Fund only to the extent of the balance of its Capital Account in the Fund in the Accounting Period to which such debts and obligations are attributable.

*Indemnification and Exculpation*

Under the Limited Partnership Agreement, none of the General Partner, Investment Manager, any affiliate of the General Partner or Investment Manager, nor any other officer, director, member, manager, employees, shareholders, partners, members, agents and consultants of the General Partner or Investment Manager (each, a "Covered Person") will be liable in damages or otherwise to the Partnership or to any Limited Partner for any act or omission by it in connection with the Fund's activities, except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgement or order that such act or omission resulted from such Covered Person's bad faith, gross negligence, willful misconduct, fraud or material breach of the Limited Partnership Agreement or the Investment Management Agreement. The Fund will indemnify each Covered Person for any loss or damage incurred by the Covered Person in connection with the Fund's activities, except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgement or order that such act or omission resulted from such Covered Person's bad faith, gross negligence, willful misconduct, fraud or material breach of the Limited Partnership Agreement or the Investment Management Agreement. *See Section 4.03 of the Limited Partnership Agreement.*

*Reports to Partners*

The Fund will provide to each Limited Partner balance reports through its online portal, which balance reports shall be posted at least quarterly. The balance reports shall show the balance of the Partners' accounts as well as an overview of the Fund's investments and strategy. In addition, at the end of each Fiscal year, the Fund will provide each Limited Partner with unaudited financial statements. To the extent that the Partner has made Capital Contributions totaling greater or equal to $500,000, that Partner may request that the Fund provide an audited financial statement at the end of a Fiscal Year in lieu of the unaudited statement. At the end of each fiscal year, each Partner will be furnished certain tax information for the preparation of its tax returns. Except as may be required by law, Limited Partners will not be entitled at any time to receive information about specific portfolio positions held or previously held by the Fund. *See Article X of the Limited Partnership Agreement.*

*Investments by General Partner*

The members of the General Partner, including certain of its affiliates, associates or employees, may invest their own funds into the Fund, either directly or through the General Partner, and such investments may or may not be subject to the Investment Management Fee or Performance Allocation. Although not required by the Limited Partnership Agreement, the General Partner intends to maintain a certain level of investment in the Fund.

## TAXATION

The following is a summary of certain U.S. federal income and other tax considerations related to the purchase, ownership and disposition of Interests by a Limited Partner that is a U.S. person (as defined below). The discussion is based upon the Code, Treasury regulations promulgated thereunder (the

"***Regulations***"), judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect). This discussion does not address all of the tax consequences that may be relevant to a particular investor in light of such investor's specific circumstances or to certain categories of investors subject to special treatment under U.S. federal income tax laws (such as foreign persons, financial institutions, insurance companies, dealers in securities or currencies, persons that have a functional currency that is not the U.S. dollar, persons that have elected "mark-to-market" accounting, or persons that hold their Interest through a partnership or other entity which is a pass-through entity for U.S. federal income tax purposes). This discussion is limited to Limited Partners that hold their Interests as capital assets (within the meaning of Section 1221 of the Code). No ruling has been or will be sought from the IRS or any other federal, state or local agency with respect to any of the tax issues affecting the Fund, and counsel to the Fund has not rendered any legal opinion regarding any tax consequence relating to the Fund or any investment in the Fund. No assurance can be given that the IRS would not assert, or that a court would not sustain, a position contrary to any of the tax aspects described below. Prospective investors should consult their tax advisors concerning the application of the U.S. federal income tax laws to their particular situations, as well as any consequences of the purchase, ownership and disposition of Interests arising under the laws of any other taxing jurisdiction.

For purposes of this discussion, a "***U.S. person***" means a beneficial owner of Interests that, for U.S. federal income tax purposes, is (a) a citizen or resident of the United States, (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States or any political subdivision thereof, (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source or (d) a trust (i) if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Regulations to be treated as a domestic trust. If a partnership or other entity or arrangement treated as a partnership for U.S. federal income tax purposes holds Interests, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.

### Circular 230

Any discussion of U.S. federal tax issues set forth in this Memorandum was written in connection with the promotion and marketing of the Interests by the Fund and the General Partner. Such discussion was not intended or written to be legal or tax advice to any person and was not intended or written to be used, and it cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties that may be imposed on such person. Each prospective investor should seek advice based on its particular circumstances from an independent tax advisor.

### Tax Status of the Fund

The General Partner expects that, for U.S. federal income tax purposes, the Fund will be treated as a partnership and not as an association or publicly-traded partnership taxable as a corporation. To the extent the Fund invests its assets with another investment partnership or similar investment vehicle (an "***Investment Fund***"), the Fund intends, but is not obligated, to invest in Investment Funds that are U.S. entities treated as partnerships and not as associations or publicly-traded partnerships taxable as corporations for U.S. federal income tax purposes. No assurance can be given, however, that the IRS will not challenge the classification of the Fund or any Investment Fund as a partnership or that a court would not sustain such challenge. If, for any reason, the Fund or an Investment Fund were treated as an association or publicly traded partnership taxable as a corporation, (i) in the case of the Fund or an Investment Fund that is a U.S. entity, such entity would be subject to U.S. federal income tax on its taxable

income at regular corporate income tax rates, without a deduction for any distributions to its investors, thereby materially reducing the amount of cash available for distribution to such investors (including, in the case of the Fund, to Limited Partners) and (ii) in the case of an Investment Fund that is not a U.S. entity, an investment in such entity would constitute an investment in a non-U.S. corporation potentially subject to the special U.S. federal income tax regimes discussed in *"Nature of Investments – Income from Investments in Non-U.S. Corporations"* below. In addition, capital gains and losses, and other income and deductions of such entity would not be passed through to its investors, and investors in such entities would be treated as shareholders of a corporation for U.S. federal income tax purposes. The following discussion assumes that the Fund and each Investment Fund will be classified as a partnership for U.S. federal income tax purposes, and that the Fund will be treated as a partner in each Investment Fund.

### Tax Treatment of Limited Partners on Profits and Losses of the Fund

The Fund, as an entity, will not be subject to U.S. federal income tax. Rather, each Limited Partner, in computing its U.S. federal income tax liability for a taxable year, will be required to take into account its allocable share of all items of Fund income, gain, loss, deduction, expenditure and credit (including the Fund's allocable share of all items of income, gain, loss, deduction, expenditure and credit of any Investment Fund) for the taxable year of the Fund ending with or within such Limited Partner's taxable year, regardless of whether such Limited Partner has received any distributions from the Fund. The characterization of an item of Fund income or loss for a Limited Partner generally will be determined at the Fund level rather than at the Limited Partner level. Similarly, the characterization of an item of any Investment Fund income or loss for the Fund generally will be determined at the Investment Fund level rather than at the Fund level. The General Partner does not anticipate that the Fund will make distributions. Accordingly, each Limited Partner should have alternative sources of cash from which to pay its U.S. federal income tax liability or be prepared to withdraw such amounts from the Fund, as the tax liability related to such allocated income and gain may exceed distributions to such Limited Partner for a taxable year.

For U.S. federal income tax purposes, a Limited Partner's allocable share of items of Fund income, gain, loss, deduction, expenditure and credit will be determined as provided by the Limited Fund Agreement, unless such allocations do not have "substantial economic effect" or are not in accordance with the Limited Partner's interests in the Fund. Similarly, the Fund's allocable share of items of Investment Fund income, gain, loss, deduction, expenditure and credit will be determined as provided by the partnership agreement or other operating agreement of the applicable Investment Fund, unless such allocations do not have "substantial economic effect" or are not in accordance with the Fund's interests in the Investment Fund. Under the Limited Fund Agreement, items of Fund income, gain, loss, deduction, expenditure and credits are generally allocated in proportion to the Limited Partners' Capital Account balances. The General Partner believes that the allocations under the Limited Fund Agreement should have substantial economic effect or should be viewed as in accordance with the Limited Partners' interests in the Fund. No assurance can be given, however, that such allocations (or the allocations by an Investment Fund to the Fund, which will flow through to the Limited Partners, as described above) will be respected for tax purposes. If any such allocations were successfully challenged by the IRS, the redetermination of the allocations to a particular Limited Partner for U.S. federal income tax purposes could be less favorable than the allocations to such Limited Partner set forth in the Limited Fund Agreement (or applicable Investment Fund agreement).

### Adjusted Tax Basis for an Interest

For U.S. federal income tax purposes, a Limited Partner's adjusted tax basis for its Interest generally will be equal to the amount of its initial capital contribution and will be increased by (a) any additional capital contributions made by such Limited Partner and (b) such Limited Partner's allocable

share of Fund taxable and tax-exempt income and gain, and the amount of any constructive contributions resulting from an increase in such Limited Partner's allocable share of the Fund's liabilities (including the Fund's allocable share of any Investment Fund's liabilities). A Limited Partner's adjusted tax basis for its Interest will be decreased, but not below zero, by such Limited Partner's allocable share of (x) items of Fund deduction, expense and loss and (y) the amount of cash and the adjusted tax basis of any property (other than cash) distributed by the Fund to such Limited Partner, and the amount of any constructive distributions resulting from a reduction in such Limited Partner's allocable share of the Fund's liabilities (including the Fund's allocable share of any Investment Fund's liabilities).

### *Fund Distributions*

Distributions of cash or property by the Fund with respect to an Interest (other than liquidating distributions, as discussed below) generally will not be taxable to a Limited Partner. Instead, such distributions will reduce, but not below zero, the Limited Partner's adjusted tax basis in the Interest held by such Limited Partner. If a Limited Partner receives a cash distribution (including a constructive distribution resulting from a reduction in such Limited Partner's allocable share of the Fund's liabilities (including the Fund's allocable share of any Investment Fund's liabilities)) in an amount in excess of the Limited Partner's adjusted tax basis in its Interest, such excess generally will be taxable to the Limited Partner as gain from the sale or exchange of its Interest, and long-term capital gain if such Limited Partner has held its Interest for more than one year. Allocations of Fund income will increase a Limited Partner's tax basis in its Interest at the end of the taxable year. Thus, cash distributions made during the taxable year could result in taxable gain to a Limited Partner even though no gain would result if the same cash distributions were made at the end of the taxable year.

A Limited Partner will recognize gain or loss for U.S. federal income tax purposes on a complete liquidation of its Interest equal to the difference, if any, between the cash received upon such complete liquidation (including any constructive distribution resulting from a reduction in such Limited Partner's allocable share of the Fund's liabilities, including the Fund's allocable share of any Investment Fund liabilities) and the Limited Partner's adjusted tax basis attributable to such Limited Partner's Interest. For this purpose, a Limited Partner's adjusted tax basis in its Interest includes any adjustment to such adjusted tax basis as a result of such Limited Partner's distributive share of the Fund income or loss for the year of such complete withdrawal or sale or exchange. Any gain or loss recognized with respect to such complete withdrawal or sale or exchange generally will be treated as capital gain or loss, except that such gain will be treated as ordinary income to the extent the proceeds of the complete withdrawal or sale or exchange are attributable to such Limited Partner's allocable share of the Fund's "unrealized receivables" (including, for this purpose, any accrued but unpaid "market discount," as discussed below, with respect to any securities held by the Fund) or certain inventory, as defined in Section 751 of the Code. Any capital gain or loss recognized on a complete withdrawal or a sale or exchange of an Interest will be long-term capital gain or loss if such Interest has been held by the Limited Partner for more than one year.

### *Limitations on Deductibility of Fund Losses*

A Limited Partner is entitled to deduct its allocable share of Fund losses, if any, only to the extent of such Limited Partner's adjusted tax basis in its Interest as of the end of the Fund's taxable year in which such loss occurred, and the recognition of any excess would be deferred until such time as the recognition of such loss would not reduce the Limited Partner's adjusted tax basis in its Interest below zero.

In addition, individuals and certain closely-held corporations are allowed to deduct their allocable share of Fund losses, if any, for U.S. federal income tax purposes, only to the extent such Limited Partner is "at risk" with respect to its Interest as of the end of the Fund's taxable year in which such loss occurred. The amount for which a Limited Partner is "at risk" with respect to its Interest generally is equal to its

adjusted tax basis for such Interest, less any amounts borrowed (i) in connection with its acquisition of such Interest for which the Limited Partner is not personally liable and for which it has pledged no property other than its Interest, (ii) from persons who have a proprietary interest in the Fund and from certain persons related to such persons, or (iii) for which the Limited Partner is protected against loss through nonrecourse financing, guarantees or similar arrangements. To the extent that a Limited Partner's allocable share of Fund losses is not allowed because such Limited Partner has an insufficient amount at risk in the Fund, such disallowed losses may be carried over by the Limited Partner to subsequent taxable years and will be allowed as a deduction (subject to any other applicable limitations) if and to the extent of the Limited Partner's at risk amount in subsequent taxable years.

### Treatment of Income and Loss Under the Passive Activity Loss Rules

The Code restricts individuals, certain non-corporate taxpayers and certain closely-held corporations from deducting losses from a "passive activity" against certain income that is not derived from a passive activity, such as salary or other earned income, active business income and "portfolio income" (*i.e.*, interest, dividends and non-business capital gains). The investment activities of the Fund will not constitute a "passive activity," and therefore, a Limited Partner's passive activity losses (as defined for U.S. federal income tax purposes) from other sources generally will not be deductible against such Limited Partner's allocable share of Fund items of income or gain.

### Limited Deduction for Certain Expenses

Under the Code, non-corporate taxpayers may deduct "miscellaneous itemized deductions" (which include investment expenses) only to the extent such deductions exceed, in the aggregate, 2% of a taxpayer's adjusted gross income. In addition, the Code further restricts the ability of individuals with adjusted gross income in excess of a specified amount (the "*AGI Threshold*") to deduct such miscellaneous itemized deductions. Under this limitation, investment expenses in excess of 2% of the taxpayer's adjusted gross income may only be deducted to the extent such excess expenses, when combined with certain of the taxpayer's other miscellaneous deductions, exceed the lesser of (i) 3% of the taxpayer's adjusted gross income in excess of the AGI Threshold and (ii) 80% of the amount of certain itemized deductions otherwise allowable for the taxable year (the "*Phase-out*"). For taxable years beginning in 2009, the amount of miscellaneous itemized deductions disallowed under the Phase-out is reduced by two-thirds of the amount that would otherwise be disallowed, and the Phase-out does not apply to any taxable years beginning after 2009. In addition, investment expenses are miscellaneous itemized deductions which are not deductible by a non-corporate taxpayer in calculating its alternative minimum tax liability.

The Fund may be treated as trader or as an investor for U.S. federal income tax purposes. If the General Partner determines that the Fund is an investor for U.S. federal income tax purposes, the Fund will treat the Management Fee, as well as the other ordinary expenses of the Fund (including interest paid or accrued by the Fund), as investment expenses, subject to the 2% floor and the Phase-out. If, however, the General Partner determines that the Fund is a trader for U.S. federal income tax purposes, the Fund will treat the Management Fee, as well as the other ordinary expenses of the Fund (including interest paid or accrued by the Fund), as ordinary business deductions not subject to the 2% floor or the Phase-out. Even if the General Partner determines that the Fund is a trader, the IRS could contend that the Fund should be characterized as an investor and that such expenses are subject to the aforementioned limitations on deductibility.

### Limitation on Deductibility of Interest on Investment Indebtedness

Limited Partners that are individuals or other non-corporate taxpayers are allowed to deduct interest paid or accrued by the Fund on indebtedness (so-called "investment interest") only to the extent

of each such Limited Partner's net investment income for the taxable year. A Limited Partner's net investment income generally is the excess, if any, of the Limited Partner's investment income from all sources (which generally is gross income from property held for investment) over investment expenses from all sources (which generally are non-interest deductions allowed that are directly connected with the production of investment income). Investment income excludes net capital gain attributable to the disposition of property held for investment (and therefore would not include any capital gains of the Fund allocated to the Limited Partner) and any qualified dividend income, unless the Limited Partner elects to pay tax on such gain at ordinary income rates.

To the extent that a Limited Partner's allocable share of Fund investment interest is not allowed as a deduction because the Limited Partner has insufficient net investment income, such disallowed investment interest may be carried over by the Limited Partner to subsequent taxable years and will be allowed if and to the extent of the Limited Partner's net investment income in subsequent years. If a Limited Partner borrows to finance the purchase of Interests, any interest paid or accrued on the borrowing will be investment interest that is subject to these limitations. Because the amount of a Limited Partner's allocable share of investment interest that is subject to this limitation will depend on the Limited Partner's aggregate investment interest and net investment income from all sources for any taxable year, the extent, if any, to which Fund investment interest will be disallowed under this limitation will depend upon each Limited Partner's particular circumstances.

### Organizational and Syndication Expenses

Organizational expenses of the Fund are not currently deductible, but may, at the election of the Fund be amortized over a period of 180 months. Syndication expenses of the Fund (*i.e.*, expenditures made in connection with the marketing and issuance of interests, including placement fees) are neither deductible nor amortizable.

### Nature of Investments

As discussed above under "*Investment Objectives and Strategies*," the Fund (through the Fund Managers) will engage in a wide variety of investments, which may include sophisticated financial and derivative instruments, the proper tax treatment of which may not be entirely free from doubt. In addition, the investment practices of the Fund Managers generally may be subject to special and complex U.S. federal income tax provisions that may, among other things, (i) disallow, suspend or otherwise limit the allowance of certain losses or deductions, (ii) convert lower taxed long-term capital gain into higher taxed short-term capital gain or ordinary income, (iii) convert an ordinary loss or deduction into a capital loss (the deductibility of which is more limited), (iv) cause the Fund to recognize income or gain without a corresponding receipt of cash, (v) adversely affect the timing as to when a purchase or sale of stock or securities is deemed to occur, and/or (vi) adversely alter the characterization of certain complex financial transactions. The following discussion is a summary of material U.S. federal income tax consequences to taxpayers generally of certain of the investments and transactions that the Fund (directly or indirectly) may make or enter into. The U.S. federal income tax consequences associated with these and other investments will depend upon the specific facts and circumstances associated with, and the specific terms of, such investments and transactions. The following discussion is not intended to describe the tax consequences of any specific investment of the Fund.

General. Subject to the treatment of certain currency exchange gains and losses and certain other transactions giving rise to ordinary income or loss (discussed below), the Fund expects that its gains and losses from its investments (and its allocable share of the gains and losses of each Investment Fund) will be capital gains and losses. These capital gains and losses may be long-term or short-term, depending, in general, upon the length of time that the Fund (or applicable Investment Fund) maintains a particular

("FATCA") impose a 30% withholding tax on certain payments received by foreign financial institutions, their affiliates and certain other foreign entities, unless the payee entity agrees to comply with certain due diligence, reporting and related requirements with respect to its account holders and, in some cases, the owners of its debt and equity securities. Persons located in a jurisdiction that has entered into an intergovernmental agreement with the U.S. governing FATCA (an "IGA") may be subject to different rules. Withholding under FATCA began to apply to certain payments of U.S. source income such as interest and dividends paid on or after July 1, 2014, and is expected to apply to gross proceeds from the sale of most U.S. securities on or after January 1, 2019. Accordingly, the Fund may be required to withhold under FATCA on distributions or other payments to investors that fail to comply with the applicable requirements of FATCA or to timely certify as to such compliance. A U.S. Investor will generally be required to provide to the Fund a properly completed and duly executed IRS Form W-9 (or applicable substitute form). A Non-U.S. Investor will generally be required to provide to the Fund a properly completed and duly executed applicable IRS Form W-8 and information which identifies its direct and indirect U.S. ownership. Any such information provided to the Fund will be shared with the IRS. An investor that fails to provide such information to the Fund will be subject to the 30% withholding tax with respect to its share of any such payments attributable to actual and deemed U.S. investments of the Fund and the General Partner may take any action in relation to such Limited Partner to ensure that such withholding is economically borne by the relevant investor whose failure to provide the necessary information or take any necessary action gave rise to the withholding. Investors should consult their own tax advisers regarding the possible implications of this legislation and the impact of any applicable IGA on their investments in the Fund.

Gain and Loss on Section 1256 Contracts. The Code generally applies a mark-to-market system of taxing unrealized gains and losses with respect to "Section 1256 contracts" (generally, certain regulated futures contracts, certain foreign currency contracts and certain options contracts). Under these rules, each Section 1256 contract held by the Fund (or an Investment Fund in which the Fund invests) as of the end of each taxable year will be treated as if it were sold by the Fund (or applicable Investment Fund) for its fair market value as of the last day of such taxable year. The net gain or loss, if any, resulting from such deemed sales, together with any gain or loss resulting from any actual sales of Section 1256 contracts, must be taken into account by the Fund (or applicable Investment Fund) in computing its taxable income for such year. If a Section 1256 contract held at the end of the taxable year is sold in a subsequent taxable year, the amount of any gain or loss realized on such sale is adjusted to reflect gain or loss previously taken into account under the mark-to-market rules. In general, 60% of the net gain or loss which is generated by transactions in Section 1256 contracts is treated as long-term capital gain or loss and the remaining 40% of such net gain or loss is treated as short-term capital gain or loss (the "*60/40 Rule*"), provided, however, that the 60/40 Rule does not apply to any gain or loss with respect to a Section 1256 contract that would otherwise be treated as ordinary income in the absence of the 60/40 Rule (*e.g.*, gains and losses from certain foreign currency contracts; see "*Non-U.S. Currency Gains and Losses*" below).

Non-U.S. Currency Gains or Losses. If the Fund (directly or indirectly) makes an investment or obtains financing denominated in a currency other than the U.S. dollar, the Fund may recognize gain or loss attributable to fluctuations in such currency relative to the U.S. dollar. The Fund may also recognize gain or loss on such fluctuations occurring between the times it obtains and disposes of a non-U.S. currency, between the times it accrues and collects income denominated in a non-U.S. currency, or between the times it accrues and pays liabilities denominated in a non-U.S. currency. Such gains or losses generally will be treated as ordinary income or loss.

Income from Investments in Non-U.S. Corporations. The Fund (directly or indirectly) may invest

in non-U.S. corporations that could be classified as "passive foreign investment companies" or "controlled foreign corporations" (each, as defined for U.S. federal income tax purposes). For U.S. federal income tax purposes, these investments may, among other things, cause a Limited Partner to recognize taxable income without a corresponding receipt of cash, to incur an interest charge on taxable income that is deemed to have been deferred and/or to recognize ordinary income that would have otherwise been treated as capital gains.

Straddles. The Code contains special rules which apply to "straddles," defined generally as the holding of "offsetting positions with respect to personal property." In general, certain positions will be treated as offsetting if there is a substantial diminution in the risk of loss from holding one position by reason of holding one or more other positions. If two (or more) positions constitute a straddle, recognition of a realized loss from one position must be deferred to the extent of unrecognized gain in an offsetting position. In addition, long-term capital gain may be re-characterized as short-term capital gain and short-term capital loss as long-term capital loss. Interest and other carrying charges allocable to personal property that is part of a straddle are not currently deductible but instead must be capitalized. For purposes of applying the straddle rules, if a Limited Partner takes into account gain or loss with respect to a position held by the Fund (directly or indirectly), the Limited Partner will be treated as holding the Fund's position, except as otherwise provided in the Regulations. Accordingly, positions held by the Fund (directly or indirectly) may limit the deductibility of realized losses sustained by a Limited Partner with respect to positions held for such Limited Partner's own account or through other investment vehicles, and positions held by a Limited Partner for such Limited Partner's own account or through other investment vehicles may limit its ability to deduct realized losses sustained by the Fund (directly or indirectly).

Foreign Taxes and Foreign Tax Credits. Interest and dividends paid on, and capital gains on the sale or exchange of, securities of foreign issuers held by the Fund (directly or indirectly) may be subject to taxes imposed by a foreign country. Pursuant to Regulations under section 704(b) of the Code, foreign tax credits generally must be allocated in proportion to a Limited Partner's distributive share of income to which the foreign tax credits relate. Subject to the requirements and limitations imposed by the Code, Limited Partners may elect to claim their allocable share of any such foreign taxes paid by, or withheld from payments to, the Fund as a foreign tax credit against their U.S. federal income tax liability. Limited Partners who do not elect to claim a foreign tax credit may claim a deduction for their allocable share of such foreign taxes (subject to other applicable limitations on the deductibility of such foreign taxes).

**Alternative Minimum Tax**

In certain circumstances, individuals, corporations and other taxpayers may be subject to an alternative minimum tax in addition to regular U.S. federal income tax. A Limited Partner's potential alternative minimum tax liability may be affected by reason of an investment in the Fund. The extent, if any, to which the alternative minimum tax applies will depend on each Limited Partner's particular circumstances for each taxable year.

**Tax-Exempt Investors**

In general, qualifying tax-exempt organizations, including pension and profit-sharing plans, are exempt from U.S. federal income taxation. This general exemption from tax does not apply to the UBTI of a tax-exempt organization. UBTI includes income from an unrelated trade or business and income from property as to which there is acquisition indebtedness. The Fund (directly or indirectly) may borrow funds or otherwise incur indebtedness in order to conduct its investment activities and to pay expenses. If the Fund (directly or indirectly) incurs any "acquisition indebtedness" with respect to its investments, a Tax-Exempt Investor would recognize UBTI under the debt-financed income rules of Section 514 of the Code with respect to all or a portion of the income derived from such investments. In addition, a Tax-Exempt

Investor may recognize UBTI with respect to any fees actually or deemed to be received by the Fund or any Investment Fund.

Each Tax-Exempt Investor should consult its tax advisor regarding the tax consequences of an investment in the Fund, including the potential recognition of UBTI as a result of the Fund's direct or indirect borrowing activities.

### Contributions In Kind

The General Partner, in its sole discretion, may accept subscriptions from Limited Partners in the form of digital assets. In advance of any subscription, subscriber should be aware that there are certain risks associated with an in kind contribution of digital assets, including Section 721(b) of the Internal Revenue Code which overrides the non-recognition of gain that normally applies to such contributions to partnerships, in the case of certain contributions to 'investment companies' that results in a 'diversification' of the investor's interests. The tax issues involved are complex and depend on the facts of a situation. For this reason, any subscriber seeking to undertake an in kind contribution to the Partnership, is advised to consult with a tax professional in advance of any such in kind contribution.

To the extent that the contribution of appreciated digital assets is accepted as a subscription to the Partnership, a contributing Limited Partner will be asked to provide the Partnership the acquisition date and tax basis of such digital asset, as well as any other information regarding such digital asset as shall be required by the General Partner.

In regards to allocations profit and loss, a Limited Partner that contributes property other than cash to the Partnership will be specially allocated items of income, deduction, gain, loss or credit attributable to such property to the extent of the difference, if any, between the book value and the adjusted tax basis of the property at the time of such contribution. There can be no assurance, however, that the particular methodology of allocations used by the Partnership will be accepted by the IRS. If such allocations are successfully challenged by the IRS, the allocation of the Partnership's tax items among the Limited Partners may be affected.

*Distributions within Two Years.* If a partner who has contributed appreciated property to a partnership receives a distribution of any other property or cash within two years of the contribution, based on the applicable facts and circumstances, the distribution may cause the Limited Partner to recognize gain as of the original date of contribution with respect to his or her contributed digital assets under the "disguised sale" provisions of Section 707(a)(2)(B) of the Code. Limited Partners should consult their own tax advisors concerning whether such redemptions within two years of the contribution of property should be treated as "disguised sales" for these purposes. Regulations require a Limited Partner who does not treat such redemptions as "disguised sales" to disclose such person's tax treatment of those items to the Service.

*Effect on Contributing Limited Partner of Distribution of Digital Assets to Contributing Limited Partner within Seven Years of the Date of Contribution.* If a Limited Partner contributes appreciated digital assets to the Partnership and, within seven years of the date of contribution, that Limited Partner receives a distribution of any property other than such Limited Partner's contributed digital assets, such Limited Partner generally will be required to recognize gain upon the receipt of such other property. The amount of the gain is equal to the least of (a) the excess of the fair market value of the distributed property over the adjusted tax basis of such Limited Partner's interest in the Partnership immediately before the distribution, reduced by the amount of money received in the distribution; (b) the excess of the fair market value of such Limited Partner's contributed digital assets over their adjusted tax basis at the time they were contributed to the Partnership or (c) the excess of the fair market value of such Limited

Partner's contributed digital assets over their adjusted tax basis in the hands of the Partnership, at the time of the distribution of such other property. Limited Partners should note that, in the event of a distribution of digital assets to a Limited Partner, the Partnership may not be able to distribute such Limited Partner's contributed digital assets to the redeeming Limited Partner.

*Effect on Contributing Limited Partner of Distribution of Digital Assets to "Non- Contributing" Limited Partner within Seven Years of the Date of Contribution.* If Contributed digital assets are distributed within seven years of the date of contribution to any Limited Partner other than the Limited Partner who contributed such digital asset ("Shifted Digital Asset"), the contributing Limited Partner must generally recognize a taxable gain or loss in the year of distribution. The amount of such gain or loss would generally equal the lesser of (a) the difference between the fair market value of the Shifted Digital Asset at the time such Shifted Digital Asset had been contributed to the Partnership and the contributing Limited Partner's tax basis in such Shifted Digital Asset or (b) the difference between the fair market value of the Shifted Digital Asset and their adjusted tax basis in the hands of the Partnership at the time of their distribution.

### Reportable Transactions

A participant in a "reportable transaction" is required to disclose its participation in such transaction by filing IRS Form 8886 ("***Reportable Transaction Disclosure Statement***"). In addition, a "material advisor" with respect to such transaction is required to (i) maintain a list containing certain information with respect to such transaction (including the participants with respect to whom the material advisor acted in such capacity) and (ii) file an information return that identifies and describes the transaction and any potential tax benefits expected to result from the transaction. The failure to comply with such rules can result in substantial penalties.

The General Partner cannot predict whether any of the Fund's transactions (directly or indirectly) will subject it, the Fund or any of the Limited Partners to the aforementioned requirements. However, if the General Partner (or any material advisor) determines that any such transaction causes either of them or the Fund to be subject to the aforementioned requirements, the General Partner will, and will cause the Fund to, fully comply with such requirements. Prospective investors should consult with their tax advisors regarding the applicability of these rules to their investment in the Fund.

### Reports to Partners

The Fund will provide Schedule K-1s to Limited Partners as soon as practicable after receipt of all of the necessary information. The Fund may not be able to provide final Schedule K-1s to Limited Partners for any given taxable year until after April 15 of the following year. Accordingly, Limited Partners should be prepared to obtain extensions to the initial due date for their income tax returns at the federal, state and local level.

### Fund Tax Returns and Audits

The tax treatment of partnership-related items is determined at the Fund level rather than at the Limited Partner level and each Limited Partner is required to treat Fund items on its U.S. federal income tax returns consistently with the treatment of the items on the Fund's tax return, as reflected on the Schedule K-1s, unless such Limited Partner files a statement with the IRS disclosing the inconsistency. The IRS may audit the Fund tax returns at the Fund level in a single proceeding rather than separate proceedings with each Limited Partner. The General Partner, as the "***Tax Matters Partner***" for the Fund, would represent the Fund at any such audit, and generally has considerable authority to make decisions affecting the tax treatment and procedural rights of all Limited Partners. In addition, the General Partner

generally may also enter into settlement agreements that bind the Limited Partners (unless, under certain circumstances, a Limited Partner affirmatively acts to contest the proposed adjustments under such settlement agreement on such Limited Partner's own behalf), and generally have the authority to extend the statute of limitations relating to all Limited Partners' tax liabilities with respect to the Fund. There can be no assurance that the Fund's tax return will not be audited by the IRS or that no adjustments to such tax returns will be made as a result of such an audit.

### *State and Local Taxes*

A Limited Partner may be subject to tax return filing obligations and income, franchise and other taxes in state or local jurisdictions in which the Fund operates or is deemed to operate, as well as in such Limited Partner's own state or locality of residence or domicile. In addition, the Fund itself may be subject to tax liability in certain jurisdictions in which it operates or is deemed to operate. Furthermore, a Limited Partner may be subject to tax treatment in such Limited Partner's own state or locality of residence or domicile different than that described above with respect to its Interest. Prospective investors should consult their tax advisors regarding the possible applicability of state or local taxes to an investment in the Fund.

The foregoing discussion should not be considered to describe fully the U.S. federal, state, local and other tax consequences of an investment in the Fund. Each prospective investor in the Fund should consult its tax advisor regarding the U.S. federal, state, local and other tax consequences of an investment in the Fund in light of their particular circumstances.

## CERTAIN CONSIDERATIONS FOR ERISA PLANS

**CIRCULAR 230 NOTICE - THE FOLLOWING NOTICE IS BASED ON U.S. TREASURY REGULATIONS GOVERNING PRACTICE BEFORE THE U.S. INTERNAL REVENUE SERVICE: (1) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN, INCLUDING ANY OPINION OF COUNSEL REFERRED TO HEREIN, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER; (2) ANY SUCH ADVICE IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED HEREIN (OR IN ANY SUCH OPINION OF COUNSEL); AND (3) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

THE FOLLOWING SUMMARY OF CERTAIN ASPECTS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED (**"*ERISA*"**) IS BASED UPON ERISA, JUDICIAL DECISIONS, DEPARTMENT OF LABOR REGULATIONS AND RULINGS IN EXISTENCE ON THE DATE HEREOF. THIS SUMMARY IS GENERAL IN NATURE AND DOES NOT ADDRESS EVERY ERISA ISSUE THAT MAY BE APPLICABLE TO THE FUND OR A PARTICULAR INVESTOR. ACCORDINGLY, EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN COUNSEL IN ORDER TO UNDERSTAND THE ERISA ISSUES AFFECTING THE FUND AND THE INVESTOR.

### *General*

Persons who are fiduciaries with respect to a U.S. employee benefit plan or trust within the meaning of and subject to the provisions of ERISA (an "***ERISA Plan***"), an individual retirement account

or a Keogh plan subject solely to the provisions of the Code[1] (an "***Individual Retirement Fund***") should consider, among other things, the matters described below before determining whether to invest in the Fund.

ERISA imposes certain general and specific responsibilities on persons who are fiduciaries with respect to an ERISA Plan, including prudence, diversification, avoidance of prohibited transactions and compliance with other standards. In determining whether a particular investment is appropriate for an ERISA Plan, U.S. Department of Labor ("***DOL***") regulations provide that a fiduciary of an ERISA Plan must give appropriate consideration to, among other things, the role that the investment plays in the ERISA Plan's portfolio, taking into consideration whether the investment is designed reasonably to further the ERISA Plan's purposes, the risk and return factors of the potential investment, including the fact that the returns may be subject to federal tax as unrelated business taxable income, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the ERISA Plan, the projected return of the total portfolio relative to the ERISA Plan's funding objectives, and the limitation on the rights of Limited Partners to redeem all or any part of their Interests or to transfer their Interests. Before investing the assets of an ERISA Plan in the Fund, a fiduciary should determine whether such an investment is consistent with its fiduciary responsibilities and the foregoing regulations. For example, a fiduciary should consider whether an investment in the Fund may be too illiquid or too speculative for a particular ERISA Plan and whether the assets of the ERISA Plan would be sufficiently diversified. If a fiduciary with respect to any such ERISA Plan breaches its responsibilities with regard to selecting an investment or an investment course of action for such ERISA Plan, the fiduciary may be held personally liable for losses incurred by the ERISA Plan as a result of such breach.

### *Plan Assets Defined*

ERISA and applicable DOL regulations describe when the underlying assets of an entity in which benefit plan investors ("***Benefit Plan Investors***") invest are treated as "plan assets" for purposes of ERISA. Under ERISA, the term Benefit Plan Investors is defined to include an "employee benefit plan" that is subject to the provisions of Title I of ERISA, a "plan" that is subject to the prohibited transaction provisions of Section 4975 of the Code, and entities the assets of which are treated as "plan assets" by reason of investment therein by Benefit Plan Investors.

Under ERISA, as a general rule, when an ERISA Plan invests assets in another entity, the ERISA Plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, when an ERISA Plan acquires an "equity interest" in an entity that is neither: (a) a "publicly offered security;" nor (b) a security issued by an investment fund registered under the Company Act, then the ERISA Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that: (i) the entity is an "operating company;" or (ii) the equity participation in the entity by Benefit Plan Investors is limited.

Under ERISA, the assets of an entity will not be treated as "plan assets" if Benefit Plan Investors hold less than 25% (or such higher percentage as may be specified in regulations promulgated by the DOL) of the value of each class of equity interests in the entity. Equity interests held by a person with discretionary authority or control with respect to the assets of the entity and equity interests held by a person who provides investment advice for a fee (direct or indirect) with respect to such assets or any affiliate of any such person (other than a Benefit Plan Investor) are not considered for purposes of determining whether the assets of an entity will be treated as "plan assets" for purposes of ERISA. The Benefit Plan Investor percentage of ownership test applies at the time of an acquisition by any person of

---

[1] References hereinafter made to ERISA include parallel references to the Code.

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

the equity interests. In addition, an advisory opinion of the DOL takes the position that a redemption of an equity interest by an investor constitutes the acquisition of an equity interest by the remaining investors (through an increase in their percentage ownership of the remaining equity interests), thus triggering an application of the Benefit Plan Investor percentage of ownership test at the time of the redemption.

### Limitation on Investments by Benefit Plan Investors

It is the current intent of the General Partner to monitor the investments in the Fund to ensure that the aggregate investment by Benefit Plan Investors does not equal or exceed 25% of the value of any class of the Interests in the Fund (or such higher percentage as may be specified in regulations promulgated by the DOL) so that assets of the Fund will not be treated as "plan assets" under ERISA. Interests held by the General Partner and its affiliates are not considered for purposes of determining whether the assets of the Fund will be treated as "plan assets" for the purpose of ERISA. The Limited Partnership Agreement contains certain safeguards to ensure that the assets of Benefit Plan Investors are not considered "plan assets" for the purposes of ERISA and these should be review by any prospective Benefit Plan Investor.

### Representations by Plans

An ERISA Plan proposing to invest in the Fund will be required to represent that it is, and any fiduciaries responsible for the ERISA Plan's investments are, aware of and understand the Fund's investment objectives, policies and strategies, and that the decision to invest plan assets in the Fund was made with appropriate consideration of relevant investment factors with regard to the ERISA Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

WHETHER OR NOT THE ASSETS OF THE FUND ARE TREATED AS "PLAN ASSETS" UNDER ERISA, AN INVESTMENT IN THE FUND BY AN ERISA PLAN IS SUBJECT TO ERISA. ACCORDINGLY, FIDUCIARIES OF ERISA PLANS SHOULD CONSULT WITH THEIR OWN COUNSEL AS TO THE CONSEQUENCES UNDER ERISA OF AN INVESTMENT IN THE FUND.

## ADDITIONAL INFORMATION

### Legal Counsel

Dzuba Law, P.A., a Florida professional association with principal place of business at 1101 Brickell Avenue South Tower #8, Miami, Florida 33131 ("Dzuba Law") currently serves as counsel to the Fund in connection with the offering of limited partnership interests. Dzuba Law also acts as counsel to the General Partner and Investment Manager. In connection with the Fund's offering of limited partnership interests and subsequent advice to the General Partner and Investment Manager, Dzuba Law will not be representing Limited Partners of the Fund. No independent counsel has been retained to represent Limited Partners of the Fund. Dzuba Law's principal, Peter Dzuba, Esq., as well as of Counsel to Dzuba Law, Brandon Esposito, collectively hold a 5% equity stake in the General Partner. Such equity stake is associated with certain limited reasonable ongoing legal representation at no additional fee for the General Partner, which is in the best interests of the General Partner. In light of this equity stake and agreement, it is foreseeable that Dzuba Law will continue to serve as legal counsel of the General Partner, the Investment Manager, and of the Fund as long as the Fund is in existence.

### Additional Notices

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

As noted in the "Summary of Principal Terms" section above, this Memorandum does not set forth all the provisions of the Limited Partnership Agreement that may be significant to a particular prospective investor. It is qualified in its entirety by reference to the Limited Partnership Agreement, the Subscription Agreement and the other documents described herein. Each prospective investor should examine this Memorandum and those Agreements carefully, and consult with his or her own advisors, before making an investment decision.

Prospective investors have a right to inquire about, and request and receive, any additional information they may deem appropriate or necessary to further evaluate this Offering and to make an investment decision. Representatives of the General Partner may prepare written responses to such inquiries or requests if the information requested is available. Only information or representations contained herein may be relied upon as having been authorized by the General Partner. No person has been authorized to give any information or to make any representations other than those contained in the Memorandum in connection with the offer being made hereby, and if given or made, such information or representations must not be relied upon as having been authorized by the General Partner. The use of any oral representations or any written documents other than those prepared and expressly authorized by the General Partner in connection with this Offering are not to be relied upon by any prospective investor. The information presented is as of the date on the cover hereof unless another date is specified, and neither the delivery of this Memorandum nor any sale hereunder shall create any implication that there has been no change in the information presentation subsequent to such date(s). Please contact the General Partner directly if you have any questions or require additional information.

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

**EXHIBIT A**
**LIMITED PARTNERSHIP AGREEMENT**

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

**EXHIBIT B**
**SUBSCRIPTION AGREEMENT**

# EXHIBIT D
## Limited Partnership Agreement

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

**FIRST AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP**


**BKCOIN CAPITAL LP**

dated as of


**AUGUST 28, 2020**

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

# FIRST AMENDED AND RESTATED
# LIMITED PARTNERSHIP AGREEMENT
# OF
# BKCOIN CAPITAL LP

This FIRST AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT (this "Agreement") of BKCOIN CAPITAL LP, a Delaware limited partnership (the "Partnership"), is entered into as of August 28, 2020, by and among BKCOIN MANAGEMENT, LLC, a Delaware limited liability company, as the General Partner and those additional parties who sign copies of this Agreement to become limited partners, and that have been or shall be admitted as Limited Partners in accordance with the terms of this Agreement.

## RECITALS

WHEREAS, the General Partner formed the Partnership pursuant to a certificate of limited partnership of the Partnership (the "**Certificate of Limited Partnership**") filed with the Secretary of State of the State of Delaware on March 5, 2018; and

WHEREAS, on November 30, 2018 the first Limited Partnership Agreement was entered into, which was subsequently amended and restated on August 28, 2020, and which sets forth the rights and obligations of the parties hereto.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01  Definitions.** Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.01.

"**Advisers Act**" means the Investment Advisers Act of 1940, as amended from time to time.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly (including through one or more intermediaries), controls, is controlled by or is under common control with such person. The term "control" means (a) the legal or beneficial ownership of securities representing a majority of the voting power of any Person or (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

"**Aggregate Contributions**" means the sum of the Capital Contributions to the Fund.

"**Agreement**" means this Limited Partnership Agreement, as it may be amended, modified, supplemented, or restated from time to time, as provided herein.

"**AML Laws**" has the meaning set forth in Section 11.05(a).

1

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

"**Assumed Tax Rate**" means the highest effective marginal combined federal, state, and local income tax rate for a Fiscal Year prescribed for an individual residing in New York, New York, taking into account the character (for example, long-term or short-term capital gain, ordinary or exempt) of the applicable income.

"**Available Assets**" means, for any period, the excess of (a) Distributable Cash and other property to be distributed pursuant to Section 8.01 and Temporary Investments over (b) the sum of (i) Investment Expenses, (ii) amounts paid or payable in respect of any loan or other Indebtedness of the Partnership and (iii) the amount of reserves established by the General Partner as contemplated by Section 3.02(n).

"**Bankruptcy**" means, with respect to any Person, the occurrence of any of the following: (a) the filing of an application by such Person for, or consent to, the appointment of a trustee of such Person's assets; (b) the filing by such Person of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Person's inability to pay its debts as they come due; (c) the making by such Person of a general assignment for the benefit of such Person's creditors; (d) the filing by such Person of an answer admitting the material allegations of, or such Person's consenting to, or defaulting in answering a bankruptcy petition filed against, such Person in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Person a bankrupt or appointing a trustee of such Person's assets.

"**BBA**" means the Bipartisan Budget Act of 2015.

"**BBA Procedures**" has the meaning set forth in Section 10.02.

"**Benefit Plan Investor**" means a limited partner that is any of the following:

(a) an "employee benefit plan" within the meaning of Section 3(3) of ERISA that is subject to Title I of ERISA;

(b) a "plan" within the meaning of, and subject to, Section 4975 of the Code; or

(c) any person or entity whose assets are deemed to include the assets of any such "employee benefit plan" or "plan" under the Plan Asset Rules or otherwise for purposes of Section 406 of ERISA or Section 4975 of the Code.

"**Book Depreciation**" means, with respect to any Partnership asset for each Fiscal Year, the Partnership's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the General Partner in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g)(3).

"**Book Value**" means, with respect to any Partnership asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a) the initial Book Value of any Partnership asset contributed by a Partner to the Partnership shall be the gross Fair Market Value of such Partnership asset as of the date of such contribution;

2

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

(b) immediately prior to the distribution by the Partnership of any Partnership asset to a Partner, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such distribution;

(c) the Book Value of all Partnership assets shall be adjusted to equal their respective gross Fair Market Values, as reasonably determined by the General Partner, as of the following times:

(i) the acquisition of an additional Interest in the Partnership by a new or existing Partner in consideration of a Capital Contribution of more than a *de minimis* amount;

(ii) the distribution by the Partnership to a Partner of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Partner's Interest;

(iii) the liquidation of the Partnership within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g);

(iv) provided, that adjustments pursuant to Subclauses (i), (ii) and (iii) above need not be made if the General Partner reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Partners and that the absence of such adjustment does not adversely and disproportionately affect any Partner;

(d) the Book Value of each Partnership asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Partnership asset pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), provided, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to Paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this Paragraph (d); and

(e) if the Book Value of a Partnership asset has been determined pursuant to Paragraph (a) or adjusted pursuant to Paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Partnership asset for purposes of computing Net Income and Net Losses.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized or required to close.

"**Capital Account**" has the meaning set forth in Section 6.04.

"**Capital Contribution**" means, with respect to each Partner, the amount the Partner has contributed to the Partnership pursuant to the terms of this Agreement.

"**Carried Interest Distributions**" means all amounts distributed to the General Partner pursuant to Section 8.01(b) and 12.02 (to the extent made in accordance with the priorities of Sections 8.01(b)) and advances to the General Partner pursuant to Section 8.02.

"**Cause**" means a final determination by a court of competent jurisdiction or a government body, that the General Partner or any of its Affiliates has committed a willful act constituting bad faith, fraud, gross negligence, willful misconduct, a violation of federal securities laws, breach of fiduciary duty, or a material breach of this Agreement that has a material adverse effect on the business of the Partnership.

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

"**Certificate of Cancellation**" has the meaning set forth in <u>Section 12.02(d)</u>.

"**Closing**" means the Initial Closing or any Subsequent Closing, as the case may be.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Covered Person**" means the General Partner (including, without limitation, the General Partner in its role as Tax Matters Partner and, if applicable, in its capacity as a special limited partner or a former general partner), the Investment Manager, each of their Affiliates, any officers, directors, managers, employees, shareholders, partners, members, agents and consultants of any of the foregoing.

"**Delaware Act**" means the Delaware Revised Uniform Limited Partnership Act (6 Del. C. § 17) and any successor statute, as amended from time to time.

"**Disposition**" means, with respect to any Portfolio Investment, the sale, exchange or other disposition by the Partnership of all or any portion of that Portfolio Investment for cash or in exchange for Marketable Securities or other assets, including but not limited to, cryptocurrencies.

"**Distributable Cash**" means all cash received by the Partnership relating to the Portfolio Investments or Temporary Investments other than Capital Contributions, including, without limitation, income, dividends, distributions, interest and proceeds from the Disposition of a Portfolio Investment and any other miscellaneous receipts or revenues of the Partnership related directly to Portfolio Investments held by the Partnership, to the extent that such cash constitutes Available Assets.

"**ECI**" means "effectively connected income" as defined in Section 864 of the Code or income treated as "effectively connected" under Section 897 of the Code.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Partner**" means any Limited Partner that is a Benefit Plan Investor and any other Limited Partner to the extent that the General Partner has agreed to treat such Limited Partner as an ERISA Partner.

"**Expert**" has the meaning set forth in <u>Section 4.09(b)</u>.

"**Fair Market Value**" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the General Partner based on such factors as the General Partner, in the exercise of its reasonable business judgment, considers relevant.

"**Fair Value**" means the fair value of any Interest or Portfolio Investment, as determined in good faith by the General Partner or, in the case of <u>Section 4.09</u> and <u>4.10</u>, as determined by an Expert, using generally accepted valuation methods. All valuations shall be made taking into account all relevant factors that might reasonably affect the sales price of the Interest or Portfolio Investment in question. For all purposes of this Agreement, all valuations made in accordance with the foregoing shall be final and conclusive on the Fund, the Fund Investors, the General Partner, and their successors and assigns, absent manifest error.

"**Fiscal Year**" means the calendar year, unless the Partnership is required to have a taxable year other than the calendar year, in which case the Fiscal Year shall be the period that conforms to its taxable year.

"**Foreign Taxes**" has the meaning set forth in <u>Section 7.01(c)</u>.

4

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

"**Fund**" means the Partnership.

"**Fund Investor**" means a Limited Partner or General Partner that has invested money into the Fund.

"**General Partner**" means BKCOIN MANAGEMENT LLC or any other Person who becomes a successor general partner pursuant to the terms of this Agreement.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Indebtedness**" means, with respect to any Person, (a) (i) all indebtedness of such Person for borrowed money or for the deferred purchase price of property, goods or services, (ii) all other obligations, contingent or otherwise, of such Person for the repayment of borrowed money in the form of surety bonds, letters of credit and bankers' acceptances whether or not matured, and (iii) all net payment obligations under hedges and other derivative contracts and similar financial instruments, (b) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments, (c) all capital lease obligations of such Person and (d) all indebtedness referred to in clause (a), (b) or (c) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness (and thus such indebtedness is not an obligation of such Person).

"**Initial Closing**" means the first Closing at which a Limited Partner was admitted to the Partnership.

"**Interest**" means the partnership interest of a Partner in the Partnership at any particular time, including the right of such Partner to any and all benefits to which such Partner may be entitled as provided in this Agreement or under the Delaware Act, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement and of the Delaware Act.

"**Investment Company Act**" means the Investment Company Act of 1940, as amended.

"**Investment Expenses**" means the sum of (a) the Investment Management Fee, (b) Organizational Expenses and (c) Operating Expenses.

"**Investment Management Agreement**" has the meaning set forth in Section 9.01.

"**Investment Management Fee**" has the meaning set forth in Section 9.02.

"**Investment Management Fee Commencement Date**" has the meaning set forth in Section 9.02.

"**Investment Manager**" means BKCOIN MANAGEMENT LLC engaged by the Fund in accordance with the Investment Management Agreement.

"**Key Person**" means, each of CARLOS BETANCOURT and KEVIN KANG, and any replacement for any such person replaced in accordance with Section 4.04.

"**Legal Violation**" has the meaning set forth in Section 11.05(a).

"**Limited Partner**" means any limited partner admitted to the Partnership in accordance with the terms of this Agreement.

"**Liquidator**" has the meaning set forth in Section 12.02(a).

"**Loss Recovery Account**" has the meaning set forth in Section 9.04.

"**Majority in Interest**" means Limited Partners or Fund Investors, as applicable, the aggregate value of whose Capital Account balances represents greater than Fifty Percent (50%) of the aggregate value of the Capital Account balances of all Limited Partners or Fund Investors, as applicable. Except as otherwise specifically provided herein, the Limited Partners or the Fund Investors, as applicable, shall be considered to constitute a single class or group, the vote of which shall be counted together for purposes of granting any consent of a Majority in Interest pursuant to this Agreement or the Delaware Act.

"**Marketable Securities**" means Securities that (a) are tradable on an established national U.S. or non-U.S. stock exchange or reported through NASDAQ or a comparable established non-U.S. over-the-counter trading system and (b) are not subject to restrictions on transfer under the Securities Act or contractual restrictions on transfer.

"**NASDAQ**" means The Nasdaq Stock Market LLC.

"**Net Asset Value**" or "**NAV**" shall have the meaning set forth in Article XV.

"**Net Income or Net Loss**" means, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Partnership's taxable income or taxable loss, or particular items thereof, determined in accordance with Section 703(a) of the Code (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or taxable loss), but with the following adjustments:

(a) any income realized by the Partnership that is exempt from federal income taxation, as described in Section 705(a)(1)(B) of the Code, shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b) any expenditures of the Partnership described in Section 705(a)(2)(B) of the Code, including any items treated under Treasury Regulation Section 1.704-1(b)(2)(iv)(i) as items described in Section 705(a)(2)(B) of the Code, shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c) any gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d) any items of depreciation, amortization and other cost recovery deductions with respect to Partnership property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(e) if the Book Value of any Partnership property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

6

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

(f)  to the extent an adjustment to the adjusted tax basis of any Partnership property pursuant to Sections 732(d), 734(b) or 743(b) of the Code is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"**Non-Public Information**" has the meaning set forth in Section 17.14(b).

"**Nonrecourse Deductions**" mean nonrecourse deductions as described in Treasury Regulation Section 1.704-2(c).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(3).

"**Non-United States Limited Partner**" means a Limited Partner that is not a "United States person" as that term is defined in Section 7701(a)(30) of the Code.

"**Operating Expenses**" means, except as otherwise specifically provided in this Agreement, the Partnership's *pro rata* share of all third-party costs and expenses of maintaining the operations of the Fund and appraising and valuing, acquiring, maintaining, financing, hedging and disposing of Portfolio Investments, including, without limitation, taxes, fees and other governmental charges levied against the Fund; insurance; administrative and research fees; expenses of custodians, outside advisors, counsel (including Partnership Counsel), accountants, auditors, administrators and other consultants and professionals; technological expenses; interest on and fees, costs and expenses arising out of all financings entered into by the Fund (including, without limitation, those of lenders, investment banks, and other financing sources); travel expenses; brokerage commissions; custodial expenses; litigation expenses (including the amount of any judgments or settlements paid in connection therewith); winding up and liquidation expenses; expenses incurred in connection with any tax audit, investigation, settlement or review; the costs of any services provided by the General Partner or its Affiliates in accordance with Section 4.02; expenses associated with meetings the Fund Investors and the preparation and distribution of reports, financial statements, tax returns and K-1s to the Fund Investors; indemnification and other unreimbursed expenses; and any extraordinary expenses to the extent not reimbursed or paid by insurance, but specifically excluding the Investment Management Fee, the Performance Allocation, and Organizational Expenses.

"**Organizational Expenses**" means the Partnership's *pro rata* share of all out-of-pocket expenses incurred in connection with the organization and formation of the General Partner, the Partnership, and other related entities organized by the General Partner or its Affiliates and the offering of the interests therein, including, without limitation, legal and accounting fees and expenses; printing costs; filing fees; and the transportation, meal, and lodging expenses of the personnel of the General Partner and the Investment Manager.

"**Partner(s)**" means, as the context may require, some or all of the General Partner and the Limited Partners.

"**Partner Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulation Section 1.704-2(b)(4).

"**Partner Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Partnership Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if the Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation Section 1.704-2(i)(3).

7

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

"**Partner Nonrecourse Deductions**" mean "partner nonrecourse deductions" as defined in Treasury Regulation Section 1.704-2(i)(2).

"**Partnership**" means the limited partnership referred to in this Agreement, as it may from time to time be constituted.

"**Partnership Counsel**" has the meaning set forth in <u>Section 17.13</u>.

"**Partnership Minimum Gain**" means for any Fiscal Year of the Partnership the "partnership minimum gain" as determined in accordance with Treasury Regulation Section 1.704-2(b)(2) and Section 1.704-2(d).

"**Partnership Representative**" has the meaning set forth in <u>Section 10.02(a)</u>.

"**Percentage Interest**" means, as to any Partner, a fraction, expressed as a percentage, equal to the amount of the Capital Account balance of such Partner divided by the total Capital Account balances of all Partners, as may be adjusted from time to time in accordance with the provisions of this Agreement.

"**Performance Allocation**" shall have the meaning set forth in <u>Section 9.03</u> below.

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"**Placement Agent**" means any placement agent, financial advisor, or finder retained by the General Partner in connection with the offering and sale of the Interests.

"**Plan Asset Rules**" mean Department of Labor regulation 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA, as modified or amended from time to time.

"**Portfolio Company**" means a Person whose Securities have been acquired, directly or indirectly, in whole or in part, by the Partnership, other than through a Temporary Investment.

"**Portfolio Investments**" mean investments in Securities of a Portfolio Company, commodities, futures contracts, or other assets not considered Securities, commodities, or futures contracts, including but not limited to, cryptocurrencies, in each case made (directly or indirectly) by the Partnership. The assets that the Partnership may invest in are extremely broad, and are set forth in greater detail in the Private Placement Memorandum (as defined below).

"**Prime Rate**" means, on any day, the annual rate of interest for such day published by *The Wall Street Journal* as the "U.S. Prime Rate" and, if not published by *The Wall Street Journal*, then the rate of interest publicly announced from time to time by any money center bank as its prime rate in effect at its principal office, as notified in writing by the General Partner to the Limited Partners.

"**Private Placement Memorandum**" means the Confidential Private Placement Memorandum of the Fund, with event date herewith, as amended and/or supplemented from time to time.

"**Regulations**" mean the final or temporary regulations of the United States Department of Treasury promulgated under the Code, and any successor regulations.

"**Securities**" means shares of capital stock, partnership interests, limited liability company interests, warrants, options, bonds, notes, debentures and other equity and debt instruments of any kind of any Person.

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

"**Securities Act**" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

"**Service**" means the U.S. Internal Revenue Service, a branch of the U.S. Treasury Department.

"**Similar Law**" means any federal, state, local or foreign law or regulation that would cause the underlying assets of the Partnership to be treated similar to "plan assets" under the Plan Asset Rules and impose on the General Partner, Investment Manager (or other Persons responsible for the operation and management of the Partnership and investment of the Partnership's assets) responsibilities similar to those of a "fiduciary" within the meaning of ERISA, and/or subject the Partnership to restrictions on investment activities and other dealings similar to the prohibited transaction rules under Title I of ERISA or Section 4975 of the Code.

"**Subscription Agreement**" means the agreement executed and delivered by a Limited Partner pursuant to which it makes a Capital Contribution to the Partnership and agrees to be bound by the terms of this Agreement, a form of which is attached hereto as Exhibit A.

"**Subsequent Closing**" means a Closing that occurs after the Initial Closing, at which any additional Fund Investor is admitted to the Partnership.

"**Substitute Limited Partner**" has the meaning set forth in Section 11.03.

"**Successor Fund**" has the meaning set forth in Section 4.05.

"**Tax Exempt Limited Partner**" means a Limited Partner that is exempt from United States federal income taxation, including a partner that is exempt under Section 501 of the Code.

"**Tax Matters Partner**" has the meaning set forth in Section 10.02(a).

"**Taxing Authority**" means any federal, state, local or foreign taxing authority.

"**Temporary Investments**" has the meaning set forth in Section 3.02(k).

"**Transfer**" means to directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, all or a portion of an Interest or beneficial ownership thereof. "Transfer" when used as a noun shall have a correlative meaning.

"**UBTI**" means "unrelated business taxable income" within the meaning of Section 512 of the Code, determined without regard to the special rules contained in Section 512(a)(3) of the Code that are applicable solely to organizations described in paragraphs (7), (9), (17) or (20) of Section 501(c) of the Code.

"**Valuation Policy**" has the meaning set forth in Article XV.

"**Withdrawal Date**" has the meaning set forth in Section 11.05(a).

"**Withholding Advances**" has the meaning set forth in Section 8.03(b).

**Section 1.02 Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement

as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Exhibits and Schedules mean the Articles and Sections of, and the Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

# ARTICLE II
# GENERAL PROVISIONS

**Section 2.01 Formation and Continuation.** The Partnership was formed as a limited partnership under the laws of the State of Delaware on March 5, 2018 by the filing of the Certificate of Limited Partnership with the Secretary of State of the State of Delaware by the General Partner, as required by the Delaware Act. The parties agree to continue the Partnership as a limited partnership pursuant to the Delaware Act. The General Partner is authorized to take all action necessary or appropriate to comply with all applicable requirements for the operation of the Partnership as partnership in the State of Delaware and in all other jurisdictions in which the Partnership may elect to conduct business.

**Section 2.02 Name.** The name of the Partnership is BKCOIN CAPITAL LP. The General Partner is authorized to make any variations in the Partnership's name that the General Partner may deem necessary or advisable to comply with the laws of any jurisdiction in which the Partnership may elect to conduct business; *provided*, that such name as varied shall be a name permitted for a limited partnership under the Delaware Act.

**Section 2.03 Principal Office.** The principal place of business and office of the Partnership is located at 1101 Brickell Avenue South Tower #8, Miami, Florida 33131, or such other place or places as the General Partner may from time to time designate. The General Partner may establish such additional places of business of the Partnership in such other jurisdictions as it may from time to time determine. The General Partner shall provide notice to the Limited Partners of any change in the Partnership's principal place of business.

**Section 2.04 Registered Office; Registered Agent.**

(a) The registered office of the Partnership shall be the office of the initial registered agent named in the Certificate of Limited Partnership or such other office (which need not be a place of business of the Partnership) as the General Partner may designate from time to time in the manner provided by the Delaware Act.

(b) The registered agent for service of process on the Partnership in the State of Delaware shall be the initial registered agent named in the Certificate of Limited Partnership or such other Person or Persons as the General Partner may designate from time to time in the manner provided by the Delaware Act.

**Section 2.05 Term.** The term of the Partnership commenced on the date the Partnership's certificate of limited partnership was filed with the Secretary of State of the state of Delaware and shall continue in full force and effect through the date of dissolution and termination of the Partnership as provided in Article XII. At such time as the Partnership is terminated, the General Partner, or if a different Person, the Liquidator, shall file a Certificate of Cancellation as required by the Delaware Act.

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

**Section 2.06 Conflict between Agreement and Statute.** This Agreement shall constitute the "limited partnership agreement" (as that term is used in the Delaware Act) of the Partnership. The rights, powers, duties, obligations, and liabilities of the Partners shall be determined pursuant to the Delaware Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Partner are different by reason of any provision of this Agreement than they would be under the Delaware Act in the absence of such provision, this Agreement shall, to the extent permitted by the Delaware Act, control.

# ARTICLE III
# PURPOSE AND BUSINESS

**Section 3.01 Purpose.** The Partnership is formed for the object and purpose of and the nature of the business to be conducted by the Partnership is, engaging in any lawful act or activity for which limited partnerships may be formed under the Delaware Act and engaging in any and all activities necessary or incidental to the foregoing. The Partnership shall have the power and authority to do any and all acts necessary or convenient to or in furtherance of the Partnership's purpose, including all power and authority, statutory or otherwise, possessed by or which may be conferred on, limited partnerships under the laws of the State of Delaware.

**Section 3.02 Authorized Activities.** In carrying out the purposes of this Agreement, the Partnership and the General Partner, acting on behalf of the Partnership, shall have all powers necessary, suitable or convenient thereto, including, without limitation, the power and authority to do or cause to be done, or not to do, any and all acts deemed by the General Partner in good faith to be necessary or appropriate in furtherance of the purposes of the Partnership including, without limitation, the power and authority to:

(a) acquire, invest in, hold, pledge, manage, sell, transfer, operate, or otherwise deal in or with the Portfolio Investments;

(b) open, maintain, and close bank, brokerage, and money market accounts and draw checks and other orders for the payment of moneys;

(c) borrow money or otherwise incur Indebtedness for any Partnership purpose, enter into credit facilities, issue evidences of Indebtedness and guarantees, and secure any such evidences of Indebtedness and guarantees by pledges or other liens on assets of the Partnership;

(d) hire consultants, advisors, custodians, attorneys, accountants, placement agents, and such other agents and employees of the Partnership, and authorize each such Person to act for and on behalf of the Partnership;

(e) enter into, perform and carry out contracts and agreements of any kind necessary, advisable or incidental to the accomplishment of the purposes of the Partnership;

(f) bring, sue, prosecute, defend, settle, or compromise actions and proceedings at law or in equity or before any Governmental Authority;

(g) have and maintain one or more offices and in connection therewith to rent or acquire office space and to engage personnel;

(h) execute, deliver, and perform all agreements in connection with the sale of Interests, including but not limited to the Subscription Agreements and any side letters with one or more Limited Partners;

11

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

(i)  form one or more subsidiary corporations or partnerships or other entities;

(j)  pay the fee described in 9.02;

(k)  (i) make investments in (A) marketable direct obligations issued or unconditionally guaranteed by the United States, or issued by any agency thereof, maturing within one year from the date of acquisition; (B) money market instruments, commercial paper or other short-term debt obligations rated Aa or P-1 (or the equivalent thereof) or better by Moody's Investors Service Inc. or A-1 (or its equivalent) or better by Standard & Poor's Corporation; (C) certificates of deposit maturing within one year from the date of acquisition, money market accounts, savings accounts, checking accounts, or any combination thereof in banks, in each case, which have total assets of $100,000,000 or more; and (D) any other assets or Securities that the General Partner reasonably determines are appropriate for short term investments (collectively "**Temporary Investments**") and (ii) in connection with its Portfolio Investments, enter into derivative contracts and other financial instruments for the purpose of hedging such Portfolio Investments;

(l)  make any and all elections under the Code or any state or local tax law (except as otherwise provided herein), including pursuant to Sections 734(b), 743(b), and 754 of the Code, provided that the General Partner shall not cause the Partnership to make an election to be treated as other than a partnership for United States federal income tax purposes;

(m)  take all actions it deems necessary or appropriate so that the assets of the Partnership do not constitute "plan assets" for purposes of ERISA and the Plan Asset Rules;

(n)  maintain cash reserves for anticipated Investment Expenses, liabilities, and obligations of the Partnership, whether actual or contingent, in such amounts as the General Partner in its reasonable discretion deems necessary or advisable;

(o)  issue a written Certificate of Limited Partnership to a Limited Partner upon the Fund's approval of the Limited Partner's subscription to the Fund;

(p)  in the future, enter into arrangements with other investment funds managed by the General Partner with the same or substantially similar investment objectives as those of the Partnership to either allow other funds to contribute their assets to the Partnership to invest, or to pursue investment activities by investing all or a portion of the Partnership's assets in a "Master Fund";

(q)  issue classes of limited partnership interests pursuant to Section 6.10 below; and

(q)  carry on any other activities necessary to, in connection with, or incidental to, any of the foregoing or the Partnership's investment and other activities.

**Section 3.03  Operating Expenses.**

Except as otherwise provided, and subject to any limits in this Agreement, the Partnership will pay all Operating Expenses, and will reimburse the General Partner or any of its Affiliates, as applicable, for its payment of Operating Expenses. Notwithstanding the foregoing and except as otherwise specifically provided in this Agreement, neither the General Partner nor the Investment Manager shall be reimbursed for any costs and expenses relating to the general operation of their businesses.

# ARTICLE IV
# THE GENERAL PARTNER
12

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

**Section 4.01  Management and Authority.**

(a)  Subject to the provisions of this Agreement, the General Partner shall have the absolute, exclusive and complete right, power, authority, obligation, and responsibility vested in or assumed by a general partner of a limited partnership under the Delaware Act and as otherwise provided by law, including those necessary to make all decisions regarding the business of the Partnership and to take the actions specified in Section 3.02, and is hereby vested with absolute, exclusive and complete right, power, and authority to operate, manage, and control the affairs of the Partnership and carry out the business of the Partnership.

(b)  The General Partner shall have the authority to bind the Partnership to any obligation consistent with the provisions of this Agreement. Subject to, and except as otherwise provided in Section 4.02, the General Partner may contract with any Person for the transaction of the business of the Partnership, and the General Partner shall use reasonable care in the selection and retention of such Persons. The General Partner may delegate the management, operation, and control of the Partnership to the Investment Manager to the fullest extent permitted by law, provided that any such delegation shall not relieve the General Partner of its obligations to the Limited Partners under this Agreement.

(c)  The General Partner may rely in good faith on and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties.

(d)  The General Partner may consult with legal counsel (including Partnership Counsel), accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it with reasonable care, and shall not have any liability to the Partnership or any other Partner for any act taken or omitted to be taken in good faith reliance upon the opinion or advice of such Persons.

(e)  The General Partner will use reasonable efforts to minimize the incurrence of income that is treated as UBTI for Tax Exempt Limited Partners or ECI for Non-United States Limited Partners to the extent consistent with its goal of maximizing pre-tax income. The incurrence of UBTI or ECI by the Partnership shall in no way indicate that the General Partner has failed to comply with this covenant.

**Section 4.02  Transactions with Affiliates.**

(a)  Except as otherwise provided in Section 4.02(b), the General Partner shall not cause the Partnership or its subsidiaries to enter into any transaction with the General Partner or its Affiliates (including acquiring all or a portion of a Portfolio Investment from or selling a Portfolio Investment to the General Partner or its Affiliates) or any transaction pursuant to which the General Partner or its Affiliates will receive compensation.

(b)  Notwithstanding anything to the contrary set forth in Section 4.02(a), the General Partner may:

(i)  cause the Partnership or its subsidiaries to enter into agreements with Affiliates of the General Partner for services relating to the Portfolio Investments, for compensation and on terms that are typically available in arm's-length transactions; *provided*, that each such agreement shall provide that it may be terminated by the Partnership without penalty upon the removal or withdrawal of the General Partner;

(ii)  cause the Partnership to enter into the Investment Management Agreement as provided in Section 9.01;

13

(iii) receive the amounts described in <u>Section 9.02</u> and <u>Section 9.03</u>; and

(iv) cause the Partnership to make Portfolio Investments in accordance with the terms of this Agreement with Successor Funds, or other funds and accounts controlled by the General Partner..

## Section 4.03  Liability for Acts and Omissions.

(a) To the fullest extent permitted by applicable law, no Covered Person shall be liable, in damages or otherwise, to the Partnership, the Limited Partners, or any of their Affiliates for any act or omission in connection with or in any way relating to the Partnership's business or affairs and matters related to Portfolio Investments (including, without limitation, any act or omission performed or omitted by such Covered Person in accordance with the provisions of this Agreement or in good faith reliance upon the opinion or advice of experts selected with reasonable care by the General Partner), except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgment or order that such act or omission resulted from in the case of any Covered Person, such Covered Person's bad faith, gross negligence, willful misconduct, fraud or a material breach of this Agreement or the Investment Management Agreement. The provisions of this Agreement, to the extent that such provisions expressly restrict or eliminate the duties (including fiduciary duties) and liabilities of a Covered Person otherwise existing at law or in equity are agreed by the Partners to replace such other duties and liabilities of such Covered Person.

(b) To the fullest extent permitted by applicable law, the Partnership shall and does hereby agree to indemnify and hold harmless each Covered Person from and against any damages, costs, losses, claims, liabilities, actions, and expenses (including reasonable legal and other professional fees and disbursements and all expenses reasonably incurred investigating, preparing, or defending against any claim whatsoever, judgment, fines, and settlements (collectively "**Indemnification  Obligations**") incurred by such Covered Person arising out of or relating to this Agreement, the Investment Management Agreement, or any entity in which the Partnership invests (including, without limitation, any act or omission as a director, officer, manager or member of an Affiliate of the Partnership), except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgment or order that such act or omission resulted from such Covered Person's bad faith, gross negligence, willful misconduct, fraud or a material breach of this Agreement or the Investment Management Agreement. The indemnity set forth herein shall not apply to an internal dispute among the Covered Persons to which the Partnership is not a party. The provisions set forth in this <u>Section 4.03(b)</u> shall survive the termination of this Agreement.

(c) No Covered Person shall be liable to the Partnership or any Limited Partner for, and the Partnership shall also indemnify and hold harmless each Covered Person from and against any and all Indemnification Obligations suffered or sustained by such Covered Person by reason of, any acts or omissions of any broker or other agent of the Partnership unless such broker or agent was selected, engaged, or retained by such Covered Person and the standard of care exercised by such Covered Person in such selection, engagement or retention constituted bad faith, gross negligence, willful misconduct, fraud, or a material breach of this Agreement or the Investment Management Agreement.

(d) The satisfaction of any indemnification pursuant to this <u>Section 4.03</u> shall be from and limited to Partnership assets.

(e) Expenses reasonably incurred by a Covered Person in defense or settlement of any claim that may be subject to a right of indemnification hereunder shall be advanced by the Partnership prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of such Covered Person to repay

14

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

such amount to the extent that it is ultimately determined that such Covered Person is not entitled to be indemnified hereunder. The termination of a proceeding or claim against a Covered Person by settlement or a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that any Covered Person's conduct constituted bad faith, gross negligence, willful misconduct, fraud, or a material breach of this Agreement or the Investment Management Agreement.

(f)  The right of any Covered Person to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which such Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Covered Person's heirs, successors, and assigns.

(g)  Any Person entitled to indemnification from the Partnership hereunder shall initially seek recovery under any other indemnity or any insurance policies maintained the Partnership by which such Person is indemnified or covered, as the case may be, but only to the extent that the applicable indemnitor or insurer provides (or acknowledges its obligation to provide) such indemnity or coverage on a timely basis. A Covered Person other than the General Partner shall obtain the written consent of the General Partner (which shall not be unreasonably withheld) prior to entering into any compromise or settlement which would result in an obligation of the Partnership to indemnify such Person. If liabilities arise out of the conduct of the affairs of the Partnership and any other Person for which the Person entitled to indemnification from the Partnership hereunder was then acting in a similar capacity, the amount of the indemnification provided by the Partnership shall be limited to the Partnership's proportionate share thereof as determined in good faith by the General Partner.

(h)  The General Partner may, but shall not be required to, cause the Partnership to purchase and maintain insurance coverage reasonably satisfactory to the General Partner that provides the Partnership with coverage with respect to losses, claims, damages, liabilities, and expenses that would otherwise be Indemnification Obligations. The fees and expenses incurred in connection with obtaining and maintaining any such insurance policy or policies, including any commissions and premiums, shall be Operating Expenses.

**Section 4.04 Key Persons.**  So long as BKCOIN MANAGEMENT LLC or any of its Affiliates is the General Partner, the General Partner shall cause the Key Persons to devote the required amount of their business time and attention to the investment and other activities of the Fund. At any time and from time to time, the General Partner may replace any of the Key Persons with substitute Key Persons.

**Section 4.05 Successor Funds.**  The General Partner shall itself, or via any of its Affiliates, have the right, without any prior approval of Fund Investors, to hold closings with third party investors on behalf of another pooled investment fund, for which the General Partner or its Affiliate acts as a manager or the primary source of transactions, with objectives substantially similar to those of the Partnership (a "**Successor Fund**").

**Section 4.06 Other Activities.**  The General Partner and its Affiliates and the Fund Investors and their respective Affiliates may engage in or possess an interest in other business ventures of every nature and description for their own account, independently or with others, whether or not such other enterprises shall be in competition with any activities of the Partnership. None of the Partnership, the Fund Investors, and the General Partner shall have any right by virtue of this Agreement in and to such independent ventures or to the income or profits derived therefrom.

**Section 4.07 Miscellaneous Revenues.**  Except for any fees authorized, acknowledged or approved in accordance with this Agreement, the General Partner shall apply the Partnership's *pro rata* share of any fees paid by third parties to the General Partner or its Affiliates arising from the Partnership's Portfolio Investments or potential Portfolio Investments to offset, pay or reserve for the payment of Investment Expenses (or repay any credit facility drawdowns used to pay the same) or to offset the next installment of the Investment

Management Fee payable by the Partnership to the Investment Manager under this Agreement. If any such fees exceed such next installment of the Investment Management Fee payable by the Partnership to the Investment Manager under this Agreement, the excess shall be carried forward for offset against future installments of such Investment Management Fees. To the extent any such fees have not been set off against the Investment Management Fee payable by the Partnership to the Investment Manager under this Agreement prior to the liquidation of the Partnership, such excess fees shall be remitted to the Partnership by the General Partner immediately prior to liquidation.

**Section 4.08  Transfer or Withdrawal by the General Partner.** The General Partner shall not have the right to Transfer its Interest as the general partner of the Partnership and shall not have the right to withdraw from the Partnership, provided, that, without the consent of any Limited Partner, the General Partner may, at its own expense, (a) be reconstituted as or converted into a corporation or other form of entity (any such reconstituted or converted entity being deemed to be the General Partner for all purposes hereof) by merger, consolidation, conversion, or otherwise or (b) transfer all of its Interest as the general partner of the Partnership to one of its Affiliates so long as, in either case, such reconstitution or Transfer does not have material adverse tax or legal consequences for the Fund Investors. In the event of a Transfer of all of its Interest as a general partner of the Partnership in accordance with this <u>Section 4.08</u> its transferee shall be substituted in its place as general partner of the Partnership and immediately thereafter the General Partner shall withdraw as the general partner of the Partnership and the business of the Partnership shall be continued without dissolution.

**Section 4.09  Bankruptcy or Dissolution of the General Partner.**

(a) Upon the Bankruptcy or dissolution of the General Partner, (i) the General Partner or its legal representative shall give notice to the Fund Investors of such event and shall automatically, with or without delivery of such notice, become a special Limited Partner with no power, authority, or responsibility to bind the Partnership or to make decisions concerning, or manage or control, the affairs of the Partnership, and the Partnership's certificate of limited partnership shall be amended to reflect such fact, and (ii) such Person as may be selected and approved by consent of a Majority in Interest of the Limited Partners within 90 days of the date of the Bankruptcy or dissolution of the General Partner shall be admitted to the Partnership as a successor to the General Partner (effective as of the date of the Bankruptcy or dissolution of the General Partner) and such successor shall continue the business of the Partnership without dissolution. If a successor to the General Partner is not approved to be admitted to the Partnership (effective as of the date of the Bankruptcy or dissolution of the General Partner) by consent of a Majority in Interest of the Limited Partners within such 90-day period, the Partnership shall dissolve in accordance with <u>Article XII</u>. The General Partner shall not take any action seeking its voluntary dissolution.

(b) In the case of a conversion of the General Partner to a special Limited Partner and continuance of the Partnership without dissolution, the Majority in Interest of the Limited Partners shall select an Expert reasonably acceptable to the special Limited Partner and such Expert shall determine the Fair Value of the General Partner's Interest as of the date of the Bankruptcy or dissolution of the General Partner, taking into account all Net Income, Net Loss, gains, deductions, distributions and other credits and charges to which the General Partner was and would have been entitled under this Agreement if all Portfolio Investments of the Partnership were sold on the effective date of such Bankruptcy or dissolution for their Fair Value and the proceeds were distributed on such date in accordance with <u>Section 8.01</u>. Thereafter, the General Partner, in its capacity as a special Limited Partner, shall be entitled to a percentage of all future Net Income, Net Loss, gains, deductions, distributions and other credits and charges of the Partnership arising from the Portfolio Investments held as of the date of the Bankruptcy or dissolution of the General Partner equal to the quotient of (x) the Fair Value of the General Partner's Interest as of the date of the Bankruptcy or dissolution of the General Partner divided by (y) the amounts that would have been available for distribution to all Partners as of such date, in each case as determined by the Expert.

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

The determinations of the Expert shall be final and conclusive. The fees and expenses of the Expert retained pursuant to this Section 4.9 shall be borne by the General Partner.

**Section 4.10   Removal of the General Partner.**

(a)  The Fund Investors may, at any time upon a finding of Cause, by unanimous approval of the Fund Investors, send notice to the General Partner that the General Partner will be removed as the general partner of the Partnership pursuant to this Section 4.10, provided that such removal shall not become effective until a successor to the General Partner is admitted pursuant to Section 4.12.

(b)  The Majority in Interest of the Limited Partners shall select an Expert reasonably acceptable to the removed General Partner and such Expert shall determine the Fair Value of the removed General Partner's Interest as of the effective date of the removal, taking into account all Net Income, Net Loss, gains, deductions, distributions and other credits and charges to which the General Partner was and would have been entitled under this Agreement if all Portfolio Investments of the Partnership were sold on the effective date of such removal of the General Partner for their Fair Value and the proceeds were distributed on such date in accordance with Section 8.01. The determinations of the Expert shall be final and conclusive. The fees and expenses of the Expert retained pursuant to this Section 4.10(b) shall be borne by the General Partner.

(c)  Promptly upon the disclosure by the Expert of the Fair Value of the General Partner's Interest, the removed General Partner's Interest shall be converted to that of a special Limited Partner. Following such conversion, the special Limited Partner shall not be entitled to vote with the Limited Partners upon any matter that requires the consent of the Limited Partners or the Fund Investors under this Agreement or the Delaware Act.

(d)  The special Limited Partner shall be entitled to a percentage of all future Net Income, Net Loss, distributions and other credits and charges of the Partnership arising from the Portfolio Investments held as of the date of removal equal to the quotient of (x) the value of the General Partner's Interest as of the date of removal divided by (y) the amounts which would be available for distribution to all Partners as of such date, in each case as determined by the Expert.

**Section 4.11   Obligations of a Former General Partner.** In the event that the General Partner withdraws from the Partnership or Transfers its Interest, in each case, in accordance with Section 4.08 or has its Interest redeemed in accordance with Section 4.09 or 4.10, it shall have no further obligation or liability as a general partner to the Partnership pursuant to this Agreement in connection with any obligations or liabilities arising from and after such withdrawal, Transfer, redemption or conversion, and all such future obligations and liabilities shall automatically cease and terminate and be of no further force or effect, provided that nothing contained herein shall be deemed to relieve the General Partner of any obligations or liabilities (a) arising prior to such withdrawal, Transfer, redemption, or conversion or (b) resulting from a dissolution of the Partnership caused by an act of the General Partner where liability is imposed upon the General Partner by law or by the provisions of this Agreement, provided, further, that the General Partner shall continue to be indemnified in accordance with Section 4.03 with respect to the activities of the Partnership prior to such Transfer.

**Section 4.12   Successor to the General Partner.**

(a)  Following the proposed withdrawal or removal of the General Partner, any Fund Investor may propose for admission a successor General Partner. If a successor General Partner proposed pursuant to this Section 4.12 satisfies the terms and conditions set forth in Section 4.12(b), then such proposed successor General Partner shall become the successor General Partner as of the date of withdrawal or removal of the General Partner and shall thereupon continue the Partnership's business.

(b) A Person shall be admitted as a successor General Partner only if the following terms and conditions are satisfied:

(i) except as permitted by Section 4.08, the admission of such Person shall have been approved by consent of a Majority in Interest of the Limited Partners;

(ii) the Person shall have accepted and agreed to be bound by all the terms and provisions of this Agreement by executing a counterpart hereof and thereof and such other documents or instruments as may be required or appropriate in order to effect the admission of such Person as a general partner of the Partnership; and

(iii) the Partnership's certificate of limited partnership shall be amended to reflect the admission of such Person as a general partner (or managing member, as applicable).

(c) If, within 90 calendar days of the date of the General Partner's withdrawal or removal, a Majority in Interest of the Limited Partners has not approved the admission of a successor General Partner, effective as of the date of the General Partner's withdrawal or removal, then the Partnership shall thereupon terminate and dissolve in accordance with Article XII.

**Section 4.13 Use of Name.** Promptly after the date the General Partner withdraws or is removed, the name of the Partnership will be changed to omit reference to "BKCOIN" and no further use of "BKCOIN" or any derivations thereof, including the appropriate trademark and service mark symbol will be permitted by the Partnership, the successor General Partner or any other Person in relation to the activities of the Partnership. The Partnership and each direct or indirect subsidiary shall file amendments to their certificates of limited partnership or other similar documents, take all further action necessary to remove the word "BKCOIN" from each such entity's name.

# ARTICLE V
# LIMITED PARTNERS

**Section 5.01 No Participation in Management of the Partnership.** No Limited Partner shall participate in the management or control of the business and affairs of the Partnership or have any authority or right to act on behalf of the Partnership in connection with any matter or the transaction of any business. No Limited Partner shall have any rights and powers with respect to the Partnership, except as provided in the Delaware Act or by this Agreement. The exercise of any of the rights and powers of the Limited Partners pursuant to the Delaware Act or the terms of this Agreement shall not be deemed taking part in the day-to-day affairs of the Partnership or the exercise of control over the business and affairs of the Partnership.

**Section 5.02 Limitation on Liability.** No Limited Partner shall have any obligation to contribute any amounts to the Partnership other than the Capital Contribution(s) it has already made to the Fund, and as otherwise provided in this Agreement and the Delaware Act, and the liability of each Limited Partner shall be limited to such amounts. No Limited Partner shall be obligated to repay to the Partnership, any Partner or any creditor of the Partnership all or any portion of the amounts distributed to such Limited Partner.

**Section 5.03 Power of Attorney.**

(a) Each Limited Partner hereby irrevocably constitutes and appoints the General Partner, with full power of substitution, as its true and lawful attorney-in-fact (which appointment shall be deemed to be coupled with an interest) and agent, to execute, acknowledge, verify, swear to, deliver, record and file, in its or its

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

assignee's name, place and stead, all in accordance with the terms of this Agreement:

(i) all certificates and other instruments, and amendments thereto, which the General Partner deems necessary or desirable to form, qualify or continue the Partnership as a limited partnership (or a partnership in which the Limited Partners have limited liability) in all jurisdictions in which the Partnership conducts or plans to conduct its affairs;

(ii) any agreement or instrument which the General Partner deems necessary or desirable to effect (a) the complete or partial Transfer, addition, substitution, withdrawal or removal (voluntary or involuntary) of any Limited Partner or the General Partner pursuant to this Agreement; (b) the dissolution and liquidation of the Partnership in accordance with the provisions of Article XII or (c) any amendment or modification to this Agreement adopted in accordance with Section 16.01;

(iii) all conveyances and other instruments which the General Partner deems necessary or desirable to reflect the dissolution and termination of the Partnership pursuant to Article XII, including the requirements of the Delaware Act;

(iv) certificates of assumed name or fictitious name certificates and such other certificates and instruments as may be necessary under the fictitious or assumed name statutes from time to time in effect in all jurisdictions in which the Partnership conducts or plans to conduct its affairs;

(v) all certificates or other instruments necessary or desirable to accomplish the business, purposes and objectives of the Partnership or required by any applicable law; and

(vi) all other documents or instruments that may reasonably be considered necessary by the General Partner to carry out the foregoing.

(b) Such attorney-in-fact and agent shall not, however, have the right, power, or authority to amend or modify this Agreement when acting in such capacities, except to the extent expressly authorized herein. Each Limited Partner hereby agrees not to revoke this power of attorney. This power of attorney shall terminate upon (i) with respect to such Limited Partner, a Transfer of the Limited Partner's entire Interest in accordance with the terms of this Agreement, and (ii) the removal, Bankruptcy, dissolution, or withdrawal of the General Partner, except that such power of attorney shall remain in effect with respect to any successor General Partner. The power of attorney granted herein shall be irrevocable, shall survive and not be affected by the death, incapacity, dissolution, Bankruptcy or legal disability of the Limited Partner, shall extend to its successors and assigns and may be exercisable by the General Partner by executing any instrument on behalf of the Limited Partner as its attorney-in-fact. To the fullest extent permitted by applicable law, this power of attorney may be exercised by such attorney-in-fact and agent for all Limited Partners (or any of them) by a single signature of the General Partner acting as attorney-in-fact with or without listing all of the Limited Partners executing an instrument. Any Person dealing with the Partnership may conclusively presume and rely upon the fact that any instrument referred to above, executed by the General Partner as attorney-in-fact, is authorized, regular and binding, without further inquiry. If required, each Limited Partner shall execute and deliver to the General Partner, within five (5) Business Days after receipt of a request from the General Partner, such further designations, powers of attorney or other instruments as the General Partner shall determine to be necessary for the purposes hereof consistent with the provisions of this Agreement, including as required by any applicable state statute or other similar legal requirement.

# ARTICLE VI
# INTERESTS; CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

19

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

**Section 6.01  General Partner.**

(a)  The name and address of the General Partner is BKCOIN MANAGEMENT LLC, a Delaware limited liability company, having an address at 1101 Brickell Avenue South Tower #8, Miami, Florida 33131.

(b)  The General Partner may participate in and make Capital Contributions to the Fund, in its sole discretion. There shall be no obligation to make any minimum investment into the Fund on the part of the General Partner.

(c)  The General Partner shall also be a Limited Partner to the extent that it subscribes for or becomes a transferee of all or any part of the Interest of a Limited Partner, and to such extent shall be treated as a Limited Partner in all respects, except as otherwise provided in this Agreement.

**Section 6.02  Limited Partners.** Except as provided in Article XI, a Person shall be admitted as a Limited Partner as of the time of the execution of the Limited Partner's subscription agreement and this Agreement, or when the General Partner holds a Closing with respect to such Person, if applicable. In the discretion of the General Partner, subscriptions to the Partnership may be made in cash or in kind, or partly in cash and partly in kind. Generally such closing shall take place as of the first day of a given month unless otherwise agreed to by the General Partner in its sole discretion. The General Partner shall maintain a record of the name, address, and Capital Contributions of each Limited Partner.

**Section 6.03  Lock Up Period; Redemption of Capital Contributions.** For six (6) months following the date of admission to the Partnership, the Limited Partner shall not be allowed to withdraw or reduce its Capital Contribution made as part of that Closing or any portion of the value of its Capital Account, as adjusted pursuant to Section 6.04 below, from the Fund ("Lock-Up Period"). Following the expiration of the Lock-Up Period, a Limited Partner may redeem any portion of the value of its Capital Account, but only quarterly, either on January 1, April 1, July 1, or October 1 of each year (the "Redemption Dates"). In order for the Limited Partner to be able to exercise this right of redemption, the Limited Partner must provide notice to the General Partner, at least thirty (30) days prior to a Redemption Date that the Limited Partner intends to exercise this right of redemption with regards to that Redemption Date. The notice must also specify what portion of the value of the Limited Partners' Capital Account it intends to redeem. After the notice has been duly received by the General Partner, the Limited Partner shall not be entitled redeem a greater amount on the given Redemption Date than the amount stated in the notice. Withdrawal requests are irrevocable unless the General Partner determines otherwise in its sole and absolute discretion, or unless made during a period when the calculation of the Net Asset Value of the Partnership is suspended. The General Partner may waive notice requirements or permit withdrawals at such other times and under such other circumstances and on such conditions as it deems appropriate.

**Section 6.04  Maintenance of Capital Accounts.** The Partnership shall establish and maintain, for each Partner, a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 6.04. Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)  Each Partner's Capital Account shall be increased by:

(i)  the cash amount of all Capital Contributions made by such Partner to the Partnership;

(ii)  the amount of any Net Income or other item of income or gain allocated to such Partner pursuant to Article VII; and

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

(iii) any liabilities of the Partnership that are assumed by such Partner or secured by any property distributed to such Partner.

(b) Each Partner's Capital Account shall be decreased by:

(i) the cash amount or Book Value of any property distributed to such Partner;

(ii) the amount of any Net Loss or other item of loss or deduction allocated to such Partner pursuant to Article VII; and

(iii) the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership.

**Section 6.05 Interest.** Interest, if any, earned on Partnership funds shall inure to the benefit of the Partnership. The Partners shall not receive interest on their Capital Contributions or Capital Account balances. The General Partner shall have no obligation to keep Partnership funds in an interest-bearing account.

**Section 6.06 Withdrawal of Capital Contributions.** Subject to the General Partner's ability to designate Side Pockets (*as defined below*), provided that the Limited Partner follows all of the requirements of Section 6.03 for the withdrawal of all or a portion of the value of that Limited Partner's Capital Account balance, the General Partner shall remit to the Limited Partner the requested value of its Capital Account, as adjusted pursuant to Section 6.04 and other terms herein (including Section 6.07 below), on the Redemption Date. Except as otherwise provided in this Agreement or by law, no Partner shall have the right to demand and receive property other than property distributed by the Partnership in accordance with the terms hereof in return for its Capital Contributions, and any return of Capital Contributions to the Limited Partners shall be solely from Partnership assets, and the General Partner shall not be personally liable for any such return. Notwithstanding the foregoing, the General Partner shall have the right, at its discretion, to withhold up to 5% of the net asset value of the withdrawn Capital Account for the Partnership's liabilities and other contingencies until no later than 30 days after the completion of the year-end review of the Partnership's financial statements for any withdrawals of 90% or more of a Limited Partner's Capital Account balance (or if a withdrawal, when combined with all other withdrawals of such Limited Partner during the preceding 12 months, would result in such Limited Partner having withdrawn 90% or more of such Limited Partner's Capital Account as of the beginning of such period). In those circumstances, the General Partner will remit the balance of the withdrawal proceeds without interest. The General Partner, in its sole discretion, may effect withdrawal payments in cash or in-kind.

**Section 6.07 Costs and Reserves.** The Partnership, at any time in its discretion and in consultation with the General Partner, may establish reserves for contingencies (including general reserves for unspecified contingencies) which may or may not be in accordance with GAAP. The establishment of such reserves will not insulate any portion of the Partnership's assets from being at risk, and such assets may still be traded by the Partnership. A pro rata portion of any reserve may be withheld from distribution to a withdrawing Limited Partner.

**Section 6.08 Succession Upon Transfer.** In the event that an Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the transferred Interest and shall receive allocations and distributions pursuant to Article VII and Article VIII in respect of such Interest.

**Section 6.09 Restoration of Negative Capital Accounts.** Subject to 5.02, neither the General Partner nor any other Partner shall be obligated to restore any deficit balance in a Partner's Capital Account. A deficit in a Partner's Capital Account shall not constitute a Partnership asset.

**Section 6.10  Admission of Limited Partners After Initial Closing.**  The Limited Partners agree that the General Partner shall have the right to admit additional Limited Partners to the Partnership in one or more Subsequent Closings. The Limited Partners hereby consent to such admission of any additional Limited Partners and agree to take all actions reasonably requested by the General Partner to give effect to the foregoing. The General Partner may admit new Limited Partners to the Fund on the first business day of each month, or other times in its sole discretion. Persons interested in subscribing to the Fund should deliver the Subscription Agreement in substantially the form set forth at <u>Exhibit A</u> at least five (5) days before the intended subscription date.

**Section 6.10  Additional Classes of Interests.**  Notwithstanding anything in this Agreement to the contrary, the General Partner, on its own behalf, or on behalf of the Partnership, is specifically authorized without further consent by anyone to issue additional classes of Limited Partnership Interests which may differ in terms of, among other things, denomination of currency, the fees charged, minimum commitment amounts, withdrawal rights and other rights. Such additional class of Limited Partnership Interests shall be issued pursuant to a Separate Class Agreement. The terms of such classes will be determined by the General Partner in its sole discretion. Should a Limited Partner not be eligible to participate in "New Issues" pursuant to the relevant FINRA rules, then the General Partner, when issuing a class of Limited Partnership Interests pursuant to this <u>Section 6.10</u>, may designate the class additionally as "Restricted".

**Section 6.11  Side Pockets.**  The General Partner may designate certain assets, including investments in pre-ICOs, as "Side Pockets" when the General Partner, in its sole discretion, determines that an asset is illiquid or it is in the best interest of the Partnership to value such investment separately from the Partnership's other assets. If the General Partner designates an asset as a Side Pocket, the Partners of the Partnership at the time of such designation will have a proportionate interest in that investment. The General Partner shall not receive a Performance Allocation with respect to any Side Pocket until the investment is liquidated, and the Limited Partners may not make a withdrawal with respect to a Side Pocket until that event. Side Pockets will be included in the calculation of the Management Fee. Notwithstanding the foregoing, the Partnership's financial statements will reflect the Performance Allocation as if it was earned, treating all assets and liabilities as if they were realized at the reporting date.

# ARTICLE VII
# ALLOCATIONS

**Section 7.01  Allocations of Net Income and Net Loss and Special Allocations.**

(a) **Net Income and Net Loss.**  Except as otherwise provided in this Agreement, for each Fiscal Year (or portion thereof, and at a minimum at the end of each quarter), Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Partnership shall be allocated among the Partners in a manner such that, after giving effect to the special allocations set forth in Sections <u>7.02(c)</u> and <u>(d)</u>, the Capital Account balance of each Partner, immediately after making such allocations, is, as nearly as possible, equal to (i) the Distributions that would be made to such Partner pursuant to <u>Sections 8.01</u> and <u>12.02(c)(iii)</u> if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Partnership liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), and the net assets of the Partnership were Distributed, in accordance with <u>Sections 8.01</u> and <u>12.02(c)(iii)</u>, to the Partners immediately after making such allocations, minus (ii) such Partner's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets. Notwithstanding the foregoing, the General Partner may make such allocations as it deems reasonably necessary to give economic effect

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

to the provisions of this Agreement taking into account such facts and circumstances as the General Partner deems reasonably necessary for this purpose. Along these lines, for the purposes of this Article VII, and notwithstanding anything in this Article VII to the contrary, allocation of net income and net loss, as referenced in Sections 6.04(a)(ii) and 6.04(b)(ii) above respectively, may be made in accordance with Article XV below, and shall equal the pro rata increase or decrease in the Fund's Net Asset Value over the relevant time period, and shall be credited or debited, as the case may be, pro rata to the Capital Accounts of all Fund Investors. Once the General Partner uses this method of allocation, the General Partner shall apply this method consistently across all Partners.

(b) **Investment Management Fees.**  For each Fiscal Year or portion thereof, deductions of the Partnership related to the Investment Management Fee shall be allocated to the Limited Partners in proportion to their respective shares of such fees.

(c) **Withholding and Income Taxes.**  Any withholding or income taxes imposed by any non-United States jurisdiction ("**Foreign Taxes**") (and related tax credits) on items of income, gain, loss, or deduction of the Partnership or incurred directly or indirectly by the Partnership with respect to any investment shall be allocated to each Partner in accordance with each such Partner's respective share of the Capital Account balances attributable to the investment giving rise to income or gains subject to Foreign Taxes. Notwithstanding the foregoing, any increase or decrease in such Foreign Taxes (and related tax credits) resulting from the identity, nationality, residence or status of a Partner, or from the failure of a Partner or its direct or indirect members to provide information as requested pursuant to Section 8.03(a), will be specially allocated to such Partner.

**Section 7.02  Regulatory Allocations.** Notwithstanding the provisions of Section 7.01:

(a) **Minimum Gain Chargeback.**  If there is a net decrease in Partnership Minimum Gain (determined according to Treasury Regulation Section 1.704-2(d)(1)) during any Fiscal Year, each Partner shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Treasury Regulation Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 7.02(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(b) **Partner Minimum Gain Chargeback.**  If there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Partner with a share of such Partner Nonrecourse Debt Minimum Gain (determined according to Treasury Regulation Section 1.704-2(i)(5)) shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain. The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(i)(4) and 1.704-2(j). This Section 7.02(b) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) **Nonrecourse Deductions.**  Nonrecourse Deductions for any Fiscal Year shall be allocated to the Partners in accordance with their respective Percentage Interests.

(d) **Partner Nonrecourse Deductions.**  Partner Nonrecourse Deductions for any Fiscal Year shall be allocated to the Partner or Partners that bear the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in the manner required by Treasury Regulation Section 1.704-2(i).

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

(e) **Qualified Income Offset.**   In the event any Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Partner in an amount and manner sufficient to eliminate the deficit balance in its Capital Account created by such adjustments, allocations, or distributions as quickly as possible. This <u>Section 7.02(e)</u> is intended to comply with the qualified income offset requirement in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(f) **New Issues**. Notwithstanding anything else in this Agreement, the Partnership may specially allocate all or a portion of any item of income, gain, loss and expense arising out of or related to any particular type or types of transaction or asset (including, for example, securities that constitute "new issues" under rules of the Financial Industry Regulatory Authority ("FINRA")) so as to exclude from some or all of those allocations one or more Partners as to whom the General Partner determines that, for reasons agreed or deemed to have been agreed upon between the General Partner and those Partners (including tax or regulatory reasons or reasons based on rules of self-regulatory organizations such as FINRA), it would be inappropriate for those items to be allocated to those Partners to the full extent they would otherwise be allocated to them. In regard to New Issues, the General Partner is authorized to determine, among other things: (i) the manner in which New Issues are purchased, held, transferred and sold by the Partnership and any adjustments with respect thereto; (ii) the Partners who are eligible and ineligible to participate in New Issues; (iii) the method by which profits and losses from New Issues are to be allocated among Partners in a manner that is permitted under the rules of FINRA (including whether the Partnership will avail itself of the "de minimis" exemption or any other exemption); and (iv) the time at which New Issues are no longer considered as such under the rules of FINRA. The General Partner may take such steps as it considers appropriate to effect the special allocations contemplated in this Section 6.02(e).

**Section 7.03 Tax Allocations.**

(a) Subject to <u>Section 7.03(b)</u>, <u>Section 7.03(c)</u> and <u>Section 7.03(d)</u>, all income, gains, losses, and deductions of the Partnership shall be allocated, for federal, state, and local income tax purposes, among the Partners in accordance with the allocation of such income, gains, losses, and deductions among the Partners for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other applicable law, the Partnership's subsequent income, gains, losses, and deductions shall be allocated among the Partners for tax purposes, to the extent permitted by the Code and other applicable law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b) Items of Partnership taxable income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall be allocated among the Partners in accordance with Section 704(c) of the Code and any reasonable method selected by the General Partner, so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its Book Value.

(c) If the Book Value of any Partnership asset is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Section 704(c) of the Code.

(d) Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Partners according to their interests in such items as determined by the General Partner taking into account

24

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)   Allocations pursuant to this Section 7.03 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 7.04  Allocations to Transferred Interests.** In the event an Interest is assigned during a Fiscal Year in compliance with the provisions of Article XI, Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Partnership attributable to such Interest for such Fiscal Year shall be determined using the interim closing of the books method.

# ARTICLE VIII
# DISTRIBUTIONS

**Section 8.01  Distributions.** Subject to Sections 8.03, 8.05, 4.11, the Partnership may make distributions of Distributable Cash to the extent constituting proceeds from Dispositions, or income, dividends, distributions, or interest from a Portfolio Investment, within a reasonable period of time following the end of the fiscal year in which such amounts are received, and (ii) income from Temporary Investments, within a reasonable period of time following the end of the fiscal year in which such amounts are received, or more frequently in the sole discretion of the General Partner, in each case in the order of priority set forth below. Notwithstanding any other provision of this Agreement, distributions shall be made only to the extent of Available Assets and in compliance with the Delaware Act and other applicable law. Distributable Cash shall initially be notionally apportioned among the Partners (including the General Partner in its capacity as a Partner, and the amount so apportioned to the General Partner shall be distributed to the General Partner) in proportion to their relative Capital Contributions. The amount apportioned to each Limited Partner shall be distributed as follows:

(a)   **Return of Capital:** First, 100% to such Limited Partner until distributions to such Limited Partner of Distributable Cash on a cumulative basis pursuant to this clause equal such Limited Partner's Capital Contributions; and

(b)   **80/20 Split:** Any balance, (i) 80% to such Limited Partner and (ii) 20% to the General Partner.

**Section 8.02  Tax Distributions.** Notwithstanding any provision in Section 8.01 to the contrary, the General Partner may receive a cash advance against distributions to be paid pursuant to Section 8.01(b) to the extent that cumulative distributions actually received by the General Partner pursuant to Section 8.01(b) are not sufficient for the General Partner or any of its direct or indirect members to pay when due (including estimated income tax) the cumulative amount of taxes imposed on it (excluding penalties) resulting from allocations of income and gain from the Partnership to the General Partner in respect of Carried Interest Distributions, calculated using the Assumed Tax Rate. Future distributions otherwise to be made to the General Partner pursuant to Section 8.01(b) shall be reduced by the amount of any prior advances made to the General Partner pursuant to this Section 8.02. If such distributions are not sufficient to offset distributions made pursuant to this Section 8.02, the proceeds of liquidation otherwise payable to the General Partner shall be so reduced. To the extent an amount otherwise distributable to the General Partner is not actually distributed to take into account previous distributions under this Section 8.02, the amount shall be treated for all purposes under this Agreement as if it had actually been distributed.

**Section 8.03  Withholding and Income Taxes.**

(a)   **Tax Withholding Information.**   Each Partner agrees to:

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

(i)   provide any information, certification, representation, form, or other document reasonably requested by and acceptable to the General Partner for the purpose of (A) obtaining any exemption, reduction, or refund of any withholding or other taxes imposed by any Taxing Authority or other governmental agency (including withholding taxes imposed pursuant to Sections 1471-1474 of the Code and the Treasury Regulations thereunder) or (B) to satisfy reporting or other obligations under the Code and the Treasury Regulations thereunder;

(ii)   update or replace such information, certification, representation, form, or other document in accordance with its terms or subsequent amendments; and

(iii)   otherwise comply with any reporting obligations or information disclosure requirements imposed by the United States or any other jurisdiction and any reporting obligations that may be imposed by future legislation.

If a Limited Partner fails or is unable to deliver to the General Partner such information, certification, representation, form, or other document described in Section 8.03(a)(i), the General Partner shall have full authority on behalf of the Partnership to withhold any taxes required to be withheld pursuant to any applicable laws, regulations, rules. or agreements

(b)  **Withholding Advances.**   The Partnership is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Partner in amounts required to discharge any obligation of the Partnership (pursuant to the Code or any provision of United States federal, state or local or non-United States tax law or otherwise) to withhold or make payments to any Taxing Authority with respect to any distribution or allocation by the Partnership of income or gain to such Partner and to withhold the same from distributions to such Partner (including payments made pursuant to Section 6225 of the Code and allocable to a Partner as determined by the Partnership Representative in its sole discretion). Any funds withheld from a distribution by reason of this Section 8.03(b) shall nonetheless be deemed distributed to the Partner in question for all purposes under this Agreement and, at the option of the General Partner, shall be charged against the Partner's Capital Account.

(c)  **Repayment of Withholding Advances.**   Any Withholding Advance made by the Partnership to a Taxing Authority on behalf of a Partner and not simultaneously withheld from a distribution to that Partner shall, with interest thereon accruing from the date of payment at a rate equal to the Prime Rate plus 2%:

(i)   be promptly repaid to the Partnership by the Partner on whose behalf the Withholding Advance was made (which repayment by the Partner shall not constitute a Capital Contribution, but shall credit the Partner's Capital Account if the General Partner shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii)   with the consent of the General Partner, be repaid by reducing the amount of the next succeeding distribution or distributions to be made to such Partner (which reduction amount shall be deemed to have been distributed to the Partner, but which shall not further reduce the Partner's Capital Account if the General Partner shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Partner on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d)  **Indemnification.**   Each Partner hereby agrees to indemnify and hold harmless the Partnership and

the other Partners from and against any liability with respect to taxes, interest, or penalties, which may be asserted by reason of the Partnership's failure to deduct and withhold tax on amounts distributable or allocable to such Partner. The provisions of this Section 8.03(d) and the obligations of a Partner pursuant to Section 8.03(c) shall survive the termination, dissolution, liquidation, and winding up of the Partnership and the withdrawal of such Partner from the Partnership or transfer of its Interest. The Partnership may pursue and enforce all rights and remedies it may have against each Partner under this Section 8.03, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e) **Overwithholding.**  Neither the Partnership nor the General Partner shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Partner. In the event of an overwithholding, a Partner's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

(f) **Calculation of Net Available Investment Cash Flow Before Income and Withholding Taxes.**  The amount of any Distributable Cash treated as distributed to the Partners pursuant to Section 8.01 shall include the amount of any withholding or income taxes imposed by any jurisdiction directly or indirectly on the Partnership with respect to any Portfolio Investment.

**Section 8.04 Form of Distributions.** Distributions of Distributable Cash made prior to the dissolution and liquidation of the Fund may only take the form of cash or Marketable Securities. Upon liquidation and termination of the Fund, the Fund may distribute non-Marketable Securities or other assets, in the sole discretion of the General Partner (or Liquidator, if different). In the event that the General Partner (or Liquidator, if different) intends to make a distribution of assets in kind, the General Partner (or Liquidator, if different) shall deliver a notice to the Limited Partners not less than 15 Business Days prior to making such distribution. The General Partner may cause certificates evidencing any Securities to be distributed to be imprinted with legends as to such restrictions on transfer that it may in its sole discretion deem necessary or appropriate, including legends as to applicable federal or state securities laws or other legal or contractual restrictions, and may require any Partner to which Securities are to be distributed to agree in writing (a) that such Securities will not be transferred except in compliance with such restrictions and (b) to such other matters as the General Partner may deem necessary or appropriate. The General Partner (or Liquidator, if different) will not make any distribution of Marketable Securities, non-Marketable Securities, or other assets to any Limited Partner if, not more than five Business Days after it discloses the intended distribution, the General Partner (or Liquidator, if different) has received notice from such Limited Partner not to do so. In the event of any such notification, the General Partner (or Liquidator, if different) will, subject to applicable legal restrictions, retain such Marketable Securities, non-Marketable Securities, or other assets and use reasonable commercial efforts to sell on behalf of and at the direction of such Limited Partner any Marketable Securities, non-Marketable Securities or other assets that would otherwise have been distributed to such Limited Partner and shall distribute to such Limited Partner the proceeds of such sale, net of the expenses related thereto. Notwithstanding the foregoing, any retained Marketable Securities, non-Marketable Securities, or other assets shall be deemed for all purposes to have been distributed to such Limited Partner at their Fair Value regardless of ultimate sales proceeds. Distributions of assets in kind shall be allocated in accordance with Section 8.01 as if such assets (valued at their Fair Value) were Distributable Cash.

# ARTICLE IX
# THE INVESTMENT MANAGER

**Section 9.01 Investment Management Agreement.** The Fund has entered into an agreement with the Investment Manager (as amended, supplemented or otherwise modified from time to time in accordance with

the provisions thereof and of this Agreement and a form of which is attached hereto as <u>Exhibit B</u>, the "**Investment Management Agreement**"), pursuant to which the Investment Manager will provide investment management services to the Partnership and be paid the Investment Management Fee as described in <u>Section 9.02</u>.

**Section 9.02  Investment Management Fees.** The Investment Manager or an Affiliate thereof shall be paid a quarterly investment management fee (the "**Investment Management Fee**") by the Partnership, subject to reduction as set forth in <u>Sections 4.07</u>, quarterly, with accrual commencing on the date the Investment Management Agreement has been entered into (the "**Investment Management Fee Commencement Date**") and paid quarterly on the last Business Day of each quarter. Any payment of the Investment Management Fee in respect of a period less than quarterly shall be prorated based on the actual number of days in such period. Each installment of the Investment Management Fee shall be due and payable based on an annual amount equal to 2% ("Annual Rate"), with the Investment Manager being paid a quarterly fee equal to 1/4 of the Annual Rate or 0.5% multiplied by each Limited Partner's Capital Account balance (prior to any accrual of the Performance Allocation), determined as of the last day of each calendar quarter and due and payable that same day. Any payment by the Fund of the Investment Management Fee with respect to a Partner will be debited from the Partner's Capital Account as of the end of the quarter in which the fee is paid, and no portion of the Investment Management fee shall be refundable if all or a portion of the Limited Partner's Capital Account balance is withdrawn during a given quarter.

**Section 9.03  Performance Allocation.** The Investment Manager or an Affiliate thereof, in addition to the Investment Management Fee set forth in <u>Section 9.02</u> above, shall be entitled to receive a performance allocation by the Fund based on its investment performance. At the end of each fiscal quarter, 20% of the net profits (if any) allocated to each Capital Account of each eligible Limited Partner will be reallocated to the Capital Account of the General Partner (the "**Performance Allocation**"). In the event that the Limited Partner withdraws any portion of its Capital Account balance on a day other than on the last business day of a fiscal quarter, the Performance Allocation for that Limited Partner will be determined with respect to the withdrawn amount as of the withdrawal date. The General Partner shall be entitled to take all steps necessary to reduce the taxation to the General Partner with regards to this Performance Allocation amount, including but not limited to, structuring the allocation as a profits interest, and this Agreement may be amended by the General Partner to reflect such structuring without any additional prior approval of any Limited Partners pursuant to <u>Article XVI</u> below. Further, in each case, the Performance Allocation shall be subject to the High Water Mark set forth in <u>Section 9.04</u> below.

**Section 9.04  High Water Mark .** The Fund will maintain a memorandum loss recovery account for each Capital Account (a "**Loss Recovery Account**"). Each Loss Recovery Account will be debited at the end of each fiscal year with the net losses of the Partnership (if any) allocable to the related Capital Account for that fiscal year, provided such net loss results in the Partner's Capital Account balance falling below the amount of that Partner's Capital Contributions. The General Partner will not receive a Profits Allocation attributable to a Capital Account until the Limited Partner has recovered the net losses, if any, debited from the Loss Recovery Account by the application of the net profits of the Partnership allocable to the Capital Account (as adjusted for any withdrawals of the Limited Partner's Capital Account balance attributable to the Capital Account).

# ARTICLE X
# ACCOUNTING AND REPORTS

**Section 10.01  Books and Records.**

(a)  The General Partner shall maintain at the office of the Partnership full and accurate books of the

28

Partnership (which at all times shall remain the property of the Partnership), in the name of the Partnership and separate and apart from the books of the General Partner and its Affiliates, including a list of the names, addresses and interests of all Limited Partners and all other books, records and information required by the Delaware Act. The Partnership's books and records shall be maintained in U.S. dollars and in accordance with U.S. generally accepted accounting principles. The General Partner may cause the Partnership to retain any other nationally recognized accounting firm as its independent certified public accounting firm as it may from time to time determine and shall provide notice of such retention to the Limited Partners.

(b)  Subject to Section 17.14, each Limited Partner shall be allowed full and complete access to review all records and books of account of the Partnership for a purpose reasonably related to such Limited Partner's Interest as a limited partner at the offices of the General Partner (or such other location designated by the General Partner in its sole discretion) during regular business hours, at its expense and upon ten (10) Business Days' notice to the General Partner. The General Partner shall retain all records and books relating to the Partnership for a period of at least five (5) years after the termination of the Partnership. Each Limited Partner agrees that (i) such books and records contain confidential information relating to the Partnership and its affairs that is subject to Section 17.14, and (ii) the General Partner shall have the right, except as prohibited by the Delaware Act, to prohibit or otherwise limit in its reasonable discretion the making of any copies of such books and records.

**Section 10.02   Tax Matters Partner; Partnership Representative.**

(a)  **Designation.**   The General Partner shall be designated as the "tax matters partner" (as defined in Section 6231 of the Code prior to its amendment by the BBA (the "Tax Matters Partner") and, for tax years beginning on or after January 1, 2018, the "partnership representative" (the "Partnership Representative") as provided in Section 6223(a) of the Code (or under any applicable state or local law providing for an analogous capacity). Any expenses incurred by the Tax Matters Partner or Partnership Representative in carrying out its responsibilities and duties under this Agreement shall be an Operating Expense of the Partnership for which the Tax Matters Partner or Partnership Representative shall be reimbursed.

(b)  **Tax Examinations and Audits**   The Tax Matters Partner and Partnership Representative is authorized and required to represent the Partnership in connection with all examinations of the affairs of the Partnership by any Taxing Authority, including any resulting administrative and judicial proceedings, and to expend funds of the Partnership for professional services and costs associated therewith. Each Partner agrees that any action taken by the Tax Matters Partner or Partnership Representative in connection with audits of the Partnership shall be binding upon such Partners and that such Partner shall not independently act with respect to tax audits or tax litigation affecting the Partnership. The Tax Matters Partner and Partnership Representative shall have sole discretion to determine whether the Partnership (either on its own behalf or on behalf of the Partners) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority. Each Partner agrees to cooperate with the Tax Matters Partner and Partnership Representative and to do or refrain from doing any or all things reasonably requested by the Tax Matters Partner or Partnership Representative with respect to the conduct of examinations by Taxing Authorities and any resulting proceedings; *provided*, that a Partner shall not be required to file an amended federal income tax return, as described in Section 6225(c)(2)(A) of the Code, or pay any tax due and provide information to the Service as described in Section 6225(c)(2)(B) of the Code.

(c)  **BBA Elections and Procedures.**   Except as otherwise set forth herein, in the event of an audit of the Partnership that is subject to the partnership audit procedures enacted under Section 1101 of the BBA (the "BBA Procedures") or any analogous provision of state or local law, the Partnership Representative, in

29

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

its sole discretion, shall have the right to make any and all elections and to take any actions that are available to be made or taken by the Partnership Representative or the Partnership under the BBA Procedures (or analogous provisions of state or local law). To the extent that the Partnership Representative does not make an election under Section 6221(b) of the Code, the Partnership Representative shall use commercially reasonable efforts to reduce to the extent possible the amount of tax owed by the Partnership pursuant to an audit under the BBA Procedures (or analogous state or local partnership audit procedures) by either (i) making any modifications available under Section 6225(c)(3), (4), and (5) of the Code (or analogous provisions of state or local law) or (ii) making a timely election under Section 6226 of the Code (or an analogous provision of state or local law). If an election under Section 6226(a) of the Code is made, the Partnership shall furnish to each Partner for the year under audit a statement of the Partner's share of any adjustment set forth in the notice of final partnership adjustment, and each Partner shall take such adjustment into account as required under Section 6226(b) of the Code.

(d) **Tax Returns and Tax Deficiencies.** Each Partner agrees that such Partner shall not treat any Partnership item inconsistently on such Partner's federal, state, foreign or other income tax return with the treatment of the item on the Partnership's return. Any deficiency for taxes imposed on any Partner (including penalties, additions to tax or interest imposed with respect to such taxes and any tax deficiency imposed pursuant to Section 6226 of the Code) will be paid by such Partner and if required to be paid (and actually paid) by the Partnership, will be recoverable from such Partner as provided in Section 8.03(d).

(e) **Tax Returns**  The General Partner shall cause to be prepared and timely filed all US and non-US tax returns required to be filed by or for the Partnership.

### Section 10.03   Reports to Partners.

The Fund will provide to each Limited Partner balance reports through its online portal, which balance reports shall be posted at least quarterly. These balance reports shall show the balance of the Partners' account as well as an overview of the Fund's investments and strategy. In addition, at the end of each Fiscal Year, the Fund will provide each Limited Partner with unaudited financial statements. To the extent that the Partner has made Capital Contributions totaling greater or equal to $500,000, that Partner may request that the Fund provide an audited financial statement at the end of a Fiscal Year in lieu of the unaudited statement.

# ARTICLE XI
## TRANSFER OF LIMITED PARTNERSHIP INTERESTS

**Section 11.01  Transfers.** A Limited Partner may not Transfer its Interest in the Partnership or any part thereof except as permitted in this Article XI. Any Transfer in violation of this Article XI shall be null and void and of no force or effect.

### Section 11.02  Transfer by Limited Partners

(a) A Limited Partner may Transfer all or a portion of its Interest in the Partnership only if the General Partner consents in writing to the Transfer, which consent it may grant or withhold in its sole discretion, and all of the following conditions are satisfied (provided that the transferring Limited Partner shall continue to be subject to the provisions of Section 8.03 and Section 17.14);

(i) the transferring Limited Partner and proposed transferee file a notice, signed and certified by the transferring Limited Partner, with the General Partner at least thirty (30) Business Days in advance of the proposed Transfer which contains (A) the terms and conditions of and the circumstances under

which the proposed Transfer is to be made, (B) a description of the Interests to be transferred, and (C) all other information reasonably requested by the General Partner;

(ii) the Transfer does not cause the Partnership to be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code and the regulations promulgated thereunder;

(iii) all costs and expenses incurred by the Partnership in connection with the Transfer are paid by the transferring Limited Partner to the Partnership, and the transferring Limited Partner shall be responsible for such costs and expenses whether or not the proposed Transfer is consummated;

(iv) a fully executed and acknowledged written transfer agreement between the transferring Limited Partner and the transferee has been filed with the Partnership;

(v) the transferee has executed a copy of this Agreement; and

(vi) the General Partner determines, and such determination is confirmed by an opinion of counsel satisfactory to the General Partner stating, that (A) the Transfer does not violate the Securities Act, applicable state securities laws, (B) the Transfer will not require the Partnership or the General Partner to register as an investment company under the Investment Company Act, (C) the Transfer will not require the General Partner or any Affiliate that is not registered under the Advisers Act to register as an investment adviser under the Advisers Act, (D) notwithstanding such Transfer, the Partnership shall continue to be treated as a partnership under the Code (including Section 7704 of the Code), (E) the Transfer would not pose a material risk that (1) all or any portion of the assets of the Partnership would constitute "plan assets" under the Plan Asset Rules of any existing or contemplated ERISA Partner or (2) the Partnership would be subject to the provisions of ERISA, Section 4975 of the Code or any applicable Similar Law or (3) the General Partner would become a fiduciary with respect to any existing or contemplated ERISA Partner or other Partner, pursuant to ERISA or the applicable provisions of any Similar Law or otherwise, and (F) the Transfer will not violate the applicable laws of any state or the applicable rules and regulations of any Governmental Authority, provided that the delivery of such opinion may be waived, in whole or in part, at the sole discretion of the General Partner.

(b) Notwithstanding the foregoing, the General Partner shall not unreasonably withhold consent to a Transfer that otherwise satisfies Section 11.02(a) in the event such Transfer is to an Affiliate of the transferring Limited Partner, provided that the General Partner is reasonably satisfied that such Affiliate, other than a Benefit Plan Investor, has the financial capability to meet its obligations under this Agreement.

(c) If a Person who is a transferee in compliance with this Section 11.02 is not admitted to the Partnership as a Substitute Limited Partner pursuant to Section 11.03, such transferee shall be entitled only to the allocations and distributions with respect to its Interest in accordance with this Agreement and, to the fullest extent permitted by applicable law, shall not have any non-economic rights of a Limited Partner of the Partnership, including, without limitation, the right to require any information on account of the Partnership's business, inspect the Partnership's books, or vote on Partnership matters.

Section 11.03  Substitute Limited Partners. A transferee of all or a portion of an Interest in the Partnership pursuant to Section 11.02 shall have the right to become a substitute Limited Partner (a "**Substitute Limited Partner**") in place of its transferor, effective as of the last day of a fiscal quarter, only if all of the following conditions are satisfied:

(a) the fully executed and acknowledged written instrument of Transfer has been filed with the

31

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

Partnership;

(b) the transferee executes, adopts and acknowledges this Agreement and is listed in the books and records of the Partnership as a Limited Partner;

(c) any costs and expenses of Transfer incurred by the Partnership are paid to the Partnership; and

(d) the General Partner shall have provided its consent in writing to the substitution, which consent it may grant or withhold in its sole discretion, and which consent may be conditioned upon, among other things, delivery of the opinion of counsel, satisfactory to the General Partner, as to the matters referred to in the opinion described in Section 11.02(a)(vi) as such matters relate to the transferee becoming a Substitute Limited Partner; *provided*, that a consent to a Transfer shall be a consent to substitution.

**Section 11.04   Involuntary Withdrawal by Limited Partners.**

(a)   Upon the death, Bankruptcy, dissolution or other cessation of existence of a Limited Partner, such Limited Partner shall not be entitled to receive the Fair Value of its Interest in the Partnership in accordance with Section 17-604 of the Delaware Act. Such Limited Partner's authorized representative, however, shall have all the rights of a Limited Partner for the purpose of settling or managing the estate or effecting the orderly winding up and disposition of the business of such Limited Partner and such power as such Limited Partner possessed to designate a successor as a transferee of its Interest and to join with such transferee in making application to substitute such successor or transferee as a Substitute Limited Partner.

(b)   The death, Bankruptcy, dissolution, disability, or legal incapacity of a Limited Partner shall not dissolve or terminate the Partnership.

**Section 11.05   Required Withdrawals.**

(a)   If the General Partner determines, in good faith after consultation with counsel, that the continued participation of a Limited Partner in the Partnership would be reasonably likely to result in a violation of any law or regulation applicable to the Partnership (including, without limitation, the anti-money laundering or anti-terrorism laws or regulations, including Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 (the "**AML Laws**")) or subject the Partnership to any unintended law or regulatory scheme (including, without limitation, ERISA) (a "**Legal Violation**"), then the General Partner shall notify such Limited Partner of such Legal Violation and such Limited Partner shall be required to withdraw from the Partnership immediately following such notification (the "**Withdrawal Date**"), provided, that, if the General Partner in its sole discretion determines that the Legal Violation (other than a Legal Violation involving the AML Laws) is capable of being reasonably mitigated, prevented or cured, then the General Partner and such Limited Partner may take actions as the General Partner deems necessary and appropriate to mitigate, prevent or cure such Legal Violation, including (i) prohibiting such Limited Partner from making additional Capital Contributions into the Fund, (ii) converting such Limited Partner's Interest into a non-voting Interest, (iii) allowing, in the General Partner's sole discretion, some or all of the Fund Investors or other Persons to purchase all or a portion of the Interest of such Limited Partner for an amount, in cash, equal to the Fair Value of such Interest, and/or (iv) making appropriate applications to the relevant Governmental Authority in respect of such Legal Violation.

(b)   Further, if the General Partner determines, in its sole discretion, that the continued participation of a Limited Partner in the Partnership would be detrimental in any way to the success of the Partnership, or for any other reason, then the General Partner shall notify such Limited Partner of such determination,

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

and such Limited Partner shall be required to withdraw from the Partnership immediately following such notification.

(c)  A withdrawing Limited Partner under Section 11.05(a) and Section 11.05(b) shall be entitled to receive a distribution equal to any amounts it would have been entitled to if the Partnership, in accordance with the provisions hereof, dissolved, liquidated, and distributed all the proceeds thereof as of the date of withdrawal of such Limited Partner, provided however, that in all instances effect is given to the Performance Allocation at the time of the withdrawal.

# ARTICLE XII
# DISSOLUTION AND LIQUIDATION

**Section 12.01  Dissolution.** The Partnership shall be dissolved upon the first to occur of the following:

(a)  an election to dissolve the Partnership is made by the General Partner in its sole discretion;

(b)  subject to the provisions of Sections 4.08 through 4.12, the Bankruptcy, dissolution, removal or other withdrawal of the General Partner, or the Transfer of the General Partner's Interest in the Partnership;

(c)  the entry of a decree of a judicial dissolution pursuant to the Delaware Act; or

(d)  any other event causing dissolution of the Partnership under the Delaware Act.

**Section 12.02  Liquidation.**

(a)  Upon dissolution of the Partnership and subject to Section 12.02(b), the General Partner, or if the General Partner's withdrawal, removal, or Bankruptcy caused the dissolution of the Partnership, such other Person who may be appointed by consent of a Majority in Interest of the Limited Partners, who shall be responsible for taking all action necessary or appropriate to wind up the affairs and distribute the assets of the Partnership following its dissolution (the "**Liquidator**") shall wind up the affairs of the Partnership and proceed within a reasonable period of time to sell or otherwise liquidate the assets of the Partnership, subject to obtaining fair value for such assets and any tax or other legal considerations, and, after paying or making due provision by the setting up of reserves for all liabilities to creditors of the Partnership who are not Partners, distribute the proceeds therefrom among the Partners in accordance with Section 12.02(c). Notwithstanding the foregoing, the Liquidator may, if it determines that it is in the best interests of the Partnership, distribute part or all of any Portfolio Investments to the Partners in kind (utilizing the principles of Section 8.04 and the valuation procedures described herein).

(b)  No Partner shall be liable for the return of the Capital Contributions of any other Partner, provided, that this provision shall not relieve any Partner of any other duty or liability it may have under this Agreement.

(c)  Upon liquidation of the Partnership, all of the assets of the Partnership, and any proceeds therefrom, shall be applied in the following order of priority:

(i)  first, in discharge of (1) all claims of creditors of the Partnership who are not Partners and (2) all expenses of liquidation;

(ii)  second, to establish any reserves which the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership; and

(iii) third, to the Partners in the same manner as distributions are made under <u>Section 8.01</u>.

(d) When the Liquidator has complied with the foregoing liquidation plan, the termination of the Partnership shall be effective on the filing of, and the General Partner or Liquidator shall file, a certificate of cancellation of the Certificate of Limited Partnership (the "**Certificate of Cancellation**") with the Office of the Secretary of State of the State of Delaware in accordance with Section § 17-203 of the Delaware Act.

# ARTICLE XIII
# REPRESENTATIONS AND WARRANTIES OF THE GENERAL PARTNER

**Section 13.01  Representations and Warranties of the General Partner.** The General Partner represents, warrants and covenants to each Limited Partner that as of the date of the Initial Closing:

(a) The Partnership has been duly formed and is a validly existing limited partnership under the laws of the State of Delaware with full power and authority to conduct its business as described in this Agreement.

(b) The General Partner has been duly formed and is a validly existing limited liability company under the laws of the State of Delaware, with full power and authority to perform its obligations herein.

(c) All action required to be taken by the General Partner and the Partnership, as a condition to the issuance and sale of the Interests being purchased by the Limited Partners, has been taken.

(d) The Interest of each Limited Partner represents a duly and validly issued limited partnership interest in the Partnership and each Limited Partner is entitled to all the benefits of a Limited Partner under this Agreement and the Delaware Act.

(e) This Agreement has been duly authorized, executed and delivered by the General Partner and, assuming due authorization, execution and delivery by each Limited Partner, constitutes a valid and binding agreement of the General Partner enforceable in accordance with its terms against the General Partner, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity).

(f) The Private Placement Memorandum for the Fund did not contain any untrue statement of a material fact and did not omit to state a material fact necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, except that the description therein of this Agreement and the provisions hereof is superseded in its entirety by this Agreement.

(g) Assuming the accuracy of the representations and warranties made by each Limited Partner pursuant to the relevant Subscription Agreement, the Partnership is not required to register as an investment company under the Investment Company Act.

(h) Assuming the accuracy of the representations and warranties made by each Limited Partner pursuant to the relevant Subscription Agreement, the offer and sale of the Interests in accordance with the terms of the relevant Subscription Agreement does not require registration of the Interests under the Securities Act.

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

(i) The only fees payable to the General Partner or the Investment Manager by the Partnership or the Limited Partners are those contemplated or specified by this Agreement or the Investment Management Agreement.

# ARTICLE XIV
# ERISA CONSIDERATIONS

The General Partner shall use its reasonable best efforts to conduct the affairs of the Partnership to comply with such other exception as may be available under the Plan Asset Rules to prevent the assets of the Partnership from being treated as the assets of any ERISA Partner, including, if the General Partner so elects in its discretion, to limit investment in the Partnership so that investment by any Benefit Plan Investors is not deemed to be "significant" under the Plan Asset Rules.

# ARTICLE XV
# NET ASSET VALUE

**Section 15.01  Calculation of NAV.** The General Partner shall cause the Partnership's assets to be valued pursuant to the valuation policy attached hereto at <u>Exhibit C</u> (the "**Valuation Policy**"). The Partnership's net asset value shall be determined by the General Partner (or delegated to the Investment Manager to determine) as of the last day of each fiscal quarter, or at such other times as required under this Agreement, pursuant to the Valuation Policy ("**Net Asset Value**" or "**NAV**"). In short, the NAV of the Fund is equal to its total assets minus its total liabilities, determined in accordance with generally accepted accounting principles consistently applied under the accrual method of accounting. For this purpose:

(a) The Fund's assets as of any date shall include: (i) all cash on hand or on deposit, including any interest accrued thereon; (ii) all bills, demand notes, and accounts receivable (including proceeds of assets sold but not delivered); (iii) all instruments owned or contracted for by the Fund; (iv) all Securities and other Portfolio Investments owned by the Fund; (v) all cash dividends, and cash distributions receivable by the Fund (the General Partner may make adjustments with regard to fluctuations in the market value of instruments caused by trading ex- dividend, ex-rights, or by similar practices); (vi) all interest accrued on any interest-bearing instrument except to the extent that the same is included or reflected in the valuation of the instrument; and (vii) all other assets of every kind and nature, including prepaid expenses.

(b) The liabilities of the Fund as of any date shall include: (i) all outstanding loans, bills and accounts payable; (ii) accrued or payable expenses; (iii) the current market value of all short sale obligations; and (iv) all other liabilities. The General Partner and the Administrator may treat estimates of expenses that are incurred on a regular or recurring basis over yearly or other periods as accruing in equal proportions over such period.

(c) The General Partner and the Administrator may establish such reserves for unknown or unfixed liabilities or contingencies as it may determine.

(d) The General Partner may treat any liability or expenditure which becomes fixed or is incurred in an Accounting Period subsequent to the Accounting Period to which the liability or expenditure relates as either (i) arising in the Accounting Period in which the liability becomes fixed or the expenditure is made or (ii) arising in the prior Accounting Period. In the latter case the liability or expenditure shall be charged to Persons who were Limited Partners during that prior Accounting Period (whether or not the Persons are Limited Partners during the Accounting Period in which the liability is fixed or the expenditure is incurred) pro rata for that prior Accounting Period.

**Section 15.02  Suspension of NAV.** The General Partner may suspend the determination of the Fund's Net Asset Value, the acceptance of capital contributions and the processing of requests for withdrawals:

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

(a) during any period in which any market on which a material part of the assets of the Fund are quoted is closed or has materially limited or suspended dealings;

(b) during the existence of any state of affairs (including the restriction of trading in one or more markets) which, in the opinion of the General Partner, makes the determination of the price or value of the disposition of a material part of the Fund's investments impractical or prejudicial to the Partners;

(c) during any breakdown in any of the means normally employed by the Fund in ascertaining the value of a material part of its assets or for any other reason the General Partner is of the opinion that the Fund cannot reasonably ascertain the value of a material part of its assets on the valuation date concerned;

(d) during any period where the conversion and remittance of the funds which would or might be involved in the realization or acquisition of a material part of the Fund's investments (whether actual or hypothetical for valuation purposes) could not in the opinion of the General Partner be carried out at normal rates of exchange and without undue delay;

(e) during any period in which distributions or withdrawals would, in the opinion of the General Partner, result in a violation of applicable law; or

(f) in the event of the dissolution or winding-up of the Fund.

All Limited Partners will be notified of any suspension, and the termination of any suspension, by means of a promptly delivered written notice. If monthly withdrawals are suspended as a result of the foregoing events, withdrawal requests will be honored as of the end of the calendar month next following the termination of any suspension.

# ARTICLE XVI
# AMENDMENTS AND MEETINGS

**Section 16.01  Amendment Procedure.** This Agreement may be amended or modified only as follows:

(a)  Amendments to this Agreement shall be proposed by the General Partner.

(b)  A proposed amendment will be adopted and effective only if it receives the consent of the General Partner, which consent it may grant or withhold in its sole discretion, and consent of a Majority in Interest of the Limited Partners, except that amendments may be adopted by the General Partner, without consent of a Majority in Interest of the Limited Partners, to (A) effect changes of an administrative or ministerial nature or to cure ambiguities or inconsistencies in the Agreement, (B) admit or withdraw one or more Partners in accordance with the terms of this Agreement, (C) make changes to this Agreement negotiated with Limited Partners admitted to the Partnership after the Initial Closing so long as such changes do not materially adversely affect the rights and obligations of any existing Limited Partner or (D) change the name of the Partnership.

(c)  The General Partner shall furnish each Limited Partner with a copy of each amendment to this Agreement promptly after its adoption.

(d)  The Partnership or the General Partner may, without any further act, approval, or vote of any Partner, enter into side letters or other agreements with one or more Limited Partners that have the effect of establishing rights under, or altering or supplementing, the terms of, this Agreement, and any rights established or any terms of this Agreement altered or supplemented in a side letter with a Limited Partner shall govern solely with respect to such Limited Partner notwithstanding any other provision of this Agreement, provided, that no such side letter or other agreement shall adversely affect the rights of any other Limited Partner hereunder.

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

**Section 16.02 Exceptions.** Notwithstanding the provisions of <u>Section 16.01</u>, no amendment shall be effective as to any Limited Partner without the consent of such Limited Partner that:

(a) adversely affects the limited liability of such Limited Partner under this Agreement or the Delaware Act; or

(b) directly or indirectly affects or jeopardizes the status of the Partnership as a partnership for federal income tax purposes.

Notwithstanding anything herein to the contrary, this Agreement may be amended, and/or the Partnership may be reorganized or reconstituted, from time to time by the General Partner, without the consent of any Limited Partner, to address any change in regulatory or tax legislation, provided that any such amendment, reorganization, or reconstitution would not add to the obligations (including any tax liabilities) of any Limited Partner or adversely alter any of the rights or benefits (including entitlements to distributions or any other economic rights) of any Limited Partner.

**Section 16.03 Meetings and Voting.**

(a) Meetings of the Partners may be called by the General Partner for any purpose permitted by this Agreement or the Delaware Act at a time and place reasonably selected by the General Partner. Except as otherwise specified herein, the General Partner shall give all Limited Partners not less than 15 nor more than 60 days' notice of the purpose of such proposed meeting and any votes to be conducted at such meeting. Partners may participate in a meeting by telephone or similar communications by means of which all Persons participating in the meeting can hear and be heard. The General Partner shall call a meeting of the Partners for informational purposes at least once every Fiscal Year with at least 60 days' notice to discuss the Fund's investment activities.

(b) The General Partner shall, where feasible, solicit required consents of the Limited Partners under this Agreement by written ballot with at least 15 days' notice or, if a written ballot is not feasible, at a meeting held pursuant to <u>Section 16.03(a)</u>.

# ARTICLE XVII
# MISCELLANEOUS

**Section 17.01 Severability.** Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable, or illegal under any existing or future law in any jurisdiction, such invalidity, unenforceability, or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable, and legal.

**Section 17.02 Governing Law.** All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

**Section 17.03 Submission to Jurisdiction.** The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought exclusively in the federal or state courts located in New York County of the State of New York, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State

37

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

of New York. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum. Service of process, summons, notice, or other document by registered mail to the address set forth in the books and records of the Partnership shall be effective service of process for any suit, action, or other proceeding brought in any such court.

**Section 17.04 Successors and Assigns.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

**Section 17.05 Waiver of Jury Trial.** Each party hereto hereby acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 17.06 Waiver of Action for Partition.** Each of the parties hereto irrevocably waives during the term of the Partnership any right that it may have to maintain any action for partition with respect to any property of the Partnership.

**Section 17.07 Record of Limited Partners.** The General Partner shall maintain at the office of the Partnership a record showing the names and addresses of all the Limited Partners. All Limited Partners and their duly authorized representatives shall have the right to inspect such record for a purpose reasonably related to such Limited Partner's Interest.

**Section 17.08 Headings.** The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

**Section 17.09 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 17.10 Notices.** All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 17.10</u>):

*If to the General Partner:*     BKCOIN MANAGEMENT LLC
                                 E-mail: trading@bkcoincapital.com
                                 Attention: Manager

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

| | |
|---|---|
| *with a copy to:* | DZUBA LAW, P.A.<br>E-mail: peter@dzubalaw.com<br>Attention: Peter Dzuba |
| *If to Partnership:* | BKCOIN CAPITAL LP<br>E-mail: trading@bkcoincapital.com<br>Attention: Manager |
| *with a copy to:* | DZUBA LAW, P.A.<br>E-mail: peter@dzubalaw.com<br>Attention: Peter Dzuba |

**Section 17.11  Entire Agreement.** This Agreement (including any Schedules and Exhibits), the Subscription Agreements, and any other written agreements between the General Partner or the Partnership and the Limited Partners executed in connection with the subscription by the Limited Partners for the Interests, constitutes the sole and entire agreement of the parties to this Agreement.

**Section 17.12  No Third-party Beneficiaries.** Except as expressly provided to the contrary in this Agreement (including the authorization given to the General Partner to grant and assign to lenders and credit providers the security interests and rights described in <u>Section 3.02(c)</u> and those provisions which are for the benefit of the Covered Persons), this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 17.13  Counsel.** The General Partner, acting on behalf of the Partnership, has initially selected Dzuba Law, P.A. ("Partnership Counsel") as legal counsel to the General Partner when acting on behalf of the Partnership. Each Limited Partner acknowledges that Partnership Counsel does not represent any Limited Partner (in its capacity as such) and shall owe no duties directly to any Limited Partner (in its capacity as such) whether or not Partnership Counsel has in the past represented or is currently representing such Limited Partner with respect to other matters. Counsel to the Partnership may also be counsel to the General Partner and its Affiliates. The General Partner may execute on behalf of the Partnership and the Partners any consent to the representation of the General Partner when acting on behalf of the Partnership or the General Partner that counsel may request pursuant to the applicable rules of professional conduct in any jurisdiction. In the event any dispute or controversy (including litigation) arises between any Limited Partner and the General Partner when acting on behalf of the Partnership or itself, or between any Limited Partner and the General Partner when acting on behalf of the Partnership, on the one hand, and the General Partner (or an Affiliate of the General Partner) that Partnership Counsel represents, on the other hand, then each Limited Partner agrees that Partnership Counsel may represent either the General Partner when acting on behalf of the Partnership, or the General Partner (or its Affiliate), or both, in any such dispute or controversy to the extent permitted by the applicable rules of professional conduct in any jurisdiction, and each Limited Partner hereby consents to such representation.

**Section 17.14  Confidentiality.**

(a) Each Limited Partner shall maintain the confidentiality of (i) "Non-Public Information," (ii) any information subject to a confidentiality agreement binding upon the General Partner or the Partnership of which such Limited Partner has provided written notice and (iii) the identity of other Limited Partners

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

and their Affiliates so long as such information has not become otherwise publicly available unless, after reasonable notice to the Partnership by the Limited Partner, otherwise compelled by court order or other legal process or in response to other governmentally imposed reporting or disclosure obligations including, without limitation, any act regarding the freedom of information to which it may be subject; *provided*, that, for any *bona fide* business purpose reasonably related to its Interest in the Partnership, each Limited Partner may disclose "Non-Public Information" to its Affiliates, officers, employees, agents, professional consultants, and regulators upon notification to such Affiliates, officers, employees, agents, consultants, or regulators that such disclosure is made in confidence and shall be kept in confidence; *provided, further*, that each Limited Partner shall be liable for any subsequent disclosure of any such Non-Public Information disclosed by it to any such Person.

(b)   As used in this Section 17.14, "**Non-Public Information**" means information regarding the Fund, the Partnership, the General Partner, the Investment Manager, their respective Affiliates, any Portfolio Investment or potential investment, or any existing or potential counterparty of the Partnership or source of existing or potential Portfolio Investments received by such Limited Partner pursuant to this Agreement, but does not include information that was publicly known when received by such Limited Partner, subsequently becomes publicly known through no act or omission by such Limited Partner or is disclosed to such Limited Partner by a third party not known to such Limited Partner to be bound by any confidentiality obligation. The General Partner may not disclose the identities of the Limited Partners, except on a confidential basis to prospective and other Limited Partners in the Partnership, or to lenders, third-party partners, or other financial sources. In the event a Limited Partner receives a request for the disclosure of information under freedom of information acts or similar statutes that is Non-Public Information, the Limited Partner shall (i) promptly notify the Partnership and the General Partner of the existence, terms, and circumstances surrounding such request, (ii) consult with the Partnership and the General Partner regarding taking steps to resist or narrow such request, (iii) if disclosure of such information is required, furnish only such portion of such information as such Limited Partner is advised by counsel is legally required to be disclosed, and (iv) cooperate with the Partnership and the General Partner in their efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the information that is required to be disclosed. Notwithstanding any provision of the Agreement to the contrary, the General Partner may withhold disclosure of any Non-Public Information (other than this Agreement or tax reports) to any Limited Partner if the General Partner reasonably determines that the disclosure of such Non-Public Information to such Limited Partner may result in the public disclosure of such Non-Public Information, and in such case the General Partner will use commercially reasonable efforts to make such information available to such Limited Partner through an alternate means; provided that such information will not thereby become subject to public disclosure.

**Section 17.15  Compliance with FATCA.** Each Limited Partner hereby agrees to provide to the Partnership on a timely basis (i) such information, representations, forms or other documentation as the General Partner may reasonably request in order for the General Partner and the Partnership (and any member of any "expanded affiliated group" (as defined in Section 1471(e)(2) of the Code) of which the General Partner, the Partnership or any of their Affiliates is a member) to comply with their obligations under, and avoid becoming subject to, withholding, or to obtain any available exemption, reduction or refund of any tax withheld, pursuant to (a) Sections 1471-1474 of the Code (or any amended or successor version thereof), Treasury Regulations and any forms, instructions or other guidance issued thereunder (now or in the future) and any intergovernmental agreement or other similar agreement between the United States and one or more other governments or tax authorities that is entered into in order to facilitate compliance with, or otherwise relates to, any of the preceding, together with any regulations, forms, instructions or other guidance issued (now or in the future) by any government or tax authority in a jurisdiction other than the United States in relation to any intergovernmental agreement or similar agreement ("FATCA"); or (b) any legislation in any jurisdiction that the General Partner reasonably believes to be similar to FATCA; or (ii) any other information required for the Partnership to comply with its tax obligations (including, for the avoidance of

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

doubt, obligations pursuant to any agreement that the Partnership enters into pursuant to Section 1471 of the Code or any similar agreement) or to answer any inquiries from any tax authority. In the event that any Limited Partner fails to provide any of the information, representations, certificates or forms (or undertake any of the actions) required by this Section 17.15, the General Partner shall be entitled to (i) form an entity organized in the United States, transfer such Limited Partner's interest in the Partnership to such entity, admit such Limited Partner as an owner of such entity and cause such Limited Partner to cease to be a Partner in the Partnership or (ii) take any other steps as the General Partner determines in its sole discretion are necessary or appropriate to mitigate the consequences of such Limited Partner's failure to comply with the requirements of this Section 17.15. Each Limited Partner hereby consents to the General Partner's exercise of the remedies described above and agrees, to the fullest extent permitted by applicable law, to indemnify and hold harmless the Partnership, each investor in the Partnership, and the General Partner and any Affiliate thereof against the amount of any costs incurred by the Partnership or the General Partner (including, without limitation, the withholding of any tax on payments to the Partnership pursuant to FATCA) as a result of (A) such Limited Partner's failure to comply with any of the above requirements or to do so in a timely manner, or (B) such Limited Partner's participation in the Partnership.

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

GENERAL PARTNER:

BKCOIN MANAGEMENT LLC

By: *Carlos Betancourt*
Carlos Betancourt
Manager

10/26/2021

42

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

**LIMITED PARTNERSHIP AGREEMENT SIGNATURE PAGE**

By its signature below, the undersigned hereby agrees that effective as of the date of its admission to the Partnership initialed above as a Limited Partner it shall (i) be bound by each and every term and provision of the Limited Partnership Agreement of such Partnership as the same may be duly amended from time to time in accordance with the provisions thereof; and (ii) become and be a party to said Limited Partnership Agreement of such Partnership.

*Date:* 10/26/2021 _____

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

# EXHIBIT A
# FORM OF SUBSCRIPTION AGREEMENT

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

**EXHIBIT B**
**FORM OF INVESTMENT MANAGEMENT AGREEMENT**

DocuSign Envelope ID: 9AF9C184-CDE0-4372-B541-5DD10B8EFF3C

# EXHIBIT C
## METHOD OF CALCULATING NET ASSET VALUE

The Partnership shall provide each Limited Partner from time to time with a PDF containing the then-in-effect method of calculating net asset value for each of the assets currently being traded by the Fund.

# EXHIBIT D
## Subscription Agreement

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

**Subscription Documents**

**of**

**BKCoin Multi-Strategy Fund Ltd.,**

*a British Virgin Islands company limited by shares.*

***BKCoin Management LLC***
**Investment Manager**
1101 Brickell Ave South Tower #8
Miami, Florida 33131
(786) 623-4656

Name of Offeree: _____

Copy #: _____

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

## SUBSCRIPTION INSTRUCTIONS

Prospective subscribers (each a "<u>Subscriber</u>", and collectively the "<u>Subscribers</u>") to BKCoin Multi-Strategy Fund Ltd. (the "<u>Fund</u>") should, in addition to carefully reading and reviewing these subscription documents, also carefully read the Fund's confidential private placement memorandum (the "<u>Memorandum</u>"), and the Fund's Memorandum and Articles of Association (the "<u>M&A</u>"), prior to subscribing to the Fund. Capitalized terms used herein but not otherwise defined, shall have the meanings attributed to them in the M&A.

In order to subscribe to the Fund, the Subscriber will need to complete each of the following:

1) Complete and sign the Subscriber Questionnaire below •
2) Thoroughly review and then sign the Subscription Agreement, including filling out any additional representation sections which may be applicable to that specific Subscriber •
3) Complete and sign either a Form W-9 or the applicable Form W-8, as applicable for the Subscriber •
4) Complete the Anti-Money Laundering supplement at **Appendix A** below •
5) Complete the Individual Self-Certification Form at **Appendix E** and/or the Entity Self-Certification Form at **Appendix F**, as appropriate.

Next, take all of the foregoing completed and/or signed documents and send them to the Administrator to its address below, in each case at least five (5) Business Days prior to the beginning of the month in which the investment will be made. In addition, please keep a copy of the same documentation for your records.

> **State Street Bank and Trust Co.**
> 100 Summer Street, 5th Floor
> Boston, MA 02110

After you receive notification from the Fund that the subscription has been accepted pursuant to the terms of the M&A, send the intended subscription amount to the Fund at least three (3) Business Days before the beginning of the month in which the investment will be credited to the investor's account. Subscription amounts should be sent by wire transfer to using the following wire instructions:

> **Bank:** State Street Bank and Trust Co.
> **Address:** Boston, Massachusetts
> **ABA No.:** [insert]
> **Swift:** [insert]
> **A/c Name:** [insert]
> **A/c No:** [insert]
> **Ref:** [INVESTOR NAME]

> <u>Note</u>: It is recommended that if the Subscriber is making the transfer via wire transfer, that Subscriber have the bank charge its wiring fees separately so that an even amount may be invested.

Upon completion of the Subscription by Subscriber, a copy of the fully executed Subscription Agreement, signed as accepted on behalf of the Fund, will be made available to Subscriber. Notwithstanding the foregoing, the Fund or the Administrator may request additional documents as necessary under securities laws, other applicable laws, from any prospective investor. Please keep a copy of the Additional Subscription Form (**Appendix B**) and the Redemption Notice (**Appendix C**) for future use.

## SUBSCRIBER QUESTIONNAIRE

### *REQUIRED INFORMATION – BOTH INDIVIDUAL AND ENTITY INVESTORS*

Name of Subscriber: ███████████████

SSN/Tax ID of Subscriber: ████████████████████

Date of Birth (if natural person): _____

==========================================================================

Type of Subscriber (*select option that is applicable*):

- Individual •
- Corporation •
- Partnership • ✓
- LLC •
- Trust •
- Joint Tenant (with ROS) •
- Tenants in Common •
- IRA •
- Foundation •
- Endowment •
- Keogh Plan •
- Employee Benefit Plan •
- Charitable Remainder Trust •
- Other: _____ •

==========================================================================

Mailing Address █████████████████████████

Phone

Fax

Email

==========================================================================

Residential Address/ ███████████████████

Principal Place of Business

1

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

Phone          ████████

Fax

Email          ██████████████

=================================================================

Authorized Representative     ████████

Address          ████████████████████████

Phone          ████████

Fax

Email          ██████████████

=================================================================

### *Authorized Signatories*

Set forth below are the names of persons authorized by Subscriber to give and receive instructions between the Fund (or the Investment Manager) and Subscriber, together with their respective signatures.  Such persons are the only persons so authorized until further written notice to the Fund signed by one or more of such persons.

| Name | Signature |
|------|-----------|
| ████████ | |
| | |
| | |
| | |
| | |
| | |

======================================================================

*Standing Wire Instructions*

Until further written notice to the Fund signed by one or more of the persons listed above, funds may be wired to Subscriber using the following instructions (must be to an account in the EXACT same name as the Subscriber).

| | |
|---|---|
| Signature Bank | Name of Bank |
| N/A | Address of Bank |
| N/A | ABA Number |
| N/A | Account Number |
| ███████ | Name Under Which Account Is Held |

======================================================================

*Payment Information*

In connection with the efforts of the international financial community to avoid association with money-laundering activities or financial activities of persons identified as terrorists, the Fund requests that Subscriber supply information regarding Subscriber's subscription payment if such subscription payment is not being wired from the United States.

(a)  Country of Wiring Bank          United States

(b)  Is the account at the Wiring Bank held in the name of Subscriber?

✔ Yes          No

(c)  Is Subscriber subject to regulation by any governmental agency with jurisdiction over financial institutions or financial intermediaries (e.g., banking, insurance or securities regulatory authorities)?

Yes          ✔ No

If "Yes," please identify the regulator and explain the nature of the regulation:

_____

_____

3

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

===============================================================

Legal Proceedings

Describe briefly any legal actions, including lawsuits, arbitrations and mediations, involving securities, commodities or other investments, in which you have been involved in the past five years. Attach a separate page if necessary. State the names of the parties to the proceeding, whether you were a plaintiff or defendant, where the action took place (i.e., name of court, location of arbitration), and a brief description of the dispute and the resolution of the matter.  Provide this information for Subscriber unless you are completing this Subscriber Questionnaire as a representative of Subscriber (e.g., an officer of a corporation that is subscribing or a custodian for the account of a minor).  If you are acting as a representative, provide this information for yourself and, to the extent of your knowledge, for Subscriber.

_____

_____

_____

_____

4

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

### *ADDITIONAL INFORMATION – U.S. INVESTORS ONLY*

*If you are a U.S. Person, please check the box that identifies your tax status:*

☐ • Taxable          ☐ • Tax Exempt

### *ADDITIONAL INFORMATION - ENTITY INVESTORS ONLY*

Full Legal Name: ██████████████

Jurisdiction of Formation: ████████

Date Organized: ███████████_

Number of Partners, Shareholders, Members, or
Beneficiaries: ██_____

Purpose of Organization: ████████_____

Was the Subscriber formed for the purpose of investing in the Fund?

_____ Yes

___✔___ No

At the time of the investment in the Fund, will the Fund be the Subscriber's only investment?

_____ Yes

___✔___ No

What percentage of Subscriber's total assets will be accounted for by the Fund?

___10___ %

Do any of the Subscriber's beneficial owners have the power to vary their level of participation in investments made by the entity on an investment by-investment basis?

_____ Yes

___✔___ No

Is the Subscriber an "investment company" as defined in the Investment Company Act of 1940, as amended (the "Investment Company Act")?

_____ Yes

___✔___ No

Is the Subscriber excluded from the definition of an investment company under the exceptions provided for in Sections 3(c)(1) or 3(c)(7) of the Investment Company Act?

___✔___ Yes     If yes, select exemption:     _____ 3(c)(7)     ___✔___ 3(c)(1)

_____ No

5

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

Fund of Fund Status: • ✓   (please check this box if Subscriber is a pooled investment vehicle in which ten percent (10%) or more of its total assets are invested in one or more pooled investment vehicles).

For purposes of completion of the Form PF, please check the form of organization of entity Subscriber. (If the Subscriber is acting as trustee, agent, representative or nominee for a beneficial owner, please check the item that best describes the beneficial owner.)  *Please check one*:

_____broker-dealer

_____insurance company

_____investment company registered with the Securities and Exchange Commission

✓_____private fund[1]

_____non-profit

_____pension plan (other than a governmental pension plan)

_____banking or thrift institution (proprietary)

_____state or municipal government entity[2] (other than a governmental pension plan)

_____state or municipal governmental pension plan

_____trust of a natural person resident in the United States

_____other (please describe): _____

---

[1] The term "private fund" means any issuer that would be an investment company as defined in Section 3 of the Investment Company Act but for Section 3(c)(1) or 3(c)(7) of the Investment Company Act.

[2] For purposes of determining whether the subscriber is a state or municipal government entity, the term "government entity" means any state (including any U.S. state, the District of Columbia, Puerto Rico, the U.S. Virgin Islands or any other possession of the United States) or political subdivision of a state, including: (i) any agency, authority, or instrumentality of the state or political subdivision; (ii) a plan or pool of assets controlled by the state or political subdivision or any agency, authority, or instrumentality thereof; and (iii) any officer, agent, or employee of the state or political subdivision or any agency, authority, or instrumentality thereof, acting in their official capacity. However, please note that if you are a governmental pension plan, you should check the box for "State or municipal governmental pension plan" and not "State or municipal governmental entity."

## BENEFIT PLAN INVESTOR STATUS - ALL INVESTORS COMPLETE

In order for the Fund to accurately monitor its benefit plan investor participation, please review the following definition of a benefit plan investor and make the appropriate representations by checking all applicable boxes following the definition.

A "Benefit Plan Investor" is: (i) any employee benefit plan subject to the fiduciary responsibility provisions of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); (ii) any individual retirement plan or account subject to the prohibited transaction rules of Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"); or (iii) any entity whose underlying assets include "plan assets" (as defined by ERISA and the regulations thereunder) by reason of a plan's investment in the entity.

The Subscriber ▮▮▮▮▮ts that it is (*please initial all applicable spaces*):

A.     ▮▮▮▮     <u>not</u> a Benefit Plan Investor; or

B.     _____     a Benefit Plan Investor that is

    1.     _____     subject to Part 4 of Title I of ERISA;

    2.     _____     subject to Section 4975 of the Code (that has not initialed B1);

    3.     _____     an entity whose underlying assets include "plan assets".

       The Subscriber also represents that the percentage of its "plan assets" compared to the value of its total assets or included in its general account is not more than:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | 10%* | ☐ | 20%* | ☐ | 30% | ☐ | 40% | ☐ | 50% |
| ☐ | 60% | ☐ | 70% | ☐ | 80% | ☐ | 90% | ☐ | 100% |

       * applicable to entities with multiple classes, one of which exceeds the 25% threshold for Benefit Plan Investors and to U.S. insurance company general accounts

    4.     _____     a group trust, a bank common or collective trust or an insurance company separate account.

The Subscriber further agrees: (i) to notify the Fund not less than 30 days prior to this representation (or any part thereof) no longer being true or likely to become untrue; and (ii) to provide the Fund upon request such information as may be required to confirm and/or refine the representations provided above.

<u>Note:</u> the Fund does not currently intend to accept any subscription if the result thereof would be to make the assets of the Fund "plan assets" for purposes of ERISA. The Fund has the right to require Subscriber's withdrawal in order to maintain this status.

7

## INDEPENDENT FIDUCIARY REPRESENTATIONS – INDEPENDENT FIDUCIARY OF BENEFIT PLAN INVESTORS ONLY

The person signing below is the fiduciary of the Subscriber (the "Independent Fiduciary") and represents that the Subscriber is a Benefit Plan Investor.[3] The Independent Fiduciary further represents that the Subscriber's decision to invest in the Fund was made by the Independent Fiduciary and the Independent Fiduciary: (i) has received and reviewed the Fund's confidential private placement memorandum, as the same may be updated or modified from time to time (the "Memorandum"), and the Fund's Memorandum and Articles of Association, as the same may be amended from time to time (the "M&A"); (ii) is a fiduciary under ERISA or Section 4975 of the Code, or both, with respect to the Subscriber's decision to invest in the Fund; (iii) is responsible for exercising independent judgment in evaluating the investment in the Fund; (iv) (A) has no financial or ownership interest in the Investment Manager, or any of its employees or affiliates, including, without limitation, the Fund (collectively, the "Management Parties"); (B) has no other relationship, agreement or understanding with any Management Party that would limit the ability of the Independent Fiduciary to carry out its fiduciary responsibility to the Subscriber beyond the control, direction or influence of the Management Parties; and (C) is independent of the Management Parties; and (v) is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies, including the decision on behalf of the Subscriber to invest in the Fund.

The Independent Fiduciary further represents that it is (*please initial all applicable spaces*):

A. _____ an independent fiduciary that holds, or has under management or control, total assets of at least $50 million;

B. _____ a bank as defined in section 202 of the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act") or similar institution that is regulated and supervised and subject to periodic examination by a State or Federal agency;

C. _____ an insurance carrier which is qualified under the laws of more than one state to perform services of managing, acquiring or disposing of assets of a plan;

D. _____ an investment adviser that is registered under the Investment Advisers Act or, if not registered under the Investment Advisers Act by reason of paragraph (1) of section 203A of such Act, that is registered as an investment adviser under the laws of the State in which it maintains its principal office and place of business; or

E. _____ a broker-dealer that is registered under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

[3] **IF THE SUBSCRIBER DOES NOT HAVE AN INDEPENDENT FIDUCIARY OR IF THE INDEPENDENT FIDUCIARY CANNOT EXECUTE THIS DOCUMENT, PLEASE CONTACT THE INVESTMENT MANAGER.**

8

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

The Independent Fiduciary further represents that none of the Management Parties is undertaking, or has undertaken, to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the decision for the Subscriber to invest in the Fund or otherwise. The Investment Manager's financial interests with respect to the Fund are described in the Memorandum and the M&A.

_____

Name of Subscriber (*please print*)

_____

Signature of Independent Fiduciary

_____

Name of Independent Fiduciary (*please print*)

_____

Title of Independent Fiduciary (*if any*)

_____

Date

9

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

## ACCREDITED INVESTOR STATUS - ALL SUBSCRIBERS COMPLETE

**I. Accredited Investor Certification.** The Subscriber certifies that the Subscriber is as an "accredited investor" as defined in Regulation D under the Securities Act of 1933, as amended (the "Securities Act") because the Subscriber is a(n) (*Please initial all appropriate spaces*):

### <u>Individuals</u>

_____A. natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000. (For purposes of calculating net worth individuals should exclude the value of the primary residence and the related amount of indebtedness secured by the primary residence up to its fair market value. Indebtedness secured by the primary residence in excess of the value of the primary residence should be considered a liability and deducted from net worth. In addition, any increase in the amount of indebtedness secured by the primary residence in the 60 days prior to making the investment must be treated as a liability.)

_____B. natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

_____C. director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer.

_____D. natural person holding in good standing one or more professional certifications or designations or credentials from an accredited educational institution that the SEC has designated as qualifying an individual for accredited investor status.

_____E. natural person who is a "knowledgeable employee" as defined in rule 3c-5(a)(4) under the Investment Company Act, of the issuer of securities being offered or sold where the issuer would be an investment company, as defined in section 3 of such act, but for the exclusion provided by either section 3(c)(1) or section 3(c)(7) of such act.

or

_____F. none of the above apply.

### <u>Institutions</u>

_____G. bank as defined in section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity (collectively, a "Banking Institution").

_____H. broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934, as amended.

_____I. insurance company as defined in section 2(a)(13) of the Securities Act.

_____J. investment company registered under the Investment Company Act or a business development company as defined in section 2(a)(48) of that act.

10

_____K. Small Business Investment Company licensed by the U.S. Small Business Administration undersection 301(c) or (d) of the Small Business Investment Act of 1958.

_____L. plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

_____M. employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

_____N. private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act") (a "PDC").

_____O. organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership (a "501(c)(3) Organization"), not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000.

_____P. trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) (a "Eligible Trust").

Q. entity in which all of the equity owners are accredited investors ("Other Eligible Entity").

_____R. an entity which is not either (i) a Banking Institution, (ii) a PDC, (iii) a 501(c)(3) Organization, (iv) an Eligible Trust, (v) or an Other Eligible Entity, which is not formed for the specific purpose of acquiring the securities offered, owning investments in excess of $5,000,000.

_____S. 'family office' as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act (i) with assets under management in excess of $5,000,000, (ii) that is not formed for the specific purpose of acquiring the securities offered, and (iii) whose prospective investment is directed by a person who has such knowledge and experience in financial and business matters that such family office is capable of evaluating the merits and risks of the prospective investment ("Eligible Family Office").

_____T. 'family client' as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act, of a family office meeting the requirements of an Eligible Family Office, and whose prospective investment in the issuer is directed by such family office pursuant to subsection (iii) of the item above.

or

_____U. none of the above apply.

11

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

**IF YOU ARE A NATURAL PERSON RELYING UPON (A) OR (B) ABOVE TO SATISFY THE ACCREDITED INVESTOR REQUIREMENTS, PLEASE COMPLETE II. BELOW, OR HAVE A QUALIFIED THIRD PARTY COMPLETE III. BELOW ON YOUR BEHALF. ALL OTHER ACCREDITED INVESTORS MAY SKIP (II) AND (III) BELOW.**

**II. Evidence of Accredited Investor Status**

_____ (**A - Accredited Investor Based on Net Worth**) I am providing the following documents, dated within the past three months, to the Fund so that it may reasonably rely upon my representation that I am an Accredited Investor (*check all that apply*):

_____ bank statement
_____ brokerage statement/other statement of securities holdings
_____ certificate of deposit
_____ tax assessment
_____ appraisal report issued by independent third parties
_____ credit report from a nationwide consumer reporting agency
_____ other (*Please explain*): _____

_____ (**B - Accredited Investor Based on Income**) I am providing the following documents, dated within the past three months, to the Fund so that it may reasonably rely upon my representation that I am an Accredited Investor (*check all that apply*):

_____ W-2/1099/Schedule K-1 to Form 1065/Form 1040
_____ paystub
_____ other (*Please explain*): _____

I certify that I have provided all documents and information necessary for the Fund to form a reasonable belief that I am an Accredited Investor. If I have made a representation and warranty based on (A) above, then I further represent and warrant that I have disclosed all liabilities necessary for the Fund to make a determination of my net worth. If I have made a representation and warranty based on (B) above, then I further represent and warrant that I have a reasonable expectation of earning income sufficient to qualify as an Accredited Investor during the current calendar year.

Signature of Subscriber: _____

Date: _____

Print Name of Subscriber: _____

Signature of Co-Subscriber _____

Date: _____

Print Name of Co-Subscriber_____

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

**III. Additional Accredited Investor Certification (For Natural Persons Only) by Certifying Professional**

This Additional Accredited Investor Certification ("Additional Certification") is being delivered to the State Street Bank and Trust Co. (the "Administrator") acting on behalf of BKCoin Management LLC (the "Investment Manager") of BKCoin Multi-Strategy Fund Ltd. (the "Issuer"), in connection with the potential investment by _____ ("Subscriber") in the shares (the "Securities") of the Issuer . The Issuer will rely on upon the accuracy and completeness of the information provided in the Additional Certification in establishing that the Subscriber is an "Accredited Investor" (as that term is defined in 501(a) of Regulation D promulgated under Section 4(a)(2) of the Securities Act). The Certifying Professional understands and agrees that the Issuer may present this Additional Certification to such parties as the Issuer deems appropriate if called upon to establish that the Securities have been offered and sold in accordance with Rule 506(c) under the Securities Act or any other applicable federal or state securities laws.

## CERTIFICATION

The Certifying Professional hereby certifies that:

1. The Certifying Professional is:

_____An attorney, licensed to practice, and in good standing, in the state of _____.
_____A certified public accountant, licensed to practice, and in good standing, in the state of _____.
_____A registered broker–dealer.
_____An SEC registered investment adviser.

2. The Subscriber is an Accredited Investor because (*check all that apply*):

_____ (a) The Subscriber is a natural person whose individual net worth, or joint net worth with his/her spouse, exceeds $1,000,000,[1] and the Certifying Professional has personally reviewed the following documents, dated within the past three months, in order to make the determination above (*check all that apply*):

_____ bank statement
_____ brokerage statement/other statement of securities holdings
_____ certificate of deposit
_____ tax assessment
_____ appraisal report issued by independent third parties
_____ credit report from a nationwide consumer reporting agency
_____ other (*Please explain*): _____
_____ written representation from the Subscriber that all liabilities necessary to make a determination of net worth have been disclosed

---

[1] For purposes of Item 2(a), **net worth** means the excess of total assets at fair market value (including personal and real property, but excluding the estimated fair market value of a person's primary home) over total liabilities. Total liabilities excludes any mortgage on the primary home in an amount of up to the home's estimated fair market value as long as the mortgage was incurred more than 60 days before the Seucrites are purchased, but includes (i) any mortgage amount in excess of the home's fair market value and (ii) any mortgage amount that was borrowed during the 60-day period before the closing date for the sale of Securities for the purpose of purchasing the Securities.

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

_____ (b) The Subscriber is a natural person who had individual income exceeding $200,000 —or joint income with his/her spouse exceeding $300,000—in each of the last two calendar years and who has a reasonable expectation of reaching the same income level in the current calendar year[2], and the Certifying Professional has personally reviewed the following documents, dated within the past three months, in order to make the determination above (*check all that apply*):

_____ W-2/1099/Schedule K-1 to Form 1065/Form 1040
_____ paystub
_____ other (*Please explain*): _____
_____ written representation from the Subscriber that the Subscriber has a reasonable expectation of earning income sufficient to qualify as an Accredited Investor during the current calendar year.

## CERTIFYING PROFESSIONAL:

Sign Here: _____

Individual Name: _____

Title: _____

Company: _____

Address: _____

_____

Telephone Number: _____

Email Address: _____

Date: _____

License/Registration Number: _____

Licensing/Registering Agency: _____

---

[2] For purposes of Item 2(b), "**income**" means annual adjusted gross income, as reported for federal income tax purposes, plus (i) the amount of any tax-exempt interest income received; (ii) the amount of losses claimed as a limited partner in a limited partnership; (iii) any deduction claimed for depletion; (iv) amounts contributed to an IRA or Keogh retirement plan; (v) alimony paid; and (vi) any amount by which income from long term capital gains has been reduced in arriving at adjusted gross income pursuant to the provision of Section 1202 of the Internal Revenue Code of 1986, as amended.



## QUALIFIED CLIENT STATUS - ALL SUBSCRIBERS COMPLETE

The Subscriber certifies that the Subscriber is a "qualified client" as defined in Rule 205-3 under the Investment Advisers Act because the Subscriber is a(n):

Please initial all appropriate spaces.

### Individuals

_____natural person who has at least $1,100,000 under the management of the Investment Manager after executing the Subscription Agreement.

_____natural person who has a net worth (together with assets held jointly with a spouse) of more than $2,200,000 at the time of executing the Subscription Agreement. (For purposes of calculating net worth individuals should exclude the value of the primary residence and the related amount of indebtedness secured by the primary residence up to its fair market value. Indebtedness secured by the primary residence in excess of the value of the primary residence should be considered a liability and deducted from net worth. In addition, any increase in the amount of indebtedness secured by the primary residence in the 60 days prior to making the investment must be treated as a liability.)

_____natural person who is a qualified purchaser as defined in section 2(a)(51)(A) of the Investment Company Act at the time of executing the Subscription Agreement.

_____natural person who immediately prior to executing the Subscription Agreement is an executive officer, director, trustee, general partner, or person serving in a similar capacity, of the Investment Manager.

_____natural person who immediately prior to signing the Subscription Agreement is an employee of the Investment Manager (other than an employee performing solely clerical, secretarial or administrative functions with regard to the Investment Manager) who, in connection with his or her regular functions or duties, participates in the investment activities of such Investment Manager, provided that such employee has been performing such functions and duties for or on behalf of the Investment Manager, or substantially similar functions or duties for or on behalf of another company for at least 12 months.

or

_____none of the above apply.

### Institutions

**Entities (including a trust, corporation, partnership, limited liability company, association, joint-**
**▮▮▮▮ompany, or any organized group of persons, whether incorporated or not):**

_____entity that has at least $1,100,000 under the management of the Investment Manager after executing the Subscription Agreement.

15

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

_____entity that has a net worth of more than $2,200,000 at the time of executing the Subscription Agreement.

_____entity that is a qualified purchaser as defined in section 2(a)(51)(A) of the Investment Company Act at the time of executing the Subscription Agreement.

or

_____none of the above apply.

## <u>**Additional Certification for Institutions**</u>

**An entity that (1) would be defined as an investment company under the Investment Company Act but for the exception from that definition provided under Section 3(c)(1) of the Investment Company Act ("Section 3(c)(1) Fund"); (2) is an investment company registered under the Investment Company Act; or (3) is a "business development company" as defined in Section 202(a)(22) of the Investment Advisers Act MUST complete the additional certification below by initialing all appropriate spaces:**

_____each of the Subscriber's equity owners satisfies one or more of the qualified client criteria under "Individuals" or "Institutions" above.

_____the Subscriber represents that with respect to each of its equity owners that is a Section 3(c)(1) Fund, an investment company registered or required to be registered under the Investment Company Act or a business development company (if any), the Subscriber has determined that each ultimate beneficial owner of such an entity, after looking though all such entity owners, satisfies one or more of the qualified client criteria under "Individuals" or "Institutions" above.

_____the Subscriber represents that it has identified all equity owners who are not qualified clients (if any) and has the ability to, and does, allocate charges for performance fees so that its equity owners who are not qualified clients are not charged a performance fee.

16

**RESTRICTED PERSON STATUS (FINRA RULE 5130) - ALL SUBSCRIBERS COMPLETE**

The Subscriber must complete this section in order for the Fund to be able to determine the extent to which the Subscriber may participate in new issue securities ("New Issues") in accordance with Rule 5130 or any successor provision thereto ("Rule 5130") of the Conduct Rules of the Financial Regulatory Authority, Inc. ("FINRA"). If the Subscriber is a corporation, partnership, trust or any other entity or a nominee for another person, the person completing this section with respect to the Subscriber must be the beneficial owner(s), a person authorized to represent the beneficial owner(s), or a bank, foreign bank, broker-dealer, investment adviser or other conduit acting on behalf of the beneficial owner(s).

☐      **IF YOU WISH TO BE TREATED AS A "RESTRICTED PERSON" FOR THE PURPOSES OF RULE 5130, PLEASE CHECK THE BOX. Otherwise, please complete Part I and Part II below, as applicable.**

INSTRUCTIONS: Each Subscriber must complete this section by placing their initials next to all applicable categories under Part I to determine whether the Subscriber is a restricted person (a "Restricted Person") or indicating under Part II that none of the Restricted Person categories apply to it and the Subscriber is eligible to participate in New Issues. A Subscriber that is an entity and that is also a Restricted Person under Part I may still be able to participate in New Issues if it indicates in Part II that it is also an exempted entity (an "Exempted Entity"). Accordingly, each such Subscriber should initial the area next to any applicable categories under Part II to determine whether the Subscriber is an Exempted Entity. If you do not complete this section, you may not be permitted to participate in New Issues to any extent until you establish your eligibility to participate in New Issues to the Fund's satisfaction.

**Part I - For All Subscribers**

(a)      Is Subscriber a FINRA member firm or other broker-dealer?

                      _____ Yes        No

(b)      Is Subscriber an officer, director, general partner, associated person or employee of a FINRA member firm or any other broker-dealer (other than a limited business broker-dealer)?

                      _____ Yes        No

(c)      Is Subscriber an agent of a FINRA member firm or any other broker-dealer (other than a limited business broker-dealer) that is engaged in the investment banking or securities business?

                      _____ Yes        No

(d)      Is Subscriber a person who has authority to buy or sell securities for a bank, savings and loan association, insurance company, investment company, investment adviser (whether or not registered as an investment adviser) or collective investment account?

                      _____ Yes        No

(e)     Is Subscriber a person listed, or required to be listed, on one of the following schedules to Form BD as filed, or required to be filed, with the SEC by a broker-dealer (other than with respect to a limited broker-dealer): (i) Schedule A, unless the person is identified by an ownership code of less than 10%; (ii) Schedule B, unless the person's listing on Schedule B relates to an ownership interest in a person that is listed on Schedule A and identified by an ownership code of less than 10%; or (iii) Schedule C, unless the person would be excluded under the percentage ownership criteria for Schedule A or B above?

_____Yes     ▮No

(f)     Is Subscriber a person that directly or indirectly owns an interest, in the amounts specified below, of a public reporting company listed, or required to be listed, on Schedule A or B of Form BD relating to a broker-dealer (other than a limited business broker-dealer), unless the public reporting company is listed on a national securities exchange or is traded on the NASDAQ Global Market: (i) 10% or more of a public reporting company listed, or required to be listed, on Schedule A or (ii) 25% or more of a public reporting company listed, or required to be listed, on Schedule B.

_____Yes     ▮No

(g)     Is Subscriber a person acting: (i) as a finder in connection with any new issue in which the person is participating or (ii) in a fiduciary capacity to the managing underwriter(s) in connection with any new issue in which the person is p_____ting?

_____Yes     ▮No

(h)     Is Subscriber an immediate family member of (i) a person specified in items (b)-(g) that materially supports, or receives support from, that person; (ii) a person specified in items (b)-(c) that is employed by or associated with the FINRA member or its affiliate selling the new issue to the immediate family member, or that has an ability to control the allocation of the new issue; or (iii) a person specified in items (e)-(f) that is an owner of the FINRA member or its affiliate selling the new issue to the immediate family member, or that has an ability to control the allocation of the new issue?

_____Yes     ▮No

**Part II - For Entity Subscribers Who Initialed "Yes" Above**

A Subscriber that is an entity and that is also a Restricted Person under Part I may still be able to participate fully in the profits and losses of new issues if it indicates below that it is also an exempted entity. Please answer the following questions:

(a)     Is Subscriber an investment company registered under the Investment Company Act?

_____Yes     _____No

(b)     Is Subscriber a common trust fund or similar fund as described in Section 3(a)(12)(A)(iii) of the Exchange Act, and (i) the fund has investments from 1,000 or more accounts; and (ii) the

18

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

fund does not limit beneficial interests in the fund principally to trust accounts of restricted persons?

_____Yes    _____No

(c)     Is Subscriber an insurance company general, separate or investment account and (i) the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders; and (ii) the insurance company does not limit the policyholders whose premiums are used to fund the account principally to restricted persons, or, if a general account, the insurance company does not limit its policyholders principally to restricted persons?

_____Yes    _____No

(d)     Is Subscriber an account (including a collective investment account such as a hedge fund or an offshore fund, or a broker-dealer organized as an investment vehicle) and (i) the beneficial interests of restricted persons do not exceed in the aggregate 10% of such account or (ii) such entity limits participation by Restricted Persons to not more than 10% of the profits and losses of new issues?

_____Yes    _____No

(e)     Is Subscriber a publicly traded entity (other than a broker-dealer or an affiliate of a broker-dealer where such broker-dealer is authorized to engage in the public offering of new issues either as a selling group member or underwriter) and (i) is listed on a national securities exchange or (ii) is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange?

_____Yes    _____No

(f)     An investment company organized under the laws of a foreign jurisdiction, provided that: (i) the investment company is listed on a foreign exchange for sale to the public or authorized for sale to the public by a foreign regulatory authority; and (ii) no person owning more than 5% of the shares of the investment company is a restricted person?

_____Yes    _____No

(g)     Is Subscriber an ERISA benefits plan that is qualified under Section 401(a) of the Code, provided that such plan is not sponsored solely by a broker-dealer?

_____Yes    _____No

(h)     Is Subscriber a state or municipal government benefits plan that is subject to state and/or municipal regulation?

_____Yes    _____No

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

(i)      Is Subscriber a tax exempt charitable organization under Section 501(c)(3) of the Code?

_____Yes      _____No

(j)      Is Subscriber a church plan under Section 414(e) of the Code?

_____Yes      _____No

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

**SPINNING PROHIBITION (FINRA RULE 5131) - ALL SUBSCRIBERS COMPLETE**

The practice of "spinning" occurs when a broker-dealer allocates a new issue to an executive officer or director of a company, who then returns the favor by using the broker-dealer for its company's investment banking needs. Subject to certain conditions and exceptions, Section (b) of FINRA Rule 5131, or any successor provision thereto ("Rule 5131"), bans spinning by generally prohibiting a FINRA member from allocating shares of a new issue to any account (e.g., a private investment fund) in which an executive officer or director of a "public company" or a "covered non-public company," or a "person materially supported" by such an executive officer or director, has a beneficial interest if such person's company has or expects to have an investment banking relationship with the FINRA member. Please see "FINRA Rule 5130 and Rule 5131 Definitions" below for definitions of the above terms.

**If the Subscriber indicated in Part I above that it wishes to be treated as a "Restricted Person" and not participate in any profits and losses attributable to New Issues, Subscriber may skip this section. Otherwise, please complete Part A and Part B below, as applicable.**

INSTRUCTIONS: In order for the Fund to determine (i) whether it has complied with such requirements and (ii) the extent to which the undersigned Subscriber is eligible to participate in profits and losses from such New Issues, each Subscriber must complete this section by placing their initials next to all applicable categories under Part A to determine whether the Subscriber is exempt from Rule 5131 restrictions or indicating its restricted status and providing the necessary information under Part B. If the Subscriber is a corporation, partnership, trust or any other entity or a nominee for another person, the person completing this section with respect to the Subscriber must be the beneficial owner(s), a person authorized to represent the beneficial owner(s), or a bank, foreign bank, broker-dealer, investment adviser or other conduit acting on behalf of the beneficial owner(s). If you do not complete this section, you may not be permitted to participate in New Issues to any extent until you establish your eligibility to participate in New Issues to the Fund's satisfaction.

**Part A – Entity Subscriber Only (*Determination of Exempt Status*)**

(a)     Is Subscriber an entity listed above in Part II (a)-(c) or _____ above?



_____Yes            _____No

(b)     Is Subscriber a corporation, partnership, trust or other entity and the beneficial interests of Rule 5131 Restricted Persons (as defined below) that serve on behalf of (or are materially supported by an executive officer or director of) a particular public company or covered non-public company do not exceed in the aggregate 25% of such entity? A Subscriber that limits the participation by Rule 5131 Restricted Persons that serve on behalf of (or are materially supported by an executive officer or director of) a particular public company or covered non-public company to no more than 25% (in the aggregate) of the profits and losses of new issues may initial this statement.

_____Yes            _____No

21

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

**Part B – For Individual Subscribers and Entity Subscribers Who Initialed "No" Above**

(a)    Is the Subscriber or a person having a beneficial interest in the Subscriber, an executive officer or director of a public company?

_____Yes  ▮ No

Name of Company: _____

(b)    Is the Subscriber or a person having a beneficial interest in the Subscriber, an executive officer or director of a covered non-public company?

_____Yes  ▮ No

Name of Company: _____

(c)    Is the Subscriber or a person having a beneficial interest in the Subscriber, a person materially supported by an executive officer or director of a public company or a covered non-public company?

_____Yes  ▮ No

Name of Company: _____

(d)    Is the Subscriber or a person having a beneficial interest in the Subscriber, a corporation, partnership, trust or other entity in which persons described in Part B (a), (b) or (c) (each, a "Rule 5131 Restricted Person") have a beneficial interest?

_____Yes  ▮ No

Name of Company: _____

Share of Profits: _____

22

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

**FINRA Rule 5130 and Rule 5131 Definitions:**

*Associated Person or employee of a FINRA member firm.* (1) Any natural person registered with FINRA and (2) any natural person, whether or not registered or exempt from registration with FINRA, who is a sole proprietor, partner, officer, director, or branch manager of a FINRA member firm, or any natural person occupying a similar status or performing similar functions, or any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a FINRA member firm (for example, any employee).

*Beneficial interest.* Any economic interest, including the right to share in gains or losses, other than management or performance-based fees for operating a collective investment account, or other fees for acting in a fiduciary capacity.

*Collective investment account.* Any hedge fund, investment partnership, investment corporation, or any other collective investment vehicle that is engaged primarily in the purchase and sale of securities, but not (1) a legal entity that is beneficially owned solely by immediate family members or (2) an investment club comprising a group of friends, neighbors, business associates or others who pool their money to invest in stock or other securities and are collectively responsible for making investment decisions.

*Covered Non-Public Company.* Any non-public company satisfying the following criteria:

(i)     income of at least $1 million in the last fiscal year or in two of the last three fiscal years and shareholders' equity of at least $15 million;

(ii)    shareholders' equity of at least $30 million and a two-year operating history; or

(iii)   total assets and total revenue of at least $75 million in the latest fiscal year or in two of the last three fiscal years.

*Finder.* A person who receives compensation for identifying potential investors in an offering.

*Immediate family member.* A person's parents, mother-in-law or father-in-law, spouse, brother or sister, brother-in-law or sister-in-law, son-in-law or daughter-in-law and children, and any other individual to whom the person provides material support.

*Limited business broker-dealer.* Any broker-dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company/variable contracts securities and direct participation program securities.

*Material support.* Directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to be providing each other with material support.

*Public Company.* Any company that is registered under Section 12 of the Exchange Act or files periodic reports pursuant to Section 15(d) thereof.

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

## FATCA INFORMATION – ALL SUBSCRIBERS COMPLETE

Please provide the following information with respect to the Subscriber's designated responsible officer ("RO") for purposes of FATCA (if applicable):

Legal Name (Last, First):

Title:

Address

Business Telephone Number:

Business Email Address:

24

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

## SUBSCRIBER QUESTIONNAIRE SIGNATURE PAGE

The Subscriber understands that the Fund will be relying on the accuracy and completeness of the responses to the foregoing questions, and the Subscriber represents and warrants to each of them that: (i) the answers to the above questions are complete and correct and may be relied upon by the Fund in determining whether the offering in which the Subscriber proposes to participate is exempt from registration under federal and state securities laws; (ii) the Subscriber will notify the Fund immediately of any material change in any statement made herein occurring prior to the closing of any purchase by the Subscriber of any Interests in the Fund; and (iii) the Subscriber is able to bear the economic risk of the investment and, at the present time, can afford a complete loss of such investment.

The Fund's primary mode of communication will be via e-mail. Please indicate where written communications should be sent.  Please initial all that apply.

_____ Mailing Address

_____ Residence or Principal Place of Business Address

_____ Authorized Representative/Agent


_____
Name of Subscriber (please print)

_____
Signature and Applicable Title (if any)

June 17, 2022
_____
Date

_____
Signature and Applicable Title (if more than one)

_____
Date

25

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

## SUBSCRIPTION AGREEMENT

BKCoin Multi-Strategy Fund Ltd.
c/o State Street Bank and Trust Co.
100 Summer Street, 5th Floor
Boston, MA 02110

To Whom It May Concern:

The undersigned (the "Subscriber") wishes to become a shareholder of BKCoin Multi-Strategy Fund Ltd., the "Fund"), a British Virgin Islands company limited by shares, and irrevocably apply for such number of participating, redeemable, non-voting Shares (an "Interest") in the Fund as may be purchased with the subscription amount specified at Section 1 below, upon the terms and conditions set forth herein, in the confidential privateplacement memorandum of the Fund, as the same may be updated or modified from time to time (the "Memorandum"), and in the Memorandum and Articles of Association of the Fund, as the same maybe amended from time to time (the "M&A"). Capitalized terms used herein but not defined herein shall have the meanings assigned to them in the M&A.

Accordingly, the Subscriber agrees as follows:

1.  **Subscription.** The Subscriber hereby irrevocably subscribes for the dollar amount of Interests in the Fund in the following amount:

<div align="center">Cash Subscription</div>

*Please complete the following table for a subscription being made in fiat (USD):*

| | |
|---|---|
| *Subscription in USD:* | US $ **250000** |

<div align="center">In-Kind Subscription</div>

*Please complete the following table for an in kind subscription:*

| | |
|---|---|
| *Quantity of* _____ : | |

Note: for contributions in-kind of digital assets, the Fund will provide further instructions on how to transfer the relevant digital assets. The amount of the in-kind capital contribution shall be the value as of the time of receipt of the in-kind assets by the Fund. Please see the 'Taxation – Contributions In-Kind' in the Fund's Memorandum for certain tax risks of subscribing to the Fund with an in-kind contribution of digital assets, including such contribution possibly triggering the recognition of gain to the subscriber.

The Subscriber understands and agrees that the Fund may accept or reject the amount of any subscription for an Interest in whole or in part. If the subscription is rejected, payment received by the Fund from the Subscriber, if any, will be returned, without interest, promptly to the Subscriber and this subscription agreement (the "Subscription Agreement") shall have no force or effect. Upon acceptance of this subscription by the Fund, the Subscriber shall become a Shareholder in the Fund. In addition to the foregoing, the Shareholder understands that the Interest issued to Subscriber may be designated as either restricted or unrestricted for purposes of FINRA Rule 5130.

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

2.    **Representations and Warranties of the Subscriber.** To induce the Investment Manager to accept this Subscription Agreement on behalf of the Fund, the Subscriber hereby represents, warrants and covenants to the Investment Manager and the Fund as follows:

(a)    The Subscriber hereby represents and warrants that: (*Please tick as appropriate*):

- the Subscriber is not a U.S. Person and it hereby declares, represents and warrants to the Manager and the Fund the terms set out in paragraph 6 below; or

- the Subscriber is a U.S. Person[3] and it hereby declares, represents and warrants to the Manager and the Fund the terms set out in paragraph 7 below.

(b)    The Subscriber will not sell or otherwise transfer the Interest except in accordance with the terms of the M&A and, if applicable, without registration under the Securities Act of 1933, as amended (the "Securities Act"), or an exemption therefrom. The Subscriber understands and agrees that it must bear the economic risk of its investment for an indefinite period of time (subject to limited rights of withdrawal provided in the M&A) because, among other reasons, the Interest has not been registered under the Securities Act or under the securities laws of certain states and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless it is so registered or an exemption from registration is available. The Subscriber understands that the Fund is under no obligation to register the Interest on its behalf or to assist it in complying with any exemption from registration under the Securities Act. Furthermore, the Interest can only be transferred with the prior authorization of the directors, which may be withheld in the directors in their sole discretion. The Subscriber understands and acknowledges that the directors in

---

[3] For purposes of this section, "U.S. Person" shall mean any of the following persons: (i) a natural person resident in the United States of America; (ii) a partnership or corporation organized or incorporated under the laws of the United States; (iii) an estate of which any executor or administrator is a U.S. Person; (iv) a trust of which any trustees is a U.S. Person; (v) an agency or branch of a foreign entity located in the United States; (vi) a non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. Person; (vii) a discretionary account or similar account that is held for the benefit of a U.S. Person by a dealer or other professional fiduciary if the dealer or professional fiduciary is a related person of the investment adviser and is not organized, incorporated, or (if an individual) resident in the U.S.; or (viii) a partnership or corporation that is (a) organized or incorporated under the laws of any foreign jurisdiction and (b) formed by a U.S Person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by Accredited Investors who are not natural persons, estates or trusts. Notwithstanding the foregoing, you would NOT be considered a U.S. Person if any of the following apply: (i) you are a discretionary account or similar account (other than an estate or trust) held for the benefit or account of a non-U.S. Person by a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the U.S.; (ii) you are an estate of which any professional fiduciary acting as executor or administrator is a U.S. Person and (a) the executor or administrator of the estate who is not a U.S. Person has sole or shared investment discretion with respect to the assets of the estate and (b) the estate is governed by foreign law; (iii) you are a trust of which a professional fiduciary acting as trustee is a U.S. Person and (a) a trustee who is not a U.S. Person has sole or shared investment discretion with respect to the trust assets and (b) no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. Person; (iv) you are an employee benefit plan established and administered in accordance with (a) the law of a country other than the United States and (b) customary practices and documentation of such country; (v) you are an agency or branch of a U.S. Person located outside the United States and (a) the agency or branch operates for valid business reasons and (b) the agency or branch is engaged in the business of insurance or banking and is subject to substantive insurance or banking regulation, respectively, in the jurisdiction where located; or (vi) you are one of the following: the International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Bank, the Asian Development Bank, the African Development Bank, the United Nations, or their agencies, affiliates, and person plans, or any other similar international organizations, their agencies, affiliates, and pension plans.

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

its sole discretion may cause a compulsory withdrawal of all or any portion of Subscriber's Interest in accordance with the M&A.

(c)     The Subscriber has received, carefully read and understands the M&A and the Memorandum outlining, among other things, the organization and investment objectives and policies of, and the risks and expenses of an investment in, the Fund. The Subscriber acknowledges that it has made an independent decision to invest in the Fund and that, in making its decision to subscribe for an Interest, the Subscriber has relied solely upon the Memorandum, the M&A, and independent investigations made by the Subscriber. The Subscriber is not relying on the Fund or the Investment Manager, or any other person or entity with respect to the legal, tax and other economic considerations involved in this investment other than the Subscriber's own advisers. The Subscriber's investment in the Interest is consistent with the investment purposes, objectives and cash flow requirements of the Subscriber and will not adversely affect the Subscriber's overall need for diversification and liquidity.

The Subscriber has been provided an opportunity to obtain any additional information concerning the offering, the Fund and all other information to the extent the Fund or the Investment Manager possesses such information or can acquire it without unreasonable effort or expense, and has been given the opportunity to ask questions of, and receive answers from, the Investment Manager concerning the terms and conditions of the offering and other matters pertaining to this investment.

(d)     The Subscriber has not reproduced, duplicated or delivered the Memorandum, the M&A, or this Subscription Agreement to any other person, except professional advisers to the Subscriber or as instructed by the Investment Manager. Notwithstanding the foregoing, the Subscriber (and each employee, representative or other agent of the Subscriber) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of (i) the Fund; and (ii) any of its transactions, and all materials of any kind (including opinions or other tax analyses) that are provided to the Subscriber relating to such tax treatment and tax structure.

(e)     The Subscriber has, together with the purchaser representative, if any, such knowledge and experience in financial and business matters that the Subscriber is capable of evaluating the merits and risks of the Subscriber's investment in the Fund and is able to bear such risks, and has obtained, in the Subscriber's judgment, sufficient information from the Fund to evaluate the merits and risks of such investment. The Subscriber has evaluated the risks of investing in the Fund, understands there are substantial risks of loss incidental to the purchase of an Interest and has determined that the Interest is a suitable investment for the Subscriber.

(f)     The Subscriber is aware of the limited provisions for transferability and withdrawal from the Fund.  The Subscriber has no need for liquidity in this investment, can afford a complete loss of the investment in the Interest and can afford to hold the investment for an indefinite period of time. The Subscriber acknowledges that distributions, including, without limitation, the proceeds of withdrawals, may be paid in cash or in-kind.

The Subscriber understands that the value of a Shareholder's capital account and withdrawals therefrom under the M&A, and the performance of the Fund, may be based

on unaudited and in some cases, estimated, valuations of the Fund's investments and that valuations provided in a Subscriber's account statement may be an unaudited, estimated value.

(g)     The Subscriber is acquiring the Interest for its own account, for investment purposes only and not with a view toward distributing or reselling the Interest in whole or in part.

(h)     The Subscriber understands the method of compensation under the M&A between the Fund and the Investment Manager and its risks.

(i)     The Subscriber understands that no federal or state agency (including any federal or state agency in the U.S. or any other country) has passed upon the Interests or made any findings or determination as to the fairness of this investment.

(j)     The Subscriber has all requisite power, authority and capacity to acquire and hold the Interest and to execute, deliver and comply with the terms of each of the instruments required to be executed and delivered by the Subscriber in connection with the Subscriber's subscription for the Interest, including this Subscription Agreement, and such execution, delivery and compliance does not conflict with, or constitute a default under, any instruments governing the Subscriber, or violate any law, regulation or order, or any agreement to which the Subscriber is a party or by which the Subscriber may be bound. If the Subscriber is an entity, the person executing and delivering each of such instruments on behalf of the Subscriber has all requisite power, authority and capacity to execute and deliver such instruments, and such entity is duly formed and organized, validly existing, and in good standing under the laws of its jurisdiction of formation, and such entity is authorized by its governing documents to execute, deliver, and perform its obligations under this Subscription Agreement and to become a member in the Fund. The person executing this Subscription Agreement on behalf of the Subscriber will, upon request by the Fund or the Investment Manager, furnish to the Fund true and correct copies of any instruments governing the Subscriber, including all amendments thereto.

(k)     All information which the Subscriber has provided to the Fund or the Investment Manager concerning the Subscriber, the Subscriber's status, financial position and knowledge and experience of financial, tax and business matters, or, in the case of a Subscriber that is an entity, the knowledge and experience of financial, tax and business matters of the person making the investment decision on behalf of such entity, is correct and complete as of the date set forth herein.

(l)     Subscriber understands that the Fund will not register as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"), nor will it make a public offering of its securities within the United States. The Subscriber understands that the Fund complies with Section 3(c)(1) of the Investment Company Act, which excludes from the definition of investment company any issuer whose outstanding securities are beneficially owned exclusively by no more than 100 beneficial owners or fewer persons and which is not making and does not at that time propose to make a public offering of such securities.

If the Subscriber is an entity, the Subscriber represents that: (i) it was not formed for the purpose of investing in the Fund; (ii) it does not invest more than 40% of its total assets

29

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

in the Fund; (iii) each of its beneficial owners participates in investments made by the Subscriber pro rata in accordance with its interest in the Subscriber and, accordingly, its beneficial owners cannot opt in or out of investments made by the Subscriber; and (iv) its beneficial owners did not and will not contribute additional capital (other than previously committed capital) for the purpose of purchasing the Interests.

The Subscriber acknowledges that the Fund reserves the right to refuse any transfer of the Interests if the effect of a transfer would cause the Fund to be required to register as an investment company under the Investment Company Act.

(m)     The Subscriber represents and warrants that it is an "accredited investor" as such term is defined pursuant to Regulation D promulgated under the Securities Act and a "qualified client" as defined in Rule 205-3 under the Investment Advisers Act, the definitions of which are set forth in the attached suitability questionnaire ("Subscriber Questionnaire"). The Subscriber further understands that none of the Investment Manager, its principals or their respective affiliates are registered as investment advisers pursuant to the Investment Advisers Act or the securities laws of any state.

*If the Subscriber is not a "qualified client," the Subscriber should strike through the appropriate part of this section.*

(n)     If the Subscriber is a "plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") that is subject to the provisions of Title I of ERISA, and/or a "plan" that is subject to the prohibited transaction provisions of Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or an entity whose assets are treated as "plan assets" under Section 3(42) of ERISA and any regulations promulgated thereunder (a "Plan"), the person executing this Subscription Agreement on behalf of the Plan (the "Fiduciary") represents and warrants to the Fund that:

(i)     such person is a "fiduciary" of such Plan and trust and/or custodial account within the meaning of Section 3(21) of ERISA, and/or Section 4975(e)(3) of the Code and such person is authorized to execute the Subscription Agreement;

(ii)    unless otherwise indicated in writing to the Fund, the Plan is not a participant-directed defined contribution plan;

(iii)   the Fiduciary has considered a number of factors with respect to the Plan's investment in the Interest and has determined that, in view of such considerations, the purchase of an Interest is consistent with the Fiduciary's responsibilities under ERISA. Such factors include, but are not limited to: (a) the role such investment or investment course of action plays in that portion of the Plan's portfolio that the Fiduciary manages; (b) whether the investment or investment course of action is reasonably designed as part of that portion of the portfolio managed by the Fiduciary to further the purposes of the Plan, taking into account both the risk of loss and the opportunity for gain that could result therefrom; (c) the composition of that portion of the portfolio that the Fiduciary manages with regard to diversification; (d) the liquidity and current rate of return of that portion of the portfolio managed by the Fiduciary relative to the anticipated cash flow requirements of the Plan; (e) the

projected return of that portion of the portfolio managed by the Fiduciary relative to the funding objectives of the Plan; and (f) the risks associated with an investment in the Fund and the fact that the Subscriber has only limited withdrawal rights.

(iv)    the investment in the Fund has been duly authorized under, and conforms in all respects to, the documents governing the Plan and the Fiduciary;

(v)    the Fiduciary is: (a) responsible for the decision to invest in the Fund; (b) independent of the Fund; and (c) qualified to make such investment decision;

(vi)    (a) none of the Investment Manager, any of its employees or affiliates: (i) manages any part of the Subscriber's investment portfolio on a discretionary basis; (ii) regularly gives investment advice with respect to the assets of the Subscriber; (iii) has an agreement or understanding, written or unwritten, with the Subscriber under which the latter receives information, recommendations or advice concerning investments which are used as a primary basis for the Subscriber's investment decisions; or (iv) has an agreement or understanding, written or unwritten, with the Subscriber under which the latter receives individualized investment advice concerning the Subscriber's assets;

OR

(b): (i) the Fiduciary, who is independent of the Investment Manager, has studied the Memorandum and has made an independent decision to purchase Interests solely on the basis of such Memorandum and without reliance on any other information or statements as to the appropriateness of this investment for the Subscriber; and (ii) the Subscriber represents and warrants that neither the Investment Manager nor any of its employees or affiliates: (A) has exercised any investment discretion or control with respect to the Subscriber's purchase of Interests; (B) has authority, responsibility to give, or has given individualized investment advice with respect to the Subscriber's purchase of the Interests; or (C) is the employer maintaining or contributing to such Plan.

(o)    If the Subscriber is an insurance company and is investing the assets of its general account (or the assets of a wholly owned subsidiary of its general account) in the Fund, it has identified in the Subscriber Questionnaire whether the assets underlying the general account constitute "plan assets" within the meaning of Section 401(c) of ERISA. The Subscriber agrees to promptly notify the Investment Manager in writing if there is a change in the percentage of the general account's assets that constitute "plan assets" within the meaning of Section 401(c) of ERISA and shall disclose such new percentage ownership.

(p)    If the Subscriber is an investment company ("Investment Company") as defined in Section 3(a) of the Investment Company Act or an Investment Company that is exempt from registration pursuant to Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act (a "3(c)(1) or 3(c)(7) Company"), the Subscriber recognizes that the Fund is restricted by law as to the number of beneficial interests held in the Fund, and, that in determining the number of beneficial interests in the Fund, it may be necessary, in certain circumstances, to count the beneficial owners of the Subscriber, if it owns 10% or more

31

of the members' interests in the Fund. Accordingly, the Subscriber agrees: (i) to notify the Fund prior to making a capital contribution, if it is a 3(c)(1) or 3(c)(7) Company or an Investment Company; (ii) to take whatever action is requested by the Fund to have its interest in the Fund be less than 10% of the total interests of the members; and (iii) that the General Partner of the Fund may require the Subscriber to withdraw at any time so much of its interest as is necessary to keep such interest below 10%.

(q)     If the Subscriber is a "charitable remainder trust" within the meaning of Section 664 of the Code, the Subscriber has advised the Investment Manager in writing of such fact and the Subscriber acknowledges that it understands the risks, including specifically the tax risks, if any, associated with its investment in the Fund.

(r)     If the Subscriber is purchasing in a representative or fiduciary capacity, the representations and warranties herein shall be deemed to have been made on behalf of the person or persons for whom the Subscriber is so purchasing, and the Subscriber agrees to furnish to the Investment Manager, upon request, documentation satisfactory to the Investment Manager in the Investment Manager' sole discretion, supporting the truthfulness of such representations and warranties as made on behalf of such person or persons.

(s)     The Subscriber understands and agrees that, although the Fund will use its reasonable efforts to keep the information provided in the answers to this Subscription Agreement strictly confidential, the Fund may present this Subscription Agreement and the information provided in answers to it to such parties (e.g., affiliates, attorneys, auditors, administrators, brokers and regulators) as it deems necessary or advisable to facilitate the acceptance and management of the Subscriber's subscription amounts including, but not limited to, in connection with anti-money laundering and similar laws, if called upon to establish the availability under any applicable law of an exemption from registration of the Interests, the compliance with applicable law and any relevant exemptions thereto by the Fund, the Investment Manager or its affiliates, or if the contents thereof are relevant to any issue in any action, suit or proceeding to which the Fund, the Investment Manager or its affiliates are a party or by which they are or may be bound or if the information is required to facilitate the Fund's investments. The Fund may also release information about the Subscriber (and any beneficial owners of the Subscriber) if directed to do so by the Subscriber, if compelled to do so by law or in connection with any government or self-regulatory organization request or investigation.

(t)     The Subscriber acknowledges that, if the Subscriber has used the services of a purchaser representative in connection with an investment in the Fund, such purchaser representative has disclosed, by submitting a Purchaser Representative Letter attached as Appendix D to these subscription documents, any material relationship between such purchaser representative or such purchaser representative's affiliates and the Fund and its affiliates that now exists or mutually is understood to be contemplated or that has existed at any time during the previous two years, and further setting forth any compensation received or to be received as a result of such relationship.

(u)     The Subscriber acknowledges that in implementing the investment strategies of the Fund, the Investment Manager may arrange, without the Investment Manager's consent, for securities to be bought or sold between the Fund and the accounts of other clients of the Investment Manager (including other funds and entities) in order to achieve the mix of

32

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

securities required by the strategies.

If any answers provided or background documentation required under this Subscription Agreement is found to be false, forged or misleading, the Subscriber understands that the Investment Manager may require such Subscriber to fully withdraw from the Fund as permitted under the M&A.

(v)     Subscriber has the option to subscribe to the Interests with cash, in kind, or some combination of the two. To the extent a subscriber subscribes to the Fund in kind via the transfer to the Fund of digital assets, Subscriber hereby acknowledges and agrees that transfers of such digital assets is irreversible and there is no recourse against anyone for the wrongful delivery of digital assets to an inadvertent recipient, an inactive (dead) wallet address, or an invalid wallet address, and there is currently no method to retrieve the digital assets from an inadvertent recipient, an inactive (dead) wallet address or an invalid address. The expense and risk of delivery, ownership and safekeeping of digital assets, until such digital assts has been received by the Fund, shall be borne solely by the Subscriber. The Fund, the Investment Manager, and each of their affiliates and agents, are not responsible for errant transfers due to typographical, computer, or human error.

3.     **U.S. Foreign Account Tax Compliance Act.**  The Subscriber covenants that: (i) it will provide any form, certification or other information reasonably requested by and acceptable to the Fund that is necessary for the Fund (A) to prevent withholding or qualify for a reduced rate of withholding or backup withholding in any jurisdiction from or through which the Fund receives payments or (B) to satisfy reporting or other obligations under the Code and the Treasury Regulations; (ii) it will update or replace such form, certification or other information in accordance with its terms or subsequent amendments; and (iii) it will otherwise comply with any reporting obligations imposed by the United States or any other jurisdiction, including reporting obligations that may be imposed by future legislation. The Subscriber understands and acknowledges that if Subscriber fails to provide any such form, certification or other information as requested, Subscriber would be subject to a withholding tax and the Investment Manager may take any action in relation to Subscriber's investment in the Fund or withdrawal proceeds to ensure that such withholding is economically borne by Subscriber.

4.     **AML Representations.**

(a)     The Subscriber understands and agrees that the Fund prohibits the investment of funds by any persons or entities that are acting, directly or indirectly: (i) in contravention of any U.S. or international laws and regulations, including anti-money laundering regulations or conventions; (ii) on behalf of terrorists or terrorist organizations, including those persons or entities that are included on the List of Specially Designated Nationals and Blocked Persons maintained by the United States Treasury Department's Office of Foreign Assets Control[4] ("OFAC"), as such list maybe amended from time to time; (iii) for a senior foreign political figure, any member of a senior foreign political figure's immediate family or any close associate of a senior foreign political figure,[5]

---

[4] The OFAC list may be accessed on the web at http://www.treas.gov/ofac.

[5] Senior foreign political figure means a current or former senior official in the executive, legislative, administrative, military or

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

unless the Investment Manager, or the party that it designates to perform anti-money laundering compliance for the Fund on its behalf, after being specifically notified by the Subscriber in writing that it is such a person, conducts further due diligence, and determines that such investment shall be permitted; or (iv) for a foreign shell bank[6] (such persons or entities in (i)–(iv) are collectively referred to as "Prohibited Persons").

(b)     The Subscriber represents, warrants and covenants that: (i) it is not, nor is any person or entity controlling, controlled by or under common control with the Subscriber, a Prohibited Person; and (ii) to the extent the Subscriber has any beneficial owners,[7] (A) it has carried out thorough due diligence to establish the identities of such beneficial owners, (B) based on such due diligence, the Subscriber reasonably believes that no such beneficial owners are Prohibited Persons, (C) it holds the evidence of such identities and status and will maintain all such evidence for at least five years from the date of the Subscriber's complete withdrawal from the Fund, and (D) it will make available such information and any additional information that the Fund may require upon request.

(c)     If any of the foregoing representations, warranties or covenants ceases to be true or if the Fund no longer reasonably believes that it has satisfactory evidence as to their truth, notwithstanding any other agreement to the contrary, the Fund may be obligated to freeze the Subscriber's investment, either by prohibiting additional investments, declining or suspending any withdrawal requests and/or segregating the assets constituting the investment in accordance with applicable regulations, or the Subscriber's investment may immediately be involuntarily withdrawn by the Fund, and the Fund may also be required to report such action and to disclose the Subscriber's identity to OFAC or other authorities. In the event that the Fund is required to take any of the foregoing actions, the Subscriber understands and agrees that it shall have no claim against the Fund, the Investment Manager, and their respective affiliates, directors, members, partners, shareholders, officers, employees and agents for any form of damages as a result of any of the aforementioned actions.

(d)     Subscriber understands and agrees that any withdrawal proceeds paid to it will be paid to the same account from which the Subscriber's investment in the Fund was originally remitted, unless the Investment Manager, in its sole discretion, agrees otherwise.

---

judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a senior foreign political figure includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure. The immediate family of a senior foreign political figure typically includes the political figure's parents, siblings, spouse, children and in-laws. A close associate of a senior foreign political figure is a person who is widely and publicly known internationally to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

[6] Foreign shell bank means a foreign bank without a physical presence in any country, but does not include a regulated affiliate. A post office box or electronic address would not be considered a physical presence. A regulated affiliate means a foreign shell bank that: (1) is an affiliate of a depository institution, credit union, or foreign bank that maintains a physical presence in the United States or a foreign country, as applicable; and (2) is subject to supervision by a banking authority in the country regulating such affiliated depository institution, credit union, or foreign bank

[7] Beneficial owners will include, but not be limited to: (i) shareholders of a corporation; (ii) partners of a partnership; (iii) members of a limited liability company; (iv) investors in a fund-of-funds; (v) the grantor of a revocable or grantor trust; (vi) the beneficiaries of an irrevocable trust; (vii) the individual who established an IRA; (viii) the participant in a self-directed pension plan; (ix) the sponsor of any other pension plan; and (x) any person being represented by the Subscriber in an agent, representative, intermediary, nominee or similar capacity. If the beneficial owner is itself an entity, the information and representations set forth herein must also be given with respect to its individual beneficial owners. If the Subscriber is a publicly-traded company, it need not conduct due diligence as to its beneficial owners.

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

(e)     The Fund reserves the right to request such information as is necessary to verify the identity of a Subscriber or its beneficial owners. To ensure compliance with statutory and other requirements relating to anti-money laundering, the Fund may require verification of identity from any person submitting a completed Agreement. Pending the provision of evidence satisfactory to the Fund as to identity, the evidence of title in respect of Shares may be retained in the absolute discretion of the Fund. If within a reasonable period of time following a request for verification of identity, the Fund has not received evidence satisfactory to each as aforesaid, it may, in its absolute discretion, refuse to admit the Subscriber to the Fund, in which event subscription monies will be returned without interest to the account from which such monies were originally debited. Subscription monies may be rejected by the Fund if the remitting bank or financial institution is unknown to the Fund. An individual may be required to produce a copy of a passport or identification card certified by a notary public. If the Subscriber is an entity, it may be required to produce a certified copy of its certificate of incorporation (and change of name), memorandum and articles of association (or other comparable organizational documents), and the names, occupations, dates of birth, and residential and business addresses of all directors.

5.    **Tax Reporting Requirement.** The Subscriber has completed and delivered to Fund (i) an IRS Form W-9 (for Subscribers who are U.S. Persons for U.S. Tax Purposes[8]) or Form W-8 BEN (or other applicable version of Form W-8) (for personal other than U.S. Persons for U.S. Tax Purposes), as applicable, along with any corresponding statement, certificates and forms and (ii) the Individual Self-Certification Form in Appendix E or Entity Self-Certification Form in Appendix F (as applicable), and certifies that the information contained in such executed documents submitted herewith are complete and accurate. The Subscriber shall promptly inform the Investment Manager of any change in such information. The Subscriber agrees to complete and execute an updated, complete and valid Form W-9 or Form W-8, as applicable, as well as the applicable Self-Certification Form, on or before the date that the previously submitted form expires or becomes obsolete or incorrect. In addition, the Subscriber covenants that, if admitted as a subscriber to the Fund, it will also provide, and cause its direct and indirect owners or beneficiaries to provide, any information, documentation, and representations as the Fund, the Investment Manager, or any affiliate thereof to avoid withholding taxes in any jurisdiction or to comply with any legal, regulatory, or tax requirements (including any information reporting, disclosure or similar requirements), including pursuant to any provision of FATCA, and any guidance with respect thereto. The Subscriber agrees that any such information, documentation and representations shall be true, correct, and complete in all material respects and may be disclosed as necessary or advisable to avoid such withholding taxes or to comply with any such requirements. In the event that the Subscriber fails to promptly provide the requested information, documentation, and representations, the Subscriber understands that the Fund or the Manager may mandate that such Subscriber withdraw from the Fund and/or require such Subscriber to indemnify the Fund, the Manager or Other Subscribers for any liabilities (including taxes, interest and penalties) arising out of such failure.

6.    **Representations Specifically by Non-U.S. Persons.** The Subscriber hereby (a) declares,

---

[8] For purposes of this section, a "U.S. Person for U.S. Tax Purposes" shall mean any of the following persons: (i) with respect to individuals, any U.S. citizen (and certain former U.S. citizens) or "resident alien" within the meaning of U.S. income tax laws as in effect from time to time. Currently, the term "resident alien" is defined under U.S. federal income

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

warrants, represents and agrees with, the Investment Manager and the Fund that the following statements are true as of the date hereof and will be true as of the closing date applicable to the Subscriber and as of each date the Subscriber makes additional subscriptions to the Fund and (b) undertakes and agrees to comply with the covenants set forth below:

a. Neither the Subscriber, nor any other person (if any) on whose behalf it is acquiring a beneficial interest in the Fund is a U.S. Person. The Subscriber and each person (if any) on whose behalf it is acquiring a beneficial interest in the Fund have not been offered, and are not acquiring or purchasing, the Interests in the United States. In addition, the Subscriber is not funding its investment in the Fund with funds obtained from U.S. Persons;

b. All offers to sell and offers to buy Interests were made to or by the Subscriber while it was outside the United States and at the time that its order to buy the Interests was originated outside the United States, or its is a United States dealer or other professional fiduciary acting on behalf of a discretionary account or similar account (other than an estate or trust) held for the benefit or account of a person other than a U.S. Person;

c. The Subscriber understands that the Interests have not been and will not be registered under the Securities Act, the Exchange Act, or the securities laws of any State within the United States and accordingly may not be offered, sold, transferred or pledged by it or on its behalf (a) outside the United States to a non-U.S. Person, or (b) in the United States to a U.S. Person, unless:

   i. the Interests are duly registered under the Securities Act and all applicable State securities laws; or

   ii. such offer or sale is made in accordance with the provisions of Regulation D under the Securities Act or pursuant to another applicable exemption from registration, and, if requested, the Investment Manager has received an opinion of counsel to such effect satisfactory to it; or

   iii. in the case of transfers outside the United States to non-U.S. Persons, such offer or sale is made in accordance with the provisions of Regulation S under the Securities Act or pursuant to another applicable exemption from registration, and, if requested, the Investment Manager has received an opinion of counsel to such effect satisfactory to it.

d. The Subscriber hereby represents and warrants that it was offered the Interests in the jurisdiction listed as its jurisdiction within the Suitability Questionnaire above, or in another jurisdiction outside the United States.

---

tax laws generally to include any individual who (i) holds an Alien Registration Card (a "green card") issued by the U.S. Immigration and Naturalization Service, (ii) meets a "substantial presence" test, or (iii) is qualified to and does affirmatively elect on his or her tax return to be treated as a U.S. resident pursuant to Section 7701(b)(1)(A)(iii) of the Code. The "substantial presence" test is generally met with respect to any calendar year if (a) the individual was present in the United States on at least 31 days during such calendar year and (b) the sum of the number of days on which such individual was present in the United States during the current year, 1/3 of the number of such days during the preceding year, and 1/6 of the number of such days during the second preceding year, equals or exceeds 183 days and (ii) with respect to persons other than individuals, (a) a corporation or partnership created or organized in the United States or under the laws of the United States or any state thereof, (b) an estate which is subject to U.S. tax on its worldwide income from all sources, or (c) a trust if (x) a court within the United States is able to exercise primary supervision over the administration of the trust and (y) one or more United States persons have the authority to control all substantial decisions of the trust.

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

7.  **Representations Specifically by U.S. Persons.**

 e. The Subscriber hereby (a) declares, warrants, represents and agrees with, the Investment Manager and the Fund that the following statements are true as of the date hereof and will be true as of the closing date applicable to Subscriber and as of each date the Subscriber makes additional subscriptions to the Fund and (b) undertakes and agrees to comply with the covenants set forth below:

  i. The Subscriber's Interest is being acquired for its own account solely for investment and not with a view to resale or distribution thereof.

  ii. The Subscriber acknowledges that (A) the offering and sale of the Interests have not been and will not be registered under the Securities Act, or any applicable state law or the applicable laws of any other jurisdiction, and are being made in reliance upon U.S. federal and state exemptions for transactions not involving a public offering; and (B) pursuant to Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act, the Fund will not be registered as an investment company under the Investment Company Act and the regulations issued thereunder. The Investment Manager is under no obligation to register the Interests on the Subscriber's behalf or to assist the Subscriber in complying with any exemption from registration under the Securities Act or otherwise. The Subscriber agrees that it will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Regulation D promulgated under the Securities Act with respect to the offer and sale of the Interest;

  iii. The Subscriber acknowledges that none of the Investment Manager, its principals or their respective affiliates are registered as investment advisors pursuant to the Investment Adviser Act, or the securities laws of any state.

  iv. The Interests are speculative investments and involve a high degree of risk. There is no public market for the Interests, and no such public or other market is expected to develop. The transferability of the Interests is substantially restricted both by the terms of the M&A and applicable law;

  v. The Subscriber shall not act as, or hold itself out as, an agent or representative of the Fund or any placement agent in any offers or sales of the Interests;

  vi. No sale of any Interest shall be made by the Subscriber that would, in and of itself: (A) constitute a public offer or public distribution of the Interests in any jurisdiction, (B) otherwise trigger securities law filings, registration or listings in any jurisdiction, or (C) cause the Fund or the Investment Manager or any of their respective Affiliates to be required to register, or seek an exemption from registration, as an investment company under the Investment Company Act;

  vii. It is an "Accredited Investor" as such term is defined in Rule 501 of Regulation D under the Securities Act, as amended by Section 413(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act and it satisfies the conditions set forth in the appropriate category listed in Appendix A that it has marked with an "X"; and

  viii. It is a "Qualified Client" as such term is defined in Rule 205-3 under the Investment Adviser Act and the related SEC order ("Qualified Client") and it satisfies the conditions to be a Qualified Client set forth in the appropriate category listed in Appendix A that it has marked with an "X".

 f. Each Subscriber acknowledges and agrees that:

  i. in the event the Subscriber is an entity, (a) it was not formed for the purpose of investing in the Fund; (b) it does not invest more than 40% of its total assets in

the Fund; (c) each of its beneficial owners participates in investments made by the Subscriber pro rata in accordance with its interest in the Subscriber and, accordingly, its beneficial owners cannot opt in or out of investments made by the Subscriber; and (d) its beneficial owners did not and will not contribute additional capital (other than previously committed capital) for the purpose of purchasing the Interests; and

    ii. any certificate representing the Interest will bear a restrictive legend stating, among other things, that the Interest has not been registered under the Securities Act nor the Fund registered under the Investment Company Act and setting forth the restrictions on transfer of the Interests set forth in the M&A.

g.  The Subscriber warrants, confirms, and represents under penalty of perjury that:
    i.   it is a U.S. Person as defined in Section 7701(a)(30) of the Code;
    ii.  its taxpayer identification number provided in Appendix A of this Subscription Agreement is correct;
    iii. it has completed and returned with this Subscription Agreement a Form W-9, Request for Taxpayer Identification Number and Certification; and
    iv. it is not subject to backup withholding because either (1) it is exempt from backup withholding, (2) it has not been notified by the IRS that it is subject to backup withholding as a result of failure to report all interest or dividends; or (3) the IRS has notified it that it is no longer subject to backup withholding.

h.  If the Subscriber is an insurance company and is investing the assets of its general account (or the assets of a wholly owned subsidiary of its general account) in the Fund, it has identified in the Suitability Questionnaire whether the assets underlying the general account constitute "plan assets" within the meaning of Section 401(c) of ERISA. The Subscriber agrees to promptly notify the Manager in writing if there is a change in the percentage of the general account's assets that constitute "plan assets" within the meaning of Section 401(c) of ERISA and shall disclose such new percentage ownership.

i.  If the Subscriber is an investment company ("Investment Company") as defined in Section 3(a) of the Investment Company Act or an Investment Company that is exempt from registration pursuant to Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act (a "3(c)(1) or 3(c)(7) Company"), the Subscriber recognizes that the Fund is restricted by law as to the number of beneficial interests held in the Fund, and, that in determining the number of beneficial interests in the Fund, it may be necessary, in certain circumstances, to count the beneficial owners of the Subscriber, if it owns 10% or more of the limited partners' interests in the Fund. Accordingly, the Subscriber agrees: (i) to notify the Fund prior to making a capital contribution, if it is a 3(c)(1) or 3(c)(7) Company or an Investment Company; (ii) to take whatever action is requested by the Fund to have its interest in the Fund be less than 10% of the total interests of the limited partners; and (iii) that the Manager of the Fund may require the Subscriber to withdraw at any time so much of its interest as is necessary to keep such interest below 10%.

j.  If the Subscriber is a "charitable remainder trust" within the meaning of Section 664 of the Code, the Subscriber has advised the Investment Manager in writing of such fact and the Subscriber acknowledges that it understands the risks, including specifically the tax risks, if any, associated with its investment in the Fund.

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

8.    **Compliance with Automatic Exchange of Information Legislation**

For the purposes of the following provisions, AEOI Legislation means any legislation, regulations or guidance in force in the British Virgin Islands relating to the systematic and periodic exchange of information for tax purposes pursuant to any agreement or treaty entered into by the British Virgin Islands (or any British Virgin Islands government body) including the intergovernmental agreement entered into with the United States to facilitate compliance with sections 1471 to 1474 of the US Internal Revenue Code of 1986 (commonly referred to as *FATCA*).

The Subscriber acknowledges and agrees that:

(a) the Fund is required to comply with the provisions of the AEOI Legislation;

(b) it will provide, in a timely manner, such information regarding the Subscriber and its beneficial owners and such forms or documentation as may be requested from time to time by the Fund, its delegates or agents, to enable the Fund to comply with the requirements and obligations imposed on it pursuant to the AEOI Legislation, specifically, but not limited to, forms and documentation which the Fund may require to determine whether or not the relevant investment is a "US Reportable Account" for the purposes of FATCA and to comply with the relevant due diligence procedures in making such determination;

(c) any such forms or documentation requested by the Fund, its delegates or agents pursuant to paragraph (b) above, or any financial or account information with respect to the Subscriber's investment in the Fund, may be disclosed to the BVI International Tax Authority (or any other British Virgin Islands governmental body which collects information in accordance with the AEOI Legislation) and to any person or regulatory authority where the provision of that information to such person or regulatory authority is required to ensure compliance by the Fund with its obligations under the AEOI Legislation or to avoid being subject to withholding tax or other liabilities under the AEOI Legislation;

(d) it waives, and/or shall cooperate with the Fund to obtain a waiver of, the provisions of any applicable laws which:

(i) prohibit the disclosure by the Fund, or by any of its delegates or agents, of the information or documentation requested from the Subscriber pursuant to paragraph (b) above; or

(ii) prohibit the reporting of financial or account information by the Fund, its delegates or agents required pursuant to the AEOI Legislation; or

(iii) otherwise prevent compliance by the Fund with its obligations under the AEOI Legislation;

(e) if it provides information and documentation that is in anyway misleading, or it fails to provide the Fund, its delegates or agents with the requested information and documentation necessary in either case to satisfy the Fund's obligations under the AEOI Legislation, the Fund may (whether or not such action or inaction leads

39

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

to compliance failures by the Fund, or a risk of the Fund or its shareholders being subject to withholding tax or other liabilities under the AEOI Legislation):

(i) take any action and/or pursue all remedies at its disposal including, without limitation, the compulsory redemption of all or any of the Participating Shares issued to the Subscriber; and

(ii) hold back from any redemption proceeds or distributions and retain, an amount sufficient to discharge any liabilities, costs, expenses, taxes, withholdings or deductions incurred or suffered by the Fund, or that in the opinion of the directors will be incurred or suffered by the Fund, due to the representations, actions or inactions (directly or indirectly) by the Subscriber; and

(f) it shall have no claim against the Fund, its delegates or agents, for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund pursuant to this Clause 8 in order to comply with the AEOI Legislation.

The Subscriber agrees to indemnify and keep indemnified the Fund and its directors, officers and employees and the Investment Manager, from and against any AEOI Legislation related liability, action, proceeding, claim, demand, costs, damages, expenses (including legal expenses) penalties or taxes whatsoever which the Fund may incur under the provisions of the AEOI Legislation as a result of any representation, action or inaction (directly or indirectly) of the Subscriber. This indemnification shall survive the Subscriber's death or disposition of its Shares.

9. **Reliance on Representations and Warranties.** The Subscriber understands the meaning of the representations and warranties contained in this Subscription Agreement and in the Subscriber Questionnaire and understands and acknowledges that the Fund and the Investment Manager are relying upon the representations and warranties contained in this Subscription Agreement and in the Subscriber Questionnaire in determining whether the offering is eligible for exemption from the registration requirements contained in the Securities Act and in determining whether to accept the subscription tendered hereby. The Subscriber represents and warrants that the information contained in this Subscription Agreement and in the Subscriber Questionnaire is true and correct as of the date hereof and agrees to notify immediately the Investment Manager of any changes in such information (or, if there have been any changes in the information provided to the Fund by the Subscriber in the Subscriber Questionnaire since the date the Subscriber Questionnaire was furnished, the Subscriber has advised the Fund in writing of such changes). The Subscriber hereby agrees to indemnify and hold harmless the Fund, the Investment Manager, and each other Shareholder of the Fund, from and against any and all losses, damages, expenses, liabilities, or reasonable attorneys' fees (including attorneys' fees and expenses incurred in a securities or other action in which no judgment in favor of the Subscriber is rendered) due to or arising out of a breach of any representation or warranty of the Subscriber, whether contained in the M&A, this Subscription Agreement or the Subscriber Questionnaire. Notwithstanding any of the representations, warranties, acknowledgments or agreements made in this Subscription Agreement and in the Subscriber Questionnaire by the Subscriber, the Subscriber does not thereby or in any other manner waive any rights granted to the Subscriber under federal or state securities law.

10. **Survival of Representations and Warranties.** In the event that this subscription is accepted, the Subscriber agrees that the representations, warranties and agreements set forth in this Subscription Agreement and in the Subscriber Questionnaire shall survive the acceptance of this subscription.

11. **Indemnification.** The Subscriber agrees to indemnify and hold harmless the Fund, its Investment Manager, their agents and each of their affiliates, and each other person, if any, who controls, is controlled by, or is under common control with, any of the foregoing, within the meaning of Section 15 of the Securities Act, against any and all loss, liability, claim, damage and expense whatsoever (including all expenses reasonably incurred in investigating, preparing or defending against any claim whatsoever) arising out of or based upon (i) any false representation or warranty made by the Subscriber, or breach or failure by the Subscriber to comply with any covenant or agreement made by the Subscriber, in this Subscription Agreement or in any other document furnished by the Subscriber to any of the foregoing in connection with this transaction; or (ii) any action for securities law violations instituted by the Subscriber which is finally resolved by judgment against the Subscriber. The Subscriber also agrees to indemnify the Fund, the Investment Manager, and their affiliates and agents for any and all costs, fees and expenses (including legal fees and disbursements) in connection with any damages resulting from the Subscriber's assertion of lack of proper authorization from the beneficial owner to enter into this Subscription Agreement or perform the obligations hereof.

12. **Communications to Subscriber.** The Subscriber represents, warrants and agrees that by providing the Fund with an e-mail address, Subscriber consents to the receipt of statements, reports and other communications (including but not limited to net asset value information, subscription and withdrawal activity, Schedule K-1 statements and unaudited or audited financial statements) relating to the Fund and Subscriber's investment in the Fund in electronic form. Subscriber represents that Subscriber has accessed this Agreement as an Adobe PDF document and understands Adobe PDF will be the format in which Schedule K-1 statements will be provided. By consenting to electronic receipt of communications, Subscriber acknowledges that e-mails and other electronic communications from the Fund, the Investment Manager and/or the Administrator may be accessed by recipients other than the Subscriber and may be interfered with, may contain computer viruses or other defects and may not be successfully replicated on other systems. The Fund, the Investment Manager, and the Administrator each give no warranties in relation to these matters. Subscriber understands and agrees that Subscriber's consent to receipt of electronic statements, reports and other communications shall be valid until Subscriber withdraws such consent by notifying the Fund and the Investment Manager in writing. Such withdrawal of consent will take effect on a subsequent date determined by the Fund and communicated to the Subscriber within a reasonable period of time after the Fund receives the written withdrawal of consent and the withdrawal of consent will not apply to any statements, reports or other communications that were furnished electronically before the date on which the withdrawal of consent becomes effective. Subscriber understands and agrees that Schedule K-1 statements will be furnished on paper if Subscriber does not consent to electronic receipt. Subscriber represents and warrants that Subscriber has all necessary hardware and software necessary to access, print and retain the electronic statements, reports and other communications.

13. **Binding Nature.** Upon acceptance by the Investment Manager of the subscription of the Subscriber, the Subscriber will become a Shareholder and be bound by the terms of the M&A.

14. **Entire Agreement.** This Subscription Agreement, together with the M&A, constitutes the entire

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

understanding of the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements or understandings of the parties related hereto. This Subscription Agreement may only be modified or amended by an instrument in writing signed by the parties hereto. This Subscription Agreement shall be binding up and inure to the benefit of and be enforceable by the respective heirs, successors and permitted assigns of the parties hereto.

15. **Representation by Counsel.** Subscriber understands that Harney, Westwood & Riegels LP has acted as counsel to the Fund and the Investment Manager and their affiliates in connection with this offering of Interests. The Subscriber also understands that, in connection with this offering of Interests and subsequent advice to the Fund and the Investment Manager and their affiliates, Harney, Westwood & Riegels LP will not be representing investors in the Fund, including the Subscriber, and no independent counsel has been retained to represent investors in the Fund.

The Subscriber further acknowledges and agrees that Harney, Westwood & Riegels' representation of the Fund, the Investment Manager and its affiliates is limited to specific matters as to which it has been consulted by the Fund, the Investment Manager and/or its affiliates. There may exist other matters which could have a bearing on the Fund, the Investment Manager or its affiliates as to which it has not been consulted. In addition, Harney, Westwood & Riegels does not undertake to monitor the compliance of the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth in the Memorandum, nor does it monitor compliance with applicable laws. In preparing the Memorandum, Harney Westwood & Riegels LP relies upon information furnished to it by the Fund, the Investment Manager and/or its affiliates, and does not investigate or verify the accuracy and completeness of information set forth therein concerning the Fund, the Investment Manager and their affiliates and personnel.

16. **Applicable Law.** This Subscription agreement shall be governed by, and shall be construed in accordance with, the laws of the British Virgin Islands. Each party irrevocably agrees to submit to the non-exclusive jurisdiction of the courts of the British Virgin Islands in respect of any claim or matter arising under or in connection with this Agreement.

17. **Construction.** If any provision of this Subscription Agreement is invalid or unenforceable under any applicable law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such applicable law. Any provision hereof which may be held invalid or unenforceable under any applicable law shall not affect the validity or enforceability of any other provisions hereof, and to this extent the provisions hereof shall be severable.

18. **Counterparts.** This Subscription Agreement may be executed through the use of separate signature pages or in any number of counterparts. The counterparts shall, for all purposes, constitute one agreement binding on all the parties, notwithstanding that all parties do not execute the same counterpart.

*[Signatures on following page.]*

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

**SUBSCRIPTION AGREEMENT SIGNATURE PAGE**

The undersigned has executed this Agreement on this 17 day of June , 20 22 .

███████████████████████████████

Title of Authorized Signatory (*if any*)

June 17, 2022

Date

Signature of Authorized Signatory

Title of Authorized Signatory (*if any*)

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**TO BE COMPLETED BY THE INVESTMENT MANAGER**

ACCEPTED THIS 06 DAY OF June , 20 22 .

BKCoin Multi-Strategy Fund Ltd.

By:    BKCoin Management LLC,
       Investment Manager

By:    *Carlos Betancourt*
       Name: Carlos Betancourt
       Title: Manager

Subscription Amount:        250,000
                    US$

Effective Date of Subscription: 07/01/2022

---

[5] If the Subscriber is an IRA or a self-directed pension plan or this Subscription Agreement is being executed by a directed trustee, the custodian or trustee of the Subscriber executes this Subscription Agreement and the fiduciary who directed the IRA's or pension plan's investment in the Fund is required to execute the Additional Representation attached hereto.

43

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

**ADDITIONAL REPRESENTATION WITH RESPECT TO INVESTMENT FROM AN IRA OR SELF-DIRECTED PENSION PLAN OR BY A DIRECTED TRUSTEE**

If the Subscriber is an IRA or a self-directed pension plan or this Subscription Agreement is being executed by a directed trustee, the individual who established the IRA or the person who directed the pension plan's investment in the Fund, as the case may be: (i) has directed the custodian or trustee of the Subscriber to execute this Subscription Agreement on the line set forth above for Authorized Signatory; (ii) has exclusive authority with respect to the decision to invest in the Fund; and (iii) has signed below to indicate that he or she has reviewed, directed and certifies to the accuracy of the representation and warranties made by the Subscriber herein.

_____

Name

_____

Signature

Name and Address of Custodian/Trustee
and Contact Individual:

_____

_____

_____

Account or Other Reference Number:

_____

Custodian's Tax I.D. Number:

_____

44

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

**Appendix A**
***Anti-Money Laundering Supplement***

The Subscriber shall provide one or more of the items in accordance with the instructions below to establish and verify Subscriber's identity. If Subscriber is an entity, the Subscriber acknowledges and agrees that the Fund, the Investment Manager, and the Administrator may seek publicly available information from law enforcement agencies or regulatory authorities regarding the Subscriber or its business and/or may request the Subscriber's financial statements and/or bank or similar references. The Fund, the Investment Manager and/or the Administrator reserve the right to request any additional documentation or information that they may deem necessary or appropriate to verify the Subscriber's identity. Failure to provide the necessary documentation or information they may deem necessary or appropriate to verify the Subscriber's identity. Failure to provide the necessary documentation or information may result in, among other thing, the full or partial rejection of subscriptions or delay in redemptions.

*1.  Information to be Provided*

In order to ensure compliance with the provisions of this policy, the Administrator, for itself and on behalf of the Fund, requires each Subscriber to provide it with the following information:

*FOR ALL IN-KIND SUBSCRIPTIONS TO CRYPTO FUNDS*

☐ Screenprint(s) of the Subscriber's exchange account profile from where the in-kind subscription is being transferred showing name and account number (name must match Subscriber's name on subscription document);

☐ Screenprint(s) of the Subscriber's exchange account showing the transaction to the Fund from the Subscriber's account showing the fund name and/or account number on same screen;

*INDIVIDUALS (Including Individual Retirement Accounts ("IRA"), SEP IRAs and 401(k)s)::*

☐ Full name and legal address, AND;

☐ Tax I.D. number, AND.

☐ Copy of a current driver's license and/or passport.

*INVESTMENT FUNDS (LP or LLC):*

☐ Certificate of Partnership, Formation or equivalent;

☐ A current Limited Partnership Agreement, Operating Agreement or equivalent;

☐ A signed AML Comfort Letter completed by the party responsible for AML/KYC for the fund;

☐ Authorized signatory list (if not included in other supporting docs);

ÿ Government-issued photo ID (e.g. Passport or Driver's License) for at least one (1) or more Authorized Signatories;

☐ Evidence of the identity of at least two directors as for "Individuals" above.

**PARTNERSHIPS (*Not formed as an Investment Fund*):**

☐ Certificate of Partnership;

☐ Current Limited Partnership Agreement or equivalent;

☐ Provide a list or completed Appendix A, Section 2 chart (*below*) providing details of Partners who have 25% or more ownership (directly or indirectly) including their Name, Address, Citizenship or Principal Place of Business;

☐ For each corporate General Partner, documentation as specified, as applicable, under "Limited Liability Corporations", "Corporations", etc. herein.

**LIMITED LIABILITY CORPORATIONS (*Not formed as an Investment Fund*):**

☐ Certificate of Formation;

☐ Current Operating Agreement or equivalent;

☐ Provide a list or completed Appendix A, Section 2 chart (*below*) providing details of Members who have 25% or more ownership (directly or indirectly) including their Name, Address, Citizenship or Principal Place of Business and documentation in relation each such entity or individual as specified under "Limited Liability Corporations", "Corporations", "Foundations", "Trusts", "Individuals" etc. herein;

☐ Register of Managing Members;

☐ Authorized signatory list (if not included in other supporting docs);

☐ For all Managing Members holding 25% or more in interest, documentation as specified under "Corporations", etc. herein below or, as the case may be, "Individuals" above.

**CORPORATIONS:**

☐ A certificate of due formation and organization (e.g. Certificate of Incorporation or Good Standing)

☐ A Register of Directors and Officers

☐ Provide a list or completed Appendix A, Section 2 chart (*below*) providing details of individuals or entities that own > 25% (directly or indirectly) including their Name, Address, Citizenship or Principal Place of Business and documentation in relation each such entity or individual as specified under "Limited Liability Corporations", "Corporations",

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

"Foundations", "Trusts", etc. below as applicable or, as the case may be, "Individuals" herein;

☐ Authorized signatory list (if not included in other supporting docs);

☐ For at least two (2) Directors, documentation as specified under "Limited Liability Corporations" or "Corporations" below or, as the case may be, "Individuals" above.

**FOUNDATIONS**:

☐ A certificate of due formation and organization (e.g. A copy of its Charter or other formation document)

☐ A Register of Directors and Officers

☐ A statement detailing the nature and purpose of the Foundation and its activities

☐ Authorized signatory list (if not included in other supporting docs);

☐ For at least two (2) Directors documentation as specified under "Limited Liability Corporations" or "Corporations" below or, as the case may be, "Individuals" above.

**TRUSTS**:

☐ A certificate of due formation and organization (e.g. Trust Deed or equivalent);

☐ Provide a list or completed Appendix A, Section 2 chart (*below*) providing details of individuals or entities that own > 25% (directly or indirectly) including their Name, Address, Citizenship and documentation in relation each such entity or individual as specified as applicable under "Limited Liability Corporations", "Corporations", "Foundations", or, as the case may be, "Individuals" above;

☐ Authorized signatory list (if not included in other supporting docs);

☐ For at least two (2) Trustees documentation as specified under "Limited Liability Corporations" or "Corporations" below or, as the case may be, "Individuals" above.

**PENSIONS**:

☐ A certificate of due formation and organization (e.g. Pension Offering Document or equivalent);

☐ Name and address of the parties who administer the pension;

☐ Provide a list or completed Appendix A, Section 2 chart (*below*) providing details of individuals or entities that own > 25% (directly or indirectly) including their Name, Address, Citizenship and documentation in relation each such entity or individual as specified under "Limited Liability Corporations", "Corporations", "Foundations", "Trusts", etc. below as applicable or, as the case may be, "Individuals" above;

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

☐  Authorized signatory list (if not included in other supporting docs);

☐  For any Trustee documentation as specified under "Limited Liability Corporations" or "Corporations" below or, as the case may be, "Individuals" above;

☐  For at least two (2) Authorized Signatories or documentation as specified under "Individuals" above.

\*The Administrator reserves the right to require additional information and/or documentation prior to accepting or processing any subscription, transfer, withdrawal or redemption. Along these lines, the Administrator may request Subscriber complete an "Enhanced Due Diligence Questionnaire", which will be provided separately by the Administrator, should it be required.

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

## 2. *Beneficial Ownership Information*

<u>Instructions:</u> Please complete the following chart and provide the name of every person who is directly, or indirectly through intermediaries, the beneficial owner of 25% or more of the entity. If the intermediary's shareholders or partners are not individuals, continue up the chain of ownership listing their 25% or more equity interest holders until individuals are listed. If there are no 25% beneficial owners, please write None.

| Full Name | Address | Citizenship (for individuals) or Principal Place of Business (for entities). |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

**3. *AML Certification Form for Fund of Fund or Entities that Invest on Behalf of Third Parties that Are Not Located In an Approved Country***

The undersigned, being the _____ of _____,

<div align="center">Insert Title                                    Insert Name of Entity</div>

a _____ organized under the laws of _____

<div align="center">Insert Type of Entity                          Insert Jurisdiction of Organization</div>

(the "Company"), does hereby certify on behalf of the Company that it is aware of applicable anti-money laundering laws and regulations, including the requirements of the USA PATRIOT Act of 2001 and the regulations administered by the U.S. Department of Treasury's Office of Foreign Assets Control (collectively, the "anti-money laundering/OFAC laws"). The Company has anti-money laundering policies and procedures in place reasonably designed to verify the identity of its underlying investors and their sources of funds. Such policies and procedures are properly enforced and are consistent with the anti-money laundering/OFAC laws such that BKCoin Multi-Strategy Fund Ltd. (the "Fund") may rely on this Certification.

The Company hereby represents to the Fund that, to the best of its knowledge, the Company's underlying investors are not individuals, entities or countries that may subject the Fund to criminal or civil violations of any anti-money laundering/OFAC laws. The Company has taken all reasonable steps to ensure that its underlying investors are able to certify to such representations. The Company agrees to promptly notify the Fund in writing should the Company have any questions relating to any of the investors or become aware of any changes in the representations set forth in this Certification.

Date: _____

By: _____

Name: _____

Title: _____

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

**Appendix B**

*Additional Subscription Form*

BKCoin Multi-Strategy Fund Ltd.
c/o State Street Bank and Trust Co.
100 Summer Street, 5th Floor
Boston, Massachusetts 02110
USA

To Whom It May Concern:

The Subscriber is an existing subscriber in BKCoin Multi-Strategy Fund Ltd. (the "Fund") and by this instrument subscribes for additional Interests in the Fund. The Subscriber reaffirms the accuracy of the representations and agreements contained in the Subscriber's current Subscription Agreement, as if such representations and warranties were made and restated as of the date hereof.

The undersigned acknowledges that subscription amounts will be credited to the Fund on the first Business Day of the next calendar month, except as provided by the Investment Manager; provided that the undersigned submits the subscription amount by wire at least three (3) Business Days prior to the beginning of the month in which the investment will be made. Payment may be made by check or wire as follows:

| *Wire Instructions:* | Bank: State Street Bank and Trust Co.<br>Address: Boston, Massachusetts<br>ABA No.: [insert]<br>Swift: [insert]<br>A/c Name: [insert]<br>A/c No: [insert<br>Ref: [INVESTOR NAME] |
|---|---|

The undersigned submits the following:

## Cash Additional Subscription

*Please complete the following table for an additional subscription being made in fiat (USD):*

| *Subscription in USD:* | US $_____ |
|---|---|

## In-Kind Additional Subscription

*Please complete the following table for an additional in kind subscription:*

| *Quantity of _____ :* | |
|---|---|

<u>Note</u>: for contributions in-kind of digital assets, the Fund will provide further instructions on how to transfer the relevant digital assets. The amount of the in-kind capital contribution shall be the value as of the time of receipt of the in-kind

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

assets by the Fund. Please see the 'Taxation – Contributions In-Kind' in the Fund's Memorandum for certain tax risks of subscribing to the Fund with an in-kind contribution of digital assets, including such contribution possibly triggering the recognition of gain to the subscriber.

_____

Name of Subscriber (please print)

_____

Signature and Applicable Title (if any)

_____

Date

*Notes:*

- *If the application for Shares in being made by joint subscribers, this Agreement must be signed by each joint subscriber.*
- *If the application for Shares is being made by a corporation, this Agreement must be signed by an individual authorised to sign it on behalf of the corporation and that individual must state his/her capacity.*
- *If the application for Shares is being made by a limited partnership, this Agreement must be signed by an individual authorised to sign it on behalf of the general partner of the limited partnership.*

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

**APPENDIX C – REDEMPTION NOTICE**

BKCoin Multi-Strategy Fund Ltd.
c/o State Street Bank and Trust Co.
100 Summer Street, 5th Floor
Boston, Massachusetts 02110
USA

To Whom It May Concern:

The undersigned shareholder (the "Shareholder") of BKCoin Multi-Strategy Fund Ltd. (the "Fund") hereby irrevocably requests the redemption of such number of my/our Participating Shares in that the Fund as indicated below, on the terms of the constitutional documents of the Fund and the Memorandum relating to the offering of shares of the Fund (collectively, the "Offering Documents"). Unless otherwise defined, capitalized terms have the meanings given to them in the Offering Documents.

Full name(s): _____

_____

Correspondence Address: _____

_____

Telephone no: _____      Facsimile no: _____

Email address: _____

**Class of Participating Shares to be Redeemed:**

- Class A Shares      • Class Restricted A Shares

**Number of Shares to be redeemed:** _____

Or

**Amount to be redeemed:** $US _____

*Please insert number of Participating Shares or an amount in the relevant Dealing Currency. If a total redemption is required, please state "ALL".*

(initial one)

_____      the entire balance of Shares

_____      $_____

on the next available withdrawal date following receipt of this letter.

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

If desired, set forth instructions for the account to which the cash proceeds of the withdrawal may be sent by wire transfer:

_____Name of Bank

_____Address of Bank

_____ABA Number

_____Account Number

_____Name Under Which Account Is Held

## POWER AND AUTHORITY

If the Shareholder is an entity: The Person executing this Redemption Notice for the Shareholder represents and warrants that (a) he or she is duly authorized to do so, (b) the Shareholder has full power and authority to request the redemption of Participating Shares to which this Redemption Notice relates, and (c) those Participating Shares are not subject to any pledge or otherwise encumbered in any fashion.

If the Shareholder is an acting trustee, agent, representative or nominee for another person or entity (a Beneficial Owner): The Shareholder represents and warrants that (a) it has all requisite power and authority from the Beneficial Owner to request the redemption of the Participating Shares to which this Redemption Notice relates, and (b) those Participating Shares are not subject to any pledge or otherwise encumbered in any fashion.

## EXECUTION

_____          _____
Signature                               Date

_____          _____
Name                                    Capacity

_____          _____
Signature                               Date

_____          _____
Name                                    Capacity

- This Redemption Notice must be signed by each registered holder of the Participating Shares to be redeemed unless the Shareholder stated in its Subscription Agreement that any of the joint holders could give instructions to the Fund.
- If the Shareholder is a corporation, this Redemption Notice must be signed by an individual authorized to sign it on behalf of the corporation and that individual must state his/her capacity.
- If the Shareholder is a limited partnership, this Redemption Notice must be signed by an individual authorized to sign it on behalf of the general partner of the limited partnership. _____

**Appendix D**

***Purchaser Representative Letter***

Re:     BKCoin Multi-Strategy Fund Ltd.
        Offering of Interests

To:     _____
        (Name of Subscriber)

You have requested that the undersigned act as your purchaser representative, as the term is defined in Regulation D of the General Rules and Regulations under the Securities Act of 1933, as amended, in connection with the evaluation of the merits and risks of a prospective investment by you in the above named company. Before you acknowledge the undersigned as your purchaser representative by signing below, please be advised of the following:

1.     The following is a description of all material relationships between (a) the undersigned purchaser representative and the affiliates of the undersigned and (b) BKCoin Multi-Strategy Fund Ltd. (the "Fund"), its Investment Manager and its affiliates that now exist or are mutually understood to be contemplated or that have existed at any time during the previous two years, and all compensation received or to be received as a result of such relationships. (If there are no such relationships or compensation answer "none"): _____
       _____

2.     The following is my present occupation: _____

3.     The following is my knowledge and experience with respect to my ability to evaluate the merits and risks of investing in a private placement of interests in a such a Fund:
       _____
       _____

4.     I am not an affiliate of the Fund or any of its affiliates. I have the necessary knowledge and experience in financial and business matters so that I am capable of evaluating the merits and risks of an investment in a private placement of interests in a limited partnership of the type described in the Memorandum issued by the Fund.

_____
*Signature of Purchaser Representative*

*Print Name:*  _____
*Address:*
       _____
       _____

*Telephone:*  _____

*Date:*  _____

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

## APPENDIX E - INDIVIDUAL SELF-CERTIFICATION FORM

*Instructions for completion*

*We are obliged under the Tax Information Authority Law (as amended), Regulations, and Guidance Notes made pursuant to that Law, and intergovernmental agreements ("IGA") entered into by the British Virgin Islands in relation to the automatic exchange of information for tax matters (collectively "FATCA"), to collect certain information about each account holder's tax arrangements. Please complete the sections below as directed and provide any additional information that is requested. Please note that in certain circumstances we may be obliged to share this information with relevant tax authorities. Terms referenced in this Form shall have the same meaning as applicable under the relevant IGA, Regulations and/or Guidance Notes.*

*If any of the information below about your tax resident or FATCA classification changes in the future, please ensure that you advise us of these changes promptly. If you have any questions about how to complete this form, please contact your tax advisor.*

*Please note that where there are joint account holders each investor is required to complete a separate Self-Certification form.*

**Section 1: Account Holder Information**

| Account Holder Name | Date of Birth (dd/mm/yyyy) | Country of Birth |
|---|---|---|

**Permanent Residence Address:**

| Number & Street | | City / Town |
|---|---|---|

| State/Province/County | Postal Code | Country |
|---|---|---|

**Mailing address (if different from above):**

| Number & Street | | City / Town |
|---|---|---|

| State/Province/County | Postal Code | Country |
|---|---|---|

**Section 2: Declaration of U.S. Citizenship or U.S. Residence for Tax purposes**

Please tick either (a) or (b) or (c) and complete as appropriate.
- (a) • I confirm that I am a U.S. citizen and/or resident in the U.S. for tax purposes (green card holder or resident under the substantial presence test) and my U.S. federal tax payer identifying number (U.S. TIN) is as follows:
- (b) • I confirm that I was born in the U.S. (or a U.S. territory) but am no longer a U.S. citizen as I have voluntarily surrendered my citizenship as evidenced by the attached documents.
- (c) • I confirm that I am not a U.S. citizen or resident in the U.S. for tax purposes.

*Complete Section 3 if you have non-U.S. tax residencies.*

*[Remainder of page intentionally left blank]*

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

**Section 3: Declaration of Tax Residency (other than U.S.)**

I hereby confirm that I am, for tax purposes, resident in the following countries (indicate the tax reference number type and number applicable in each country).

| Country/countries of tax residency | Tax reference number type | Tax reference number |
|---|---|---|
| | | |
| | | |
| | | |

**Section 4: Declaration and Undertakings**

I declare that the information provided in this form is, to the best of my knowledge and belief, accurate and complete.

I undertake to advise the recipient promptly and provide an updates Self-Certification form within 30 days where any change in circumstances occurs which causes any of the information contained in this form to be inaccurate.

Where legally obliged to do so, I hereby consent to the recipient sharing this information with the relevant tax information authorities.

Signature: _____

Date (dd/mm/yyyy): _____

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

## APPENDIX F - ENTITY SELF-CERTIFICATION FORM

*Instructions for completion*
*We are obliged under the Tax Information Authority Law (as amended), Regulations, and Guidance Notes made pursuant to that Law, and intergovernmental agreements ("IGAs") entered into by the British Virgin Islands in relation to the automatic exchange of information for tax matters (collectively, "FATCA"), to collect certain information about each account holder's tax arrangements. Please complete the sections below as directed and provide any additional information that is requested. Please note that in certain circumstances we may be obligated to share this information with relevant tax authorities. Terms referenced in this Form shall have the same meaning as applicable under the relevant IGA, Regulations and/or Guidance Notes.*

*If any of the information below regarding your tax residence or FATCA classification changes in the future, please ensure you advise us of these changes promptly. If you have any questions about how to complete this form, please contact your tax advisor.*

**Section 1: Account Holder Identification**

| Account Holder Name | Date of Incorporation/Organization | Country |
| --- | --- | --- |

**Registered Address:**

| Number & Street | | City / Town |
| --- | --- | --- |

| State/Province/County | Postal Code | Country |
| --- | --- | --- |

**Mailing address (if different from above):**

| Number & Street | | City / Town |
| --- | --- | --- |

| State/Province/County | Postal Code | Country |
| --- | --- | --- |

*[Remainder of page intentionally left blank]*

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

**Section 2: U.S. or United Kingdom Persons**

Please tick and complete as appropriate.

(a)  •  The entity is a ***Specified U.S. Person*** and the entity's U.S. federal taxpayer identifying number (U.S. TIN) is as follows: _____

      (b)  •  The entity is a U.S. Person that is not a Specified U.S. Person. Indicate exemption[9]: _____

(c)  •  The entity is a ***Specified United Kingdom Person*** and the entity's United Kingdom identifying tax number is as follows: _____

      (d)  •  The entity is a United Kingdom Person that is not a Specified United Kingdom Person. Indicate exemption[10]: _____

***Complete Section 3 if you have non-U.S. or non-U.K. tax residencies.***

**Section 3: Declaration of Tax Residency (other than U.S. or U.K.)**

Please indicate the Entity's place of tax residence (if resident in more than one country please detail all countries and associated tax reference number type and number).

| Country/countries of tax residency | Tax reference number type | Tax reference number |
|---|---|---|
|  |  |  |
|  |  |  |

***Complete Section 4 and proceed to Section 5: Declaration and Undertakings.***

**Section 4: Entity FATCA Classification**

4.1 If you are a ***Registered Financial Institution***, please tick one of the below categories, and provide your FATCA GIIN at 4.1.1.

      (a)  •  British Virgin Islands or IGA Partner Jurisdiction Financial Institution
      (b)  •  Registered Deemed Compliant Foreign Financial Institution
      (c)  •  Participating Foreign Financial Institution

      4.1.1 Please provide your Global Intermediary Identification Number (GIIN):

_____

4.2 If you are a ***Financial Institution but unable to provide a GIIN***, please tick one of the below reasons:

      (a)  •  The Entity is a Model 1 Financial Institution and has not yet obtained a GIIN but intends to do so, if required.

---

[9] Under the US IGA and in the US Internal Revenue Code, Specified US Person does not include: An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37); The United States or any of its agencies or instrumentalities; A state, the District of Columbia, a possession of the United States, or any of their political subdivisions, or instrumentalities; A corporation the stock of which is regularly traded on one or more established securities markets, as described in Reg. section 1.1472-1(c)(1)(i); A corporation that is a member of the same expanded affiliated group as a corporation described in Reg. section 1.1472-1(c)(l)(i); A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state; A real estate investment trust; A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940; A common trust fund as defined in section 584(a); A bank as defined in section 581; A broker; A trust exempt from tax under section 664 or described in section 4947; or A tax-exempt trust under a section 403(b) plan or section 457(g) plan.

[10] Under the UK IGA, Specified UK Person does not include: A corporation the stock of which is regularly traded on one or more established securities markets or a member of the same EAG; A depository institution; A broker or dealer in securities, commodities, or derivative financial instruments that is registered as such under the laws of the United Kingdom; or a Non-Reportable United Kingdom Entity as defined in Annex II paragraph v.

DocuSign Envelope ID: 1544D9BF-44E9-4BA1-A687-89BE954691BD

(b)  •  The Entity is a Sponsored Financial Institution and has not yet obtained a GIIN but is sponsored by another entity that has registered as a Sponsoring Entity. Please provide the Sponsoring Entity's name and GIIN.

Sponsoring Entity's Name: _____

Sponsoring Entity's GIIN: _____

(c)  •  The Entity is a Trustee Documented Trust. Please provide your Trustee's name and GIIN.

Trustee's Name: _____

Trustee's GIIN: _____

(d)  •  The Entity is Certified Deemed Complaint, or otherwise Non-Reporting, Foreign Financial Institution (including a Foreign Financial Institution deemed complaint under Annex II of an IGA, except for a Trustee Documented Trust or Sponsored Financial Institution). Indicate exemption:

_____

(e)  •  The Entity is an Excepted Foreign Financial Institution. Indicate exemption:

_____

(f)  •  The Entity is a Non-Participating Foreign Financial Institution

(g)  •  The Entity is a US Financial Institution

4.3 If you are not a Foreign Financial Institution, please confirm the Entity's FATCA status below:

(a)  •  The Entity is an Exempt Beneficial Owner. Indicate status:

_____

(b)  •  The Entity is an *Active Non-Financial Foreign Entity* (including Excepted NFFE)

(c)  •  The Entity is a *Passive Non-Financial Foreign Entity* (please complete the table below providing details of any Controlling Persons)

| Full Name | Date of Birth | Full residence address | Details of controlling person's beneficial interest* | Country(ies) of tax residence | Tax reference type and number |
|-----------|---------------|------------------------|------------------------------------------------------|-------------------------------|-------------------------------|
|           |               |                        |                                                      |                               |                               |
|           |               |                        |                                                      |                               |                               |
|           |               |                        |                                                      |                               |                               |

*\* Natural persons that are controlling should also complete the Individual Self-Certification.*

## Section 5: Declaration and Undertakings

I/We declare (as an authorized signatory of the Entity) that the information provided in this form is, to the best of my/our knowledge and belief, accurate and complete. I/We undertake to advise the recipient promptly and provide an updated Self-Certification form within 30 days where any change in the circumstances occurs, which causes any of the information contained in this form to be inaccurate or incomplete. Where legally obliged to do so, I/we hereby consent to the recipient sharing this information with the relevant tax information authorities.

Authorized Signature: _____        Authorized Signature: _____

Position/Title: _____        Position/Title: _____

Date (dd/mm/yyyy): _____        Date (dd/mm/yyyy): _____

# EXHIBIT D
## Side Letter

<span style="background:black;color:black">████████</span> **SIDE LETTER**

**BKCoin Multi-Strategy Fund LP**

      This letter agreement (this "<u>Agreement</u>") dated May 9, 2022 (the "<u>Effective Date</u>") is provided to <span style="background:black;color:black">████████████</span>, a Delaware limited liability company ("<span style="background:black;color:black">████████</span>"), and each private fund vehicle managed by <span style="background:black;color:black">████████</span> executing this Agreement (each, a "<span style="background:black;color:black">████████</span>" and collectively with <span style="background:black;color:black">████████</span> "<span style="background:black;color:black">████████</span>"), in consideration of one or more subscriptions in Class B limited partnership interests ("<u>Interests</u>") of BKCoin Multi-Strategy Fund LP, a Delaware limited partnership (the "<u>Fund</u>") managed by BKCoin Management LLC (the "<u>Manager</u>"), pursuant to (a) one or more subscription agreements entered into between <span style="background:black;color:black">████████</span> and the Fund (the "<u>Subscription Agreement</u>") dated on or about the date hereof, (b) the Fund's private placement memorandum dated March 3rd, 2022 (the "<u>Offering Memorandum</u>"), and (c) the limited partnership agreement of the Fund dated as of March 3rd, 2022 (the "<u>LPA</u>" and collectively with the Offering Memorandum and the Subscription Agreement, the "<u>Fund Documents</u>"). Capitalized terms not otherwise defined herein have the same meanings given to them in the Fund Documents.

      The parties hereto hereby agree as follows:

      1.   <u>Traditional Interests</u>.  On or about the date of this Agreement, one or more <span style="background:black;color:black">████████</span> shall subscribe for Interests of the Fund in the aggregate amount of $15,000,000. Each <span style="background:black;color:black">████████</span>'s Interests shall be assigned its own capital account in the Fund (the "<u>Capital Account</u>") and such account shall be adjusted for allocations of profits, losses, subscriptions and redemptions as provided herein and in the LPA.  Each such Fund's Interests shall be in a Class of Interests newly created by BK Coin Management LLC, as the initial general partner of the Fund (together with any successor or additional general partner of the Partnership, the "<u>General Partner</u>"), in accordance with the LPA (the "<u>Traditional Class Interests</u>").  The Traditional Class is sometimes referred to herein as the "<span style="background:black;color:black">████████</span> Class".

      2.   <u>Capacity</u>.

          (a)   The <span style="background:black;color:black">████████</span> shall have the right, but not the obligation, (i) to subscribe for additional Traditional Class Interests (for the avoidance of doubt, in amounts in excess of the Traditional Class Interests being subscribed for on or about the date hereof) or (ii) to the extent the Traditional Class Interests are no longer available for investment, to make an investment in such other structure or arrangement as the Manager shall use best efforts to facilitate that would represent a comparable investment in the Trading Strategy (described on <u>Schedule A</u> attached hereto) (an "<u>Alternative Structure</u>"), as of any business day (upon one day's prior written notice) in an aggregate amount equal to the greater of (i) 20% of the Trading Strategy's Total Strategy Capacity (as defined below), and (ii) US$75,000,000; which investment in Traditional Class Interests (or an Alternative Structure) shall be subject to the terms set forth in this Agreement, including, for the avoidance of doubt, the performance fee terms (in addition to the initial investment amount referenced in Section 1, the "<u>Reserved Capacity</u>"). <span style="background:black;color:black">████████</span> shall have such

amount of Reserved Capacity beginning on the date of its initial subscription into the Fund, and ending on the date that is eighteen (18) months after the initial subscription date (the end of such 18-month period being referred to herein as the "Capacity Date"). For the avoidance of doubt, ███████ capacity rights under this Section 2 shall be effective beginning on the Effective Date.

(b)    After the Capacity Date, ███████'s Reserved Capacity shall be decreased to an aggregate amount equal to the greater of (i) 10% of the Trading Strategy's Total Strategy Capacity, and (ii) $37,500,000. Any Reserved Capacity not used within the eighteen (18) month period following the Capacity Date (the end of such period, the "Expiration Date") will be forfeited; provided that, the Expiration Date shall be extended by the amount of time during which Advisor has not fully complied with all of its obligations under this Section 2. Following the Expiration Date, ███████ may not subscribe for additional Traditional Class Interests without the prior written approval of the Manager.

(c)    Except as specified in Section 4, ███████ shall be permitted to maintain any and all capital it has deployed with the Fund or the Manager in the Trading Strategy for as long as ███████ determines in its sole discretion (and such investment shall remain subject to the terms set forth in this Agreement), and no portion of such capital may be withdrawn, redeemed, returned or refused by the Fund or Manager without ███████ prior written consent.

(d)    Prior to the Expiration Date, ███████ may at any time increase the amount of capital it has deployed in the Trading Strategy (whether by investment in the Traditional Class Interests or an Alternative Structure) up to the then-effective Reserved Capacity. ███████ may allocate the Reserved Capacity between or among the ███████ and/or other clients of ███████ or its affiliates, in such proportions as it determines from time to time in its sole discretion; provided, that in each case, (i) such ███████ or client is otherwise eligible to invest in the Fund and (ii) such ███████ or client executes a Subscription Agreement and a standard transfer agreement, if applicable.

(e)    ███████ capacity rights under this Section 2 shall apply with equal force and effect with respect to any Affiliate of or successor to the Manager or the Fund and any other funds or other entities or persons controlled by a Principal (as defined below), including where a Principal is a Control Person or Sub-Advisor (each as defined below) of a fund or other person, which, in each case, is employing or intending to employ the Trading Strategy or another strategy substantially similar to the Trading Strategy, either exclusively or as part of a broader program or strategy. In addition, each of the Manager and the Principals shall use their best efforts to give effect to and implement ███████ capacity rights under this Section 2.

(f)    The General Partner and the Manager acknowledge that, though the investment by ███████ in the Trading Strategy and use of the Reserved Capacity is initially being effected by the ███████ investing in the Traditional Class Interests, the General Partner and the Manager shall use good faith best efforts to

2

accommodate any reasonable request by  to convert such investment into an allocation pursuant to a separately managed account agreement subject to substantially identical terms as those set forth herein whereby the General Partner or the Manager would manage the applicable account pursuant to the Trading Strategy (which would constitute an Alternative Structure, including for purposes of applying the capacity rights herein).

(g)    For the avoidance of doubt, ▮▮▮▮▮ capacity rights under this Section 2 shall survive a full redemption by ▮▮▮▮ of its Traditional Class Interests (or, if applicable, its investment in an Alternative Structure), except that if the Fund compulsorily withdraws or redeems a ▮▮▮▮▮▮ investment in Traditional Class Interests or an Alternative Structure for Cause, ▮▮▮▮▮ shall not be entitled to exercise its capacity rights for such time that the circumstances that constituted Cause continue to exist; provided that, during the four (4) year period after the occurrence of Cause, the General Partner and the Manager shall, at the request of ▮▮▮▮▮ ▮▮▮▮▮ engage in good faith best efforts to resolve the circumstances that constitute Cause (which may include implementing an Alternative Structure), and in the event that the parties identify a manner in which a ▮▮▮▮▮ may reinvest in a manner that does not result in Cause during such period (including, through the establishment of an Alternative Structure), ▮▮▮▮▮ would then be entitled to exercise its capacity rights in such manner.

"Total Strategy Capacity" means the maximum aggregate dollar amount which Manager could deploy in the Trading Strategy across all funds, managed accounts, and other vehicles without a material degradation of the Trading Strategy returns. For the avoidance of doubt, the Total Strategy Capacity cannot be less than the total amount of assets deployed in the applicable Trading Strategy across all accounts traded by or invested in by the Manager, its Affiliates, Control Persons, or Principals, at a given time.

"Affiliate" means, with respect to a particular person or entity, another person or entity controlling, controlled by or under common control with such person or entity.

"Principal" means Kevin Kang, Carlos Betancourt, Mark Treinkman, or an owner, partner or member of Manager or General Partner who has investment discretion over all or any portion of the Fund.

"Control Person" means, with respect to a particular entity, a person who has the ability, by means of equity ownership, contractual rights or otherwise, to establish policy for or exercise operating control over any portion of the business of such entity in which such person is to be involved.

"Sub-Advisor" means a person who performs investment advisory or management services for all or a portion of a pooled investment fund and is compensated primarily based on a formulaic percentage of the returns generated by such person and/or their team.

3.    Fees; Expenses.

3

      (a)    ***Traditional Class.***

      (i)    *Management Fee.* Each ████████ Capital Account shall not be subject to any Management Fees (or any similar asset-based fees).

      (ii)    *Traditional Performance Fee.*

      (A)    Each ████████ Capital Account shall pay the Manager a performance fee (the "Traditional Class Performance Fee") for each Traditional Class Calculation Period (as defined below) equal to the product of (I) the Performance Fee Rate (as defined below) multiplied by (II) the Net Profit (as defined below) of the such ████████ Capital Account for such Traditional Class Calculation Period reduced for any unrecouped Carryforward Loss (as defined and described below) with respect to such ████████ Capital Account.

      (B)    "Performance Fee Rate" means the weighted average of each of the applicable Marginal Performance Fee Rate tiers (set forth in the table below). The Performance Fee Rate shall be calculated with respect to each Traditional Class Calculation Period following the conclusion of such Traditional Class Calculation Period by taking the sum of the products of each of the applicable Marginal Performance Fee Rate tier and the applicable portion of the ████████ Aggregate Average Daily Capital Account Balance during such Traditional Class Calculation Period to achieve one blended Performance Fee Rate percentage for such Traditional Class Calculation Period.

| Tier | ████ Classes' Aggregate Average Daily Capital Account Balance | Marginal Performance Fee Rate |
|------|---------------------------------------------------------------|-------------------------------|
| 1    | Up to, but not including, $35,000,000                         | 22%                           |
| 2    | Greater than, or equal to, $35,000,000                        | 18%                           |

      By way of illustration, if the ████████ Aggregate Average Daily Capital Account Balance for a Traditional Class Calculation Period was $65,000,000, then the Performance Fee Rate for such Traditional Class Calculation Period would be calculated as the sum of (i) (a) 53.85% (the percentage of the ████████ Aggregate Average Daily Capital Account Balance during such Traditional Class Calculation Period applicable to Tier 1 in the table above) multiplied by (b) 22% (the Marginal Performance Fee Rate for Tier 1) and (ii) (a) 46.15% (the percentage of the ████████ Aggregate Average Daily Capital Account Balance during such Traditional Class Calculation Period applicable to Tier 2 in the table above) multiplied by (b) 18% (the Marginal Performance Fee Rate for Tier 2); resulting in a Performance Fee Rate for such illustrative Traditional Class Calculation Period of 20.15%.

      (C)    "Traditional Class Calculation Period" means (I) initially, the period from the date on which Traditional Class Interests are first issued to a ████ through the immediately following December 31st, and (II) subsequently, the period from the end of the immediately preceding Traditional Class Calculation Period through the end of the immediately following December 31st (or, if earlier, the end of the Term (as defined below)). An amount equal to 85% of the Traditional Class Performance Fee earned for a Traditional Class Calculation Period will be paid following the end of such Traditional

Class Calculation Period once the Fund's administrator completes its calculation. The remaining portion of such Traditional Class Performance Fee (the "Holdback Amount") will be payable following the end of the next Traditional Class Calculation Period after the end of the applicable Traditional Class Calculation Period provided that the Traditional Class does not have an existing Carryforward Loss as of the end of such subsequent Traditional Class Calculation Period. If the Traditional Class does have an existing Carryforward Loss as of the end of such subsequent Traditional Class Calculation Period, then the Holdback Amount will be payable to the Manager only after the next subsequent Traditional Class Calculation Period, if any, as of which the Traditional Class no longer has an existing Carryforward Loss. If this Agreement is terminated at a time when there is both (x) a Holdback Amount, and (y) an existing Carryforward Loss in the Traditional Class Interests, then the net redemption proceeds paid to each ███████████ shall be increased by an amount which is equal to (i) the Carryforward Loss amount as of the Effective Redemption Date, multiplied by (ii) the Traditional Class Performance Fee. Such amount by which each ███████████ net redemption proceeds are increased shall be offset against the Holdback Amount (if any) due to the Manager and may not be an amount which is greater than the total Holdback Amount.

(D)    "Net Profit" or "Net Loss" for each ███████████ Capital Account with respect to a Traditional Class Calculation Period means the aggregate net investment profits or losses (in U.S. dollars), as applicable, both realized and unrealized, in such ███████████ Capital Account including, without limitation, any dividends, interest, Fee Rebates (as defined in Section 7) and other payments, less Fund Expenses for such Traditional Class Calculation Period. Notwithstanding the foregoing, any profits resulting from an investment in Restricted Instruments (as defined on Schedule 1 hereto) or from investments made in material breach of any Risk Limit set forth on Schedule 1 hereto shall not be included in the calculation of Net Profit or Net Loss for purposes of calculating the Traditional Class Performance Fee, although, for the avoidance of doubt, any losses resulting from investments in Restricted Instruments or from investments made in material breach of any Risk Limit set forth on Schedule 1 hereto shall be included in the calculation of Net Profit or Net Loss for purposes of calculating the Traditional Class Performance Fee.

(E)    If a ███████████ Capital Account suffers a Net Loss for a Traditional Class Calculation Period, the amount of such Net Loss (the "Carryforward Loss") will be carried forward and deducted from Net Profits in such ███████████ Capital Account in each succeeding Traditional Class Calculation Period for the purpose of determining the Traditional Class Performance Fee until the full amount of the Carryforward Loss has been offset by subsequent Net Profits. If any portion of such ███████████ Traditional Class Interest are redeemed, any then-existing Carryforward Loss shall be proportionately reduced. Notwithstanding the foregoing, if Traditional Class Interests are redeemed by a ███████████ and then subsequently such ███████████ subscribes for additional Traditional Class Interests, the Carryforward Loss will be proportionately increased up to the aggregate amount of the previous reductions to the Carryforward Loss amount.

(iii)     **Fund Expenses.** Each ██████████ Capital Account shall be allocated (A) their *pro rata* share of the Fund's investment related expenses (including trading expenses, brokerage commissions and other transaction charges, fees and expenses incurred in the borrowing and lending of assets, interest, margin expense and other financing charges charged to the Fund attributable to the acquisition of securities or other assets by the Fund, custodial fees, bank service fees, transfer taxes, withholding taxes, and other fees and expenses directly related to the purchase, sale or other disposition of Fund assets) and (B) their *pro rata* share of the Fund's audit expenses, organizational expenses, administrative expenses and other expenses of the Fund as specified in the Fund Documents; provided that (i) for any period of time during which the Fund's assets under management are equal to, or less than, US$250,000,000, each ██████████ Capital Account will not be allocated expenses under this clause (B) in excess of 0.06% (i.e., 6 basis points) per annum on such ██████████ average daily Capital Account balance, (ii) for any period of time during which the Fund's assets under management are greater than US$250,000,000, but less than or equal to, US$500,000,000, each such ██████████ Capital Account will not be allocated expenses under this clause (B) in excess of 0.05% (i.e., 5 basis points) per annum on such ██████████ average daily Capital Account balance, (iii) for any period of time during which the Fund's assets under management are greater than US$500,000,000, but less than or equal to, US$750,000,000, each such ██████████ Capital Account will not be allocated expenses under this clause (B) in excess of 0.04% (i.e., 4 basis points) per annum on such ██████████ average daily Capital Account balance and (iv) for any period of time during which the Fund's assets under management are greater than US$750,000,000, then each such ██████████ Capital Account will not be allocated expenses under this clause (B) in excess of 0.03% (i.e., 3 basis points) per annum on such ██████████'s average daily Capital Account balance; in each case, without the prior written consent of ██████████

4.     <u>Redemptions.</u>

(a)     A ██████████ may redeem all or any portion of its then current Capital Account balance at any time for any reason upon five (5) business days prior written notice to the Fund (the effective redemption date specified in such written notice, the "<u>Effective Redemption Date</u>"); provided that, a ██████████ may not redeem more than two (2) separate times during any given single calendar month. The Fund shall pay to each ██████████ an amount equal to 100% of such ██████████ net redemption proceeds in cash (US dollars) via wire transfer within one (1) business day following the Effective Redemption Date. Furthermore, a ██████████ may redeem all or any portion of its then current Capital Account balance at any time for any reason upon one (1) business days prior written notice to the Fund if such redemption is pursuant to "<u>Redemption Cause</u>". The Fund shall pay to each ██████████ an amount equal to 100% of such ██████████s net redemption proceeds in cash (US dollars) via wire transfer within one (1) business day following the Effective Redemption Date if such redemption is pursuant to Redemption Cause.

(i)     ██████████ shall have "Redemption Cause" to redeem all or any portion of a ██████████ then current Capital Account balance in any one or more of the following circumstances: (i) a breach of this Agreement by Manager or General Partner (including, without limitation, a breach of a representation, warranty or any of the limitations set forth on <u>Schedule A</u> hereto) which is not cured within one (1) business day of Manager's receipt of written

6

notice thereof; (ii) a violation of law, rule or regulation, criminal conduct, a misrepresentation, a breach of fiduciary duty, intentional misconduct, negligence or fraud, in each case by Manager, General Partner, or any principal, member, partner, officer or employee of Manager or General Partner; (iii) the cessation or failure of Manager to provide services to ███████ hereunder in accordance with the terms of this Agreement; or (iv) at any time after the occurrence of a Reportable Event or a Disqualifying Event.

       (b)    For the avoidance of doubt, notwithstanding anything to the contrary in the Fund Documents, redemptions by a ███████ shall not be subject to any Holdback, Redemption Charge (or fee), Fund-Level Gate, Redemption Gate, Lock-Up Period, Side Pocket or delayed redemption mechanism, Reserves, Suspension of Withdrawals, Suspension of Withdrawal Proceeds, redemption holdback, deduction for tax liabilities, the establishment of any reserves, or any suspensions of redemptions or of Net Asset Value.

       (c)    Except as may be set forth in alternate written instructions from ███████ to the Fund (i) as of the last day of each calendar year (expected to be on or about December 31st), the Fund shall automatically redeem all of a ███████ then current Capital Account Balance, and 100% of the redemption proceeds with respect to such redemption will be paid to such ███████ within three (3) days after such Effective Redemption Date (the "Automatically Redeemed Investment"); and (ii) the ███████ shall have the right (but not the obligation) to reinvest an equivalent amount in the Fund effective as of a date on or prior to the first available subscription date in the subsequent calendar year (expected to be on or about January 1st) (the "Replacement Investment"), and in such event, the Traditional Class Interests issued pursuant to the Replacement Investment shall be subject to the terms of the Fund Documents and this Agreement with respect to Carryforward Losses and entitlement to Catch-Up Allocations, as applicable, as though the Automatically Redeemed Investment had not been redeemed.

       (d)    For the avoidance of doubt, except as otherwise agreed in writing by ███████ any investment by a ███████ in Traditional Class Interests or an Alternative Structure shall be subject to the terms set forth in this Agreement, even if such investment is made after a full redemption by a ███████ from the Traditional Class Interests.

       (e)    Notwithstanding the terms of the Fund Documents or anything to the contrary herein, the Fund may not compulsorily redeem Traditional Class Interests held by a ███████ unless such termination is for "Cause"; and even in such event it may not do so without at least five (5) days' prior written notice to ███████ "Cause" shall mean a good faith determination by the General Partner, after consulting with counsel and ███████ that the continued investment by a ███████ in Traditional Class Interests will result in a violation of any law or regulation applicable to the Fund, or subject the Fund, the General Partner or the Manager to a body of regulations solely as a result of such investment by a ███████ to which they would not otherwise be subject; provided that, such determination may only be made by the General Partner after (i) consulting with counsel and (ii) providing ninety (90) days' prior notice to ███████ of the General Partner's belief that Cause will

be triggered, and the General Partner and the Manager coordinating with ████████
████████ using its good faith best efforts during such ninety (90) day period to try preventing such investment by a ████████ constituting Cause.

(f)     For the avoidance of doubt, any references herein to "redeem", "redemption" or "redeeming" (or any comparable term) with respect to Traditional Interests shall be deemed to refer to a withdrawal or withdrawing (as applicable) of applicable amounts from the applicable Capital Account associate with Traditional Interests.

5.     Trading Strategy; Investment Limitations.

(a)     The trading strategy that Manager shall follow with respect to the ████████ is described on Schedule A attached hereto (the "Trading Strategy"). The Trading Strategy may be modified by the Manager from time to time with ████████ Management's prior written consent, which ████████ may grant or withhold in its sole discretion. The Manager shall comply with the Trading Strategy, including the Risk Limits (as defined on Schedule A hereto), at all times when making investments or taking other actions on behalf of the ████████. In addition, the Manager shall promptly adjust the ████████ portfolio to comply with any properly adopted amendments to the Trading Strategy. The Manager shall in no event buy or sell any Restricted Instrument (as defined on Schedule A hereto) on behalf of or for the benefit of the ████████, except to the extent expressly consented to in writing by ████████ in its sole discretion.

(b)     The Manager shall manage the ████████ in accordance with the investment limitations and other provisions set forth on Schedule 1 hereto (collectively, the "Investment Limitations"), and shall not allocate any Fund investments to a ████████ that are not in compliance with the Investment Limitations in all material respects. Any profits with respect to a ████████ that are attributable to investments that are not in compliance with the Investment Limitations in all material respects shall be excluded from Net Profits for purposes of (i) calculating the Traditional Class Performance Fee due to the Manager

(c)     The Manager shall not be permitted to delegate any of its functions or responsibilities under this Agreement without the prior written consent of ████████, which may be granted or withheld in ████████ sole discretion.

6.     Reporting.

(a)     The Manager and the Fund shall provide ████████ ████████ with the reports and other information set forth on Schedule 2 hereto within the time periods set forth in Schedule 2 (such reports and time periods as may be amended from time to time in ████████ reasonable discretion).

(b)     At any time upon ████████ request, the Manager shall disclose the public key wallet addresses utilized by the Manager for the discretionary investment management of the ████████ class (each such public key utilized

8

by the manager, a "Public Key Wallet Address"). Furthermore, at any time upon ████ ████ request, the Manager shall provide ████████ with read only, or read only API, access to the Fund's exchange accounts, Fund's accounts hosted by cryptocurrency custodians, and the Fund's third party administrators monthly position and performance reporting for the ████ and, to the extent such reporting is produced on a daily basis, daily position and performance reporting (which, with respect to the Fund's third party administrator, such read only access may be via reports which the Manager causes to be delivered to ████ through a secure electronic data interface on a daily basis); provided that, if the ████ ' assets are not segregated from the other Classes of Interests or client assets of the Fund at any exchange or cryptocurrency custodian, and the Manager, despite utilizing its best efforts, is unable to provide ████ with read only access to only the ████' assets at an exchange or cryptocurrency custodian, then the Manager may elect to delay providing ████ with read only access to such exchange account and/or cryptocurrency custodian until such time as the Manager is able to segregate the ████ assets in such a way as to only provide ████ read only access to only the ████ assets, and Manager will use its best efforts to arrange such segregation and thereafter such read only access. The Manager shall promptly notify ████ upon the additional or removal of any Public Key Wallet Address or the addition or removal of any exchange account or cryptocurrency custodian with respect to the ████ and promptly provide ████ with any such new Public Key Wallet Address or read only access to any such new cryptocurrency exchange or cryptocurrency custodian account.



7.    Brokerage Practices.

(a)    Manager will pay reasonable market rates that Manager deems are necessary for conducting business. Manager has not entered, and does not anticipate entering, into any formal soft dollar arrangements (or arrangements that a reasonable person would consider similar to a soft dollar arrangement) which would be applicable to the ████ in which a part of the commission, mark-up or mark-down charged for trade execution is allocated toward payment for research or brokerage products or services provided by the executing broker-dealer or third parties on its behalf. Advisor may enter into any such arrangement only with the prior written consent of ████ and only in compliance with the "safe harbor" provided by Section 28(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). To the extent that the Manager receives any "fee rebates" from any of its execution counterparties, or execution venues, such pro-rata portion of rebated amounts (such amounts, "Fee Rebates") applicable to the ████ shall be allocated to each such ████ Capital Account and included in the calculation of Net Profit or Net Loss (as the case may be) for the applicable Traditional Class Calculation Period in which such trading occurred and with respect to which such applicable Fee Rebate is being received.

8.    Confidential Relationship; Non-Disparagement.

(a)    Except as otherwise agreed in writing or as required by applicable law, rule or regulation, the Manager shall (and shall cause its principals, employees,

Affiliates, agents and representatives to) keep confidential and not use for any purpose other than in connection with the ▓▓▓▓▓▓ investment in the Fund for the benefit of ▓▓▓▓▓ all confidential and proprietary information of ▓▓▓▓▓, including, without limitation, the terms of this Agreement and any information concerning the financial affairs, strategies or investments of ▓▓▓▓▓ (collectively, "▓▓▓▓▓ Confidential Information"), except for disclosures of information to authorized agents of the Manager on a strictly "need-to-know" basis in connection with rendering the services to the Fund; provided, that to the extent the Manager is required to disclose confidential and proprietary information of ▓▓▓▓▓ pursuant to applicable law, rule or regulation, it shall, to the extent legally permissible, provide ▓▓▓▓▓ with prompt written notice of such requirement so that ▓▓▓▓ may seek, at its sole cost and expense, a protective order or other remedy, but notwithstanding the foregoing, the Manager may disclose such confidential and proprietary information upon demand from a regulatory agency with authority over it as part of a regular audit or request that is not focused specifically on ▓▓▓▓▓ or a ▓▓▓▓▓ investment in the Fund. Notwithstanding the foregoing, the Manager shall be permitted to retain and use the track record of the ▓▓▓▓▓▓ for any lawful purpose in its sole discretion.

(b)  Neither the Manager, nor any of its respective principals, members, partners, employees, Affiliates, agents or representatives, shall prepare, create, approve, use, distribute or authorize the use or distribution of any written or electronic literature, marketing document or advertisement in which ▓▓▓▓▓ is named or referred to unless such literature, marketing document or advertisement shall first be approved by ▓▓▓▓ ▓▓▓▓▓▓ in writing.

(c)  Upon termination of this Agreement, or at any time that ▓▓▓▓ may so request, the Manager shall promptly return to ▓▓▓▓▓ or destroy all Confidential Information in its possession or under its control, except that it is not required to return to ▓▓▓▓▓ or destroy any ▓▓▓▓▓ Confidential Information that it must retain pursuant to applicable law.

(d)  Notwithstanding any other provision of the Fund Documents to the contrary, ▓▓▓▓▓ and its affiliates shall be permitted to disclose the existence and terms of a ▓▓▓▓▓ investment in the Fund, including, without limitation, the terms of this Agreement, and the performance of the ▓▓▓▓▓ Class to any of their current or prospective investors, service providers, or financing sources, in their sole discretion without notice to the Manager or the Fund.

(e)  Each of the Manager and Principals agrees that at no time, even if this Agreement has been terminated, shall it disparage or defame, orally or in writing, the reputation or business of ▓▓▓▓▓ or any current or former affiliates or employees of ▓▓▓▓▓.

9.  <u>Manager Representations</u>. The Manager hereby represents and warrants as follows:

(a)    *Power and Authority*.  It has full power and authority to execute, deliver and perform its respective obligations under this Agreement and the Fund Documents.

(b)    *Registrations*.    It and its officers and employees have all governmental and regulatory registrations, qualifications, approvals and licenses required by them to perform their respective obligations under this Agreement and the Fund Documents.  The performance of such obligations under this Agreement and the Fund Documents will not conflict with, violate the terms of or constitute a default under (i) any agreement (including, but not limited to, any employment agreement or non-competition agreement, or partnership or investment management agreement governing its or any of its officer's or employee's relationship with any other current or former client or shareholder of the Fund) or instrument to which it or any of its officers or employees is a party or by which any such person or entity is bound or to which any of such person's or entity's assets is subject, or (ii) any applicable order, rule, law, regulation or other legal requirement.

(c)    *Trading Approach and Methodology*.  It has full right, title and interest in and to the trading approach and methodology to be used for the ▮▮▮▮▮Class (except to the extent of programs incorporated into such trading approach and methodology that are duly licensed by it or its Affiliate).

(d)    *Prior Acts*.  Neither it nor any of its officers or employees has ever been (i) charged with, convicted of or pled guilty or nolo contendere to any felony crime or to any other crime involving fraud, theft, deceit or dishonesty, (ii) sanctioned by or the subject of any action of or investigation by or entered into a settlement agreement with the U.S. Securities and Exchange Commission (the "SEC"), the U.S. Commodity Futures Trading Commission, any other U.S. federal, U.S. state or foreign regulatory agency or any exchange or self-regulatory organization, or (iii) a defendant in any civil action involving investments, an investment related business, an act or alleged act of deceit, fraud or breach of fiduciary duty.

(e)    *No Litigation*.    No litigation, suit, action, proceeding or investigation (formal or informal and including the receipt of a Wells notice) of or before any court, arbitration panel, regulatory authority, exchange, self-regulatory organization or governmental authority to which it or any of its officers or employees is a party is pending or, to its knowledge, threatened.

(f)    *Information*.  All information supplied by it in writing to ▮▮▮▮▮ and its agents with respect to it and the Fund did not and will not contain a material misstatement or omission as of the date so supplied. It will promptly furnish to ▮▮▮▮▮ such information regarding the Manager or the Fund and their respective Affiliates as ▮▮▮▮▮ may reasonably request from time to time in connection with the preparation of disclosure documents and/or other materials required for compliance purposes.

(g)    *Resources*.  It has adequate financial resources, personnel, facilities and assets to perform its respective obligations under this Agreement and the Fund Documents and shall notify ▮▮▮▮▮ promptly in writing of any developments in its

11

financial situation or otherwise that adversely impacts their ability to perform its respective obligations under this Agreement and the Fund Documents.

(h) **_Certifications_**. It has completed each of the CFTC/NFA Certification and the Bad Actor Certification attached hereto as Exhibits A and B, and all of its representations and warranties contained in such certifications are true, complete and correct in all material respects.

(i) **_Taxation_**.

(i) the Fund is treated as a partnership for U.S. tax purposes and, on an annual basis, the Fund will provide any ▉▉▉▉▉ an annual K-1 Statement; and in each such year will make best efforts to arrange delivery of an estimated K-1 by April 1 and a final K-1 by July 31;

(ii) It has consulted with reputable U.S. tax counsel and/or advisers ("US Advisers") that have confirmed their opinion that the Fund's activities should not be treated as conducting a U.S. trade or business (i.e., that the Fund's activities will be within the safe harbors set forth in Section 864(B)(2) of the Code);

(iii) Relying on advice of US Advisers, it will use best efforts to ensure the Fund does not engage in activities that would constitute conducting a U.S. trade or business, including that it will (i) consult with US Advisers prior to engaging in new activities in order to confirm the opinion of US Advisers that such activities will not constitute conduct of a U.S. trade or business and (ii) monitor for further guidance regarding whether the activities engaged in by the Fund might be considered conduct of a U.S. trade or business;

(iv) It has consulted with reputable non-U.S. tax counsel and/or advisers ("Non-US Advisers") that have confirmed their opinion that the Fund's activities should not be subject to taxation in any other jurisdiction, or cause investors in the Fund to be subject to taxation in any other jurisdiction;

(v) Relying on advice of Non-US Advisers, it will use best efforts to ensure the Fund does not engage in activities that would subject the Fund to taxation in any other jurisdiction, or cause investors in the Fund to be subject to taxation in any other jurisdiction, including that it will (i) consult with Non-US Advisers prior to engaging in new activities to confirm the opinion of Non-US Advisers that such activities will not subject the Fund to taxation in any other jurisdiction, or cause investor in the Fund to be subject to taxation in any other jurisdiction and (ii) monitor for further guidance regarding whether the activities engaged in by the Fund might subject the Fund to taxation in any other jurisdiction, or cause investor in the Fund to be subject to taxation in any other jurisdiction;

(vi) It will notify ▉▉▉▉▉ promptly of any development that might result in (i) the Fund being deemed to be conducting a U.S. trade or business, or (ii) the Fund, or investors in the Fund, being subject to taxation in any other jurisdiction.

Other than with respect to such representations and warranties that are expressly made only as of a specific date, the representations and warranties contained in this Section shall be

continuing during the term of a ▌▌▌▌▌▌'s investment in the Fund and if at any time during such term the Manager discovers that any of the representations or warranties contained in this Agreement has become materially incomplete or inaccurate, it shall notify ▌▌▌▌▌▌ ▌▌▌▌▌▌ in writing of such material incompleteness or inaccuracy and of the steps, if any, being taken to remedy the matter, within three (3) days of the discovery thereof.

      10.   <u>Compliance</u>.

      (a)   ***Policies and Procedures***.

      (i)   The Manager has established, and will maintain and comply with, a system of operational and compliance policies and procedures (the "<u>Policies and Procedures</u>") that are reasonably designed to prevent violation by it, its supervised persons and the Fund of the laws and regulations applicable to it with respect to its providing services to the Fund hereunder, including taking into account (A) its regulatory status and the nature of its operations and the Fund's trading strategy and (B) any relationship or affiliation between it and any other investment advisor. In all cases, the Policies and Procedures shall include (I) policies and procedures reasonably designed to prevent the misuse by the Manager, as applicable, and its supervised persons of material non-public information and to avoid and detect trade errors, and (II) all other policies and procedures required to be implemented by the Manager, as applicable, by virtue of its regulatory and/or registration status as in effect at such times, and under any other applicable laws, rules and regulations.

      (ii)   To the extent the Manager is registered (or is required to register) as an investment adviser with the SEC (a "<u>Registered Adviser</u>"), the Policies and Procedures will meet a standard at least consistent with the minimum requirements for a Registered Adviser and shall include policies and procedures regarding trade allocations and the allocation of investment opportunities, custody of client assets, managing actual and potential conflicts of interest, seeking best execution for trades made for the Fund, use of soft dollars, privacy, cybersecurity, and business continuity and disaster recovery.

      (iii)   The Manager shall effect all transactions for the Fund in accordance with the Policies and Procedures (except to the extent the terms of this Agreement are more restrictive than the Policies and Procedures, in which case the terms of this Agreement shall govern and control). The Manager shall notify ▌▌▌▌▌▌▌▌▌ in writing within three (3) days of its discovery of any material violation of the Policies and Procedures with respect to the Fund.

      (iv)   The Manager shall provide a copy of the Policies and Procedures to ▌▌▌▌▌▌▌▌ (and any subsequent amendments thereto) promptly upon request. The Manager agrees to promptly complete and return to ▌▌▌▌▌▌▌▌▌ such periodic compliance and due diligence questionnaires and certifications as are reasonably requested by ▌▌▌▌ from time to time, and to submit to due diligence reviews of the Policies and Procedures as they relate to the Fund, to be performed by ▌▌▌▌▌ or its designee in a manner so as not to unreasonably interfere with or disrupt the Manager's business operations. Any reasonable expenses associated with such reviews shall be deemed an expense of the ▌▌▌▌▌ ▌.

(b)     *Trade Errors*. The Manager will use its reasonable best efforts to timely detect and remedy any trade errors that occur in the Fund in accordance with the Policies and Procedures and without disadvantaging the ███████████, in any material respect. If a trade error occurs with respect to a ███████████, the Manager shall promptly notify ███████████ thereof. If a trade error occurs due to the Manager's fraud, gross negligence, intentional misconduct, violation of applicable law, bad faith or a breach of this Agreement or a representation, warranty or agreement made herein by the Manager and the Manager shall fully reimburse such ███████████ for any net loss resulting therefrom.

(c)     *Filing and Reporting Requirements*. The Manager shall comply with, and cause the Fund and each ███████████ to comply with, all of their required position-related filing and reporting requirements under applicable securities, commodities and investment advisory laws that may arise as a result of the Fund's activities. The Manager acknowledges that it is its responsibility in regard to the Fund's and its own obligations for compliance with applicable U.S. Commodity Futures Trading Commission ("CFTC") and National Futures Association rules and regulations, including but not limited to ensuring the Fund's and its compliance with position limits set forth in CFTC Regulation 150.2 and the rules of each applicable futures exchange or contract market for accounts under the control and management of the Manager, as applicable, or its respective Affiliates.

(d)     *Background Checks*. The Manager consents to the performance by ███████████ and/or its designated agents of background checks on the Manager and their respective officers and employees from time to time, and the Manager will provide written consents to such background checks upon reasonable request.

(e)     *No Coordination with Third-Party Managers; No MNPI*.

(i)     The Manager agrees that it will not (A) direct trading of, or coordinate trading for, a ███████████ with any other person or entity providing investment advisory or commodity trading services to ███████████ (each, a "Third-Party Manager"), (B) effect any allocations or transfers of securities or other positions between or among a ███████████ and any ███████████ account managed by a Third-Party Manager, or (C) in any other way operate in a manner that is not independent of any Third-Party Manager, in each case without first obtaining the written consent of ███████████ on a case-by-case basis.

(ii)     The Manager agrees that it will not provide to ███████████ any material non-public information regarding any security or issuer without (A) it first asking ███████████ whether it wishes to receive such information (without referencing the relevant security or issuer) and (B) ███████████ confirming in writing that it is willing to receive such information. For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, the Manager acknowledges and agrees that, except as explicitly agreed in a separate writing between it and ███████████ referencing an individual security or issuer by name, ███████████ has no obligation to the Manager, the Fund, or any other shareholder of the Fund to avoid trading in any particular security or issuer, whether such security or issuer is held by the Fund, in other accounts under the management of the Manager, or

14

otherwise, and that ███████ and its affiliates engage in investment management and trading activities, and may trade in such securities or issuers either for themselves or on behalf of others.

11.   Disclosure of Reportable Events.  The Manager shall provide written notice to ███████████████ within three (3) days of the occurrence of any of the following events (each, a "Reportable Event"):

(a)   The departure, death or incapacity of a Principal or any other circumstances under which a Principal is no longer devoting their full business time and attention and best efforts to the Manager (including, without limitation, due to the termination of a Principal's employment and/or association with the Manager);

(b)   Any officer, Principal, member, partner or employee of the Manager is charged with, convicted of or pleads guilty or *nolo contendere* to any felony crime or any other crime involving fraud, theft, deceit or dishonesty;

(c)   A litigation, suit, action, proceeding or investigation (formal or informal and including the receipt of a Wells notice) of or before any court, arbitration panel, regulatory authority, exchange, self-regulatory organization or governmental authority is brought, or to the Manager's knowledge, threatened, against the Manager, a Principal, the Fund or any of the Manager's owners, officers or employees;

(d)   The Manager becomes aware of any material errors, changes and/or corrections to the information supplied by the Manager or any of their respective agents to ████████ ;

(e)   The bankruptcy or insolvency of the Manager, a Principal, or an Affiliate of the Manager or a Principal; and

(f)   A change to any of the Fund or Manager's service providers set forth on Schedule 3 hereto and, if applicable, the Public Key Wallet Address(es) used by the Manager for the discretionary investment management of the ███████████ .

12.   Data Privacy and Cybersecurity.  The Manager hereby represents and warrants that it has administrative, technical, and physical safeguards in place that comply with all applicable laws, regulations, and industry standards related to data privacy and cybersecurity applicable to the Fund and itself.  Upon written request, ████████ or, upon ████████ election, a third party on its behalf, shall be permitted to perform, an assessment, audit, examination or review of controls in the Manager's physical and/or technical environment.  In the event that the Manager becomes aware of any actual or suspected network, system and/or data breach with respect to its infrastructure (including, but not limited to, a system intrusion, virus or malicious code attack, loss of data, data theft, manipulation of data integrity, unauthorized access to confidential information and/or nonpublic personal information, hacking incident, wire fraud or any acts of data ransom) that results, or is suspected to have resulted, in unauthorized access to and/or use by third parties of the confidential information related to the Fund or ████████ or causes monetary losses to the Fund or ████████ (the "Breach"), the Manager agrees to report the Breach to ███████████ ███████████ no later than twenty four (24) hours after having become aware of it and agrees that it shall take the appropriate steps to contain or mitigate the Breach and reasonably cooperate with

15

█████████████████ with respect to notifying regulators, law enforcement, clients and/or investors regarding the Breach.

      13.    Indemnification; Limitation of Liability.

          (b)    Each of the Manager, Fund, and General Partner shall indemnify, defend and hold harmless each █████████████ ███████████████ and █████ ████████'s partners, officers, directors, employees, agents and Affiliates from all losses, claims, costs, liabilities (joint and several), damages and expenses (including reasonable attorneys' fees incurred in defense of any demands, claims, arbitrations or lawsuits whether judicial, administrative, investigative or otherwise) (collectively, "Losses") arising directly out of acts or omissions that constitute fraud, gross negligence, intentional misconduct, violations of applicable law, bad faith or a breach of this Agreement or a representation, warranty or agreement made herein by Manager, Fund, or General Partner.

          (c)    The foregoing agreement of indemnity shall be in addition to, and shall in no respect limit or restrict, any other remedies which may be available to an indemnified party. The termination of any demand, claim, lawsuit, action or proceeding by settlement shall not, in itself, create a presumption that the conduct in question was not undertaken in good faith and without fraud, gross negligence or intentional misconduct.  Nothing contained in this Section shall constitute a waiver by ████████ of any of its legal rights under applicable U.S. federal securities laws or any other laws whose applicability is not permitted to be contractually waived. The provisions of this Section will survive the termination of this Agreement.

          (d)    Each of the Manager, Fund, and General Partner agree that, other than as set forth herein, the assets of the ███████████ shall not be subject to any settlement, fine, or other levy required to be paid as a result of the acts or omissions of Manager, a Principal, or General Partner, including but not limited to any settlement with, or fine by, regulatory authorities or as a result of any action, suit, or proceeding, other than with respect to any required disgorgement of profits in the ████████████ in connection therewith.

      14.    Valuation. The value of all securities and other assets held in the Fund with respect to the ███████████ shall be determined by the Fund's third party administrator in accordance with U.S. generally accepted accounting principles and its or the Manager's valuation and pricing policies from time to time in effect. The Manager shall notify █████████████████ in writing within three (3) days of any valuation that is inconsistent with the Manager's valuation and pricing policies then in effect. Additionally, the Manager shall notify ████████████████ within three (3) days of any change to its, or the Fund's thirty party administrator's, valuation or pricing policy, and in such event the Manager shall provide ███████████████████ with

such newly implemented pricing or valuation policy at the time of written notification to ██████ ████████████ of such change.

15.     Survival. The provisions of Sections 2, 8, 12, 13, and 15 of the Agreement shall survive the termination of this Agreement.

16.     Miscellaneous.

(a)     Governing Law; Jurisdiction.

(i)     This Agreement shall be governed by and construed both as to validity and enforceability in accordance with the laws of the State of New York without regard to its conflict of law principles.

(ii)     Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in New York, New York before one arbitrator.  The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. Judgment on the award may be entered in any court having jurisdiction.  This paragraph shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(b)     Injunctive Relief.  The parties expressly agree and understand that the breach or threatened breach by the Manager of its obligations under Section 2 or 8 of this Agreement may cause irreparable harm to ████████, that the remedy at law for any such breach or threatened breach will be inadequate and that the damages flowing from such breach are not readily susceptible to being measured in monetary terms.  Accordingly, it is acknowledged that upon the Manager's breach or threatened breach of any provision of Section 2 or 8, ██████████ shall be entitled to immediate injunctive relief and may, in addition, obtain a temporary or permanent order restraining any threatened or further breach; provided, however, that nothing in this Section 15(b) shall be deemed to limit ██████████ remedies at law or in equity for any breach of this Agreement.

(c)     Severability.  Any term or provision of this Agreement, which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms or provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

(d)     Assignment. This Agreement may not be assigned or delegated by the Manager or Fund without the prior written consent of ████████. ████████████ in its sole discretion, may at any time and from time to time assign or transfer all or any portion of its Reserved Capacity and/or other capacity rights to any Affiliate of ████████████ or a ████████████ or to any other investment entity managed or advised by ████████████ (each, a "Capacity Assignee"), upon written notice to Manager and Fund.  A Capacity Assignee shall be required to become a party to this Agreement prior to exercising any of the capacity rights so assigned or

transferred to it by ████████ and such Capacity Assignee must be (i) eligible to invest in the Fund and (ii) such Capacity Assignee executes a Subscription Agreement and a standard transfer agreement, if applicable.

(e)     <u>Headings</u>. The section and other headings of this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(f)     <u>Amendments</u>. This Agreement and the terms of the ████████ may be amended or modified only by an instrument in writing signed by all of the parties hereto, and compliance with any provision hereof may be waived only by an instrument in writing signed by the party or parties against whom or which enforcement of such waiver is sought.

(g)     <u>Conflicts</u>.   In the event of a conflict between the terms of this Agreement, on the one hand, and the Fund Documents, on the other hand, this Agreement shall control in all respects.  The parties hereby acknowledge and agree that, except to the extent modified or superseded by the terms of this Agreement, ████████ shall be subject to all provisions of the Fund Documents with respect to its investment in the Fund.

(h)     <u>Notices</u>.

(i)     Any notice or report to be given to ████████ under this Agreement will be delivered in person, by U.S. mail or overnight courier (postage prepaid) or sent by e-mail (with a hard copy sent by U.S. mail or overnight courier) to ████████ at the following address, or at such other address as ████████ may designate in writing from time to time:



(ii)     Any notice or report given to the Manager under this Agreement will be delivered in person, by U.S. mail or overnight courier (postage prepaid) or sent by e-mail (with a hard copy sent by U.S. mail or overnight courier) to the Manager at the address set forth below or at such other address as the Manager may designate in writing from time to time:

> 1101 Brickell Ave, S-800
> Miami, Florida 33131
> Attn: Carlos Betancourt
> Tel: 786-623-4656
> Email: carlos@bkcoincapital.com

(i)     <u>Electronic Delivery</u>. Each party hereby consents to have the other parties electronically deliver Account Communications (as defined below).  "<u>Account Communications</u>" means all current and future information exchanged under this Agreement, including but not limited to information required to be submitted by the

Manager or the Fund to ███████ and by ███████ to the Manager or the Fund, such as account statements; notices (including privacy notices); letters to investors; regulatory communications and other information, documents, data and records regarding ███████ investment in the Fund. Electronic Communications includes e-mail delivery as well as electronically making Account Communications available on a secure website. It is a party's affirmative obligation to notify the other parties in writing if its e-mail address changes. A party may revoke or restrict its consent to electronic delivery of Account Communications at any time by notifying the other parties, in writing, of its intention to do so. A party will not be liable for any interception of its Account Communications.

       (j)   <u>Counterparts; Facsimiles and Electronic Signatures</u>. This Agreement may be executed in one or more counterparts, each of which is an original and all of which together are deemed one and the same instrument. Delivery of an executed counterparty by facsimile, electronic mail in portable document format (.pdf) or by any other electronic means has the same effect as delivery of an executed original of this Agreement.

       (k)   <u>Waiver</u>. A waiver by a party hereto of any provision of this Agreement shall not constitute a waiver of any subsequent breach of such provision or any other provision hereof. The failure of either party to enforce at any time or from time to time any provision of this Agreement shall not be construed as a waiver thereof.

*[Signature page follows]*

19

Please signify your acceptance of and agreement to the terms of this Agreement by signing below where indicated.

Sincerely,

BKCOIN MULTI-STRATEGY FUND LP

By: _____
Name: Kevin Kang
Title: General Partner

BKCOIN MANAGEMENT LLC

By: _____
Name: Kevin Kang
Title: General Partner

**ACCEPTED AND AGREED:**

██████████████████████ ████

By: _____████████████████_____

██████████████████████████████

By:_____████████████_____

██████████████████████████

By:_____████████████_____

20

By signing below, the undersigned hereby agrees to be personally bound by the terms of Sections 2, 8 and, and, with respect to the survival of each such section, Section 15 of this Agreement to the same extent as if the undersigned were a party to this Agreement.

Date: May 9, 2022

_____
Kevin Kang

_____
Carlos Betancourt

_____
Mark Treinkman

Schedule 1

- **Trading Strategy**: Market-neutral strategy around top 20 tokens by market capitalization including, but not limited to arbitrage strategies across spot, futures and options.

- **Restricted Instruments:**  The parties agree that the ███████ shall not hold any Restricted Instruments (as defined below).

  "Restricted Instrument" means any of the following:

  1. Uncovered short option positions (unless ██████ has provided prior written approval)
  2. Privacy coins
  3. Any security (or security of or relating to an issuer) that ██████████ notifies in writing to the Manager from time to time not to transact and/or hold in the ██████████ (or to limit the size of any such transaction or holding) due to legal and/or regulatory restrictions applicable to ███████ (including, without limitation, due to such security and/or issuer being on ██████████'s "Restricted List")

- **Position Limits, Account Limits, Exposure and Liquidity Guidelines**.  Manager agrees that it shall at all times comply with the following limits with respect to the ██████ (as may be amended from time to time in ██████ sole and absolute discretion), along with any limits set forth within Trading Strategy (each, a "Risk Limit" and collectively with the restrictions set forth elsewhere in this Schedule 1, the "Risk Limits"):

  Risk Limits as a percentage of the ██████████ Net Asset Value:

  - Maximum Centralized Financial Exchange Concentration: 25% per exchange

  - Maximum Centralized Financial Exchange Leverage: 2x (i.e., 50% collateral requirement).

  - Maximum Single Coin Concentration: 20%

  - Maximum Delta-Adjusted Net Exposure: 20%

  - Maximum Gamma: 0%

  - Maximum Theta: 0%

  - Maximum Vega: 0%

  - Liquidity: 80% of the ██████████ portfolio can be liquidated in 1 day, 90% of the ██████████ portfolio can be liquidated in 5 days, 98% of the ██████████ portfolio can be liquidated in 10 days, and 100% of the portfolio can be liquidated in 14 days (assuming a maximum slippage of 1%).

- If any Investment Limit is breached, the Manager will immediately cure such breach, or as quickly as possible using the Manager's best judgment so as to not adversely affect the

22

market, but not later than 5:00 pm New York time if the breach occurs before 12:00 am New York time that day, otherwise it will be met by 8:00 am the following day.

•       Notwithstanding anything to the contrary herein or in the Fund Agreements, Manager shall not (i) utilize, access, or interact with any mixing protocol or comparable system (including, without limitation, Tornado Cash, Blender, Wasabi, JointMarket, and any fork thereof) or (ii) invest in privacy coins with respect to any portion of the ███████████ without the express prior written consent of the ███████ and any such consent, if granted, shall be deemed to only apply to the specific interaction with such mixing protocol or privacy coin investment (as applicable) for which such consent is requested, and shall not be interpreted or construed to extend to any subsequent activity or investment.

•       Without the express prior written consent of ████████████████ with respect to each transaction, the Manager will not engage in any transactions with itself, any Principal or employee of the Manager or its Affiliates, or their respective clients, or for the benefit of any such persons, on behalf of or in connection with the ████████████ (including the purchase or sale of any assets between Manager, any principal or employee of Manager or its Affiliates, or their respective clients, on the one hand, and the ████████████, on the other hand).

•       The parties will review gross and net portfolio and position exposure limits, acceptable investments, exchanges, and counterparty concentration limits at least every six (6) months.

•       All of the Investment Limitations, Risk Limits and other limits set forth in this Agreement shall apply to both direct investments by the Fund and to indirect investments by the Fund through any other funds, managed accounts, and other vehicles utilized by the Manager for the discretionary investment management of the ████████.

23

Schedule 2

**Reports**

- Daily estimates of profits and losses and portfolio exposures with respect to the ███████ ████ delivered by no later than 4:15 pm New York time.

- A daily report detailing the ██████████████ and the Fund's exposures (notional and net equity) by counterparty and custodian/exchange.

- On a monthly basis, a transparency report from the Fund's third party administrator in a format substantially similar to the format set forth on <u>Exhibit C</u> of this Agreement.

- On a monthly basis (or any other time interval which ██████████████████ may reasonably request), a report detailing the █████████████ portfolio.

- Monthly (estimated) and annual (final) summary of all expenses allocated to the ████████ ██.

- Any other report related to the ██████████ on an interval which █████████████ █████████ may reasonably request.

<u>Schedule 3</u>

**Service Providers**

- <u>Fund's Administrator</u>: State Street Bank and Trust Company

- <u>Fund's Custodian(s)</u>: Copper Technologies (UK) Limited, Gemini Trust Company, LLC, State Street Bank and Trust Company, and Cowen Digital LLC

- <u>Legal Counsel (U.S)</u>: Dzuba Law, P.A.

- <u>Legal Counsel (BVI)</u>: Harneys Westwood & Riegels LP

- <u>Fund's Auditor</u>: KPMG US

- <u>Fund's Bank</u>: Silvergate Bank

25

## **Exhibit A**

### **CFTC/NFA Status Certification**

The Manager represents and warrants that (*please select and/or complete <u>one or more</u> categories if and as applicable*):

☐    1.      The Manager is registered with the U.S. Commodity Futures Trading Commission ("<u>CFTC</u>").

                   *If the Manager is so registered, please indicate the category(ies) of registration (e.g., commodity pool operator ("<u>CPO</u>"), commodity trading advisor ("<u>CTA</u>"), introducing broker ("<u>IB</u>"), futures commission merchant ("<u>FCM</u>"), leverage transaction merchant ("<u>LTM</u>"), swap dealer ("<u>SD</u>") or major swap participant ("<u>MSP</u>")):* _____

X    2.      The Manager is <u>not</u> registered with the CFTC in any capacity (*e.g.*, as a CPO, CTA, IB, FCM, LTM, SD or MSP).

                   *If the Manager selects this Item 2, please select and/or complete <u>one or more</u> categories as applicable in each of Item 2(a) and Item 2(b):*

X    (a)    (i)      The Manager relies upon an exemption from registration as a CPO with the CFTC pursuant to CFTC Regulation 4.13(a) and has filed a notice claiming this exemption with the National Futures Association ("<u>NFA</u>").

☐        (ii)      The Manager relies upon an exclusion from the definition of CPO under CFTC Regulation 4.5.

☐        (iii)      The Manager relies upon another exemption or otherwise is not required to register as a CPO with the CFTC.

                   *If the Manager selects this Item 2(a)(iii), please indicate below the applicable exemption upon which the Manager relies or indicate the basis upon which the Manager has determined that registration and/or an exemption is not required.*

                   _____

                   _____

                   _____

X    (b)    (i)      The Manager relies upon a self-executing exemption from registration as a CTA with the CFTC pursuant to CFTC Regulation 4.14(a)(10).

☐        (ii)      The Manager relies upon an exclusion from the definition of CTA under CFTC Regulation 4.6.

☐        (iii)      The Manager relies upon another exemption or otherwise is not required to register as a CTA with the CFTC.

                   *If the Manager selects this Item 2(b)(iii), please indicate below the applicable exemption upon which the Manager relies or indicate the basis upon which the Manager has determined that registration and/or an exemption is not required.*

_____
_____
_____

☐   **3.**    The Manager is a member of the NFA.

☐   **4.**    The Manager's registration as a member of the NFA has been suspended.

          If the Manager's registration as a member of the NFA has been suspended, indicate the date of suspension:_____.

27

**Exhibit B**

**Bad Actor Certification**

Has the Manager or any of its directors, officers, general partners or managing members (each of the following being a "Disqualifying Event"):

*Please check the applicable box.*

| | | |
|---|---|---|
| i. | been convicted, within the last ten (10) years, of any felony or misdemeanor:<br><br>   a.  in connection with the purchase or sale of any security;<br>   b.  involving the making of any false filing with the U.S. Securities and Exchange Commission (the "SEC"); or<br>   c.  arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities? | ☐ Yes  ☒ No |
| ii. | been subject to any order, judgment or decree of any court of competent jurisdiction, entered within the last five (5) years, that restrains or enjoins one from engaging or continuing to engage in any conduct or practice:<br><br>   a.  in connection with the purchase or sale of any security;<br>   b.  involving the making of any false filing with the SEC; or<br>   c.  arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities? | ☐ Yes  ☒ No |
| iii. | been subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:<br><br>   a.  bars one from (i) association with an entity regulated by such commission, authority, agency, or officer; (ii) engaging in the business of securities, insurance or banking; or (iii) engaging in savings association or credit union activities; or<br>   b.  constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within the last ten (10) years? | ☐ Yes  ☒ No |

28

| | | |
|---|---|---|
| iv. | been subject to an order of the SEC entered pursuant to section 15(b) or 15B(c) of the U.S. Securities Exchange Act of 1934 (the "Exchange Act"), or section 203(e) or (f) of the U.S. Investment Advisers Act of 1940 (the "Advisers Act") that:<br><br>a.  suspends or revokes one's registration as a broker, dealer, municipal securities dealer or investment adviser;<br><br>b.  places limitations on one's activities, functions or operations; or<br><br>c.  bars one from being associated with any entity or from participating in the offering of any penny stock? | ☐ Yes  ☒ No |
| v. | been subject to any order of the SEC entered within the last five (5) years that orders one to cease and desist from committing or causing a violation or future violation of:<br><br>a.  any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the U.S. Securities Act of 1933 (15 U.S.C. 77q(a)(1)) (the "Securities Act"), section 10(b) of the Exchange Act and 17 CFR 240.10b-5, section 15(c)(1) of the Exchange Act, and section 206(1) of the Advisers Act, or any other rule or regulation thereunder; or<br><br>b.  Section 5 of the Securities Act? | ☐ Yes  ☒ No |
| vi. | been suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade? | ☐ Yes  ☒ No |
| vii. | filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the SEC that, within the last five (5) years, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued? | ☐ Yes  ☒ No |
| viii. | been subject to a United States Postal Service false representation order entered within the last five years or currently subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations? | ☐ Yes  ☒ No |

*NOTE: The relevant look-back periods are measured from the date of conviction or sanction, not from the date of the conduct that led to the conviction or sanction.*

The Manager acknowledges that the statements and representations contained in this Bad Actor Certification are being obtained by ███████ in connection with its compliance with various securities laws, including without limitation, Rule 506 under Regulation D, and agrees that ███████ intends to and is expressly authorized to rely on the statements and representations contained in this Bad Actor Certification in connection with its compliance with applicable securities laws.

Notwithstanding any non-disclosure agreements between the Manager and ███████, either currently in existence or entered into at any time in the future, the Manager acknowledges and agrees that ███████ may disclose without limitation the information contained in this Bad Actor Certification (including any information that the Manager may provide to us in subsequent communications relating hereto) without limitation to investors and potential investors, service providers, and applicable regulatory authorities, in connection with their compliance with applicable securities laws.  Such information may be disclosed in offering materials, disclosure documents and other communications.

# Exhibit C

## Form of Monthly Transparency Report

**Administrator Transparency Reporting**

**FUND XXXX**
**REPORTING FOR THE PERIOD ENDED December 31, 2021**

**Net Asset Value ("NAV") in USD**

| | |
|---|---|
| FUND XXXX | 100 |

| Independent Asset/Liability Verification | Assets ($) | Liabilities ($) | Gross (%) |
|---|---|---|---|
| Verified by Administrator | 200 | 100 | 100.00% |
| Verified/Provided by fund manager | - | - | 0.00% |
| Total | 200 | 100 | 100.00% |

Investment in other funds valued at NAV using practical expedient

| Price Input Verification | Assets ($) | Liabilities ($) | Gross (%) |
|---|---|---|---|
| Administrator verified independent pricing feed directly from source | 150 | 70 | 73.33% |
| Verified/Provided by fund manager | 50 | 30 | 26.67% |
| Total | 200 | 100 | 100.00% |

| Custodian, Counterparty and Other Confirmation Sources | USD | % NAV |
|---|---|---|
| Counterparty 1 | 12 | 12.00% |
| Counterparty 2 | 11 | 11.00% |
| Counterparty 3 | 15 | 15.00% |
| Counterparty 4 | 33 | 33.00% |
| Counterparty 5 | 45 | 45.00% |
| Counterparty 6 | 4 | 4.00% |
| Counterparty 7 | 6 | 6.00% |
| Counterparty 8 | 46 | 46.00% |
| Counterparty 9 | 19 | 19.00% |
| Counterparty 10 | 10 | 10.00% |
| Redemption payable | 10 | -10.00% |
| Subscription Received | 45 | -45.00% |
| Broker interest receivable / payable | 15 | -15.00% |
| Operating expenses payable | 12 | -12.00% |
| Other receivable / payable* | 19 | -19.00% |
| | 100 | 100.00% |

*Includes Other receivable, Other trading cost and Foreign tax withheld payables

| ASC 820 (FAS 157) Classification | Assets ($) | Liabilities ($) | Gross (%) |
|---|---|---|---|
| Level I | 120 | 100 | 20.00% |
| Level II | 90 | - | 90.00% |
| Level III | - | - | 0.00% |
| Total | 200 | 100 | 100.00% |

Investment in other funds valued at NAV using practical expedient

**Amounts reported above are unaudited.**
**All these numbers are presented on look through basis**



# **EXHIBIT D**

## INVESTMENT MANAGEMENT AGREEMENT

This Agreement is made this 19ᵗʰ day of October, 2020 (this "Agreement"), by and between **BKCoin Management LLC**, a Delaware limited liability company with principal place of business located at 38 E 37ᵗʰ Street #11, New York, New York 10016 (the "Manager"), a limited liability company, and **Anasazi New Ventures Corporation represented by Mr. Jared Rose, CEO** a Texas State resident with principal place of business at **6100 West Loop South, Suite 280, Bellaire, Texas 77401** (the "Client")(each a "Party" and collectively the "Parties"). The Parties agree as follows:

1. Appointment. Client hereby appoints Manager as an investment manager to manage such of Client's cryptocurrency (Bitcoin) assets, pursuant to the terms of this Agreement, as Client shall from time to time assign to it, the proceeds from the sale of such cryptocurrency assets, and the income attributable to such cryptocurrency assets (the "Account"). Client shall promptly notify Manager in writing of any increase or reduction in the amount of the Account's assets subject to Manager's investment direction.

2. Authority of Manager. Manager is authorized to supervise and direct the investment and reinvestment of the cryptocurrency assets in the Account, subject to such limitations as are contained in the Guidelines described in Section 3 of this Agreement, as they may be from time to time amended, and subject to Client's right to direct the investment of the Account, if so desired, by means of Instructions as described in Section 3 of this Agreement. Manager, as Client's agent and attorney-in-fact with respect to the Account, when it deems appropriate and without prior consultation with Client, may: (a) buy, sell, exchange, convert and otherwise invest or trade in Bitcoin, at such times and in such manner as Manager determines; (b) place orders for the execution of such Bitcoin with or through such brokers, dealers or issuers as Manager may select, which brokers or dealers are entitled to receive compensation out of the Account for their services; and (c) execute any documentation as the Account's agent and attorney-in-fact as Manager may deem necessary to facilitate any such investment or reinvestment. Manager, as Client's agent and attorney-in-fact with respect to the Account, when it deems appropriate and without prior consultation with Client, may engage external legal counsel to review relevant trade-related documentation, and charge the Account for such costs. Manager may give a copy of this Agreement to any broker, dealer or other party to a transaction, as evidence of its authority to act on the Account's behalf.

The cryptocurrency assets of the Account shall be held in an account that is owned by Client. Notwithstanding the foregoing, given the unique nature of the cryptocurrency exchanges, and given that Manager has corporate level accounts across numerous exchanges that allows it to execute the Investment Objectives contemplated herein, Client hereby consents to such temporary movement out of the Account and into the corporate accounts of Client among the various exchanges for purposes of execution of the Investment Objectives as Manager deems appropriate. In furtherance of this movement of the cryptocurrency assets, Client hereby grants to Manager a power of attorney coupled with an interest, authorizing and permitting Manager to take Client's cryptocurrency assets out of the Account, move the cryptocurrency assets into Manager's corporate accounts at whichever exchange that Manager deems appropriate for execution of the Investment Objectives, to execute the trades in such accounts as the Manager deems appropriate, and finally to move the money back into the Account upon conclusion of the strategy employed by Manager. The Parties also hold open the possibility that Client's cryptocurrency assets may, at some point in the future, be held by a custodian (the "Custodian") which shall have custody of the Account, and which shall be directed by Client to follow the directions relating to trading that is conveyed to the Custodian by the Manager. In such cases, Client shall not change the Custodian without giving Manager reasonable advance written notice of its intention to do so, together with the name and other relevant information with respect to the new Custodian. Manager shall not be liable for any act or omission of any Custodian used.

3. Guidelines and Instructions. Attached hereto as Exhibit A is a statement of the investment objectives of Client together with a statement of any and all specific investment restrictions applicable to the investment of the Account (the "Guidelines"). Client shall have the right at all times to modify the Guidelines or to give Manager instructions ("Instructions") to buy, sell or retain any investment, but no modification of the Guidelines and no Instructions or modifications of Instructions shall be binding upon Manager unless Manager has received written notice of them from an Authorized Person (as defined in Section 5(d)). Manager shall have a reasonable period to bring the Account into compliance with any changes to the Guidelines. Manager shall be under no duty to make any investigation or inquiry as to any statement contained in any written Guidelines or Instruction given and, unless and until specifically advised otherwise, Manager may accept the same as conclusive evidence of the truth and accuracy of the statements contained therein. The Guidelines and all Instructions, unless they expressly provide otherwise,

1

shall continue to be effective until duly canceled by subsequent modifications duly communicated to Manager in writing.

4. Fees. As full compensation for its services under this Agreement, Manager shall be paid quarterly a management fee (the "Management Fee") equal to one-fourth of the annual rates specified in Exhibit B, based on the asset value of the Account as of the last day of each calendar quarter on which a Bitcoin exchange is open for trading (the "Valuation Date"), and before deductions for the Performance Fee below. The initial billing period of the Management Fee will begin when this Agreement is signed by Client and accepted by Manager, and initial funding has been received by the Custodian (the "Inception Date"). The initial fee will be pro-rated to cover the period from the Inception Date through the Valuation Date for that calendar quarter and will be based on the valuation as of that Valuation Date. Future quarterly fees will be calculated similarly in arrears. If Manager shall serve for less than the whole of any quarter, its compensation shall be determined as provided above on the basis of the value of the assets in the Account as of the end of the date of termination and shall be payable on a pro rata basis for the period of the quarter for which it served as Manager hereunder. In addition, Manager shall be entitled to a performance fee (the "Performance Fee") for good performance, and the terms of the Performance Fee are substantially set forth within Exhibit B below. Other than as specifically indicated in this Agreement, the Manager shall not be required to pay any expenses in connection with the investment management services that are contemplated herein. Client shall direct the Custodian automatically to charge to the Account and pay directly to Manager all of Manager's fees upon the Custodian's receipt of an invoice from Manager.

5. Representations and Warranties. Client hereby acknowledges, represents and warrants to, and agrees with Manager, as follows:

(a) Client Assets. Client is the sole owner of all cryptocurrency assets in the Account and (i) there are no restrictions on the transfer, sale or public distribution of any such assets and (ii) no option, lien, charge, security or encumbrance exists over such assets, except as disclosed to Manager in writing.

(b) Authority. The Client has full authority and power to engage Manager under the terms and conditions of this Agreement, and such engagement does not violate Client's constituent documents, any other material agreement, order or judgment of any court or governmental authority, or any law applicable to Client. Client further represents that all investments permitted herein are within its power to enter into and have been duly authorized.

(c) Form ADV. Client acknowledges receipt of Part II of Manager's Form ADV. Notwithstanding anything to the contrary herein, if Client did not receive a copy of the Form ADV at least forty-eight (48) hours prior to execution of this Agreement, Client shall have the right to terminate this Agreement without penalty within five (5) business days of the execution of this Agreement; provided, however, that Client shall be at risk for any market fluctuations in the Account up to the time of such termination. Note that in light of the Manager's taking on the management of Client's cryptocurrency assets pursuant to this Agreement, Manager's Form ADV will likely have to be amended, and Client will be provided with the amended Form ADV within a reasonable time following its successful posting.

(d) Authorized Persons. Any individual whose signature is affixed to this Agreement on Client's behalf has full authority and power to execute this Agreement on Client's behalf. Client represents that the officer specified on the attached Certification of Authorized Persons (Exhibit C) is authorized to act for Client and to certify to Manager from time to time, by listing on, and delivering to Manager Exhibit C or a substantially similar form, those other persons who also are so authorized to act on Client's behalf ("Authorized Persons"). The Client shall promptly notify Manager in writing of any event that could reasonably be anticipated to affect any such individual's authority under this Agreement.

(e) Notice of Certain Events. Client will promptly notify Manager in writing of any occurrence that results, or threatens to result, in any representations by Client contained in this Agreement becoming inaccurate, false, misleading or incomplete.

6. Non-Exclusive Agreement. Nothing in this Agreement shall be deemed to limit or restrict Manager's right, or the right of any of its officers, directors, employees, or independent contractors, to engage in any other business

2

or to devote time and attention to the management or other aspects of any business, whether of a similar or dissimilar nature, or to render investment advisory services or services of any kind to any other corporation, firm, association, fund or individual. Client understands that Manager provides investment advisory services and other services to numerous other clients and accounts. Client also understands that Manager may give advice and take action with respect to any of its other clients or for its own account which may differ from the timing or nature of action taken by Manager with respect to the Account.

Nothing in this Agreement shall impose upon Manager any obligation to purchase or sell or to recommend for purchase or sale, with respect to the Account, any security (including long and short positions) which Manager, or its affiliates, or its or their shareholders, directors, officers, employees, or independent contractor may purchase or sell for its or their own account(s) or for the account of any other client. Client acknowledges that Manager's ability and that of its affiliates to effect or recommend transactions may be restricted by applicable regulatory requirements in the United States and elsewhere or its or their internal policies designed to comply with such requirements. Consequently, there may be periods when Manager may not initiate or recommend certain types of transactions in certain investments when Manager or its affiliates are performing services or when aggregated position limits have been reached, and Client will not be advised of that fact.

7. Liability of Manager. Except as may otherwise be provided by law, Client specifically agrees that Manager shall not be liable for: (a) any loss that Client may suffer by reason of any investment decision made or other action taken or omitted in good faith and with that degree of care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an enterprise of a like character and with like aims; (b) any loss, expense or other liability (including but not limited to attorneys' fees) incurred by Client or Manager arising from or in connection with Manager's compliance with the Guidelines or Instructions believed by Manager to be accurate; (c) any act or failure to act by any broker or other person with whom Manager or Client may deal in connection with the subject matter of this Agreement; or (d) any loss or failure or delay in performance of any obligation under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond Manager's reasonable control, including, without limitation, acts of God, earthquakes, fires, floods, wars, terrorism, civil or military disturbances, sabotage, epidemics, riots, interruptions, loss or malfunctions of utility, computer software or hardware, transportation or communication service, accidents, labor disputes, acts of civil or military authority, governmental actions and inability to obtain labor, material, equipment or transportation.

8. Brokerage. Where Manager places orders, or directs the placement of orders, for the purchase or sale of Bitcoin for the Account, in selecting brokers or dealers to execute such orders, Manager is expressly authorized to consider, among other factors, the fact that a broker or dealer has furnished statistical, research or other information or services which enhance Manager's investment research and portfolio management capability generally. Manager may negotiate with and assign to a broker a commission which may exceed the commission which another broker would have charged for effecting the transaction if Manager determines in good faith that the amount of commission charged was reasonable in relation to the value of brokerage and research services provided by such broker, viewed in terms either of the Account or Manager's overall responsibilities to Manager's discretionary accounts. With respect to the allocation of trades among the accounts it is managing, Manager shall not favor any account over any other and purchase or sale orders executed contemporaneously shall be allocated in a manner it deems equitable among the accounts involved.

In no event shall Manager be obligated to effect or place an order for any transaction for Client which Manager believes would violate any applicable state or federal law, rule, or regulation, or of the regulations of any regulatory or self-regulatory body to which Manager or any of its affiliates is subject to at the time of the proposed transaction.

9. Confidential Relationship. Each Party agrees that all non-public confidential information concerning the other Party which may become available to such party in connection with services, transactions or relationships contemplated in this Agreement shall at all times be treated in strictest confidence and shall not be disclosed to third persons except as (a) may be required by law or regulatory authority, including but not limited to any subpoena, administrative, regulatory or judicial demand or court order, (b) as otherwise set forth in this Agreement, or (c) upon the prior written approval of the other party to this Agreement. Client authorizes Manager (i) to include Client's name in a representative or sample client list prepared by Manager, provided Manager shall not disclose Client contact information or any information about Client's holdings, and (ii) to use Manager's investment experience with respect to the Account, or the Account's performance, in composite performance presentations, marketing

3

materials, attribution analyses, statistical compilations, or other similar compilations or presentations, provided such use does not disclose Client's identity except to the extent permitted by Client.

10. <u>Reports</u>. Manager shall send to Client a written report of the Account as of the Valuation Date of each calendar quarter. Such reports shall be submitted within a reasonable period following such Valuation Date. For the purposes of all reports made by Manager to Client, Bitcoin will be valued denominated in United States dollars, unless otherwise agreed by Manager and Client. Client shall examine promptly each such report and any other report provided by Manager. To the extent permissible under applicable law, upon the expiration of the sixty (60) day period immediately following the date of such report, or the termination of this Agreement as provided herein, if earlier, Manager shall be forever released and discharged from all liability and accountability to anyone with respect to each such report, including, without limitation, all acts and omissions of Manager shown or reflected in each such report, except with respect to any acts or omissions as to which Client shall have filed written objections with Manager within such sixty (60) day period. Nothing herein shall impair the right of Manager to a judicial settlement of any report rendered by it.

11. <u>Valuation</u>. In computing the asset value of the Accounts, Manager shall use its best discretion to provide Client an accurate estimation of the fair market value of the Accounts at a given point in time. The method selected will factor in all relevant information, including but not limited to: bid-ask spread of the relevant cryptocurrency on various exchanges, the official closing price, if a market event occurs that calls into question the reliability of current market quotations. Whichever methodology is selected shall be explained to Client in a manner that may be easily understood by Client.

12. <u>Acknowledgment of Investment Risk</u>. Notwithstanding any provision herein to the contrary, Client understands that the value of investments made for the Account may go down as well as up and is not guaranteed. In addition, Client has reviewed the risk factors at <u>Exhibit E</u> below. Client is fully aware and understands the risks associated with Manager's cryptocurrency trading activities pursuant to this Agreement, and nevertheless wishes to engage Manager to provide such investment management services under the terms and conditions set forth herein. Client agrees that Manager has not made and is not making any guarantees, including without limitation a guarantee as to any specific level of performance of the Account. Client further understands and acknowledges that investment decisions made on behalf of Client's Account by Manager are subject to various market, currency, economic, and business risks as well as the risk that those investment decisions will not always be profitable. Client acknowledges that past performance results achieved by accounts supervised or managed by Manager are not indicative of the future performance of the Account. Client understands that the Bitcoin in the Account is not guaranteed by Manager or any affiliate, is not insured by the Federal Deposit Insurance Corporation ("FDIC") or any other government agency, and are subject to investment risk, including possible loss of principal amounts invested.

13. <u>Termination; Survival</u>. This Agreement may be terminated by either party upon thirty (30) days' written notice to the other party. Such termination will not, however, affect the liabilities or obligations of the parties under this Agreement arising from transactions initiated prior to such termination. Sections <u>4</u>, <u>7</u>, <u>9</u>, <u>10</u>, <u>17</u>, and <u>18</u> shall survive the termination of this Agreement. Upon any termination of this Agreement, Manager shall have no further obligations hereunder, provided that: (a) any liability under this Agreement of one party to the other shall survive and remain in full force and effect, notwithstanding such termination, with respect to any claim or matter on which either of the parties has given the other written notice prior to such termination (except that Manager may render to Client a statement of fees due Manager through the date of termination after such date), until such liability has been finally settled; (b) Manager retains the right to complete any transactions open as of the termination date and to retain amounts in the Account sufficient to effect such completion; and (c) Manager shall be entitled to its fees and expenses, pro rated to the date of termination. Upon termination, it shall be Client's exclusive responsibility to issue instructions in writing regarding any assets in the Account.

14. <u>Assignment</u>. This Agreement may not be assigned (within the meaning of the Investment Advisers Act of 1940, as amended), in whole or in part, by Manager without the prior written consent of Client. Subject to the preceding sentence, Manager may delegate all or part of its duties under this Agreement to any affiliate.

15. <u>Communications</u>. All reports and other communications required hereunder to be in writing shall be delivered in person or sent by first-class mail postage prepaid, overnight courier, or confirmed facsimile with original to follow.

**If to Client:**

**Anasazi New Ventures Corporation**
6100 West Loop South, Suite 280
Bellaire, Texas 77401

Attention: Mr. Jared Rose

**If to Manager:**

**BKCoin Management LLC**
38 E 37th Street #11
New York, New York 10016

Attention: Mr. Kevin Kang, Founding Principal/Manager

Attention: Mr. Carlos Betancourt, Founding Principal/Manager

Either Party to this Agreement may, by written notice given at any time, designate a different address for the receipt of reports and other communications due hereunder.

16. Governing Law; Venue. This Agreement shall be governed by and construed and enforced in accordance with the laws of the United States and with the laws of the State of Delaware, without giving effect to the choice of law or conflict of law provisions thereof. The parties hereby consent to jurisdiction and venue in the federal and state courts located in New York County of the State of New York.

17. Entire Agreement; Modification. This Agreement along with all exhibits attached hereto: (a) sets forth the entire understanding of the parties with respect to the subject matter hereof; (b) supersedes any and all previous agreements, understandings and communications, oral or written, regarding this subject matter; and (c) may not be modified, amended, or waived except by a specific written instrument duly executed by the party against whom such modification, amendment, or waiver is sought to be enforced. In the event of any conflict or inconsistency with this Agreement and any instructions or investment guidelines that are not made part of this Agreement or any investment policy statement, this Agreement will control.

18. Headings. The headings of the sections of this Agreement are for convenience of reference only and will not affect the meaning or operation of this Agreement. As used herein, references in the singular shall, as and if appropriate, include the plural.

19. Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

20. Severability. In the event that any provision of this Agreement is deemed to be void, voidable, illegal, or invalid for any reason, such provision will be of no force and effect only to the extent that it is so declared void, voidable, illegal, or invalid. All of the provisions of this Agreement not specifically found to be so deficient will remain in full force and effect.

5

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their duly authorized officers to be effective as of the date first written above.

**Anasazi New Ventures Corporation**

By:

Name: Mr. Jared Rose

Title:  CEO

**BKCOIN MANAGEMENT LLC**                    *CB*

By:

Name: Carlos Betancourt

Title:  Manager

6

## EXHIBIT A

**Statement of Investment Objectives**

Dedicated to delivering consistent, uncorrelated absolute returns through our Long/Short and Statistical Arbitrage strategies with Bitcoin (BTC) long-bias.

The Separately Managed Account for **Anasazi New Ventures Corporation ("Anasazi-SMA")** will offer the investor an opportunity to capitalize on inefficient and volatile market conditions as well as long-term capital growth. The account will ensure the non-BTC risks are minimized while capitalizing on the upside of the BTC as the investor is specifically looking for bitcoin exposure.

Subject to the 'Statement of Client Account Restrictions' below, Manager shall have full discretion to make the Bitcoin (BTC) trades it deems appropriate in furtherance of maximizing Account returns, across as many exchanges as it deems appropriate.

**Statement of Client Account Restrictions**

Assets in Account to be maintained in Bitcoin (BTC) rather than converted to fiat money at the close of each trading day.

7

**<u>EXHIBIT B</u>**

**FEE SCHEDULE**

As compensation for managing the Account, Manager shall be paid as follows:

0% Management Fee and 20% Performance Fee to be charged quarterly and paid in bitcoin, regardless of where bitcoin is trading in USD, as per Exhibit A this account will be maintained and denominated in bitcoin at all times.

In addition, the following terms apply relevant to fees shall apply to the Performance Fee:

With regards to the Performance Fee, the Manager shall be paid, in addition to the Management Fee hereunder an annual Performance Fee equal to 20% of the annual net profits generated on the account and paid quarterly in bitcoin, regardless of where bitcoin is trading in USD, provided that the annual net profits shall be reduced to the extent of any unrecovered balance remaining in the Loss Recovery Account (*as defined herein*), and immediately prior to giving effect to the adjustment required to the Loss Recovery Account for any annual net profits in that fiscal year.

There shall be established for the Client a memorandum account (the "<u>Loss Recovery Account</u>"), the balance of which shall initially be zero. At the end of each fiscal year (or such other times as required below), the balance in each such Loss Recovery Account shall be adjusted as follows:

(i) in the event that there have been annual net losses with respect to the Client's Account since the last day of the immediately preceding fiscal year (or, if no calculation has yet been made with respect to the Client's Account, since its creation), an amount equal to such annual net losses shall be **credited** to such Loss Recovery Account; and

(ii) in the event that there have been annual net profits with respect to such the Client's Account since the immediately preceding date as of which a calculation of an Incentive Allocation was made, an amount equal to such annual net profits, before any Incentive Allocation to the Manager, shall be **debited** from and reduce any unrecovered balance in such Loss Recovery Account, but shall not reduce the balance below zero.

8

**EXHIBIT C**

**CERTIFICATION OF AUTHORIZED PERSONS**

I certify, as the Manager of **Anasazi New Ventures Corporation** that the
following persons are "Authorized Persons" under the Agreement:

| NAME | TITLE | SPECIMEN SIGNATURE |
|------|-------|--------------------|
| Mr. Jared Rose | CEO | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Anasazi New Ventures Corporation**
Name of Legal Entity (Please Print)

By: 
Signature

Mr. Jared Rose
Name and Title (Please Print)

Date: *10·20·2020*

9

**EXHIBIT D**

**MANAGER'S CURRENT FORM ADV**

**EXHIBIT F**

**CLIENT'S ANTI MONEY LAUNDERING REPRESENTATIONS**

1. All evidence of identity I have provided in connection with this Agreement is true and correct and all related information furnished is genuine and accurate.

2. I agree to provide such additional information as may be deemed necessary by the Manager from time to time for ongoing compliance with anti-money laundering programs.

3. I hereby represent and warrant that neither I, or in the case of an entity, neither it, nor any person controlling, controlled by, or under common control with it, nor any person having a beneficial interest in it, is an individual, organization, or entity on the List of Specifically Designated Nationals and Blocked Persons (the "OFAC Control List") maintained by the US Office of Foreign Assets Control ("OFAC"). I further agree to notify the Manager of any change in information affecting these representations and covenants.

4. I hereby represent and warrant that the amounts of cryptocurrency in the separately managed account contemplated herein, was not indirectly derived from activities that contravene U.S. federal or state laws or regulations and international laws and regulations, including anti-money laundering laws and regulations.

5. I hereby represent and warrant that I am not a Senior Foreign Political Figure, a member of a Senior Foreign Political Figure's Immediate Family, and/or a Close Associate of a Senior Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated by the US Treasury as warranting special measures due to money laundering concerns, nor am I a former Senior Foreign Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated as warranting special measures due to money laundering concerns.

6. I hereby represent and warrant that I am not resident in, or organized or chartered under the laws of a jurisdiction that has been designated by the US Secretary of Treasury under Sections 311 and 312 of the Patriot Act as warranting special measures due to money laundering concerns.

7. I hereby represent and warrant that the entity I represent, if any, is not a Foreign Shell Bank as the term is defined in the Patriot Act.

8. I hereby represent and warrant that the cryptocurrency funds in the Account do not originate from, nor will they be routed through an account maintained at a Foreign Shell Bank, an "offshore bank," or a bank organized or chartered under the laws of a jurisdiction deemed to be a non-cooperative country or territory (list available at www1.oecd.org/fatf).

The undersigned does represent and certify under penalty of perjury, by executing this Client's Anti-Money Laundering Representations, that the foregoing statements are true and correct.

Executed this 19TH day of October 2020.

**CLIENT:**

**Signature:**_____
**Name:** Mr. Jared Rose
**Title:** CEO at **Anasazi New Ventures Corporation**
**Jurisdiction:** Texas, USA

12

# **EXHIBIT E**

23 May 2019

No:

Provided to:

# TERM SHEET

---

## BK OFFSHORE FUND LTD.

a BVI business company approved as an approved fund under the Securities and Investment Business
(Incubator and Approved Funds) Regulations, 2015 of the British Virgin Islands

5 June 2019

---

## IMPORTANT NOTICES TO POTENTIAL INVESTORS

The Fund is a BVI business company incorporated with limited liability under the BVI Business Companies Act, 2004 (**BCA**) with registration number [●] May 2019.  This Term Sheet relates to the offering of participating shares in the Fund (the **Shares**).

**Responsibility statement**

The directors of the Fund (the **Directors**), whose names appear below, accept responsibility for the information contained in this Term Sheet. To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case) the information contained in this Term Sheet is in accordance with the facts and, in the reasonable opinion of the Directors, contains such information as is necessary to enable a prospective investor to make an informed decision as to whether or not to subscribe for Shares.

**Regulation**

The Fund has been established as an approved fund under the Securities and Investment Business (Incubator and Approved Funds) Regulations, 2015 of the British Virgin Islands (the **Regulations**). As such, no offer or invitation may be made to an investor or potential investor to purchase or subscribe for Shares in the Fund unless the investor or potential investor is provided with the following investment warning complying with the Regulations:

(a)     the total number of investors in the Fund is limited to a maximum of twenty;

(b)     the Fund can only have investments not exceeding US$100,000,000 in net assets or its equivalence in any other currency;

(c)     the Fund is not subject to the supervision by the British Virgin Islands Financial Services Commission (the **Commission**) or by any other regulator outside of the British Virgin Islands and the requirements considered necessary for the protection of investors that apply to a fund registered under the British Virgin Islands Securities and Investment Business Act, 2010 (**SIBA**) as a public fund do not apply to the Fund;

(d)     an investor in the Fund is solely responsible for determining whether the Fund is suitable for his or her investment needs; and

(e)     by reason of the above, investment in the Fund may present a greater risk to an investor than an investment in a fund registered under SIBA as a public fund.

The Financial Services Commission Act, 2001 of the British Virgin Islands provides that the Commission may require the Fund to provide specified information or information of a specified description or to produce specified documents or documents of a specified description if such disclosure is reasonably required for the purpose of discharging the Commission's function or ensuring compliance with any financial services legislation.  The Commission may impose conditions on the Fund's certificate of approval.  In addition, the Commission may take enforcement action against the Fund (which may include revocation or suspension of the Fund's certificate of approval).

**Reliance on this Term Sheet**

Shares are being offered only on the basis of the information contained in this Term Sheet.  No person has been authorised to give any information or to make any representations in connection with the offering of Shares other than those contained in this Term Sheet and, if given or made, such information or representations must not be relied on as having been authorised by the Directors.

Statements in this Term Sheet are based on the law and practice in force in the British Virgin Islands at the date of this Term Sheet and are therefore subject to change should that law or practice change.

**Risks**

An investment in the Fund carries substantial risk.  There can be no assurance that the investment objective of the Fund will be achieved and investment results may vary substantially over time.  An investment in the Fund is only suitable for investors who are able to bear the loss of a substantial portion or even all of their investment in the Fund.

There is no public market for Shares, nor is a public market expected to develop in the future.

**Distribution and selling restrictions**

Neither this Term Sheet nor the Shares described in it have been qualified for offer, sale or distribution under the laws of any jurisdiction governing the offer or sale of mutual fund equity interests or other securities.  The distribution of this Term Sheet and the offering or purchase of Shares may be restricted in certain jurisdictions.  This Term Sheet does not constitute an offer, solicitation or invitation to subscribe for Shares in any jurisdiction in which such offer, solicitation or invitation is not authorised, or to any person to whom it would be unlawful to make such an offer, solicitation or invitation. It is the responsibility of any person in possession of this Term Sheet, and any person wishing to apply for Shares pursuant to this Term Sheet, to inform themselves of and to observe all applicable laws and regulations of any jurisdiction relevant to them.

**Confidentiality**

This Term Sheet is strictly confidential and is to be read only by the person to whom it has been delivered to enable that person to evaluate an investment in the Fund.  It is not to be reproduced or distributed to any other persons except that a potential investor may provide a copy to its professional advisers.

**Investor responsibility**

No representations or warranties of any kind are intended or should be inferred with respect to the economic return from, or the tax consequences of, an investment in the Fund.  No assurance can be given that existing laws will not be changed or interpreted adversely.  Potential investors should not construe this Term Sheet as legal, tax or financial advice.

The above information is for general guidance only. Before making an investment in the Fund prospective investors should review this Term Sheet carefully and in its entirety.  Prospective investors should consult with their legal, tax and financial advisers as to any legal, tax, financial or other consequences of subscribing for, purchasing, holding, redeeming or disposing of Shares in their country of citizenship, residence and/or domicile.

**Compliance with automatic exchange of information legislation**

The British Virgin Islands has entered into intergovernmental agreements with the US and the UK, is a signatory to the multi-lateral competent authority agreement (**MCAA**) regarding the OECD's Common Reporting Standard and has adopted legislation and guidance implementing such intergovernmental agreements and the MCAA (together **AEOI Legislation**) pursuant to which it has made commitments in relation to the periodic exchange of information for tax purposes.

In order to comply with the AEOI legislation the Fund may be required to disclose certain confidential information to the British Virgin Islands International Tax Authority (**ITA**) which will in turn report the information to the relevant fiscal authority. If a Shareholder does not provide the requested information and/or documentation, whether or not that leads to compliance failures by the Fund or a risk of the Fund being subject to any witholding tax or other liability or being required to withhold amounts from distributions to be made to any Shareholder, the Fund may take any action and/or pursue an remedy at its disposal (which may include the compulsory redemption of some or all of the Shares held by such Shareholder).

To the extent the Fund incurs any costs or suffers any withholding as a result of a Shareholder's failure, or is required by law to apply a withholding against the Shareholder, it may set off such amount against any payment otherwise due from the Fund to the Shareholder or may allocate such amount to the Shares held by such Shareholder.  No Shareholder affected by any such action or remedy shall have any claim against the Fund for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with the AEOI Legislation.

## KEY TERMS OF INVESTMENT

| | |
|---|---|
| **The Fund** | BK Offshore Fund Ltd. is a BVI business company incorporated with limited liability in the British Virgin Islands. |
| **Regulation** | The Fund is approved as an approved fund under SIBA and the Regulations. |
| **Registered Office** | Craigmuir Chambers<br>PO Box 71<br>Road Town<br>Tortola VG1110<br>British Virgin Islands |
| **Directors** | The Directors of the Fund are: |

**Kevin Kang**

Mr Kang is a founding principal of BKCoin Capital LP. He shares the daily management and trading responsibilities for the fund. Prior to founding BKCoin Capital, Mr Kang was the portfolio manager and trader at an NYC-based fund, managing over $5 billion in multi-asset portfolios specializing in US equities and fixed income. His experience includes being Associate Portfolio Manager at AllianceBernstein in NYC. During his tenure at AllianceBernstein, he effectively collaborated with multiple portfolio managers in managing the largest US equities' product by AUM. Additionally, he successfully implemented investment decisions and efficiently oversaw the firm's daily positioning of its $40 billion portfolio.

Mr Lang is a CFA charterholder and earned his B.S. in Finance from Stetson University. He is fluent in English and Korean.

**Carlos Betancourt Rodriguez**

Mr Rodriguez is a founding principal of BKCoin Capital LP. He oversees the firm's daily operations and legal, compliance, and research staff report to him. Prior to founding BKCoin Capital, Mr Rodriguez was the Founder and Managing Director of Yorkville Commodities, a full-service physical commodities brokerage and consulting company that offered financing services to small and medium-sized companies within energy, mining, and natural resources industries in North America and LATAM. His previous experience includes working at AMCI Group as a Commodities Manager, KCM Asset Management as an Equity Analyst, and The Newport Group as a Business Analyst.

Mr Rodriguez earned his B.S in Finance and MBA with a concentration in Finance from Stetson University. Mr Rodriguez is fluent in English, Spanish, and Papiamento.

| | |
|---|---|
| **Shares** | The Fund is authorised to issue a maximum of 50,000 shares comprising of 100 non-participating no par value shares designated as Class M Shares and a maximum of 49,900 no par value shares in two classes, being Class A Shares and Class Restricted A Shares. |
| | All classes of Shares are being offered under the terms of the constitutional documents of the Fund (the *M&A*) and this Term Sheet. At any time the Directors may amend the M&A to create and designate additional classes of participating shares without notice to, or the consent of, the Shareholders. |
| **Management Shares** | Class M Shares (being the only voting shares of the Fund) are not being offered pursuant to this Term Sheet. |

**INVESTMENT OPPORTUNITY**

| | |
|---|---|
| **Investment objective and strategy** | To deliver uncorrelated, absolute returns of 10-15% annually by using statistical arbitrage strategy. |
| | There can be no assurance that the investment objective will be achieved, and certain strategies will involve higher risk, including limited liquidity and possible risks associated with leverage and more complex financial products. |
| **Leverage** | The Fund may use leverage as part of the investment strategy.  The total leverage in the Fund will not normally exceed 500 per cent of the latest net asset value of the Fund.  The use of leverage will increase the risk of an investment in the Fund. |
| **Investment restrictions** | The Fund has not imposed any particular investment restrictions with regard to the investment of the assets of the Fund. |
| **Changes to investment objective, strategy and restrictions** | The investment objective, investment strategies, investment restrictions and limits on leverage summarised above represent the current intentions of the Directors.  Subject to any applicable law or regulation, the Directors may change the investment objective, investment strategies, investment restrictions and limits on leverage by giving Shareholders not less than 3 months' prior written notice of the proposed changes. |

**SUBSCRIPTIONS**

| | |
|---|---|
| **Initial Offer Period** | Shares will first be offered for subscription during an initial offer period (the *Initial Offer Period*) which will commence at 9:00 am (BVI time) on 1 June and end at 5:00 pm (BVI time) on 30 June 2019, or such other day or time as the Directors may determine. |

| | |
|---|---|
| **Subscriptions** | Shares are being offered for subscription during the Initial Offer Period at a fixed price of US$1,000 per Share. Following the close of the Initial Offer Period, Shares will be issued at a subscription price equal to the net asset value per Share of the initial series as at the Valuation Day immediately preceding the Subscription Day on which the application is effective. |
| | After the Initial Offer Period Shares will be available for subscription on the first business day of every month and such other day or days as the Directors may determine (each such day a *Subscription Day*). A new series of Shares of each class will be issued on each Subscription Day on which Shares of that class are issued. |
| **Minimum subscription** | The minimum initial investment per subscriber is US$100,000. |
| **New Issues Securities** | The Fund may, from time to time, purchase New Issue securities. A New Issue is an initial public offering of an equity security which is subject to the provisions of Rule 5130 and 5131 of the Rules of the United States Financial Industry Regulatory Authority (*FINRA*), as amended, extended, consolidated, substituted or re-enacted from time to time, and includes any initial public offering of an equity security as defined in Section 3(a)(11) of the United States Securities Exchange Act 1934, as amended. Under the Rules of FINRA, members of FINRA may not sell such securities to an account beneficially owned by broker/dealers, employees, owners and affiliates of broker/dealers, certain other classes of persons including portfolio managers and certain family members of those persons (each such person, a *Restricted Person*). Additionally, members of FINRA may not allocate New Issue securities to executive officers and/or directors, and materially supported persons thereof, of certain public or private companies (each such person, a *Covered Investor*) that have an investment banking relationship with such FINRA member or where such FINRA member expects to establish an investment banking relationship with any such company. |

Subscribers for, and transferees of, Participating Shares will be required to provide such representations, warranties or documentation as the Fund may require to determine whether they are Restricted Persons and/or Covered Investors.

To enable the Fund to participate in New Issues, the Fund has a separate class of Participating A Shares, namely the Class Restricted A Shares, although the Directors may create and designate additional classes (each a class of *Restricted Shares*) that will not participate in any investments in New Issue securities except to the extent permitted by the Rules of FINRA in respect of New Issues.  The same investment objective, strategies and restrictions will be applied to all Classes save that profits and losses in respect of investments in New Issue securities will not be allocated to Restricted Shares except to the extent permitted by the Rules of FINRA in respect of New Issues.  In such event the Fund may compel the conversion of Participating Shares held by Restricted Persons and Covered Investors into Restricted Shares of the corresponding new Class.   References in this Memorandum to a particular Class include the corresponding Class of Restricted Shares.

The Fund may rely on a "*de minimis*" exemption pursuant to which the Directors may from time to time (but shall not be under any duty to) allocate any profits or losses arising directly or indirectly from New Issue securities to the Restricted Shares in the circumstances and to the extent permitted by the Rules of FINRA in respect of New Issues.  Any such allocation made by the Directors may be amended by the Directors from time to time to the extent required to ensure compliance with the Rules of FINRA in respect of New Issues.

The Fund may compulsorily convert Participating Shares into Restricted Shares of the corresponding Class in the event that a holder of Participating Shares becomes ineligible to participate in New Issue securities due to a change in the Shareholder's status, any changes to the Rules of FINRA or as otherwise required by law or regulation.

**VALUATIONS**

**Valuations**

The net asset value per Share will be determined in accordance with the M&A on the business day immediately preceding each Redemption Day and each Subscription Day and such other day or days as the Directors may determine (each such day a *Valuation Day*).

**REDEMPTIONS**

**Redemption**

Shares may be redeemed at the option of the Shareholder on the first business day of January, April, July and October in each year (each such day a *Redemption Day*) falling after the expiry of the lock-up period. The lock-up period is 12 months in respect of Participating Shares commencing on the issue of such Share.  The Directors may shorten the lock-up period either generally or in any particular case.

A redemption request must be received by the Fund by no later than 5:00 pm (BVI time) on a business day falling at least 30 calendar days (or such shorter period as the Directors may permit, either generally or in any particular case) before the relevant Redemption Day.

The redemption price of a Share will be equal to the net asset value of the Share as at the Valuation Day immediately preceding the relevant Redemption Day.

All redemptions are subject to the terms and conditions set out in the M&A.

**Redemption fee**

A redemption fee of 2 per cent of the Redemption Price will be charged on the redemption of any Share.

**Compulsory Redemption**

Shares may be compulsorily redeemed at the discretion of the Directors on the terms set out in the M&A.

**Restrictions on redemptions**

The Directors may temporarily suspend the calculation of the net asset value, the redemption of Shares and/or payment of redemption proceeds in certain circumstances in accordance with the M&A.

**Payment of redemption proceeds**

Redemption proceeds will normally be paid in cash by electronic transfer at the Shareholder's risk and expense.   However, in certain circumstances, the Fund may pay redemption proceeds by way of a transfer of assets or partly in cash and partly by way of a transfer of assets.

**FEES AND EXPENSES**

**Management Fee**

The Fund will pay the Investment Manager a management fee of one-quarter (¼) of 2 per cent per month of the net asset value of the Fund (before deduction of that quarter's management fee and before making any deduction for any accrued performance fee) as at the last Valuation Day in each quarter, adjusted for any subscriptions and redemptions during the quarter.

| | |
|---|---|
| **Performance Fee** | The Fund will also pay the Investment Manager a performance fee. For each Calculation Period, the performance fee in respect of each class will be equal to 20 per cent 20 per cent) of the appreciation in the net asset value during that Calculation Period above the High Water Mark of each class in issue. |
| | A **Calculation Period** is a period of 3 months commencing on each 1 January, 1 April, 1 July and 1 October. The **High Water Mark** of a class is the highest net asset value of that class (after payment of any performance fee) as at the last Valuation Day in any previous Calculation Period or, if higher, the initial net asset value of that class. |
| | The performance fee will be calculated as at the last Valuation Day in each Calculation Period before deduction for any accrued performance fees. |
| **Adminstration Fee** | The Administrator will receive an all-inclusive monthly fee of US$2,000 per month, which is shared by the Fund and an onshore fund also managed by BKCoin Management LLC. Such fees may be varied from time to time as agreed between the Administrator and the Fund. |
| **Preliminary expenses borne by investors** | The preliminary expenses of and incidental to the initial offering of Shares, including those relating to the establishment of the Fund in the BVI, the negotiation of and preparation of the contracts to which the Fund is a party and the fees and expenses of professional advisers will be charged to the Fund. Such costs are expected to be approximately US$30,000 and will be amortised on a straight line basis over a period of 12 months. |
| **Operating expenses** | The Fund will bear all expenses related to its investment programme and its operations as the Directors consider appropriate in their absolute discretion. |
| **Reporting** | The financial year of the Fund will end on 31 December. |
| | Accounts will be prepared in respect of each financial year but will not be audited. |
| | Each Shareholder will be provided with a copy of an annual report that will include unaudited financial statements. Shareholders will also be provided with a quarterly report on the investment performance of the Fund. |

**MANAGEMENT**

| | |
|---|---|
| **Management** | BKCoin Management LLC (the **Investment Manager**) has been appointed as investment manager to the Fund. |
| **Administrator** | Sudrania Fund Services has been appointed as administrator of the Fund. |

**Custodian**            No custodian has been appointed although the Fund reserves the right to appoint one or more custodians without the consent or approval of, or notice to, Shareholders.

**Prime Broker**         No prime broker has been appointed although the Fund reserves the right to appoint one or more prime brokers without the consent or approval of, or notice to, Shareholders.

**Auditors**             No auditor has been appointed although the Fund reserves the right to appoint an auditor without the consent or approval of, or notice to, Shareholders.


In this Term Sheet, where a term is capitalised but not defined, it shall have the same meaning as attributed to it in the M&A.

# **EXHIBIT F**

**BKCoin Multi-Strategy Fund Ltd.**

## ACCOUNT STATEMENT FOR THE MONTH ENDED JUNE 30, 2022

(UNAUDITED)



### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 400 | $996 | $398,485.64 | (0.38%) | (0.38%) |
| Total |  |  | $398,485.64 |  |  |

| | |
|---|---|
| Total Beginning Capital | $0.00 |
| Capital Added/(Redeemed) | 400,000.00 |
| Net Income (Loss) Allocation for Month | (1,514.36) |
| Total Ending Capital | $398,485.64 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**

---

### ACCOUNT STATEMENT FOR THE MONTH ENDED JUNE 30, 2022

(UNAUDITED)



---

### SHAREHOLDER SUMMARY

| | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 400 | $996 | $398,485.64 | (0.38%) | (0.38%) |
| Total | | | $398,485.64 | | |

| | |
|---|---|
| Total Beginning Capital | $0.00 |
| Capital Added/(Redeemed) | 400,000.00 |
| Net Income (Loss) Allocation for Month | (1,514.36) |
| Total Ending Capital | $398,485.64 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**

---

### ACCOUNT STATEMENT FOR THE MONTH ENDED JUNE 30, 2022

(UNAUDITED)



---

### SHAREHOLDER SUMMARY

| | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A-R Series 6/1 | 1.000 | $996 | $996,214.09 | (0.38%) | (0.38%) |
| Total | | | $996,214.09 | | |

| | |
|---|---|
| Total Beginning Capital | $0.00 |
| Capital Added/(Redeemed) | 1,000,000.00 |
| Net Income (Loss) Allocation for Month | (3,785.91) |
| Total Ending Capital | $996,214.09 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**

### ACCOUNT STATEMENT FOR THE MONTH ENDED JUNE 30, 2022
(UNAUDITED)

### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 5.750 | $996 | $5.728.231.03 | (0.38%) | (0.38%) |
| Total |  |  | $5.728.231.03 |  |  |

| | |
|---|---|
| Total Beginning Capital | $0.00 |
| Capital Added/(Redeemed) | 5.750.000.00 |
| Net Income (Loss) Allocation for Month | (21.768.97) |
| Total Ending Capital | $5.728.231.03 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.



**BKCoin Multi-Strategy Fund Ltd.**

ACCOUNT STATEMENT FOR THE MONTH ENDED JUNE 30, 2022

(UNAUDITED)



### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 5,750 | $996 | $5,728,231.03 | (0.38%) | (0.38%) |
| Total |  |  | $5,728,231.03 |  |  |

| | |
|---|---|
| Total Beginning Capital | $0.00 |
| Capital Added/(Redeemed) | 5,750,000.00 |
| Net Income (Loss) Allocation for Month | (21,768.97) |
| Total Ending Capital | $5,728,231.03 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

## Report Summary

| | |
|---|---|
| Opening Balance | 0.00 |
| Subscriptions/Redemptions | 7,150,000.00 |
| Net Income | (27,069.24) |
| Ending Balance | 7,122,930.76 |

**BKCoin Multi-Strategy Fund Ltd.**

ACCOUNT STATEMENT FOR THE MONTH ENDED JUNE 30, 2022

(UNAUDITED)



## SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 400 | $997 | $398,884.08 | (0.28%) | (0.28%) |
| Total |  |  | $398,884.08 |  |  |

| | |
|---|---|
| Total Beginning Capital | $0.00 |
| Capital Added/(Redeemed) | 400,000.00 |
| Net Income (Loss) Allocation for Month | (1,115.92) |
| Total Ending Capital | $398,884.08 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**

### ACCOUNT STATEMENT FOR THE MONTH  ENDED JUNE 30, 2022
(UNAUDITED)



### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 400 | $997 | $398.884.08 | (0.28%) | (0.28%) |
| Total |  |  | $398.884.08 |  |  |

| | |
|---|---|
| Total Beginning Capital | $0.00 |
| Capital Added/(Redeemed) | 400.000.00 |
| Net Income (Loss) Allocation for Month | (1.115.92) |
| Total Ending Capital | $398.884.08 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**

### ACCOUNT STATEMENT FOR THE MONTH ENDED JUNE 30, 2022
(UNAUDITED)



#### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A-R Series 6/1 | 1.000 | $997 | $997,210.19 | (0.28%) | (0.28%) |
| Total |  |  | $997,210.19 |  |  |

| | |
|---|---|
| Total Beginning Capital | $0.00 |
| Capital Added/(Redeemed) | 1,000,000.00 |
| Net Income (Loss) Allocation for Month | (2,789.81) |
| Total Ending Capital | $997,210.19 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**

ACCOUNT STATEMENT FOR THE MONTH ENDED JUNE 30, 2022

(UNAUDITED)

SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 5,750 | $997 | $5,733,958.58 | (0.28%) | (0.28%) |
| Total |  |  | $5,733,958.58 |  |  |

| | |
|---|---|
| Total Beginning Capital | $0.00 |
| Capital Added/(Redeemed) | 5,750,000.00 |
| Net Income (Loss) Allocation for Month | (16,041.42) |
| Total Ending Capital | $5,733,958.58 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**



### ACCOUNT STATEMENT FOR THE MONTH ENDED JUNE 30, 2022

(UNAUDITED)



### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 5,750 | $997 | $5,733,958.58 | (0.28%) | (0.28%) |
| Total |  |  | $5,733,958.58 |  |  |

| | |
|---|---|
| Total Beginning Capital | $0.00 |
| Capital Added/(Redeemed) | 5,750,000.00 |
| Net Income (Loss) Allocation for Month | (16,041.42) |
| Total Ending Capital | $5,733,958.58 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

## Report Summary

| | |
|---|---|
| Opening Balance | 0.00 |
| Subscriptions/Redemptions | 7,150,000.00 |
| Net Income | (19,947.15) |
| Ending Balance | 7,130,052.85 |

**BKCoin Multi-Strategy Fund Ltd.**

### ACCOUNT STATEMENT FOR THE MONTH  ENDED JULY 31, 2022

(UNAUDITED)



### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 400 | $998 | $399,312.55 | 0.11% | (0.17%) |
| Total |  |  | $399,312.55 |  |  |

| | |
|---|---|
| Total Beginning Capital | $398,884.08 |
| Capital Added/(Redeemed) | 0.00 |
| Net Income (Loss) Allocation for Month | 428.47 |
| Total Ending Capital | $399,312.55 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**

### ACCOUNT STATEMENT FOR THE MONTH ENDED JULY 31, 2022
(UNAUDITED)



### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 400 | $998 | $399,312.55 | 0.11% | (0.17%) |
| Total |  |  | $399,312.55 |  |  |

| | |
|---|---|
| Total Beginning Capital | $398,884.08 |
| Capital Added/(Redeemed) | 0.00 |
| Net Income (Loss) Allocation for Month | 428.47 |
| Total Ending Capital | $399,312.55 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**



### ACCOUNT STATEMENT FOR THE MONTH ENDED JULY 31, 2022
(UNAUDITED)



### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A-R Series 6/1 | 1.000 | $998 | $998,281.38 | 0.11% | (0.17%) |
| Total |  |  | $998,281.38 |  |  |

| | |
|---|---|
| Total Beginning Capital | $997,210.19 |
| Capital Added/(Redeemed) | 0.00 |
| Net Income (Loss) Allocation for Month | 1,071.19 |
| Total Ending Capital | $998,281.38 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year-end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**

<u>ACCOUNT STATEMENT FOR THE MONTH ENDED JULY 31, 2022</u>

(UNAUDITED)



### SHAREHOLDER SUMMARY

| | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 0 | $998 | $0.00 | 0.00% | 0.00% |
| Total | | | $0.00 | | |

| | |
|---|---|
| Total Beginning Capital | $5,733,958.58 |
| Capital Added/(Redeemed) | (5,733,958.58) |
| Net Income (Loss) Allocation for Month | 0.00 |
| Total Ending Capital | $0.00 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

## BKCoin Multi-Strategy Fund Ltd.

**ACCOUNT STATEMENT FOR THE MONTH ENDED JULY 31, 2022**

(UNAUDITED)



**SHAREHOLDER SUMMARY**

| | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 0 | $998 | $0.00 | 0.00% | 0.00% |
| Total | | | $0.00 | | |

| | |
|---|---|
| Total Beginning Capital | $5,733,958.58 |
| Capital Added/(Redeemed) | (5,733,958.58) |
| Net Income (Loss) Allocation for Month | 0.00 |
| Total Ending Capital | $0.00 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**



## ACCOUNT STATEMENT FOR THE MONTH ENDED JULY 31, 2022

(UNAUDITED)



### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 7/1 | 1.300 | $1.001 | $1.301.117.16 | 0.09% | 0.09% |
| Total |  |  | $1.301.117.16 |  |  |

| | |
|---|---|
| Total Beginning Capital | $0.00 |
| Capital Added/(Redeemed) | 1.300.000.00 |
| Net Income (Loss) Allocation for Month | 1.117.16 |
| Total Ending Capital | $1.301.117.16 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**

### ACCOUNT STATEMENT FOR THE MONTH ENDED JULY 31, 2022
(UNAUDITED)

#### SHAREHOLDER SUMMARY

|  | Shares Held. | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 7/1 | 1.300 | $1.001 | $1.301.117.16 | 0.09% | 0.09% |
| Total |  |  | $1.301.117.16 |  |  |

| | |
|---|---|
| Total Beginning Capital | $0.00 |
| Capital Added/(Redeemed) | 1.300.000.00 |
| Net Income (Loss) Allocation for Month | 1.117.16 |
| Total Ending Capital | $1.301.117.16 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

████████████████████████████████████████

## Report Summary

| | |
|---|---|
| Opening Balance | 7,130,052.85 |
| Subscriptions/Redemptions | (4,433,958.58) |
| Net Income | 2,616.82 |
| Ending Balance | 2,698,711.09 |

**BKCoin Multi-Strategy Fund Ltd.**

**ACCOUNT STATEMENT FOR THE MONTH  ENDED JULY 31, 2022**

(UNAUDITED)

███████████

### SHAREHOLDER SUMMARY

| | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 400 | $998 | $399,312.55 | 0.11% | (0.17%) |
| Total | | | $399,312.55 | | |

| | |
|---|---|
| Total Beginning Capital | $398,884.08 |
| Capital Added/(Redeemed) | 0.00 |
| Net Income (Loss) Allocation for Month | 428.47 |
| Total Ending Capital | $399,312.55 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd  Any republishing of this information is prohibited  This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns

**BKCoin Multi-Strategy Fund Ltd.**

---

### ACCOUNT STATEMENT FOR THE MONTH ENDED JULY 31, 2022
#### (UNAUDITED)

██████████████████

---

### SHAREHOLDER SUMMARY

| | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A-R Series 6/1 | 1,000 | $998 | $998,281.38 | 0.11% | (0.17%) |
| Total | | | $998,281.38 | | |

| | |
|---|---|
| Total Beginning Capital | $997,210.19 |
| Capital Added/(Redeemed) | 0.00 |
| Net Income (Loss) Allocation for Month | 1,071.19 |
| Total Ending Capital | $998,281.38 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd  Any republishing of this information is prohibited  This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns

**BKCoin Multi-Strategy Fund Ltd.**

ACCOUNT STATEMENT FOR THE MONTH  ENDED JULY 31, 2022

(UNAUDITED)

███████████████████████████████

SHAREHOLDER SUMMARY

| | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 0 | $998 | $0.00 | 0.00% | 0.00% |
| Total | | | $0.00 | | |

| | |
|---|---|
| Total Beginning Capital | $5,733,958.58 |
| Capital Added/(Redeemed) | (5,733,958.58) |
| Net Income (Loss) Allocation for Month | 0.00 |
| Total Ending Capital | $0.00 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd  Any republishing of this information is prohibited  This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns

**BKCoin Multi-Strategy Fund Ltd.**

### ACCOUNT STATEMENT FOR THE MONTH  ENDED JULY 31, 2022
(UNAUDITED)

██████████████████

### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 7/1 | 1,300 | $1,001 | $1,301,117.16 | 0.09% | 0.09% |
| Total |  |  | $1,301,117.16 |  |  |

| | |
|---|---|
| Total Beginning Capital | $0.00 |
| Capital Added/(Redeemed) | 1,300,000.00 |
| Net Income (Loss) Allocation for Month | 1,117.16 |
| Total Ending Capital | $1,301,117.16 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd  Any republishing of this information is prohibited  This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns

## BKCoin Multi-Strategy Fund Ltd.

### ACCOUNT STATEMENT FOR THE MONTH ENDED AUGUST 31, 2022
(UNAUDITED)



### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 400 | $988 | $395,009.19 | (1.08%) | (1.25%) |
| Total |  |  | $395,009.19 |  |  |

| | |
|---|---|
| Total Beginning Capital | $399,312.55 |
| Capital Added/(Redeemed) | 0.00 |
| Net Income (Loss) Allocation for Month | (4,303.36) |
| Total Ending Capital | $395,009.19 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**

## ACCOUNT STATEMENT FOR THE MONTH  ENDED AUGUST 31, 2022
### (UNAUDITED)



### SHAREHOLDER SUMMARY

| | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 400 | $988 | $395,009.19 | (1.08%) | (1.25%) |
| Total | | | $395,009.19 | | |

| | |
|---|---|
| Total Beginning Capital | $399,312.55 |
| Capital Added/(Redeemed) | 0.00 |
| Net Income (Loss) Allocation for Month | (4,303.36) |
| Total Ending Capital | $395,009.19 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**

### ACCOUNT STATEMENT FOR THE MONTH ENDED AUGUST 31, 2022
(UNAUDITED)



### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A-R Series 6/1 | 1.000 | $988 | $987,522.98 | (1.08%) | (1.25%) |
| Total |  |  | $987,522.98 |  |  |

| | | |
|---|---|---|
| Total Beginning Capital | | $998,281.38 |
| Capital Added/(Redeemed) | | 0.00 |
| Net Income (Loss) Allocation for Month | | (10,758.40) |
| Total Ending Capital | | $987,522.98 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**

## ACCOUNT STATEMENT FOR THE MONTH ENDED AUGUST 31, 2022
### (UNAUDITED)



### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 7/1 | 1.300 | $990 | $1.287.371.40 | (1.06%) | (0.97%) |
| Total |  |  | $1.287.371.40 |  |  |

| | |
|---|---|
| Total Beginning Capital | $1.301.117.16 |
| Capital Added/(Redeemed) | 0.00 |
| Net Income (Loss) Allocation for Month | (13.745.76) |
| Total Ending Capital | $1.287.371.40 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**BKCoin Multi-Strategy Fund Ltd.**

### ACCOUNT STATEMENT FOR THE MONTH ENDED AUGUST 31, 2022

(UNAUDITED)

#### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 7/1 | 1.300 | $990 | $1.287.371.40 | (1.06%) | (0.97%) |
| Total |  |  | $1.287.371.40 |  |  |

| | |
|---|---|
| Total Beginning Capital | $1.301.117.16 |
| Capital Added/(Redeemed) | 0.00 |
| Net Income (Loss) Allocation for Month | (13.745.76) |
| Total Ending Capital | $1.287.371.40 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

## Report Summary

| | |
|---|---|
| Opening Balance | 2,698,711.09 |
| Subscriptions/Redemptions | 0.00 |
| Net Income | (28,807.52) |
| Ending Balance | 2,669,903.57 |

**BKCoin Multi-Strategy Fund Ltd.**

### ACCOUNT STATEMENT FOR THE MONTH  ENDED AUGUST 31, 2022
(UNAUDITED)

███████████

#### SHAREHOLDER SUMMARY

| | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 6/1 | 400 | $988 | $395,009.19 | (1.08%) | (1.25%) |
| Total | | | $395,009.19 | | |

| | |
|---|---|
| Total Beginning Capital | $399,312.55 |
| Capital Added/(Redeemed) | 0.00 |
| Net Income (Loss) Allocation for Month | (4,303.36) |
| Total Ending Capital | $395,009.19 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd  Any republishing of this information is prohibited  This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns

**BKCoin Multi-Strategy Fund Ltd.**

## ACCOUNT STATEMENT FOR THE MONTH  ENDED AUGUST 31, 2022
### (UNAUDITED)

████████████████████████

### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A-R Series 6/1 | 1,000 | $988 | $987,522.98 | (1.08%) | (1.25%) |
| Total | | | $987,522.98 | | |

| | |
|---|---|
| Total Beginning Capital | $998,281.38 |
| Capital Added/(Redeemed) | 0.00 |
| Net Income (Loss) Allocation for Month | (10,758.40) |
| Total Ending Capital | $987,522.98 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd  Any republishing of this information is prohibited   This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns

**BKCoin Multi-Strategy Fund Ltd.**

## ACCOUNT STATEMENT FOR THE MONTH  ENDED AUGUST 31, 2022
### (UNAUDITED)

███████████████████████

### SHAREHOLDER SUMMARY

|  | Shares Held | NAV Per Share | Investment Value | MTD % Return | YTD % Return |
|---|---|---|---|---|---|
| Class A Series 7/1 | 1,300 | $990 | $1,287,371.40 | (1.06%) | (0.97%) |
| Total |  |  | $1,287,371.40 |  |  |

| | |
|---|---|
| Total Beginning Capital | $1,301,117.16 |
| Capital Added/(Redeemed) | 0.00 |
| Net Income (Loss) Allocation for Month | (13,745.76) |
| Total Ending Capital | $1,287,371.40 |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund Ltd   Any republishing of this information is prohibited   This is not an offer to sell any securities or a solicitation to buy any securities   This performance data has not been audited and may be subject to further adjustment   You should rely exclusively on the year end reports provided by the Fund's auditors   Returns are calculated net of applicable fees   Your interest in the Fund, when redeemed, may be worth more or less than its cost   Past performance does not guarantee future returns

# **EXHIBIT G**

IFS | INTERNATIONAL FUND SERVICES
A State Street Company

## BKCOIN MULTI-STRATEGY FUND LP

### ACCOUNT STATEMENT FOR THE MONTH ENDED JUNE 30, 2022
(Unaudited)

[redacted]

### PARTNER SUMMARY

| | |
|---|---|
| Capital account at beginning of the month | $0.00 |
| Capital contributed | 9,250,000.00 |
| Capital redeemed | 0.00 |
| Net profit (loss) for the month | ( 34,571.44) |
| Capital account at end of the month | $9,215,428.56 |

| | |
|---|---|
| Percentage change for month (net) | (0.37%) |
| Percentage change for year (net) | (0.37%) |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP Any republishing of this information is prohibited This is not an offer to sell any securities or a solicitation to buy any securities This performance data has not been audited and may be subject to further adjustment You should rely exclusively on the year end reports provided by the Fund's auditors Returns are calculated net of applicable fees Your interest in the Fund, when redeemed, may be worth more or less than its cost Past performance does not guarantee future returns

**IFS | INTERNATIONAL FUND SERVICES**
A State Street Company

## BKCOIN MULTI-STRATEGY FUND LP

### ACCOUNT STATEMENT FOR THE MONTH ENDED JUNE 30, 2022
#### (Unaudited)



### PARTNER SUMMARY

| | |
|---|---:|
| Capital account at beginning of the month | $0.00 |
| Capital contributed | 9,250,000.00 |
| Capital redeemed | 0.00 |
| Net profit (loss) for the month | ( 34,571.44) |
| Capital account at end of the month | $9,215,428.56 |

| | |
|---|---:|
| Percentage change for month (net) | (0.37%) |
| Percentage change for year (net) | (0.37%) |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP Any republishing of this information is prohibited  This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns

## Report Summary

| | |
|---|---:|
| Opening Balance | 0.00 |
| Subscriptions | 9,250,000.00 |
| Redemptions | 0.00 |
| Net Income | (34,571.44) |
| Ending Balance | 9,215,428.56 |



IFS | INTERNATIONAL FUND SERVICES
A State Street Company

# BKCOIN MULTI-STRATEGY FUND LP

## ACCOUNT STATEMENT FOR THE MONTH ENDED JUNE 30, 2022
### (Unaudited)



### PARTNER SUMMARY

| | |
|---|---|
| Capital account at beginning of the month | $0.00 |
| Capital contributed | 9,250,000.00 |
| Capital redeemed | 0.00 |
| Net profit (loss) for the month | ( 25,805.75) |
| Capital account at end of the month | $9,224,194.25 |

| | |
|---|---|
| Percentage change for month (net) | (0.28%) |
| Percentage change for year (net) | (0.28%) |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.



## BKCOIN MULTI-STRATEGY FUND LP

### ACCOUNT STATEMENT FOR THE MONTH ENDED JUNE 30, 2022
#### (Unaudited)



### PARTNER SUMMARY

| | |
|---|---:|
| Capital account at beginning of the month | $0.00 |
| Capital contributed | 9,250,000.00 |
| Capital redeemed | 0.00 |
| Net profit (loss) for the month | ( 25,805.75) |
| Capital account at end of the month | $9,224,194.25 |

| | |
|---|---:|
| Percentage change for month (net) | (0.28%) |
| Percentage change for year (net) | (0.28%) |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP Any republishing of this information is prohibited  This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns

## Report Summary

| | |
|---|---:|
| Opening Balance | 0.00 |
| Subscriptions | 9,250,000.00 |
| Redemptions | 0.00 |
| Net Income | (25,805.75) |
| Ending Balance | 9,224,194.25 |



**IFS** | INTERNATIONAL
FUND SERVICES
A State Street Company

## BKCOIN MULTI-STRATEGY FUND LP

### ACCOUNT STATEMENT FOR THE MONTH ENDED JULY 31, 2022
**(Unaudited)**



### PARTNER SUMMARY

| | |
|---|---|
| Capital account at beginning of the month | $9,224,194.25 |
| Capital contributed | 0.00 |
| Capital redeemed | ( 1,232,500.00) |
| Net profit (loss) for the month | 8,584.60 |
| Capital account at end of the month | $8,000,278.85 |

| | |
|---|---|
| Percentage change for month (net) | 0.11% |
| Percentage change for year (net) | (0.17%) |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

IFS | INTERNATIONAL
FUND SERVICES
A State Street Company

## BKCOIN MULTI-STRATEGY FUND LP

### ACCOUNT STATEMENT FOR THE MONTH ENDED JULY 31, 2022
#### (Unaudited)



### PARTNER SUMMARY

| | |
|---|---|
| Capital account at beginning of the month | $9,224,194.25 |
| Capital contributed | 0.00 |
| Capital redeemed | ( 1,232,500.00) |
| Net profit (loss) for the month | 8,584.60 |
| Capital account at end of the month | $8,000,278.85 |

| | |
|---|---|
| Percentage change for month (net) | 0.11% |
| Percentage change for year (net) | (0.17%) |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.



# BKCOIN MULTI-STRATEGY FUND LP

## ACCOUNT STATEMENT FOR THE MONTH ENDED JULY 31, 2022
### (Unaudited)



### PARTNER SUMMARY

| | |
|---|---:|
| Capital account at beginning of the month | $0.00 |
| Capital contributed | 6,966,458.58 |
| Capital redeemed | 0.00 |
| Net profit (loss) for the month | 5,986.65 |
| Capital account at end of the month | $6,972,445.23 |

| | |
|---|---:|
| Percentage change for month (net) | 0.09% |
| Percentage change for year (net) | 0.09% |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.



## BKCOIN MULTI-STRATEGY FUND LP

### ACCOUNT STATEMENT FOR THE MONTH ENDED JULY 31, 2022
#### (Unaudited)



### PARTNER SUMMARY

| | |
|---|---|
| Capital account at beginning of the month | $0.00 |
| Capital contributed | 6,966,458.58 |
| Capital redeemed | 0.00 |
| Net profit (loss) for the month | 5,986.65 |
| Capital account at end of the month | $6,972,445.23 |

| | |
|---|---|
| Percentage change for month (net) | 0.09% |
| Percentage change for year (net) | 0.09% |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP Any republishing of this information is prohibited  This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns

## Report Summary

| | |
|---|---:|
| Opening Balance | 9,224,194.25 |
| Subscriptions | 6,966,458.58 |
| Redemptions | (1,232,500.00) |
| Net Income | 14,571.25 |
| Ending Balance | 14,972,724.08 |



# BKCOIN MULTI-STRATEGY FUND LP

### ACCOUNT STATEMENT FOR THE MONTH ENDED JULY 31, 2022
**(Unaudited)**

████████████████████

### PARTNER SUMMARY

| | |
|---|---|
| Capital account at beginning of the month | $9,224,194.25 |
| Capital contributed | 0.00 |
| Capital redeemed | ( 1,232,500.00) |
| Net profit (loss) for the month | 8,584.60 |
| Capital account at end of the month | $8,000,278.85 |

| | |
|---|---|
| Percentage change for month (net) | 0.11% |
| Percentage change for year (net) | (0.17%) |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP  Any republishing of this information is prohibited  This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns



## BKCOIN MULTI-STRATEGY FUND LP

### ACCOUNT STATEMENT FOR THE MONTH ENDED JULY 31, 2022
#### (Unaudited)

**PARTNER SUMMARY**

| | |
|---|---:|
| Capital account at beginning of the month | $0.00 |
| Capital contributed | 6,966,458.58 |
| Capital redeemed | 0.00 |
| Net profit (loss) for the month | 5,986.65 |
| Capital account at end of the month | $6,972,445.23 |

| | |
|---|---:|
| Percentage change for month (net) | 0.09% |
| Percentage change for year (net) | 0.09% |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP  Any republishing of this information is prohibited  This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns

**IFS | INTERNATIONAL FUND SERVICES**
A State Street Company

## BKCOIN MULTI-STRATEGY FUND LP

### ACCOUNT STATEMENT FOR THE MONTH ENDED AUGUST 31, 2022
#### (Unaudited)



#### PARTNER SUMMARY

| | |
|---|---:|
| Capital account at beginning of the month | $8.000.278.85 |
| Capital contributed | 0.00 |
| Capital redeemed | 0.00 |
| Net profit (loss) for the month | ( 86.218.39) |
| Capital account at end of the month | $7.914.060.46 |

| | |
|---|---:|
| Percentage change for month (net) | (1.08%) |
| Percentage change for year (net) | (1.25%) |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP  Any republishing of this information is prohibited  This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns

**IFS** | INTERNATIONAL FUND SERVICES
A State Street Company

## BKCOIN MULTI-STRATEGY FUND LP

### ACCOUNT STATEMENT FOR THE MONTH ENDED AUGUST 31, 2022
**(Unaudited)**



### PARTNER SUMMARY

| | |
|---|---:|
| Capital account at beginning of the month | $8.000.278.85 |
| Capital contributed | 0.00 |
| Capital redeemed | 0.00 |
| Net profit (loss) for the month | ( 86.218.39) |
| Capital account at end of the month | $7.914.060.46 |

| | |
|---|---:|
| Percentage change for month (net) | (1.08%) |
| Percentage change for year (net) | (1.25%) |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP Any republishing of this information is prohibited  This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns

**IFS** | INTERNATIONAL
FUND SERVICES
A State Street Company

## BKCOIN MULTI-STRATEGY FUND LP

### ACCOUNT STATEMENT FOR THE MONTH ENDED AUGUST 31, 2022
**(Unaudited)**



### PARTNER SUMMARY

| | |
|---|---|
| Capital account at beginning of the month | $6,972,445.23 |
| Capital contributed | 0.00 |
| Capital redeemed | 0.00 |
| Net profit (loss) for the month | ( 73,660.97) |
| Capital account at end of the month | $6,898,784.26 |

| | |
|---|---|
| Percentage change for month (net) | (1.06%) |
| Percentage change for year (net) | (0.97%) |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

**IFS | INTERNATIONAL FUND SERVICES**
A State Street Company

# BKCOIN MULTI-STRATEGY FUND LP

### ACCOUNT STATEMENT FOR THE MONTH ENDED AUGUST 31, 2022

**(Unaudited)**



### PARTNER SUMMARY

| | |
|---|---:|
| Capital account at beginning of the month | $6,972,445.23 |
| Capital contributed | 0.00 |
| Capital redeemed | 0.00 |
| Net profit (loss) for the month | ( 73,660.97) |
| Capital account at end of the month | $6,898,784.26 |

| | |
|---|---:|
| Percentage change for month (net) | (1.06%) |
| Percentage change for year (net) | (0.97%) |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP. Any republishing of this information is prohibited. This is not an offer to sell any securities or a solicitation to buy any securities. This performance data has not been audited and may be subject to further adjustment. You should rely exclusively on the year end reports provided by the Fund's auditors. Returns are calculated net of applicable fees. Your interest in the Fund, when redeemed, may be worth more or less than its cost. Past performance does not guarantee future returns.

## Report Summary

| | |
|---|---|
| Opening Balance | 14,972,724.08 |
| Subscriptions | 0.00 |
| Redemptions | 0.00 |
| Net Income | (159,879.36) |
| Ending Balance | 14,812,844.72 |



# BKCOIN MULTI-STRATEGY FUND LP

### ACCOUNT STATEMENT FOR THE MONTH ENDED AUGUST 31, 2022
**(Unaudited)**

### PARTNER SUMMARY

| | |
|---|---|
| Capital account at beginning of the month | $8,000,278.85 |
| Capital contributed | 0.00 |
| Capital redeemed | 0.00 |
| Net profit (loss) for the month | ( 86,218.39) |
| Capital account at end of the month | $7,914,060.46 |

| | |
|---|---|
| Percentage change for month (net) | (1.08%) |
| Percentage change for year (net) | (1.25%) |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP  Any republishing of this information is prohibited  This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns

**IFS** | INTERNATIONAL
FUND SERVICES
A State Street Company

# BKCOIN MULTI-STRATEGY FUND LP

## ACCOUNT STATEMENT FOR THE MONTH ENDED AUGUST 31, 2022
### (Unaudited)

### PARTNER SUMMARY

| | |
|---|---:|
| Capital account at beginning of the month | $6,972,445.23 |
| Capital contributed | 0.00 |
| Capital redeemed | 0.00 |
| Net profit (loss) for the month | ( 73,660.97) |
| Capital account at end of the month | $6,898,784.26 |

| | |
|---|---:|
| Percentage change for month (net) | (1.06%) |
| Percentage change for year (net) | (0.97%) |

This statement has been prepared for informational purposes only and is intended for current investors in BKCoin Multi-Strategy Fund LP Any republishing of this information is prohibited  This is not an offer to sell any securities or a solicitation to buy any securities  This performance data has not been audited and may be subject to further adjustment  You should rely exclusively on the year end reports provided by the Fund's auditors  Returns are calculated net of applicable fees  Your interest in the Fund, when redeemed, may be worth more or less than its cost  Past performance does not guarantee future returns