# EXHIBIT 5

Declaration of Bryce Guideland

Pursuant to 28 U.S.C. Section 1746, the undersigned declares as follows:

1. My name is Bryce Guideland. I am over the age of twenty-one and I have personal knowledge of the matters set forth herein.

2. I reside in Carolina, Puerto Rico. I am Chief Executive Officer at Asha Capital Partners, LP ("Asha"), a crypto asset fund of funds, which I formed in June 2021.

3. Asha invested approximately $3,300,000 in BKCoin Capital, LP (the "Legacy Fund") in October 2021. Thereafter, Asha invested an additional $190,000 in the Legacy Fund in December 2021 and an additional $269,000 in January 2022.

4. Asha received a limited partnership agreement for BKCoin Capital, LP, which Daniel Strachman executed on behalf of Asha on October 29, 2021. The agreement is attached as **Exhibit 1**. Section 3.02 of the limited partnership agreement identifies the authorized activities of the General Partner, BKCoin Management, LP ("BKCoin Management") which include, among other things, the power to "acquire, invest in, hold, pledge, manage, sell, transfer, operate, or otherwise deal in or with the Portfolio Investments."

5. Prior to Asha investing, I participated in telephone conversations with Kevin Kang and Carlos Betancourt on September 7, 2021 and October 14, 2021 regarding a possible investment by Asha in the Legacy Fund.

6. During those two phone calls, Mr. Kang described the Legacy Fund to me as a market neutral fund that would identify, and attempt to profit from, arbitrage opportunities in the crypto asset markets.

7. During those two phone calls, Mr. Kang told me that BKCoin Management would use Legacy Fund assets to purchase or sell crypto assets or crypto asset derivatives in service of the Legacy Fund's market neutral strategy. Mr. Kang's statements about how BKCoin Management would use Legacy Fund assets were consistent with the statements in the limited partnership agreement regarding the authorized activities of the General Partner.

8. Mr. Kang did not state that he would use Legacy Fund assets to pay for residential real estate or other personal expenses.

9.  If I, or others at Asha, had known that Mr. Kang would use Legacy Fund assets to pay for residential real estate or other personal expenses, then Asha would not have invested in the Legacy Fund.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on this 16 day of January, 2023.

Bryce Gilleland

# EXHIBIT 1

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

# FIRST AMENDED AND RESTATED
# AGREEMENT OF LIMITED PARTNERSHIP

## BKCOIN CAPITAL LP

dated as of

## AUGUST 28, 2020

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

# FIRST AMENDED AND RESTATED
# LIMITED PARTNERSHIP AGREEMENT
# OF
# BKCOIN CAPITAL LP

This FIRST AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT (this "Agreement") of BKCOIN CAPITAL LP, a Delaware limited partnership (the "Partnership"), is entered into as of August 28, 2020, by and among BKCOIN MANAGEMENT, LLC, a Delaware limited liability company, as the General Partner and those additional parties who sign copies of this Agreement to become limited partners, and that have been or shall be admitted as Limited Partners in accordance with the terms of this Agreement.

## RECITALS

WHEREAS, the General Partner formed the Partnership pursuant to a certificate of limited partnership of the Partnership (the "**Certificate of Limited Partnership**") filed with the Secretary of State of the State of Delaware on March 5, 2018; and

WHEREAS, on November 30, 2018 the first Limited Partnership Agreement was entered into, which was



subsequently amended and restated on August 28, 2020, and which sets forth the rights and obligations of the parties hereto.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

# ARTICLE I
# DEFINITIONS

**Section 1.01 Definitions.** Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.01.

"**Advisers Act**" means the Investment Advisers Act of 1940, as amended from time to time.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly (including through one or more intermediaries), controls, is controlled by or is under common control with such person. The term "control" means (a) the legal or beneficial ownership of securities representing a majority of the voting power of any Person or (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

"**Aggregate Contributions**" means the sum of the Capital Contributions to the Fund.

"**Agreement**" means this Limited Partnership Agreement, as it may be amended, modified, supplemented, or restated from time to time, as provided herein.

"**AML Laws**" has the meaning set forth in Section 11.05(a).

1

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

"**Assumed Tax Rate**" means the highest effective marginal combined federal, state, and local income tax rate for a Fiscal Year prescribed for an individual residing in New York, New York, taking into account the character (for example, long-term or short-term capital gain, ordinary or exempt) of the applicable income.

"**Available Assets**" means, for any period, the excess of (a) Distributable Cash and other property to be distributed pursuant to Section 8.01 and Temporary Investments over (b) the sum of (i) Investment Expenses, (ii) amounts paid or payable in respect of any loan or other Indebtedness of the Partnership and (iii) the amount of reserves established by the General Partner as contemplated by Section 3.02(n).

"**Bankruptcy**" means, with respect to any Person, the occurrence of any of the following: (a) the filing of an application by such Person for, or consent to, the appointment of a trustee of such Person's assets; (b) the filing by such Person of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Person's inability to pay its debts as they come due; (c) the making by such Person of a general assignment for the benefit of such Person's creditors; (d) the filing by such Person of an answer admitting the material allegations of, or such Person's consenting to, or defaulting in answering a bankruptcy petition filed against, such Person in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Person a bankrupt or appointing a trustee of such Person's assets.

"**BBA**" means the Bipartisan Budget Act of 2015.

"**BBA Procedures**" has the meaning set forth in Section 10.02.

"**Benefit Plan Investor**" means a limited partner that is any of the following:

(a) an "employee benefit plan" within the meaning of Section 3(3) of ERISA that is subject to Title I of ERISA;

(b) a "plan" within the meaning of, and subject to, Section 4975 of the Code; or

(c) any person or entity whose assets are deemed to include the assets of any such "employee benefit plan" or "plan" under the Plan Asset Rules or otherwise for purposes of Section 406 of ERISA or Section 4975 of the Code.

"**Book Depreciation**" means, with respect to any Partnership asset for each Fiscal Year, the Partnership's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the General Partner in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g)(3).

"**Book Value**" means, with respect to any Partnership asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a) the initial Book Value of any Partnership asset contributed by a Partner to the Partnership shall be the gross Fair Market Value of such Partnership asset as of the date of such contribution;

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

(b) immediately prior to the distribution by the Partnership of any Partnership asset to a Partner, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such distribution;

(c) the Book Value of all Partnership assets shall be adjusted to equal their respective gross Fair Market Values, as reasonably determined by the General Partner, as of the following times:

(i) the acquisition of an additional Interest in the Partnership by a new or existing Partner in consideration of a Capital Contribution of more than a *de minimis* amount;

(ii) the distribution by the Partnership to a Partner of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Partner's Interest;

(iii) the liquidation of the Partnership within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g);

(iv) provided, that adjustments pursuant to Subclauses (i), (ii) and (iii) above need not be made if the General Partner reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Partners and that the absence of such adjustment does not adversely and disproportionately affect any Partner;

(d) the Book Value of each Partnership asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Partnership asset pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), provided, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to Paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this Paragraph (d); and

(e) if the Book Value of a Partnership asset has been determined pursuant to Paragraph (a) or adjusted pursuant to Paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Partnership asset for purposes of computing Net Income and Net Losses.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized or required to close.

"**Capital Account**" has the meaning set forth in Section 6.04.

"**Capital Contribution**" means, with respect to each Partner, the amount the Partner has contributed to the Partnership pursuant to the terms of this Agreement.

"**Carried Interest Distributions**" means all amounts distributed to the General Partner pursuant to Section 8.01(b) and 12.02 (to the extent made in accordance with the priorities of Sections 8.01(b)) and advances to the General Partner pursuant to Section 8.02.

"**Cause**" means a final determination by a court of competent jurisdiction or a government body, that the General Partner or any of its Affiliates has committed a willful act constituting bad faith, fraud, gross negligence, willful misconduct, a violation of federal securities laws, breach of fiduciary duty, or a material breach of this Agreement that has a material adverse effect on the business of the Partnership.

3

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

"**Certificate of Cancellation**" has the meaning set forth in Section 12.02(d).

"**Closing**" means the Initial Closing or any Subsequent Closing, as the case may be.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Covered Person**" means the General Partner (including, without limitation, the General Partner in its role as Tax Matters Partner and, if applicable, in its capacity as a special limited partner or a former general partner), the Investment Manager, each of their Affiliates, any officers, directors, managers, employees, shareholders, partners, members, agents and consultants of any of the foregoing.

"**Delaware Act**" means the Delaware Revised Uniform Limited Partnership Act (6 Del. C. § 17) and any successor statute, as amended from time to time.

"**Disposition**" means, with respect to any Portfolio Investment, the sale, exchange or other disposition by the Partnership of all or any portion of that Portfolio Investment for cash or in exchange for Marketable Securities or other assets, including but not limited to, cryptocurrencies.

"**Distributable Cash**" means all cash received by the Partnership relating to the Portfolio Investments or Temporary Investments other than Capital Contributions, including, without limitation, income, dividends, distributions, interest and proceeds from the Disposition of a Portfolio Investment and any other miscellaneous receipts or revenues of the Partnership related directly to Portfolio Investments held by the Partnership, to the

extent that such cash constitutes Available Assets.

"**ECI**" means "effectively connected income" as defined in Section 864 of the Code or income treated as "effectively connected" under Section 897 of the Code.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Partner**" means any Limited Partner that is a Benefit Plan Investor and any other Limited Partner to the extent that the General Partner has agreed to treat such Limited Partner as an ERISA Partner.

"**Expert**" has the meaning set forth in Section 4.09(b).

"**Fair Market Value**" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the General Partner based on such factors as the General Partner, in the exercise of its reasonable business judgment, considers relevant.

"**Fair Value**" means the fair value of any Interest or Portfolio Investment, as determined in good faith by the General Partner or, in the case of Section 4.09 and 4.10, as determined by an Expert, using generally accepted valuation methods. All valuations shall be made taking into account all relevant factors that might reasonably affect the sales price of the Interest or Portfolio Investment in question. For all purposes of this Agreement, all valuations made in accordance with the foregoing shall be final and conclusive on the Fund, the Fund Investors, the General Partner, and their successors and assigns, absent manifest error.

"**Fiscal Year**" means the calendar year, unless the Partnership is required to have a taxable year other than the calendar year, in which case the Fiscal Year shall be the period that conforms to its taxable year.

"**Foreign Taxes**" has the meaning set forth in Section 7.01(c).

4

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

"**Fund**" means the Partnership.

"**Fund Investor**" means a Limited Partner or General Partner that has invested money into the Fund.

"**General Partner**" means BKCOIN MANAGEMENT LLC or any other Person who becomes a successor general partner pursuant to the terms of this Agreement.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Indebtedness**" means, with respect to any Person, (a) (i) all indebtedness of such Person for borrowed money or for the deferred purchase price of property, goods or services, (ii) all other obligations, contingent or otherwise, of such Person for the repayment of borrowed money in the form of surety bonds, letters of credit and bankers' acceptances whether or not matured, and (iii) all net payment obligations under hedges and other derivative contracts and similar financial instruments, (b) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments, (c) all capital lease obligations of such Person and (d) all indebtedness referred to in clause (a), (b) or (c) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness (and thus such indebtedness is not an obligation of such Person).

"**Initial Closing**" means the first Closing at which a Limited Partner was admitted to the Partnership.

"**Interest**" means the partnership interest of a Partner in the Partnership at any particular time, including the right of such Partner to any and all benefits to which such Partner may be entitled as provided in this Agreement or under the Delaware Act, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement and of the Delaware Act.

"**Investment Company Act**" means the Investment Company Act of 1940, as amended.

"**Investment Expenses**" means the sum of (a) the Investment Management Fee, (b) Organizational Expenses and (c) Operating Expenses.

"**Investment Management Agreement**" has the meaning set forth in <u>Section 9.01.</u>

"**Investment Management Fee**" has the meaning set forth in <u>Section 9.02.</u>

"**Investment Management Fee Commencement Date**" has the meaning set forth in <u>Section 9.02.</u>

"**Investment Manager**" means BKCOIN MANAGEMENT LLC engaged by the Fund in accordance with the Investment Management Agreement.

"**Key Person**" means, each of CARLOS BETANCOURT and KEVIN KANG, and any replacement for any such person replaced in accordance with <u>Section 4.04.</u>

"**Legal Violation**" has the meaning set forth in <u>Section 11.05(a).</u>

5

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

"**Limited Partner**" means any limited partner admitted to the Partnership in accordance with the terms of this Agreement.

"**Liquidator**" has the meaning set forth in <u>Section 12.02(a).</u>

"**Loss Recovery Account**" has the meaning set forth in <u>Section 9.04.</u>

"**Majority in Interest**" means Limited Partners or Fund Investors, as applicable, the aggregate value of whose Capital Account balances represents greater than Fifty Percent (50%) of the aggregate value of the Capital Account balances of all Limited Partners or Fund Investors, as applicable. Except as otherwise specifically provided herein, the Limited Partners or the Fund Investors, as applicable, shall be considered to constitute a single class or group, the vote of which shall be counted together for purposes of granting any consent of a Majority in Interest pursuant to this Agreement or the Delaware Act.

"**Marketable Securities**" means Securities that (a) are tradable on an established national U.S. or non-U.S. stock exchange or reported through NASDAQ or a comparable established non-U.S. over-the-counter trading system and (b) are not subject to restrictions on transfer under the Securities Act or contractual restrictions on transfer.

"**NASDAQ**" means The Nasdaq Stock Market LLC.

