UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 23-20719-Civ-Scola

Securities and Exchange Commission,

    Plaintiff,

v.

BK Coin Management, LLC and
others,

    Defendants.
_____/

### INTERESTED PARTIES, SMA INVESTORS' LIMITED OBJECTION TO RECEIVER'S EXPEDITED EX PARTE MOTION SEEKING ENTRY OF AN ORDER AUTHORIZING LIQUIDATION

Interested Parties, Jeffrey Ghitman ("Ghitman"), The Ghitman Family Trust ("Ghitman Trust"), Joseph Lifschutz ("Lifschutz"), Joseph Lifschutz Living Trust ("Lifschutz Trust"), Kevin Henderson ("Henderson"), The Henderson Family Trust ("Henderson Trust"), New World Markets, LLC ("NWM"), and GH Holdings, LLC ("GH") (collectively, the "SMA Investors"), by and through undersigned counsel, file this Limited Objection to the Receiver's Expedited Ex Parte Motion Seeking Entry of an Order Authorizing Liquidation [DE 32] (the "Motion")[1] and in support states:

    1.    On March 10, 2023, the Court-appointed Receiver filed his motion seeking authorization from this Court to withdraw and liquidate certain cryptocurrency assets being held by the Receivership Estate at Standard Custody & Trust Company, LLC.

---

[1] The Court issued an Order granting the Motion on March 13, 2023 [DE 33] while the SMA Investors were finalizing this Limited Objection. The Receiver did not seek or obtain the SMA Investors' input or consent as to the relief sought in the Motion per Local Rule 7.1(a)(3) despite the Motion affecting the SMA Investors' rights. The SMA Investors filed their notice of appearance in this case on March 7, 2023 [DE 18] and have been in regular communication with the Receiver for several months.

2. The Motion identifies four categories of cryptocurrency assets that the Receiver seeks authorization from the Court to liquidate. However, the Receiver does not raise or address in the Motion the SMA Investors' ownership of such cryptocurrency assets.

3. The SMA Investors are a class separate and apart from the general BKCoin Funds.[2] BKCoin managed separately managed accounts (the "Accounts") on behalf of the SMA Investors and, according to the terms of the SMA Investors' Investment Management Agreements with BKCoin ("IMAs"), the cryptocurrency assets held in those Accounts were ***owned by the SMA Investors***. By way of example, *see* Paragraph 2, "Authority of Manager" of GH IMA attached as **Exhibit A** ("The cryptocurrency assets of the Account shall be held in an account that is owned by Client."). This same language is present in each of the IMAs for the SMA Investors.

4. Further, the Complaint acknowledges that BKCoin merely served as the investment adviser to the SMA managed accounts and does not allege that the SMA Investors transferred ownership of the cryptocurrency assets to BKCoin such that they may be property of the Receivership Estate and subject to liquidation.

5. The issue of ownership of the SMA Investors' cryptocurrency assets has not been decided by the Receiver of by this Court.

6. As such, the Court would significantly prejudice the SMA Investors rights by authorizing the sale of the assets identified in the Motion without any disclosure form the Receiver as to ownership of the assets, particularly whether the cryptocurrency assets identified in the Motion include those owned by the SMA Investors.

---

[2] *See* Complaint for Injunctive and Other Relief [DE 1].

7. The SMA Investors respectfully request that this Court conduct an evidentiary hearing as to the limited issue of whether the assets identified in the Motion include cryptocurrency assets owned by the SMA Investors prior to authorizing the Receiver to liquidate same.

Respectfully submitted on March 13, 2023

**DGIM Law, PLLC**
*Counsel for the SMA Investors*
2875 NE 191st Street, Suite 705
Aventura, FL 33180
Phone: (305) 763-8708

*/s/ Jonathan Groth*
Jonathan Groth, Esq.
Florida Bar No. 102648
jonathan@dgimlaw.com
Daniel Y. Gielchinsky, Esq.
Florida Bar No. 97646
dan@dgimlaw.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, on this March 13, 2023 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that a true and correct copy of the foregoing was served via CM/ECF electronic transmission upon those parties who are registered with the Court to receive notifications in this matter.

