# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**CASE NO.: 22-cv-8858 (JPO)**

ALEJANDRO CANTO, on behalf of himself
and all others similarly situated,

        Plaintiff,

vs.

BKCOIN MANAGEMENT, LLC,
CARLOS BETANCOURT, and KEVIN KANG,

        Defendants.

_____/

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff, Alejandro Canto, by and through his counsel of record, files this class action complaint on behalf of himself and all others similarly situated against Defendants, BKCoin Management, LLC ("BKCoin"),[1] Carlos Betancourt ("Betancourt"), and Kevin Kang ("Kang") (collectively, "Defendants"), and in support thereof states as follows:

### I.     INTRODUCTION

1.     Defendants violated the most exacting loyalties and strictest of confidences to hide massive losses in Plaintiff Alejandro Canto's investment portfolio while illegally raiding his portfolio of millions of dollars. Upon information and belief, Defendants Betancourt and Kang have similarly mismanaged and otherwise defrauded numerous others who invested in funds they controlled.

---

[1]     As noted below, in light of a stay associated with a receivership action involving BKCoin, Plaintiff does not seek any relief as to BKCoin individually or on a class basis at the present time. *See also* ECF No. 24.

2.     Canto is a young entrepreneur who earned millions of dollars in emerging industries, such as cannabis and, as relevant here, cryptocurrency. Canto retained BKCoin—a cryptocurrency fund ran by Betancourt and Kang—to manage his cryptocurrency investment portfolio. Betancourt and Kang acted as investment managers and/or advisers to Canto, directly managing and advising as to Canto's financial affairs with BKCoin. BKCoin and its principals heralded themselves as prodigies as Canto's portfolio grew from a few hundred thousand dollars to more than $11 million.

3.     But when the crypto markets began to see downturns, BKCoin ceased regularly updating Canto about his investment portfolio. Then, BKCoin, at the direction of its principals, began raiding Canto's multi-million dollar portfolio, purportedly for margin calls related to certain loans Canto executed with BKCoin. But Canto never authorized such margin calls, and neither BKCoin nor its principals had the authority to do so under the relevant loan agreements.

4.     Instead of prioritizing Canto's and their other investors' financial interests above their own, BKCoin violated its fiduciary duties of loyalty, and Kang and Betancourt violated their fiduciary duties and obligations as investment advisors, by unilaterally seizing cryptocurrency from Canto's investment portfolio and misrepresenting their authority to do so, all to satisfy their own agenda.  Defendants have disregarded the gravity of Canto's suffered injuries as a result of their tortious acts. Canto has suffered millions of dollars in damages for which he seeks to be fully compensated.

5.     Upon information and belief, Defendants Betancourt and Kang, in their role as Canto's investment managers, made numerous fraudulent misrepresentations and omissions to Canto regarding the status of his investments, including by preparing and providing Canto with investment statements that misrepresented the amount, location, and status of his investments. The

statements prepared by Betancourt and Kang indicated that Canto's investments were secure and being held and managed on his behalf. Instead, Defendants Betancourt and Kang were raiding Canto's investment accounts to pay themselves, to pay for BKCoin's operating expenses, and to pay other investors that were withdrawing funds from BKCoin.

6.      Betancourt and Kang also failed to inform Canto of their self-dealing and mismanagement of his investments. Had they informed him of their conduct and the true status of his investments, Canto would have withdrawn his investments prior to suffering losses.

7.      As to the class a whole, Defendants, whether individually, in concert, or otherwise, breached their duties and obligations by comingling and then dissipating assets of numerous investors (like Canto), misrepresenting the nature of their investment holdings, and failing to properly disclose material facts or account for investors' holdings, among other things.

## II.      PARTIES

8.      Plaintiff Alejandro Canto is domiciled in, and thus a citizen of, Florida.

9.      Defendant BKCoin Management, LLC, is a Delaware limited liability company. BKCoin has two members: Defendants Carlos Betancourt and Kevin Kang.

10.      BKCoin is an affiliate of BKCoin Capital LP ("BKCoin Capital") and along with other funds—including, BKCoin Multi-Strategy Fund, LTD; BKCoin Multi-Strategy Master Fund, LTD; and BKCoin Multi-Strategy Fund LP, (collectively the "Multi-Strat Funds") — operate under the umbrella of BKCoin Capital.

11.      Defendant Carlos Betancourt is domiciled in, and thus a citizen of, California and is a founding principal and co-manager for BKCoin. Betancourt had registered individually with the SEC as an investment advisor and thus, under the Investment Advisors Act, was required to act in a fiduciary capacity regarding Canto's investments.

3

12.     Defendant Kevin Kang is domiciled in, and thus a citizen of, New York and is a founding principal and co-manager for BKCoin. Kang had registered individually with the SEC as an investment advisor and thus, under the Investment Advisors Act, was required to act in a fiduciary capacity regarding Canto's investments.

### III.     JURISDICTION AND VENUE

13.     This Court has original jurisdiction over this class action pursuant to the Class Action Fairness Act and 28 U.S.C. § 1332(d) because members of the proposed Class are citizens of states different from Defendants home states, New York and California. The total amount in controversy in this action exceeds $5,000,000 exclusive of interest and costs. The Court has pendent or supplemental jurisdiction over any other claims.

14.     This Court has personal jurisdiction over Defendants Betancourt and Kang because, among other things detailed below, their tortious activities occurred within this District.

15.     BKCoin conducts business operations in New York. BKCoin also failed to act in accordance with its fiduciary duties in this District and performed the margin calls at issue in this District. Further, BKCoin consented to the jurisdiction of this Court under the Investment Management Agreements. *See Investment Management Agreements* ¶ 16, attached as **Composite Exhibit A**.

16.     Defendant Betancourt regularly conducts business in New York, and his actions or inactions that resulted in harm to Canto and the putative class occurred in this District.

17.     Defendant Kang is domiciled in New York, regularly conducts business in New York, and his actions or inactions that resulted in harm to Canto and the putative class occurred in this District.

18.     Venue is proper in the Southern District of New York because BKCoin agreed to litigate matters in this District pursuant to the Investment Management Agreements. *See* Ex. A. at ¶ 16. Betancourt and Kang are likewise bound by the Investment Management Agreements' forum selection clauses as non-signatories because their conduct is closely related to the contractual relationship between BKCoin and Canto. Venue is also proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this District.

### IV.     FACTUAL ALLEGATIONS

19.     BKCoin Capital, is a New York-based multi-million-dollar digital asset hedge fund, managing, at one time, more than $100 million dollars in assets. Defendant BKCoin is an affiliate of BKCoin Capital, which manages and trades digital assets, including cryptocurrency, to deliver returns to investors.

**A.  Plaintiff Canto's Individual Factual Allegations**

20.     Canto has earned millions of dollars as an entrepreneur in emerging industries. One of those industries was the cryptocurrency industry.

***The Parties Execute Investment Management Agreements for Canto's Cryptocurrency***

21.     In 2019, after previous investments in cryptocurrency, Canto engaged with BKCoin to manage his investment portfolio. Canto entrusted his confidence in BKCoin and relied on it to manage his investments.

22.     As part of the engagement, Canto executed two Investment Management Agreements with BKCoin, dated March 16, 2020, and December 7, 2020. The Investment Management Agreements were virtually identical to each other. *See* Ex. A.

23.     Under the Investment Management Agreements, BKCoin agreed to manage Canto's cryptocurrency assets. *See* Ex. A. at ¶ 1.

24.     Thus, a fiduciary relationship arose from the trust and confidence between Canto and BKCoin, where BKCoin owed several fiduciary duties to Canto including the fiduciary duty to exercise due skill, care, and diligence in handling Canto's investment portfolio.

25.     BKCoin had a fiduciary duty to timely communicate with Canto about his investment portfolio and advise him of its status. BKCoin also had a fiduciary duty to provide, at a minimum, quarterly statements to Canto regarding the performance status of his investment portfolio and to carefully supervise Canto's portfolio under his express authorization. *See* Ex. A. at ¶¶ 2, 10.

26.     Under the Investment Management Agreements, BKCoin owed a duty of loyalty and good faith to Canto, which required that it put his financial interests above its own.

27.     The Investment Management Agreements specified that BKCoin would manage the following cryptocurrencies for Canto: Bitcoin, Ethereum, XRP (Ripple), and BitTorrent (BTT). *See* Ex. A at Exhibit A (Statement of Client Account Restrictions). BKCoin would later acquire and manage for Canto an additional cryptocurrency called HBAR (Hedera), which was not subject to the Investment Management Agreements.

### *Betancourt's & Kang's Roles with BKCoin*

28.     BKCoin is a relatively small company, composed of possibly as few as five, full-time employees. Virtually all of BKCoin's employees are located or work in New York.

29.     BKCoin's members and principals—e.g., Betancourt and Kang—were involved in its day-to-day activities and made the principal decisions regarding operating the company,

managing Canto's investment portfolio, and providing him notice of the status of his holdings with the company.

30.     Betancourt was the primary relationship manager for Canto's investment portfolio, serving, among other things, as the primary broker, adviser, and contact for Canto's account.

31.     Kang was responsible for monitoring and managing Canto's investment portfolio and providing updates to Canto regarding his holdings and financial affairs at BKCoin.

32.     Both Kang and Betancourt had registered with the SEC as investment advisors and, among other things, were obligated to act in the best interests of their clients, like Canto, and prohibited from engaging in activities in conflict with their clients' interests.

### *The Parties Execute Loan Agreements Related to the Acquisition of Cryptocurrency*

33.     In addition to the Investment Management Agreements, Canto executed multiple loan agreements with BKCoin, three of which are relevant here, dated October 7, 2021, November 19, 2021, and March 9, 2022. *See* **Composite Exhibit B**.

34.     BKCoin loaned Canto at least $4.05 million under the loan agreements. *See* Ex. B. Under the loan agreements, Canto's investment portfolio with BKCoin served as collateral for the loans.

35.     If BKCoin loaned Canto cryptocurrency instead of U.S. dollars, the loan agreements allowed BKCoin to request margin calls for additional collateral from Canto under certain circumstances. BKCoin's loans to Canto, however, were provided in U.S. dollars, not cryptocurrency. Accordingly, BKCoin was not authorized to conduct any margin calls for additional collateral from Canto. *See* Ex. B at Exhibit B (Loan Term Sheet).

36.     Not only were margin calls thus inappropriate because BKCoin did not loan cryptocurrency to Canto, but the loan agreements did not authorize BKCoin to unilaterally seize additional collateral from Canto's investment portfolio.

### *Canto's Crypto-Portfolio Achieves Massive Gains Before Breaches*

37.     After execution of the Investment Management Agreements and certain of the loan agreements, Canto's portfolio initially earned substantial gains. Canto's cryptocurrency portfolio with BKCoin—excluding his XRP (Ripple) and HBAR (Hedera) coins—eventually reached highs of at least $11.4 million.

38.     But, shortly after Canto's portfolio reached its highs, BKCoin committed several breaches of its fiduciary duties in the management of Canto's multi-million-dollar investment portfolio, resulting in millions in losses to Canto.

39.     For more than a year after the execution of the initial Investment Management Agreement, BKCoin, through Betancourt and Kang, provided statements to Canto virtually every month that detailed the status and performance of Canto's investment portfolio.[2]

40.     However, beginning in July 2021 when his portfolio began to see its first losses, Betancourt and Kang stopped providing Canto with monthly reports detailing the status of his investments.

41.     On October 26, 2021, after the cryptocurrency market dramatically recovered from Summer 2021 lows, BKCoin provided Canto monthly statements that it had not previously issued Canto through that date.

---

[2] As explained herein, the statements that were provided to Canto were fraudulent because Kang and Betancourt were commingling and misappropriating Canto's investments. Because of these fraudulent statements, Canto is unaware of the current status of his investments.

42.     But the cryptocurrency market experienced another significant downturn the weeks following October 26, 2021, and BKCoin once again failed to provide Canto monthly (or any statements) thereafter until June 7, 2022, more than a half a year later. During that time, Canto's investment portfolio suffered significant losses.

43.     Defendants' practices establish that it provided portfolio updates to Canto only when the market was favorable. For example, Defendants did not provide Canto statements in July, August, or September 2021 when the market was volatile. But Defendants provided Canto an update on October 26, 2021, while the market was favorable. Following that update, the market again turbulently fell, and Defendants failed to timely inform Canto about his portfolio.

44.     Canto continually demanded updates regarding his investment portfolio—during this period and earlier—that were never provided, a further breach of fiduciary duty.

45.     To date, Canto has yet to receive any portfolio statements reflecting the status of his investments in HBAR or XRP cryptocurrency.

46.     When Canto finally received an update in June 2022, Betancourt and Kang informed him, over the phone, that his near $12 million-dollar portfolio was under water and that he owed BKCoin $1 million. Thereafter, Defendants have still failed to provide Canto updates regarding his investment portfolio, despite repeated requests to BKCoin, its principals, and BKCoin's attorneys.

47.     BKCoin's failure to provide timely updates or otherwise communicate with Canto during its management of Canto's portfolio is a breach of the fiduciary duty of care created by the Investment Management Agreements. Betancourt and Kang also had obligations as registered investment advisors to provide full and fair disclosures of all material facts regarding Canto's investment account.

48.     Had Canto received timely updates from Defendants regarding his cryptocurrency investments, he would have sold his portfolio at near market highs before he lost nearly all of his investments.

### BKCoin Improperly Seizes Collateral From Canto's Investment Portfolio

49.     BKCoin also breached its fiduciary duty as investment manager when it conducted improper margin calls on Canto's investment portfolio.

50.     The loan agreements, the only contracted modification of the BKCoin's fiduciary obligations, expressly outlined the rights of responsibilities between BKCoin and Canto.

51.     The loan agreements expressly permitted margin calls on Canto's investment portfolio only in the event that Canto borrowed cryptocurrency from BKCoin (and then, only under certain conditions). The loan agreements did not authorize margin calls when the loans were made in U.S. dollars as they were here. In no circumstances did the loan agreements authorize BKCoin to unilaterally seize collateral from Canto's investment portfolio.

52.     Purporting to act pursuant to the loan agreements, however, BKCoin, acting through Betancourt and Kang, unilaterally conducted margin calls on Canto's investment portfolio. In other words, BKCoin, without notice to Canto, transferred or seized additional cryptocurrency collateral from Canto's investment portfolio despite neither the loan agreements nor Canto providing BKCoin (or its principals) that authority.

53.     BKCoin's improper margin calls breached its fiduciary duties of loyalty, good faith, and care to Canto that it agreed to fulfill as his investment manager.

54.     As a result of those breaches, BKCoin (and its principals) improperly raided Canto's investment portfolio of millions of dollars based on the improper margin calls.

55. As of close of market on October 14, 2022, Canto's portfolio was purportedly worth only $2.9 million, excluding his holdings in HBAR and XRP. However, Canto is without knowledge of the actual holdings in his investment account because the account statements he did receive did not reflect the fact that his investments were being commingled with other investors funds and being misappropriated by Betancourt and Kang for improper purposes.

56. Canto is also without knowledge as to the current value of his HBAR and XRP coins because Defendants have failed to provide him with this information, despite their obligations as his investment manager.

### *Defendants Betancourt and Kang Fraudulent Misrepresentations to Canto*

57. Defendants Betancourt and Kang oversaw and managed Canto's investments and were responsible for providing him account statements and other communications regarding the status of his investments.

58. As registered investment advisors, Betancourt and Kang were required use reasonable care to avoid misleading Canto, to avoid any conflicts of interest regarding his investments, and to disclose all material facts regarding Canto's investments, among other things.

59. Canto was led to believe, by Betancourt and Kang through the account statements they prepared and approved (or otherwise), that his investments were being held and managed in his own personal investment account.

60. For example, Canto was provided an account statement on December 31, 2021, reflecting that his investment account contained Bitcoin and Ethereum worth approximately $4.6 million. Canto was sent a similar account statement on March 31, 2022, showing the value of his account remained at approximately $4.6 million.

61.     These account statements, and others provided to Canto, misrepresented the actual status and amounts of Canto's investments. Rather than being held in a personal investment account, Canto's investments were commingled with funds of other investors and Canto's and other investors' funds were raided by Betancourt and Kang for their own personal gain, to pay operating costs of BKCoin, and/or to pay out other investors who were withdrawing funds.

62.     Upon information and belief, Betancourt and Kang created false account statements to hide their commingling and misappropriation of Canto's holdings and prevent Canto from liquidating his accounts.

63.     Betancourt and Kang also misrepresented and/or failed to disclose the purpose of the "margin calls" on Canto's investments as well as their own authority to conduct such margin calls.

64.     As explained above, Betancourt and Kang conducted purported "margin calls" and withdrew funds from Canto's investment accounts without the authority to do so. Betancourt and Kang either failed to inform Canto of these withdrawals or misrepresented their purpose.

65.     The minimal account statements that Canto did receive, did not reflect the amounts or dates that the "margin calls" were conducted. Thus, Canto was unaware, and remains unaware, of how many margin calls were conducted and what amounts were withdrawn.

66.     When Betancourt and Kang did inform Canto that they would be conducting margin calls, they misrepresented the purpose of the withdrawals. For example, on May 17, 2022, Kang falsely claimed that certain "counterparties" were requesting additional funds to conduct a margin call on Canto's account because it had a negative balance of approximately $140,000.

67.     In June 2022, Betancourt and Kang called Canto and demanded that he pay approximately $2 million as a margin call for collateral under the Loan Agreements because his investment account was underwater.

68.     These and other representations about the need for margin calls were false. These funds and the other "margin calls" conducted by Betancourt and Kang were not because BKCoin needed collateral under the Loan Agreements but rather, they needed funds to continue commingling accounts to pay themselves, BKCoin's operating costs, and investors who were pulling their money out.

69.     Betancourt's and Kang's misrepresentations and omissions were material. Had Betancourt and Kang not misrepresented the nature of Canto's investment holdings or disclosed their conduct (mismanagement and commingling of investment accounts, improper margin calls, etc.), Canto would have withdrawn his funds prior to his losses.

**B.  BKCoin Similarly Breaches its Fiduciary Duties to Other Investors**

70.     On or about October 28, 2022, BKCoin filed an Emergency Petition for Appointment of Receiver in an action styled, *BKCoin Management, LLC, et al v. BKCoin Multi-Strategy Fund, Ltd., et al*, Case No. 2022-020760-CA-01, pending before the Eleventh Judicial Circuit Court of Florida in Miami-Dade County (the "BKCoin Receivership Action").

71.     The BKCoin Receivership Action, which was initiated by Betancourt, alleges that Kang has diverted or comingled $12 million in cash and other assets out of various funds controlled by Betancourt and Kang.

72.     The BKCoin Receivership Action demonstrates that various funds controlled by Betancourt and Kang were mismanaged, and Canto is not alone in the harm he suffered.

73.     Upon information and belief, Defendants separately hold or manage investors' funds (including Canto's funds). Instead, all investors' funds were commingled and BKCoin through, Betancourt and Kang, would raid the funds for various purposes including funding BKCoin's operating account and using some investors' funds to pay off other investors who were liquidating their accounts.

74.     Similar to their conduct towards Canto, BKCoin breached its fiduciary duties by failing to disclose or provide proper accounting to all investors.

75.     Months prior to the institution of the BKCoin Receivership Action, Canto requested a disclosure regarding the status of his investments. Canto also requested BKCoin liquidate his portfolio. Because BKCoin comingled Canto's investments with other investors in the various funds (and potentially used Canto's funds for other purposes, *see* ¶ 58, *supra*), neither BKCoin, Betancourt, or Kang could either identify Canto's current holdings or comply with his instructions to liquidate his holdings, causing Canto further losses.

76.     Defendants' malfeasance likewise extends to all parties who trusted the various entities under the BKCoin Capital umbrella to manage their money.

77.     All conditions precedent to the institution, maintenance, and conclusion of this action, if any, have been performed, waived, or executed.

78.     Canto is suing regarding the breaches of fiduciary duty arising from the Investment Management Agreements only. The loan agreements are mentioned here because they formally define the parties' modifications of their legal and other contractual duties.

## V.     CLASS ALLEGATIONS

**Class Definition**

79.     Canto brings this action on his own behalf, and on behalf of all persons similarly

14

situated, pursuant to Rules 23(a) and (b)(2) or (b)(3) of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. Canto seeks to certify the following proposed nationwide class:

### The Nationwide Class

All persons in the United States who invested in any funds under the BKCoin Capital umbrella, including BKCoin, and the Multi-Strat Funds, all of which were controlled by Betancourt and Kang.

80.     Excluded from the proposed class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

81.     Canto reserves the right to modify, expand, or amend the definitions of the proposed class following the discovery period and before the Court determines whether class certification is appropriate.

82.     Certification of Canto's claims for class-wide treatment is appropriate because Canto can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

**Numerosity**

83.     This action satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1). There are dozens of investors in the funds under the BKCoin Capital.

84.     The identities of Class members are ascertainable, as the names and addresses of all Class members can be identified in BKCoin Capital's or its affiliates' books and account records. Canto anticipates providing appropriate notice to the certified class in compliance with Federal Rule of Civil Procedure 23(c)(2)(A) and/or (B), to be approved by the Court after class

certification, or pursuant to court order under Federal Rule of Civil Procedure 23(d).

