## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## MIAMI DIVISION

### CASE NO. 23-CV-20719-SCOLA/GOODMAN

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.

BKCOIN MANAGEMENT, LLC, *et al.*,

        Defendants.

_____/

### REPORT AND RECOMMENDATIONS ON DEFENDANT
### KANG'S MOTION FOR A LIMITED LIFT OF THE STAY OF LITIGATION

Defendant Min Woo Kang a/k/a "Kevin" Kang ("Kang") filed the instant motion

seeking a limited lift of the stay "to allow [him] to file a complaint for indemnification

and advancement of attorneys' fees, or in the alternative, for an order requiring that the

Receiver should advance [his] attorneys' fees and costs as required under [the First

Amended and Restated Limited Partnership Agreement dated August 28, 2020

("Agreement")] with BKCoin Capital LP [("BKCoin Capital")]." [ECF No. 109-1, p. 2].[1]

Michael I. Goldberg, in his capacity as the Court-appointed Receiver ("Receiver"), filed a

response in opposition [ECF No. 113] and Kang filed a reply [ECF No. 118]. Kang also

---

[1]      The Undersigned cites to the pagination generated by CM/ECF, which appears in the headers of all court filings.

filed an [amended] notice of supplemental authority [ECF No. 134] concerning the Delaware Chancery Court's ruling in *Jeffries v. Abercrombie & Fitch Co.*, No. 2023-1211-PAF (Del. Ch. Mar. 8, 2024).[2]

Senior United States District Judge Robert N. Scola, Jr. referred this motion to the Undersigned "for either an order or a report and recommendations, consistent with 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72, and Rule 1 of the Local Magistrate Judge Rules." [ECF No. 110]. As explained below, the Undersigned **respectfully recommends** that Judge Scola **deny** Kang's motion.

## I.    Background

On February 23, 2023, the SEC commenced this action against Defendants BKCoin Management, LLC ("BKCoin Management"), Kang, BKCoin Capital, BK Offshore Fund, LTD., BKCoin Multi-Strategy Master Fund, Ltd., BKCoin Multi-Strategy Fund, LP, BKCoin Multi-Strategy Fund Ltd., and Bison Digital LLC, asserting that Defendants violated various sections of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940 and for unjust enrichment against certain Defendants. [ECF No. 1].

The SEC sought and obtained the appointment of the Receiver. [ECF Nos. 4; 8].

---

[2]    The Undersigned struck Kang's initial notice of supplemental authority because it exceeded the word limit set forth in S.D. Fla. L.R. 7.8. [ECF No. 133]. He did not call his corrected submission an amended or supplemental filing, though.

The Court's Order stayed certain proceedings:

> 30.     As set forth in detail below, **the following proceedings**, excluding the instant proceeding and all police or regulatory actions and actions of the Commission related to the above-captioned enforcement action, **are stayed until further Order of this Court**:
>
>> **All civil legal proceedings of any nature**, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, **or other actions of any nature involving:** (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) **any of the Receivership Defendants and Relief Defendants, including subsidiaries and partnerships; or, (d) any of the Receivership Defendants and Relief Defendants' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature**, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise . . . .

[ECF No. 8, ¶ 30 (emphasis added)].

On March 24, 2023, Kang sent a letter to the Receiver, demanding advancement of legal fees and indemnification. [ECF No. 109-4]. The letter specifically identified the instant action and *Canto v. BKCoin Mgmt., LLC*, No. 1:22-cv-08858-JPO (S.D.N.Y.) ("*Canto* lawsuit").[3] It demanded $154,842.00 in already-incurred expenses and future

---

[3]     The *Canto* lawsuit is an investor-filed class action, asserting many of the same assertions alleged against Khan in the instant action. *Compare* [ECF No. 1] *with* [ECF No. 107-6].

advancement of expenses from the Receiver, citing §§ 4.03(b) and (e) of the Agreement. *Id.*

Kang's letter was accompanied by a signed undertaking to repay any advance in the event Kang is not entitled to indemnification. It states, in its entirety, as follows:

<u>UNDERTAKING OF KEVIN KANG</u>

Pursuant to the Amended LP Agreement, I, Kevin Kang, undertake to repay any expenses advanced to me to the extent that it is ultimately determined that I am not entitled to be indemnified.

*Id.* at 4.

On March 30, 2023, the Receiver sent a letter denying Kang's request. [ECF No. 109-5]. The letter stated that "the Receiver ha[d] concluded that under the terms of the Agreement and the circumstances, the Receivership [E]ntities [were] not required to and [would] not advance [ ] Kang any funds for his legal expenses or any other expenses." *Id.* at 2.

The letter provided two reasons for this determination. <u>First</u>, it noted that "the Receivership [E]ntities' obligation to advance funds for expenses to [ ] Kang [was], under the express terms of the Agreement, **limited to partnership assets**." *Id.* (citing §§ 1.01 and 403(d) of the Agreement (emphasis added)). It noted that although the term "Partnership assets" was not defined by the Agreement, the term "Available Assets" was limited to:

the excess of (a) Distributable Cash and other property to be distributed pursuant to Section 8.01 and Temporary Investments over (b) the sum of (i)

4

> Investment Expenses, (ii) amounts paid or payable in respect of any loan or other Indebtedness of the Partnership and (iii) the amount of reserves established by the General Partner as contemplated by Section 3.02(n).

*Id.* (quoting § 1.01 of the Agreement).

The letter states that the Receiver's investigation "unequivocally revealed that **the only funds the Receivership [E]ntities possess are directly traceable to investor funds**" and "[could not] be considered Partnership assets under the definition of Available Assets set forth above, or under any reasonable definition of the term Partnership assets, since they properly belong to investors." *Id.* at 3 (emphasis added). Thus, the Receiver asserted that there were *no* funds from which to pay Kang's expenses. *Id.* ("[B]ecause the Receivership [E]ntities do not possess Partnership assets with which to advance funds for expenses to [ ] Kang, we are not required to do so under Section 4.03(d) of the Agreement, and we will not be doing so.").

Second, the letter noted that:

> the Receivership [E]ntities [were] not required to indemnify [ ] Kang for **"any act or omission with respect to which a court of competent jurisdiction . . . has issued a final and non-appealable decision, judgment or order that such act or omission resulted from . . . bad faith, gross negligence, willful misconduct, fraud or a material breach of this Agreement."**

*Id.* (quoting § 4.03(b) of the Agreement). It further noted that "[i]t [was] undisputed that the Securities and Exchange Commission and private parties have alleged numerous acts of fraud, willful misconduct, and bad faith against [ ] Kang" and that "the Receiver's

investigation ha[d] yielded significant evidence of [ ] Kang's fraud." *Id.* The letter concluded that "it [was] highly likely that even if the Receivership [E]ntities had Partnership assets to advance to [ ] Kang, he would have to repay them" and expressed doubt that "the Receivership [E]ntities could recover any advanced funds from [ ] Kang in the likely event he is found to have committed fraud." *Id.* For these reasons, the Receiver refused Kang's request for the advancement of litigation expenses.