"**Net Asset Value**" or "**NAV**" shall have the meaning set forth in <u>Article XV.</u>

"**Net Income or Net Loss**" means, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Partnership's taxable income or taxable loss, or particular items thereof, determined in accordance with Section 703(a) of the Code (where, for this purpose, all items of income, gain, loss or deduction required to

be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or taxable loss), but with the following adjustments:

(a) any income realized by the Partnership that is exempt from federal income taxation, as described in Section 705(a)(1)(B) of the Code, shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b) any expenditures of the Partnership described in Section 705(a)(2)(B) of the Code, including any items treated under Treasury Regulation Section 1.704-1(b)(2)(iv)(i) as items described in Section 705(a)(2)(B) of the Code, shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c) any gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d) any items of depreciation, amortization and other cost recovery deductions with respect to Partnership property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(e) if the Book Value of any Partnership property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

6

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

(f) to the extent an adjustment to the adjusted tax basis of any Partnership property pursuant to Sections 732(d), 734(b) or 743(b) of the Code is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"**Non-Public Information**" has the meaning set forth in Section 17.14(b).

"**Nonrecourse Deductions**" mean nonrecourse deductions as described in Treasury Regulation Section 1.704-2(c).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(3).

"**Non-United States Limited Partner**" means a Limited Partner that is not a "United States person" as that term is defined in Section 7701(a)(30) of the Code.

"**Operating Expenses**" means, except as otherwise specifically provided in this Agreement, the Partnership's *pro rata* share of all third-party costs and expenses of maintaining the operations of the Fund and appraising and valuing, acquiring, maintaining, financing, hedging and disposing of Portfolio Investments, including, without limitation, taxes, fees and other governmental charges levied against the Fund; insurance; administrative and research fees; expenses of custodians, outside advisors, counsel (including Partnership Counsel), accountants, auditors, administrators and other consultants and professionals; technological expenses; interest on and fees, costs and expenses arising out of all financings entered into by the Fund (including, without limitation, those of lenders, investment banks, and other financing sources); travel expenses; brokerage commissions; custodial expenses; litigation expenses (including the amount of any judgments or settlements paid in connection therewith); winding up and liquidation expenses; expenses incurred in connection with any tax audit,

investigation, settlement or review; the costs of any services provided by the General Partner or its Affiliates in accordance with Section 4.02; expenses associated with meetings the Fund Investors and the preparation and distribution of reports, financial statements, tax returns and K-1s to the Fund Investors; indemnification and other unreimbursed expenses; and any extraordinary expenses to the extent not reimbursed or paid by insurance, but specifically excluding the Investment Management Fee, the Performance Allocation, and Organizational Expenses.

"**Organizational Expenses**" means the Partnership's *pro rata* share of all out-of-pocket expenses incurred in connection with the organization and formation of the General Partner, the Partnership, and other related entities organized by the General Partner or its Affiliates and the offering of the interests therein, including, without limitation, legal and accounting fees and expenses; printing costs; filing fees; and the transportation, meal, and lodging expenses of the personnel of the General Partner and the Investment Manager.

"**Partner(s)**" means, as the context may require, some or all of the General Partner and the Limited Partners.

"**Partner Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulation Section 1.704-2(b)(4).

"**Partner Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Partnership Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if the Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation Section 1.704-2(i)(3).

7

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

"**Partner Nonrecourse Deductions**" mean "partner nonrecourse deductions" as defined in Treasury Regulation Section 1.704-2(i)(2).

"**Partnership**" means the limited partnership referred to in this Agreement, as it may from time to time be constituted.

"**Partnership Counsel**" has the meaning set forth in Section 17.13.

"**Partnership Minimum Gain**" means for any Fiscal Year of the Partnership the "partnership minimum gain" as determined in accordance with Treasury Regulation Section 1.704-2(b)(2) and Section 1.704-2(d).

"**Partnership Representative**" has the meaning set forth in Section 10.02(a).

"**Percentage Interest**" means, as to any Partner, a fraction, expressed as a percentage, equal to the amount of the Capital Account balance of such Partner divided by the total Capital Account balances of all Partners, as may be adjusted from time to time in accordance with the provisions of this Agreement.

"**Performance Allocation**" shall have the meaning set forth in Section 9.03 below.

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"**Placement Agent**" means any placement agent, financial advisor, or finder retained by the General Partner in connection with the offering and sale of the Interests.

"**Plan Asset Rules**" mean Department of Labor regulation 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA, as modified or amended from time to time.

in part, by the Partnership, other than through a Temporary Investment.

"**Portfolio Investments**" mean investments in Securities of a Portfolio Company, commodities, futures contracts, or other assets not considered Securities, commodities, or futures contracts, including but not limited to, cryptocurrencies, in each case made (directly or indirectly) by the Partnership. The assets that the Partnership may invest in are extremely broad, and are set forth in greater detail in the Private Placement Memorandum (as defined below).

"**Prime Rate**" means, on any day, the annual rate of interest for such day published by *The Wall Street Journal* as the "U.S. Prime Rate" and, if not published by *The Wall Street Journal*, then the rate of interest publicly announced from time to time by any money center bank as its prime rate in effect at its principal office, as notified in writing by the General Partner to the Limited Partners.

"**Private Placement Memorandum**" means the Confidential Private Placement Memorandum of the Fund, with event date herewith, as amended and/or supplemented from time to time.

"**Regulations**" mean the final or temporary regulations of the United States Department of Treasury promulgated under the Code, and any successor regulations.

"**Securities**" means shares of capital stock, partnership interests, limited liability company interests, warrants, options, bonds, notes, debentures and other equity and debt instruments of any kind of any Person.

8

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

"**Securities Act**" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

"**Service**" means the U.S. Internal Revenue Service, a branch of the U.S. Treasury Department.

"**Similar Law**" means any federal, state, local or foreign law or regulation that would cause the underlying assets of the Partnership to be treated similar to "plan assets" under the Plan Asset Rules and impose on the General Partner, Investment Manager (or other Persons responsible for the operation and management of the Partnership and investment of the Partnership's assets) responsibilities similar to those of a "fiduciary" within the meaning of ERISA, and/or subject the Partnership to restrictions on investment activities and other dealings similar to the prohibited transaction rules under Title I of ERISA or Section 4975 of the Code.

"**Subscription Agreement**" means the agreement executed and delivered by a Limited Partner pursuant to which it makes a Capital Contribution to the Partnership and agrees to be bound by the terms of this Agreement, a form of which is attached hereto as Exhibit A.

"**Subsequent Closing**" means a Closing that occurs after the Initial Closing, at which any additional Fund Investor is admitted to the Partnership.

"**Substitute Limited Partner**" has the meaning set forth in Section 11.03.

"**Successor Fund**" has the meaning set forth in Section 4.05.

"**Tax Exempt Limited Partner**" means a Limited Partner that is exempt from United States federal income taxation, including a partner that is exempt under Section 501 of the Code.

"**Tax Matters Partner**" has the meaning set forth in Section 10.02(a).

"**Taxing Authority**" means any federal, state, local or foreign taxing authority.

"**Temporary Investments**" has the meaning set forth in <u>Section 3.02(k)</u>.

"**Transfer**" means to directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, all or a portion of an Interest or beneficial ownership thereof. "Transfer" when used as a noun shall have a correlative meaning.

"**UBTI**" means "unrelated business taxable income" within the meaning of Section 512 of the Code, determined without regard to the special rules contained in Section 512(a)(3) of the Code that are applicable solely to organizations described in paragraphs (7), (9), (17) or (20) of Section 501(c) of the Code.

"**Valuation Policy**" has the meaning set forth in <u>Article XV</u>.

"**Withdrawal Date**" has the meaning set forth in <u>Section 11.05(a)</u>.

"**Withholding Advances**" has the meaning set forth in <u>Section 8.03(b)</u>.

 **Section 1.02 Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement

9

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Exhibits and Schedules mean the Articles and Sections of, and the Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

# ARTICLE II
# GENERAL PROVISIONS

 **Section 2.01 Formation and Continuation.** The Partnership was formed as a limited partnership under the laws of the State of Delaware on March 5, 2018 by the filing of the Certificate of Limited Partnership with the Secretary of State of the State of Delaware by the General Partner, as required by the Delaware Act. The parties agree to continue the Partnership as a limited partnership pursuant to the Delaware Act. The General Partner is authorized to take all action necessary or appropriate to comply with all applicable requirements for the operation of the Partnership as partnership in the State of Delaware and in all other jurisdictions in which the Partnership may elect to conduct business.

 **Section 2.02 Name.** The name of the Partnership is BKCOIN CAPITAL LP. The General Partner is authorized to make any variations in the Partnership's name that the General Partner may deem necessary or advisable to comply with the laws of any jurisdiction in which the Partnership may elect to conduct business; *provided*, that such name as varied shall be a name permitted for a limited partnership under the Delaware Act.

 **Section 2.03 Principal Office.** The principal place of business and office of the Partnership is located at 1101 Brickell Avenue South Tower #8, Miami, Florida 33131, or such other place or places as the General Partner

Partnership in such other jurisdictions as it may from time to time determine. The General Partner shall provide notice to the Limited Partners of any change in the Partnership's principal place of business.

**Section 2.04 Registered Office; Registered Agent.**

(a) The registered office of the Partnership shall be the office of the initial registered agent named in the Certificate of Limited Partnership or such other office (which need not be a place of business of the Partnership) as the General Partner may designate from time to time in the manner provided by the Delaware Act.

(b) The registered agent for service of process on the Partnership in the State of Delaware shall be the initial registered agent named in the Certificate of Limited Partnership or such other Person or Persons as the General Partner may designate from time to time in the manner provided by the Delaware Act.

**Section 2.05 Term.** The term of the Partnership commenced on the date the Partnership's certificate of limited partnership was filed with the Secretary of State of the state of Delaware and shall continue in full force and effect through the date of dissolution and termination of the Partnership as provided in Article XII. At such time as the Partnership is terminated, the General Partner, or if a different Person, the Liquidator, shall file a Certificate of Cancellation as required by the Delaware Act.

- 10

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

**Section 2.06 Conflict between Agreement and Statute.** This Agreement shall constitute the "limited partnership agreement" (as that term is used in the Delaware Act) of the Partnership. The rights, powers, duties, obligations, and liabilities of the Partners shall be determined pursuant to the Delaware Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Partner are different by reason of any provision of this Agreement than they would be under the Delaware Act in the absence of such provision, this Agreement shall, to the extent permitted by the Delaware Act, control.

# ARTICLE III
# PURPOSE AND BUSINESS

**Section 3.01 Purpose.** The Partnership is formed for the object and purpose of and the nature of the business to be conducted by the Partnership is, engaging in any lawful act or activity for which limited partnerships may be formed under the Delaware Act and engaging in any and all activities necessary or incidental to the foregoing. The Partnership shall have the power and authority to do any and all acts necessary or convenient to or in furtherance of the Partnership's purpose, including all power and authority, statutory or otherwise, possessed by or which may be conferred on, limited partnerships under the laws of the State of Delaware.

**Section 3.02 Authorized Activities.** In carrying out the purposes of this Agreement, the Partnership and the General Partner, acting on behalf of the Partnership, shall have all powers necessary, suitable or convenient thereto, including, without limitation, the power and authority to do or cause to be done, or not to do, any and all acts deemed by the General Partner in good faith to be necessary or appropriate in furtherance of the purposes of the Partnership including, without limitation, the power and authority to:

(a) acquire, invest in, hold, pledge, manage, sell, transfer, operate, or otherwise deal in or with the Portfolio Investments;

(b) open, maintain, and close bank, brokerage, and money market accounts and draw checks and other orders for the payment of moneys;

(c) borrow money or otherwise incur Indebtedness for any Partnership purpose, enter into credit facilities,

issue evidences of Indebtedness and guarantees, and secure any such evidences of Indebtedness and guarantees by pledges or other liens on assets of the Partnership;

(d) hire consultants, advisors, custodians, attorneys, accountants, placement agents, and such other agents and employees of the Partnership, and authorize each such Person to act for and on behalf of the Partnership;

(e) enter into, perform and carry out contracts and agreements of any kind necessary, advisable or incidental to the accomplishment of the purposes of the Partnership;

(f) bring, sue, prosecute, defend, settle, or compromise actions and proceedings at law or in equity or before any Governmental Authority;

(g) have and maintain one or more offices and in connection therewith to rent or acquire office space and to engage personnel;

(h) execute, deliver, and perform all agreements in connection with the sale of Interests, including but not limited to the Subscription Agreements and any side letters with one or more Limited Partners;

11

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

(i) form one or more subsidiary corporations or partnerships or other entities;

(j) pay the fee described in 9.02;

(k) (i) make investments in (A) marketable direct obligations issued or unconditionally guaranteed by the United States, or issued by any agency thereof, maturing within one year from the date of acquisition; (B) money market instruments, commercial paper or other short-term debt obligations rated Aa or P-1 (or the equivalent thereof) or better by Moody's Investors Service Inc. or A-1 (or its equivalent) or better by Standard & Poor's Corporation; (C) certificates of deposit maturing within one year from the date of acquisition, money market accounts, savings accounts, checking accounts, or any combination thereof in banks, in each case, which have total assets of $100,000,000 or more; and (D) any other assets or Securities that the General Partner reasonably determines are appropriate for short term investments (collectively **"Temporary Investments"**) and (ii) in connection with its Portfolio Investments, enter into derivative contracts and other financial instruments for the purpose of hedging such Portfolio Investments;

(l) make any and all elections under the Code or any state or local tax law (except as otherwise provided herein), including pursuant to Sections 734(b), 743(b), and 754 of the Code, provided that the General Partner shall not cause the Partnership to make an election to be treated as other than a partnership for United States federal income tax purposes;

(m) take all actions it deems necessary or appropriate so that the assets of the Partnership do not constitute "plan assets" for purposes of ERISA and the Plan Asset Rules;

(n) maintain cash reserves for anticipated Investment Expenses, liabilities, and obligations of the Partnership, whether actual or contingent, in such amounts as the General Partner in its reasonable discretion deems necessary or advisable;

(o) issue a written Certificate of Limited Partnership to a Limited Partner upon the Fund's approval of the Limited Partner's subscription to the Fund;

(p) in the future, enter into arrangements with other investment funds managed by the General Partner with the same or substantially similar investment objectives as those of the Partnership to either allow other funds to contribute their assets to the Partnership to invest, or to pursue investment activities by investing all or a portion of the Partnership's assets in a "Master Fund";

(q) issue classes of limited partnership interests pursuant to Section 6.10 below; and

(q) carry on any other activities necessary to, in connection with, or incidental to, any of the foregoing or the Partnership's investment and other activities.