*/s/ Jonathan Groth*
Jonathan Groth

# EXHIBIT A

## INVESTMENT MANAGEMENT AGREEMENT

This Agreement is made this 18th day of August, 2020 (this "Agreement"), by and between **BKCoin Management LLC**, a Delaware limited liability company with principal place of business located at 38 E 37th Street #11, New York, New York 10016 (the "Manager"), a limited liability company, and **GH Holdings LLC**, a Wyoming State company with principal place of business at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "Client")(each a "Party" and collectively the "Parties"). The Parties agree as follows:

1. <u>Appointment</u>. Client hereby appoints Manager as an investment manager to manage such of Client's cryptocurrency (Bitcoin) assets, pursuant to the terms of this Agreement, as Client shall from time to time assign to it, the proceeds from the sale of such cryptocurrency assets, and the income attributable to such cryptocurrency assets (the "Account"). Client shall promptly notify Manager in writing of any increase or reduction in the amount of the Account's assets subject to Manager's investment direction.

2. <u>Authority of Manager</u>. Manager is authorized to supervise and direct the investment and reinvestment of the cryptocurrency assets in the Account, subject to such limitations as are contained in the Guidelines described in Section 3 of this Agreement, as they may be from time to time amended, and subject to Client's right to direct the investment of the Account, if so desired, by means of Instructions as described in Section 3 of this Agreement. Manager, as Client's agent and attorney-in-fact with respect to the Account, when it deems appropriate and without prior consultation with Client, may: (a) buy, sell, exchange, convert and otherwise invest or trade in Bitcoin, at such times and in such manner as Manager determines; (b) place orders for the execution of such Bitcoin with or through such brokers, dealers or issuers as Manager may select, which brokers or dealers are entitled to receive compensation out of the Account for their services; and (c) execute any documentation as the Account's agent and attorney-in-fact as Manager may deem necessary to facilitate any such investment or reinvestment. Manager, as Client's agent and attorney-in-fact with respect to the Account, when it deems appropriate and without prior consultation with Client, may engage external legal counsel to review relevant trade-related documentation, and charge the Account for such costs. Manager may give a copy of this Agreement to any broker, dealer or other party to a transaction, as evidence of its authority to act on the Account's behalf.

The cryptocurrency assets of the Account shall be held in an account that is owned by Client. Notwithstanding the foregoing, given the unique nature of the cryptocurrency exchanges, and given that Manager has corporate level accounts across numerous exchanges that allows it to execute the Investment Objectives contemplated herein, Client hereby consents to such temporary movement out of the Account and into the corporate accounts of Client among the various exchanges for purposes of execution of the Investment Objectives as Manager deems appropriate. In furtherance of this movement of the cryptocurrency assets, Client hereby grants to Manager a power of attorney coupled with an interest, authorizing and permitting Manager to take Client's cryptocurrency assets out of the Account, move the cryptocurrency assets into Manager's corporate accounts at whichever exchange that Manager deems appropriate for execution of the Investment Objectives, to execute the trades in such accounts as the Manager deems appropriate, and finally to move the money back into the Account upon conclusion of the strategy employed by Manager. The Parties also hold open the possibility that Client's cryptocurrency assets may, at some point in the future, be held by a custodian (the "Custodian") which shall have custody of the Account, and which shall be directed by Client to follow the directions relating to trading that is conveyed to the Custodian by the Manager. In such cases, Client shall not change the Custodian without giving Manager reasonable advance written notice of its intention to do so, together with the name and other relevant information with respect to the new Custodian. Manager shall not be liable for any act or omission of any Custodian used.

3. <u>Guidelines and Instructions</u>. Attached hereto as <u>Exhibit A</u> is a statement of the investment objectives of Client together with a statement of any and all specific investment restrictions applicable to the investment of the Account (the "Guidelines"). Client shall have the right at all times to modify the Guidelines or to give Manager instructions ("Instructions") to buy, sell or retain any investment, but no modification of the Guidelines and no Instructions or modifications of Instructions shall be binding upon Manager unless Manager has received written notice of them from an Authorized Person (as defined in Section 5(d)). Manager shall have a reasonable period to bring the Account into compliance with any changes to the Guidelines. Manager shall be under no duty to make any investigation or inquiry as to any statement contained in any written Guidelines or Instruction given and, unless and until specifically advised otherwise, Manager may accept the same as conclusive evidence of the truth and accuracy of the statements contained therein. The Guidelines and all Instructions, unless they expressly provide otherwise,

shall continue to be effective until duly canceled by subsequent modifications duly communicated to Manager in writing.