**Commonality**

85.     This action satisfies the requirements of Federal Rule Civil Procedure 23(a)(2) and 23(b)(3) because there are questions of law and fact that are common to the class.  These common questions predominate over any questions affecting only individual Class members.    The predominating common or Class-wide fact questions include, without limitation:

> a.   Whether Defendants breached their fiduciary duties by commingling funds from separate accounts, cryptocurrency wallets, or funds under the umbrella of BKCoin Capital;
>
> b.   Whether Betancourt and Kang aided and abetted BKCoin's breaches of fiduciary duty by directing, supervising, or otherwise managing the commingling funds from separate accounts, cryptocurrency wallets, or funds under the umbrella of BKCoin Capital;
>
> c.   Whether Betancourt and Kang improperly diverted Canto's and the Class members' money and assets out of the funds they managed;
>
> d.   Whether Betancourt and Kang aided and abetted BKCoin Capital and its subsidiary funds in diverting or otherwise mismanaging investor funds; and
>
> e.   Whether Betancourt and Kang provided investors with timely and accurate updates regarding the performance of their investments.

**Typicality**

86.     This action satisfies the requirements of Federal Rule of Civil Procedure 23(a)(3) because Canto's claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same wrongful conduct of Defendants. Each Class member invested in investment funds controlled and owned by Defendants.

**Adequacy of Representation**

87.     Canto will fairly and adequately protect the interests of the Class members.  Canto

is committed to the vigorous prosecution of this action and there is no hostility or conflict between or among Canto and the unnamed Class members. Canto anticipates no difficulty in the management of this litigation as a class action.

88. To prosecute this case, Canto has chosen the undersigned law firm, who has substantial experience in the prosecution of large and complex class action litigation and has the financial resources to meet the costs associated with the vigorous prosecution of this type of litigation. Canto and his counsel will fairly and adequately protect the interest of all Class members.

**Superiority/Predominance**

89. This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members. The joinder of individual Class members is impracticable because of the vast number of Class members invested in funds under the umbrella of BKCoin Capital.

90. The expense and burden of individual litigation would make it difficult or impossible for actions by each Class member for the same activities, conduct, or nonfeasance to redress the wrongs done to each of them individually, such that most Class members may have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to the Defendants, by even a small fraction of the Class members, would be substantial.

91. In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member. The benefits to the legitimate interests of the parties, the court, and the public resulting from class action litigation substantially

outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is simply superior to other alternatives under Federal Rule of Civil Procedure 23(b)(3)(D).

92.     Canto is unaware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Canto or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; utilize the provisions of Federal Rule of Civil Procedure 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Federal Rule of Civil Procedure 23(c)(5) to divide any Class into subclasses.

**Requirements of Federal Rule of Civil Procedure 23(b)(2)**

93.     Defendants have acted or failed to act in a manner generally applicable to the Class members in the Nationwide Class thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to either or all of the classes

## VI.     CLAIMS FOR RELIEF

### COUNT I
### BREACH OF FIDUCIARY DUTY—FAILURE TO DISCLOSE
### (Plaintiff Canto Individually Against BKCoin)

94.     Canto re-alleges and incorporates paragraphs 1-78 of this Complaint as though fully set forth herein.

95.     Canto engaged BKCoin as his investment manager to oversee and supervise his cryptocurrency portfolio.

96. At all times relevant to this litigation, BKCoin owed Canto several fiduciary duties. BKCoin's fiduciary duties included, but are not limited to, obligations to act prudently in the management of Canto's portfolio, to discharge its actions in loyalty and good faith, to act in Canto's best interests, and to put Canto's interests before its own.

97. BKCoin also owed fiduciary (and contractual) duties to Canto to communicate with him regarding the status of his cryptocurrency portfolio and to disclose material facts related thereto. BKCoin was obligated to exercise the highest degree of skill and care

98. Canto vested his trust and confidence in BKCoin to execute its responsibilities.

99. Initially in their relationship, BKCoin provided Canto statements virtually every month detailing the status of his investment portfolio at BKCoin. Canto earned substantial gains on his portfolio during that time.

100. However, beginning in or about July 2021, BKCoin suddenly ceased providing these monthly statements to Canto as soon as Canto's portfolio began to experience losses. After an update in October 2021, more than half a year passed without BKCoin providing any statements to Canto on the then-present status of Canto's investment portfolio.

101. During the time that BKCoin failed to keep Canto informed, his investment portfolio suffered considerable losses.

102. Nearly a year later, and only after multiple requests by Canto for information on his investment portfolio, did BKCoin inform Canto that his investments were under water by at least $1 million.

103. But for the lack of portfolio statements provided by BKCoin and its breaches of fiduciary duty, Canto would have liquidated his investment portfolio at an advantageous time and would not have suffered those losses.

104.     As a result, Canto was unable to sell his investment portfolio when it reached its highs to reap millions of dollars. Now, his once multimillion-dollar portfolio is underwater.

105.     Pursuant to the BKCoin Receivership Action, any and all actions to establish or enforce any claim, right, or interest against BKCoin and certain of its affiliated entities are enjoined.

WHEREFORE, and in light of the stay in the BKCoin Receiver Action, Canto does not presently seek any relief or establish any claim against BKCoin.

**COUNT II**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY—**
**FAILURE TO DISCLOSE**
**(Against Betancourt and Kang**
**On Behalf of Plaintiff Canto and the Nationwide Class)**

106.     On behalf of the Class and himself, Canto re-alleges and incorporates paragraphs 1-93 and 95-105 of this Complaint as though fully set forth herein.

107.      BKCoin owed Canto and the other Class members (including investors in the Multi Strat Funds) several fiduciary duties. BKCoin's fiduciary duties included, but are not limited to, obligations to act prudently in the management of Canto and other Class members' portfolios, to discharge its actions in loyalty and good faith, to act in Canto's and the other investors' best interests, and to put the investors' interests before its own.

108.     Betancourt and Kang were principals of BKCoin and responsible for managing the investments and Funds. Betancourt and Kang substantially assisted BKCoin's breach of its fiduciary duties by improperly failing to communicate with investors regarding the status of their investment portfolios.

109.     Betancourt and Kang knew that BKCoin was bound to communicate to Canto and other Class members regarding the status of and nature of their investment portfolios and to disclose all material information.

110.     As principals of the company and as managers of the investors' funds, Betancourt and Kang were responsible for providing communications and disclosures on behalf of BKCoin to Canto and other Class members. Betancourt and Kang, however failed to provide such communications with investors and, thereby, also substantially assisted in BKCoin's breach of its fiduciary duties.

111.     Instead of enabling BKCoin to carry out its fiduciary responsibilities, Betancourt and Kang knowingly participated in BKCoin's breaches of fiduciary duties to Canto and the Class members by not providing the requisite and necessary updates regarding the management of their investment portfolios. Under Betancourt's and Kang's leadership, and as result of their nonfeasance, many months passed before Canto or Class Members received any portfolio statements from BKCoin or accurate statements.

112.     To date, BKCoin has refused to provide Canto information regarding the status of his investment portfolio. BKCoin has likewise failed to provide similar information to Class members, and as a result, Canto and Class members have suffered damages as they were, among other things, prevented from taking actions to prevent losses or sell at more advantageous times resulting from the breaches of fiduciary duties aided and abetted by Betancourt and Kang.

**COUNT III**
**BREACH OF FIDUCIARY DUTY—**
**FAILURE TO DISCLOSE**
**(Against Betancourt and Kang**
**On Behalf of Plaintiff Canto and the Nationwide Class)**

113.    On behalf of the Class and himself, Canto re-alleges and incorporates paragraphs 1-93 of this Complaint as though fully set forth herein.

114.    Betancourt and Kang have registered with the SEC as investment advisors and therefore are subject to the requirements of the Investment Advisors Act, 15 U.S.C. 80b-1, *et seq.* ("IAA").

115.    Betancourt and Kang acted as investment advisors/managers for Canto and the other Class members (including investors in the Multi Strat Funds). Under the IAA, Betancourt and Kang owed several fiduciary duties to the investors. These duties included, but are not limited to, obligations to act prudently in the management of Canto and other Class members' portfolios, to discharge their actions in loyalty and good faith, to act in Canto's and the other investors' best interests, and to put the investors' interests before its own.

116.    Canto vested his trust and confidence in Betancourt and Kang to execute their responsibilities

117.    Betancourt and Kang were principals of BKCoin and responsible for managing the investments and the Multi-Strat Funds. Betancourt and Kang breached their fiduciary duties by improperly failing to communicate with investors regarding the status of their investment portfolios.

118.    Betancourt and Kang knew that they were bound to communicate to Canto and other Class members regarding the status of and nature of their investment portfolios and to disclose all material information.

119.     As principals of the company and as the investment managers of the investors' funds, Betancourt and Kang were responsible for providing communications and disclosures to Canto and other Class members. Betancourt and Kang, however failed to provide such communications to investors and, thereby, breached their fiduciary duties.

120.     Betancourt and Kang breached their fiduciary duties to Canto and the Class members by not providing the requisite and necessary updates regarding the management of their investment portfolios. Under Betancourt's and Kang's leadership, and as result of their nonfeasance, many months passed before Canto or Class Members received any portfolio statements or accurate statements.

121.     During the time that Betancourt and Kang failed to keep Canto informed, his investment portfolio suffered considerable losses.

122.     Nearly a year later, and only after multiple requests by Canto for information on his investment portfolio, did Betancourt and Kang inform Canto that his investments were under water by at least $1 million.

123.     But for the lack of portfolio statements provided by Betancourt and Kang and their breaches of fiduciary duty, Canto would have liquidated his investment portfolio at an advantageous time and would not have suffered those losses.

124.     As a result, Canto was unable to sell his investment portfolio when it reached its highs to reap millions of dollars. Now, his once multimillion-dollar portfolio is underwater.

125.     To date, Betancourt and Kang have refused to provide Canto information regarding the status of his investment portfolio. They have likewise failed to provide similar information to Class members, and as a result, Canto and Class members have suffered damages as they were, among other things, prevented from taking actions to prevent losses or sell at more

advantageous times resulting from the breaches of fiduciary duties aided and abetted by Betancourt and Kang.

## COUNT IV
## BREACH OF FIDUCIARY DUTY—IMPROPER MARGIN CALLS
### (Plaintiff Canto individually Against BKCoin)

126.     Canto re-alleges and incorporates paragraphs 1-78 of this Complaint as though fully set forth herein.

127.     As the appointed investment manager of Canto's investment portfolio, BKCoin owed fiduciary duties to Canto to act in the utmost good faith and loyalty. At all times relevant to this litigation, BKCoin owed Canto several fiduciary duties. BKCoin's fiduciary duties included, but are not limited to, obligations to act prudently in the management of Canto's portfolio, to discharge its actions in loyalty and good faith, to act in Canto's best interests, and to put Canto's interests before its own.

128.     BKCoin violated its fiduciary duties to Canto by conducting ultra vires acts not permitted under the agreements or otherwise authorized by Canto.

129.     The loan agreements permitted margin calls only in specific circumstances, and only in the event where BKCoin provided loans in the form of cryptocurrency to Canto. *See* Ex. B at § IV(b).

130.     Here, BKCoin had no right to conduct margin calls under the loan agreements because Canto did not borrow cryptocurrency from BKCoin. Instead, Canto directly borrowed U.S. dollars from BKCoin. In exchange, Canto agreed to BKCoin's use of his cryptocurrency holdings as collateral to satisfy the loans.

131.     Without consideration for Canto's financial interests or his prior authorization, BKCoin seized additional collateral—conduct not authorized under the loan agreements.

132.     Canto suffered millions of dollars in damages due to BKCoin's violation of its fiduciary duties by unilaterally seizing cryptocurrency from Canto's investment portfolio to cover BKCoin's loans to Canto. Canto did not authorize those seizures, whether orally or through the loan agreements. At most, BKCoin could only request that Canto supply additional collateral.

133.     Betancourt informed Canto that several margin calls were conducted on his investment portfolio that ultimately resulted, in part or otherwise, in his multi-million-dollar investment portfolio being depleted and underwater by at least $1 million. BKCoin has refused to provide Canto information regarding the current status of his investment portfolio. BKCoin sold Canto's cryptocurrency or removed them from traditional trades, the latter of which prevent him from reaping investment gains from his portfolio.

134.     BKCoin breached its fiduciary duties by taking actions calculated to protect and advance the interests of BKCoin in a manner not authorized by law or any contractual arrangement of the parties. Those breaches resulted in the multi-million-dollar losses in Canto's investment portfolio.

135.     Pursuant to the BKCoin Receivership Action, any and all actions to establish or enforce any claim, right, or interest against BKCoin and certain of its affiliated entities are enjoined.

WHEREFORE, and in light of the stay in the BKCoin Receiver Action, Canto does not presently seek any relief or establish any claim against BKCoin.

## COUNT V
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY—
## IMPROPER MARGIN CALLS
## (Plaintiff Canto individually Against Betancourt and Kang)

136.     Canto re-alleges and incorporates paragraphs 1-78 and paragraphs 127-135 of this this Class Complaint as though fully set forth herein.

25

137.     At all times relevant to this litigation, BKCoin owed Canto several fiduciary duties. BKCoin's fiduciary duties included, but are not limited to, obligations to act prudently in the management of Canto's portfolio, to discharge its actions in loyalty and good faith, to act in Canto's best interests, and to put Canto's interests before its own.

138.     BKCoin breached its fiduciary duties by conducting improper and unilateral margin calls in which BKCoin removed from trading or otherwise seized and/or sold Canto's cryptocurrency to provide additional collateral for BKCoin's loans to Canto.

139.     Betancourt and Kang knowingly participated in BKCoin's improper margin calls by directing, performing, or otherwise authorizing margin calls to protect their company's interests over Canto's interests.

140.     Betancourt informed Canto that BKCoin conducted several margin calls on Canto's investment portfolio—without Canto's knowledge or approval—that ultimately resulted in his multi-million investment portfolio being depleted and underwater by at least $1 million.

141.     To date, BKCoin, Betancourt, and Kang have refused to provide Canto information regarding the current status of his investment portfolio. BKCoin sold Canto's cryptocurrency or removed them from traditional trades, the latter of which prevent him from reaping investment gains from his portfolio.

142.     Kang and Betancourt aided and abetted BKCoin's breach of its fiduciary duties by taking actions calculated to protect and advance the interests of BKCoin in a manner not authorized by law or any contractual arrangement of the parties. The concerted actions of BKCoin, Betancourt, and Kang resulted in the multi-million-dollar losses in Canto's investment portfolio.

## COUNT VI
## BREACH OF FIDUCIARY DUTY—
## IMPROPER MARGIN CALLS
## (Plaintiff Canto individually Against Betancourt and Kang)

143.     Canto re-alleges and incorporates paragraphs 1-78 of this this Complaint as though fully set forth herein

144.      Betancourt and Kang have registered with the SEC as investment advisors and therefore are subject to the requirements of the Investment Advisors Act, 15 U.S.C. 80b-1, *et seq*.

145.      Betancourt and Kang acted as investment advisors/managers for Canto and under the IAA, Betancourt and Kang owed several fiduciary duties to the investors. These duties included, but are not limited to, obligations to act prudently in the management of Canto and other Class members' portfolios, to discharge their actions in loyalty and good faith, to act in Canto's and the other investors' best interests, and to put the investors' interests before their own.

146.     Betancourt informed Canto that several margin calls were conducted on his investment portfolio that ultimately resulted, in part or otherwise, in his multi-million-dollar investment portfolio being depleted and underwater by at least $1 million. BKCoin has refused to provide Canto information regarding the current status of his investment portfolio. BKCoin sold Canto's cryptocurrency or removed them from traditional trades, the latter of which prevent him from reaping investment gains from his portfolio.

147.     Betancourt and Kang seized additional collateral, without consideration for Canto's financial interests or his prior authorization—conduct not authorized under the loan agreements.

148.      Canto suffered millions of dollars in damages due to Betancourt's and Kang's violation of their fiduciary duties by unilaterally seizing cryptocurrency from Canto's investment portfolio to cover BKCoin's loans to Canto. Canto did not authorize those seizures, whether orally

27

or through the loan agreements. At most, Betancourt and Kang could only request that Canto supply additional collateral.

149. BKCoin breached its fiduciary duties. Those breaches resulted in the multi-million-dollar losses in Canto's investment portfolio

150. Betancourt and Kang breached their fiduciary duties by taking actions calculated to protect and advance the interests of BKCoin in a manner not authorized by law or any contractual arrangement of the parties. Betancourt and Kang conducted improper and unilateral margin calls in which they removed from trading or otherwise seized and/or sold Canto's cryptocurrency to provide additional collateral for BKCoin's loans to Canto.

151. Betancourt and Kang knowingly directed, performed, or otherwise authorized these margin calls to protect their own interests over Canto's interests.

152. Betancourt and Kang conducted or authorized several margin calls on Canto's investment portfolio—without Canto's knowledge or approval—that ultimately resulted in his multi-million investment portfolio being depleted and underwater by at least $1 million.

153. To date, Betancourt and Kang have refused to provide Canto information regarding the current status of his investment portfolio. Betancourt and Kang sold Canto's cryptocurrency or removed it from traditional trades, the latter of which prevent him from reaping investment gains from his portfolio.

154. Kang and Betancourt breached their fiduciary duties by taking actions calculated to protect and advance the interests of themselves or BKCoin in a manner not authorized by law or any contractual arrangement of the parties. The concerted actions of Betancourt and Kang resulted in the multi-million-dollar losses in Canto's investment portfolio.

## COUNT VII
## BREACH OF FIDUCIARY DUTY—IMPROPER MISUSE/COMMINGLING OF FUNDS
### (Against Betancourt and Kang
### On Behalf of Plaintiff Canto and the Nationwide Class)

155.     On behalf of the Class, Canto re-alleges and incorporates paragraphs 1-93 of this Complaint as though fully set forth herein.

156.     Betancourt, and Kang, as registered investment advisors, along with BKCoin owed Canto and the other Class members (including investors in the Multi Strat Funds) several fiduciary duties. Those fiduciary duties included, but are not limited to, obligations to act prudently in the management of Canto's and other Class member's portfolios, to discharge their actions in loyalty and good faith, to act in Canto's and the other investors' best interests, and to put the investors' interests before their own.

157.     BKCoin, Betancourt, and Kang breached their duties when they commingled or otherwise misappropriated investors' monies that were under their control.

158.     As senior management of BKCoin, Betancourt and Kang were responsible for ensuring that BKCoin and the Multi-Strat Funds executed their fiduciary duties to Canto and other investors.

159.     Instead of enabling BKCoin and the Multi-Strat Funds to carry out their fiduciary responsibilities, and in addition to their breaches of fiduciary duties, Betancourt and Kang knowingly participated in breaches of fiduciary duties to Canto and other investors by knowingly commingling and misappropriating funds for improper purposes.  As an apparent result of the comingling and misappropriation, by the time BKCoin notified Canto of the status of his investment portfolio in June 2022, BKCoin claimed that Canto's multi-million-dollar investment portfolio was underwater by at least $1 million. Other Class Members experienced similar losses.

160.     Betancourt has provided sworn allegations against Kang, confirming that $12 million in cash or other investment funds were diverted from investor accounts to the detriment of Canto and the Class.

161.     Betancourt knew of the commingling and misuse of investor funds but failed to act until it was too late. For multiple months, Betancourt stalled providing Canto updates regarding his account at a time he must have known of commingling and misuse of investor funds. Betancourt retained or commissioned multiple law firms to stall Canto and protect against revealing the breaches of fiduciary duties—knowingly allowing for the continued misuse of investor funds to the detriment of Canto and the Class members.

162.     But for Betancourt's and Kang's tortious acts and substantial assistance in BKCoin's breach of its fiduciary duties, Canto and other Class members would not have suffered losses as the result of Defendants' breaches.    Class members' losses flow directly from the concerted actions of BKCoin's principals—Betancourt and Kang.

### COUNT VIII
### FRAUDULENT MISREPRESENTATION
### (Plaintiff Canto individually Against Betancourt and Kang)

163.     Canto re-alleges and incorporates paragraphs 1-78 of this this Complaint as though fully set forth herein.

164.     Betancourt and Kang made several fraudulent misrepresentations and omissions to Canto regarding his investments. These misrepresentations include:

a.    Providing Canto with false investment account statements that showed his investments being held in his own investment account when in fact his investments were being commingled with other investors' funds and being mismanaged and misappropriated;

b. Providing Canto with false investment account statements that showed inaccurate amounts of his investment holdings because Betancourt and Kang had commingled his funds with other investors and misappropriated funds for their own personal gain, to pay BKCoin's operating costs, or to pay other investors;

c. Providing Canto with false investment account statements that showed inaccurate amounts of his investment holdings because the statements did not reflect that Betancourt and Kang had been conducting improper "margin calls" on his investment holdings;

d. Failing to disclose to Canto the nature of their misconduct and mismanagement of his funds including failing to disclose the dates and amounts of when they conducted purported "margin calls" on Canto's investment funds; and

e. In June 2022, representing to Canto on the phone that his account was under water by approximately $1 million due to standard investment losses when in fact Canto's investment losses were due to Betancourt and Kang misappropriating his funds for other purposes.