Kang now seeks a limited lift of the litigation stay "to allow [him] to file a complaint for indemnification and advancement of attorneys' fees, or in the alternative, for an order requiring that the Receiver should advance [his] attorneys' fees and costs as required under [the Agreement]." [ECF No. 109-1, p. 2].

The Receiver opposes the relief requested on three grounds: (1) the Agreement limits the assets that may be used to indemnify legal fees and the Receiver does not possess those assets; (2) "Delaware's public policy in favor of advancement of legal fees for corporate officers gives way to the public policy of not diminishing scarce Receivership assets in cases such as this one, particularly where the corporate officer is accused of the fraud that caused the appointment of a [r]eceiver"; and (3) the three-factor test for lifting the stay strongly weighs against lifting the stay of litigation against the Receivership Entities. [ECF No. 113, p. 2].

II.    **Analysis**

Kang maintains that "[a]s a former partner of BKCoin Capital[ ], [he] is entitled to both advancement and indemnification for 'reasonable legal and other professional fees' connected to defending against any claim pursuant to the [Agreement]." [ECF No. 109-1, p. 2]. He cites to sections 4.03(b) and (e) of the Agreement, which state as follows:

> **Section 4.03 Liability for Acts and Omissions**.
>
> ***
>
> **(b) To the fullest extent permitted by applicable law, the Partnership shall and does hereby agree to indemnify and hold harmless each Covered Person from and against** any damages, costs, losses, claims, liabilities, actions, and **expenses (including reasonable legal and other professional fees and disbursements and all expenses reasonably incurred investigating, preparing, or defending against any claim whatsoever, judgment, fines, and settlements (collectively "Indemnification Obligations") incurred by such Covered Person arising out of or relating to this Agreement**, the Investment Management Agreement, or any entity in which the Partnership invests (including, without limitation, any act or omission as a director, officer, manager or member of an Affiliate of the Partnership), **except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgment or order that such act or omission resulted from such Covered Person's bad faith, gross negligence, willful misconduct, fraud or a material breach of this Agreement or the Investment Management Agreement**. The indemnity set forth herein shall not apply to an internal dispute among the Covered Persons to which the Partnership is not a party. The provisions set forth in this Section 4.03(b) shall survive the termination of this Agreement.
>
> ***

> **(e) Expenses reasonably incurred by a Covered Person in defense or settlement of any claim that may be subject to a right of indemnification hereunder shall be advanced by the Partnership prior to the final disposition thereof <u>upon receipt of a written undertaking by or on behalf of such Covered Person to repay such amount to the extent that it is ultimately determined that such Covered Person is not entitled to be indemnified hereunder.</u>** The termination of a proceeding or claim against a Covered Person by settlement or a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that any Covered Person's conduct constituted bad faith, gross negligence, willful misconduct, fraud, or a material breach of this Agreement or the Investment Management Agreement.

[ECF No. 109-3, §§ 4.03(b), (e) (emphasis added)].

The Agreement defines the term "Covered Person" as:

> the General Partner (including, without limitation, the General Partner in its role as Tax Matters Partner and, if applicable, in its capacity as a special limited partner or a former general partner), the Investment Manager, each of their Affiliates, any officers, directors, managers, employees, shareholders, partners, members, agents and consultants of any of the foregoing."

*Id.* at § 1.01 ("Definitions") (emphasis added). It is governed by Delaware law and includes a New York venue provision. *Id.* at §§ 17.02, 17.03.

Kang argues that because he "was a manager of the General Partner, BKCoin [Management]," he falls within the Agreement's definition of a "Covered Person." [ECF No. 109-1, p. 4]. He further states that he "was required to obtain counsel immediately to defend against accusations 'arising out of or relating to this Agreement, the Investment Management Agreement, or any entity in which the Partnership invests (including,

without limitation, any act or omission as a director, officer, manager or member of an Affiliate of the Partnership)[.]'" *Id.* at 6 (quoting § 4.03(b) of the Agreement).

He states that he has incurred legal fees and costs in connection with the instant action and the *Canto* lawsuit filed "against BKCoin [Management], Carlos Betancourt, and Kevin Kang alleging breaches of fiduciary duty in connection with the management of [Canto's] funds that were in a separately managed account, and certain loan agreements." *Id.* (citing *Canto,* No. 1:22-cv-08858-JPO (S.D.N.Y.), ECF No. 3).

For these reasons, Kang asserts that, under the Agreement, he is entitled to advancement of his legal fees and indemnification.

### a. The Meaning of "Partnership Assets" in Section 4.03(d) of the Agreement

At the outset, the parties disagree on the meaning of "Partnership assets" in section 4.03(d) of the Agreement, which states, in its entirety: "(d) The satisfaction of any indemnification pursuant to this <u>Section 4.03</u> **shall be from and limited to Partnership assets**." [ECF No. 109-3, § 4.03(d) (underline emphasis in original; bold emphasis added)].

The Receiver contends that, assuming Kang is a "Covered Person" under the Agreement, there are no available funds from which to pay Kang's indemnity and advancement because the Agreement states that "[t]he satisfaction of any indemnification pursuant to this <u>Section 4.03</u> shall be from and limited to Partnership assets." [ECF No. 113, p. 7 (quoting § 4.03(d) of the Agreement (emphasis in Agreement))].

He explains his position as follows:

The term "Partnership [a]ssets" is not defined in the Agreement. The term "Partnership" is defined in Article 1, which circuitously defines "Partnership" as the limited partnership referred to in the Agreement. ECF No. 107-3 at 10 of 48. However, that sheds no light on what "Partnership [a]ssets" means. **The only time the term "assets" is defined anywhere in the Agreement is at "Available Assets" in Article 1, defined as "the excess of (a) Distributable Cash and other property to be distributed pursuant to Section 8.01 and Temporary Investments over (b) the sum of (i) Investment Expenses, (ii) amounts paid or payable in respect of any loan or other Indebtedness of the Partnership and (iii) the amount of reserves established by the General Partner as contemplated by Section 3.02(n)."** ECF No. 107-3 at 4 of 48.

Reference to the term "Distributable Cash" (defined at ECF No. 107-3 at 6 of 48) and the remainder of that definition show **the term "Available Assets" plainly refers to assets of the partnership in excess of any amounts to be distributed to the limited partners (who are the investors)**, expenses, other indebtedness, or reserves. Across seven Receivership Entities, **investors invested $100 million; yet, the Receiver has only recovered less than $10 million of those funds.** Of the cash recovered to date, **only a fraction of those funds were in accounts in the name of BKCoin Capital**. Even worse, **given the extensive commingling across funds, the Receiver and his accounting professionals are not in a position at this time to determine the source of those cash assets or verify that they truly originated from BKCoin Capital investors**. Accordingly, **there is no way any funds the Receiver currently possesses could be considered "Available Assets" -- i.e., assets in excess of BKCoin Capital investor funds**. The Receivership owes more than $90 million it does not have to the investors of the <u>seven</u> Receivership Entities, and so far, the rampant commingling has made it near impossible to determine what assets comprise the BKCoin Capital-specific assets. **Because the Receiver possesses only assets which rightfully belong to defrauded investors, Section 4.03(d) of the Agreement makes it clear the Receiver is not obligated to indemnify or advance Kang's legal fees**.