**Section 3.03 Operating Expenses.**

Except as otherwise provided, and subject to any limits in this Agreement, the Partnership will pay all Operating Expenses, and will reimburse the General Partner or any of its Affiliates, as applicable, for its payment of Operating Expenses. Notwithstanding the foregoing and except as otherwise specifically provided in this Agreement, neither the General Partner nor the Investment Manager shall be reimbursed for any costs and expenses relating to the general operation of their businesses.

# ARTICLE IV
# THE GENERAL PARTNER

12

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

**Section 4.01 Management and Authority.**

(a) Subject to the provisions of this Agreement, the General Partner shall have the absolute, exclusive and complete right, power, authority, obligation, and responsibility vested in or assumed by a general partner of a limited partnership under the Delaware Act and as otherwise provided by law, including those necessary to make all decisions regarding the business of the Partnership and to take the actions specified in Section 3.02, and is hereby vested with absolute, exclusive and complete right, power, and authority to operate, manage, and control the affairs of the Partnership and carry out the business of the Partnership.

(b) The General Partner shall have the authority to bind the Partnership to any obligation consistent with the provisions of this Agreement. Subject to, and except as otherwise provided in Section 4.02, the General Partner may contract with any Person for the transaction of the business of the Partnership, and the General Partner shall use reasonable care in the selection and retention of such Persons. The General Partner may delegate the management, operation, and control of the Partnership to the Investment Manager to the fullest extent permitted by law, provided that any such delegation shall not relieve the General Partner of its obligations to the Limited Partners under this Agreement.

(c) The General Partner may rely in good faith on and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties.

(d) The General Partner may consult with legal counsel (including Partnership Counsel), accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it with reasonable care, and shall not have any liability to the Partnership or any other Partner for any act taken or omitted to be taken in good faith reliance upon the opinion or advice of such Persons.

(e) The General Partner will use reasonable efforts to minimize the incurrence of income that is treated as UBTI for Tax Exempt Limited Partners or ECI for Non-United States Limited Partners to the extent consistent with its goal of maximizing pre-tax income. The incurrence of UBTI or ECI by the Partnership shall in no way indicate that the General Partner has failed to comply with this covenant.

**Section 4.02 Transactions with Affiliates.**

(a) Except as otherwise provided in Section 4.02(b), the General Partner shall not cause the Partnership

acquiring all or a portion of a Portfolio Investment from or selling a Portfolio Investment to the General Partner or its Affiliates) or any transaction pursuant to which the General Partner or its Affiliates will receive compensation.

(b) Notwithstanding anything to the contrary set forth in <u>Section 4.02(a)</u>, the General Partner may:

(i) cause the Partnership or its subsidiaries to enter into agreements with Affiliates of the General Partner for services relating to the Portfolio Investments, for compensation and on terms that are typically available in arm's-length transactions; *provided*, that each such agreement shall provide that it may be terminated by the Partnership without penalty upon the removal or withdrawal of the General Partner;

(ii) cause the Partnership to enter into the Investment Management Agreement as provided in <u>Section 9.01</u>;

13

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

(iii) receive the amounts described in <u>Section 9.02</u> and <u>Section 9.03</u>; and

(iv) cause the Partnership to make Portfolio Investments in accordance with the terms of this Agreement with Successor Funds, or other funds and accounts controlled by the General Partner..

**Section 4.03 Liability for Acts and Omissions.**

(a) To the fullest extent permitted by applicable law, no Covered Person shall be liable, in damages or otherwise, to the Partnership, the Limited Partners, or any of their Affiliates for any act or omission in connection with or in any way relating to the Partnership's business or affairs and matters related to Portfolio Investments (including, without limitation, any act or omission performed or omitted by such Covered Person in accordance with the provisions of this Agreement or in good faith reliance upon the opinion or advice of experts selected with reasonable care by the General Partner), except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgment or order that such act or omission resulted from in the case of any Covered Person, such Covered Person's bad faith, gross negligence, willful misconduct, fraud or a material breach of this Agreement or the Investment Management Agreement. The provisions of this Agreement, to the extent that such provisions expressly restrict or eliminate the duties (including fiduciary duties) and liabilities of a Covered Person otherwise existing at law or in equity are agreed by the Partners to replace such other duties and liabilities of such Covered Person.

(b) To the fullest extent permitted by applicable law, the Partnership shall and does hereby agree to indemnify and hold harmless each Covered Person from and against any damages, costs, losses, claims, liabilities, actions, and expenses (including reasonable legal and other professional fees and disbursements and all expenses reasonably incurred investigating, preparing, or defending against any claim whatsoever, judgment, fines, and settlements (collectively **"Indemnification Obligations"**) incurred by such Covered Person arising out of or relating to this Agreement, the Investment Management Agreement, or any entity in which the Partnership invests (including, without limitation, any act or omission as a director, officer, manager or member of an Affiliate of the Partnership), except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgment or order that such act or omission resulted from such Covered Person's bad faith, gross negligence, willful misconduct, fraud or a material breach of this Agreement or the Investment Management Agreement. The indemnity set forth herein shall not apply to an internal dispute among the Covered Persons to which the Partnership is not a party. The provisions set forth in this <u>Section 4.03(b)</u> shall survive the termination of this Agreement.

(c) No Covered Person shall be liable to the Partnership or any Limited Partner for, and the Partnership shall also indemnify and hold harmless each Covered Person from and against any and all Indemnification Obligations suffered or sustained by such Covered Person by reason of, any acts or omissions of any broker or other agent of the Partnership unless such broker or agent was selected, engaged, or retained by such Covered Person and the standard of care exercised by such Covered Person in such selection, engagement or retention constituted bad faith, gross negligence, willful misconduct, fraud, or a material breach of this Agreement or the Investment Management Agreement.

(d) The satisfaction of any indemnification pursuant to this Section 4.03 shall be from and limited to Partnership assets.

(e) Expenses reasonably incurred by a Covered Person in defense or settlement of any claim that may be subject to a right of indemnification hereunder shall be advanced by the Partnership prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of such Covered Person to repay

14

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

such amount to the extent that it is ultimately determined that such Covered Person is not entitled to be indemnified hereunder. The termination of a proceeding or claim against a Covered Person by settlement or a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that any Covered Person's conduct constituted bad faith, gross negligence, willful misconduct, fraud, or a material breach of this Agreement or the Investment Management Agreement.

(f) The right of any Covered Person to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which such Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Covered Person's heirs, successors, and assigns.

(g) Any Person entitled to indemnification from the Partnership hereunder shall initially seek recovery under any other indemnity or any insurance policies maintained the Partnership by which such Person is indemnified or covered, as the case may be, but only to the extent that the applicable indemnitor or insurer provides (or acknowledges its obligation to provide) such indemnity or coverage on a timely basis. A Covered Person other than the General Partner shall obtain the written consent of the General Partner (which shall not be unreasonably withheld) prior to entering into any compromise or settlement which would result in an obligation of the Partnership to indemnify such Person. If liabilities arise out of the conduct of the affairs of the Partnership and any other Person for which the Person entitled to indemnification from the Partnership hereunder was then acting in a similar capacity, the amount of the indemnification provided by the Partnership shall be limited to the Partnership's proportionate share thereof as determined in good faith by the General Partner.

(h) The General Partner may, but shall not be required to, cause the Partnership to purchase and maintain insurance coverage reasonably satisfactory to the General Partner that provides the Partnership with coverage with respect to losses, claims, damages, liabilities, and expenses that would otherwise be Indemnification Obligations. The fees and expenses incurred in connection with obtaining and maintaining any such insurance policy or policies, including any commissions and premiums, shall be Operating Expenses.

**Section 4.04 Key Persons.** So long as BKCOIN MANAGEMENT LLC or any of its Affiliates is the General Partner, the General Partner shall cause the Key Persons to devote the required amount of their business time and attention to the investment and other activities of the Fund. At any time and from time to time, the General Partner may replace any of the Key Persons with substitute Key Persons.

**Section 4.05 Successor Funds.** The General Partner shall itself, or via any of its Affiliates, have the right, without any prior approval of Fund Investors, to hold closings with third party investors on behalf of another pooled investment fund, for which the General Partner or its Affiliate acts as a manager or the primary source of transactions, with objectives substantially similar to those of the Partnership (a "**Successor Fund**").

respective Affiliates may engage in or possess an interest in other business ventures of every nature and description for their own account, independently or with others, whether or not such other enterprises shall be in competition with any activities of the Partnership. None of the Partnership, the Fund Investors, and the General Partner shall have any right by virtue of this Agreement in and to such independent ventures or to the income or profits derived therefrom.

**Section 4.07 Miscellaneous Revenues.** Except for any fees authorized, acknowledged or approved in accordance with this Agreement, the General Partner shall apply the Partnership's *pro rata* share of any fees paid by third parties to the General Partner or its Affiliates arising from the Partnership's Portfolio Investments or potential Portfolio Investments to offset, pay or reserve for the payment of Investment Expenses (or repay any credit facility drawdowns used to pay the same) or to offset the next installment of the Investment

15

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

Management Fee payable by the Partnership to the Investment Manager under this Agreement. If any such fees exceed such next installment of the Investment Management Fee payable by the Partnership to the Investment Manager under this Agreement, the excess shall be carried forward for offset against future installments of such Investment Management Fees. To the extent any such fees have not been set off against the Investment Management Fee payable by the Partnership to the Investment Manager under this Agreement prior to the liquidation of the Partnership, such excess fees shall be remitted to the Partnership by the General Partner immediately prior to liquidation.

**Section 4.08 Transfer or Withdrawal by the General Partner.** The General Partner shall not have the right to Transfer its Interest as the general partner of the Partnership and shall not have the right to withdraw from the Partnership, provided, that, without the consent of any Limited Partner, the General Partner may, at its own expense, (a) be reconstituted as or converted into a corporation or other form of entity (any such reconstituted or converted entity being deemed to be the General Partner for all purposes hereof) by merger, consolidation, conversion, or otherwise or (b) transfer all of its Interest as the general partner of the Partnership to one of its Affiliates so long as, in either case, such reconstitution or Transfer does not have material adverse tax or legal consequences for the Fund Investors. In the event of a Transfer of all of its Interest as a general partner of the Partnership in accordance with this Section 4.08 its transferee shall be substituted in its place as general partner of the Partnership and immediately thereafter the General Partner shall withdraw as the general partner of the Partnership and the business of the Partnership shall be continued without dissolution.

**Section 4.09 Bankruptcy or Dissolution of the General Partner.**

(a) Upon the Bankruptcy or dissolution of the General Partner, (i) the General Partner or its legal representative shall give notice to the Fund Investors of such event and shall automatically, with or without delivery of such notice, become a special Limited Partner with no power, authority, or responsibility to bind the Partnership or to make decisions concerning, or manage or control, the affairs of the Partnership, and the Partnership's certificate of limited partnership shall be amended to reflect such fact, and (ii) such Person as may be selected and approved by consent of a Majority in Interest of the Limited Partners within 90 days of the date of the Bankruptcy or dissolution of the General Partner shall be admitted to the Partnership as a successor to the General Partner (effective as of the date of the Bankruptcy or dissolution of the General Partner) and such successor shall continue the business of the Partnership without dissolution. If a successor to the General Partner is not approved to be admitted to the Partnership (effective as of the date of the Bankruptcy or dissolution of the General Partner) by consent of a Majority in Interest of the Limited Partners within such 90-day period, the Partnership shall dissolve in accordance with Article XII. The General Partner shall not take any action seeking its voluntary dissolution.

(b) In the case of a conversion of the General Partner to a special Limited Partner and continuance of the Partnership without dissolution, the Majority in Interest of the Limited Partners shall select an Expert reasonably acceptable to the special Limited Partner and such Expert shall determine the Fair Value of the General Partner's Interest as of the date of the Bankruptcy or dissolution of the General Partner, taking

into account all Net Income, Net Loss, gains, deductions, distributions and other credits and charges to which the General Partner was and would have been entitled under this Agreement if all Portfolio Investments of the Partnership were sold on the effective date of such Bankruptcy or dissolution for their Fair Value and the proceeds were distributed on such date in accordance with <u>Section 8.01</u>. Thereafter, the General Partner, in its capacity as a special Limited Partner, shall be entitled to a percentage of all future Net Income, Net Loss, gains, deductions, distributions and other credits and charges of the Partnership arising from the Portfolio Investments held as of the date of the Bankruptcy or dissolution of the General Partner equal to the quotient of (x) the Fair Value of the General Partner's Interest as of the date of the Bankruptcy or dissolution of the General Partner divided by (y) the amounts that would have been available for distribution to all Partners as of such date, in each case as determined by the Expert.

16

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

The determinations of the Expert shall be final and conclusive. The fees and expenses of the Expert retained pursuant to this <u>Section 4.9</u> shall be borne by the General Partner.

**Section 4.10 Removal of the General Partner.**

(a) The Fund Investors may, at any time upon a finding of Cause, by unanimous approval of the Fund Investors, send notice to the General Partner that the General Partner will be removed as the general partner of the Partnership pursuant to this <u>Section 4.10</u>, provided that such removal shall not become effective until a successor to the General Partner is admitted pursuant to <u>Section 4.12</u>.