4. Fees. As full compensation for its services under this Agreement, Manager shall be paid quarterly a management fee (the "Management Fee") equal to one-fourth of the annual rates specified in Exhibit B, based on the asset value of the Account as of the last day of each calendar quarter on which a Bitcoin exchange is open for trading (the "Valuation Date"), and before deductions for the Performance Fee below. The initial billing period of the Management Fee will begin when this Agreement is signed by Client and accepted by Manager, and initial funding has been received by the Custodian (the "Inception Date"). The initial fee will be pro-rated to cover the period from the Inception Date through the Valuation Date for that calendar quarter and will be based on the valuation as of that Valuation Date. Future quarterly fees will be calculated similarly in arrears. If Manager shall serve for less than the whole of any quarter, its compensation shall be determined as provided above on the basis of the value of the assets in the Account as of the end of the date of termination and shall be payable on a pro rata basis for the period of the quarter for which it served as Manager hereunder. In addition, Manager shall be entitled to a performance fee (the "Performance Fee") for good performance, and the terms of the Performance Fee are substantially set forth within Exhibit B below. Other than as specifically indicated in this Agreement, the Manager shall not be required to pay any expenses in connection with the investment management services that are contemplated herein. Client shall direct the Custodian automatically to charge to the Account and pay directly to Manager all of Manager's fees upon the Custodian's receipt of an invoice from Manager.

5. Representations and Warranties. Client hereby acknowledges, represents and warrants to, and agrees with Manager, as follows:

(a) Client Assets. Client is the sole owner of all cryptocurrency assets in the Account and (i) there are no restrictions on the transfer, sale or public distribution of any such assets and (ii) no option, lien, charge, security or encumbrance exists over such assets, except as disclosed to Manager in writing.

(b) Authority. The Client has full authority and power to engage Manager under the terms and conditions of this Agreement, and such engagement does not violate Client's constituent documents, any other material agreement, order or judgment of any court or governmental authority, or any law applicable to Client. Client further represents that all investments permitted herein are within its power to enter into and have been duly authorized.

(c) Form ADV. Client acknowledges receipt of Part II of Manager's Form ADV. Notwithstanding anything to the contrary herein, if Client did not receive a copy of the Form ADV at least forty-eight (48) hours prior to execution of this Agreement, Client shall have the right to terminate this Agreement without penalty within five (5) business days of the execution of this Agreement; provided, however, that Client shall be at risk for any market fluctuations in the Account up to the time of such termination. Note that in light of the Manager's taking on the management of Client's cryptocurrency assets pursuant to this Agreement, Manager's Form ADV will likely have to be amended, and Client will be provided with the amended Form ADV within a reasonable time following its successful posting.

(d) Authorized Persons. Any individual whose signature is affixed to this Agreement on Client's behalf has full authority and power to execute this Agreement on Client's behalf. Client represents that the officer specified on the attached Certification of Authorized Persons (Exhibit C) is authorized to act for Client and to certify to Manager from time to time, by listing on, and delivering to Manager Exhibit C or a substantially similar form, those other persons who also are so authorized to act on Client's behalf ("Authorized Persons"). The Client shall promptly notify Manager in writing of any event that could reasonably be anticipated to affect any such individual's authority under this Agreement.

(e) Notice of Certain Events. Client will promptly notify Manager in writing of any occurrence that results, or threatens to result, in any representations by Client contained in this Agreement becoming inaccurate, false, misleading or incomplete.