165. Betancourt and Kang intended for Canto to rely on their false representations and omissions so that Canto would not liquidate his accounts and seek the return of his investment funds.

166. Canto had no way of reasonably knowing that Betancourt and Kang were misrepresenting the true nature of his investment accounts so that they could continue to misappropriate funds for improper purposes.

167.    As a direct and proximate result of Betancourt's and Kang's knowing misrepresentations and omissions, Canto has sustained damages by, among other things, not immediately withdrawing his funds from BKCoin to mitigate his losses.

### PRAYER FOR RELIEF

**WHEREFORE**, Canto, on behalf of himself and all other similarly situated Class members, request that the Court enter judgment against Defendant Betancourt and Defendant Kang only as follows:

(1)    Declare this action to be a proper class action maintainable under Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and designate and appoint Canto as class and/or subclass representative and his chosen counsel as Class Counsel for Counts II, III, and VII;

(2)    Hold that Betancourt and Kang breached their fiduciary duties to all Class members by commingling and otherwise misappropriating investor funds under their control;

(3)    Hold that Betancourt and Kang aided and abetted BKCoin's breach of fiduciary duties to all Class members by failing to provide updates as to the status Class members' investments;

(4)    Hold that Betancourt and Kang breached their fiduciary duties to all Class members by failing to provide updates as to the status Class members' investments;

(5)    Hold that Betancourt and Kang breached their fiduciary duties to Canto by conducting improper "margin calls" on his investments;

(6)    Hold that Betancourt and Kang aided and abetted BKCoin's breach of fiduciary duties to Canto by conducting improper "margin calls" on his investments;

(7)    Hold that Betancourt and Kang committed fraud by providing false account statements and information to Canto regarding his investment accounts;

(8)     Hold that Betancourt and Kang committed fraud by misrepresenting the reason for and their authority to conduct the "margin calls" on Canto's investment account;

(9)     Hold that Betancourt and Kang committed fraud by hiding material facts from Canto regarding his investments including the fact that his funds were being misappropriated for improper purposes;

(10)    Award Canto and Class members actual, compensatory, and punitive remedies, including interest, in an amount to be proven at trial under applicable claims;

(11)     Award Canto and Class members their reasonable attorneys' fees and costs, as allowed by law; and

(12)    Award Canto and Class members any further and different relief as this case may require or as determined by this Court to be just, equitable, and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiff Canto demands a trial by jury on all claims.

Dated: January 20, 2023.

**KOZYAK TROPIN & THROCKMORTON LLP**
*Attorneys for Alejandro Canto*
2525 Ponce de Leon Blvd., 9th Floor
Miami, Florida 33134
Tel.: 305-372-1800/Fax: 305-372-3508

By: */s/ Dwayne A. Robinson*
Dwayne A. Robinson, Esq. (*pro hac vice*)
Fla. Bar No. 0099976
Email: drobinson@kttlaw.com
Robert J. Neary, Esq. (*pro hac vice*)
Fla. Bar No. 81712
Email: rn@kttlaw.com
Jeffrey J. Leavitt, Esq. (*pro hac vice*)
Fla. Bar No. 1010264
Email: jleavitt@kttlaw.com
Amber J. Mannings, Esq. (*pro hac vice*)
Fla. Bar No. 1038566
Email: amannings@kttlaw.com

# COMPOSITE EXHIBIT A

# INVESTMENT MANAGEMENT AGREEMENT

This Agreement is made this 16th day of March, 2020 (this "Agreement"), by and between **BKCoin Management LLC**, a Delaware limited liability company with principal place of business located at 38 E 37th Street #11, New York, New York 10016 (the "Manager"), a limited liability company, and **Mr. Alejandro Canto**, a Washington State resident with principal place of residence at 15030 16th Pl W Lynnwood, WA 98087 (the "Client")(each a "Party" and collectively the "Parties"). The Parties agree as follows:

1. Appointment. Client hereby appoints Manager as an investment manager to manage such of Client's cryptocurrency (Bitcoin) assets, pursuant to the terms of this Agreement, as Client shall from time to time assign to it, the proceeds from the sale of such cryptocurrency assets, and the income attributable to such cryptocurrency assets (the "Account"). Client shall promptly notify Manager in writing of any increase or reduction in the amount of the Account's assets subject to Manager's investment direction.

2. Authority of Manager. Manager is authorized to supervise and direct the investment and reinvestment of the cryptocurrency assets in the Account, subject to such limitations as are contained in the Guidelines described in Section 3 of this Agreement, as they may be from time to time amended, and subject to Client's right to direct the investment of the Account, if so desired, by means of Instructions as described in Section 3 of this Agreement. Manager, as Client's agent and attorney-in-fact with respect to the Account, when it deems appropriate and without prior consultation with Client, may: (a) buy, sell, exchange, convert and otherwise invest or trade in Bitcoin, at such times and in such manner as Manager determines; (b) place orders for the execution of such Bitcoin with or through such brokers, dealers or issuers as Manager may select, which brokers or dealers are entitled to receive compensation out of the Account for their services; and (c) execute any documentation as the Account's agent and attorney-in-fact as Manager may deem necessary to facilitate any such investment or reinvestment. Manager, as Client's agent and attorney-in-fact with respect to the Account, when it deems appropriate and without prior consultation with Client, may engage external legal counsel to review relevant trade-related documentation, and charge the Account for such costs. Manager may give a copy of this Agreement to any broker, dealer or other party to a transaction, as evidence of its authority to act on the Account's behalf.

The cryptocurrency assets of the Account shall be held in an account that is owned by Client. Notwithstanding the foregoing, given the unique nature of the cryptocurrency exchanges, and given that Manager has corporate level accounts across numerous exchanges that allows it to execute the Investment Objectives contemplated herein, Client hereby consents to such temporary movement out of the Account and into the corporate accounts of Client among the various exchanges for purposes of execution of the Investment Objectives as Manager deems appropriate. In furtherance of this movement of the cryptocurrency assets, Client hereby grants to Manager a power of attorney coupled with an interest, authorizing and permitting Manager to take Client's cryptocurrency assets out of the Account, move the cryptocurrency assets into Manager's corporate accounts at whichever exchange that Manager deems appropriate for execution of the Investment Objectives, to execute the trades in such accounts as the Manager deems appropriate, and finally to move the money back into the Account upon conclusion of the strategy employed by Manager. The Parties also hold open the possibility that Client's cryptocurrency assets may, at some point in the future, be held by a custodian (the "Custodian") which shall have custody of the Account, and which shall be directed by Client to follow the directions relating to trading that is conveyed to the Custodian by the Manager. In such cases, Client shall not change the Custodian without giving Manager reasonable advance written notice of its intention to do so, together with the name and other relevant information with respect to the new Custodian. Manager shall not be liable for any act or omission of any Custodian used.

3. Guidelines and Instructions. Attached hereto as Exhibit A is a statement of the investment objectives of Client together with a statement of any and all specific investment restrictions applicable to the investment of the Account (the "Guidelines"). Client shall have the right at all times to modify the Guidelines or to give Manager instructions ("Instructions") to buy, sell or retain any investment, but no modification of the Guidelines and no Instructions or modifications of Instructions shall be binding upon Manager unless Manager has received written notice of them from an Authorized Person (as defined in Section 5(d)). Manager shall have a reasonable period to bring the Account into compliance with any changes to the Guidelines. Manager shall be under no duty to make any investigation or inquiry as to any statement contained in any written Guidelines or Instruction given and, unless and until specifically advised otherwise, Manager may accept the same as conclusive evidence of the truth and accuracy of the statements contained therein. The Guidelines and all Instructions, unless they expressly provide otherwise,

shall continue to be effective until duly canceled by subsequent modifications duly communicated to Manager in writing.

4. Fees. As full compensation for its services under this Agreement, Manager shall be paid quarterly a management fee (the "Management Fee") equal to one-fourth of the annual rates specified in Exhibit B, based on the asset value of the Account as of the last day of each calendar quarter on which a Bitcoin exchange is open for trading (the "Valuation Date"), and before deductions for the Performance Fee below. The initial billing period of the Management Fee will begin when this Agreement is signed by Client and accepted by Manager, and initial funding has been received by the Custodian (the "Inception Date"). The initial fee will be pro-rated to cover the period from the Inception Date through the Valuation Date for that calendar quarter and will be based on the valuation as of that Valuation Date. Future quarterly fees will be calculated similarly in arrears. If Manager shall serve for less than the whole of any quarter, its compensation shall be determined as provided above on the basis of the value of the assets in the Account as of the end of the date of termination and shall be payable on a pro rata basis for the period of the quarter for which it served as Manager hereunder. In addition, Manager shall be entitled to a performance fee (the "Performance Fee") for good performance, and the terms of the Performance Fee are substantially set forth within Exhibit B below. Other than as specifically indicated in this Agreement, the Manager shall not be required to pay any expenses in connection with the investment management services that are contemplated herein. Client shall direct the Custodian automatically to charge to the Account and pay directly to Manager all of Manager's fees upon the Custodian's receipt of an invoice from Manager.

5. Representations and Warranties. Client hereby acknowledges, represents and warrants to, and agrees with Manager, as follows:

(a) Client Assets. Client is the sole owner of all cryptocurrency assets in the Account and (i) there are no restrictions on the transfer, sale or public distribution of any such assets and (ii) no option, lien, charge, security or encumbrance exists over such assets, except as disclosed to Manager in writing.

(b) Authority. The Client has full authority and power to engage Manager under the terms and conditions of this Agreement, and such engagement does not violate Client's constituent documents, any other material agreement, order or judgment of any court or governmental authority, or any law applicable to Client. Client further represents that all investments permitted herein are within its power to enter into and have been duly authorized.

(c) Form ADV. Client acknowledges receipt of Part II of Manager's Form ADV. Notwithstanding anything to the contrary herein, if Client did not receive a copy of the Form ADV at least forty-eight (48) hours prior to execution of this Agreement, Client shall have the right to terminate this Agreement without penalty within five (5) business days of the execution of this Agreement; provided, however, that Client shall be at risk for any market fluctuations in the Account up to the time of such termination. Note that in light of the Manager's taking on the management of Client's cryptocurrency assets pursuant to this Agreement, Manager's Form ADV will likely have to be amended, and Client will be provided with the amended Form ADV within a reasonable time following its successful posting.

(d) Authorized Persons. Any individual whose signature is affixed to this Agreement on Client's behalf has full authority and power to execute this Agreement on Client's behalf. Client represents that the officer specified on the attached Certification of Authorized Persons (Exhibit C) is authorized to act for Client and to certify to Manager from time to time, by listing on, and delivering to Manager Exhibit C or a substantially similar form, those other persons who also are so authorized to act on Client's behalf ("Authorized Persons"). The Client shall promptly notify Manager in writing of any event that could reasonably be anticipated to affect any such individual's authority under this Agreement.

(e) Notice of Certain Events. Client will promptly notify Manager in writing of any occurrence that results, or threatens to result, in any representations by Client contained in this Agreement becoming inaccurate, false, misleading or incomplete.

6. Non-Exclusive Agreement. Nothing in this Agreement shall be deemed to limit or restrict Manager's right, or the right of any of its officers, directors, employees, or independent contractors, to engage in any other business

2

or to devote time and attention to the management or other aspects of any business, whether of a similar or dissimilar nature, or to render investment advisory services or services of any kind to any other corporation, firm, association, fund or individual. Client understands that Manager provides investment advisory services and other services to numerous other clients and accounts. Client also understands that Manager may give advice and take action with respect to any of its other clients or for its own account which may differ from the timing or nature of action taken by Manager with respect to the Account.

Nothing in this Agreement shall impose upon Manager any obligation to purchase or sell or to recommend for purchase or sale, with respect to the Account, any security (including long and short positions) which Manager, or its affiliates, or its or their shareholders, directors, officers, employees, or independent contractor may purchase or sell for its or their own account(s) or for the account of any other client. Client acknowledges that Manager's ability and that of its affiliates to effect or recommend transactions may be restricted by applicable regulatory requirements in the United States and elsewhere or its or their internal policies designed to comply with such requirements. Consequently, there may be periods when Manager may not initiate or recommend certain types of transactions in certain investments when Manager or its affiliates are performing services or when aggregated position limits have been reached, and Client will not be advised of that fact.

7. <u>Liability of Manager</u>. Except as may otherwise be provided by law, Client specifically agrees that Manager shall not be liable for: (a) any loss that Client may suffer by reason of any investment decision made or other action taken or omitted in good faith and with that degree of care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an enterprise of a like character and with like aims; (b) any loss, expense or other liability (including but not limited to attorneys' fees) incurred by Client or Manager arising from or in connection with Manager's compliance with the Guidelines or Instructions believed by Manager to be accurate; (c) any act or failure to act by any broker or other person with whom Manager or Client may deal in connection with the subject matter of this Agreement; or (d) any loss or failure or delay in performance of any obligation under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond Manager's reasonable control, including, without limitation, acts of God, earthquakes, fires, floods, wars, terrorism, civil or military disturbances, sabotage, epidemics, riots, interruptions, loss or malfunctions of utility, computer software or hardware, transportation or communication service, accidents, labor disputes, acts of civil or military authority, governmental actions and inability to obtain labor, material, equipment or transportation.

8. <u>Brokerage</u>. Where Manager places orders, or directs the placement of orders, for the purchase or sale of Bitcoin for the Account, in selecting brokers or dealers to execute such orders, Manager is expressly authorized to consider, among other factors, the fact that a broker or dealer has furnished statistical, research or other information or services which enhance Manager's investment research and portfolio management capability generally. Manager may negotiate with and assign to a broker a commission which may exceed the commission which another broker would have charged for effecting the transaction if Manager determines in good faith that the amount of commission charged was reasonable in relation to the value of brokerage and research services provided by such broker, viewed in terms either of the Account or Manager's overall responsibilities to Manager's discretionary accounts. With respect to the allocation of trades among the accounts it is managing, Manager shall not favor any account over any other and purchase or sale orders executed contemporaneously shall be allocated in a manner it deems equitable among the accounts involved.

In no event shall Manager be obligated to effect or place an order for any transaction for Client which Manager believes would violate any applicable state or federal law, rule, or regulation, or of the regulations of any regulatory or self-regulatory body to which Manager or any of its affiliates is subject to at the time of the proposed transaction.

9. <u>Confidential Relationship</u>. Each Party agrees that all non-public confidential information concerning the other Party which may become available to such party in connection with services, transactions or relationships contemplated in this Agreement shall at all times be treated in strictest confidence and shall not be disclosed to third persons except as (a) may be required by law or regulatory authority, including but not limited to any subpoena, administrative, regulatory or judicial demand or court order, (b) as otherwise set forth in this Agreement, or (c) upon the prior written approval of the other party to this Agreement. Client authorizes Manager (i) to include Client's name in a representative or sample client list prepared by Manager, provided Manager shall not disclose Client contact information or any information about Client's holdings, and (ii) to use Manager's investment experience with respect to the Account, or the Account's performance, in composite performance presentations, marketing

materials, attribution analyses, statistical compilations, or other similar compilations or presentations, provided such use does not disclose Client's identity except to the extent permitted by Client.

10. Reports. Manager shall send to Client a written report of the Account as of the Valuation Date of each calendar quarter. Such reports shall be submitted within a reasonable period following such Valuation Date. For the purposes of all reports made by Manager to Client, Bitcoin will be valued denominated in United States dollars, unless otherwise agreed by Manager and Client. Client shall examine promptly each such report and any other report provided by Manager. To the extent permissible under applicable law, upon the expiration of the sixty (60) day period immediately following the date of such report, or the termination of this Agreement as provided herein, if earlier, Manager shall be forever released and discharged from all liability and accountability to anyone with respect to each such report, including, without limitation, all acts and omissions of Manager shown or reflected in each such report, except with respect to any acts or omissions as to which Client shall have filed written objections with Manager within such sixty (60) day period. Nothing herein shall impair the right of Manager to a judicial settlement of any report rendered by it.

11. Valuation. In computing the asset value of the Accounts, Manager shall use its best discretion to provide Client an accurate estimation of the fair market value of the Accounts at a given point in time. The method selected will factor in all relevant information, including but not limited to: bid-ask spread of the relevant cryptocurrency on various exchanges, the official closing price, if a market event occurs that calls into question the reliability of current market quotations. Whichever methodology is selected shall be explained to Client in a manner that may be easily understood by Client.

12. Acknowledgment of Investment Risk. Notwithstanding any provision herein to the contrary, Client understands that the value of investments made for the Account may go down as well as up and is not guaranteed. In addition, Client has reviewed the risk factors at Exhibit E below. Client is fully aware and understands the risks associated with Manager's cryptocurrency trading activities pursuant to this Agreement, and nevertheless wishes to engage Manager to provide such investment management services under the terms and conditions set forth herein. Client agrees that Manager has not made and is not making any guarantees, including without limitation a guarantee as to any specific level of performance of the Account. Client further understands and acknowledges that investment decisions made on behalf of Client's Account by Manager are subject to various market, currency, economic, and business risks as well as the risk that those investment decisions will not always be profitable. Client acknowledges that past performance results achieved by accounts supervised or managed by Manager are not indicative of the future performance of the Account. Client understands that the Bitcoin in the Account is not guaranteed by Manager or any affiliate, is not insured by the Federal Deposit Insurance Corporation ("FDIC") or any other government agency, and are subject to investment risk, including possible loss of principal amounts invested.

13. Termination; Survival. This Agreement may be terminated by either party upon thirty (30) days' written notice to the other party. Such termination will not, however, affect the liabilities or obligations of the parties under this Agreement arising from transactions initiated prior to such termination. Sections 4, 7, 9, 10, 17, and 18 shall survive the termination of this Agreement. Upon any termination of this Agreement, Manager shall have no further obligations hereunder, provided that: (a) any liability under this Agreement of one party to the other shall survive and remain in full force and effect, notwithstanding such termination, with respect to any claim or matter on which either of the parties has given the other written notice prior to such termination (except that Manager may render to Client a statement of fees due Manager through the date of termination after such date), until such liability has been finally settled; (b) Manager retains the right to complete any transactions open as of the termination date and to retain amounts in the Account sufficient to effect such completion; and (c) Manager shall be entitled to its fees and expenses, pro rated to the date of termination. Upon termination, it shall be Client's exclusive responsibility to issue instructions in writing regarding any assets in the Account.

14. Assignment. This Agreement may not be assigned (within the meaning of the Investment Advisers Act of 1940, as amended), in whole or in part, by Manager without the prior written consent of Client. Subject to the preceding sentence, Manager may delegate all or part of its duties under this Agreement to any affiliate.

15. Communications. All reports and other communications required hereunder to be in writing shall be delivered in person or sent by first-class mail postage prepaid, overnight courier, or confirmed facsimile with original to follow.

4

**If to Client:**

**Mr. Alejandro Canto**
15030 16th Pl W Lynnwood, WA 98087

<u>Attention</u>: **Alejandro Canto**

**If to Manager:**

**BKCoin Management LLC**
38 E 37th Street #11
New York, New York 10016

<u>Attention</u>: Mr. Kevin Kang, Founding Principal/Manager

<u>Attention</u>: Mr. Carlos Betancourt, Founding Principal/Manager

      Either Party to this Agreement may, by written notice given at any time, designate a different address for the receipt of reports and other communications due hereunder.

      16. <u>Governing Law; Venue</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the United States and with the laws of the State of Delaware, without giving effect to the choice of law or conflict of law provisions thereof. The parties hereby consent to jurisdiction and venue in the federal and state courts located in New York County of the State of New York.

      17. <u>Entire Agreement; Modification</u>. This Agreement along with all exhibits attached hereto: (a) sets forth the entire understanding of the parties with respect to the subject matter hereof; (b) supersedes any and all previous agreements, understandings and communications, oral or written, regarding this subject matter; and (c) may not be modified, amended, or waived except by a specific written instrument duly executed by the party against whom such modification, amendment, or waiver is sought to be enforced. In the event of any conflict or inconsistency with this Agreement and any instructions or investment guidelines that are not made part of this Agreement or any investment policy statement, this Agreement will control.

      18. <u>Headings</u>. The headings of the sections of this Agreement are for convenience of reference only and will not affect the meaning or operation of this Agreement. As used herein, references in the singular shall, as and if appropriate, include the plural.

      19. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

      20. <u>Severability</u>. In the event that any provision of this Agreement is deemed to be void, voidable, illegal, or invalid for any reason, such provision will be of no force and effect only to the extent that it is so declared void, voidable, illegal, or invalid. All of the provisions of this Agreement not specifically found to be so deficient will remain in full force and effect.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their duly authorized officers to be effective as of the date first written above.

**MR. ALEJANDRO CANTO**

By: _____

Name: Alejandro Canto

Title: Manager

**BKCOIN MANAGEMENT LLC**

By: _____

Name: Carlos Betancourt

Title: Manager

6

## EXHIBIT A

**Statement of Investment Objectives**

Dedicated to delivering consistent, uncorrelated absolute returns through our Long/Short and Statistical Arbitrage strategies with Bitcoin (BTC), Ethereum (ETH), XRP (Ripple), BitTorrent (BTT) long-bias.