*Id*. at 7–8 (underline emphasis in original; bold emphasis added).

10

Kang argues that the Receiver's position -- that there are no funds available to pay for advancement or indemnification -- is based on a misinterpretation of the Agreement:

> [T]he Receiver improperly alleged that there were no assets available for indemnification and advancement: "the Receivership [E]ntities' obligation to advance funds for expenses to [ ] Kang is, under the express terms of the Agreement, limited to partnership assets. Agreement at Section 4.03(d): 'The satisfaction of any indemnification pursuant to this Section 4.03 shall be from and limited to Partnership assets' (emphasis added)." **Notwithstanding the definition of "Partnership" in Section 1.01 of the Amended LP Agreement, which as discussed above defines "Partnership" as BKCoin Capital[ ], the Receiver insisted that it was unclear what "Partnership [a]ssets" meant under Section 4.03**. Instead, the Receiver pointed to the defined term "Available Assets," which refers to funds available for distribution to the partners in BKCoin Capital[ ], which is distinct from the Partnership assets from which [ ] Kang is entitled to advancement of fees and indemnification.

[ECF No. 109-1, pp. 8–9 (internal citations omitted)]. Kang states that "the proper definition of "Partnership [a]ssets" encompasses all of the assets of BKCoin Capital[ ]" and therefore, "there are ample funds available for advancement." *Id.* at 10.

The Receiver contends that "Kang's claim is illogical both legally and practically."

[ECF No. 113, p. 9]. He argues that:

> From a legal standpoint, Kang's interpretation would render the limiting clause of Section 4.03(d) superfluous and unnecessary. The Agreement defines "Partnership" as the limited partnership referred to in the Agreement. ECF No. 107-3 at 10 of 48. **If Kang's interpretation of the Agreement were correct, that would mean BKCoin Capital could use any asset in the Partnership's possession or control to advance and indemnify legal fees. There would be no need for Section 4.03(d) to specify "Partnership [a]ssets" because the broad definition of "Partnership" in Article 1 would already allow any partnership asset to go towards**

> **advancement and indemnification**.

*Id.* (emphasis added).

The Receiver notes that Delaware law recognizes the "well-established principle of contract interpretation . . . that courts should not interpret contracts in a way that renders any portion superfluous, but rather interpret them in a way that gives effect to all parts of a contract." *Id.* (collecting cases). Thus, the Receiver reasons that "[b]ecause Kang's interpretation would render Section 4.03(d) superfluous, it contravenes Delaware law." *Id.* at 10.

He notes that "Kang's broad interpretation contradicts Section 4.03(d), which by its very language is intended to *limit* the assets the Partnership can use to advance and indemnify legal fees: '[t]he satisfaction of any indemnification pursuant to this <u>Section 4.03</u> shall be from and *limited to* Partnership assets.'" *Id.* (quoting § 4.03(d) (underline emphasis in Agreement; italic emphasis in Response)). Thus, it was the clear intent of the drafters "to limit what assets the partnership could use in this circumstance." *Id.*

Lastly, the Receiver contends that, as a practical matter, Kang's interpretation of the Agreement "makes no sense" because "[i]t would allow [ ] BKCoin Capital to use *any* asset, no matter where or how Kang or anyone else obtained it, to advance and indemnify his legal fees" and "would reward Kang for defrauding investors out of tens of millions of dollars by forcing the Receiver to use even *more* investor money to pay for Kang's

defense to the fraud charges with absolutely no guarantee of repayment in the event it turns out Kang is not entitled to indemnification." *Id.* (emphasis in original).

In his reply, Kang asserts that a plain reading of the Agreement supports his position that he is entitled to indemnification and advancement of fees. [ECF No. 118, p. 4]. He argues that "[t]he Receiver uses an improper definition of the assets available for advancement and indemnification under Section 4.03(d) in an attempt to ignore the obligation for indemnification." *Id.* at 4–5.

He argues that the term "Partnership assets" in section 4.03(d) means only those assets of BKCoin Capital:

> Section 4.03(d) of the Amended LP Agreement states that "satisfaction of any indemnification pursuant to this Section 4.03 shall be from and limited to Partnership assets." . . . **Section 1.01 of the . . . Agreement defines "Partnership" as "the limited partnership referred to in this Agreement, as it may from time to time be constituted[;]" in other words, BKCoin Capital [ ] . . . . The Receiver attempts to ignore the plain definition in Section 4.03(d) by ignoring the . . . Agreement's definition of "Partnership."** As the Receiver is well aware, there were multiple entities under the BKCoin umbrella. **The clause that indemnification "shall be from and limited to Partnership [a]ssets" clearly cabins indemnification under the . . . Agreement to only those assets of BKCoin Capital [ ]** and not, for example, BKCoin Multi-Strategy Fund, LP.

*Id.* at 5 (emphasis added).

Kang accuses the Receiver of "cherry-pick[ing] the definition of 'Available Assets' from the [Agreement]" and argues that "[i]t is illogical to pluck this specific definition

from the section that is connected to distributions to investors and transpose it into the definition of available assets for indemnification and advancement." *Id.* at 5–6.

He further argues that "the definition of Partnership [a]ssets necessarily must be broader than Available Assets" because "[e]ven if BKCoin Capital [ ] had allegedly insufficient funds for distribution to investors, that would be no reason to deny advancement and indemnification under Delaware law." *Id.* at 6 (citing *Agspring Holdco, LLC v. NGP X US Holdings, L.P.*, No. CV 2019-0567-JRS, 2022 WL 170092, at *7 (Del. Ch. Jan. 19, 2022) for "the general rule that inability to pay is not a justification for avoiding a binding, final advancement obligation").

The Undersigned agrees with the Receiver's interpretation of section 4.03(d). "[U]nder Delaware law, when interpreting contracts, courts give[ ] meaning to every word in the agreement and avoid[ ] interpretations that would result in superfluous verbiage." *Presidio, Inc. v. Closson*, No. CV 22-494-CFC, 2022 WL 17846561, at *2 (D. Del. Dec. 22, 2022), *dismissed*, No. 23-1021, 2023 WL 9107301 (3d Cir. Aug. 30, 2023) (internal quotation marks omitted); *Priority Healthcare Corp. v. Aetna Specialty Pharmacy, LLC*, 590 F. Supp. 2d 663, 668 (D. Del. 2008) ("[A] contract should not be read so as to render any terms or provisions meaningless." citing 11 Williston on Contracts § 32:5 (4th ed.)).

Kang's interpretation of the Agreement -- that "Partnership assets" means the assets of BKCoin Capital -- would render superfluous section 4.03(d), which is intended

to designate and limit where the funds to satisfy the section 4.03 obligations come from:

"(d) The satisfaction of any indemnification pursuant to this <u>Section 4.03</u> **shall be from and limited to Partnership assets**." [ECF No. 109-3, § 4.03(d) (underline emphasis in original; bold emphasis added)]. The Undersigned is not persuaded by Kang's argument that section 4.03(d) is intended to distinguish between BKCoin Capital's assets as opposed to the assets of entities under the BKCoin umbrella because there is no reason to believe that the Agreement contemplates that the assets of other BKCoin umbrella entities would otherwise be available to satisfy the section 4.03 obligations of BKCoin Capital.