(b) The Majority in Interest of the Limited Partners shall select an Expert reasonably acceptable to the removed General Partner and such Expert shall determine the Fair Value of the removed General Partner's Interest as of the effective date of the removal, taking into account all Net Income, Net Loss, gains, deductions, distributions and other credits and charges to which the General Partner was and would have been entitled under this Agreement if all Portfolio Investments of the Partnership were sold on the effective date of such removal of the General Partner for their Fair Value and the proceeds were distributed on such date in accordance with <u>Section 8.01</u>. The determinations of the Expert shall be final and conclusive. The fees and expenses of the Expert retained pursuant to this <u>Section 4.10(b)</u> shall be borne by the General Partner.

(c) Promptly upon the disclosure by the Expert of the Fair Value of the General Partner's Interest, the removed General Partner's Interest shall be converted to that of a special Limited Partner. Following such conversion, the special Limited Partner shall not be entitled to vote with the Limited Partners upon any matter that requires the consent of the Limited Partners or the Fund Investors under this Agreement or the Delaware Act.

(d) The special Limited Partner shall be entitled to a percentage of all future Net Income, Net Loss, distributions and other credits and charges of the Partnership arising from the Portfolio Investments held as of the date of removal equal to the quotient of (x) the value of the General Partner's Interest as of the date of removal divided by (y) the amounts which would be available for distribution to all Partners as of such date, in each case as determined by the Expert.

**Section 4.11 Obligations of a Former General Partner.** In the event that the General Partner withdraws from the Partnership or Transfers its Interest, in each case, in accordance with <u>Section 4.08</u> or has its Interest redeemed in accordance with <u>Section 4.09</u> or <u>4.10</u>, it shall have no further obligation or liability as a general partner to the Partnership pursuant to this Agreement in connection with any obligations or liabilities arising from and after such withdrawal, Transfer, redemption or conversion, and all such future obligations and liabilities shall automatically cease and terminate and be of no further force or effect, provided that nothing contained herein shall be deemed to relieve the General Partner of any obligations or liabilities (a) arising prior to such withdrawal, Transfer, redemption, or conversion or (b) resulting from a dissolution of the Partnership caused by an act of the General Partner where liability is imposed upon the General Partner by law or by the provisions of this Agreement, provided, further, that the General Partner shall continue to be indemnified in

### Section 4.12 Successor to the General Partner.

(a) Following the proposed withdrawal or removal of the General Partner, any Fund Investor may propose for admission a successor General Partner. If a successor General Partner proposed pursuant to this Section 4.12 satisfies the terms and conditions set forth in Section 4.12(b), then such proposed successor General Partner shall become the successor General Partner as of the date of withdrawal or removal of the General Partner and shall thereupon continue the Partnership's business.

17

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

(b) A Person shall be admitted as a successor General Partner only if the following terms and conditions are satisfied:

(i) except as permitted by Section 4.08, the admission of such Person shall have been approved by consent of a Majority in Interest of the Limited Partners;

(ii) the Person shall have accepted and agreed to be bound by all the terms and provisions of this Agreement by executing a counterpart hereof and thereof and such other documents or instruments as may be required or appropriate in order to effect the admission of such Person as a general partner of the Partnership; and

(iii) the Partnership's certificate of limited partnership shall be amended to reflect the admission of such Person as a general partner (or managing member, as applicable).

(c) If, within 90 calendar days of the date of the General Partner's withdrawal or removal, a Majority in Interest of the Limited Partners has not approved the admission of a successor General Partner, effective as of the date of the General Partner's withdrawal or removal, then the Partnership shall thereupon terminate and dissolve in accordance with Article XII.

**Section 4.13 Use of Name.** Promptly after the date the General Partner withdraws or is removed, the name of the Partnership will be changed to omit reference to "BKCOIN" and no further use of "BKCOIN" or any derivations thereof, including the appropriate trademark and service mark symbol will be permitted by the Partnership, the successor General Partner or any other Person in relation to the activities of the Partnership. The Partnership and each direct or indirect subsidiary shall file amendments to their certificates of limited partnership or other similar documents, take all further action necessary to remove the word "BKCOIN" from each such entity's name.

# ARTICLE V
# LIMITED PARTNERS

**Section 5.01 No Participation in Management of the Partnership.** No Limited Partner shall participate in the management or control of the business and affairs of the Partnership or have any authority or right to act on behalf of the Partnership in connection with any matter or the transaction of any business. No Limited Partner shall have any rights and powers with respect to the Partnership, except as provided in the Delaware Act or by this Agreement. The exercise of any of the rights and powers of the Limited Partners pursuant to the Delaware Act or the terms of this Agreement shall not be deemed taking part in the day-to-day affairs of the Partnership or the exercise of control over the business and affairs of the Partnership.

**Section 5.02 Limitation on Liability.** No Limited Partner shall have any obligation to contribute any amounts to the Partnership other than the Capital Contribution(s) it has already made to the Fund, and as

otherwise provided in this Agreement and the Delaware Act, and the liability of each Limited Partner shall be limited to such amounts. No Limited Partner shall be obligated to repay to the Partnership, any Partner or any creditor of the Partnership all or any portion of the amounts distributed to such Limited Partner.

**Section 5.03 Power of Attorney.**

(a) Each Limited Partner hereby irrevocably constitutes and appoints the General Partner, with full power of substitution, as its true and lawful attorney-in-fact (which appointment shall be deemed to be coupled with an interest) and agent, to execute, acknowledge, verify, swear to, deliver, record and file, in its or its

18

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

assignee's name, place and stead, all in accordance with the terms of this Agreement:

(i) all certificates and other instruments, and amendments thereto, which the General Partner deems necessary or desirable to form, qualify or continue the Partnership as a limited partnership (or a partnership in which the Limited Partners have limited liability) in all jurisdictions in which the Partnership conducts or plans to conduct its affairs;

(ii) any agreement or instrument which the General Partner deems necessary or desirable to effect (a) the complete or partial Transfer, addition, substitution, withdrawal or removal (voluntary or involuntary) of any Limited Partner or the General Partner pursuant to this Agreement; (b) the dissolution and liquidation of the Partnership in accordance with the provisions of Article XII or (c) any amendment or modification to this Agreement adopted in accordance with Section 16.01;

(iii) all conveyances and other instruments which the General Partner deems necessary or desirable to reflect the dissolution and termination of the Partnership pursuant to Article XII, including the requirements of the Delaware Act;

(iv) certificates of assumed name or fictitious name certificates and such other certificates and instruments as may be necessary under the fictitious or assumed name statutes from time to time in effect in all jurisdictions in which the Partnership conducts or plans to conduct its affairs;

(v) all certificates or other instruments necessary or desirable to accomplish the business, purposes and objectives of the Partnership or required by any applicable law; and

(vi) all other documents or instruments that may reasonably be considered necessary by the General Partner to carry out the foregoing.

(b) Such attorney-in-fact and agent shall not, however, have the right, power, or authority to amend or modify this Agreement when acting in such capacities, except to the extent expressly authorized herein. Each Limited Partner hereby agrees not to revoke this power of attorney. This power of attorney shall terminate upon (i) with respect to such Limited Partner, a Transfer of the Limited Partner's entire Interest in accordance with the terms of this Agreement, and (ii) the removal, Bankruptcy, dissolution, or withdrawal of the General Partner, except that such power of attorney shall remain in effect with respect to any successor General Partner. The power of attorney granted herein shall be irrevocable, shall survive and not be affected by the death, incapacity, dissolution, Bankruptcy or legal disability of the Limited Partner, shall extend to its successors and assigns and may be exercisable by the General Partner by executing any instrument on behalf of the Limited Partner as its attorney-in-fact. To the fullest extent permitted by applicable law, this power of attorney may be exercised by such attorney-in-fact and agent for all Limited Partners (or any of them) by a single signature of the General Partner acting as attorney-in-fact with or without listing all of the Limited Partners executing an instrument. Any Person dealing with the Partnership may conclusively presume and rely upon the fact that any instrument referred to above, executed by the General Partner as attorney-in-fact, is authorized, regular and binding, without further inquiry. If required, each Limited Partner shall execute and deliver to the General Partner, within five (5) Business Days after receipt of a request from the General Partner, such further designations,

powers of attorney or other instruments as the General Partner shall determine to be necessary for the purposes hereof consistent with the provisions of this Agreement, including as required by any applicable state statute or other similar legal requirement.

# ARTICLE VI
# INTERESTS; CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS
19

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

**Section 6.01 General Partner.**

(a) The name and address of the General Partner is BKCOIN MANAGEMENT LLC, a Delaware limited liability company, having an address at 1101 Brickell Avenue South Tower #8, Miami, Florida 33131.

(b) The General Partner may participate in and make Capital Contributions to the Fund, in its sole discretion. There shall be no obligation to make any minimum investment into the Fund on the part of the General Partner.

(c) The General Partner shall also be a Limited Partner to the extent that it subscribes for or becomes a transferee of all or any part of the Interest of a Limited Partner, and to such extent shall be treated as a Limited Partner in all respects, except as otherwise provided in this Agreement.

**Section 6.02 Limited Partners.** Except as provided in Article XI, a Person shall be admitted as a Limited Partner as of the time of the execution of the Limited Partner's subscription agreement and this Agreement, or when the General Partner holds a Closing with respect to such Person, if applicable. In the discretion of the General Partner, subscriptions to the Partnership may be made in cash or in kind, or partly in cash and partly in kind. Generally such closing shall take place as of the first day of a given month unless otherwise agreed to by the General Partner in its sole discretion. The General Partner shall maintain a record of the name, address, and Capital Contributions of each Limited Partner.

**Section 6.03 Lock Up Period; Redemption of Capital Contributions.** For six (6) months following the date of admission to the Partnership, the Limited Partner shall not be allowed to withdraw or reduce its Capital Contribution made as part of that Closing or any portion of the value of its Capital Account, as adjusted pursuant to Section 6.04 below, from the Fund ("Lock-Up Period"). Following the expiration of the Lock-Up Period, a Limited Partner may redeem any portion of the value of its Capital Account, but only quarterly, either on January 1, April 1, July 1, or October 1 of each year (the "Redemption Dates"). In order for the Limited Partner to be able to exercise this right of redemption, the Limited Partner must provide notice to the General Partner, at least thirty (30) days prior to a Redemption Date that the Limited Partner intends to exercise this right of redemption with regards to that Redemption Date. The notice must also specify what portion of the value of the Limited Partners' Capital Account it intends to redeem. After the notice has been duly received by the General Partner, the Limited Partner shall not be entitled redeem a greater amount on the given Redemption Date than the amount stated in the notice. Withdrawal requests are irrevocable unless the General Partner determines otherwise in its sole and absolute discretion, or unless made during a period when the calculation of the Net Asset Value of the Partnership is suspended. The General Partner may waive notice requirements or permit withdrawals at such other times and under such other circumstances and on such conditions as it deems appropriate.

**Section 6.04 Maintenance of Capital Accounts.** The Partnership shall establish and maintain, for each Partner, a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 6.04. Each Capital Account shall be established and maintained in accordance with the following provisions:

(a) Each Partner's Capital Account shall be increased by:

(i) the cash amount of all Capital Contributions made by such Partner to the Partnership;

(ii) the amount of any Net Income or other item of income or gain allocated to such Partner pursuant to Article VII; and

20

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

(iii) any liabilities of the Partnership that are assumed by such Partner or secured by any property distributed to such Partner.

(b) Each Partner's Capital Account shall be decreased by:

(i) the cash amount or Book Value of any property distributed to such Partner;

(ii) the amount of any Net Loss or other item of loss or deduction allocated to such Partner pursuant to Article VII; and

(iii) the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership.

**Section 6.05 Interest.** Interest, if any, earned on Partnership funds shall inure to the benefit of the Partnership. The Partners shall not receive interest on their Capital Contributions or Capital Account balances. The General Partner shall have no obligation to keep Partnership funds in an interest-bearing account.

**Section 6.06 Withdrawal of Capital Contributions.** Subject to the General Partner's ability to designate Side Pockets (*as defined below*), provided that the Limited Partner follows all of the requirements of Section 6.03 for the withdrawal of all or a portion of the value of that Limited Partner's Capital Account balance, the General Partner shall remit to the Limited Partner the requested value of its Capital Account, as adjusted pursuant to Section 6.04 and other terms herein (including Section 6.07 below), on the Redemption Date. Except as otherwise provided in this Agreement or by law, no Partner shall have the right to demand and receive property other than property distributed by the Partnership in accordance with the terms hereof in return for its Capital Contributions, and any return of Capital Contributions to the Limited Partners shall be solely from Partnership assets, and the General Partner shall not be personally liable for any such return. Notwithstanding the foregoing, the General Partner shall have the right, at its discretion, to withhold up to 5% of the net asset value of the withdrawn Capital Account for the Partnership's liabilities and other contingencies until no later than 30 days after the completion of the year-end review of the Partnership's financial statements for any withdrawals of 90% or more of a Limited Partner's Capital Account balance (or if a withdrawal, when combined with all other withdrawals of such Limited Partner during the preceding 12 months, would result in such Limited Partner having withdrawn 90% or more of such Limited Partner's Capital Account as of the beginning of such period). In those circumstances, the General Partner will remit the balance of the withdrawal proceeds without interest. The General Partner, in its sole discretion, may effect withdrawal payments in cash or in-kind.

**Section 6.07 Costs and Reserves.** The Partnership, at any time in its discretion and in consultation with the General Partner, may establish reserves for contingencies (including general reserves for unspecified contingencies) which may or may not be in accordance with GAAP. The establishment of such reserves will not insulate any portion of the Partnership's assets from being at risk, and such assets may still be traded by the Partnership. A pro rata portion of any reserve may be withheld from distribution to a withdrawing Limited Partner.