6. Non-Exclusive Agreement. Nothing in this Agreement shall be deemed to limit or restrict Manager's right, or the right of any of its officers, directors, employees, or independent contractors, to engage in any other business

or to devote time and attention to the management or other aspects of any business, whether of a similar or dissimilar nature, or to render investment advisory services or services of any kind to any other corporation, firm, association, fund or individual. Client understands that Manager provides investment advisory services and other services to numerous other clients and accounts. Client also understands that Manager may give advice and take action with respect to any of its other clients or for its own account which may differ from the timing or nature of action taken by Manager with respect to the Account.

Nothing in this Agreement shall impose upon Manager any obligation to purchase or sell or to recommend for purchase or sale, with respect to the Account, any security (including long and short positions) which Manager, or its affiliates, or its or their shareholders, directors, officers, employees, or independent contractor may purchase or sell for its or their own account(s) or for the account of any other client. Client acknowledges that Manager's ability and that of its affiliates to effect or recommend transactions may be restricted by applicable regulatory requirements in the United States and elsewhere or its or their internal policies designed to comply with such requirements. Consequently, there may be periods when Manager may not initiate or recommend certain types of transactions in certain investments when Manager or its affiliates are performing services or when aggregated position limits have been reached, and Client will not be advised of that fact.

7. <u>Liability of Manager</u>. Except as may otherwise be provided by law, Client specifically agrees that Manager shall not be liable for: (a) any loss that Client may suffer by reason of any investment decision made or other action taken or omitted in good faith and with that degree of care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an enterprise of a like character and with like aims; (b) any loss, expense or other liability (including but not limited to attorneys' fees) incurred by Client or Manager arising from or in connection with Manager's compliance with the Guidelines or Instructions believed by Manager to be accurate; (c) any act or failure to act by any broker or other person with whom Manager or Client may deal in connection with the subject matter of this Agreement; or (d) any loss or failure or delay in performance of any obligation under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond Manager's reasonable control, including, without limitation, acts of God, earthquakes, fires, floods, wars, terrorism, civil or military disturbances, sabotage, epidemics, riots, interruptions, loss or malfunctions of utility, computer software or hardware, transportation or communication service, accidents, labor disputes, acts of civil or military authority, governmental actions and inability to obtain labor, material, equipment or transportation.

8. <u>Brokerage</u>. Where Manager places orders, or directs the placement of orders, for the purchase or sale of Bitcoin for the Account, in selecting brokers or dealers to execute such orders, Manager is expressly authorized to consider, among other factors, the fact that a broker or dealer has furnished statistical, research or other information or services which enhance Manager's investment research and portfolio management capability generally. Manager may negotiate with and assign to a broker a commission which may exceed the commission which another broker would have charged for effecting the transaction if Manager determines in good faith that the amount of commission charged was reasonable in relation to the value of brokerage and research services provided by such broker, viewed in terms either of the Account or Manager's overall responsibilities to Manager's discretionary accounts. With respect to the allocation of trades among the accounts it is managing, Manager shall not favor any account over any other and purchase or sale orders executed contemporaneously shall be allocated in a manner it deems equitable among the accounts involved.

In no event shall Manager be obligated to effect or place an order for any transaction for Client which Manager believes would violate any applicable state or federal law, rule, or regulation, or of the regulations of any regulatory or self-regulatory body to which Manager or any of its affiliates is subject to at the time of the proposed transaction.

9. <u>Confidential Relationship</u>. Each Party agrees that all non-public confidential information concerning the other Party which may become available to such party in connection with services, transactions or relationships contemplated in this Agreement shall at all times be treated in strictest confidence and shall not be disclosed to third persons except as (a) may be required by law or regulatory authority, including but not limited to any subpoena, administrative, regulatory or judicial demand or court order, (b) as otherwise set forth in this Agreement, or (c) upon the prior written approval of the other party to this Agreement. Client authorizes Manager (i) to include Client's name in a representative or sample client list prepared by Manager, provided Manager shall not disclose Client contact information or any information about Client's holdings, and (ii) to use Manager's investment experience with respect to the Account, or the Account's performance, in composite performance presentations, marketing

3

materials, attribution analyses, statistical compilations, or other similar compilations or presentations, provided such use does not disclose Client's identity except to the extent permitted by Client.