The Separately Managed Account for Mr. Alejandro Canto will offer the investor an opportunity to capitalize on inefficient and volatile market conditions as well as long-term capital growth. The account will ensure the non-BTC risks are minimized while capitalizing on the upside of the BTC as the investor is specifically looking for bitcoin exposure.

Subject to the 'Statement of Client Account Restrictions' below, Manager shall have full discretion to make the Bitcoin (BTC), Ethereum (ETH), XRP (Ripple), BitTorrent (BTT) trades it deems appropriate in furtherance of maximizing Account returns, across as many exchanges as it deems appropriate.

**Statement of Client Account Restrictions**

Assets in Account to be maintained in Bitcoin (BTC), Ethereum (ETH), XRP (Ripple), BitTorrent (BTT) rather than converted to fiat money at the close of each trading day.

## EXHIBIT B

### FEE SCHEDULE

As compensation for managing the Account, Manager shall be paid as follows:

1% Management Fee; 16% Performance Fee

In addition, the following terms apply relevant to fees shall apply to the Performance Fee:

With regards to the Performance Fee, the Manager shall be paid, in addition to the Management Fee hereunder an annual Performance Fee equal to 16% of the annual net profits generated on the account, provided that the annual net profits shall be reduced to the extent of any unrecovered balance remaining in the Loss Recovery Account (*as defined herein*), and immediately prior to giving effect to the adjustment required to the Loss Recovery Account for any annual net profits in that fiscal year.

There shall be established for the Client a memorandum account (the "Loss Recovery Account"), the balance of which shall initially be zero. At the end of each fiscal year (or such other times as required below), the balance in each such Loss Recovery Account shall be adjusted as follows:

(i) in the event that there have been annual net losses with respect to the Client's Account since the last day of the immediately preceding fiscal year (or, if no calculation has yet been made with respect to the Client's Account, since its creation), an amount equal to such annual net losses shall be **credited** to such Loss Recovery Account; and

(ii) in the event that there have been annual net profits with respect to such the Client's Account since the immediately preceding date as of which a calculation of an Incentive Allocation was made, an amount equal to such annual net profits, before any Incentive Allocation to the Manager, shall be **debited** from and reduce any unrecovered balance in such Loss Recovery Account, but shall not reduce the balance below zero.

8

**EXHIBIT C**

**CERTIFICATION OF AUTHORIZED PERSONS**

I certify, as the Manager of Belton Capital LLC that the
following persons are "Authorized Persons" under the Agreement:

| NAME | TITLE | SPECIMEN SIGNATURE |
|------|-------|--------------------|
| Alejandro Canto | Investor | |
| | | |
| | | |
| | | |
| | | |
| | | |

Alejandro Canto
Name of Legal Entity (Please Print)

By: _____
Signature

Alejandro Canto
Name and Title (Please Print)

Date: _____

9

**EXHIBIT D**

**MANAGER'S CURRENT FORM ADV**

**EXHIBIT E**

## CERTAIN RISKS ASSOCIATED WITH THE TRADING ACTIVITIES
## CONTEMPLATED IN THIS AGREEMENT

*There can be no assurance that the Manager will achieve the Investment Objectives.* The trading activities contemplated herein by the Manager bear certain financial and other risks, including the risk of a loss of principal. The following risk factors do not purport to be complete explanation of the risks and potential conflicts of interest related to the trading activities contemplated herein. Client should consult its own professional advisors, before determining to enter into this Agreement.

**EXHIBIT F**

**CLIENT'S ANTI MONEY LAUNDERING REPRESENTATIONS**

1. All evidence of identity I have provided in connection with this Agreement is true and correct and all related information furnished is genuine and accurate.

2. I agree to provide such additional information as may be deemed necessary by the Manager from time to time for ongoing compliance with anti-money laundering programs.

3. I hereby represent and warrant that neither I, or in the case of an entity, neither it, nor any person controlling, controlled by, or under common control with it, nor any person having a beneficial interest in it, is an individual, organization, or entity on the List of Specifically Designated Nationals and Blocked Persons (the "OFAC Control List") maintained by the US Office of Foreign Assets Control ("OFAC"). I further agree to notify the Manager of any change in information affecting these representations and covenants.

4. I hereby represent and warrant that the amounts of cryptocurrency in the separately managed account contemplated herein, was not indirectly derived from activities that contravene U.S. federal or state laws or regulations and international laws and regulations, including anti-money laundering laws and regulations.

5. I hereby represent and warrant that I am not a Senior Foreign Political Figure, a member of a Senior Foreign Political Figure's Immediate Family, and/or a Close Associate of a Senior Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated by the US Treasury as warranting special measures due to money laundering concerns, nor am I a former Senior Foreign Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated as warranting special measures due to money laundering concerns.

6. I hereby represent and warrant that I am not resident in, or organized or chartered under the laws of a jurisdiction that has been designated by the US Secretary of Treasury under Sections 311 and 312 of the Patriot Act as warranting special measures due to money laundering concerns.

7. I hereby represent and warrant that the entity I represent, if any, is not a Foreign Shell Bank as the term is defined in the Patriot Act.

8. I hereby represent and warrant that the cryptocurrency funds in the Account do not originate from, nor will they be routed through an account maintained at a Foreign Shell Bank, an "offshore bank," or a bank organized or chartered under the laws of a jurisdiction deemed to be a non-cooperative country or territory (list available at www1.oecd.org/fatf).

The undersigned does represent and certify under penalty of perjury, by executing this Client's Anti-Money Laundering Representations, that the foregoing statements are true and correct.

Executed this 16th day of March, 2020.

**CLIENT:**

**Signature:** _____

**Name:** Alejandro Canto
**Title:** Investor
**Entity:** Mr. Alejandro Canto
**Jurisdiction of Organization:** Lynnwood, WA

# INVESTMENT MANAGEMENT AGREEMENT

This Agreement is made this 07 day of December, 2020, (this "Agreement"), by and between **BKCoin Management LLC**, a Delaware limited liability company with principal place of business located at 38 E 37th Street #11, New York, New York 10016 (the "Manager"), a limited liability company, and **Mr. Alejandro Canto**, a Washington State resident with principal place of residence at 15030 16th Pl W Lynnwood, WA 98087 (the "Client")(each a "Party" and collectively the "Parties"). The Parties agree as follows:

1. Appointment. Client hereby appoints Manager as an investment manager to manage such of Client's cryptocurrency (Bitcoin) assets, pursuant to the terms of this Agreement, as Client shall from time to time assign to it, the proceeds from the sale of such cryptocurrency assets, and the income attributable to such cryptocurrency assets (the "Account"). Client shall promptly notify Manager in writing of any increase or reduction in the amount of the Account's assets subject to Manager's investment direction.

2. Authority of Manager. Manager is authorized to supervise and direct the investment and reinvestment of the cryptocurrency assets in the Account, subject to such limitations as are contained in the Guidelines described in Section 3 of this Agreement, as they may be from time to time amended, and subject to Client's right to direct the investment of the Account, if so desired, by means of Instructions as described in Section 3 of this Agreement. Manager, as Client's agent and attorney-in-fact with respect to the Account, when it deems appropriate and without prior consultation with Client, may: (a) buy, sell, exchange, convert and otherwise invest or trade in Bitcoin, at such times and in such manner as Manager determines; (b) place orders for the execution of such Bitcoin with or through such brokers, dealers or issuers as Manager may select, which brokers or dealers are entitled to receive compensation out of the Account for their services; and (c) execute any documentation as the Account's agent and attorney-in-fact as Manager may deem necessary to facilitate any such investment or reinvestment. Manager, as Client's agent and attorney-in-fact with respect to the Account, when it deems appropriate and without prior consultation with Client, may engage external legal counsel to review relevant trade-related documentation, and charge the Account for such costs. Manager may give a copy of this Agreement to any broker, dealer or other party to a transaction, as evidence of its authority to act on the Account's behalf.

The cryptocurrency assets of the Account shall be held in an account that is owned by Client. Notwithstanding the foregoing, given the unique nature of the cryptocurrency exchanges, and given that Manager has corporate level accounts across numerous exchanges that allows it to execute the Investment Objectives contemplated herein, Client hereby consents to such temporary movement out of the Account and into the corporate accounts of Client among the various exchanges for purposes of execution of the Investment Objectives as Manager deems appropriate. In furtherance of this movement of the cryptocurrency assets, Client hereby grants to Manager a power of attorney coupled with an interest, authorizing and permitting Manager to take Client's cryptocurrency assets out of the Account, move the cryptocurrency assets into Manager's corporate accounts at whichever exchange that Manager deems appropriate for execution of the Investment Objectives, to execute the trades in such accounts as the Manager deems appropriate, and finally to move the money back into the Account upon conclusion of the strategy employed by Manager. The Parties also hold open the possibility that Client's cryptocurrency assets may, at some point in the future, be held by a custodian (the "Custodian") which shall have custody of the Account, and which shall be directed by Client to follow the directions relating to trading that is conveyed to the Custodian by the Manager. In such cases, Client shall not change the Custodian without giving Manager reasonable advance written notice of its intention to do so, together with the name and other relevant information with respect to the new Custodian. Manager shall not be liable for any act or omission of any Custodian used.

3. Guidelines and Instructions. Attached hereto as Exhibit A is a statement of the investment objectives of Client together with a statement of any and all specific investment restrictions applicable to the investment of the Account (the "Guidelines"). Client shall have the right at all times to modify the Guidelines or to give Manager instructions ("Instructions") to buy, sell or retain any investment, but no modification of the Guidelines and no Instructions or modifications of Instructions shall be binding upon Manager unless Manager has received written notice of them from an Authorized Person (as defined in Section 5(d)). Manager shall have a reasonable period to bring the Account into compliance with any changes to the Guidelines. Manager shall be under no duty to make any investigation or inquiry as to any statement contained in any written Guidelines or Instruction given and, unless and until specifically advised otherwise, Manager may accept the same as conclusive evidence of the truth and accuracy of the statements contained therein. The Guidelines and all Instructions, unless they expressly provide otherwise,

1

shall continue to be effective until duly canceled by subsequent modifications duly communicated to Manager in writing.

4. Fees. As full compensation for its services under this Agreement, Manager shall be paid quarterly a management fee (the "Management Fee") equal to one-fourth of the annual rates specified in Exhibit B, based on the asset value of the Account as of the last day of each calendar quarter on which a Bitcoin exchange is open for trading (the "Valuation Date"), and before deductions for the Performance Fee below. The initial billing period of the Management Fee will begin when this Agreement is signed by Client and accepted by Manager, and initial funding has been received by the Custodian (the "Inception Date"). The initial fee will be pro-rated to cover the period from the Inception Date through the Valuation Date for that calendar quarter and will be based on the valuation as of that Valuation Date. Future quarterly fees will be calculated similarly in arrears. If Manager shall serve for less than the whole of any quarter, its compensation shall be determined as provided above on the basis of the value of the assets in the Account as of the end of the date of termination and shall be payable on a pro rata basis for the period of the quarter for which it served as Manager hereunder. In addition, Manager shall be entitled to a performance fee (the "Performance Fee") for good performance, and the terms of the Performance Fee are substantially set forth within Exhibit B below. Other than as specifically indicated in this Agreement, the Manager shall not be required to pay any expenses in connection with the investment management services that are contemplated herein. Client shall direct the Custodian automatically to charge to the Account and pay directly to Manager all of Manager's fees upon the Custodian's receipt of an invoice from Manager.

5. Representations and Warranties. Client hereby acknowledges, represents and warrants to, and agrees with Manager, as follows:

(a) Client Assets. Client is the sole owner of all cryptocurrency assets in the Account and (i) there are no restrictions on the transfer, sale or public distribution of any such assets and (ii) no option, lien, charge, security or encumbrance exists over such assets, except as disclosed to Manager in writing.

(b) Authority. The Client has full authority and power to engage Manager under the terms and conditions of this Agreement, and such engagement does not violate Client's constituent documents, any other material agreement, order or judgment of any court or governmental authority, or any law applicable to Client. Client further represents that all investments permitted herein are within its power to enter into and have been duly authorized.

(c) Form ADV. Client acknowledges receipt of Part II of Manager's Form ADV. Notwithstanding anything to the contrary herein, if Client did not receive a copy of the Form ADV at least forty-eight (48) hours prior to execution of this Agreement, Client shall have the right to terminate this Agreement without penalty within five (5) business days of the execution of this Agreement; provided, however, that Client shall be at risk for any market fluctuations in the Account up to the time of such termination. Note that in light of the Manager's taking on the management of Client's cryptocurrency assets pursuant to this Agreement, Manager's Form ADV will likely have to be amended, and Client will be provided with the amended Form ADV within a reasonable time following its successful posting.

(d) Authorized Persons. Any individual whose signature is affixed to this Agreement on Client's behalf has full authority and power to execute this Agreement on Client's behalf. Client represents that the officer specified on the attached Certification of Authorized Persons (Exhibit C) is authorized to act for Client and to certify to Manager from time to time, by listing on, and delivering to Manager Exhibit C or a substantially similar form, those other persons who also are so authorized to act on Client's behalf ("Authorized Persons"). The Client shall promptly notify Manager in writing of any event that could reasonably be anticipated to affect any such individual's authority under this Agreement.

(e) Notice of Certain Events. Client will promptly notify Manager in writing of any occurrence that results, or threatens to result, in any representations by Client contained in this Agreement becoming inaccurate, false, misleading or incomplete.

6. Non-Exclusive Agreement. Nothing in this Agreement shall be deemed to limit or restrict Manager's right, or the right of any of its officers, directors, employees, or independent contractors, to engage in any other business

2

or to devote time and attention to the management or other aspects of any business, whether of a similar or dissimilar nature, or to render investment advisory services or services of any kind to any other corporation, firm, association, fund or individual. Client understands that Manager provides investment advisory services and other services to numerous other clients and accounts. Client also understands that Manager may give advice and take action with respect to any of its other clients or for its own account which may differ from the timing or nature of action taken by Manager with respect to the Account.

Nothing in this Agreement shall impose upon Manager any obligation to purchase or sell or to recommend for purchase or sale, with respect to the Account, any security (including long and short positions) which Manager, or its affiliates, or its or their shareholders, directors, officers, employees, or independent contractor may purchase or sell for its or their own account(s) or for the account of any other client. Client acknowledges that Manager's ability and that of its affiliates to effect or recommend transactions may be restricted by applicable regulatory requirements in the United States and elsewhere or its or their internal policies designed to comply with such requirements. Consequently, there may be periods when Manager may not initiate or recommend certain types of transactions in certain investments when Manager or its affiliates are performing services or when aggregated position limits have been reached, and Client will not be advised of that fact.

7. <u>Liability of Manager</u>. Except as may otherwise be provided by law, Client specifically agrees that Manager shall not be liable for: (a) any loss that Client may suffer by reason of any investment decision made or other action taken or omitted in good faith and with that degree of care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an enterprise of a like character and with like aims; (b) any loss, expense or other liability (including but not limited to attorneys' fees) incurred by Client or Manager arising from or in connection with Manager's compliance with the Guidelines or Instructions believed by Manager to be accurate; (c) any act or failure to act by any broker or other person with whom Manager or Client may deal in connection with the subject matter of this Agreement; or (d) any loss or failure or delay in performance of any obligation under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond Manager's reasonable control, including, without limitation, acts of God, earthquakes, fires, floods, wars, terrorism, civil or military disturbances, sabotage, epidemics, riots, interruptions, loss or malfunctions of utility, computer software or hardware, transportation or communication service, accidents, labor disputes, acts of civil or military authority, governmental actions and inability to obtain labor, material, equipment or transportation.

8. <u>Brokerage</u>. Where Manager places orders, or directs the placement of orders, for the purchase or sale of Bitcoin for the Account, in selecting brokers or dealers to execute such orders, Manager is expressly authorized to consider, among other factors, the fact that a broker or dealer has furnished statistical, research or other information or services which enhance Manager's investment research and portfolio management capability generally. Manager may negotiate with and assign to a broker a commission which may exceed the commission which another broker would have charged for effecting the transaction if Manager determines in good faith that the amount of commission charged was reasonable in relation to the value of brokerage and research services provided by such broker, viewed in terms either of the Account or Manager's overall responsibilities to Manager's discretionary accounts. With respect to the allocation of trades among the accounts it is managing, Manager shall not favor any account over any other and purchase or sale orders executed contemporaneously shall be allocated in a manner it deems equitable among the accounts involved.

In no event shall Manager be obligated to effect or place an order for any transaction for Client which Manager believes would violate any applicable state or federal law, rule, or regulation, or of the regulations of any regulatory or self-regulatory body to which Manager or any of its affiliates is subject to at the time of the proposed transaction.

9. <u>Confidential Relationship</u>. Each Party agrees that all non-public confidential information concerning the other Party which may become available to such party in connection with services, transactions or relationships contemplated in this Agreement shall at all times be treated in strictest confidence and shall not be disclosed to third persons except as (a) may be required by law or regulatory authority, including but not limited to any subpoena, administrative, regulatory or judicial demand or court order, (b) as otherwise set forth in this Agreement, or (c) upon the prior written approval of the other party to this Agreement. Client authorizes Manager (i) to include Client's name in a representative or sample client list prepared by Manager, provided Manager shall not disclose Client contact information or any information about Client's holdings, and (ii) to use Manager's investment experience with respect to the Account, or the Account's performance, in composite performance presentations, marketing

materials, attribution analyses, statistical compilations, or other similar compilations or presentations, provided such use does not disclose Client's identity except to the extent permitted by Client.

10. <u>Reports</u>. Manager shall send to Client a written report of the Account as of the Valuation Date of each calendar quarter. Such reports shall be submitted within a reasonable period following such Valuation Date. For the purposes of all reports made by Manager to Client, Bitcoin will be valued denominated in United States dollars, unless otherwise agreed by Manager and Client. Client shall examine promptly each such report and any other report provided by Manager. To the extent permissible under applicable law, upon the expiration of the sixty (60) day period immediately following the date of such report, or the termination of this Agreement as provided herein, if earlier, Manager shall be forever released and discharged from all liability and accountability to anyone with respect to each such report, including, without limitation, all acts and omissions of Manager shown or reflected in each such report, except with respect to any acts or omissions as to which Client shall have filed written objections with Manager within such sixty (60) day period. Nothing herein shall impair the right of Manager to a judicial settlement of any report rendered by it.

11. <u>Valuation</u>. In computing the asset value of the Accounts, Manager shall use its best discretion to provide Client an accurate estimation of the fair market value of the Accounts at a given point in time. The method selected will factor in all relevant information, including but not limited to: bid-ask spread of the relevant cryptocurrency on various exchanges, the official closing price, if a market event occurs that calls into question the reliability of current market quotations. Whichever methodology is selected shall be explained to Client in a manner that may be easily understood by Client.

12. <u>Acknowledgment of Investment Risk</u>. Notwithstanding any provision herein to the contrary, Client understands that the value of investments made for the Account may go down as well as up and is not guaranteed. In addition, Client has reviewed the risk factors at <u>Exhibit E</u> below. Client is fully aware and understands the risks associated with Manager's cryptocurrency trading activities pursuant to this Agreement, and nevertheless wishes to engage Manager to provide such investment management services under the terms and conditions set forth herein. Client agrees that Manager has not made and is not making any guarantees, including without limitation a guarantee as to any specific level of performance of the Account. Client further understands and acknowledges that investment decisions made on behalf of Client's Account by Manager are subject to various market, currency, economic, and business risks as well as the risk that those investment decisions will not always be profitable. Client acknowledges that past performance results achieved by accounts supervised or managed by Manager are not indicative of the future performance of the Account. Client understands that the Bitcoin in the Account is not guaranteed by Manager or any affiliate, is not insured by the Federal Deposit Insurance Corporation ("FDIC") or any other government agency, and are subject to investment risk, including possible loss of principal amounts invested.

13. <u>Termination; Survival</u>. This Agreement may be terminated by either party upon thirty (30) days' written notice to the other party. Such termination will not, however, affect the liabilities or obligations of the parties under this Agreement arising from transactions initiated prior to such termination. <u>Sections 4</u>, <u>7</u>, <u>9</u>, <u>10</u>, <u>17</u>, and <u>18</u> shall survive the termination of this Agreement. Upon any termination of this Agreement, Manager shall have no further obligations hereunder, provided that: (a) any liability under this Agreement of one party to the other shall survive and remain in full force and effect, notwithstanding such termination, with respect to any claim or matter on which either of the parties has given the other written notice prior to such termination (except that Manager may render to Client a statement of fees due Manager through the date of termination after such date), until such liability has been finally settled; (b) Manager retains the right to complete any transactions open as of the termination date and to retain amounts in the Account sufficient to effect such completion; and (c) Manager shall be entitled to its fees and expenses, pro rated to the date of termination. Upon termination, it shall be Client's exclusive responsibility to issue instructions in writing regarding any assets in the Account.

14. <u>Assignment</u>. This Agreement may not be assigned (within the meaning of the Investment Advisers Act of 1940, as amended), in whole or in part, by Manager without the prior written consent of Client. Subject to the preceding sentence, Manager may delegate all or part of its duties under this Agreement to any affiliate.