The Receiver also seeks to have any ambiguities construed against Kang, as the drafter of the Agreement, "under well-established Delaware law holding that ambiguities in contracts and partnership agreements are construed against the drafter." [ECF No. 113, pp. 11–12 (citing cases)]. The Receiver argues that because Kang was "the co-founder and one of two managing members of BKCoin Management, the general partner of BKCoin Capital" [ECF No. 1, ¶¶ 8, 20], he "was intricately involved in the management and operation of BKCoin Management and BKCoin Capital, and had primary responsibility for implementation of the Agreement." *Id.* at 12.

Moreover, the Receiver maintains that the fact that he has stepped into the shoes of BKCoin Management does not alter this principle of contract interpretation. *Id.* (citing *Andrikopoulos v. Silicon Valley Innovation Co., LLC*, 120 A.3d 19, 25 (Del. Ch. 2015), *aff'd*, 142

A.3d 504 (Del. 2016) for the proposition that ("[T]here is substantial force to the idea that the pre-receivership and the receivership entity are meaningfully different: they are managed by different individuals for different purposes and are governed by different rules."). Thus, the Receiver argues that "to the extent there is any ambiguity in the Agreement as to what assets are to be used to advance and indemnify legal fees, that ambiguity should be construed against Kang and in favor of the Receiver." *Id.*

Kang did not address this argument in his reply.[4] *See Conden v. Royal Caribbean Cruises Ltd.*, No. 20-22956-CIV, 2021 WL 4973533, at *7 (S.D. Fla. June 21, 2021) (finding that the defendant conceded counterarguments raised in the plaintiff's response by not addressing the counterargument in its reply); *W. Flagler Assocs., Ltd. v. City of Miami*, 407 F. Supp. 3d 1291, 1297 (S.D. Fla. 2019) ("The [d]efendant abandoned its argument regarding the [p]laintiff's standing because its [r]eply failed to address any of the [ ] arguments or authority." (collecting cases)). Thus, to the extent that there is an ambiguity in section 4.03(d), it should be construed against Kang.

---

[4]      In his *motion*, Kang does cite to two cases for the proposition that public policy favors resolving any ambiguity in favor of advancement and indemnification. [ECF No. 109-1, p. 12]. But he does not in his Reply respond to the Receiver's counterargument that under these circumstances, where Kang was a co-founder and a managing member of BKCoin Management, any ambiguities in the Agreement should be construed against him.

**b.    Unclean Hands**

The Receiver also invokes Kang's purported unclean hands as grounds for denying Kang's request:

> **Kang's unclean hands in demanding funds from the Receivership under these circumstances also weighs against the Court allowing him to have even one penny of Receivership money**. *SEC v. Illarramendi*, Case No. 3:11-cv-78, 2014 WL 545720 at *9 (D. Conn. Feb. 10, 2014); *see also Illarramendi*, 2014 WL 8019048 at *11–12 (D. Conn. Mar. 27, 2014) (post-hearing order declining to order receiver to advance three movants' legal fees regardless of their contractual right to indemnification and advancement because movants' claims for advancement were barred by unclean hands where movants transferred funds to their accounts ahead of SEC enforcement action). **The [m]otion claims, without justification, that Kang does not have unclean hands; however, as recently as September 28, 2023, Kang was moving funds out of a known Receivership Entity hardware wallet in violation of the Asset Freeze Order (ECF No. 9) and returned the funds only upon receiving a letter from the SEC instructing him to do so**. Much like the *Illarramendi* case, **this alone should suffice to reject Kang's claim for advancement**. *See Illarramendi*, 2014 WL 8019048 at *11–12 (finding after a three-day evidentiary hearing that two of the movants' unclean hands in helping themselves to Receivership funds barred advancement of their legal fees – the third movant withdrew his motion). Thus, *Illarramendi* stands for the fact that a [d]efendant such as Kang, whose unclean hands in this case are well established, is not entitled to advancement of legal fees from scarce Receivership resources.

*Id.* at 11 (footnotes omitted; emphasis added).

Not surprisingly, Kang disputes the unclean hands assertion. [ECF No. 118, pp. 6–7].[5] He notes that "at no point has the Receiver provided **any evidence** to support this baseless allegation that these were misappropriated investor funds." *Id.* (emphasis added).

Kang argues that *Illarramendi* is different from our case because in *Illarramendi* "the movants surreptitiously transferred $2.9 million for their legal fees before making the claim for advancement, and did not advise the SEC that they had done so," but in the instant case, "Kang openly paid his attorneys prior to the Receiver's and the SEC's involvement, and his counsel informed the Receiver that he had done so." *Id.*

Kang further adds that "the Receiver cannot demonstrate that the transferred funds are investor funds." *Id.* Concerning the removal of funds from the hardware wallet, Kang notes that "[t]he full amount of funds were immediately returned to the wallet, and [he] did not intend to violate the asset freeze order." *Id.*

---

[5]     Kang notes that the Receiver did not raise this argument in response to Kang's letter seeking indemnification and advancement of fees. [ECF No. 118, p. 6 ("This is the first time the Receiver has raised this particular claim despite being fully and timely informed about the payment to [ ] Kang's counsel prior to the appointment of the Receiver.")]. But Kang does not argue that the Receiver is limited to only those arguments raised in his letter or is otherwise precluded from raising this argument. Therefore, the Undersigned will consider the Receiver's unclean hands argument. *See United States Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a "perfunctory and underdeveloped argument" with no citation to legal authority and collecting cases).

At this juncture and based on the information in the parties' briefings, the Undersigned agrees with Kang that the instant case is distinguishable from *Illarramendi*. In *Illarramendi*, the receiver accused the movants of "engag[ing] in impermissible self-help when . . . they withdrew more than $2.9 million from [a fund] to satisfy outstanding legal fees and to provide retainers to law firms representing them." 2014 WL 545720, at *4. They took "these withdrawals . . . without notice to or authorization from the [f]und's directors, and just days after the SEC sent . . . [a] notice, advising that an enforcement action was imminent." *Id.* Moreover, the *Illarramendi* Court noted that "even if the transfers had been the result of a good-faith misunderstanding, once that misunderstanding was corrected, [the] [m]ovants did not act to reverse their actions and drew down those retainers after being expressly told that doing so was not authorized." 2014 WL 8019048, at *11.

"In evaluating the unclean hands doctrine, courts look only to whether a party has engaged in inequitable conduct in seeking advancement, and not whether its conduct in the underlying suit was inequitable." *Illarramendi*, 2014 WL 545720, at *10 (citing *Tafeen v. Homestore, Inc.*, No. CIVA. 023-N, 2004 WL 556733, at *6 (Del. Ch. Mar. 22, 2004), *aff'd*, 888 A.2d 204 (Del. 2005)). Here, Kang did not hide the payments to his counsel and he returned the funds to the wallet. It may well be that additional facts come to light that bring this case closer to the facts of *Illarramendi*. But, at this point, and based on the facts

proffered in the parties' briefs, the Undersigned concludes that the circumstances here do **not** trigger the unclean hands exception recognized in *Illarramendi*.