**Section 6.08 Succession Upon Transfer.** In the event that an Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that

it relates to the transferred Interest and shall receive allocations and distributions pursuant to Article VII and Article VIII in respect of such Interest.

**Section 6.09 Restoration of Negative Capital Accounts.** Subject to 5.02, neither the General Partner nor any other Partner shall be obligated to restore any deficit balance in a Partner's Capital Account. A deficit in a Partner's Capital Account shall not constitute a Partnership asset.

21

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

**Section 6.10 Admission of Limited Partners After Initial Closing.** The Limited Partners agree that the General Partner shall have the right to admit additional Limited Partners to the Partnership in one or more Subsequent Closings. The Limited Partners hereby consent to such admission of any additional Limited Partners and agree to take all actions reasonably requested by the General Partner to give effect to the foregoing. The General Partner may admit new Limited Partners to the Fund on the first business day of each month, or other times in its sole discretion. Persons interested in subscribing to the Fund should deliver the Subscription Agreement in substantially the form set forth at Exhibit A at least five (5) days before the intended subscription date.

**Section 6.10 Additional Classes of Interests.** Notwithstanding anything in this Agreement to the contrary, the General Partner, on its own behalf, or on behalf of the Partnership, is specifically authorized without further consent by anyone to issue additional classes of Limited Partnership Interests which may differ in terms of, among other things, denomination of currency, the fees charged, minimum commitment amounts, withdrawal rights and other rights. Such additional class of Limited Partnership Interests shall be issued pursuant to a Separate Class Agreement. The terms of such classes will be determined by the General Partner in its sole discretion. Should a Limited Partner not be eligible to participate in "New Issues" pursuant to the relevant FINRA rules, then the General Partner, when issuing a class of Limited Partnership Interests pursuant to this Section 6.10, may designate the class additionally as "Restricted".

**Section 6.11 Side Pockets.** The General Partner may designate certain assets, including investments in pre ICOs, as "Side Pockets" when the General Partner, in its sole discretion, determines that an asset is illiquid or it is in the best interest of the Partnership to value such investment separately from the Partnership's other assets. If the General Partner designates an asset as a Side Pocket, the Partners of the Partnership at the time of such designation will have a proportionate interest in that investment. The General Partner shall not receive a Performance Allocation with respect to any Side Pocket until the investment is liquidated, and the Limited Partners may not make a withdrawal with respect to a Side Pocket until that event. Side Pockets will be included in the calculation of the Management Fee. Notwithstanding the foregoing, the Partnership's financial statements will reflect the Performance Allocation as if it was earned, treating all assets and liabilities as if they were realized at the reporting date.

# ARTICLE VII
# ALLOCATIONS

**Section 7.01 Allocations of Net Income and Net Loss and Special Allocations.**

(a) **Net Income and Net Loss.** Except as otherwise provided in this Agreement, for each Fiscal Year (or portion thereof, and at a minimum at the end of each quarter), Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Partnership shall be allocated among the Partners in a manner such that, after giving effect to the special allocations set forth in Sections 7.02(c) and (d), the Capital Account balance of each Partner, immediately after making such allocations, is, as nearly as possible, equal to (i) the Distributions that would be made to such Partner pursuant to Sections 8.01 and 12.02(c)(iii) if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Partnership liabilities were

satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), and the net assets of the Partnership were Distributed, in accordance with Sections 8.01 and 12.02(c)(iii), to the Partners immediately after making such allocations, minus (ii) such Partner's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets. Notwithstanding the foregoing, the General Partner may make such allocations as it deems reasonably necessary to give economic effect

22

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

to the provisions of this Agreement taking into account such facts and circumstances as the General Partner deems reasonably necessary for this purpose. Along these lines, for the purposes of this Article VII, and notwithstanding anything in this Article VII to the contrary, allocation of net income and net loss, as referenced in Sections 6.04(a)(ii) and 6.04(b)(ii) above respectively, may be made in accordance with Article XV below, and shall equal the pro rata increase or decrease in the Fund's Net Asset Value over the relevant time period, and shall be credited or debited, as the case may be, pro rata to the Capital Accounts of all Fund Investors. Once the General Partner uses this method of allocation, the General Partner shall apply this method consistently across all Partners.

(b) **Investment Management Fees.** For each Fiscal Year or portion thereof, deductions of the Partnership related to the Investment Management Fee shall be allocated to the Limited Partners in proportion to their respective shares of such fees.

(c) **Withholding and Income Taxes.** Any withholding or income taxes imposed by any non-United States jurisdiction ("**Foreign Taxes**") (and related tax credits) on items of income, gain, loss, or deduction of the Partnership or incurred directly or indirectly by the Partnership with respect to any investment shall be allocated to each Partner in accordance with each such Partner's respective share of the Capital Account balances attributable to the investment giving rise to income or gains subject to Foreign Taxes. Notwithstanding the foregoing, any increase or decrease in such Foreign Taxes (and related tax credits) resulting from the identity, nationality, residence or status of a Partner, or from the failure of a Partner or its direct or indirect members to provide information as requested pursuant to Section 8.03(a), will be specially allocated to such Partner.

**Section 7.02 Regulatory Allocations.** Notwithstanding the provisions of Section 7.01:

(a) **Minimum Gain Chargeback.** If there is a net decrease in Partnership Minimum Gain (determined according to Treasury Regulation Section 1.704-2(d)(1)) during any Fiscal Year, each Partner shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Treasury Regulation Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 7.02(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(b) **Partner Minimum Gain Chargeback.** If there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Partner with a share of such Partner Nonrecourse Debt Minimum Gain (determined according to Treasury Regulation Section 1.704-2(i)(5)) shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain. The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(i)(4) and 1.704-2(j). This Section 7.02(b) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) **Nonrecourse Deductions.** Nonrecourse Deductions for any Fiscal Year shall be allocated to the Partners in accordance with their respective Percentage Interests.

(d) **Partner Nonrecourse Deductions.** Partner Nonrecourse Deductions for any Fiscal Year shall be allocated to the Partner or Partners that bear the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in the manner required by Treasury Regulation Section 1.704-2(i).

23

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

(e) **Qualified Income Offset.** In the event any Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Partner in an amount and manner sufficient to eliminate  the deficit balance in its Capital Account created by such adjustments, allocations, or distributions as  quickly as possible. This Section 7.02(e) is intended to comply with the qualified income offset  requirement in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently  therewith.

(f) **New Issues.** Notwithstanding anything else in this Agreement, the Partnership may specially allocate all or a portion of any item of income, gain, loss and expense arising out of or related to any particular type or types of transaction or asset (including, for example, securities that constitute "new issues" under rules of the Financial Industry Regulatory Authority ("FINRA")) so as to exclude from some or all of those allocations one or more Partners as to whom the General Partner determines that, for reasons agreed or deemed to have been agreed upon between the General Partner and those Partners (including tax or regulatory reasons or reasons based on rules of self-regulatory organizations such as FINRA), it would be inappropriate for those items to be allocated to those Partners to the full extent they would otherwise be allocated to them. In regard to New Issues, the General Partner is authorized to determine, among other things: (i) the manner in which New Issues are purchased, held, transferred and sold by the Partnership and any adjustments with respect thereto; (ii) the Partners who are eligible and ineligible to participate in New Issues; (iii) the method by which profits and losses from New Issues are to be allocated among Partners in a manner that is permitted under the rules of FINRA (including whether the Partnership will avail itself of the "de minimis" exemption or any other exemption); and (iv) the time at which New Issues are no longer considered as such under the rules of FINRA. The General Partner may take such steps as it considers appropriate to effect the special allocations contemplated in this Section 6.02(e).

**Section 7.03 Tax Allocations.**

(a) Subject to Section 7.03(b), Section 7.03(c) and Section 7.03(d), all income, gains, losses, and deductions of the Partnership shall be allocated, for federal, state, and local income tax purposes, among the Partners in accordance with the allocation of such income, gains, losses, and deductions among the Partners for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other applicable law, the Partnership's subsequent income, gains, losses, and deductions shall be allocated among the Partners for tax purposes, to the extent permitted by the Code and other applicable law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b) Items of Partnership taxable income, gain, loss, and deduction with respect to any property  contributed to the capital of the Partnership shall be allocated among the Partners in accordance with  Section 704(c) of the Code and any reasonable method selected by the General Partner, so as to take  account of any variation between the adjusted basis of such property to the Partnership for federal income  tax purposes and its Book Value.

(c) If the Book Value of any Partnership asset is adjusted pursuant to Treasury Regulation Section 1.704- 1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items  of taxable income, gain, loss, and deduction with respect to such asset shall take account of any variation  between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same  manner as under Section 704(c) of the Code.

(d) Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Partners according to their interests in such items as determined by the General Partner taking into account

24

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e) Allocations pursuant to this Section 7.03 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 7.04 Allocations to Transferred Interests.** In the event an Interest is assigned during a Fiscal Year in compliance with the provisions of Article XI, Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Partnership attributable to such Interest for such Fiscal Year shall be determined using the interim closing of the books method.

# ARTICLE VIII
# DISTRIBUTIONS

**Section 8.01 Distributions.** Subject to Sections 8.03, 8.05, 4.11, the Partnership may make distributions of Distributable Cash to the extent constituting proceeds from Dispositions, or income, dividends, distributions, or interest from a Portfolio Investment, within a reasonable period of time following the end of the fiscal year in which such amounts are received, and (ii) income from Temporary Investments, within a reasonable period of time following the end of the fiscal year in which such amounts are received, or more frequently in the sole discretion of the General Partner, in each case in the order of priority set forth below. Notwithstanding any other provision of this Agreement, distributions shall be made only to the extent of Available Assets and in compliance with the Delaware Act and other applicable law. Distributable Cash shall initially be notionally apportioned among the Partners (including the General Partner in its capacity as a Partner, and the amount so apportioned to the General Partner shall be distributed to the General Partner) in proportion to their relative Capital Contributions. The amount apportioned to each Limited Partner shall be distributed as follows:

(a) **Return of Capital:** First, 100% to such Limited Partner until distributions to such Limited Partner of Distributable Cash on a cumulative basis pursuant to this clause equal such Limited Partner's Capital Contributions; and

(b) **80/20 Split:** Any balance, (i) 80% to such Limited Partner and (ii) 20% to the General Partner.

**Section 8.02 Tax Distributions.** Notwithstanding any provision in Section 8.01 to the contrary, the General Partner may receive a cash advance against distributions to be paid pursuant to Section 8.01(b) to the extent that cumulative distributions actually received by the General Partner pursuant to Section 8.01(b) are not sufficient for the General Partner or any of its direct or indirect members to pay when due (including estimated income tax) the cumulative amount of taxes imposed on it (excluding penalties) resulting from allocations of income and gain from the Partnership to the General Partner in respect of Carried Interest Distributions, calculated using the Assumed Tax Rate. Future distributions otherwise to be made to the General Partner pursuant to Section 8.01(b) shall be reduced by the amount of any prior advances made to the General Partner pursuant to this Section 8.02. If such distributions are not sufficient to offset distributions made pursuant to this Section 8.02, the proceeds of liquidation otherwise payable to the General Partner shall be so reduced. To the extent an amount otherwise distributable to the General Partner is not actually distributed to take into account previous distributions under this Section 8.02, the amount shall be treated for all purposes under this Agreement as if it had actually been distributed.

**Section 8.03 Withholding and Income Taxes.**

(a) **Tax Withholding Information.** Each Partner agrees to:

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

(i) provide any information, certification, representation, form, or other document reasonably requested by and acceptable to the General Partner for the purpose of (A) obtaining any exemption, reduction, or refund of any withholding or other taxes imposed by any Taxing Authority or other governmental agency (including withholding taxes imposed pursuant to Sections 1471-1474 of the Code and the Treasury Regulations thereunder) or (B) to satisfy reporting or other obligations under the Code and the Treasury Regulations thereunder;

(ii) update or replace such information, certification, representation, form, or other document in accordance with its terms or subsequent amendments; and

(iii) otherwise comply with any reporting obligations or information disclosure requirements imposed by the United States or any other jurisdiction and any reporting obligations that may be imposed by future legislation.

If a Limited Partner fails or is unable to deliver to the General Partner such information, certification, representation, form, or other document described in Section 8.03(a)(i), the General Partner shall have full authority on behalf of the Partnership to withhold any taxes required to be withheld pursuant to any applicable laws, regulations, rules, or agreements

(b) **Withholding Advances.** The Partnership is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Partner in amounts required to discharge any obligation of the Partnership (pursuant to the Code or any provision of United States federal, state or local or non United States tax law or otherwise) to withhold or make payments to any Taxing Authority with respect to any distribution or allocation by the Partnership of income or gain to such Partner and to withhold the same from distributions to such Partner (including payments made pursuant to Section 6225 of the Code and allocable to a Partner as determined by the Partnership Representative in its sole discretion). Any funds withheld from a distribution by reason of this Section 8.03(b) shall nonetheless be deemed distributed to the Partner in question for all purposes under this Agreement and, at the option of the General Partner, shall be charged against the Partner's Capital Account.