10. <u>Reports</u>. Manager shall send to Client a written report of the Account as of the Valuation Date of each calendar quarter. Such reports shall be submitted within a reasonable period following such Valuation Date. For the purposes of all reports made by Manager to Client, Bitcoin will be valued denominated in United States dollars, unless otherwise agreed by Manager and Client. Client shall examine promptly each such report and any other report provided by Manager. To the extent permissible under applicable law, upon the expiration of the sixty (60) day period immediately following the date of such report, or the termination of this Agreement as provided herein, if earlier, Manager shall be forever released and discharged from all liability and accountability to anyone with respect to each such report, including, without limitation, all acts and omissions of Manager shown or reflected in each such report, except with respect to any acts or omissions as to which Client shall have filed written objections with Manager within such sixty (60) day period. Nothing herein shall impair the right of Manager to a judicial settlement of any report rendered by it.

11. <u>Valuation</u>. In computing the asset value of the Accounts, Manager shall use its best discretion to provide Client an accurate estimation of the fair market value of the Accounts at a given point in time. The method selected will factor in all relevant information, including but not limited to: bid-ask spread of the relevant cryptocurrency on various exchanges, the official closing price, if a market event occurs that calls into question the reliability of current market quotations. Whichever methodology is selected shall be explained to Client in a manner that may be easily understood by Client.

12. <u>Acknowledgment of Investment Risk</u>. Notwithstanding any provision herein to the contrary, Client understands that the value of investments made for the Account may go down as well as up and is not guaranteed. In addition, Client has reviewed the risk factors at <u>Exhibit E</u> below. Client is fully aware and understands the risks associated with Manager's cryptocurrency trading activities pursuant to this Agreement, and nevertheless wishes to engage Manager to provide such investment management services under the terms and conditions set forth herein. Client agrees that Manager has not made and is not making any guarantees, including without limitation a guarantee as to any specific level of performance of the Account. Client further understands and acknowledges that investment decisions made on behalf of Client's Account by Manager are subject to various market, currency, economic, and business risks as well as the risk that those investment decisions will not always be profitable. Client acknowledges that past performance results achieved by accounts supervised or managed by Manager are not indicative of the future performance of the Account. Client understands that the Bitcoin in the Account is not guaranteed by Manager or any affiliate, is not insured by the Federal Deposit Insurance Corporation ("FDIC") or any other government agency, and are subject to investment risk, including possible loss of principal amounts invested.

13. <u>Termination; Survival</u>. This Agreement may be terminated by either party upon thirty (30) days' written notice to the other party. Such termination will not, however, affect the liabilities or obligations of the parties under this Agreement arising from transactions initiated prior to such termination. Sections <u>4</u>, <u>7</u>, <u>9</u>, <u>10</u>, <u>17</u>, and <u>18</u> shall survive the termination of this Agreement. Upon any termination of this Agreement, Manager shall have no further obligations hereunder, provided that: (a) any liability under this Agreement of one party to the other shall survive and remain in full force and effect, notwithstanding such termination, with respect to any claim or matter on which either of the parties has given the other written notice prior to such termination (except that Manager may render to Client a statement of fees due Manager through the date of termination after such date), until such liability has been finally settled; (b) Manager retains the right to complete any transactions open as of the termination date and to retain amounts in the Account sufficient to effect such completion; and (c) Manager shall be entitled to its fees and expenses, pro rated to the date of termination. Upon termination, it shall be Client's exclusive responsibility to issue instructions in writing regarding any assets in the Account.

14. <u>Assignment</u>. This Agreement may not be assigned (within the meaning of the Investment Advisers Act of 1940, as amended), in whole or in part, by Manager without the prior written consent of Client. Subject to the preceding sentence, Manager may delegate all or part of its duties under this Agreement to any affiliate.

15. <u>Communications</u>. All reports and other communications required hereunder to be in writing shall be delivered in person or sent by first-class mail postage prepaid, overnight courier, or confirmed facsimile with original to follow.