15. <u>Communications</u>. All reports and other communications required hereunder to be in writing shall be delivered in person or sent by first-class mail postage prepaid, overnight courier, or confirmed facsimile with original to follow.

**If to Client:**

**Mr. Alejandro Canto**
15030 16th Pl W Lynnwood, WA 98087

<u>Attention:</u> Alejandro Canto

**If to Manager:**

**BKCoin Management LLC**
38 E 37th Street #11
New York, New York 10016

<u>Attention:</u> Mr. Kevin Kang, Founding Principal/Manager

<u>Attention:</u> Mr. Carlos Betancourt, Founding Principal/Manager

Either Party to this Agreement may, by written notice given at any time, designate a different address for the receipt of reports and other communications due hereunder.

16. <u>Governing Law; Venue</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the United States and with the laws of the State of Delaware, without giving effect to the choice of law or conflict of law provisions thereof. The parties hereby consent to jurisdiction and venue in the federal and state courts located in New York County of the State of New York.

17. <u>Entire Agreement; Modification</u>. This Agreement along with all exhibits attached hereto: (a) sets forth the entire understanding of the parties with respect to the subject matter hereof; (b) supersedes any and all previous agreements, understandings and communications, oral or written, regarding this subject matter; and (c) may not be modified, amended, or waived except by a specific written instrument duly executed by the party against whom such modification, amendment, or waiver is sought to be enforced. In the event of any conflict or inconsistency with this Agreement and any instructions or investment guidelines that are not made part of this Agreement or any investment policy statement, this Agreement will control.

18. <u>Headings</u>. The headings of the sections of this Agreement are for convenience of reference only and will not affect the meaning or operation of this Agreement. As used herein, references in the singular shall, as and if appropriate, include the plural.

19. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

20. <u>Severability</u>. In the event that any provision of this Agreement is deemed to be void, voidable, illegal, or invalid for any reason, such provision will be of no force and effect only to the extent that it is so declared void, voidable, illegal, or invalid. All of the provisions of this Agreement not specifically found to be so deficient will remain in full force and effect.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their duly authorized officers to be effective as of the date first written above.

**MR. ALEJANDRO CANTO**

By: _____

Name: Alejandro Canto

Title:  Manager

**BKCOIN MANAGEMENT LLC**

By: _____          *CB*

Name: Carlos Betancourt

Title:   Manager

## EXHIBIT A

**Statement of Investment Objectives**

Dedicated to delivering consistent, uncorrelated absolute returns through our Long/Short and Statistical Arbitrage strategies with Bitcoin (BTC) and Ethereum (ETH) long-bias.

The Separately Managed Account for Mr. Alejandro Canto will offer the investor an opportunity to capitalize on inefficient and volatile market conditions as well as long-term capital growth. The account will ensure the non-BTC and non-ETH risks are minimized while capitalizing on the upside of the BTC and ETH as the investor is specifically looking for bitcoin and Ethereum exposure.

Subject to the 'Statement of Client Account Restrictions' below, Manager shall have full discretion to make the Bitcoin trades it deems appropriate in furtherance of maximizing Account returns, across as many exchanges as it deems appropriate.

**Statement of Client Account Restrictions**

Assets in Account to be maintained in Bitcoin, rather than converted to fiat money at the close of each trading day.

## EXHIBIT B

### FEE SCHEDULE

As compensation for managing the Account, Manager shall be paid as follows:

0% Management Fee; 22.5% Performance Fee

In addition, the following terms apply relevant to fees shall apply to the Performance Fee:

With regards to the Performance Fee, the Manager shall be paid, in addition to the Management Fee hereunder an annual Performance Fee equal to 22.5% of the annual net profits generated on the account, provided that the annual net profits shall be reduced to the extent of any unrecovered balance remaining in the Loss Recovery Account (*as defined herein*), and immediately prior to giving effect to the adjustment required to the Loss Recovery Account for any annual net profits in that fiscal year.

There shall be established for the Client a memorandum account (the "Loss Recovery Account"), the balance of which shall initially be zero. At the end of each fiscal year (or such other times as required below), the balance in each such Loss Recovery Account shall be adjusted as follows:

(i) in the event that there have been annual net losses with respect to the Client's Account since the last day of the immediately preceding fiscal year (or, if no calculation has yet been made with respect to the Client's Account, since its creation), an amount equal to such annual net losses shall be **credited** to such Loss Recovery Account; and

(ii) in the event that there have been annual net profits with respect to such the Client's Account since the immediately preceding date as of which a calculation of an Incentive Allocation was made, an amount equal to such annual net profits, before any Incentive Allocation to the Manager, shall be **debited** from and reduce any unrecovered balance in such Loss Recovery Account, but shall not reduce the balance below zero.

**EXHIBIT C**

**CERTIFICATION OF AUTHORIZED PERSONS**

I certify, as the Manager of Alejandro Canto SMA that the
following persons are "Authorized Persons" under the Agreement:

| NAME | TITLE | SPECIMEN SIGNATURE |
|---|---|---|
| Alejandro Canto | Investor | |
| | | |
| | | |
| | | |
| | | |
| | | |

Alejandro Canto "SMA"
Name of Legal Entity (Please Print)

By: _____
                Signature

Alejandro Canto
Name and Title (Please Print)

Date: 12/07/2020

**EXHIBIT D**

**MANAGER'S CURRENT FORM ADV**

**EXHIBIT E**

**CERTAIN RISKS ASSOCIATED WITH THE TRADING ACTIVITIES
CONTEMPLATED IN THIS AGREEMENT**

*There can be no assurance that the Manager will achieve the Investment Objectives.* The trading activities contemplated herein by the Manager bear certain financial and other risks, including the risk of a loss of principal. The following risk factors do not purport to be complete explanation of the risks and potential conflicts of interest related to the trading activities contemplated herein. Client should consult its own professional advisors, before determining to enter into this Agreement.

*[insert relevant risk factors]*

**EXHIBIT F**

**CLIENT'S ANTI MONEY LAUNDERING REPRESENTATIONS**

1. All evidence of identity I have provided in connection with this Agreement is true and correct and all related information furnished is genuine and accurate.

2. I agree to provide such additional information as may be deemed necessary by the Manager from time to time for ongoing compliance with anti-money laundering programs.

3. I hereby represent and warrant that neither I, or in the case of an entity, neither it, nor any person controlling, controlled by, or under common control with it, nor any person having a beneficial interest in it, is an individual, organization, or entity on the List of Specifically Designated Nationals and Blocked Persons (the "OFAC Control List") maintained by the US Office of Foreign Assets Control ("OFAC"). I further agree to notify the Manager of any change in information affecting these representations and covenants.

4. I hereby represent and warrant that the amounts of cryptocurrency in the separately managed account contemplated herein, was not indirectly derived from activities that contravene U.S. federal or state laws or regulations and international laws and regulations, including anti-money laundering laws and regulations.

5. I hereby represent and warrant that I am not a Senior Foreign Political Figure, a member of a Senior Foreign Political Figure's Immediate Family, and/or a Close Associate of a Senior Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated by the US Treasury as warranting special measures due to money laundering concerns, nor am I a former Senior Foreign Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated as warranting special measures due to money laundering concerns.

6. I hereby represent and warrant that I am not resident in, or organized or chartered under the laws of a jurisdiction that has been designated by the US Secretary of Treasury under Sections 311 and 312 of the Patriot Act as warranting special measures due to money laundering concerns.

7. I hereby represent and warrant that the entity I represent, if any, is not a Foreign Shell Bank as the term is defined in the Patriot Act.

8. I hereby represent and warrant that the cryptocurrency funds in the Account do not originate from, nor will they be routed through an account maintained at a Foreign Shell Bank, an "offshore bank," or a bank organized or chartered under the laws of a jurisdiction deemed to be a non-cooperative country of territory (list available at www1.oecd.org/fatf).

The undersigned does represent and certify under penalty of perjury, by executing this Client's Anti-Money Laundering Representations, that the foregoing statements are true and correct.

Executed this 7th day of December, 2020.

**CLIENT:**

**Signature:**
**Name:** Alejandro Canto
**Title:** Investor
**Entity:** n/a
**Jurisdiction of Organization:** USA

12

# COMPOSITE
# EXHIBIT B

DocuSign Envelope ID: 284E468C-59DD-4C45-A0A6-B3359207D2E8

## MASTER DIGITAL CURRENCY LOAN AGREEMENT

This Master Digital Currency Loan Agreement ("Agreement") is made on this 7TH day of October, 2021 ("Effective Date") by and between BKCoin Management LLC, ("BKCoin" or "Lender"), a limited liability company organized and existing under the laws of Delaware and Alejandro Canto ("Borrower") an individual with primary address at 4531 sw 15th st, Coral Gables Fl 33134.

## RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend Digital Currency to Borrower and Borrower will return such Digital Currency to Lender upon the termination of the Loan.

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby agree as follows:

## I.    Definitions

"*Airdrop*" means a distribution of a new token or tokens resulting from the ownership of a separate token. For the purposes of Section V, an "*Applicable Airdrop*" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time. A "*Non-Applicable Airdrop*" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution.

"*Applicable Law*" means (regardless of jurisdiction) any applicable (i) federal, national, state and local laws, ordinances, regulations, orders, statutory instrument, rules, treaties, codes of practice, guidance notes, policy statements, customary laws, decrees, injunctions, or judgments and any (ii) ruling, declaration, regulation, requirement, request or interpretation issued by any (or any quasi-) regulatory, judicial, administrative or governmental body or person;

"*Authorized Agent*" has the meaning set forth in Exhibit A.

"*Borrow Fee*" means the fee paid by Borrower to the Lender for the Loan.

"*Borrower*" means Alejandro Canto.

"*Business Day*" means a day on which BKCoin Management LLC is open for business. BKCoin Management LLC follows the New York Stock Exchange calendar of holidays.

"*Callable Option*" means the Borrower and Lender each have the option to redeliver or recall an Open Deal Loan at any time during the term of the deal.

"*Confirmation Protocol*" means the requirement that the Transfer of a Digital Currency, may not be deemed settled and completed until (i) the transaction has been recorded in a block and five (5) consecutive subsequent blocks referring back to such block (meaning six (6) blocks in total) have been added to the applicable blockchain; or (ii) the transaction has met a different protocol for a specific Digital Currency agreed to by the parties and added hereto as **Exhibit C.**

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), any Resulting Currency and any digital currency that the Borrower and Lender agree upon.

"*Digital Currency Address*" means an identifier of 26-34 alphanumeric characters that represents a possible destination for a Transfer of Digital Currency.

"*Dollars*" and "*$*" mean lawful money of the United States of America.

"*Fees*" mean the Borrow Fee and the Late Fee.

"*Fork*" means a permanent divergence in the relevant Digital Currency block chain, that commonly occurs when non-upgraded nodes can't validate blocks created by upgraded nodes that follow newer consensus rules.

"*Governmental Authority*" means the government of any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Hard Fork*" has the meaning set forth in Section (h).

"*Late Fee*" has the meaning set forth in Section III(b).

"*Lender*" means BKCoin Management LLC

"*Loan*" means a request for a loan or an actual loan of Digital Currency made pursuant to and subject to this Agreement.

"*Loan Documents*" shall mean this Agreement, all Lending Requests and all exhibits and schedules hereto.

"*Loan Effective Date*" means the date upon which a Loan begins.

DocuSign Envelope ID: 284E468C-59DD-4C45-A0A6-B3359207D2E8

"*Maturity Date*" means the date upon which a Loan is terminated.

"*Open Deal*" means a Loan without a Maturity Date where Borrower may redeliver the Digital Currency and Lender to may recall the Digital Currency at any time, subject to this Agreement.

"*Resulting Currency*" means a Digital Currency issued as a result of a Hard Fork.

"*Taxes*" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to Tax or penalties applicable thereto.

"*Term*" shall have the meaning set forth in Section XX.

"*Term Deal*" means a Loan with a pre-determined Maturity Date, where only Borrower can return the Digital Currency prior to maturity.

"*Transfer*" shall mean, as applicable, the delivery of Digital Currency by Lender or the redelivery of Digital Currency by Borrower hereunder.

## II. General Operation.

(a) Loans of Digital Currency

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request the Lender to Loan to Borrower a specified amount of Digital Currency, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan.

(b) Loan Procedure

From time to time during the Term of this Agreement, on a Business Day (the "Request Day") an Authorized Agent of Borrower may by email directed to trading@bkcoincapital.com, request from Lender a Loan of a specific amount of Digital Currency (a "Lending Request"). Lender shall by email directed to alejandro@mecbd.com, inform Borrower whether Lender agrees to make such a Loan. Once made, Lending Requests may not be withdrawn by Borrower and a Lending Request shall be deemed rejected unless accepted by Lender as set forth above within two (2) Business Days of the Request Date.

As part of its Lending Request, Borrower shall provide the following information:

(i)     The type of Digital Currency requested;
(ii)    the amount of Digital Currency requested;
(iii)   whether the Loan is a Term Deal or an Open Deal;

     (iv)    the Loan Effective Date, which shall be no less than five (5) Business Days from the date of the Lending Request; and

     (v)    the Maturity Date (if a Term Deal).

If Lender agrees to make a Loan, the Lender shall commence transmission to the Borrower's Digital Currency Address the amount of Digital Currency set forth in the Lending Request (the "Borrowed Amount") on or before 5:00 pm New York Time on the Request Day.

Specifics of each Loan shall be memorialized using the Loan Term Sheet attached as **Exhibit B**.

    (c)   Callable Option

Applicable to Open Deal Loans, Lender may at any time from 9:00 am until 5:00 pm New York time on a Business Day (the "Recall Request Day") exercise the Callable Option and recall all or any portion of a Digital Currency loaned to Borrower (the "Recall Amount"). Borrower will then have until 5:00 pm New York time on the "Recall Delivery Day", as agreed to and defined in the relevant Loan Term Sheet, to deliver the Recall Amount. In the event a Market Disruption Event is in effect on any Recall Delivery Day, the Recall Delivery Day will be extended fifteen (15) days.  If a Market Disruption Event is still in effect at the end of such fifteen (15) day period, Borrower shall immediately transfer available funds an amount in Dollars  equal to the average price on the Liquidity Exchanges (measured at 4:00 p.m. New York time) of the borrowed Digital Currency during the fifteen (15) Calendar Days including and prior to the Market Disruption Event in the borrowed Digital Currency (the "Market Disruption Spot Rate"). For purposes of this Agreement, "Market Disruption Event" means any event, circumstance, occurrence or condition that is beyond Borrower's control that restricts Borrower from delivering the Recall Amount in the normal course by exercising commercially reasonable efforts, including, for example, 51% attacks in which any Liquidity Exchange limits transfers, mining of empty blocks, no blocks being produced at all, or any Liquidity Exchange being censored by miners.

Borrower may at any time from 9:00 am until 5:00 pm New York time on a Business Day (the "Redelivery Day") exercise the Callable Option and deliver all or any portion of any Digital Currency loaned to Borrower.

    (d)   Termination of Loan

Loans will terminate:

     (i)    If a Term Deal, upon redelivery by Borrower of the Digital Currency at the Maturity Date or sooner;

     (ii)   If an Open Deal, upon redelivery by Borrower of the Digital Currency once the Borrower or Lender exercises the Callable Option; or

Case 1:23-cv-01192-RC-28-SB-1-Document-19-2 of Filed-11/20/23 Page 66 of
Case 1:23-cv-01192-RC 28-SB Document Docket Entry 28-2 Filed SD 11/20/23 Page 66 of
DocuSign Envelope ID: 284E468C-59DD-4C45-A0A6-B3359207D2E8 117

> (iii)  At the end of the TermXX.

(e)  Redelivery of Borrowed Digital Currency

Upon termination of a Loan according to this Agreement, the Borrower shall commence redelivery of the borrowed Digital Currency on or before 5:00 pm New York time of the applicable Business Day (i.e., the Maturity Date, the Recall Delivery Day, or the Redelivery Day).

(f)  Redelivery in an Illiquid Market

If the market in the borrowed Digital Currency becomes Illiquid (as defined below), Borrower may repay the Loan in Dollars at the Illiquid Market Spot Rate (as defined below). The market in the borrowed Digital Currency is "Illiquid" if the seven-day average daily trading volume across each of the top three exchanges reporting prices for the borrowed Digital Currency (as measured by the 30-day average daily trading volume on the Loan Date) (the such exchanges, the "Liquidity Exchanges") has decreased by 90% from the date of the Loan Term Sheet to the Maturity Date, or if the borrowed Digital Currency ceases to be listed on any of the Liquidity Exchanges. If the market is Illiquid, Borrower shall repay on the Maturity Date or on the Recall Delivery Date an amount in Dollars equal to the average price on the Liquidity Exchanges (measured at 4:00 p.m. New York time) of the borrowed Digital Currency during the fifteen (15) Calendar Days including and prior to the determination of an Illiquid market in the borrowed Digital Currency (the "Illiquid Market Spot Rate").  Notwithstanding the forgoing or anything in this Agreement to the contrary, Borrower may always satisfy its repayment or delivery obligations in this Agreement by repaying or delivering the applicable amount of borrowed Digital Currency.

(g)  Acts by Governmental Authorities and Changes in Applicable Laws.

If because of enforcement actions by Governmental Authorities of competent jurisdiction or changes in Applicable Laws ("Government Restrictions"), a party's ability to transfer or own a Digital Currency that has been the subject of a Loan or Loans is eliminated, materially impaired or declared illegal:

> (1) if possible under the Government Restrictions, including, without limitation, during any notice or grace period, Borrower shall repay to the Lender any outstanding balance of such Digital Currency and any accrued but unpaid Fees, such repayment to be made in the Digital Currency;

> (2) if return is not possible under the Government Restrictions, Borrower shall repay Lender an amount in Dollars equal to the volume-weighted average price on the Liquidity Exchanges (measured at 4 p.m. New York time) of the borrowed Digital Currency during the 30 day period prior to the effective date of the Government

Restrictions.

**III.** **Borrow Fees and Transaction Fees.**

(a) Borrow Fee Calculation

When a Loan is executed, the Borrower will be responsible to pay the Borrow Fee as agreed to in the relevant Loan Term Sheet, the Borrow Fee shall be annualized but calculated daily and is subject to change if agreed to by Borrower and Lender. The Borrow Fee shall be payable, unless otherwise agreed by the Borrower and Lender, in the applicable Digital Currency.

Lender shall calculate any Borrow Fees owed on a daily basis and provide Borrower with the calculation upon request.

(b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned any Digital Currency, Borrower shall incur an additional fee (the "Late Fee") of 5% (annualized, calculated daily) of the notional amount of the Loan in addition to the Borrow Fee.

(c) Payment of Borrow Fees and Late Fees

An invoice for Borrow Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Borrow Fees incurred from the previous month. Borrower shall have up to five Business Days to submit payment for the invoice (the "Invoice Due Date"). Fees unpaid by the Invoice Due Date shall also become subject to the Late Fee commencing the day after the Invoice Due Date.

(d) Application of Payments

Borrower shall, at the time of making each payment under this Agreement, specify to the Lender the Loan to which such payment is to be applied. In the event that the Borrower fails to so specify, or if an Event of Default has occurred and is continuing, the Lender may apply the payment in such manner as it may determine to be appropriate in its sole discretion.

(e) Application of Insufficient Payments

If at any time insufficient amounts are received by the Lender to pay fully all amounts of principal, Fees, and other amounts then due and payable hereunder, such Digital Currency payment received shall be applied (i) first, to pay Fees then due and payable hereunder, (ii) then, to pay principal then due and payable hereunder, and (iii) then, to pay other amounts then due and payable under this Agreement. In no event shall payments by Borrower in one Digital Currency be applied by Lender

DocuSign Envelope ID: 284E468C-59DD-4C45-A0A6-B3359207D2E8

to pay off obligations outstanding with respect to a Loan in another Digital Currency.

    (f)  <u>Non-Business Days</u>

If the due date of any payment under this Agreement would otherwise fall on a day that is not a Business Day, such date shall be extended to the next succeeding Business Day and, in the case of any payment accruing Fees such Fees shall be payable for the period of such extension.

    (g)  <u>Computations</u>

Fees shall be computed on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which payable. For purposes of calculating Fees, Digital Currencies shall be deemed to have been Transferred by one party to the other when the applicable Confirmation Protocol for the relevant Digital Currency has been completed. If the requirements of the Confirmation Protocol are not met by 5pm New York Time, the Transfer shall be deemed to have been made on the following Business Day. Calculation of Fees shall be based on the date when the relevant Transfer is deemed to have occurred.

    (h)  <u>Taxes</u>

        (1)  All Taxes assessed on Borrower with respect to the Borrowed Amount shall be paid by Borrower.

        (2)  No Loans made under this Agreement shall be treated as a taxable disposition under Internal Revenue Code section 1001.

**IV.**    **<u>Collateral Requirements</u>**

    (a)  <u>Collateral</u>

Borrower shall provide as collateral an amount of U.S. Dollars or Digital Currency to be determined and agreed upon by the Borrower and Lender ("Collateral") and memorialized using the Loan Term Sheet attached as Exhibit B. The Collateral will be defined as a percentage of the value of the borrowed Digital Currency, such value determined by a spot rate agreed upon in the Loan Term Sheet. Lender shall be entitled to use the Collateral to conduct its digital currency lending and borrowing business, including transferring the Collateral to other non-Galaxy bank accounts.