### c.      Delaware Public Policy

Concerning Kang's undertaking, the Receiver notes that if "a judg[ ]ment for fraud is entered against [Kang] in either the [instant action] or the [*Canto*] class action lawsuit[,] [t]here is absolutely no guarantee Kang would be able to make good on this undertaking[.]" [ECF No. 113, p. 10 n.4]. Thus, the Receiver argues that "[e]ven if the undertaking were legally sufficient, **it would be highly inequitable to give it any credibility or weight given the lack of a guarantee of repayment in it**." *Id.* (emphasis added).

Kang argues that the Receiver's second ground for denying his request -- that it is highly unlikely that Kang would be able to repay the Receiver if it is later determined he is not entitled to indemnification -- is inconsistent with Delaware law. [ECF No. 109-1, p. 9]. He states that Delaware law merely requires a party "to furnish an undertaking in order to receive an advancement" and that "[t]here is no requirement for parties to secure the undertaking or show their immediate ability to repay the advance." *Id.* at 9 (citing *Blankenship v. Alpha Appalachia Holdings, Inc.*, No. CV 10610-CB, 2015 WL 3408255, at *29 (Del. Ch. May 28, 2015)). Kang reasons that because he provided the Receiver with an

undertaking in accordance with section 4.03(e) of the Agreement, the Receiver is required to advance Kang's legal fees. *Id.* at 9–10.

Delaware law favors advancement and indemnification provisions. *See Illarramendi*, 2014 WL 545720, at *5 ("There is no dispute that Delaware law, which governs the [agreements], favors indemnification and the advancement of attorney's fees for public policy reasons."). As one court explained:

> Mandatory advances, like indemnification, serve the salutary purpose of encouraging qualified persons to become or remain as directors of Delaware corporations, by assuring them, *ex ante*, that they may resist lawsuits that they consider meritless, free of the burden of financing (at least initially) their own legal defense. *See Essential Enterprise Corp. v. Automatic Steel Prods., Inc.*, Del.Ch., 164 A.2d 437, 441–42 (1960). That policy would be undermined if the corporation is permitted to rewrite its mandatory advance indemnification contract to condition such advances upon the furnishing of security or upon a demonstration that the officer or director-recipient has the monetary resources to satisfy his or her undertaking.

*In re Cent. Banking Sys., Inc.*, No. C.A. 12497, 1993 WL 183692, at *3 (Del. Ch. May 11, 1993)).

Nonetheless, the Receiver argues that even if "Delaware law and policy favor advancement and indemnification of corporate officer legal fees," "that principle is altered when the corporation is in receivership." [ECF No. 113, p. 13]. The Receiver relies on *Andrikopoulos*, 120 A.3d at 23–26, *Henson v. Sousa*, No. CV 8057-VCG, 2015 WL 4640415, at *2 (Del. Ch. Aug. 4, 2015), and *Sec. & Exch. Comm'n v. Platinum Mgmt. (NY) LLC*, No.

21

16-CV-6848 (BMC), 2018 WL 6172404, at *3–4 (E.D.N.Y. Nov. 25, 2018) in support of his

argument that the Court should not order him to advance Kang's legal fees. *Id.* at 13–15.

He contends that "[t]he situation here mirrors the circumstances in the three cases

cited above" and highlights the following similarities:

> As in those cases, **the Receivership has extremely limited funds** at this
> point to satisfy the claims of investors and other creditors and forensic
> accounting is still ongoing as the extensive commingling of funds has made
> it difficult to ascertain what funds are specific to BKCoin Capital versus
> other Receivership Entities. As in those cases, with the focus of the
> Receivership on winding up affairs and distributing assets to investors, **the
> policy justification for advancement of legal fees -- attracting qualified
> officers to serve -- is diminished**. As in those cases, **depleting the already
> limited funds available for investors could impede the Receiver's ability
> to collect more funds and pursue claims** against third parties holding
> investor funds. Therefore, under the rationale of those three cases, Kang
> should not get to "jump the line" in front of the very investors he defrauded.
> Nor should he be able to further diminish Receivership funds to pay his
> legal fees in advance. As in the three cases above, **the Court may hold that
> Kang can submit a claim for indemnification of his legal fees to be
> adjudicated with other investor and unsecured creditor claims at such
> time as the Receiver establishes a claims process and knows the amount
> of funds he has to distribute**.

*Id.* at 15 (footnote omitted; emphasis added).

Kang distinguishes *Andrikopoulos* on the ground that the two former officers

brought an advancement action against the company and "[t]he defunct company's only

assets were claims against the company's own former officers and directors, including

the two who sought advancement." [ECF No. 118, p. 8]. Thus, as the *Andrikopoulos* Court

noted, "the former officers' claims for advancement 'seriously could undermine, if not

entirely eliminate, the ability of companies in receivership to pursue claims against former management.'" 120 A.3d at 25. Kang notes that, in the instant case, "[he] has not engaged in litigation against the BKCoin-related entities outside of this indemnification and advancement proceeding and the BKCoin-related entities have not commenced any litigation against him." [ECF No. 118, p. 8].

Kang also notes that although the court in *Platinum Mgmt. (NY) LLC*, 2018 WL 6172404 relied on *Andrikopoulos* in denying the requests for advancements by former officers, two of those former officers were later acquitted in the related criminal case. *Id.* at 9. Thus, Kang argues that:

> [i]f the Receiver's broad interpretation of *Andrikopolous* were to prevail, former officers will be denied their contractual rights and forced to choose between defending themselves against criminal and civil charges—or they will be forced to concede cases despite their innocence—to avoid incurring exorbitant legal costs they may be unable to afford.

*Id.* For this reason, he argues that "this case is governed squarely by Delaware's stated public policy concern favoring advancement as 'an inducement for attracting capable individuals into corporate service[;]' otherwise, individuals will avoid corporate service, lest they end up in this trap." *Id.* (quoting *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 211 (Del. 2005)).

He does not address the third case cited by the Receiver, *Henson*, 2015 WL 4640415.