(c) **Repayment of Withholding Advances.** Any Withholding Advance made by the Partnership to a Taxing Authority on behalf of a Partner and not simultaneously withheld from a distribution to that Partner shall, with interest thereon accruing from the date of payment at a rate equal to the Prime Rate plus 2%:

(i) be promptly repaid to the Partnership by the Partner on whose behalf the Withholding Advance was made (which repayment by the Partner shall not constitute a Capital Contribution, but shall credit the Partner's Capital Account if the General Partner shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii) with the consent of the General Partner, be repaid by reducing the amount of the next succeeding distribution or distributions to be made to such Partner (which reduction amount shall be deemed to have been distributed to the Partner, but which shall not further reduce the Partner's Capital Account if the General Partner shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Partner on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d) **Indemnification.** Each Partner hereby agrees to indemnify and hold harmless the Partnership and

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

the other Partners from and against any liability with respect to taxes, interest, or penalties, which may be asserted by reason of the Partnership's failure to deduct and withhold tax on amounts distributable or allocable to such Partner. The provisions of this <u>Section 8.03(d)</u> and the obligations of a Partner pursuant to <u>Section 8.03(c)</u>shall survive the termination, dissolution, liquidation, and winding up of the Partnership and the withdrawal of such Partner from the Partnership or transfer of its Interest. The Partnership may pursue and enforce all rights and remedies it may have against each Partner under this <u>Section 8.03</u>, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e) **Overwithholding.** Neither the Partnership nor the General Partner shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Partner. In the event of an overwithholding, a Partner's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

(f) **Calculation of Net Available Investment Cash Flow Before Income and Withholding Taxes.** The amount of any Distributable Cash treated as distributed to the Partners pursuant to <u>Section 8.01</u> shall include the amount of any withholding or income taxes imposed by any jurisdiction directly or indirectly on the Partnership with respect to any Portfolio Investment.

**Section 8.04 Form of Distributions.** Distributions of Distributable Cash made prior to the dissolution and liquidation of the Fund may only take the form of cash or Marketable Securities. Upon liquidation and termination of the Fund, the Fund may distribute non-Marketable Securities or other assets, in the sole discretion of the General Partner (or Liquidator, if different). In the event that the General Partner (or Liquidator, if different) intends to make a distribution of assets in kind, the General Partner (or Liquidator, if different) shall deliver a notice to the Limited Partners not less than 15 Business Days prior to making such distribution. The General Partner may cause certificates evidencing any Securities to be distributed to be imprinted with legends as to such restrictions on transfer that it may in its sole discretion deem necessary or appropriate, including legends as to applicable federal or state securities laws or other legal or contractual restrictions, and may require any Partner to which Securities are to be distributed to agree in writing (a) that such Securities will not be transferred except in compliance with such restrictions and (b) to such other matters as the General Partner may deem necessary or appropriate. The General Partner (or Liquidator, if different) will not make any distribution of Marketable Securities, non-Marketable Securities, or other assets to any Limited Partner if, not more than five Business Days after it discloses the intended distribution, the General Partner (or Liquidator, if different) has received notice from such Limited Partner not to do so. In the event of any such notification, the General Partner (or Liquidator, if different) will, subject to applicable legal restrictions, retain such Marketable Securities, non-Marketable Securities, or other assets and use reasonable commercial efforts to sell on behalf of and at the direction of such Limited Partner any Marketable Securities, non-Marketable Securities or other assets that would otherwise have been distributed to such Limited Partner and shall distribute to such Limited Partner the proceeds of such sale, net of the expenses related thereto. Notwithstanding the foregoing, any retained Marketable Securities, non-Marketable Securities, or other assets shall be deemed for all purposes to have been distributed to such Limited Partner at their Fair Value regardless of ultimate sales proceeds. Distributions of assets in kind shall be allocated in accordance with <u>Section 8.01</u> as if such assets (valued at their Fair Value) were Distributable Cash.

# ARTICLE IX
# THE INVESTMENT MANAGER

**Section 9.01 Investment Management Agreement.** The Fund has entered into an agreement with the Investment Manager (as amended, supplemented or otherwise modified from time to time in accordance with

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

the provisions thereof and of this Agreement and a form of which is attached hereto as Exhibit B, the "**Investment Management Agreement**"), pursuant to which the Investment Manager will provide investment management services to the Partnership and be paid the Investment Management Fee as described in Section 9.02.

**Section 9.02 Investment Management Fees.** The Investment Manager or an Affiliate thereof shall be paid a quarterly investment management fee (the "**Investment Management Fee**") by the Partnership, subject to reduction as set forth in Sections 4.07, quarterly, with accrual commencing on the date the Investment Management Agreement has been entered into (the "**Investment Management Fee Commencement Date**") and paid quarterly on the last Business Day of each quarter. Any payment of the Investment Management Fee in respect of a period less than quarterly shall be prorated based on the actual number of days in such period. Each installment of the Investment Management Fee shall be due and payable based on an annual amount equal to 2% ("Annual Rate"), with the Investment Manager being paid a quarterly fee equal to 1/4 of the Annual Rate or 0.5% multiplied by each Limited Partner's Capital Account balance (prior to any accrual of the Performance Allocation), determined as of the last day of each calendar quarter and due and payable that same day. Any payment by the Fund of the Investment Management Fee with respect to a Partner will be debited from the Partner's Capital Account as of the end of the quarter in which the fee is paid, and no portion of the Investment Management fee shall be refundable if all or a portion of the Limited Partner's Capital Account balance is withdrawn during a given quarter.

**Section 9.03 Performance Allocation.** The Investment Manager or an Affiliate thereof, in addition to the Investment Management Fee set forth in Section 9.02 above, shall be entitled to receive a performance allocation by the Fund based on its investment performance. At the end of each fiscal quarter, 20% of the net profits (if any) allocated to each Capital Account of each eligible Limited Partner will be reallocated to the Capital Account of the General Partner (the "**Performance Allocation**"). In the event that the Limited Partner withdraws any portion of its Capital Account balance on a day other than on the last business day of a fiscal quarter, the Performance Allocation for that Limited Partner will be determined with respect to the withdrawn amount as of the withdrawal date. The General Partner shall be entitled to take all steps necessary to reduce the taxation to the General Partner with regards to this Performance Allocation amount, including but not limited to, structuring the allocation as a profits interest, and this Agreement may be amended by the General Partner to reflect such structuring without any additional prior approval of any Limited Partners pursuant to Article XVI below. Further, in each case, the Performance Allocation shall be subject to the High Water Mark set forth in Section 9.04 below.

**Section 9.04 High Water Mark .** The Fund will maintain a memorandum loss recovery account for each Capital Account (a "**Loss Recovery Account**"). Each Loss Recovery Account will be debited at the end of each fiscal year with the net losses of the Partnership (if any) allocable to the related Capital Account for that fiscal year, provided such net loss results in the Partner's Capital Account balance falling below the amount of that Partner's Capital Contributions. The General Partner will not receive a Profits Allocation attributable to a Capital Account until the Limited Partner has recovered the net losses, if any, debited from the Loss Recovery Account by the application of the net profits of the Partnership allocable to the Capital Account (as adjusted for any withdrawals of the Limited Partner's Capital Account balance attributable to the Capital Account).

# ARTICLE X
# ACCOUNTING AND REPORTS

**Section 10.01 Books and Records.**

(a) The General Partner shall maintain at the office of the Partnership full and accurate books of the

28

Partnership and separate and apart from the books of the General Partner and its Affiliates, including a list of the names, addresses and interests of all Limited Partners and all other books, records and information required by the Delaware Act. The Partnership's books and records shall be maintained in U.S. dollars and in accordance with U.S. generally accepted accounting principles. The General Partner may cause the Partnership to retain any other nationally recognized accounting firm as its independent certified public accounting firm as it may from time to time determine and shall provide notice of such retention to the Limited Partners.

(b) Subject to Section 17.14, each Limited Partner shall be allowed full and complete access to review all records and books of account of the Partnership for a purpose reasonably related to such Limited Partner's Interest as a limited partner at the offices of the General Partner (or such other location designated by the General Partner in its sole discretion) during regular business hours, at its expense and upon ten (10) Business Days' notice to the General Partner. The General Partner shall retain all records and books relating to the Partnership for a period of at least five (5) years after the termination of the Partnership. Each Limited Partner agrees that (i) such books and records contain confidential information relating to the Partnership and its affairs that is subject to Section 17.14, and (ii) the General Partner shall have the right, except as prohibited by the Delaware Act, to prohibit or otherwise limit in its reasonable discretion the making of any copies of such books and records.

**Section 10.02 Tax Matters Partner; Partnership Representative.**

(a) **Designation.** The General Partner shall be designated as the "tax matters partner" (as defined in Section 6231 of the Code prior to its amendment by the BBA (the "Tax Matters Partner") and, for tax years beginning on or after January 1, 2018, the "partnership representative" (the "Partnership Representative") as provided in Section 6223(a) of the Code (or under any applicable state or local law providing for an analogous capacity). Any expenses incurred by the Tax Matters Partner or Partnership Representative in carrying out its responsibilities and duties under this Agreement shall be an Operating Expense of the Partnership for which the Tax Matters Partner or Partnership Representative shall be reimbursed.

(b) **Tax Examinations and Audits** The Tax Matters Partner and Partnership Representative is authorized and required to represent the Partnership in connection with all examinations of the affairs of the Partnership by any Taxing Authority, including any resulting administrative and judicial proceedings, and to expend funds of the Partnership for professional services and costs associated therewith. Each Partner agrees that any action taken by the Tax Matters Partner or Partnership Representative in connection with audits of the Partnership shall be binding upon such Partners and that such Partner shall not independently act with respect to tax audits or tax litigation affecting the Partnership. The Tax Matters Partner and Partnership Representative shall have sole discretion to determine whether the Partnership (either on its own behalf or on behalf of the Partners) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority. Each Partner agrees to cooperate with the Tax Matters Partner and Partnership Representative and to do or refrain from doing any or all things reasonably requested by the Tax Matters Partner or Partnership Representative with respect to the conduct of examinations by Taxing Authorities and any resulting proceedings; *provided*, that a Partner shall not be required to file an amended federal income tax return, as described in Section 6225(c)(2)(A) of the Code, or pay any tax due and provide information to the Service as described in Section 6225(c)(2)(B) of the Code.

(c) **BBA Elections and Procedures.** Except as otherwise set forth herein, in the event of an audit of the Partnership that is subject to the partnership audit procedures enacted under Section 1101 of the BBA (the "BBA Procedures") or any analogous provision of state or local law, the Partnership Representative, in

29

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

its sole discretion, shall have the right to make any and all elections and to take any actions that are

available to be made or taken by the Partnership Representative or the Partnership under the BBA Procedures (or analogous provisions of state or local law). To the extent that the Partnership Representative does not make an election under Section 6221(b) of the Code, the Partnership Representative shall use commercially reasonable efforts to reduce to the extent possible the amount of tax owed by the Partnership pursuant to an audit under the BBA Procedures (or analogous state or local partnership audit procedures) by either (i) making any modifications available under Section 6225(c)(3), (4), and (5) of the Code (or analogous provisions of state or local law) or (ii) making a timely election under Section 6226 of the Code (or an analogous provision of state or local law). If an election under Section 6226(a) of the Code is made, the Partnership shall furnish to each Partner for the year under audit a statement of the Partner's share of any adjustment set forth in the notice of final partnership adjustment, and each Partner shall take such adjustment into account as required under Section 6226(b) of the Code.

(d) **Tax Returns and Tax Deficiencies.** Each Partner agrees that such Partner shall not treat any Partnership item inconsistently on such Partner's federal, state, foreign or other income tax return with the treatment of the item on the Partnership's return. Any deficiency for taxes imposed on any Partner (including penalties, additions to tax or interest imposed with respect to such taxes and any tax deficiency imposed pursuant to Section 6226 of the Code) will be paid by such Partner and if required to be paid (and actually paid) by the Partnership, will be recoverable from such Partner as provided in <u>Section 8.03(d).</u>

(e) **Tax Returns** The General Partner shall cause to be prepared and timely filed all US and non-US tax returns required to be filed by or for the Partnership.

### Section 10.03 Reports to Partners.

The Fund will provide to each Limited Partner balance reports through its online portal, which balance reports shall be posted at least quarterly. These balance reports shall show the balance of the Partners' account as well as an overview of the Fund's investments and strategy. In addition, at the end of each Fiscal Year, the Fund will provide each Limited Partner with unaudited financial statements. To the extent that the Partner has made Capital Contributions totaling greater or equal to $500,000, that Partner may request that the Fund provide an audited financial statement at the end of a Fiscal Year in lieu of the unaudited statement.

## ARTICLE XI
## TRANSFER OF LIMITED PARTNERSHIP INTERESTS

**Section 11.01 Transfers.** A Limited Partner may not Transfer its Interest in the Partnership or any part thereof except as permitted in this <u>Article XI</u>. Any Transfer in violation of this <u>Article XI</u> shall be null and void and of no force or effect.

### Section 11.02 Transfer by Limited Partners

(a) A Limited Partner may Transfer all or a portion of its Interest in the Partnership only if the General Partner consents in writing to the Transfer, which consent it may grant or withhold in its sole discretion, and all of the following conditions are satisfied (provided that the transferring Limited Partner shall continue to be subject to the provisions of <u>Section 8.03</u> and <u>Section 17.14</u>);

(i) the transferring Limited Partner and proposed transferee file a notice, signed and certified by the transferring Limited Partner, with the General Partner at least thirty (30) Business Days in advance of the proposed Transfer which contains (A) the terms and conditions of and the circumstances under

30

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

which the proposed Transfer is to be made, (B) a description of the Interests to be transferred, and (C) all other information reasonably requested by the General Partner;

(ii) the Transfer does not cause the Partnership to be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code and the regulations promulgated thereunder;

(iii) all costs and expenses incurred by the Partnership in connection with the Transfer are paid by the transferring Limited Partner to the Partnership, and the transferring Limited Partner shall be responsible for such costs and expenses whether or not the proposed Transfer is consummated;

(iv) a fully executed and acknowledged written transfer agreement between the transferring Limited Partner and the transferee has been filed with the Partnership;

(v) the transferee has executed a copy of this Agreement; and

(vi) the General Partner determines, and such determination is confirmed by an opinion of counsel satisfactory to the General Partner stating, that (A) the Transfer does not violate the Securities Act, applicable state securities laws, (B) the Transfer will not require the Partnership or the General Partner to register as an investment company under the Investment Company Act, (C) the Transfer will not require the General Partner or any Affiliate that is not registered under the Advisers Act to register as an investment adviser under the Advisers Act, (D) notwithstanding such Transfer, the Partnership shall continue to be treated as a partnership under the Code (including Section 7704 of the Code), (E) the Transfer would not pose a material risk that (1) all or any portion of the assets of the Partnership would constitute "plan assets" under the Plan Asset Rules of any existing or contemplated ERISA Partner or (2) the Partnership would be subject to the provisions of ERISA, Section 4975 of the Code or any applicable Similar Law or (3) the General Partner would become a fiduciary with respect to any existing or contemplated ERISA Partner or other Partner, pursuant to ERISA or the applicable provisions of any Similar Law or otherwise, and (F) the Transfer will not violate the applicable laws of any state or the applicable rules and regulations of any Governmental Authority, provided that the delivery of such opinion may be waived, in whole or in part, at the sole discretion of the General Partner.