DocuSign Envelope ID: 2FB88E17-AFF9-42C5-9EE2-77CDFF149163
Case 1:23-cv-20719-RNS   Document 34   Entered on FLSD Docket 03/13/2023   Page 9 of 16

**If to Client:**

**GH Holdings LLC**

[REDACTED]

Attention: Mr. Jeffrey Ghitman

**If to Manager:**

**BKCoin Management LLC**
38 E 37th Street #11
New York, New York 10016

Attention: Mr. Kevin Kang, Founding Principal/Manager

Attention: Mr. Carlos Betancourt, Founding Principal/Manager

Either Party to this Agreement may, by written notice given at any time, designate a different address for the receipt of reports and other communications due hereunder.

16. <u>Governing Law; Venue</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the United States and with the laws of the State of Delaware, without giving effect to the choice of law or conflict of law provisions thereof. The parties hereby consent to jurisdiction and venue in the federal and state courts located in New York County of the State of New York.

17. <u>Entire Agreement; Modification</u>. This Agreement along with all exhibits attached hereto: (a) sets forth the entire understanding of the parties with respect to the subject matter hereof; (b) supersedes any and all previous agreements, understandings and communications, oral or written, regarding this subject matter; and (c) may not be modified, amended, or waived except by a specific written instrument duly executed by the party against whom such modification, amendment, or waiver is sought to be enforced. In the event of any conflict or inconsistency with this Agreement and any instructions or investment guidelines that are not made part of this Agreement or any investment policy statement, this Agreement will control.

18. <u>Headings</u>. The headings of the sections of this Agreement are for convenience of reference only and will not affect the meaning or operation of this Agreement. As used herein, references in the singular shall, as and if appropriate, include the plural.

19. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

20. <u>Severability</u>. In the event that any provision of this Agreement is deemed to be void, voidable, illegal, or invalid for any reason, such provision will be of no force and effect only to the extent that it is so declared void, voidable, illegal, or invalid. All of the provisions of this Agreement not specifically found to be so deficient will remain in full force and effect.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their duly authorized officers to be effective as of the date first written above.

**GH Holdings LLC**

By: _____
Name: Jeffrey Ghitman
Title: Director

**BKCOIN MANAGEMENT LLC**

By: _____   CB
Name: Carlos Betancourt
Title: Manager

## EXHIBIT A

**Statement of Investment Objectives**

Dedicated to delivering consistent, uncorrelated absolute returns through our Long/Short and Statistical Arbitrage strategies with Bitcoin (BTC) long-bias.

The Separately Managed Account for **GH Holdings LLC** will offer the investor an opportunity to capitalize on inefficient and volatile market conditions as well as long-term capital growth. The account will ensure the non-BTC risks are minimized while capitalizing on the upside of the BTC as the investor is specifically looking for bitcoin exposure.

Subject to the 'Statement of Client Account Restrictions' below, Manager shall have full discretion to make the Bitcoin (BTC) trades it deems appropriate in furtherance of maximizing Account returns, across as many exchanges as it deems appropriate.

**Statement of Client Account Restrictions**

Assets in Account to be maintained in Bitcoin (BTC) rather than converted to fiat money at the close of each trading day.

## EXHIBIT B

## FEE SCHEDULE

As compensation for managing the Account, Manager shall be paid as follows:

**0% Management Fee; 25% Performance Fee**

In addition, the following terms apply relevant to fees shall apply to the Performance Fee:

With regards to the Performance Fee, the Manager shall be paid, in addition to the Management Fee hereunder an annual Performance Fee equal to 25% of the annual net profits generated on the account, provided that the annual net profits shall be reduced to the extent of any unrecovered balance remaining in the Loss Recovery Account (*as defined herein*), and immediately prior to giving effect to the adjustment required to the Loss Recovery Account for any annual net profits in that fiscal year.

There shall be established for the Client a memorandum account (the "Loss Recovery Account"), the balance of which shall initially be zero. At the end of each fiscal year (or such other times as required below), the balance in each such Loss Recovery Account shall be adjusted as follows:

(i) in the event that there have been annual net losses with respect to the Client's Account since the last day of the immediately preceding fiscal year (or, if no calculation has yet been made with respect to the Client's Account, since its creation), an amount equal to such annual net losses shall be **credited** to such Loss Recovery Account; and

(ii) in the event that there have been annual net profits with respect to such the Client's Account since the immediately preceding date as of which a calculation of an Incentive Allocation was made, an amount equal to such annual net profits, before any Incentive Allocation to the Manager, shall be **debited** from and reduce any unrecovered balance in such Loss Recovery Account, but shall not reduce the balance below zero.