    (b)  <u>Margin Calls</u>

If during the term of a Loan the value of the borrowed Digital Currency increases by the Margin Call Rate indicated on the Loan Term Sheet as measured by the spot rate published on Coinbase Pro, or if borrowed Digital Currency is not listed on Coinbase Pro, then the spot rate published on Kraken (such rate, the "Margin Call Spot Rate") over the spot rate indicated in the Loan Term Sheet, or the prior Margin Call Spot Rate, as applicable, Lender shall have the right to require

Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in the Loan Term Sheet relative to the value of the borrowed Digital Currency at the Margin Call Spot Rate (the "Additional Collateral"). If during the term of a Loan the value of the borrowed Digital Currency decreases below the original borrowed amount, Borrower shall have the right to require Lender to return a portion of Collateral equivalent to such decrease (the "Collateral Return Amount").

If Lender requires Borrower to contribute Additional Collateral, or if Borrower requires Lender to return Collateral, such requiring party shall send an email notification (the "First Notification") to the other party on a Business Day at the email address indicated in Section XIII that sets forth: (i) the Margin Call Spot Rate and (ii) the amount of Additional Collateral required based on the Margin Call Spot Rate, or the Collateral Return Amount, as applicable. Borrower or Lender, as applicable, shall have twelve (12) hours on a Business Day from the time it receives such First Notification to (x) respond and send payment to the requesting party , or (y) respond that the spot rate as indicated on Coinbase Pro or Kraken, as applicable, has changed sufficiently such that the transfer of Additional Collateral or the Collateral Return Amount, as applicable, is no longer required. If the requesting party agrees by email that the response according to (y) above is correct then no other action is required.

If Borrower or Lender, as applicable, fails to respond to the First Notification within twelve (12) hours on Business Days, and the spot rate of the borrowed Digital Currency is still at least at the Margin Call Spot Rate or below the original borrowed amount, as applicable, Lender or Borrower, as applicable, may send a second email notification (the "Second Notification") repeating the information in (i) and (ii) in the paragraph above. Borrower or Lender, as applicable, shall have six (6) hours on Business Days from the time the requesting party sends the Second Notification to respond according to (x) or (y) above. Failure to respond to either the First Notification or the Second Notification, shall give the requesting party the option to declare an Event of Default under Section VII below.

   (c)  <u>Default or Failure to Return Loan or Collateral</u>

In the event that Borrower does not return the Loan upon Termination or in the event of default pursuant to Sections VII of this Agreement, Lender shall transfer that portion of the Collateral from the Collateral Account to Lender's operating account necessary for the payment of any liability or obligation or indebtedness created by this Agreement, including, but not limited to using the Collateral to purchase the relevant Digital Currency to replenish Lender's supply of the relevant Digital Currency.

   (d)  <u>Return of Collateral</u>

Upon Borrower's redelivery of the Loan and acceptance of Lender of the Borrowed Digital Currency into Lender's wallet address as provided herein, with such delivery being confirmed on

the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral to a bank account in the name of Borrower. If Borrower provided Digital Currency as collateral, Lender's return of any Digital Currency posted as collateral must satisfy BKCoin's Bank Secrecy Act and Anti-money Laundering obligations.

## V. **Hard Fork**

### (a) Notification

In the event of a Hard Fork or an Airdrop, Lender shall provide email notification to Borrower.

### (b) No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork or an Airdrop, any outstanding Loans will not be immediately terminated.

### (c) Redelivery of Borrowed Digital Currency

Lender will receive the benefit of any incremental tokens generated as a result of a Fork in the relevant Digital Currency protocol or an Applicable Airdrop that results in a second token (the **"New Token"**) being created. For purposes of this agreement, a Hard Fork will have been deemed to have occurred if any two of the following four conditions are met:

- *Hash Power*: the average hash power mining the New Token on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 20% of the hash power mining the relevant Digital Currency on the day preceding the Hard Fork or Applicable Airdrop (calculated as a 3-day average of the 3 days preceding the hard fork). The source for the relevant Digital Currency hash power will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the hash power of the New Token will be bitinfocharts.com (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).
- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 20% of the average market capitalization of the relevant Digital Currency (defined as the total value of the relevant Digital Currency) (calculated as a 30-day average on such date). The source for the relevant Digital Currency market capitalization will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the market capitalization of

DocuSign Envelope ID: 284E468C-59DD-4C45-A0A6-B3359207D2E8

the New Token will be (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 20% of the average 24-hour trading volume of the relevant Digital Currency (calculated as a 30-day average on such date). The source for the relevant Digital Currency 24-hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to *mutually agree upon another data source) and the source for the 24-hour trading volume of the New Token* will be (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).
- *Wallet Compatibility*: the New Token is supported by either BitGo wallets or Ledger wallets within 30 days of the Hard Fork or Applicable Airdrop.

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to pay Lender. Borrower can reimburse Lender for the value of the New Tokens with any combination of a one-time Digital Currency payment of the relevant Digital Currency reflecting the amount of the New Token due using the agreed upon spot rate at the moment of repayment, returning the loaned Digital Currency so that Lender can split the tokens themselves, sending the New Tokens directly to Lender, or a Dollar cash payment at the agreed upon spot rate of the New Token at the time of repayment. In the event of a Hard Fork or Applicable Air Drop that does not meet the criteria above, or a Non-Applicable Airdrop, Borrower shall have no obligation to send the New Tokens to Lender, or to make a payment in Dollars or the relevant Digital Currency for the value of the New Tokens.

## VI. Representations and Warranties.

(a) The Borrower represents to the Lender on the date hereof and on the date of each Loan Request made to the Borrower hereunder that each of this Agreement has been duly and validly authorized, executed and delivered on behalf of the Borrower and constitutes the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and subject to the availability of equitable remedies) and will not contravene (a) the constitutive documents of Borrower, (b) any Applicable Law, and (c) any judgment, award, injunction or similar legal restriction.

(b) Each party represents that no license, consent, authorization or approval or other action by, or notice to or filing or registration with, any Governmental Authority (including any foreign exchange approval), and no other third-party consent or approval, is necessary for

the due execution, delivery and performance by such party of this Agreement or for the legality, validity or enforceability thereof against such party.

(c) Each party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan or any Digital Currency or funds received hereunder.

(d) Lender represents and warrants that it has, or will have at the time of transfer of any Digital Currency, the right to lend such Digital Currency subject to the terms and conditions hereof, that it owns the Digital Currency, free and clear of all liens and that the Digital Currency has been acquired in accordance with all Applicable Laws.

(e) Borrower represents and warrants that it has, or will have at the time of return of any Digital Currency, the right to transfer such Digital Currency subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Agreement and that the Digital Currency that it will return has been acquired in accordance with all Applicable Laws.

## VII.  **<u>Default</u>**

It is further understood that the following defaults shall constitute events of default hereunder and are hereinafter referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to return any Borrowed Amount or pay any Borrow Fees when due hereunder;

(b) the failure by the Lender to return any Collateral when due hereunder;

(c) a material default in the performance by Borrower of any of the other agreements, conditions, covenants, provisions or stipulations contained in any of the Loan Documents;

(d) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings shall be instituted by or against the Borrower and shall not be dismissed within thirty (30) days of their initiation; or

(e) any representation or warranty made in any of the Loan Documents proves to be untrue in any material respect as of the date of making or deemed making thereof.

## VIII.  **<u>Remedies</u>**

DocuSign Envelope ID: 284E468C-59DD-4C45-A0A6-B3359207D2E8

Upon the occurrence and during the continuation of any Event of Default, the Lender may, at its option, (a) declare all Borrowed Amounts outstanding hereunder immediately due and payable, (b) terminate this Agreement upon notice to Borrower, and (c) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity; provided, that upon any Event of Default pursuant to Section VII all Borrowed Amounts and the amount of any Fees then outstanding hereunder shall automatically become and be immediately due and payable.

### IX. <u>Rights and Remedies Cumulative.</u>

No delay or omission by the Lender in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of the Lender stated herein are cumulative and in addition to all other rights provided by law, in equity.

### X. <u>Collection Costs.</u>

In the event Borrower fails to pay any amounts due or to return any Digital Currency hereunder, the Borrower shall pay to the Lender upon demand all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs incurred by the Lender in connection with the enforcement of its rights hereunder.

### XI. <u>Passwords and Security.</u>

Each party is responsible for maintaining adequate security and control of any and all passwords, private keys, and any other codes that it uses to Transfer or receive Digital Currencies hereunder. Each party will be solely responsible for the private keys that it uses to make the Transfers and maintaining secure back-ups. Each party will promptly notify the others of any security breach of its accounts, systems or networks as soon as possible. Each party will cooperate with the other party in the investigation of any suspected unauthorized Transfers or attempted Transfers using a party's account credentials or private keys, and any security breach of a party's accounts, systems, or networks, and provide the other party with the results of any third-party forensic investigation that it may undertake. Each party will be responsible for any unauthorized Transfers made utilizing its passwords, private keys, and any other codes it uses to make or receive Transfers.

### XII. <u>Governing Law; Dispute Resolution.</u>

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York applicable to contracts made and to be performed wholly within such State, without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it

DocuSign Envelope ID: 284E468C-59DD-4C45-A0A6-B3359207D2E8

shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

### XIII.   Notices.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or to the respective address set forth below:

Borrower:
Alejandro Canto
9456 SW 171st Pl
Miami, FL 33196
Attn: Mr. Alejandro Canto
Email: alejandro@mecbd.com

Lender:
BKCoin Management LLC
1101 Brickell Ave. S-800
Miami, FL 33131
Attn: Trading Team
Email: trading@bkcoincapital.com

Either party may change its address by giving the other party written notice of its new address as herein provided.

### XIV.   Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

### XV.   Entire Agreement.

This Agreement and each exhibit referenced herein constitutes the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations,

understandings and agreements.

## XVI.   Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that neither party may assign this Agreement or any rights or duties hereunder without the prior written consent of the other party.

## XVII.   Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XVIII. Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XIX.   Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

## XX.   Term and Termination.

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period. The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VI or upon 30 days' notice by either party to the other.

In the event of a termination of this Agreement, all outstanding Loans shall be deemed terminated and any loaned Digital Currency shall be redelivered immediately and any fees owed shall be

DocuSign Envelope ID: 284E468C-59DD-4C45-A0A6-B3359207D2E8

payable immediately.

**XXI.** **Miscellaneous.**

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement. The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement. The Parties acknowledge that the Agreement and any Order are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

DocuSign Envelope ID: 284E468C-59DD-4C45-A0A6-B3359207D2E8

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.


Borrower:

Alejandro Canto

By: _____

Name: Alejandro Canto

Title:


Lender:

BKCoin Management LLC

By: _____

Name: Carlos Betancourt

Title: Founding Principal

DocuSign Envelope ID: 284E468C-59DD-4C45-A0A6-B3359207D2E8

**EXHIBIT A**

Authorized Agents. The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section 3 hereof:

Name:
n/a
Email:
n/a

Name:
n/a
Email:
n/a

Borrower may change its Authorized Agents by notice given to Lender as provided herein.

**EXHIBIT B**
**LOAN TERM SHEET**

The following loan agreement dated June 7th, 2021 incorporates all of the terms of the Master Credit Agreement entered into by BKCoin Management LLC ("BKCoin") and Alejandro Canto ("Borrower") on June 7, 2021 and the following specific terms:

| | |
|---|---|
| Borrower: | Alejandro Canto |
| Lender: | BKCoin Management LLC |

| | |
|---|---|
| Currency/Digital Currency: | USD 3,000,000 |
| Amount of Digital Currency: | N/A |
| Borrow Fee: | 9.99% |
| Loan Type: | Open/Callable |
| Loan Term: | N/A |
| Initial Collateral Level: | 100% |
| Type Collateral: | ETH and/or BTC |
| Margin Call Rate: | 20% |
| Margin Refund Rate: | n/a |
| Loan Effective Date: | October 7th, 2021 |
| Recall Delivery Date: | The tenth (10th) Business Day from the **Recall Request Day** |

BKCoin Management LLC                    Alejandro Canto

By: _Carlos Betancourt_
—3E340619AFA24E0...
Name: Carlos Betancourt
Title: Founding Principal

By: _[signature]_
—25C0EF449E52400...
Name: Alejandro Canto
Title:

DocuSign Envelope ID: 8415B2F1-3930-48DF-90E2-151259898D3F

## MASTER DIGITAL CURRENCY LOAN AGREEMENT

This Master Digital Currency Loan Agreement ("Agreement") is made on this 19TH day of November, 2021 ("Effective Date") by and between BKCoin Management LLC, ("BKCoin" or "Lender"), a limited liability company organized and existing under the laws of Delaware and Alejandro Canto ("Borrower") an individual with primary address at

4531 sw 15th st, miami Fl 33134
_____.

## RECITALS

**WHEREAS,** subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend Digital Currency to Borrower and Borrower will return such Digital Currency to Lender upon the termination of the Loan.

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby agree as follows:

**I.**      **Definitions**

*"Airdrop"* means a distribution of a new token or tokens resulting from the ownership of a separate token. For the purposes of Section V, an *"Applicable Airdrop"* is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time. A *"Non-Applicable Airdrop"* is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution.

*"Applicable Law"* means (regardless of jurisdiction) any applicable (i) federal, national, state and local laws, ordinances, regulations, orders, statutory instrument, rules, treaties, codes of practice, guidance notes, policy statements, customary laws, decrees, injunctions, or judgments and any (ii) ruling, declaration, regulation, requirement, request or interpretation issued by any (or any quasi-) regulatory, judicial, administrative or governmental body or person;

*"Authorized Agent"* has the meaning set forth in Exhibit A.

*"Borrow Fee"* means the fee paid by Borrower to the Lender for the Loan.

*"Borrower"* means Alejandro Canto.

*"Business Day"* means a day on which BKCoin Management LLC is open for business. BKCoin Management LLC follows the New York Stock Exchange calendar of holidays.

DocuSign Envelope ID: 8415B2F1-3930-48DF-90E2-151259898D3F

"*Callable Option*" means the Borrower and Lender each have the option to redeliver or recall an Open Deal Loan at any time during the term of the deal.

"*Confirmation Protocol*" means the requirement that the Transfer of a Digital Currency, may not be deemed settled and completed until (i) the transaction has been recorded in a block and five (5) consecutive subsequent blocks referring back to such block (meaning six (6) blocks in total) have been added to the applicable blockchain; or (ii) the transaction has met a different protocol for a specific Digital Currency agreed to by the parties and added hereto as **Exhibit C.**

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), any Resulting Currency and any digital currency that the Borrower and Lender agree upon.

"*Digital Currency Address*" means an identifier of 26-34 alphanumeric characters that represents a possible destination for a Transfer of Digital Currency.

"*Dollars*" and "*$*" mean lawful money of the United States of America.

"*Fees*" mean the Borrow Fee and the Late Fee.

"*Fork*" means a permanent divergence in the relevant Digital Currency block chain, that commonly occurs when non-upgraded nodes can't validate blocks created by upgraded nodes that follow newer consensus rules.

"*Governmental Authority*" means the government of any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Hard Fork*" has the meaning set forth in Section (h).

"*Late Fee*" has the meaning set forth in Section III(b).

"*Lender*" means BKCoin Management LLC

"*Loan*" means a request for a loan or an actual loan of Digital Currency made pursuant to and subject to this Agreement.

"*Loan Documents*" shall mean this Agreement, all Lending Requests and all exhibits and schedules hereto.

"*Loan Effective Date*" means the date upon which a Loan begins.

"**Maturity Date**" means the date upon which a Loan is terminated.

"**Open Deal**" means a Loan without a Maturity Date where Borrower may redeliver the Digital Currency and Lender to may recall the Digital Currency at any time, subject to this Agreement.

"**Resulting Currency**" means a Digital Currency issued as a result of a Hard Fork.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to Tax or penalties applicable thereto.

"**Term**" shall have the meaning set forth in Section XX.

"**Term Deal**" means a Loan with a pre-determined Maturity Date, where only Borrower can return the Digital Currency prior to maturity.

"**Transfer**" shall mean, as applicable, the delivery of Digital Currency by Lender or the redelivery of Digital Currency by Borrower hereunder.

## II.  **General Operation.**

(a)  Loans of Digital Currency

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request the Lender to Loan to Borrower a specified amount of Digital Currency, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan.

(b)  Loan Procedure

From time to time during the Term of this Agreement, on a Business Day (the "Request Day") an Authorized Agent of Borrower may by email directed to trading@bkcoincapital.com, request from Lender a Loan of a specific amount of Digital Currency (a "Lending Request"). Lender shall by email directed to alejandro@mecbd.com, inform Borrower whether Lender agrees to make such a Loan. Once made, Lending Requests may not be withdrawn by Borrower and a Lending Request shall be deemed rejected unless accepted by Lender as set forth above within two (2) Business Days of the Request Date.

As part of its Lending Request, Borrower shall provide the following information:

(i)  The type of Digital Currency requested;

(ii)  the amount of Digital Currency requested;

(iii)  whether the Loan is a Term Deal or an Open Deal;

     (iv)    the Loan Effective Date, which shall be no less than five (5) Business Days from the date of the Lending Request; and

     (v)    the Maturity Date (if a Term Deal).

If Lender agrees to make a Loan, the Lender shall commence transmission to the Borrower's Digital Currency Address the amount of Digital Currency set forth in the Lending Request (the "Borrowed Amount") on or before 5:00 pm New York Time on the Request Day.

Specifics of each Loan shall be memorialized using the Loan Term Sheet attached as **Exhibit B**.

    (c)  Callable Option

Applicable to Open Deal Loans, Lender may at any time from 9:00 am until 5:00 pm New York time on a Business Day (the "Recall Request Day") exercise the Callable Option and recall all or any portion of a Digital Currency loaned to Borrower (the "Recall Amount"). Borrower will then have until 5:00 pm New York time on the "Recall Delivery Day", as agreed to and defined in the relevant Loan Term Sheet, to deliver the Recall Amount. In the event a Market Disruption Event is in effect on any Recall Delivery Day, the Recall Delivery Day will be extended fifteen (15) days. If a Market Disruption Event is still in effect at the end of such fifteen (15) day period, Borrower shall immediately transfer available funds an amount in Dollars equal to the average price on the Liquidity Exchanges (measured at 4:00 p.m. New York time) of the borrowed Digital Currency during the fifteen (15) Calendar Days including and prior to the Market Disruption Event in the borrowed Digital Currency (the "Market Disruption Spot Rate"). For purposes of this Agreement, "Market Disruption Event" means any event, circumstance, occurrence or condition that is beyond Borrower's control that restricts Borrower from delivering the Recall Amount in the normal course by exercising commercially reasonable efforts, including, for example, 51% attacks in which any Liquidity Exchange limits transfers, mining of empty blocks, no blocks being produced at all, or any Liquidity Exchange being censored by miners.

Borrower may at any time from 9:00 am until 5:00 pm New York time on a Business Day (the "Redelivery Day") exercise the Callable Option and deliver all or any portion of any Digital Currency loaned to Borrower.

    (d)  Termination of Loan

Loans will terminate:

     (i)    If a Term Deal, upon redelivery by Borrower of the Digital Currency at the Maturity Date or sooner;

     (ii)   If an Open Deal, upon redelivery by Borrower of the Digital Currency once the Borrower or Lender exercises the Callable Option; or

DocuSign Envelope ID: 8415B2F1-3930-48DF-90E2-151259898D3F

     (iii)    At the end of the TermXX.

(e)   Redelivery of Borrowed Digital Currency

Upon termination of a Loan according to this Agreement, the Borrower shall commence redelivery of the borrowed Digital Currency on or before 5:00 pm New York time of the applicable Business Day (i.e., the Maturity Date, the Recall Delivery Day, or the Redelivery Day).

(f)   Redelivery in an Illiquid Market

If the market in the borrowed Digital Currency becomes Illiquid (as defined below), Borrower may repay the Loan in Dollars at the Illiquid Market Spot Rate (as defined below). The market in the borrowed Digital Currency is "Illiquid" if the seven-day average daily trading volume across each of the top three exchanges reporting prices for the borrowed Digital Currency (as measured by the 30-day average daily trading volume on the Loan Date) (the such exchanges, the "Liquidity Exchanges") has decreased by 90% from the date of the Loan Term Sheet to the Maturity Date, or if the borrowed Digital Currency ceases to be listed on any of the Liquidity Exchanges. If the market is Illiquid, Borrower shall repay on the Maturity Date or on the Recall Delivery Date an amount in Dollars equal to the average price on the Liquidity Exchanges (measured at 4:00 p.m. New York time) of the borrowed Digital Currency during the fifteen (15) Calendar Days including and prior to the determination of an Illiquid market in the borrowed Digital Currency (the "Illiquid Market Spot Rate"). Notwithstanding the forgoing or anything in this Agreement to the contrary, Borrower may always satisfy its repayment or delivery obligations in this Agreement by repaying or delivering the applicable amount of borrowed Digital Currency.