23

In *Andrikopoulos*, the court addressed advancement claims in the context of a receivership. 120 A.3d at 19. The "only assets [of the company in receivership] [were] contingent claims against the [c]ompany's former officers and directors." *Id.* at 20. Two individuals in a case filed by the receiver sought advancement of their legal expenses. *Id.* The parties ultimately stipulated to the individuals' entitlement to advancement and the validity of their employment agreement. *Id.* The court was left to decide "to what extent, if any, [the individuals'] advancement claims [were] entitled to priority as against the other claims asserted against [the company] in the receivership." *Id.*

In addressing this issue, the court noted that: "(1) there [was] no controlling Delaware authority; (2) the Delaware statutes on receivership provide[d] minimal guidance; (3) the *Illarramendi* decision and Delaware's strong policy in favor of advancement point[ed] in one direction; and (4) a strong analogy between receiverships and bankruptcy point[ed] in the other direction." *Id.* at 25. Ultimately, the *Andrikopoulos* Court determined that "advancement claims should be treated the same as the claims of other unsecured creditors." *Id.*

The court provided <u>four</u> reasons for this conclusion. "*First*, while advancement [was] important, so [was] the successful winding up of a corporation or other business entity." *Id* (emphasis supplied). The court acknowledged Delaware's public policy in

favor of advancements, but noted that it had diminished importance in the context of a receivership:

> In the usual receivership context, however—and especially in receiverships like this one—there is no long-term horizon; the focus is on winding up the entity's affairs. As such, **the relevant importance of the policy justification of advancement as an inducement to attract qualified individuals to manage the company is diminished**. Additionally, granting administrative priority to advancement claims, such as [the] claims here, seriously could undermine, if not entirely eliminate, the ability of companies in receivership to pursue claims against former management.

*Id.* (emphasis added).

*Second,* although the court did not find the bankruptcy analogy as strong as advocated by the company, it nonetheless recognized that "there [was] substantial force to the idea that the pre-receivership entity and the receivership entity [were] meaningfully different: they are managed by different individuals for different purposes and are governed by different rules." *Id.* at 25–26. Because "[a]dvancement obligations are contractual in nature and generally arise from pre-receivership transactions[,]" "[i]n that respect, they [were] no different from other creditors' claims." *Id.* at 26.

*Third,* in addressing the individuals' contention that treating advancements the same as unsecured creditor claims "frustrate[d] the expectations of advancement legitimately held by former corporate officers and directors," the court noted that "[m]arket-based solutions already may exist for ameliorating the challenges that may arise in this area[,]" including insurance. *Id.* at 26.

25

*Fourth*, "the reality of practical administration weigh[ed] in favor of treating advancement claims the same as the claims of other unsecured creditors." *Id*. The court noted that if advancement claims were entitled to administrative priority, then there would be the issue of whether the receiver's fees would be entitled to super-priority. This would open the door to "other 'necessities,' such as a bookkeeper, office space, a rental car, etc." which would "embroil[ ] [the court] in time-consuming, line-item accounting disputes." *Id*. Based on these considerations the *Andrikopoulos* Court determined that advancement claims should be treated like claims of other unsecured creditors.

The two other cases cited by the Receiver rely on *Andrikopoulos*. In *Henson*, the court determined that an "advancement [was] not appropriate" for two reasons: (1) there was a dispute concerning the existence of the agreement providing for the advancement and (2) the court adopted the rationale of *Andrikopolous* for treating advancement claims the same as claims by unsecured creditors. 2015 WL 4640415, at *1–2.

Similarly in *Platinum Mgmt. (NY) LLC*, the former officers of an LLC in receivership sought the payment of legal fees incurred in the defense of a criminal matter. In denying the former officers' motion to compel advancement, the court noted that the LLC "owe[d] lots of money to people and entities that it lacks sufficient funds to pay, which [was] why it [was] in receivership" and that "[t]he former officers ha[d] shown no compelling reason why they should get to jump the line." 2018 WL 6172404, at *1. Citing *Andrikopolous* and

26

*Henson*, the *Platinum Mgmt.* Court noted that "[u]nder Delaware law, claims for advancement of legal fees are treated the same as the claims of other unsecured creditors." *Id.* at *3.

As noted above, Kang seeks to distinguish *Andrikopoulos* on the ground that "one of the primary rationales for the court's decision in Andrikopolous was that the former officers' claims for advancement 'seriously could undermine, if not entirely eliminate, the ability of companies in receivership to pursue claims against former management.'" [ECF No. 118, p. 8 (quoting *Andrikopoulos*, 120 A.3d at 25)]. He also noted that unlike the individuals in *Andrikopoulos*, he is not engaged in any litigation with any BKCoin-related entities. But, as outlined above, the *Andrikopoulos* Court provided four grounds for its rationale and there is nothing in the *Andrikopoulos* decision to suggest that the court's holding was limited to only instances where advancement claims would seriously undermine or eliminate a receiver's ability to pursue claims.

Kang does not seek to distinguish *Platinum Mgmt. (NY) LLC* on its facts; he merely notes that two of the officers who were denied advancement were later acquitted in the criminal case. Lastly, and as already noted, Kang does not address *Henson*.

*Andrikopoulos*, *Henson*, and *Platinum Mgmt. (NY) LLC* address requests for advancement in the context of a receivership and are squarely on point. The Court should **deny** Kang's request for an order compelling advancement of legal fees for the reasons

stated in those cases. As the Receiver suggests, "the Court may hold that Kang can submit a claim for indemnification of his legal fees to be adjudicated with other investor and unsecured creditor claims at such time as the Receiver establishes a claims process and knows the amount of funds he has to distribute." [ECF No. 113, p. 15].

### d.    Sixth Amendment Argument

Without citation to legal authority, Kang argues that his Sixth Amendment right to counsel may be infringed if his legal fees are not advanced:

> Kang's contractual rights to indemnification are of paramount importance in this case given that the SEC—the government's civil enforcement arm for securities violations—froze all of [ ] Kang's assets, which will eventually force [ ] Kang into having to act *pro se*. [ ] Kang, a lay person, will then have to face the quandary of defending himself, while trying to simultaneously avoid potentially incriminating himself. Such an outcome could ultimately jeopardize a potential criminal case against [ ] Kang, and thereby infringes on his Sixth Amendment right to counsel.

[ECF No. 118, pp. 9–10]. But Kang does not cite any legal authority for this argument. As noted above, the Court will not consider underdeveloped arguments that are not supported by any legal authority. *See Astrue*, 495 F.3d 1272, 1287 n.13 (refusing to address a "perfunctory and underdeveloped argument" with no citation to legal authority and collecting cases).

Moreover, "[e]ven in a criminal case, the Supreme Court has upheld the constitutionality of freezing a defendant's assets and precluding their use for payment of attorney's fees." *S.E.C. v. Current Fin. Servs.*, 62 F. Supp. 2d 66, 67 (D.D.C. 1999) (citing

*United States v. Monsanto*, 491 U.S. 600 (1989) and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989)); *see also Platinum Mgmt. (NY) LLC*, 2018 WL 6172404, at *3 (rejecting Sixth Amendment argument and noting that "[s]ince a receiver [was] not a governmental actor, the Sixth Amendment [did] not protect against the actions of a receiver").

In sum, for the reasons discussed above, the Undersigned **respectfully recommends** that the District Court **deny** Kang's request for an Order "direct[ing] the Receiver to advance [ ] Kang his attorneys' fees and defense costs associated with [the instant action and the *Canto* lawsuit]." [ECF No. 109-1, p. 10].

    **e.**    **Three-Factor Test**

Kang also seeks "a limited lift of the stay on litigation to allow [him]" to file an action and enforce his contractual rights in New York state court. *Id.*[6] Some courts apply

---

6    Section 17.03 of the Agreement states, in part, as follows:

> **Section 17.03 Submission to Jurisdiction. The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision** of, or based on any matter arising out of or in connection with, **this Agreement** or the transactions contemplated hereby, whether in contract, tort, or otherwise, **shall be brought exclusively in the federal or state courts located in New York County of the State of New York, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of New York**.