(b) Notwithstanding the foregoing, the General Partner shall not unreasonably withhold consent to a Transfer that otherwise satisfies Section 11.02(a) in the event such Transfer is to an Affiliate of the transferring Limited Partner, provided that the General Partner is reasonably satisfied that such Affiliate, other than a Benefit Plan Investor, has the financial capability to meet its obligations under this Agreement.

(c) If a Person who is a transferee in compliance with this Section 11.02 is not admitted to the Partnership as a Substitute Limited Partner pursuant to Section 11.03, such transferee shall be entitled only to the allocations and distributions with respect to its Interest in accordance with this Agreement and, to the fullest extent permitted by applicable law, shall not have any non-economic rights of a Limited Partner of the Partnership, including, without limitation, the right to require any information on account of the Partnership's business, inspect the Partnership's books, or vote on Partnership matters.

**Section 11.03 Substitute Limited Partners.** A transferee of all or a portion of an Interest in the Partnership pursuant to Section 11.02 shall have the right to become a substitute Limited Partner (a **"Substitute Limited Partner"**) in place of its transferor, effective as of the last day of a fiscal quarter, only if all of the following conditions are satisfied:

(a) the fully executed and acknowledged written instrument of Transfer has been filed with the

31

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

Partnership;

(b) the transferee executes, adopts and acknowledges this Agreement and is listed in the books and records of the Partnership as a Limited Partner;

(c) any costs and expenses of Transfer incurred by the Partnership are paid to the Partnership; and

(d) the General Partner shall have provided its consent in writing to the substitution, which consent it may grant or withhold in its sole discretion, and which consent may be conditioned upon, among other things, delivery of the opinion of counsel, satisfactory to the General Partner, as to the matters referred to in the opinion described in Section 11.02(a)(vi) as such matters relate to the transferee becoming a Substitute Limited Partner; *provided*, that a consent to a Transfer shall be a consent to substitution.

## Section 11.04 Involuntary Withdrawal by Limited Partners.

(a) Upon the death, Bankruptcy, dissolution or other cessation of existence of a Limited Partner, such Limited Partner shall not be entitled to receive the Fair Value of its Interest in the Partnership in accordance with Section 17-604 of the Delaware Act. Such Limited Partner's authorized representative, however, shall have all the rights of a Limited Partner for the purpose of settling or managing the estate or effecting the orderly winding up and disposition of the business of such Limited Partner and such power as such Limited Partner possessed to designate a successor as a transferee of its Interest and to join with such transferee in making application to substitute such successor or transferee as a Substitute Limited Partner.

(b) The death, Bankruptcy, dissolution, disability, or legal incapacity of a Limited Partner shall not dissolve or terminate the Partnership.

## Section 11.05 Required Withdrawals.

(a) If the General Partner determines, in good faith after consultation with counsel, that the continued participation of a Limited Partner in the Partnership would be reasonably likely to result in a violation of any law or regulation applicable to the Partnership (including, without limitation, the anti-money laundering or anti-terrorism laws or regulations, including Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 (the "**AML Laws**")) or subject the Partnership to any unintended law or regulatory scheme (including, without limitation, ERISA) (a "**Legal Violation**"), then the General Partner shall notify such Limited Partner of such Legal Violation and such Limited Partner shall be required to withdraw from the Partnership immediately following such notification (the "**Withdrawal Date**"), provided, that, if the General Partner in its sole discretion determines that the Legal Violation (other than a Legal Violation involving the AML Laws) is capable of being reasonably mitigated, prevented or cured, then the General Partner and such Limited Partner may take actions as the General Partner deems necessary and appropriate to mitigate, prevent or cure such Legal Violation, including (i) prohibiting such Limited Partner from making additional Capital Contributions into the Fund, (ii) converting such Limited Partner's Interest into a non-voting Interest, (iii) allowing, in the General Partner's sole discretion, some or all of the Fund Investors or other Persons to purchase all or a portion of the Interest of such Limited Partner for an amount, in cash, equal to the Fair Value of such Interest, and/or (iv) making appropriate applications to the relevant Governmental Authority in respect of such Legal Violation.

(b) Further, if the General Partner determines, in its sole discretion, that the continued participation of a Limited Partner in the Partnership would be detrimental in any way to the success of the Partnership, or for any other reason, then the General Partner shall notify such Limited Partner of such determination,

32

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

and such Limited Partner shall be required to withdraw from the Partnership immediately following such notification.

(c) A withdrawing Limited Partner under Section 11.05(a) and Section 11.05(b) shall be entitled to receive a distribution equal to any amounts it would have been entitled to if the Partnership, in accordance with the provisions hereof, dissolved, liquidated, and distributed all the proceeds thereof as of the date of

withdrawal of such Limited Partner, provided however, that in all instances effect is given to the Performance Allocation at the time of the withdrawal.

# ARTICLE XII
# DISSOLUTION AND LIQUIDATION

**Section 12.01 Dissolution.** The Partnership shall be dissolved upon the first to occur of the following:

(a) an election to dissolve the Partnership is made by the General Partner in its sole discretion;

(b) subject to the provisions of Sections 4.08 through 4.12, the Bankruptcy, dissolution, removal or other withdrawal of the General Partner, or the Transfer of the General Partner's Interest in the Partnership;

(c) the entry of a decree of a judicial dissolution pursuant to the Delaware Act; or

(d) any other event causing dissolution of the Partnership under the Delaware Act.

**Section 12.02 Liquidation.**

(a) Upon dissolution of the Partnership and subject to Section 12.02(b), the General Partner, or if the General Partner's withdrawal, removal, or Bankruptcy caused the dissolution of the Partnership, such other Person who may be appointed by consent of a Majority in Interest of the Limited Partners, who shall be responsible for taking all action necessary or appropriate to wind up the affairs and distribute the assets of the Partnership following its dissolution (the **"Liquidator"**) shall wind up the affairs of the Partnership and proceed within a reasonable period of time to sell or otherwise liquidate the assets of the Partnership, subject to obtaining fair value for such assets and any tax or other legal considerations, and, after paying or making due provision by the setting up of reserves for all liabilities to creditors of the Partnership who are not Partners, distribute the proceeds therefrom among the Partners in accordance with Section 12.02(c). Notwithstanding the foregoing, the Liquidator may, if it determines that it is in the best interests of the Partnership, distribute part or all of any Portfolio Investments to the Partners in kind (utilizing the principles of Section 8.04 and the valuation procedures described herein).

(b) No Partner shall be liable for the return of the Capital Contributions of any other Partner, provided, that this provision shall not relieve any Partner of any other duty or liability it may have under this Agreement.

(c) Upon liquidation of the Partnership, all of the assets of the Partnership, and any proceeds therefrom, shall be applied in the following order of priority:

(i) first, in discharge of (1) all claims of creditors of the Partnership who are not Partners and (2) all expenses of liquidation;

(ii) second, to establish any reserves which the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership; and

33

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

(iii) third, to the Partners in the same manner as distributions are made under Section 8.01.

(d) When the Liquidator has complied with the foregoing liquidation plan, the termination of the Partnership shall be effective on the filing of, and the General Partner or Liquidator shall file, a certificate of cancellation of the Certificate of Limited Partnership (the **"Certificate of Cancellation"**) with the Office of the Secretary of State of the State of Delaware in accordance with Section § 17-203 of the

Delaware Act.

## ARTICLE XIII
## REPRESENTATIONS AND WARRANTIES OF THE GENERAL PARTNER

**Section 13.01 Representations and Warranties of the General Partner.** The General Partner represents, warrants and covenants to each Limited Partner that as of the date of the Initial Closing:

(a) The Partnership has been duly formed and is a validly existing limited partnership under the laws of the State of Delaware with full power and authority to conduct its business as described in this Agreement.

(b) The General Partner has been duly formed and is a validly existing limited liability company under the laws of the State of Delaware, with full power and authority to perform its obligations herein.

(c) All action required to be taken by the General Partner and the Partnership, as a condition to the issuance and sale of the Interests being purchased by the Limited Partners, has been taken.

(d) The Interest of each Limited Partner represents a duly and validly issued limited partnership interest in the Partnership and each Limited Partner is entitled to all the benefits of a Limited Partner under this Agreement and the Delaware Act.

(e) This Agreement has been duly authorized, executed and delivered by the General Partner and, assuming due authorization, execution and delivery by each Limited Partner, constitutes a valid and binding agreement of the General Partner enforceable in accordance with its terms against the General Partner, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity).

(f) The Private Placement Memorandum for the Fund did not contain any untrue statement of a material fact and did not omit to state a material fact necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, except that the description therein of this Agreement and the provisions hereof is superseded in its entirety by this Agreement.

(g) Assuming the accuracy of the representations and warranties made by each Limited Partner pursuant to the relevant Subscription Agreement, the Partnership is not required to register as an investment company under the Investment Company Act.

(h) Assuming the accuracy of the representations and warranties made by each Limited Partner pursuant to the relevant Subscription Agreement, the offer and sale of the Interests in accordance with the terms of the relevant Subscription Agreement does not require registration of the Interests under the Securities Act.

34

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

(i) The only fees payable to the General Partner or the Investment Manager by the Partnership or the Limited Partners are those contemplated or specified by this Agreement or the Investment Management Agreement.

## ARTICLE XIV
## ERISA CONSIDERATIONS

The General Partner shall use its reasonable best efforts to conduct the affairs of the Partnership to comply with such other exception as may be available under the Plan Asset Rules to prevent the assets of the

Partnership from being treated as the assets of any ERISA Partner, including, if the General Partner so elects in its discretion, to limit investment in the Partnership so that investment by any Benefit Plan Investors is not deemed to be "significant" under the Plan Asset Rules.

# ARTICLE XV
# NET ASSET VALUE

**Section 15.01 Calculation of NAV.** The General Partner shall cause the Partnership's assets to be valued pursuant to the valuation policy attached hereto at Exhibit C (the **"Valuation Policy"**). The Partnership's net asset value shall be determined by the General Partner (or delegated to the Investment Manager to determine) as of the last day of each fiscal quarter, or at such other times as required under this Agreement, pursuant to the Valuation Policy (**"Net Asset Value"** or **"NAV"**). In short, the NAV of the Fund is equal to its total assets minus its total liabilities, determined in accordance with generally accepted accounting principles consistently applied under the accrual method of accounting. For this purpose:

(a) The Fund's assets as of any date shall include: (i) all cash on hand or on deposit, including any interest accrued thereon; (ii) all bills, demand notes, and accounts receivable (including proceeds of assets sold but not delivered); (iii) all instruments owned or contracted for by the Fund; (iv) all Securities and other Portfolio Investments owned by the Fund; (v) all cash dividends, and cash distributions receivable by the Fund (the General Partner may make adjustments with regard to fluctuations in the market value of instruments caused by trading ex- dividend, ex-rights, or by similar practices); (vi) all interest accrued on any interest-bearing instrument except to the extent that the same is included or reflected in the valuation of the instrument; and (vii) all other assets of every kind and nature, including prepaid expenses.

(b) The liabilities of the Fund as of any date shall include: (i) all outstanding loans, bills and accounts payable; (ii) accrued or payable expenses; (iii) the current market value of all short sale obligations; and (iv) all other liabilities. The General Partner and the Administrator may treat estimates of expenses that are incurred on a regular or recurring basis over yearly or other periods as accruing in equal proportions over such period.

(c) The General Partner and the Administrator may establish such reserves for unknown or unfixed liabilities or contingencies as it may determine.

(d) The General Partner may treat any liability or expenditure which becomes fixed or is incurred in an Accounting Period subsequent to the Accounting Period to which the liability or expenditure relates as either (i) arising in the Accounting Period in which the liability becomes fixed or the expenditure is made or (ii) arising in the prior Accounting Period. In the latter case the liability or expenditure shall be charged to Persons who were Limited Partners during that prior Accounting Period (whether or not the Persons are Limited Partners during the Accounting Period in which the liability is fixed or the expenditure is incurred) pro rata for that prior Accounting Period.

**Section 15.02 Suspension of NAV.** The General Partner may suspend the determination of the Fund's Net Asset Value, the acceptance of capital contributions and the processing of requests for withdrawals:

35

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

(a) during any period in which any market on which a material part of the assets of the Fund are quoted is closed or has materially limited or suspended dealings;

(b) during the existence of any state of affairs (including the restriction of trading in one or more markets) which, in the opinion of the General Partner, makes the determination of the price or value of the disposition of a material part of the Fund's investments impractical or prejudicial to the Partners;

(c) during any breakdown in any of the means normally employed by the Fund in ascertaining the value of a material part of its assets or for any other reason the General Partner is of the opinion that the Fund cannot reasonably ascertain the value of a material part of its assets on the valuation date concerned;

(d) during any period where the conversion and remittance of the funds which would or might be involved in the realization or acquisition of a material part of the Fund's investments (whether actual or hypothetical for valuation purposes) could not in the opinion of the General Partner be carried out at normal rates of exchange and without undue delay;

(e) during any period in which distributions or withdrawals would, in the opinion of the General Partner, result in a violation of applicable law; or

(f) in the event of the dissolution or winding-up of the Fund.