## EXHIBIT C

## CERTIFICATION OF AUTHORIZED PERSONS

I certify, as the individual investor that the
following persons are "Authorized Persons" under the Agreement:

| NAME | TITLE | SPECIMEN SIGNATURE |
|---|---|---|
| Jeffrey Ghitman | Director | *DocuSigned by:* /s/ 941DFDE5014E4AE... |
| Jay Paul Henderson | Director | |
| | | |
| | | |
| | | |
| | | |

**GH Holdings LLC**
Name of Legal Entity (Please Print)

By: *DocuSigned by:* /s/ 941DFDE5014E4AE...
Signature

Jeffrey Ghitman, Director
Name and Title (Please Print)

Date: 11/24/2020

9

# EXHIBIT D

# MANAGER'S CURRENT FORM ADV

# EXHIBIT E

## CERTAIN RISKS ASSOCIATED WITH THE TRADING ACTIVITIES CONTEMPLATED IN THIS AGREEMENT

*There can be no assurance that the Manager will achieve the Investment Objectives.* The trading activities contemplated herein by the Manager bear certain financial and other risks, including the risk of a loss of principal. The following risk factors do not purport to be complete explanation of the risks and potential conflicts of interest related to the trading activities contemplated herein. Client should consult its own professional advisors, before determining to enter into this Agreement.

# EXHIBIT F

## CLIENT'S ANTI MONEY LAUNDERING REPRESENTATIONS

1. All evidence of identity I have provided in connection with this Agreement is true and correct and all related information furnished is genuine and accurate.

2. I agree to provide such additional information as may be deemed necessary by the Manager from time to time for ongoing compliance with anti-money laundering programs.

3. I hereby represent and warrant that neither I, or in the case of an entity, neither it, nor any person controlling, controlled by, or under common control with it, nor any person having a beneficial interest in it, is an individual, organization, or entity on the List of Specifically Designated Nationals and Blocked Persons (the "OFAC Control List") maintained by the US Office of Foreign Assets Control ("OFAC"). I further agree to notify the Manager of any change in information affecting these representations and covenants.

4. I hereby represent and warrant that the amounts of cryptocurrency in the separately managed account contemplated herein, was not indirectly derived from activities that contravene U.S. federal or state laws or regulations and international laws and regulations, including anti-money laundering laws and regulations.

5. I hereby represent and warrant that I am not a Senior Foreign Political Figure, a member of a Senior Foreign Political Figure's Immediate Family, and/or a Close Associate of a Senior Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated by the US Treasury as warranting special measures due to money laundering concerns, nor am I a former Senior Foreign Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated as warranting special measures due to money laundering concerns.

6. I hereby represent and warrant that I am not resident in, or organized or chartered under the laws of a jurisdiction that has been designated by the US Secretary of Treasury under Sections 311 and 312 of the Patriot Act as warranting special measures due to money laundering concerns.

7. I hereby represent and warrant that the entity I represent, if any, is not a Foreign Shell Bank as the term is defined in the Patriot Act.

8. I hereby represent and warrant that the cryptocurrency funds in the Account do not originate from, nor will they be routed through an account maintained at a Foreign Shell Bank, an "offshore bank," or a bank organized or chartered under the laws of a jurisdiction deemed to be a non-cooperative country of territory (list available at www1.oecd.org/fatf).

The undersigned does represent and certify under penalty of perjury, by executing this Client's Anti-Money Laundering Representations, that the foregoing statements are true and correct.

Executed this 18th day of August, 2020.

**CLIENT:** GH Holdings LLC

**Signature:** _DocuSigned by: 941DFDE5014E4AE..._
**Name:** Jeffrey Ghitman
**Title:** Director
**Jurisdiction:** ▇▇ USA