(g)   Acts by Governmental Authorities and Changes in Applicable Laws.

If because of enforcement actions by Governmental Authorities of competent jurisdiction or changes in Applicable Laws ("Government Restrictions"), a party's ability to transfer or own a Digital Currency that has been the subject of a Loan or Loans is eliminated, materially impaired or declared illegal:

     (1) if possible under the Government Restrictions, including, without limitation, during any notice or grace period, Borrower shall repay to the Lender any outstanding balance of such Digital Currency and any accrued but unpaid Fees, such repayment to be made in the Digital Currency;

     (2) if return is not possible under the Government Restrictions, Borrower shall repay Lender an amount in Dollars equal to the volume-weighted average price on the Liquidity Exchanges (measured at 4 p.m. New York time) of the borrowed Digital Currency during the 30 day period prior to the effective date of the Government

DocuSign Envelope ID: 8415B2F1-3930-48DF-90E2-151259898D3F

Restrictions.

### III. Borrow Fees and Transaction Fees.

(a) Borrow Fee Calculation

When a Loan is executed, the Borrower will be responsible to pay the Borrow Fee as agreed to in the relevant Loan Term Sheet, the Borrow Fee shall be annualized but calculated daily and is subject to change if agreed to by Borrower and Lender. The Borrow Fee shall be payable, unless otherwise agreed by the Borrower and Lender, in the applicable Digital Currency.

Lender shall calculate any Borrow Fees owed on a daily basis and provide Borrower with the calculation upon request.

(b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned any Digital Currency, Borrower shall incur an additional fee (the "Late Fee") of 5% (annualized, calculated daily) of the notional amount of the Loan in addition to the Borrow Fee.

(c) Payment of Borrow Fees and Late Fees

An invoice for Borrow Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Borrow Fees incurred from the previous month. Borrower shall have up to five Business Days to submit payment for the invoice (the "Invoice Due Date"). Fees unpaid by the Invoice Due Date shall also become subject to the Late Fee commencing the day after the Invoice Due Date.

(d) Application of Payments

Borrower shall, at the time of making each payment under this Agreement, specify to the Lender the Loan to which such payment is to be applied. In the event that the Borrower fails to so specify, or if an Event of Default has occurred and is continuing, the Lender may apply the payment in such manner as it may determine to be appropriate in its sole discretion.

(e) Application of Insufficient Payments

If at any time insufficient amounts are received by the Lender to pay fully all amounts of principal, Fees, and other amounts then due and payable hereunder, such Digital Currency payment received shall be applied (i) first, to pay Fees then due and payable hereunder, (ii) then, to pay principal then due and payable hereunder, and (iii) then, to pay other amounts then due and payable under this Agreement. In no event shall payments by Borrower in one Digital Currency be applied by Lender

to pay off obligations outstanding with respect to a Loan in another Digital Currency.

    (f)  <u>Non-Business Days</u>

If the due date of any payment under this Agreement would otherwise fall on a day that is not a Business Day, such date shall be extended to the next succeeding Business Day and, in the case of any payment accruing Fees such Fees shall be payable for the period of such extension.

    (g)  <u>Computations</u>

Fees shall be computed on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which payable. For purposes of calculating Fees, Digital Currencies shall be deemed to have been Transferred by one party to the other when the applicable Confirmation Protocol for the relevant Digital Currency has been completed. If the requirements of the Confirmation Protocol are not met by 5pm New York Time, the Transfer shall be deemed to have been made on the following Business Day. Calculation of Fees shall be based on the date when the relevant Transfer is deemed to have occurred.

    (h)  <u>Taxes</u>

        (1)  All Taxes assessed on Borrower with respect to the Borrowed Amount shall be paid by Borrower.
        (2)  No Loans made under this Agreement shall be treated as a taxable disposition under Internal Revenue Code section 1001.

**IV.**    <u>**Collateral Requirements**</u>

    (a)  <u>Collateral</u>

Borrower shall provide as collateral an amount of U.S. Dollars or Digital Currency to be determined and agreed upon by the Borrower and Lender ("Collateral") and memorialized using the Loan Term Sheet attached as Exhibit B. The Collateral will be defined as a percentage of the value of the borrowed Digital Currency, such value determined by a spot rate agreed upon in the Loan Term Sheet. Lender shall be entitled to use the Collateral to conduct its digital currency lending and borrowing business, including transferring the Collateral to other non-Galaxy bank accounts.

    (b)  <u>Margin Calls</u>

If during the term of a Loan the value of the borrowed Digital Currency increases by the Margin Call Rate indicated on the Loan Term Sheet as measured by the spot rate published on Coinbase Pro, or if borrowed Digital Currency is not listed on Coinbase Pro, then the spot rate published on Kraken (such rate, the "Margin Call Spot Rate") over the spot rate indicated in the Loan Term Sheet, or the prior Margin Call Spot Rate, as applicable, Lender shall have the right to require

DocuSign Envelope ID: 8415B2F1-3930-48DF-90E2-151259898D3F

Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in the Loan Term Sheet relative to the value of the borrowed Digital Currency at the Margin Call Spot Rate (the "Additional Collateral"). If during the term of a Loan the value of the borrowed Digital Currency decreases below the original borrowed amount, Borrower shall have the right to require Lender to return a portion of Collateral equivalent to such decrease (the "Collateral Return Amount").

If Lender requires Borrower to contribute Additional Collateral, or if Borrower requires Lender to return Collateral, such requiring party shall send an email notification (the "First Notification") to the other party on a Business Day at the email address indicated in Section XIII that sets forth: (i) the Margin Call Spot Rate and (ii) the amount of Additional Collateral required based on the Margin Call Spot Rate, or the Collateral Return Amount, as applicable. Borrower or Lender, as applicable, shall have twelve (12) hours on a Business Day from the time it receives such First Notification to (x) respond and send payment to the requesting party , or (y) respond that the spot rate as indicated on Coinbase Pro or Kraken, as applicable, has changed sufficiently such that the transfer of Additional Collateral or the Collateral Return Amount, as applicable, is no longer required. If the requesting party agrees by email that the response according to (y) above is correct then no other action is required.

If Borrower or Lender, as applicable, fails to respond to the First Notification within twelve (12) hours on Business Days, and the spot rate of the borrowed Digital Currency is still at least at the Margin Call Spot Rate or below the original borrowed amount, as applicable, Lender or Borrower, as applicable, may send a second email notification (the "Second Notification") repeating the information in (i) and (ii) in the paragraph above. Borrower or Lender, as applicable, shall have six (6) hours on Business Days from the time the requesting party sends the Second Notification to respond according to (x) or (y) above. Failure to respond to either the First Notification or the Second Notification, shall give the requesting party the option to declare an Event of Default under Section VII below.

   (c)  Default or Failure to Return Loan or Collateral

In the event that Borrower does not return the Loan upon Termination or in the event of default pursuant to Sections VII of this Agreement, Lender shall transfer that portion of the Collateral from the Collateral Account to Lender's operating account necessary for the payment of any liability or obligation or indebtedness created by this Agreement, including, but not limited to using the Collateral to purchase the relevant Digital Currency to replenish Lender's supply of the relevant Digital Currency.

   (d)  Return of Collateral

Upon Borrower's redelivery of the Loan and acceptance of Lender of the Borrowed Digital Currency into Lender's wallet address as provided herein, with such delivery being confirmed on

DocuSign Envelope ID: 8415B2F1-3930-48DF-90E2-151259898D3F

the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral to a bank account in the name of Borrower. If Borrower provided Digital Currency as collateral, Lender's return of any Digital Currency posted as collateral must satisfy BKCoin's Bank Secrecy Act and Anti-money Laundering obligations.

## V.     **Hard Fork**

### (a)  Notification

In the event of a Hard Fork or an Airdrop, Lender shall provide email notification to Borrower.

### (b)  No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork or an Airdrop, any outstanding Loans will not be immediately terminated.

### (c)  Redelivery of Borrowed Digital Currency

Lender will receive the benefit of any incremental tokens generated as a result of a Fork in the relevant Digital Currency protocol or an Applicable Airdrop that results in a second token (the **"New Token"**) being created. For purposes of this agreement, a Hard Fork will have been deemed to have occurred if any two of the following four conditions are met:

- *Hash Power*: the average hash power mining the New Token on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 20% of the hash power mining the relevant Digital Currency on the day preceding the Hard Fork or Applicable Airdrop (calculated as a 3-day average of the 3 days preceding the hard fork). The source for the relevant Digital Currency hash power will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the hash power of the New Token will be bitinfocharts.com (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).
- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 20% of the average market capitalization of the relevant Digital Currency (defined as the total value of the relevant Digital Currency) (calculated as a 30-day average on such date). The source for the relevant Digital Currency market capitalization will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the market capitalization of

the New Token will be (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 20% of the average 24-hour trading volume of the relevant Digital Currency (calculated as a 30-day average on such date). The source for the relevant Digital Currency 24-hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the 24-hour trading volume of the New Token will be (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).
- *Wallet Compatibility*: the New Token is supported by either BitGo wallets or Ledger wallets within 30 days of the Hard Fork or Applicable Airdrop.

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to pay Lender. Borrower can reimburse Lender for the value of the New Tokens with any combination of a one-time Digital Currency payment of the relevant Digital Currency reflecting the amount of the New Token due using the agreed upon spot rate at the moment of repayment, returning the loaned Digital Currency so that Lender can split the tokens themselves, sending the New Tokens directly to Lender, or a Dollar cash payment at the agreed upon spot rate of the New Token at the time of repayment. In the event of a Hard Fork or Applicable Air Drop that does not meet the criteria above, or a Non-Applicable Airdrop, Borrower shall have no obligation to send the New Tokens to Lender, or to make a payment in Dollars or the relevant Digital Currency for the value of the New Tokens.

## VI. <u>Representations and Warranties.</u>

(a) The Borrower represents to the Lender on the date hereof and on the date of each Loan Request made to the Borrower hereunder that each of this Agreement has been duly and validly authorized, executed and delivered on behalf of the Borrower and constitutes the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and subject to the availability of equitable remedies) and will not contravene (a) the constitutive documents of Borrower, (b) any Applicable Law, and (c) any judgment, award, injunction or similar legal restriction.

(b) Each party represents that no license, consent, authorization or approval or other action by, or notice to or filing or registration with, any Governmental Authority (including any foreign exchange approval), and no other third-party consent or approval, is necessary for

the due execution, delivery and performance by such party of this Agreement or for the legality, validity or enforceability thereof against such party.

(c) Each party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan or any Digital Currency or funds received hereunder.

(d) Lender represents and warrants that it has, or will have at the time of transfer of any Digital Currency, the right to lend such Digital Currency subject to the terms and conditions hereof, that it owns the Digital Currency, free and clear of all liens and that the Digital Currency has been acquired in accordance with all Applicable Laws.

(e) Borrower represents and warrants that it has, or will have at the time of return of any Digital Currency, the right to transfer such Digital Currency subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Agreement and that the Digital Currency that it will return has been acquired in accordance with all Applicable Laws.

## VII.   **Default**

It is further understood that the following defaults shall constitute events of default hereunder and are hereinafter referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to return any Borrowed Amount or pay any Borrow Fees when due hereunder;

(b) the failure by the Lender to return any Collateral when due hereunder;

(c) a material default in the performance by Borrower of any of the other agreements, conditions, covenants, provisions or stipulations contained in any of the Loan Documents;

(d) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings shall be instituted by or against the Borrower and shall not be dismissed within thirty (30) days of their initiation; or

(e) any representation or warranty made in any of the Loan Documents proves to be untrue in any material respect as of the date of making or deemed making thereof.

## VIII.  __Remedies__

Upon the occurrence and during the continuation of any Event of Default, the Lender may, at its
option, (a) declare all Borrowed Amounts outstanding hereunder immediately due and payable,
(b) terminate this Agreement upon notice to Borrower, and (c) exercise all other rights and
remedies available to the Lender hereunder, under applicable law, or in equity; provided, that
upon any Event of Default pursuant to Section VII all Borrowed Amounts and the amount of
any Fees then outstanding hereunder shall automatically become and be immediately due and
payable.

## IX.  __Rights and Remedies Cumulative.__

No delay or omission by the Lender in exercising any right or remedy hereunder shall operate as
a waiver of the future exercise of that right or remedy or of any other rights or remedies
hereunder. All rights of the Lender stated herein are cumulative and in addition to all other
rights provided by law, in equity.

## X.  __Collection Costs.__

In the event Borrower fails to pay any amounts due or to return any Digital Currency hereunder,
the Borrower shall pay to the Lender upon demand all reasonable costs and expenses, including
without limitation, reasonable attorneys' fees and court costs incurred by the Lender in
connection with the enforcement of its rights hereunder.

## XI.  __Passwords and Security.__

Each party is responsible for maintaining adequate security and control of any and all passwords,
private keys, and any other codes that it uses to Transfer or receive Digital Currencies hereunder.
Each party will be solely responsible for the private keys that it uses to make the Transfers and
maintaining secure back-ups. Each party will promptly notify the others of any security breach of
its accounts, systems or networks as soon as possible. Each party will cooperate with the other
party in the investigation of any suspected unauthorized Transfers or attempted Transfers using a
party's account credentials or private keys, and any security breach of a party's accounts, systems,
or networks, and provide the other party with the results of any third-party forensic investigation
that it may undertake. Each party will be responsible for any unauthorized Transfers made utilizing
its passwords, private keys, and any other codes it uses to make or receive Transfers.

## XII.  __Governing Law; Dispute Resolution.__

This Agreement is governed by, and shall be construed and enforced under, the laws of the State
of New York applicable to contracts made and to be performed wholly within such State, without
regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this

DocuSign Envelope ID: 8415B2F1-3930-48DF-90E2-151259898D3F

Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

### XIII. Notices.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or to the respective address set forth below:

Borrower:
Alejandro Canto
9456 SW 171st Pl
Miami, FL 33196
Attn: Mr. Alejandro Canto
Email: alejandro@mecbd.com

Lender:
BKCoin Management LLC
1101 Brickell Ave. S-800
Miami, FL 33131
Attn: Trading Team
Email: trading@bkcoincapital.com

Either party may change its address by giving the other party written notice of its new address as herein provided.

### XIV. Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

### XV. Entire Agreement.

This Agreement and each exhibit referenced herein constitutes the entire Agreement among the

parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.

## XVI.  Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that neither party may assign this Agreement or any rights or duties hereunder without the prior written consent of the other party.

## XVII.  Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XVIII. Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XIX.  Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

## XX.  Term and Termination.

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period. The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VI or upon 30 days' notice by either party to the other.

In the event of a termination of this Agreement, all outstanding Loans shall be deemed terminated

DocuSign Envelope ID: 8415B2F1-3930-48DF-90E2-151259898D3F

and any loaned Digital Currency shall be redelivered immediately and any fees owed shall be payable immediately.

**XXI.** <u>**Miscellaneous.**</u>

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement. The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement. The Parties acknowledge that the Agreement and any Order are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

Borrower:

Alejandro Canto

By: _____

Name:     Alejandro Canto

Title:

Lender:

BKCoin Management LLC

By: _____

Name:     Carlos Betancourt

Title:     Founding Principal

DocuSign Envelope ID: 8415B2F1-3930-48DF-90E2-151259898D3F

## EXHIBIT A

Authorized Agents. The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section 3 hereof:

Name:
n/a
Email:
n/a

Name:
n/a
Email:
n/a

Borrower may change its Authorized Agents by notice given to Lender as provided herein.

**EXHIBIT B**
**LOAN TERM SHEET**

The following loan agreement dated June 7th, 2021 incorporates all of the terms of the Master Credit Agreement entered into by BKCoin Management LLC ("BKCoin") and Alejandro Canto ("Borrower") on June 7, 2021 and the following specific terms:

| | |
|---|---|
| Borrower: | Alejandro Canto |
| Lender: | BKCoin Management LLC |

| | |
|---|---|
| Currency/Digital Currency: | USD 750,000 |
| Amount of Digital Currency: | N/A |
| Borrow Fee: | 11% |
| Loan Type: | Open/Callable |
| Loan Term: | N/A |
| Initial Collateral Level: | 100% |
| Type Collateral: | ETH and/or BTC |
| Margin Call Rate: | 20% |
| Margin Refund Rate: | n/a |
| Loan Effective Date: | November 19th, 2021 |
| Recall Delivery Date: | The tenth (10th) Business Day from the **Recall Request Day** |

BKCoin Management LLC                Alejandro Canto

By: _Carlos Betancourt_              By: _____
       3E340619AEA24E0                        25C0EF449E52400
Name:  Carlos Betancourt             Name:  Alejandro Canto
Title:     Founding Principal        Title:   Borrower

## <u>MASTER DIGITAL CURRENCY LOAN AGREEMENT</u>

This Master Digital Currency Loan Agreement ("<u>Agreement</u>") is made on this 9TH day of March, 2022 ("<u>Effective Date</u>") by and between BKCoin Management LLC, ("BKCoin" or "<u>Lender</u>"), a limited liability company organized and existing under the laws of Delaware and Alejandro Canto ("<u>Borrower</u>") an individual with primary address at <u>4531 sw 15th st, miami Florida 33134</u>.

## <u>RECITALS</u>

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend Digital Currency to Borrower and Borrower will return such Digital Currency to Lender upon the termination of the Loan.

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the *receipt and sufficiency of which hereby acknowledged*, the Borrower and the Lender hereby agree as follows:

**I.      <u>Definitions</u>**

"*Airdrop*" means a distribution of a new token or tokens resulting from the ownership of a separate token. For the purposes of Section V, an "*Applicable Airdrop*" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time. A "*Non-Applicable Airdrop*" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution.

"*Applicable Law*" means (regardless of jurisdiction) any applicable (i) federal, national, state and local laws, ordinances, regulations, orders, statutory instrument, rules, treaties, codes of practice, guidance notes, policy statements, customary laws, decrees, injunctions, or judgments and any (ii) ruling, declaration, regulation, requirement, request or interpretation issued by any (or any quasi-) regulatory, judicial, administrative or governmental body or person;

"*Authorized Agent*" has the meaning set forth in Exhibit A.

"*Borrow Fee*" means the fee paid by Borrower to the Lender for the Loan.

"*Borrower*" means Alejandro Canto.

"*Business Day*" means a day on which BKCoin Management LLC is open for business. BKCoin Management LLC follows the New York Stock Exchange calendar of holidays.

"*Callable Option*" means the Borrower and Lender each have the option to redeliver or recall an

Open Deal Loan at any time during the term of the deal.

"*Confirmation Protocol*" means the requirement that the Transfer of a Digital Currency, may not be deemed settled and completed until (i) the transaction has been recorded in a block and five (5) consecutive subsequent blocks referring back to such block (meaning six (6) blocks in total) have been added to the applicable blockchain; or (ii) the transaction has met a different protocol for a specific Digital Currency agreed to by the parties and added hereto as **Exhibit C.**

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), any Resulting Currency and any digital currency that the Borrower and Lender agree upon.

"*Digital Currency Address*" means an identifier of 26-34 alphanumeric characters that represents a possible destination for a Transfer of Digital Currency.

"*Dollars*" and "*$*" mean lawful money of the United States of America.

"*Fees*" mean the Borrow Fee and the Late Fee.

"*Fork*" means a permanent divergence in the relevant Digital Currency block chain, that commonly occurs when non-upgraded nodes can't validate blocks created by upgraded nodes that follow newer consensus rules.

"*Governmental Authority*" means the government of any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Hard Fork*" has the meaning set forth in Section (h).

"*Late Fee*" has the meaning set forth in Section III(b).

"*Lender*" means BKCoin Management LLC

"*Loan*" means a request for a loan or an actual loan of Digital Currency made pursuant to and subject to this Agreement.

"*Loan Documents*" shall mean this Agreement, all Lending Requests and all exhibits and schedules hereto.

"*Loan Effective Date*" means the date upon which a Loan begins.

"*Maturity Date*" means the date upon which a Loan is terminated.

"**Open Deal**" means a Loan without a Maturity Date where Borrower may redeliver the Digital Currency and Lender to may recall the Digital Currency at any time, subject to this Agreement.

"**Resulting Currency**" means a Digital Currency issued as a result of a Hard Fork.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to Tax or penalties applicable thereto.

"**Term**" shall have the meaning set forth in Section XX.

"**Term Deal**" means a Loan with a pre-determined Maturity Date, where only Borrower can return the Digital Currency prior to maturity.

"**Transfer**" shall mean, as applicable, the delivery of Digital Currency by Lender or the redelivery of Digital Currency by Borrower hereunder.

## II. <u>General Operation.</u>

(a) <u>Loans of Digital Currency</u>

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request the Lender to Loan to Borrower a specified amount of Digital Currency, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan.

(b) <u>Loan Procedure</u>

From time to time during the Term of this Agreement, on a Business Day (the "<u>Request Day</u>") an Authorized Agent of Borrower may by email directed to <mark>trading@bkcoincapital.com</mark>, request from Lender a Loan of a specific amount of Digital Currency (a "<u>Lending Request</u>"). Lender shall by email directed to <mark>alejandro@mecbd.com</mark>, inform Lender whether Lender agrees to make such a Loan. Once made, Lending Requests may not be withdrawn by Borrower and a Lending Request shall be deemed rejected unless accepted by Lender as set forth above within two (2) Business Days of the Request Date.