[ECF No. 109-3, § 17.03 (emphasis added)].

the following three-factor test in determining whether to lift a litigation stay in a receivership:

> (1) whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in the course of the receivership at which the motion for relief from the stay is made; and (3) the merit of the moving party's underlying claim.

*S.E.C. v. Wencke*, 742 F.2d 1230, 1231 (9th Cir. 1984); *see also S.E.C. v. Complete Bus. Sols. Grp., Inc.*, No. 20-CIV-81205-RAR, 2022 WL 20703936, at *1 (S.D. Fla. Mar. 3, 2022) (applying three-factor *Wencke* test in denying motion to lift litigation stay). "The movant bears the burden of proving that the balance of the factors weighs in favor of lifting the stay." *United States v. JHW Greentree Cap., L.P.*, No. 3:12-CV-00116 VLB, 2014 WL 2608516, at *4 (D. Conn. June 11, 2014).

Kang contends that he meets all three factors supporting the lifting of the stay. [ECF No. 109-1]. The Receiver questions whether the three-factor test applies to the circumstances here: where a *defendant* (as opposed to a non-party) is seeking to sue the Receiver. [ECF No. 113, p. 16 n.8 ("The *Wencke* [C]ourt and other courts have used this test when an outside third party seeks to lift a litigation stay against a [r]eceivership, not when a defendant in the case seeks to sue the [r]eceiver. Therefore, as a threshold matter, it is not clear whether the *Wencke* test even applies here.")]. Nonetheless, "[f]or the sake

of simplicity," the Receiver assumes this test applies here and argues that all three factors favor the Receiver (not Kang). *Id.*

### i.      First Factor: Balancing of Interests of the Receiver and Kang

"The first factor—whether the moving party will suffer substantial injury—" "is essentially a balancing of [the movant]'s interest with the interests of the [r]eceivership." *S.E.C. v. Stanford Int'l Bank Ltd.*, 465 F. App'x 316, 321 (5th Cir. 2012) (citing *S.E.C. v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 341 (5th Cir. 2011)); *S.E.C. v. Illarramendi*, No. 3:11CV78 JBA, 2012 WL 234016, at *5 (D. Conn. Jan. 25, 2012) ("The first *Wencke* factor balances the interests of the [r]eceiver in preserving the status quo against the interests of the moving party.").

Currently, Kang has no ongoing legal fees associated with the *Canto* lawsuit because that case has been stayed. [ECF No. 109-1, p. 11 n.3]. Nonetheless, he states that he "has already incurred legal fees in connection with the *Canto* lawsuit and [the instant action] and cannot continue to properly defend himself [in the instant action] without advancement and indemnification of his fees and costs." *Id.* at 11. Kang also anticipates that criminal charges may be filed against him. *Id.* For all these reasons, Kang argues that he will suffer substantial injury if the stay is not lifted.

In contrast, the Receiver argues that:

Lifting the stay against the Receivership to allow Kang to pursue costly and time-consuming litigation over his legal fees would **run the risk of**

> **significantly diminishing the limited resources available to compensate the investors Kang defrauded**. Considering Kang's misconduct caused the present circumstances, the Receiver's interest in avoiding such litigation and proceeding unfettered to collect as much money for defrauded investors as possible far outweighs the potential harm to Kang.

[ECF No. 113, p. 18 (emphasis added)].

In his reply, Kang reiterates that he will "fac[e] substantial injury if the stay is not lifted[,]" noting that he "cannot continue to properly defend himself against the SEC Complaint without advancement and indemnification of his fees and costs." [ECF No. 118, p. 10].

In addressing the first factor, the Court must balance competing interests:

> A receiver must be given a chance to do the important job of marshaling and untangling a company's assets without being forced into court by every investor or claimant. Nevertheless, an appropriate escape valve, which allows potential litigants to petition the court for permission to sue, is necessary so that litigants are not denied a day in court during a lengthy stay.

> A district court should give appropriately substantial weight to the receiver's need to proceed unhindered by litigation, and the very real danger of litigation expenses diminishing the receivership estate. At the same time, . . . the interests of litigants also need to be considered.

*United States v. Acorn Tech. Fund, L.P.*, 429 F.3d 438, 443 (3d Cir. 2005).

The Undersigned finds that, on balance and at this procedural point, the first factor weighs in favor of the Receiver. As noted in the Receiver's response, lifting the stay to allow Kang to pursue his New York action would result in time-consuming litigation and

divert the Receiver's resources from recovering funds for the defrauded investors. Allowing Kang to proceed with his lawsuit would cause significant disruption to the Receiver's work.

The Undersigned has also taken into consideration Kang's asserted harm in continuing to incur legal fees to defend against the instant action. At present, no criminal charges have been filed against Kang (and if charges are brought and he qualifies, then he would be entitled to court-appointed counsel). Moreover, the *Canto* lawsuit has been stayed and Kang acknowledges that he is not presently incurring legal fees in that case.[7]

Taking these competing interests into account, the Undersigned finds that the first factor weighs in favor of the Receiver and supports the continuation of the stay.

> **ii.    Second Factor: Time in the Course of the Receivership at Which the Motion to Lift the Stay Was Filed**

The second factor requires the Court to consider "the time in a receivership in which a motion to lift a litigation stay is made." *United States v. JHW Greentree Cap.*, L.P., No. 3:12-CV-00116 VLB, 2014 WL 2608516, at *7 (D. Conn. June 11, 2014). "There is no 'clear cut-off date after which a stay should be presumptively lifted,' and the inquiry is

---

[7]    Recently, Alejandro Canto filed a renewed motion seeking to lift the litigation stay as to Carlos Betancourt. [ECF No. 135]. But the motion concerns *Betancourt*, not Kang. *Id.* at 19 ("Canto respectfully requests that the Court allow him to intervene in this manner and further requests that the Court partially lift the stay of litigation as to [ ] Betancourt, and any other relief deemed just and proper.").

'inherently case-specific.'" *Schwartzman v. Rogue Int'l Talent Grp., Inc.*, No. CIV.A. 12-5255, 2013 WL 460218, at *3 (E.D. Pa. Feb. 7, 2013). "The timing factor is fact-specific and 'based on the number of entities, the complexity of the scheme, and any number of other factors.'" *JHW Greentree Cap., L.P.*, 2014 WL 2608516, at *7 (quoting *S.E.C. v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 341 (5th Cir. 2011)).

Kang argues that "[t]he Receiver has had ample time to identify assets and 'explore the affairs of the entities,' and it will not be harmed by a limited lift of the stay of litigation." [ECF No. 109-1, p. 12]. He notes that the Receiver is in the process of completing a thorough forensic analysis of the Receivership Entities and the Receivership Property; he has filed a liquidation plan for the Receivership Property; and has uncovered substantial cash, real property, and crypto-related assets. *Id.* at 12. Thus, Kang reasons that given the steps the Receiver has already taken, "a temporary lift of the stay to allow [ ] Kang to enforce his contractual rights to indemnification and advancement of fees will not harm the Receiver." *Id.* at 12. On the other hand, Kang notes that he "has a contractual right to indemnification and advancement of fees and will be greatly harmed if he cannot enforce those rights." *Id.* at 13.

The Receiver takes a different view. He argues that this factor "overwhelming[ly] favors [him]." [ECF No. 113, p. 18]. He notes that he:

> is still involved in the lengthy and cumbersome process of unwinding the several entities over which the Court appointed him, including their

34

relationships with each other and third parties. He has retained accounting and legal professionals to help him identify and account for numerous accounts across various banks and cryptocurrency institutions. **He is still _early_ in the process of identifying those assets and determining how to recover them (including identifying third parties against whom to pursue claims); how to value them; and how to liquidate them for the benefit of defrauded investors**.

*Id.* at 18–19 (emphasis added). The Receiver also points out that he has had to engage the services of forensic cryptocurrency experts and that Kang's own alleged uncooperativeness has impeded the Receiver's efforts. *Id.* at 19 ("Importantly, Kang himself has frustrated those efforts by refusing to give the Receiver access to the hardware wallet containing hundreds of thousands of dollars of crypto assets for the benefit of investors.").

The Receiver notes that he "still has not identified all potentially recoverable assets or third parties who may owe the Receivership funds for the benefit of defrauded investors" and that "[d]efending against a lawsuit from Kang poses a serious threat of disrupting those efforts and depleting funds which the Receiver could otherwise distribute to defrauded investors." *Id.*

In his reply, Kang argues that the Receiver has had sufficient time (and success) in identifying assets and that "Kang's brief lift of the stay of litigation will not interfere with the Receiver's efforts." [ECF No. 118, p. 11]. He notes that "[he] merely seeks a limited lift of the stay to allow him to enforce his contractual rights to indemnification and

advancement of fees through a declaratory action that will not require any discovery or elaborate motion practice by the Receiver." *Id.* He also notes that "[a]lthough the Receiver cites cases in which the stay was not lifted despite the fact that the Receivership had been in existence much longer, none of those cases involve the limited stay that [ ] Kang is seeking in this case." *Id.* at n.6.

"Generally, courts are reluctant to lift litigation stays early in a receivership where lifting a stay would disrupt the receiver's duty to organize and understand its assets." *JHW Greentree Cap., L.P.,* 2014 WL 2608516, at *7 (collecting cases). On the other hand, "a lift of the stay is more palatable later in a receivership's lifetime, **after the receiver has had sufficient time to conduct its duties**." *Id.* at *8 (emphasis added).

In *Schwartzman*, for instance, the court observed that a receivership that was approximately 28 months old had been in place for "a relatively short period of time for a receivership," and found that because the "receivership [was] at an early stage and the [r]eceiver [was] still collecting relevant information, this factor weigh[ed] in favor of maintaining the stay." No. CIV.A. 12-5255, 2013 WL 460218, at *3 (E.D. Pa. Feb. 7, 2013). Here, the receivership has been in place for approximately one year. This is a relatively short period of time for the Receiver to exercise his duties, particularly given the complexities of this case, where Defendants engaged in commingling of assets and the Receiver has had to retain the services of several professionals to assist him in carrying

out his duties. The Undersigned thus concludes that this factor weighs in favor of the Receiver.

### iii.       Third Factor: Merits of Kang's Claim

The third factor requires the Court to consider the merits of the movant's underlying claim. In making this assessment, "[a] district court need only determine whether the party has colorable claims to assert which justify lifting the receivership stay." *Acorn Tech. Fund, L.P.*, 429 F.3d at 444 (citing *Wencke*, 742 F.2d at 1232). "However, even meritorious claims may not tip the scales in favor of lifting a litigation stay where the first and second prongs . . . favor the receiver." *JHW Greentree Cap., L.P.*, 2014 WL 2608516, at *9.

As expected, the parties disagree on the merits of Kang's underlying claim. Kang contends that he has a meritorious claim for advancement and indemnification under Delaware law. [ECF No. 109-1, p. 13]. He notes that the Agreement provides for his advancement and indemnification and that he has already provided the Receiver with an undertaking. *Id.* Moreover, he states that "Delaware law requires advancement and indemnification under contract regardless of the allegations." *Id.* (citing *Blankenship*, 2015 WL 3408255, at *29).

Conversely, the Receiver argues that Kang does not have a meritorious claim for the advancement of his legal fees and indemnification based on the language of the

Agreement and "under Delaware law and public policy." [ECF No. 113, pp. 20–21]. The Receiver further argues that "even if the Court were to find some merit to Kang's potential lawsuit against the Receiver (and it should not)," it is immaterial because where "the first two factors weigh in favor of the Receiver, the Court can and still should deny the Motion to lift the stay under the *Wencke* test." *Id.* at 21.

For the reasons discussed above, the merits of Kang's underlying claim are questionable. Nonetheless, this factor requires that the Court determine only whether Kang has a *colorable* claim. *Acorn Tech. Fund, L.P.*, 429 F.3d at 444. Even assuming that Kang does have a colorable claim, the Court should not lift the stay given the weight of the first and second factors. *See Schwartzman*, 2013 WL 460218, at *3 ("assuming the underlying claims [were] colorable . . . , the [c]ourt conclude[d] that lifting the stay [was] not warranted due to the weight of the other factors"); *Acorn Tech. Fund, L.P.*, 429 F.3d at 443–44 ("[V]ery early in a receivership even the most meritorious claims might fail to justify lifting a stay given the possible disruption of the receiver's duties."). Thus, Kang has not met his burden of demonstrating that the *Wencke* factors support lifting the litigation stay.

In sum, for the reasons discussed above, the Undersigned **respectfully recommends** that the District Court **deny** Kang's request to lift the litigation stay to allow him to proceed with his New York action.

### III.  Kang's Supplemental Authority

As noted above, Kang also filed a notice of supplemental authority [ECF No. 134], concerning the Delaware Chancery Court's ruling in *Jeffries v. Abercrombie & Fitch Co.*, No. 2023-1211-PAF (Del. Ch. Mar. 8, 2024). The Delaware court stamped the word "GRANTED" over a proposed order granting the plaintiff's summary judgment motion. [ECF No. 134-1, p. 1 (capitalization in original)]. The accompanying document states that "[t]he motion is granted for the reasons stated in the court's ruling at the conclusion of today's hearing on the motion." *Id.* at 2. But Kang does not attach a copy of the hearing transcript; he attaches only the opening brief in support of the plaintiff's summary judgment motion. [ECF No. 134-2]. Thus, the grounds upon which the Delaware court granted the motion are not ascertainable from Kang's filing.

In any event, Kang's motion should be **denied** for the reasons already stated in this Report and Recommendations.

### IV.  Conclusion

For the reasons stated above, the Undersigned **respectfully recommends** that the District Court **deny** Kang's motion [ECF No. 109].

### V.  Objections

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with

the District Judge. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on March 26, 2024.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Robert N. Scola, Jr.
All Counsel of Record