All Limited Partners will be notified of any suspension, and the termination of any suspension, by means of a promptly delivered written notice. If monthly withdrawals are suspended as a result of the foregoing events, withdrawal requests will be honored as of the end of the calendar month next following the termination of any suspension.

# ARTICLE XVI
# AMENDMENTS AND MEETINGS

**Section 16.01 Amendment Procedure.** This Agreement may be amended or modified only as follows:

(a) Amendments to this Agreement shall be proposed by the General Partner.

(b) A proposed amendment will be adopted and effective only if it receives the consent of the General Partner, which consent it may grant or withhold in its sole discretion, and consent of a Majority in Interest of the Limited Partners, except that amendments may be adopted by the General Partner, without consent of a Majority in Interest of the Limited Partners, to (A) effect changes of an administrative or ministerial nature or to cure ambiguities or inconsistencies in the Agreement, (B) admit or withdraw one or more Partners in accordance with the terms of this Agreement, (C) make changes to this Agreement negotiated with Limited Partners admitted to the Partnership after the Initial Closing so long as such changes do not materially adversely affect the rights and obligations of any existing Limited Partner or (D) change the name of the Partnership.

(c) The General Partner shall furnish each Limited Partner with a copy of each amendment to this Agreement promptly after its adoption.

(d) The Partnership or the General Partner may, without any further act, approval, or vote of any Partner, enter into side letters or other agreements with one or more Limited Partners that have the effect of establishing rights under, or altering or supplementing, the terms of, this Agreement, and any rights established or any terms of this Agreement altered or supplemented in a side letter with a Limited Partner shall govern solely with respect to such Limited Partner notwithstanding any other provision of this Agreement, provided, that no such side letter or other agreement shall adversely affect the rights of any other Limited Partner hereunder.

36

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

**Section 16.02 Exceptions.** Notwithstanding the provisions of Section 16.01, no amendment shall be effective as to any Limited Partner without the consent of such Limited Partner that:

(a) adversely affects the limited liability of such Limited Partner under this Agreement or the Delaware Act; or

(b) directly or indirectly affects or jeopardizes the status of the Partnership as a partnership for federal income tax purposes.

Notwithstanding anything herein to the contrary, this Agreement may be amended, and/or the Partnership may be reorganized or reconstituted, from time to time by the General Partner, without the consent of any Limited Partner, to address any change in regulatory or tax legislation, provided that any such amendment, reorganization, or reconstitution would not add to the obligations (including any tax liabilities) of any

Limited Partner or adversely alter any of the rights or benefits (including entitlements to distributions or any other economic rights) of any Limited Partner.

**Section 16.03 Meetings and Voting.**

(a) Meetings of the Partners may be called by the General Partner for any purpose permitted by this Agreement or the Delaware Act at a time and place reasonably selected by the General Partner. Except as otherwise specified herein, the General Partner shall give all Limited Partners not less than 15 nor more than 60 days' notice of the purpose of such proposed meeting and any votes to be conducted at such meeting. Partners may participate in a meeting by telephone or similar communications by means of which all Persons participating in the meeting can hear and be heard. The General Partner shall call a meeting of the Partners for informational purposes at least once every Fiscal Year with at least 60 days' notice to discuss the Fund's investment activities.

(b) The General Partner shall, where feasible, solicit required consents of the Limited Partners under this Agreement by written ballot with at least 15 days' notice or, if a written ballot is not feasible, at a meeting held pursuant to Section 16.03(a).

# ARTICLE XVII
## MISCELLANEOUS

**Section 17.01 Severability.** Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable, or illegal under any existing or future law in any jurisdiction, such invalidity, unenforceability, or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable, and legal.

**Section 17.02 Governing Law.** All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

**Section 17.03 Submission to Jurisdiction.** The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought exclusively in the federal or state courts located in New York County of the State of New York, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State

37

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

of New York. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient forum. Service of process, summons, notice, or other document by registered mail to the address set forth in the books and records of the Partnership shall be effective service of process for any suit, action, or other proceeding brought in any such court.

**Section 17.04 Successors and Assigns.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

**Section 17.05 Waiver of Jury Trial.** Each party hereto hereby acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each

such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 17.06 Waiver of Action for Partition.** Each of the parties hereto irrevocably waives during the term of the Partnership any right that it may have to maintain any action for partition with respect to any property of the Partnership.

**Section 17.07 Record of Limited Partners.** The General Partner shall maintain at the office of the Partnership a record showing the names and addresses of all the Limited Partners. All Limited Partners and their duly authorized representatives shall have the right to inspect such record for a purpose reasonably related to such Limited Partner's Interest.

**Section 17.08 Headings.** The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

**Section 17.09 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 17.10 Notices.** All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 17.10):

*If to the General Partner:* BKCOIN MANAGEMENT LLC

> E-mail: trading@bkcoincapital.com
> Attention: Manager

38

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

*with a copy to:* DZUBA LAW, P.A.

> E-mail: peter@dzubalaw.com
> Attention: Peter Dzuba

*If to Partnership:* BKCOIN CAPITAL LP

> E-mail: trading@bkcoincapital.com
> Attention: Manager

*with a copy to:* DZUBA LAW, P.A.

> E-mail: peter@dzubalaw.com
> Attention: Peter Dzuba

**Section 17.11 Entire Agreement.** This Agreement (including any Schedules and Exhibits), the Subscription Agreements, and any other written agreements between the General Partner or the Partnership and the Limited Partners executed in connection with the subscription by the Limited Partners for the Interests, constitutes the sole and entire agreement of the parties to this Agreement.

**Section 17.12 No Third-party Beneficiaries.** Except as expressly provided to the contrary in this Agreement (including the authorization given to the General Partner to grant and assign to lenders and credit providers the security interests and rights described in <u>Section 3.02(c)</u> and those provisions which are for the benefit of the Covered Persons), this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 17.13 Counsel.** The General Partner, acting on behalf of the Partnership, has initially selected Dzuba Law, P.A. ("Partnership Counsel") as legal counsel to the General Partner when acting on behalf of the Partnership. Each Limited Partner acknowledges that Partnership Counsel does not represent any Limited Partner (in its capacity as such) and shall owe no duties directly to any Limited Partner (in its capacity as such) whether or not Partnership Counsel has in the past represented or is currently representing such Limited Partner with respect to other matters. Counsel to the Partnership may also be counsel to the General Partner and its Affiliates. The General Partner may execute on behalf of the Partnership and the Partners any consent to the representation of the General Partner when acting on behalf of the Partnership or the General Partner that counsel may request pursuant to the applicable rules of professional conduct in any jurisdiction. In the event any dispute or controversy (including litigation) arises between any Limited Partner and the General Partner when acting on behalf of the Partnership or itself, or between any Limited Partner or the General Partner when acting on behalf of the Partnership, on the one hand, and the General Partner (or an Affiliate of the General Partner) that Partnership Counsel represents, on the other hand, then each Limited Partner agrees that Partnership Counsel may represent either the General Partner when acting on behalf of the Partnership, or the General Partner (or its Affiliate), or both, in any such dispute or controversy to the extent permitted by the applicable rules of professional conduct in any jurisdiction, and each Limited Partner hereby consents to such representation.

**Section 17.14 Confidentiality.**

(a) Each Limited Partner shall maintain the confidentiality of (i) "Non-Public Information," (ii) any information subject to a confidentiality agreement binding upon the General Partner or the Partnership of which such Limited Partner has provided written notice and (iii) the identity of other Limited Partners

39

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

and their Affiliates so long as such information has not become otherwise publicly available unless, after reasonable notice to the Partnership by the Limited Partner, otherwise compelled by court order or other legal process or in response to other governmentally imposed reporting or disclosure obligations including, without limitation, any act regarding the freedom of information to which it may be subject; *provided*, that, for any *bona fide* business purpose reasonably related to its Interest in the Partnership, each Limited Partner may disclose "Non-Public Information" to its Affiliates, officers, employees, agents, professional consultants, and regulators upon notification to such Affiliates, officers, employees, agents, consultants, or regulators that such disclosure is made in confidence and shall be kept in confidence; *provided, further*, that each Limited Partner shall be liable for any subsequent disclosure of any such Non Public Information disclosed by it to any such Person.

(b) As used in this <u>Section 17.14</u>, **"Non-Public Information"** means information regarding the Fund, the Partnership, the General Partner, the Investment Manager, their respective Affiliates, any Portfolio Investment or potential investment, or any existing or potential counterparty of the Partnership or source of existing or potential Portfolio Investments received by such Limited Partner pursuant to this Agreement, but does not include information that was publicly known when received by such Limited Partner, subsequently becomes publicly known through no act or omission by such Limited Partner or is

disclosed to such Limited Partner by a third party not known to such Limited Partner to be bound by any confidentiality obligation. The General Partner may not disclose the identities of the Limited Partners, except on a confidential basis to prospective and other Limited Partners in the Partnership, or to lenders, third-party partners, or other financial sources. In the event a Limited Partner receives a request for the disclosure of information under freedom of information acts or similar statutes that is Non-Public Information, the Limited Partner shall (i) promptly notify the Partnership and the General Partner of the existence, terms, and circumstances surrounding such request, (ii) consult with the Partnership and the General Partner regarding taking steps to resist or narrow such request, (iii) if disclosure of such information is required, furnish only such portion of such information as such Limited Partner is advised by counsel is legally required to be disclosed, and (iv) cooperate with the Partnership and the General Partner in their efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the information that is required to be disclosed. Notwithstanding any provision of the Agreement to the contrary, the General Partner may withhold disclosure of any Non-Public Information (other than this Agreement or tax reports) to any Limited Partner if the General Partner reasonably determines that the disclosure of such Non-Public Information to such Limited Partner may result in the public disclosure of such Non-Public Information, and in such case the General Partner will use commercially reasonable efforts to make such information available to such Limited Partner through an alternate means; provided that such information will not thereby become subject to public disclosure.

**Section 17.15 Compliance with FATCA.** Each Limited Partner hereby agrees to provide to the Partnership on a timely basis (i) such information, representations, forms or other documentation as the General Partner may reasonably request in order for the General Partner and the Partnership (and any member of any "expanded affiliated group" (as defined in Section 1471(e)(2) of the Code) of which the General Partner, the Partnership or any of their Affiliates is a member) to comply with their obligations under, and avoid becoming subject to, withholding, or to obtain any available exemption, reduction or refund of any tax withheld, pursuant to (a) Sections 1471-1474 of the Code (or any amended or successor version thereof), Treasury Regulations and any forms, instructions or other guidance issued thereunder (now or in the future) and any intergovernmental agreement or other similar agreement between the United States and one or more other governments or tax authorities that is entered into in order to facilitate compliance with, or otherwise relates to, any of the preceding, together with any regulations, forms, instructions or other guidance issued (now or in the future) by any government or tax authority in a jurisdiction other than the United States in relation to any intergovernmental agreement or similar agreement ("FATCA"); or (b) any legislation in any jurisdiction that the General Partner reasonably believes to be similar to FATCA; or (ii) any other information required for the Partnership to comply with its tax obligations (including, for the avoidance of

40

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

doubt, obligations pursuant to any agreement that the Partnership enters into pursuant to Section 1471 of the Code or any similar agreement) or to answer any inquiries from any tax authority. In the event that any Limited Partner fails to provide any of the information, representations, certificates or forms (or undertake any of the actions) required by this Section 17.15, the General Partner shall be entitled to (i) form an entity organized in the United States, transfer such Limited Partner's interest in the Partnership to such entity, admit such Limited Partner as an owner of such entity and cause such Limited Partner to cease to be a Partner in the Partnership or (ii) take any other steps as the General Partner determines in its sole discretion are necessary or appropriate to mitigate the consequences of such Limited Partner's failure to comply with the requirements of this Section 17.15. Each Limited Partner hereby consents to the General Partner's exercise of the remedies described above and agrees, to the fullest extent permitted by applicable law, to indemnify and hold harmless the Partnership, each investor in the Partnership, and the General Partner and any Affiliate thereof against the amount of any costs incurred by the Partnership or the General Partner (including, without limitation, the withholding of any tax on payments to the Partnership pursuant to FATCA) as a result of (A) such Limited Partner's failure to comply with any of the above requirements or to do so in a timely manner, or (B) such Limited Partner's participation in the Partnership.

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written  above by their respective officers thereunto duly authorized.

GENERAL PARTNER:


BKCOIN MANAGEMENT LLC


*By:* _____
   Carlos Betancourt
   Manager

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2

**LIMITED PARTNERSHIP AGREEMENT SIGNATURE PAGE**

By its signature below, the undersigned hereby agrees that effective as of the date of its admission to the Partnership initialed above as a Limited Partner it shall (i) be bound by each and every term and provision of the Limited Partnership Agreement of such Partnership as the same may be duly amended from time to time in accordance with the provisions thereof; and (ii) become and be a party to said Limited Partnership Agreement of such Partnership.



43

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2**EXHIBIT A**

# FORM OF SUBSCRIPTION AGREEMENT

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2EXHIBIT B

# FORM OF INVESTMENT MANAGEMENT AGREEMENT

DocuSign Envelope ID: 4EF26D4E-FA89-4100-85A9-3B1751660ED2**EXHIBIT C**

# METHOD OF CALCULATING NET ASSET VALUE

The Partnership shall provide each Limited Partner from time to time with a PDF containing the then-in effect method of calculating net asset value for each of the assets currently being traded by the Fund.