As part of its Lending Request, Borrower shall provide the following information:

(i)      The type of Digital Currency requested;
(ii)     the amount of Digital Currency requested;
(iii)    whether the Loan is a Term Deal or an Open Deal;
(iv)     the Loan Effective Date, which shall be no less than five (5) Business Days from

the date of the Lending Request; and

(v)    the Maturity Date (if a Term Deal).

If Lender agrees to make a Loan, the Lender shall commence transmission to the Borrower's *Digital Currency Address the amount of Digital Currency set forth in the Lending Request* (the "<u>Borrowed Amount</u>") on or before 5:00 pm New York Time on the Request Day.

Specifics of each Loan shall be memorialized using the Loan Term Sheet attached as **Exhibit B**.

(c)  <u>Callable Option</u>

Applicable to Open Deal Loans, Lender may at any time from 9:00 am until 5:00 pm New York time on a Business Day (the "<u>Recall Request Day</u>") exercise the Callable Option and recall all or any portion of a Digital Currency loaned to Borrower (the "<u>Recall Amount</u>"). Borrower will then have until 5:00 pm New York time on the "<u>Recall Delivery Day</u>", as agreed to and defined in the relevant Loan Term Sheet, to deliver the Recall Amount. In the event a Market Disruption Event is in effect on any Recall Delivery Day, the Recall Delivery Day will be extended fifteen (15) days. If a Market Disruption Event is still in effect at the end of such fifteen (15) day period, Borrower shall immediately transfer available funds an amount in Dollars equal to the average price on the Liquidity Exchanges (measured at 4:00 p.m. New York time) of the borrowed *Digital Currency during the fifteen (15) Calendar Days including and prior to the Market* Disruption Event in the borrowed Digital Currency (the "<u>Market Disruption Spot Rate</u>"). For purposes of this Agreement, "Market Disruption Event" means any event, circumstance, occurrence or condition that is beyond Borrower's control that restricts Borrower from delivering the Recall Amount in the normal course by exercising commercially reasonable efforts, including, for example, 51% attacks in which any Liquidity Exchange limits transfers, mining of empty blocks, no blocks being produced at all, or any Liquidity Exchange being censored by miners.

Borrower may at any time from 9:00 am until 5:00 pm New York time on a Business Day (the "<u>Redelivery Day</u>") exercise the Callable Option and deliver all or any portion of any Digital Currency loaned to Borrower.

(d)  <u>Termination of Loan</u>

Loans will terminate:

(i)    If a Term Deal, upon redelivery by Borrower of the Digital Currency at the Maturity Date or sooner;

(ii)   If an Open Deal, upon redelivery by Borrower of the Digital Currency once the Borrower or Lender exercises the Callable Option; or

(iii) At the end of the TermXX.

(e) Redelivery of Borrowed Digital Currency

Upon termination of a Loan according to this Agreement, the Borrower shall commence redelivery of the borrowed Digital Currency on or before 5:00 pm New York time of the applicable Business Day (i.e., the Maturity Date, the Recall Delivery Day, or the Redelivery Day).

(f) Redelivery in an Illiquid Market

If the market in the borrowed Digital Currency becomes Illiquid (as defined below), Borrower may repay the Loan in Dollars at the Illiquid Market Spot Rate (as defined below). The market in the borrowed Digital Currency is "Illiquid" if the seven-day average daily trading volume across each of the top three exchanges reporting prices for the borrowed Digital Currency (as measured by the 30-day average daily trading volume on the Loan Date) (the such exchanges, the "Liquidity Exchanges") has decreased by 90% from the date of the Loan Term Sheet to the Maturity Date, or if the borrowed Digital Currency ceases to be listed on any of the Liquidity Exchanges. If the market is Illiquid, Borrower shall repay on the Maturity Date or on the Recall Delivery Date an amount in Dollars equal to the average price on the Liquidity Exchanges (measured at 4:00 p.m. New York time) of the borrowed Digital Currency during the fifteen (15) Calendar Days including and prior to the determination of an Illiquid market in the borrowed Digital Currency (the "Illiquid Market Spot Rate"). Notwithstanding the forgoing or anything in this Agreement to the contrary, Borrower may always satisfy its repayment or delivery obligations in this Agreement by repaying or delivering the applicable amount of borrowed Digital Currency.

(g) Acts by Governmental Authorities and Changes in Applicable Laws.

If because of enforcement actions by Governmental Authorities of competent jurisdiction or changes in Applicable Laws ("Government Restrictions"), a party's ability to transfer or own a Digital Currency that has been the subject of a Loan or Loans is eliminated, materially impaired or declared illegal:

(1) if possible under the Government Restrictions, including, without limitation, during any notice or grace period, Borrower shall repay to the Lender any outstanding balance of such Digital Currency and any accrued but unpaid Fees, such repayment to be made in the Digital Currency;

(2) if return is not possible under the Government Restrictions, Borrower shall repay Lender an amount in Dollars equal to the volume-weighted average price on the Liquidity Exchanges (measured at 4 p.m. New York time) of the borrowed Digital Currency during the 30 day period prior to the effective date of the Government Restrictions.

DocuSign Envelope ID: 0480CFF6-54EB-4B42-84EE-D8496D2219A8

### III.    Borrow Fees and Transaction Fees.

(a) Borrow Fee Calculation

When a Loan is executed, the Borrower will be responsible to pay the Borrow Fee as agreed to in the relevant Loan Term Sheet, the Borrow Fee shall be annualized but calculated daily and is subject to change if agreed to by Borrower and Lender. The Borrow Fee shall be payable, unless otherwise agreed by the Borrower and Lender, in the applicable Digital Currency.

Lender shall calculate any Borrow Fees owed on a daily basis and provide Borrower with the calculation upon request.

(b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned any Digital Currency, Borrower shall incur an additional fee (the "Late Fee") of 5% (annualized, calculated daily) of the notional amount of the Loan in addition to the Borrow Fee.

(c) Payment of Borrow Fees and Late Fees

An invoice for Borrow Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Borrow Fees incurred from the previous month. Borrower shall have up to five Business Days to submit payment for the invoice (the "Invoice Due Date"). Fees unpaid by the Invoice Due Date shall also become subject to the Late Fee commencing the day after the Invoice Due Date.

(d) Application of Payments

Borrower shall, at the time of making each payment under this Agreement, specify to the Lender the Loan to which such payment is to be applied. In the event that the Borrower fails to so specify, or if an Event of Default has occurred and is continuing, the Lender may apply the payment in such manner as it may determine to be appropriate in its sole discretion.

(e) Application of Insufficient Payments

If at any time insufficient amounts are received by the Lender to pay fully all amounts of principal, Fees, and other amounts then due and payable hereunder, such Digital Currency payment received shall be applied (i) first, to pay Fees then due and payable hereunder, (ii) then, to pay principal then due and payable hereunder, and (iii) then, to pay other amounts then due and payable under this Agreement. In no event shall payments by Borrower in one Digital Currency be applied by Lender to pay off obligations outstanding with respect to a Loan in another Digital Currency.

DocuSign Envelope ID: 0480CFF6-54EB-4B42-84EE-D8496D2219A8

(f) <u>Non-Business Days</u>

If the due date of any payment under this Agreement would otherwise fall on a day that is not a Business Day, such date shall be extended to the next succeeding Business Day and, in the case of any payment accruing Fees such Fees shall be payable for the period of such extension.

(g) <u>Computations</u>

Fees shall be computed on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which payable. For purposes of calculating Fees, Digital Currencies shall be deemed to have been Transferred by one party to the other when the applicable Confirmation Protocol for the relevant Digital Currency has been completed. If the requirements of the Confirmation Protocol are not met by 5pm New York Time, the Transfer shall be deemed to have been made on the following Business Day. Calculation of Fees shall be based on the date when the relevant Transfer is deemed to have occurred.

(h) <u>Taxes</u>

    (1) All Taxes assessed on Borrower with respect to the Borrowed Amount shall be paid by Borrower.

    (2) No Loans made under this Agreement shall be treated as a taxable disposition under Internal Revenue Code section 1001.

**IV.     Collateral Requirements**

(a) <u>Collateral</u>

Borrower shall provide as collateral an amount of U.S. Dollars or Digital Currency to be determined and agreed upon by the Borrower and Lender ("Collateral") and memorialized using the Loan Term Sheet attached as Exhibit B. The Collateral will be defined as a percentage of the value of the borrowed Digital Currency, such value determined by a spot rate agreed upon in the Loan Term Sheet. Lender shall be entitled to use the Collateral to conduct its digital currency lending and borrowing business, including transferring the Collateral to other non-Galaxy bank accounts.

(b) <u>Margin Calls</u>

If during the term of a Loan the value of the borrowed Digital Currency increases by the Margin Call Rate indicated on the Loan Term Sheet as measured by the spot rate published on Coinbase Pro, or if borrowed Digital Currency is not listed on Coinbase Pro, then the spot rate published on Kraken (such rate, the "Margin Call Spot Rate") over the spot rate indicated in the Loan Term Sheet, or the prior Margin Call Spot Rate, as applicable, Lender shall have the right to require Borrower to contribute additional Collateral so that the Collateral is at least the same percentage

Case 1:23-cv-07192-RVS-08B56-JPC nt Doe-6 Ent 28-2 of Filed 1/20/23 et Page 107 of
Case 1:23-cv-07192-RVS-08B56-JPC Document Doc-6 Entered of Filed 1/20/23 et Page 107 of
117
DocuSign Envelope ID: 0480CFF6-54EB-4B42-84EE-D8496D2219A8

indicated in the Loan Term Sheet relative to the value of the borrowed Digital Currency at the Margin Call Spot Rate (the "Additional Collateral"). If during the term of a Loan the value of the borrowed Digital Currency decreases below the original borrowed amount, Borrower shall have the right to require Lender to return a portion of Collateral equivalent to such decrease (the "Collateral Return Amount").

If Lender requires Borrower to contribute Additional Collateral, or if Borrower requires Lender to return Collateral, such requiring party shall send an email notification (the "First Notification") to the other party on a Business Day at the email address indicated in Section XIII that sets forth: (i) the Margin Call Spot Rate and (ii) the amount of Additional Collateral required based on the Margin Call Spot Rate, or the Collateral Return Amount, as applicable. Borrower or Lender, as applicable, shall have twelve (12) hours on a Business Day from the time it receives such First Notification to (x) respond and send payment to the requesting party , or (y) respond that the spot rate as indicated on Coinbase Pro or Kraken, as applicable, has changed sufficiently such that the transfer of Additional Collateral or the Collateral Return Amount, as applicable, is no longer required. If the requesting party agrees by email that the response according to (y) above is correct then no other action is required.

If Borrower or Lender, as applicable, fails to respond to the First Notification within twelve (12) hours on Business Days, and the spot rate of the borrowed Digital Currency is still at least at the Margin Call Spot Rate or below the original borrowed amount, as applicable, Lender or Borrower, as applicable, may send a second email notification (the "Second Notification") repeating the information in (i) and (ii) in the paragraph above. Borrower or Lender, as applicable, shall have six (6) hours on Business Days from the time the requesting party sends the Second Notification to respond according to (x) or (y) above. Failure to respond to either the First Notification or the Second Notification, shall give the requesting party the option to declare an Event of Default under Section VII below.

### (c) Default or Failure to Return Loan or Collateral

In the event that Borrower does not return the Loan upon Termination or in the event of default pursuant to Sections VII of this Agreement, Lender shall transfer that portion of the Collateral from the Collateral Account to Lender's operating account necessary for the payment of any liability or obligation or indebtedness created by this Agreement, including, but not limited to using the Collateral to purchase the relevant Digital Currency to replenish Lender's supply of the relevant Digital Currency.

### (d) Return of Collateral

Upon Borrower's redelivery of the Loan and acceptance of Lender of the Borrowed Digital Currency into Lender's wallet address as provided herein, with such delivery being confirmed on the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral to a

bank account in the name of Borrower. If Borrower provided Digital Currency as collateral, Lender's return of any Digital Currency posted as collateral must satisfy BKCoin's Bank Secrecy Act and Anti-money Laundering obligations.

**V.**     **Hard Fork**

(a) Notification

In the event of a Hard Fork or an Airdrop, Lender shall provide email notification to Borrower.

(b) No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork or an Airdrop, any outstanding Loans will not be immediately terminated.

(c) Redelivery of Borrowed Digital Currency

Lender will receive the benefit of any incremental tokens generated as a result of a Fork in the relevant Digital Currency protocol or an Applicable Airdrop that results in a second token (the **"New Token"**) being created. For purposes of this agreement, a Hard Fork will have been deemed to have occurred if any two of the following four conditions are met:

- *Hash Power*: the average hash power mining the New Token on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 20% of the hash power mining the relevant Digital Currency on the day preceding the Hard Fork or Applicable Airdrop (calculated as a 3-day average of the 3 days preceding the hard fork). The source for the relevant Digital Currency hash power will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the hash power of the New Token will be bitinfocharts.com (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).
- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 20% of the average market capitalization of the relevant Digital Currency (defined as the total value of the relevant Digital Currency) (calculated as a 30-day average on such date). The source for the relevant Digital Currency market capitalization will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the market capitalization of the New Token will be (or, if bitinfocharts.com does not provide the required

information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 20% of the average 24-hour trading volume of the relevant Digital Currency (calculated as a 30-day average on such date). The source for the relevant Digital Currency 24-hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the 24-hour trading volume of the New Token will be (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

- *Wallet Compatibility*: the New Token is supported by either BitGo wallets or Ledger wallets within 30 days of the Hard Fork or Applicable Airdrop.

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to pay Lender. Borrower can reimburse Lender for the value of the New Tokens with any combination of a one-time Digital Currency payment of the relevant Digital Currency reflecting the amount of the New Token due using the agreed upon spot rate at the moment of repayment, returning the loaned Digital Currency so that Lender can split the tokens themselves, sending the New Tokens directly to Lender, or a Dollar cash payment at the agreed upon spot rate of the New Token at the time of repayment. In the event of a Hard Fork or Applicable Air Drop that does not meet the criteria above, or a Non-Applicable Airdrop, Borrower shall have no obligation to send the New Tokens to Lender, or to make a payment in Dollars or the relevant Digital Currency for the value of the New Tokens.

## VI. Representations and Warranties.

(a) The Borrower represents to the Lender on the date hereof and on the date of each Loan Request made to the Borrower hereunder that each of this Agreement has been duly and validly authorized, executed and delivered on behalf of the Borrower and constitutes the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and subject to the availability of equitable remedies) and will not contravene (a) the constitutive documents of Borrower, (b) any Applicable Law, and (c) any judgment, award, injunction or similar legal restriction.

(b) Each party represents that no license, consent, authorization or approval or other action by, or notice to or filing or registration with, any Governmental Authority (including any foreign exchange approval), and no other third-party consent or approval, is necessary for the due execution, delivery and performance by such party of this Agreement or for the

DocuSign Envelope ID: 0480CFF6-54EB-4B42-84EE-D8496D2219A8

legality, validity or enforceability thereof against such party.

(c) Each party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan or any Digital Currency or funds received hereunder.

(d) Lender represents and warrants that it has, or will have at the time of transfer of any Digital Currency, the right to lend such Digital Currency subject to the terms and conditions hereof, that it owns the Digital Currency, free and clear of all liens and that the Digital Currency has been acquired in accordance with all Applicable Laws.

(e) Borrower represents and warrants that it has, or will have at the time of return of any Digital Currency, the right to transfer such Digital Currency subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Agreement and that the Digital Currency that it will return has been acquired in accordance with all Applicable Laws.

## VII. **Default**

It is further understood that the following defaults shall constitute events of default hereunder and are hereinafter referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to return any Borrowed Amount or pay any Borrow Fees when due hereunder;

(b) the failure by the Lender to return any Collateral when due hereunder;

(c) a material default in the performance by Borrower of any of the other agreements, conditions, covenants, provisions or stipulations contained in any of the Loan Documents;

(d) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings shall be instituted by or against the Borrower and shall not be dismissed within thirty (30) days of their initiation; or

(e) any representation or warranty made in any of the Loan Documents proves to be untrue in any material respect as of the date of making or deemed making thereof.

## VIII. **Remedies**

Upon the occurrence and during the continuation of any Event of Default, the Lender may, at its option, (a) declare all Borrowed Amounts outstanding hereunder immediately due and payable, (b) terminate this Agreement upon notice to Borrower, and (c) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity; provided, that upon any Event of Default pursuant to Section VII all Borrowed Amounts and the amount of any Fees then outstanding hereunder shall automatically become and be immediately due and payable.

## IX.    Rights and Remedies Cumulative.

No delay or omission by the Lender in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of the Lender stated herein are cumulative and in addition to all other rights provided by law, in equity.

## X.    Collection Costs.

In the event Borrower fails to pay any amounts due or to return any Digital Currency hereunder, the Borrower shall pay to the Lender upon demand all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs incurred by the Lender in connection with the enforcement of its rights hereunder.

## XI.    Passwords and Security.

Each party is responsible for maintaining adequate security and control of any and all passwords, private keys, and any other codes that it uses to Transfer or receive Digital Currencies hereunder. Each party will be solely responsible for the private keys that it uses to make the Transfers and maintaining secure back-ups. Each party will promptly notify the others of any security breach of its accounts, systems or networks as soon as possible. Each party will cooperate with the other party in the investigation of any suspected unauthorized Transfers or attempted Transfers using a party's account credentials or private keys, and any security breach of a party's accounts, systems, or networks, and provide the other party with the results of any third-party forensic investigation that it may undertake. Each party will be responsible for any unauthorized Transfers made utilizing its passwords, private keys, and any other codes it uses to make or receive Transfers.

## XII.    Governing Law; Dispute Resolution.

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York applicable to contracts made and to be performed wholly within such State, without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it

DocuSign Envelope ID: 0480CFF6-54EB-4B42-84EE-D8496D2219A8

shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

### XIII.  <u>Notices.</u>

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or to the respective address set forth below:

Borrower:
Alejandro Canto
9456 SW 171st Pl
Miami, FL 33196
Attn: Mr. Alejandro Canto
Email: alejandro@mecbd.com

Lender:
BKCoin Management LLC
1101 Brickell Ave. S-800
Miami, FL 33131
Attn: Trading Team
Email: trading@bkcoincapital.com

Either party may change its address by giving the other party written notice of its new address as herein provided.

### XIV.  <u>Modifications.</u>

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

### XV.  <u>Entire Agreement.</u>

This Agreement and each exhibit referenced herein constitutes the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations,

understandings and agreements.

### XVI.   Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that neither party may assign this Agreement or any rights or duties hereunder without the prior written consent of the other party.

### XVII.   Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

### XVIII. Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

### XIX.   Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

### XX.   Term and Termination.

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period. The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VI or upon 30 days' notice by either party to the other.

In the event of a termination of this Agreement, all outstanding Loans shall be deemed terminated and any loaned Digital Currency shall be redelivered immediately and any fees owed shall be

DocuSign Envelope ID: 0480CFF6-54EB-4B42-84EE-D8496D2219A8

payable immediately.

### XXI.  Miscellaneous.

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement. The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement. The Parties acknowledge that the Agreement and any Order are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

DocuSign Envelope ID: 0480CFF6-54EB-4B42-84EE-D8496D2219A8

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

Borrower:
Alejandro Canto

By: _____

Name: Alejandro Canto

Title:

Lender:
BKCoin Management LLC

By: _____

Name: Carlos Betancourt

Title: Founding Principal

DocuSign Envelope ID: 0480CFF6-54EB-4B42-84EE-D8496D2219A8

**EXHIBIT A**

Authorized Agents. The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section 3 hereof:

Name:
n/a
Email:
n/a

Name:
n/a
Email:
n/a

Borrower may change its Authorized Agents by notice given to Lender as provided herein.

DocuSign Envelope ID: 0480CFF6-54EB-4B42-84EE-D8496D2219A8

**EXHIBIT B**
**LOAN TERM SHEET**

The following loan agreement dated June 7th, 2021 incorporates all of the terms of the Master
Credit Agreement entered into by BKCoin Management LLC ("BKCoin") and Alejandro Canto
("Borrower") on March 9th, 2022 and the following specific terms:

| | |
|---|---|
| Borrower: | Alejandro Canto |
| Lender: | BKCoin Management LLC |
| | |
| Currency/Digital Currency: | USD 300,000 |
| Amount of Digital Currency: | N/A |
| Borrow Fee: | 12% |
| Loan Type: | Open/Callable |
| Loan Term: | N/A |
| Initial Collateral Level: | 100% |
| Type Collateral: | ETH and/or BTC |
| Margin Call Rate: | 20% |
| Margin Refund Rate: | n/a |
| Loan Effective Date: | March 9th, 2021 |
| Recall Delivery Date: | The tenth (10th) Business Day from the **Recall Request Day** |

BKCoin Management LLC                    Alejandro Canto

By: _Carlos Betancourt_                    By: _____
Name:   carlos Betancourt                    Name:   Alejandro Canto
Title:     Founding Principal                    Title: